ORIGINAL

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK GENERAL
   PARTNERSHIP
8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11                                    '08 CV 0582 BTM WMc

12  LEON ALPERT, an individual, on behalf of      CV No. _____
    himself, on behalf of all those similarly
13  situated, and on behalf of the general public,  **NOTICE OF REMOVAL PURSUANT TO
                                                     28 U.S.C. §§ 1331(B) (FEDERAL
14            Plaintiffs,                           QUESTION) AND 1332 (CAFA)**

15       v.

16  TIME WARNER CABLE, INC., a Delaware
    corporation, and DOES 1 TO 100,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

1  TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

2  DISTRICT OF CALIFORNIA:

3      PLEASE TAKE NOTICE that Defendant Time Warner Entertainment-Advance/

4  Newhouse Partnership, a New York general partnership ("TWC"), sued erroneously as Time

5  Warner Cable, Inc., defendant in the above-captioned action, hereby removes to this Court the

6  state court action described below, pursuant to 28 U.S.C. §§ 1331, 1332 (Class Action Fairness

7  Act of 2005), 1441, 1446, and 1453.

8  **I.      JURISDICTION**

9      1.      This Court has jurisdiction over this action pursuant to 28 U.S.C.

10  § 1332(d), as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4

11  (2005) ("CAFA"). As required by CAFA, and as more fully set out below, this is a putative class

12  action in which (a) there are 100 or more members in Plaintiff's proposed class; (b) at least one

13  member of the proposed class has citizenship in a state other than that of a defendant; (c) the

14  claims of the proposed class members exceed the sum or value of $5 million in the aggregate; and

15  (d) the action was commenced after CAFA's February 18, 2005 effective date. Thus, removal is

16  proper under 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

17      2.      This Court also has jurisdiction over this action pursuant to 28 U.S.C.

18  § 1331, as more fully set out below.

19  **A.      The Complaint**

20      3.      On or about March 13, 2007, an action was commenced in the Superior

21  Court of California, County of San Diego, entitled Leon Alpert, an individual, on behalf of

22  himself, on behalf of all others similarly situated, and on behalf of the general public v. Time

23  Warner Cable, Inc., a Delaware corporation, and Does 1 to 100, Case No. GIC881621 (the

24  "Action").

25      4.      On or about May 16, 2007, the plaintiff Leon Alpert ("Plaintiff") filed a

26  first amended complaint (the "Complaint"). Pursuant to 28 U.S.C. § 1446(a), true and correct

27  copies of all process, pleadings, and orders served upon defendants in the Action are attached to

28  this Notice as Exhibit A.

-1-

1    5.    Plaintiff's Complaint alleged that TWC violated California Business and

2    Professions Code Sections 17200, *et seq.* ("UCL"), by engaging in unfair, unlawful, and

3    deceptive conduct. (Complaint ¶¶ 37-43.)

4    6.    Specifically, Plaintiff alleged that TWC violated the "unlawful" prong of

5    the UCL by violating California Civil Code sections 1770(a)(19), 1770(a)(1), 1770(a)(13).

6    (Complaint ¶¶ 40-42.)

7    7.    Plaintiff also alleged that TWC breached its HOA agreements in violation

8    of the unlawful prong of the UCL. (Complaint ¶ 43.)

9    8.    Plaintiff's Complaint alleged a single unfair competition claim against

10    TWC based on (1) the incorrect premise that he had been overcharged for basic cable services

11    that were paid for by his HOA and, to a lesser extent, (2) the inclusion of a purportedly

12    unconscionable clause in customer agreements requiring notification of billing errors within thirty

13    days. (Complaint ¶¶ 12, 14, 15, 17, 18, 20, 29, 38, 40, 43.)

14    9.    Plaintiff did not claim in his Complaint that the aggregate amount in

15    controversy exceeds $5 million. Nor do the allegations contained in the Complaint establish that

16    aggregate amount in controversy would exceed $5 million.

17    10.    TWC filed and served its answer to the Complaint on September 5, 2007.

18    A copy of the Answer is attached hereto as Exhibit B.

19    **B.    Plaintiff's Opposition to TWC's Motion for Summary Judgment**

20    11.    On or about March 24, 2008, TWC received Plaintiff's opposition papers

21    to TWC's motion for summary judgment.

22    12.    In his opposition brief, Plaintiff alleges a federal predatory pricing claim

23    and violation of a Federal Communications Commission ("FCC") order. (Plaintiff's

24    Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary

25    Judgment ("Opposition"), p. 12, line 6—p. 15, line 3.)

26    13.    Plaintiff's unfair competition claim as alleged in the Complaint makes no

27    mention of federal predatory pricing or a purported violation of a FCC order.

28    /////

-2-

## C.    Residence of the Parties

14.    Plaintiff, according to his complaint, is a resident of California. (Complaint ¶ 1.)

15.    TWC is a New York general partnership with its principal place of business in Stamford, Connecticut.

## II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS DIVERSITY JURISDICTION UNDER CAFA

16.    The Class Action Fairness Act of 2005, which became law on February 18, 2005, broadly expands federal jurisdiction over class actions filed in state court. Specifically, this Act expands federal court jurisdiction to include class action lawsuits brought in state court where *any* class member is a citizen of a state different from *any* defendant. It eliminates the requirement that no defendant be a resident of the forum state, allows the claims for relief of the class members to be aggregated for purposes of the meeting the amount in controversy requirements allows removal to federal court by any defendant without the consent of all defendants, and sets a $5 million amount in controversy threshold. 28 U.S.C. § 1332.

17.    The diversity requirements for removal to federal court under the Class Action Fairness Act are satisfied with regard to Plaintiff's putative class action. TWC is a citizen of a state different from Plaintiff's state of residence, i.e., California.

18.    Plaintiff's opposition papers allege that Plaintiff, the purported class representative of the class, suffered damages of approximately $25.80 per month during the July 2005 through September 2006 time period. (Declaration of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment ("Nutten Decl.") p. 3, line 28—p. 4, line 1.) Plaintiff's Complaint alleges that the number of purported class members is in the thousands. (Complaint ¶ 28.) In fact, in San Diego and Desert Cities in 2005, there were approximately 56,000 homes that were part of homeowners' associations with which TWC entered into bulk contracts to provide cable services. (*See* Declaration of Barron E. Ramos in Support of Motion to Compel Further Responses to Interrogatories and Request for Sanctions, Exhibit D, p. 5.) Accordingly, without conceding the merits of the Complaint's allegations or causes of action,

-3-

1   $25.80 of alleged damages for each of the alleged 15 months described above is $387.00 for each

2   of the 56,000 potential class members.  This results in an aggregate amount of $21,672,000 for a

3   15-month period in San Diego and Desert Cities alone.  As set forth in the Complaint, the

4   purported class is comprised of all TWC subscribers in the State of California (not limited to San

5   Diego and Desert Cities) during a four-year period.  (Complaint ¶ 4.)  Thus, the $5 million

6   amount in controversy is satisfied.

7           19.     TWC expressly denies that Plaintiff and the putative class are entitled to

8   any relief in this action.  TWC further expressly denies that it has engaged in or profited from any

9   unlawful, unfair or deceptive activity.

10  **III.    REMOVAL IS PROPER BECAUSE THE COURT HAS FEDERAL**
    **QUESTION JURISDICTION UNDER 28 U.S.C. § 1331**
11

12          20.     As established in Plaintiff's Opposition, plaintiff now asserts  that this is a

13  civil action alleging that TWC violated 47 U.S.C. § 543(b)(8)(a) and a Federal Communications

14  Commission order published as FCC 07-189.  (Opposition, p. 12, line 6—p. 15, line 3.)

15          21.     This court now has original jurisdiction over this action, pursuant to 29

16  U.S.C. 1331, because the action arises under the laws of the United States.

17  **A.     Timeliness of Removal**

18          22.     Plaintiff's Complaint did not set forth any federal questions that would

19  give this court jurisdiction under 28 U.S.C. § 1331.

20          23.     Plaintiff's Complaint did not establish that the damages sought would

21  satisfy the amount in controversy necessary for this Court to have federal jurisdiction under 28

22  U.S.C. §1332(d)(2).

23          24.     Prior to receiving notice of the new allegations contained in Plaintiff's

24  opposition papers, received by TWC on or about March 24, 2008, this action was not removable

25  under CAFA because it was not possible to determine the amount in controversy and, therefore, it

26  was not possible to establish by a preponderance of the evidence that the amount in controversy

27  requirement was met. *See Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 683 (9th Cir.

28  2006); *see also Lowdermilk v. U.S. Bank Nat'l Ass'n*, 479 F.3d 994, 998 (9th Cir. 2007).

-4-

1    25.    This notice of removal is therefore timely in accordance with 28 U.S.C.

2  § 1446(b).

3  **IV.    CONCLUSION**

4    26.    For the reasons stated, federal question and diversity jurisdiction under

5  CAFA exists pursuant to 28 U.S.C. §§ 1331, 1332, 1441(b), 1446 and 1453. Accordingly, this

6  Action is removable.

7    27.    Nothing in this Notice of Removal should be construed as a waiver by

8  TWC of its defenses to the Complaint.

9    28.    TWC attaches hereto as Exhibit C the notice of filing of this removal to the

10  Clerk of the Superior Court for the County of San Diego, which will be filed in the Superior

11  Court for the County of San Diego and served on Plaintiff. *See* 28 U.S.C. § 1446(d). Proof of

12  filing of this notice and its service will be filed with this Court when completed.

13    WHEREFORE, TWC gives notice that the above-described Action pending against it in

14  the Superior Court of California, County of San Diego is removed to this Court.

15  Dated: March **27**, 2008

16  DLA PIPER US LLP

17

18  By

19  JEFFREY M. SHOHET
JULIE L. HUSSEY
CARRIE S. DOLTON
20  Attorneys for Defendant
TIME WARNER ENTERTAINMENT-
21  ADVANCE/NEWHOUSE PARTNERSHIP, A
NEW YORK GENERAL PARTNERSHIP,
22

23

24

25

26

27

28

DLA PIPER US LLP    SD\1789583.1    NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1331(B) AND 1332    CV NO.

**EXHIBIT A**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Barron E. Ramos (Of Counsel) HENDERSON & CAVERLY LLP<br>P.O. Box 9144 (all US mail), 16236 San Dieguito Road, Ste 4-13<br>Rancho Santa Fe, CA 92067<br>TELEPHONE NO. 858-756-6342    FAX NO. 858-756-4732<br>ATTORNEY FOR *(Name)*: plaintiff Leon Alpert | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego |
|---|
| STREET ADDRESS: 330 West Broadway |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: San Diego, California 92101 |
| BRANCH NAME: Hall of Justice |

| CASE NAME:<br>Alpert v. Time Warner |
|---|

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER GIC 881621 |
|---|---|---|
| [✓] Unlimited    [ ] Limited<br>(Amount    (Amount<br>demanded    demanded is<br>exceeds $25,000)    $25,000 or less) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE<br>DEPT |

*Items 1–5 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18)<br>[ ] Other contract (37) | [ ] Construction defect (10)<br>[ ] Mass tort (40) |
| [ ] Asbestos (04)<br>[ ] Product liability (24) | **Real Property**<br>[ ] Eminent domain/Inverse<br>condemnation (14) | [ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the |
| [ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | [ ] Wrongful eviction (33)<br>[ ] Other real property (26) | above listed provisionally complex case<br>types (41) |
| **Non-PI/PD/WD (Other) Tort**<br>[✓] Business tort/unfair business practice (07) | **Unlawful Detainer**<br>[ ] Commercial (31) | **Enforcement of Judgment**<br>[ ] Enforcement of judgment (20) |
| [ ] Civil rights (08)<br>[ ] Defamation (13) | [ ] Residential (32)<br>[ ] Drugs (38) | **Miscellaneous Civil Complaint**<br>[ ] RICO (27) |
| [ ] Fraud (16)<br>[ ] Intellectual property (19) | **Judicial Review**<br>[ ] Asset forfeiture (05) | [ ] Other complaint *(not specified above)* (42)<br>**Miscellaneous Civil Petition** |
| [ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35) | [ ] Petition re: arbitration award (11)<br>[ ] Writ of mandate (02) | [ ] Partnership and corporate governance (21)<br>[ ] Other petition *(not specified above)* (43) |
| **Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is [ ] is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more courts
   issues that will be time-consuming to resolve    in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Type of remedies sought *(check all that apply)*:
   a. [✓] monetary    b. [✓] nonmonetary; declaratory or injunctive relief    c. [ ] punitive

4. Number of causes of action *(specify)*: One; B&P Code section 17200

5. This case [✓] is [ ] is not    a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 9, 2007

Barron E. Ramos
_____    _____
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2007] | **CIVIL CASE COVER SHEET** | American LegalNet, Inc.<br>www.FormsWorkflow.com | Cal. Rules of Court, rules 3.220, 3.400–3.403;<br>Standards of Judicial Administration, § 19<br>www.courtinfo.ca.gov |
|---|---|---|---|

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*



FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
TIME WARNER CABLE, INC., a Delaware corporation, and
DOES 1 to 100

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
LEON ALPERT, an individual, on behalf of himself, on behalf of all
those similarly situated, and on behalf of the general public

---

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.   A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you.  If you cannot pay the filing fee, ask the court clerk for a fee waiver form.  If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of the State of California, County of San Diego<br>330 West Broadway, San Diego, California 92101 | CASE NUMBER<br>*(Número del Caso)*<br>**881621** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Barron E. Ramos (Of Counsel) HENDERSON & CAVERLY LLP (858) 756-6342 x 112
P.O. Box 9144 (all US mail), 16236 San Dieguito Road, Ste 4-13, Rancho Santa Fe, CA 92067

| | | | |
|---|---|---|---|
| DATE:<br>*(Fecha)* | MAR 1 3 2007 | Clerk, by _____<br>*(Secretario)* LANI E. MARTIN | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
        ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
        ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

        ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. January 1, 2004] | Code of Civil Procedure §§ 412.20, 465<br>American LegalNet, Inc. \| www.USCourtForms.com |

**SUMMONS**

BARRON E. RAMOS Of Counsel (State Bar No. 179620)
KRISTEN E. CAVERLY (State Bar No. 175070)
**HENDERSON & CAVERLY LLP**
P.O. Box 9144 (all U.S. Mail)
16236 San Dieguito Road, Suite 4-13
Rancho Santa Fe, CA 92067
Telephone: (858) 756-6342
Facsimile: (858) 756-4732

Attorneys for plaintiff and the Class

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO

GIC  881621

| | |
|---|---|
| LEON ALPERT, an individual, on behalf of himself, on behalf of all those similarly situated, and on behalf of the general public, | Case No. **CLASS ACTION** |
| Plaintiffs, | **COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES** |
| v. | (BUSINESS & PROFESSIONS CODE SECTION 17200) |
| TIME WARNER CABLE, INC., a Delaware corporation, and DOES 1 TO 100, | |
| Defendants. | Case Filed: Dept.: Judge: Trial Date: |

ORIGINAL

        Plaintiff, on behalf of himself, on behalf of all those similarly situated in the State of California, and on behalf of the general public, complains and alleges as follows:

1

1.    Plaintiff LEON ALPERT ("ALPERT") is an individual residing in the State of California, County of San Diego. This action is filed by ALPERT on behalf of himself, on behalf of all those similarly situated in the State of California, and on behalf of the general public.

2.    Defendant TIME WARNER CABLE, INC. (hereinafter "TIME WARNER") is incorporated in Delaware and maintains its main corporate office in Stamford, CT. TIME WARNER is a division of Time Warner Inc. (NYSE: TWX). TIME WARNER provides cable and cable related services to consumers throughout the County of San Diego and the State of California.

3.    DOES 1 to 50 are, and all relevant times hereto were, corporations and/or business entities organized and existing under and by virtue of the laws of the State of California, qualified to do business in California, and doing business in California; and DOES 51 to 100 were the agents of and/or employees of the defendants, and were at all times herein mentioned acting within the course and scope of such agency and employment.

4.    The class in this case is comprised of all TIME WARNER subscribers in the State of California during the four (4) years prior to the filing of this complaint who were members of homeowners associations (HOAs) and/or tenants of such members, where the subscriber's HOA had contracted with TIME WARNER for basic cable services (also sometimes called "bulk multi-channel video services") and where the subscriber purchased additional cable and cable related services directly from TIME WARNER but was not provided a credit for already paying the for basic cable services ("HOA Standard Service") through the subscriber's HOA.

5.    On its website, www.timewarnercable.com, TIME WARNER states that it is "the second-largest cable operator in the U.S. and an industry leader in developing and launching innovative video, data and voice services...[d]eliver[ing] services to customers over technologically-advanced, well-clustered cable systems." TIME WARNER claims to be the "first or among the first cable operators to offer high speed data service, IP-based telephony service and a range of advanced digital video services, such as VOD, high definition television and set-top boxes equipped with DVRs." TIME WARNER also claims that its service "passes more than 26 million

2

1 | U.S. homes, and serves 13.5 million basic video customers."

2 | 6.    TIME WARNER further claims that through its "family of products, Cable, High-Speed

3 | Online and Digital Phone, we bring the most innovative and rewarding digital solutions home to

4 | you. But we don't stop there. We also empower our employees to provide the best possible

5 | customer service..." See http://www.timewarnercable.com/corporate/aboutus/whoweare.html. As

6 | set forth below, TIME WARNER's "best possible customer service" does not include providing

7 | the correct pricing for HOA subscribers where the HOA has contracted with TIME WARNER to

8 | provide basic cable services. Nor does it include providing an opportunity for those subscribers

9 | that catch TIME WARNER overcharging them to obtain a refund.

10 | 7.    Plaintiff ALPERT has been a subscriber to TIME WARNER cable and cable related

11 | services at all times during the four years preceding the filing of this complaint. As part of his

12 | HOA dues, ALPERT pays a fee that covers basic cable services pursuant to an agreement between

13 | TIME WARNER and ALPERT's HOA. It is estimated that his monthly payment to TIME

14 | WARNER for basic cable which is paid through his HOA dues is approximately $ 28.77.

15 | 8.    HOA agreements with TIME WARNER provide significant financial and competitive

16 | benefits to TIME WARNER. For example, such agreements result in payments to TIME

17 | WARNER for each unit in an HOA, regardless of whether any individual homeowner or tenant

18 | will ever use those services. Such agreements also give TIME WARNER a foothold in each

19 | respective HOA's homeowner's unit which provides not only a competitive advantage, including

20 | requiring the HOA to affirmatively market TIME WARNER's services and products to its

21 | members, but also serves as a platform to offer additional cable and cable related services to those

22 | homeowners such as high speed cable Internet, movies on demand, and digital telephone services.

23 | 9.    In the fall of 2006, noticing that his cable bill seemed unusually high, ALPERT contacted

24 | TIME WARNER asking whether his bill reflected the fact that he was already paying for basic

25 | cable services in his monthly HOA dues. TIME WARNER concluded that it did not and

26 | subsequently changed his billing statement to reflect HOA pricing that should have been charged to

27 | ALPERT all along. Thus, despite being an HOA subscriber and therefore entitled to HOA pricing,

28 |

3

1   ALPERT had been unknowingly paying TIME WARNER the full cost of cable and cable related

2   services as if he had no existing service with TIME WARNER and as if he was not already an

3   existing basic cable subscriber. Despite its admitted error in ALPERT's billing, TIME WARNER

4   refused to credit ALPERT for the years of overpayment to TIME WARNER which amounted to

5   hundreds of dollars. ALPERT has since learned TIME WARNER's practice of not properly billing

6   HOA subscribers was not unique to him and happens all too frequently.

7   10.    A comparison of ALPERT's billing statements demonstrates that TIME WARNER was

8   overcharging ALPERT by at least $ 21 each and every month for additional cable and cable related

9   services. Prior to the change in his billing statement to properly reflect his HOA pricing for the

10  same services (identified on his bill as "HOA Standard Service"), ALPERT had been paying

11  approximately $ 154 per month for various cable and cable related services such as basic cable,

12  wireless "Road Runner" Internet access, a digital phone package, four premium channels (e.g.,

13  HBO, Showtime, etc.), and other services. Once TIME WARNER priced ALPERT correctly to

14  reflect his HOA's existing agreement with TIME WARNER for basic cable service (i.e., the "HOA

15  Standard Service"), his bill for the exact same services dropped to approximately $ 133. The

16  monthly difference of $ 21 was unfairly and deceptively pocketed by TIME WARNER each and

17  every month over a period of several years, all while ALPERT was already paying for his basic

18  cable services through his HOA.

19  11.    In addition to TIME WARNER's failure to properly price HOA customers such as

20  ALPERT for cable and cable related services, TIME WARNER also fails to inform such customers

21  of HOA pricing on TIME WARNER's website, www.timewarnercable.com. When referring to

22  TIME WARNER's website, a subscriber that is also a member of an HOA which is under contract

23  with TIME WARNER would have no idea that there is HOA pricing for such subscribers which

24  properly accounts for the cable services already provided under TIME WARNER's contract with

25  the subscriber's HOA. Rather, a consumer in such a situation would likely be deceived that they

26  are required to pay full pricing for cable related services despite already paying for basic cable

27  through their HOA.

28

4

12.    Indeed, on TIME WARNER's San Diego website, there is no mention whatsoever of HOA pricing for those subscribers that are members of HOA's under contract with TIME WARNER. (www.timewarnercable.com/SanDiego).  Likewise, on TIME WARNER's Los Angeles website, numerous pricing schedules applicable to various cities are listed, but none on the list have HOA pricing.   (http://www.timewarnerla.com/pricingguides)   On TIME WARNER's Desert Cities' website, there is reference to HOA pricing packages, but it is nearly impossible to locate or navigate to on TIME WARNER's website and there is no pricing provided if a subscriber ever found it.  (www.timewarnercable/dsertcties).  The only pricing provided on any of the TIME WARNER websites in California is for ordinary subscribers that are not HOA members and are not already paying for basic cable through their HOAs.

13.    Thus, while TIME WARNER enjoys the significant benefits of the reduction in competition by offering entire HOAs basic cable services to all their respective members and likewise enjoys the substantial fees generated thereby, TIME WARNER all but conceals HOA pricing from such subscribers  for additional services offered by TIME WARNER.  As in the case of ALPERT, TIME WARNER treats HOA subscribers as if those subscribers were not already paying for basic cable and entitled to pricing that reflects that fact.  Such conduct is both unfair and deceptive and results in systematically overcharging HOA customers.

14.    TIME WARNER's conduct with regard to overcharging HOA customers is further aggravated by TIME WARNER's unlawful and unfair billing procedure which is set forth on the back of every TIME WARNER bill and also appears in TIME WARNER's online subscriber agreement.  In nearly impossible to read tiny script on the back of TIME WARNER's monthly billing statements appears the following: "Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question.  If we are not notified of the discrepancy the statement will be considered correct."  Likewise, in the online subscriber agreement, TIME WARNER states the following: "2.(l) I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived."

5

1   15.   To make matters worse, in its online subscriber agreement TIME WARNER disclaims any

2   responsibility for the accuracy of its own pricing: "2.(j) … I agree that TWC is not responsible or

3   liable for the quality of any content, merchandise, products or Services (or the price thereof) made

4   available to me …" Thus, TIME WARNER disclaims any liability for erroneous billing statements

5   while limiting the subscriber to 30 days to discover TIME WARNER's over charges.

6   16.   Using these contractual provisions, TIME WARNER unfairly puts the burden on the HOA

7   subscriber to determine whether TIME WARNER's bill is "correct" within 30 days of receipt

8   while concealing from the HOA subscriber HOA pricing that properly accounts for the cable

9   services already provided under TIME WARNER's contract with the subscriber's HOA.  Such

10  conduct is plainly unfair and deceptive. It is also unlawful because contrary to TIME WARNER's

11  self-styled 30 day statute of limitations on billing disputes, the law does not so limit challenges to

12  overbilling practices.  Indeed, the statute of limitations under Business & Professions Code section

13  17200, as it is for a simple breach of written contract, is four years, which is 48 times the length of

14  time TIME WARNER provides to challenge TIME WARNER's improper overcharges.  Such a

15  limitation on a consumer's rights and remedies is contrary to law and is unfair and deceptive.

16  Moreover, such a limitation creates an incentive for TIME WARNER to overcharge its HOA

17  subscribers and to conceal HOA pricing for as long as possible since TIME WARNER will only

18  credit 30 days' worth of overcharges back to the subscriber.

19  17.   This class action suit is filed on behalf of the plaintiff individually and on behalf of all

20  members of the class defined in paragraph four (4) above under the provisions of California Code

21  of Civil Procedure section 382, which provides that a class action may be brought when the

22  question is one of common interest to many persons, or when the number of persons is numerous

23  and it is impracticable to bring them all before the court.  This action is properly maintainable as a

24  class action for the reasons set forth below.

25  18.   The class of persons for whose benefit this case is brought consists of thousands of

26  individuals whose claims, except as to amount of restitution, are otherwise identical, and whose

27  repetitive testimony at trial would be impracticable, unnecessary, and an inefficient use of judicial

28

6

1  resources. Moreover, the exhaustive list of class members is now within the exclusive possession

2  and control of defendants, and is not now known to plaintiffs, although the list may readily be

3  obtained using statutory discovery procedures.

4  19.    There are questions of law and fact common to members of the class and which

5  predominate over questions involving individual class members. The common questions include

6  the following:

7  (a) Whether defendant TIME WARNER unlawfully, unfairly and/or deceptively overcharges HOA

8  subscribers for cable and cable related services by not providing such customers HOA pricing that

9  properly accounts for the cable services already provided under TIME WARNER's contract with

10  the subscriber's HOA;

11  (b) Whether defendant TIME WARNER deceptively conceals HOA pricing from HOA

12  subscribers;

13  (c) Whether defendant TIME WARNER unlawfully, unfairly and/or deceptively attempts to limit

14  consumers' right to refunds for TIME WARNER overcharges by the purported contractual 30 day

15  limit TIME WARNER requires to challenge billing errors.

16  20.    The claims of the representative plaintiff are typical of the claims of the members of the

17  class.

18  21.    A class action is superior to other methods for the fair and efficient adjudication of this

19  controversy. Since the practices defendant engaged in are common to all members of the class,

20  judicial economy is not served by multiple actions with duplicative and repetitive testimony.

21  22.    Plaintiff is aware of no difficulty which will be encountered in the management of this

22  litigation which would preclude its maintenance as a class action.

23  23.    The names and addresses of all class members are readily ascertainable from the records of

24  TIME WARNER and can be obtained in discovery.

25  24.    The representative plaintiff will fairly and adequately protect the interests of the class and

26  has retained counsel competent and experienced in class action litigation.

27  25.    Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action against

28

7

CLASS ACTION COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES
(BUSINESS & PROFESSIONS CODE SECTION 17200)

1    TIME WARNER because:

2    (a)    A successful outcome in this action will result in the enforcement of important rights

3    affecting the public interest by maintaining the integrity of businesses that operate in the State of

4    California;

5    (b)    This action will result in a significant benefit by causing the return of significant

6    overcharges paid to TIME WARNER which monies should not have been charged or collected,

7    together with interest on those monies;

8    (c)    Unless this action is prosecuted, the class and the general public will not recover those

9    monies, and many members of the general public would not be aware that they were injured by

10   TIME WARNER's wrongful practices; and

11   (d)    Unless the attorneys' fees and costs are awarded against TIME WARNER, the general

12   public will not be fully redressed.

### FIRST CAUSE OF ACTION

14         (Violation of Business & Professions Code section 17200, Unfair Business Practices)

15   26.    Plaintiff realleges and incorporates herein by reference each and every allegation contained

16   in Paragraphs 1 through 25, inclusive, as though set forth in full herein.

17   27.    Business & Professions Code section 17200 proscribes any business activity that is

18   "unlawful" or "deceptive" or "unfair." An "unlawful" business practice is anything that can

19   properly be called a business practice and that at the same time is forbidden by law. A business

20   practice is prohibited if it is 'unfair' or 'deceptive' even if not 'unlawful' and vice versa. The

21   standard is intentionally broad allowing courts maximum discretion to prohibit new schemes to

22   defraud.

23   28.    TIME WARNER has systematically violated Business & Professions Code section 17200

24   by unlawfully, unfairly and/or deceptively overcharging HOA customers for cable and cable

25   related services by not providing such customers HOA pricing that properly accounts for the cable

26   services already provided under TIME WARNER's contract with the subscriber's HOA.

27   29.    TIME WARNER has further systematically violated Business & Professions Code section

28

8

1   17200 by unlawfully, unfairly and/or deceptively attempting to limit subscribers' rights to seek

2   refunds for overcharges to a mere 30 days after receipt of a bill, all while TIME WARNER fails to

3   adequately disclose that HOA pricing is available to HOA subscribers that properly accounts for

4   the cable services already provided under TIME WARNER's contract with the subscriber's HOA.

5   30.      Plaintiff ALPERT seeks restitution for himself and for all those California consumers

6   similarly situated.  Plaintiff ALPERT, as an existing HOA subscriber, and who may again be

7   overcharged by TIME WARNER at any time in the future under TIME WARNER's scheme, also

8   seeks to enjoin such unlawful, unfair and deceptive business practices.

9                                          **PRAYER**

10  WHEREFORE, plaintiff requests judgment against defendants and each of them as follows:

11  1. For restitution of the overcharges unlawfully collected in violation of Business & Professions

12  Code section 17200 for plaintiff and all members of the plaintiff class in the State of California

13  during the four years preceding the filing of the complaint in this matter, all according to proof;

14  2. For interest at the legal rate of interest on the foregoing sum;

15  3. For an injunction prohibiting TIME WARNER from engaging in such unlawful, unfair and

16  deceptive business practices;

17  4. For costs of suit herein incurred;

18  5. For reasonable attorneys' fees; and

19  6. For such other and further relief as the Court deems just and proper.

20

21  Dated: March 9, 2007                    HENDERSON & CAVERLY LLP

22

23                                          Barron E. Ramos
                                            Attorneys for plaintiff and the Class
24

25

26

27

28                                            9

# SUPERIOR COU..r OF CALIFORNIA, COUNT . )F SAN DIEGO
### INDEPENDENT CALENDAR CLERK
330 W. Broadway
San Diego, CA 92101

TO:                                    **FILE COPY**
BARRON E RAMOS (P)

| | |
|---|---|
| LEON ALPERT | Case No.:   GIC881621 |
| Plaintiff(s) | **NOTICE OF CASE ASSIGNMENT** |
| vs. | |
| TIME WARNER CABLE INC | Judge:        LINDA B. QUINN |
| Defendant(s) | Department:  74 |
| | Phone:       619-685-6118 |

**COMPLAINT FILED**  03/13/07

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil consists of all cases except:  Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing.  This is a mandatory document and may not be substituted by the filing of any other document. (Rule 2.5)

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.) (Rule 2.6)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service. (Rule 2.7)

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE.  MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS.  SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE.  THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO TO ARBITRATION PURSUANT TO CCP 1141.10.  THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING.

ALSO SEE THE ATTACHED NOTICE TO LITIGANTS.

### CERTIFICATE OF SERVICE
I certify that I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by personally handing it to the attorney or their personal representative at        SAN DIEGO California.

DATED: 03/13/07                          BY: CLERK OF THE SUPERIOR COURT

SDSC CIV-721(Rev 7-03)                **ASG-NOTICE OF CASE ASSIGNMENT**

1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)
    **DLA PIPER US LLP**
3   401 B Street, Suite 1700
    San Diego, CA 92101-4297
4   Tel: 619.699.2700
    Fax: 619.699.2701
5
6   Attorneys for Defendant
    TIME WARNER ENTERTAINMENT-ADVANCE
7   NEWHOUSE PARTNERSHIP, A NEW YORK
    GENERAL PARTNERSHIP, THROUGH ITS SAN
8   DIEGO DIVISION, DBA TIME WARNER CABLE
9

**COPY**

**F I L E D**
Clerk of the Superior Court

**APR 3 0 2007**

By: E. Scheitt, Deputy

                SUPERIOR COURT OF CALIFORNIA
10
                   COUNTY OF SAN DIEGO
11
12
    LEON ALPERT, an individual, on behalf        CASE NO. GIC881621
13  of himself, on behalf of all those similarly
    situated, and on behalf of the general       **DEFENDANT TIME WARNER
14  public,                                       ENTERTAINMENT-ADVANCE
                                                  NEWHOUSE PARTNERSHIP, A NEW
15              Plaintiffs,                        YORK GENERAL PARTNERSHIP,
                                                  THROUGH ITS SAN DIEGO DIVISION,
16         v.                                     DBA TIME WARNER CABLE'S NOTICE
                                                  OF DEMURRER TO AND ALTERNATIVE
17  TIME WARNER CABLE, INC., a                    MOTION TO STRIKE, DEMURRER, AND
    Delaware corporation, and DOES 1 TO          ALTERNATIVE MOTION TO STRIKE
18  100,                                          PORTIONS OF PLAINTIFF LEON
                                                  ALPERT'S COMPLAINT**
19              Defendants.
                                                  Date      June 1, 2007
20                                                Time      1:30 p.m.
                                                  Dept:     74
21                                                Judge:    Linda B. Quinn
22                                                Complaint: March 13, 2007
23
24
25
26
27
28
    GT\6528539.1
    325566-11
    ─────────────────────────────────────────────────────────────
    DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT

TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 1, 2007 at 1:30 p.m., or as soon thereafter as the matter may be heard, in Department 74 of the above-entitled court, located at 330 West Broadway, San Diego, California, Defendant Time Warner Entertainment-Advance Newhouse Partnership, a New York general partnership, through its San Diego Division, dba Time Warner Cable ("Defendant"), sued erroneously as Time Warner Cable, Inc., will and hereby does demur to Plaintiff's Complaint and alternatively moves to strike portions of Plaintiff's Complaint.

Defendant generally demurs to Plaintiff's only and First Cause of Action for Violation of Business & Professions Code section 17200, Unfair Business Practices on the grounds that it fails to state facts sufficient to constitute a cause of action. Cal. Civ. Proc. Code § 430.10(e).

Defendant separately and specially demurs to Plaintiff's only and First Cause of Action for Violation of Business & Professions Code section 17200, Unfair Business Practices on the grounds that it is uncertain because it uses ambiguous and uncertain language to describe the contracts at issue in the Complaint. Cal. Civ. Proc. Code § 430.10(f).

In the alternative to the demurrer, Defendant moves to strike specific allegations from the Complaint on the grounds that they are irrelevant, false, or improper and are not drawn in conformity with the laws of this state. Cal. Civ. Proc. Code §§ 435, 436.

In the event that the Court determines that each of Plaintiff's specific allegations related to the **"unlawful" prong** of Section 17200 is substantively defective, but otherwise determines that Plaintiff has stated facts with sufficient particularly under Section 17200, the Court should strike all language relating to these specific allegations related to **"unlawful"** business practices, including:

- Page 7, paragraph 19, subparagraph (a), line 7, the word and comma "unlawfully,".
- Page 7, paragraph 19, subparagraph (c), line 13, the word and comma "unlawfully,".
- Page 8, paragraph 28, line 24, the word and comma "unlawfully,".
- Page 9, paragraph 29, line 1, the word and comma "unlawfully,".

1    • Page 9, paragraph 30, line 8, the word and comma "unlawful,".

2    • Page 9, PRAYER clause, line 1, the word "unlawfully".

3    • Page 9, PRAYER clause, line 15, the word and comma "unlawful,".

4    In the event that the Court determines that each of Plaintiff's specific allegations related to

5    the **"unfair" prong** of Section 17200 is substantively defective, but otherwise determines that

6    Plaintiff has stated facts with sufficient particularly under Section 17200, the Court should strike

7    all language relating to these specific allegations related to **"unfair"** business practices,

8    including:

9    • Page 7, paragraph 19, subparagraph (a), line 7, the word "unfairly".

10    • Page 7, paragraph 19, subparagraph (c), line 13, the word "unfairly".

11    • Page 8, paragraph 28, line 24, the word "unfairly".

12    • Page 9, paragraph 29, line 1, the word "unfairly".

13    • Page 9, paragraph 30, line 8, the word "unfair".

14    • Page 9, PRAYER clause, line 15, the word "unfair".

15    In the event that the Court determines that each of Plaintiff's specific allegations related to

16    the **"deceptive" prong** of Section 17200 is substantively defective, but otherwise determines that

17    Plaintiff has stated facts with sufficient particularly under Section 17200, the Court should strike

18    all language relating to these specific allegations related to **"deceptive"** business practices,

19    including:

20    • Page 7, paragraph 19, subparagraph (a), line 7, the word "deceptively".

21    • Page 7, paragraph 19, subparagraph (b), in its entirety.

22    • Page 7, paragraph 19, subparagraph (c), line 13, the word "deceptively".

23    • Page 8, paragraph 28, line 24, the word "deceptively".

24    • Page 9, paragraph 29, line 1, the word "deceptively".

25    • Page 9, paragraph 30, line 8, the word "deceptive".

26    • Page 9, PRAYER clause, line 15, the word "deceptive".

27    In the event that the Court determines that Plaintiff's specific allegations related to the

28    **alleged unlawful, unfair and/or deceptive overcharging of subscribers** is substantively

GT\6528539.1
325566-11

-2-

DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT

1  defective, but otherwise determines that Plaintiff has stated facts with sufficient particularly under

2  Section 17200, the Court should strike all language relating to these specific allegations related to

3  the **alleged unlawful, unfair and/or deceptive overcharging of subscribers,** including:

4  • Page 3 and 4, paragraphs 9 and 10, in their entirety.

5  • Page 5, paragraph 13, lines 14 beginning with the word "As" through line 17,

6  which reads: "As in the case of ALPERT, TIME WARNER treats HOA

7  subscribers as if those subscribers were not already paying for basic cable and

8  entitled to pricing that reflects that fact. Such conduct is both unfair and deceptive

9  and results in systematically overcharging HOA customers."

10  • Page 5, paragraph 14, lines 18 through the word "by" on line 19, which reads

11  "TIME WARNER's conduct with regard to overcharging HOA customers is

12  further aggravated by".

13  • Page 7, paragraph 19, subparagraph (a), in its entirety.

14  • Page 8, paragraph 25, subparagraph (b), in its entirety.

15  • Page 8, paragraph 28, in its entirety.

16  • Page 9, paragraph 30, in its entirety.

17  • Page 9, PRAYER clause, subparts 1 and 2, including lines 11 through lines 14.

18  In the event that the Court determines that Plaintiff's specific allegations related to the

19  **alleged unlawful, unfair and/or deceptive billing practices** is substantively defective, but

20  otherwise determines that Plaintiff has stated facts with sufficient particularly under Section

21  17200, the Court should strike all language relating to these allegations related to the **alleged**

22  **unlawful, unfair and/or deceptive billing practices,** including:

23  • Page 3, paragraph 6, lines 8 beginning with the word "Nor" through line 9 ending

24  with the word "refund" which reads "Nor does it include providing an opportunity

25  for those subscribers that catch TIME WARNER for overcharging them to obtain

26  a refund."

27  • Page 5, paragraph 14, lines 19 beginning with the word "TIME" through lines 27.

28  • Page 6, paragraphs 15 and 16, in their entirety.

GT\6528539.1
325566-11

-3-

DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT

1    • Page 7, paragraph 19, subparagraph (c), in its entirety.

2    • Page 8, paragraph 29, lines 27 through Page 9, paragraph 29 the word and comma

3    "bill," on line 2, which reads "TIME WARNER has further systematically violated

4    Business & Professional Code section 17200 by unlawfully, unfairly and/or

5    deceptively attempting to limit subscribers' rights to seek refunds for overcharges

6    to a mere 30 days after receipt of a bill,".

7    In the event that the Court determines that Plaintiff's specific allegations related to the

8    **alleged deceptive concealing of HOA pricing** is substantively defective, but otherwise

9    determines that Plaintiff has stated facts with sufficient particularly under Section 17200, the

10    Court should strike all language relating to these specific allegations related to the **alleged**

11    **deceptive concealing of HOA pricing,** including:

12    • Page 3, paragraph 6, lines 5 starting with the word "As" through line 8 ending with

13    the word and period "services.", which reads "As set forth below, TIME

14    WARNER's "best possible customer service" does not include providing the

15    correct pricing for HOA subscribers where the HOA has contracted with TIME

16    WARNER to provide basic cable services."

17    • Page 4, Paragraphs 11 and 12, in their entirety.

18    • Page 5, paragraph 13, lines 11 through the word and period "WARNER." on line

19    14.

20    • Page 7, paragraph 19, subparagraph (b), in its entirety.

21    • Page 9, paragraph 29, lines 2 beginning with the word "all" through line 4, which

22    reads "all while TIME WARNER fails to adequately disclose that HOA pricing is

23    available to HOA subscribers that properly accounts for the cable services already

24    provided under TIME WARNER's contract with the subscriber's HOA."

25    Defendant's Demurrer to and Alternative Motion to Strike is based upon this Notice and

26    Demurrer and Alternative Motion to Strike, the accompanying Memorandum of Points and

27    Authorities, the accompanying Request for Judicial Notice and exhibits thereto, the declarations

28    /////

GT\6528539.1
325566-11

-4-

1   in support of the Request for Judicial Notice, the complete records and files of this action, and

2   any argument or additional evidence that is permitted by this Court.

3

    Dated: April **30**, 2007

4                                                    DLA PIPER US LLP

5

6                                        By

7                                            JEFFREY M. SHOHET
                                             JULIE L. HUSSEY
8                                            CARRIE S. DOLTON
                                             Attorneys for Defendant
9                                            TIME WARNER ENTERTAINMENT-
                                             ADVANCE NEWHOUSE PARTNERSHIP,
10                                           A NEW YORK GENERAL PARTNERSHIP,
                                             THROUGH ITS SAN DIEGO DIVISION,
11                                           DBA TIME WARNER CABLE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GT\6528539.1
325566-11                                    -5-

DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel:  619.699.2700
   Fax:  619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

9
                    SUPERIOR COURT OF CALIFORNIA
10
                       COUNTY OF SAN DIEGO
11

12
   LEON ALPERT, an individual, on behalf          CASE NO.  GIC881621
13 of himself, on behalf of all those similarly
   situated, and on behalf of the general        **MEMORANDUM OF POINTS AND**
14 public,                                        **AUTHORITIES IN SUPPORT OF**
                                                  **DEFENDANT TIME WARNER**
15            Plaintiffs,                          **ENTERTAINMENT-ADVANCE**
                                                  **NEWHOUSE PARTNERSHIP, THROUGH**
16       v.                                        **ITS SAN DIEGO DIVISION, DBA TIME**
                                                  **WARNER CABLE'S DEMURRER TO AND**
17 TIME WARNER CABLE, INC., a                     **ALTERNATIVE MOTION TO STRIKE**
   Delaware corporation, and DOES 1 TO           **PORTIONS OF PLAINTIFF LEON**
18 100,                                           **ALPERT'S COMPLAINT**

19            Defendants.                         Date:      June 1, 2007
                                                  Time:      1:30 p.m.
20                                                Dept:      74
                                                  Judge:     Linda B. Quinn
21
                                                  Complaint:  March 13, 2007
22

23

24

25

26

27

28

DLA PIPER US LLP     GT\6528546.3
  SAN DIEGO          325566-11
                   ─────────────────────────────────────────────────────
                   P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S COMPLAINT

F I L E D
Clerk of the Superior Court

APR 3 0 2007

By: E. Scheitt, Deputy

COPY

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION. ..........................................................................................................1

II.  PROCEDURAL AND FACTUAL BACKGROUND. ..................................................2

    A.   Procedural Background.......................................................................................2

    B.   Factual Background. ..........................................................................................2

III. STANDARD FOR DEMURRER.................................................................................3

IV.  ARGUMENT................................................................................................................4

    A.   The Complaint Fails to State A Claim of "Unlawful" Business Practices. .............5

    B.   The Complaint Fails to State A Claim of "Unfair" Business Practices..................7

    C.   The Complaint Fails To State A Claim of "Deceptive" Business Practices..........10

    D.   The Complaint is Uncertain Because It Selectively Quotes Provisions of
         the Contracts, But Fails to Provide The Entire Contract To The Court.................12

V.   CONCLUSION.............................................................................................................14

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S COMPLAINT

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### CASES

4    *Abrego Abrego v. The Dow Chemical Co.*,
        443 F.3d 676 (9th Cir. 2006) ...................................................................2, 4, 5, 13

5

6    *Bernardo v. Planned Parenthood Federation of Am.*,
        115 Cal App. 4th 322 (2004) ..............................................................................7

7    *Blank v. Kirwan*,
        39 Cal. 3d 311 (1985) .........................................................................................4

8

9    *Blatty v. New York Times Co.*,
        42 Cal. 3d 1033 (1986) ....................................................................................3, 4

10   *Capehart v. Heady*,
        206 Cal. App. 2d 386 (1962) ...............................................................................6

11

12   *Cel-Tech Communications v. Los Angeles Cellular Telephone Company*,
        20 Cal. 4th 163 (1999) ......................................................................................6, 7

13   *Charnay v. Cobert*,
        145 Cal. App. 4th 170 (2006) ..............................................................................6

14

15   *Committee on Children's Television v. General Foods Corp.*,
        35 Cal. 3d 197 (1983) ........................................................................................10

16   *E.L. White v. City of Huntington Beach*,
        21 Cal. 3d 497 (1978) ................................................................................2, 4, 5, 13

17

18   *Farmers Ins. Exchange v. Superior Court*,
        2 Cal. 4th 377 (1992) ..........................................................................................5

19   *Gilmore v. Lycoming Fire Ins. Co*,
        55 Cal. 123 (1880) .............................................................................................13

20

21   *Harboring Villas Homeowners Ass'n v. Superior Court*,
        63 Cal. App. 4th 426 (1998) ................................................................................4

22   *Hendy v. Losse*,
        54 Cal. 3d 723 (1991) ..........................................................................................5

23

24   *Khoury v. Maly's of California, Inc.*,
        14 Cal. App. 4th 612 (1993) .....................................................................7, 10, 12

25   *Lavie v. Procter & Gamble Co.*,
        105 Cal. App. 4th 496 (2003) .............................................................................10

26

27   *Leahy v. Warden*,
        163 Cal. 178 (1912) .............................................................................................7

28

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S COMPLAINT

1

## <u>TABLE OF CONTENTS</u>
### (continued)

2

<u>Page</u>

3    *Long Beach Equities, Inc. v. Superior Court* ,
        231 Cal. App. 3d 1016 (1991) ...................................................................2

4

    *Otworth v. Southern Pac. Transportation Corp.*,
5        166 Cal. App. 3d 452 (1985) ...................................................................12

6    *PH II, Inc. v. Superior Court*,
        33 Cal. App. 4th 1680 (1995) ...................................................4, 7, 10, 12

7

    *Parrino v. FHP, Inc.*,
8        146 F.3d 699 (9th Cir. 1998) ...........................................................2, 4, 5, 13

9    *People v. McKale*,
        25 Cal. 3d 626 (1979) ...................................................................................5

10

    *Perry v. Otay Irr. Dist.*,
11        127 Cal. 565 (1900) ...................................................................................7

12    *Plotkin v. Sajahtera, Inc.*,
        106 Cal. App. 4th 953 (2003) ...................................................................10, 12

13

    *Schnall v. Hertz Corp.*,
14        78 Cal. App. 4th 1144 (2000) ...................................................................8

15    *Scripps Clinic v. Superior Court*,
        108 Cal. App. 4th 917 (2003) ...................................................................8

16

    *Searle v. Wyndham Int'l, Inc.*,
17        102 Cal. App. 4th 1327 (2002) ...................................................................10

18    *Shvarts v. Budget Group, Inc.*,
        81 Cal. App. 4th 1153 (2000) ...................................................................10

19

    *State Farm Fire & Casualty Co. v. Superior Court*,
20        45 Cal. App. 4th 1093 (1996) ...................................................................6

21    *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
        17 Cal. 4th 553 (1998) ...................................................................................6

22

    *Wise v. Southern Pacific Co.*,
23        223 Cal. App. 2d 50 (1963) ...................................................................12

24

## STATUTES

25    California Business & Professions Code §17200, *et seq*...................................passim

26    Cal. Civ. Proc. Code §430.10 ...................................................................3

27    Cal. Civ. Proc. Code §430.10(f) ...................................................................13

28    Cal. Civ. Proc. Code §437(a)...................................................................4

GT\6528546.3
325566-11

-iii-

## TABLE OF CONTENTS
### (continued)

| | Page |
|---|---|
| Fed. R. Civ. P. 12(b)(6) .................................................................................................2, 4, 5, 13 | |

**MISCELLANEOUS**

4 Witkin, Cal. Procedure (4th ed. 1997) ......................................................................................12

DLA PIPER US LLP
SAN DIEGO

GT\6528546.3
325566-11

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S COMPLAINT

1    Defendant Time Warner Entertainment-Advance Newhouse Partnership, a New York

2 general partnership, through its San Diego Division, dba Time Warner Cable ("TWC-San

3 Diego"), sued erroneously as Time Warner Cable, Inc., respectfully submits the following

4 memorandum of points and authorities in support of its general and special demurrer to or, in the

5 alternative, motion to strike portions of Leon Alpert's ("Plaintiff") Complaint.

6  **I.    INTRODUCTION.**

7    This lawsuit is a classic case of the wild west motto of "shoot first, ask questions later."

8 Happily, San Diego is part of the new west and the courts do not allow this type of litigation to

9 continue past the demurrer stage.

10    The essence of the Complaint by Plaintiff is that he believes he was charged by TWC–San

11 Diego for the standard tier of service, sometimes referred to as basic cable service and that he

12 should not have been, as basic cable service was being provided to him through his homeowner's

13 association ("HOA"). The problem with Plaintiff's theory is that it is 100% factually incorrect.

14 Plaintiff has never been charged for this standard tier of service. This issue can be decided on a

15 demurrer as the documents that clearly show the facts are referred to in Plaintiff's Complaint –

16 his TWC–San Diego billing statements from before and after September 21, 2006.

17    TWC–San Diego offers multiple programming and other cable services. These products

18 can be purchased a la carte or as part of a bundle. Much like a prix fixe meal at a restaurant, with

19 the bundle comes a reduction in price compared to a la carte. Prior to September 21, 2006

20 Plaintiff purchased his services a la carte. Beginning on September 21, 2006, he received them as

21 a bundle. The price decrease that Plaintiff experienced is nothing more than the savings of the

22 bundle.

23    This fact precludes Plaintiff from successfully pleading any cause of action against TWC–

24 San Diego for violation of California Business & Professions Code section 17200, *et seq.*

25 ("Section 17200"). Plaintiff has not alleged and cannot allege that TWC–San Diego engaged in

26 unlawful, unfair, or deceptive conduct. Plaintiff has not alleged and cannot allege that TWC–San

27 Diego engaged in any violation of the law. Plaintiff has not established and cannot establish that

28 TWC–San Diego acted "unfairly" because TWC–San Diego never charged Plaintiff for the

GT\6528546.3                            -1-
325566-11

1   standard tier of service. And finally, Plaintiff cannot state a claim under the "deceptive" prong of

2   Section 17200 because Plaintiff admits that he was not deceived.

3        Through its General and Special Demurrer and Motion to Strike, Defendant respectfully

4   requests that the Court sustain without leave to amend its General Demurrer to Plaintiff's

5   Complaint. At a minimum, the Special Demurrer should be sustained with leave to amend.

6   Alternatively, if the Court determines that Plaintiff has stated a claim as to any of the "prongs" of

7   Section 17200, it should strike the allegations as to the "prongs" for which Plaintiff fails to state a

8   claim.

9   **II.    PROCEDURAL AND FACTUAL BACKGROUND.**

10       **A.    Procedural Background.**

11       Plaintiff filed a class action complaint purportedly on behalf of himself and on behalf of

12   all California TWC–San Diego subscribers: (1) who were members of HOAs and/or tenants of

13   such members; (2) where the subscriber's HOA had contracted with TWC–San Diego for basic

14   cable services; and (3) where the subscriber purchased additional cable and cable-related services

15   directly from TWC–San Diego but allegedly was not provided a credit for the basic cable services

16   provided through the subscriber's HOA. Plaintiff alleges a single cause of action for violations of

17   Section 17200.

18       **B.    Factual Background.**[1]

19       TWC–San Diego contracts with various HOAs to provide basic cable services for each

20   unit in the HOA. (Complaint, ¶ 4, 8.) As part of these HOA contracts, members of the HOAs are

21   provided basis cable services paid for out of a portion of the dues collected from the homeowners.

22

23   _____

    [1] For purposes of this demurrer only, the Court must accept as true the facts as pleaded in the
24   Complaint to the extent they are not inconsistent with facts that are subject to judicial notice. *See
    Long Beach Equities, Inc. v. Superior Court* , 231 Cal. App. 3d 1016, 1024-25 (1991). Here, as
25   Plaintiff quotes from and describes the contracts at issue, the Court may take judicial notice of the
    contracts themselves. *See E.L. White v. City of Huntington Beach*, 21 Cal. 3d 497, 504 (1978)
    (approving taking judicial notice of contract and bidding documents relating thereto on which
26   complaint was based in considering demurrer); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th
    Cir. 1998) *superseded by statute on other grounds as recognized in Abrego Abrego v. The Dow
27   Chemical Co.*, 443 F.3d 676, 681 (9th Cir. 2006) (approving taking judicial notice of documents
    whose contents are alleged in complaint to "[p]revent [] plaintiffs from surviving a Rule 12(b)(6)
28   motion by deliberately omitting references to documents upon which their claims are based);
    TWC–San Diego's Request for Judicial Notice ("RJN"), Exhibits A, B, C & D (filed herewith).

GT\6528546.3                                        -2-
325566-11

1    (*Id.* at ¶ 7.) These HOA contracts "require[e] the HOA to affirmatively market [TWC–San

2    Diego]'s services and products to its members." (*Id.* at 8.) Plaintiff is alleged to have paid a fee

3    for basic cable as part of his HOA dues of approximately $28.77. (*Id.* at ¶ 7.)

4         Plaintiff alleges his TWC–San Diego cable bill did not credit him for the basic cable

5    services he was, in effect, already paying for through his monthly HOA dues and that TWC–San

6    Diego was overcharging him "by at least $21 each and every month for additional cable and cable

7    related services." (*Id.* at ¶ 10.) As a corollary to this contract based claim, Plaintiff also alleges

8    that TWC–San Diego fails to inform TWC–San Diego subscribers of HOA pricing on TWC–San

9    Diego's website. (*Id.* at ¶ 11.). Plaintiff claims that because TWC–San Diego's website does not

10   include HOA pricing, a member of an HOA "would likely be deceived that they are required to

11   pay full pricing for cable related services despite already paying for basic cable through their

12   HOA." (*Id.* at ¶ 11.) Finally, Plaintiff alleges that TWC–San Diego's "contractual provisions"

13   on TWC–San Diego's monthly billing statements and online subscriber agreement limits

14   consumers' right to refund for billing errors. (*Id.* at ¶ 14-16, 19.)

15        Based on these alleged acts of wrongdoing, Plaintiff pleads a single cause of action under

16   Section 17200 claiming TWC–San Diego: (1) unlawfully, unfairly and/or deceptively

17   overcharged members of HOAs who are subscribers for cable and cable-related services by not

18   providing HOA subscribers HOA pricing that properly accounts for the basic cable services

19   already provided under TWC–San Diego's contract with the subscriber's HOA, (2) unlawfully,

20   unfairly and/or deceptively attempted to limit subscribers' rights to seek refunds for overcharges

21   to 30 days after receipt of a bill and (3) failed to adequately disclose that HOA pricing is available

22   to HOA subscribers that properly accounts for the cable services already provided under TWC–

23   San Diego's contract with the subscriber's HOA. (*Id.* at ¶¶ 28-29.)

24   **III.    STANDARD FOR DEMURRER.**

25        A demurrer must be sustained if the complaint does not state facts sufficient to state a

26   cause of action. Cal. Civ. Proc. Code § 430.10. The court must accept as true "all material facts

27   properly pleaded, but not contentions, deductions or conclusions of fact or law." *Blatty v. New*

28   *York Times Co.,* 42 Cal. 3d 1033, 1040 (1986). A demurrer may be used to challenge defects that

GT\6528546.3
325566-11

-3-

1    appear on the face of the pleadings. *Blank v. Kirwan*, 39 Cal. 3d 311, 318 (1985); *Harboring*

2    *Villas Homeowners Ass'n v. Superior Court*, 63 Cal. App. 4th 426, 429 (1998). The court also

3    considers facts which may be judicially noticed, and when the allegations of the complaint

4    contradict or are inconsistent with such facts, the court must accept the judicially noticed facts

5    and reject the inconsistent allegations. *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1040

6    (1986).

7        The Court may take judicial notice of documents referenced in a complaint upon which

8    plaintiff's claims are based. *See E.L. White v. City of Huntington Beach*, 21 Cal. 3d 497, 504

9    (1978) (approving taking judicial notice of contract and bidding documents relating thereto on

10    which complaint was based in considering demurrer); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06

11    (9th Cir. 1998) *superseded by statute on other grounds as recognized in Abrego Abrego v. The*

12    *Dow Chemical Co.*, 443 F.3d 676, 681 (9th Cir. 2006) (approving taking judicial notice of

13    documents whose contents are alleged in complaint to "[p]revent [] plaintiffs from surviving a

14    Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims

15    are based); RJN, Exhibits A, B, C & D.

16        Alternatively, in appropriate cases, where the court determines at the pleadings stage that

17    a portion of a cause of action, rather than the entire cause of action, is substantively defective,

18    defendant may move to strike that portion of the complaint. *PH II, Inc. v. Superior Court*, 33 Cal.

19    App. 4th 1680, 1682-83 (1995). Thus, for example, a motion to strike may lie where the

20    complaint "fails to state facts showing a primary right of the plaintiff and a primary duty of, or

21    wrong committed by, the defendant." *Id.* In ruling on a motion to strike, as on a demurrer, the

22    court may also consider matters that may be judicially noticed. Cal Civ. Proc. Code § 437(a).

23    **IV.    ARGUMENT.**

24        At the heart of this litigation are three contracts 1) a commercial services agreement

25    between TWC–San Diego and Plaintiff's Homeowners Association ("the HOA agreement"),

26    pursuant to which TWC–San Diego provided basic cable services to Plaintiff; 2) a service

27    agreement between TWC–San Diego and Plaintiff ("the service agreement"), pursuant to which

28    TWC–San Diego provided additional cable and cable-related services to Plaintiff, and 3) the

GT\6528546.3                                    -4-
325566-11

1  billings statements, pursuant to which Plaintiff is charged by TWC–San Diego for his cable and

2  cable related services.

3          Plaintiff describes and selectively quotes from these contracts. He does not, however,

4  attach a copy of the contracts to the Complaint, presumably hoping to thereby avoid a demurrer.

5  He cannot. When the contracts referenced in the complaint lie at the heart of the Complaint, this

6  Court can and should review the entire contract in considering ruling on Defendant's demurrer.

7  *See e.g., Hendy v. Losse*, 54 Cal. 3d 723, 728-29 (1991) (taking judicial notice on demurrer of the

8  employment contract of plaintiff in medical malpractice again against the employer's doctor);

9  *E.L. White v. City of Huntington Beach*, 21 Cal. 3d 497, 504 (1978) (approving taking judicial

10  notice of contract and bidding documents relating thereto on which complaint was based in

11  considering demurrer); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998) *superseded by*

12  *statute on other grounds as recognized in Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d

13  676, 681 (9th Cir. 2006) (approving taking judicial notice of documents whose contents are

14  alleged in complaint to "[p]revent [] plaintiffs from surviving a Rule 12(b)(6) motion by

15  deliberately omitting references to documents upon which their claims are based); RJN, Exhibits

16  A, B, C & D. When the Court does so, it will see that TWC–San Diego has not overcharged

17  Plaintiff, has not purported to limit a consumer's right to refunds, and has not concealed HOA

18  pricing.

19      **A.    The Complaint Fails to State A Claim of "Unlawful" Business Practices.**

20          A business act or practice is "unlawful" under Section 17200 only if it is "forbidden by

21  law." *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992). The California

22  Supreme Court has explained that Section 17200 "'borrows' violations of other laws and treats

23  these violations, when committed pursuant to business activity, as unlawful practices

24  independently actionable under [Section] 17200." *Id.* Thus the pleadings must allege the law that

25  is "borrowed" and "without supporting facts demonstrating the illegality of a rule or regulation,

26  an allegation that [the practice] is in violation of specific statute is purely conclusionary and

27  insufficient to withstand demurrer." *People v. McKale*, 25 Cal. 3d 626, 635 (1979). Likewise, a

28  complaint is insufficient to state a cause of action if it fails to state what other law was violated.

GT\6528546.3                               -5-
325566-11

1 | *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566-67 (1998), *overruled on*

2 | *other grounds by Californians For Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223 (2006);

3 | *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093,1103 (1996).[2]

4 | Plaintiff claims that TWC–San Diego 1) unlawfully overcharges HOA subscribers for

5 | cable and cable-related services by not providing such customers HOA pricing that properly

6 | accounts for the cable services already provided under TWC–San Diego's contract with the

7 | subscriber's HOA and 2) unlawfully limits consumers' right to refund for overcharges by the

8 | purported contractual 30-day limit TWC–San Diego requires to challenge billing errors. Notably,

9 | the Complaint fails to identify what law the alleged "overcharging" practice violates. As Plaintiff

10 | has not and cannot point to any legal authority making this practice illegal, he has not and cannot

11 | state a Section 17200 cause of action based on a claim of an unlawful business practice for

12 | "overcharging."

13 | As to Plaintiff's claim that requiring customers to report billing errors within 30 days is

14 | unlawful, Plaintiff alleges that "the law does not so limit challenges to overbilling practices" and

15 | cites to the four year statute of limitations period under Section 17200 and for breach of written

16 | contract actions. (Complaint, ¶ 16.) But again, the Complaint fails to identify what law the

17 | alleged billing practice violates because under California law parties may agree to a provision

18 | shortening the statute of limitations. *Charnay v. Cobert*, 145 Cal. App. 4th 170, 183 (2006)

19 | (citing *Capehart v. Heady*, 206 Cal. App. 2d 386, 388 (1962)).

20 | Moreover, the language quoted by Plaintiff is not an attempt by TWC–San Diego to

21 | shorten the statute of limitations and Plaintiff has incorrectly characterized it as a "self-styled 30

22 | day statute of limitations." (Complaint, ¶ 16.) In that regard, it does not purport to limit a

23 | subscriber's right to file a lawsuit challenging the billing statements if he fails to meet the 30-day

24 | requirement. Rather, it simply provides that "if [TWC–San Diego is] not notified of the

25 | discrepancy the statement will be considered correct." (Complaint, ¶ 14.) TWC–San Diego

26 | 

27 | [2] Other language in this case has been disapproved by the Supreme Court in a discussion expressly limited to the context of "an action by a competitor alleging anticompetitive practices." *Cel-Tech Communications v. Los Angeles Cellular Telephone Company*, 20 Cal. 4th 163, 180,

28 | 187 n.12 (1999).

GT6528546.3
325566-11

-6-

1 | provides subscribers a means to settle disputes without litigation by requiring a subscriber who

2 | contests a statement to promptly notify TWC–San Diego of the concerns regarding the bill. After

3 | such notification, TWC–San Diego has an opportunity to investigate and, if appropriate, adjust

4 | the bill.

5 |      This principle of obligating a party to a contract to provide notice of a dispute proximate

6 | to the time of payment is embodied in the voluntary payment doctrine which, as the name

7 | implies, provides that payments made voluntarily to another with knowledge of the facts cannot

8 | be recovered. *Perry v. Otay Irr. Dist.*, 127 Cal. 565, 570 (1900); *Leahy v. Warden*, 163 Cal. 178,

9 | 181 (1912). TWC–San Diego's 30-day notice provision is not unlawful—in fact, it is supported

10 | by the common law "voluntary payment" doctrine.

11 |      Insofar as the Complaint fails to set forth any unlawful practices by TWC–San Diego, the

12 | demurrer should be sustained. *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 619

13 | (1993). Alternatively, in the event that the Court otherwise determines that Plaintiff has stated

14 | facts with sufficient particularity under Section 17200, it should strike all allegations relating to

15 | purportedly "unlawful" activities. *See PH II, Inc.,* 33 Cal. App. 4th at 1682-83.

16 |     **B.**    **The Complaint Fails to State A Claim of "Unfair" Business Practices.**

17 |      An action may be deemed a violation of Section 17200 if it is "unfair," even if it is not

18 | specifically proscribed by some other law. *Cel-Tech Communications v. Los Angeles Cellular*

19 | *Telephone Company,* 20 Cal. 4th 163, 180 (1999). In *Cel-Tech,* the California Supreme Court

20 | explained that under the "unfair" prong of section 17200, "[c]ourts may not simply impose their

21 | own notions of the day as to what is fair or unfair." *Id.* at 182. "We must require that any finding

22 | of unfairness to competitors under section 17200 be tethered to some legislatively declared policy

23 | or proof of some actual or threatened impact on competition." *Id.* at 186-87. Although the

24 | Supreme Court in *Cel-Tech* limited that holding to cases involving injury to "competitors" as

25 | opposed to "consumers," *Id.* at 187 n. 12, subsequent decisions have extended the analysis of

26 | *Cel-Tech* to cases involving allegations of harm to consumers. *Bernardo v. Planned Parenthood*

27 | *Federation of Am.*, 115 Cal App. 4th 322, 353 (2004) ("*Cel-Tech ...* may signal a narrower

28 | interpretation of the prohibition of unfair acts or practices in *all* unfair competition claims.");

GT\6528546.3
325566-11

-7-

1  *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003); *Schnall v. Hertz Corp.*, 78

2  Cal. App. 4th 1144, 1166 (2000).

3       Plaintiff claims that TWC–San Diego 1) unfairly overcharges HOA subscribers for cable

4  and cable related services by not providing such customers HOA pricing that properly accounts

5  for the cable services already provided under TWC–San Diego's contract with the subscriber's

6  HOA and 2) unfairly limits consumers' right to refund for overcharges by the purported

7  contractual 30-day limit TWC–San Diego requires to challenge billing errors.  These are the same

8  two practices Plaintiff claims are also unlawful.  (*See infra* Section IV.A.)

9       In support of Plaintiff's claim that TWC–San Diego "unfairly overcharges HOA

10  subscribers," Plaintiff alleges that "[a] comparison of Alpert's billing statements demonstrates

11  that [TWC–San Diego] was overcharging [Plaintiff] by at least $21 each and every month for

12  additional cable and cable related services." (Complaint, ¶ 10.)  The Complaint alleges that

13  Plaintiff had been paying approximately $154 per month for various cable and cable related

14  services, and that once TWC–San Diego correctly priced these services to reflect his HOA's

15  existing agreement with TWC–San Diego for basic cable services, his bill for the exact same

16  services dropped to approximately $133.  (*Id.*) Plaintiff alleges that TWC–San Diego unfairly

17  pocketed the $21 monthly difference.

18       Had Plaintiff attached his billing statements to the Complaint so the Court could

19  "compare" the billing statements, the Court would see that it is clear on the face of the bills that

20  TWC–San Diego has never charged Plaintiff for the basic cable services that are covered by the

21  HOA agreement and that Plaintiff has never paid TWC–San Diego for basic cable service.

22  Plaintiff has never been "overcharged" for basic cable service.

23       The billing statements at issue are the September 12, 2006 billing statement (covering the

24  period during which Plaintiff purchased his services a la carte) and the October 12, 2006 billing

25  statement (covering the period after which Plaintiff purchased his services as a bundle).  The

26  September 12, 2006 billing statement clearly shows no charge for basic cable. (RJN, Exhibit C.)

27  The September 12, 2006 billing statement includes a detailed itemized listing of the precise

28  charge for each separate cable and cable related service (shown under the "Monthly Charges"

GT\6528546.3
325566-11

-8-

1   portion of the bill on page 2).  The itemized monthly charges clearly do not include a charge for

2   basic cable and include only the additional services, beyond basic cable.

3     Likewise, the billing statement dated October 12, 2006 shows no charge for basic cable.

4   (RJN, Exhibit D.)  As is shown on the face of the bill, during the October 12, 2006 billing period,

5   Plaintiff purchased his services as a bundle, reflected by the description of "Hoa DIGIPiC 4000

6   Trio" on page 2.  The implication is that this is special HOA pricing of the bundle.  Plaintiff was

7   charged one price for a bundle of cable and cable-related services priced at a discount.

8     The approximate $21 difference in the billing statements from September to October

9   simply reflects the fact that Plaintiff changed the package he purchased,  Plaintiff's September

10  billing statement reflect "a la carte" pricing, meaning that each additional cable and cable-related

11  service was added to his billing statement separately.  Plaintiff's October billing statement

12  reflects the special discount pricing for the services he purchased as a "bundle.  Notably, neither

13  the "a la carte" pricing nor the "bundle" pricing includes a charge for basic cable service.  The

14  price decrease that Plaintiff experienced is nothing more than the bundled price discount and does

15  not reflect that Plaintiff was previously charged for basic cable or otherwise overcharged in any

16  way.  It is no different than, for example, the better pricing a consumer is afforded when

17  purchasing a package of options on a new car rather than purchasing each option separately.

18    Plaintiff also claims that TWC–San Diego unfairly requires HOA subscribers to determine

19  whether bills are "correct" within 30 days of receipt.  But Plaintiff has not and cannot point to a

20  any law, or legislative or other policy to the effect that this common practice of requiring timely

21  notice of billing discrepancies is "unfair."  On the contrary, it is a common and reasonable

22  business practice especially appropriate where the charges may vary from month to month and

23  one party is in the best position to know whether the charges accurately reflect the services he

24  ordered during that period.  Moreover, it affords the other party an opportunity to investigate and

25  remedy the discrepancy in a timely manner.

26    More importantly the time limit for challenging the "correctness" of the billing statement

27  is not implicated by Plaintiff's situation.  The $21 reduction in the price for his service has

28  nothing to do with the "correctness" of his September 2006 billing statement or any prior invoice.

GT\6528546.3
325566-11

-9-

1    The September billing statement "correctly" priced his service based on the "a la carte" pricing,

2    which did not include a charge for basic cable service.  The later lower pricing "correctly"

3    reflected a "bundle" pricing discount that also did not include a charge for basic cable service.

4          Insofar as the Complaint fails to set forth any unfair practices by TWC–San Diego, the

5    demurrer should be sustained. *Khoury,* 14 Cal. App. 4th at 619.  Alternatively, in the event that

6    the Court otherwise determines that Plaintiff has stated facts with sufficient particularity under

7    Section 17200, it should strike all allegations relating to purportedly "unfair" activities. *See PH*

8    *II, Inc.,* 33 Cal. App. 4th at 1682-83.

9          **C.    The Complaint Fails To State A Claim of "Deceptive" Business Practices.**

10          A business act or practice is "deceptive" under Section 17200 if Plaintiff can show that

11    members of the public are likely to be deceived. *Committee on Children's Television v. General*

12    *Foods Corp.*, 35 Cal. 3d 197 (1983); *Shvarts v. Budget Group, Inc.*, 81 Cal. App. 4th 1153

13    (2000).  "Likely to deceive" means that it is probable that a significant portion of the general

14    consuming public or of targeted consumers, acting reasonably under the circumstances, could be

15    misled. *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003).  The ordinary or

16    "reasonable consumer" standard is typically used to determine whether the advertisements were

17    likely to mislead the public. *Id.*

18          The "deceptive" prong of Section 17200 does not impose an affirmative obligation for

19    businesses to provide the "best possible notice" to prevent any possible misleading of the public.

20    For example, in *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 966 (2003), the Court of

21    Appeal held that although a sign at a hotel warning patrons about a $21 charge for valet parking

22    might have been better, "there is no requirement [under Section 17200] that reasonable notice has

23    to be the best possible notice."  The court added "[m]oreover, a potential parker could ask if there

24    is a charge or a self-parking lot and thus is not forced to use valet parking." *Id.*  Likewise in

25    *Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1334 (2002) the court held that a hotel's

26    practice of not expressly advising patrons that a service charge added to room service bills gets

27    paid to the server, does not violate Section 17200.

28    /////

GT\6528546.3
325566-11

-10-

1       Plaintiff claims that TWC–San Diego 1) deceptively overcharges HOA subscribers for

2 cable and cable-related services by not providing such customers HOA pricing that properly

3 accounts for the cable services already provided under TWC–San Diego's contract with the

4 subscriber's HOA, 2) deceptively limits consumers' right to refund for overcharges by the

5 purported contractual 30-day limit TWC–San Diego requires to challenge billing errors, and

6 3) deceptively conceals HOA pricing from HOA subscribers.

7       As discussed above, the billing statements clearly show that TWC–San Diego did not

8 overcharge Plaintiff.  The billing statements show that Plaintiff was not and is not being charged

9 for basic cable.  Plaintiff's allegations that TWC–San Diego "deceptively overcharged" him are

10 directly contradicted by the billing statements and must be disregarded.

11       As to Plaintiffs' claim that TWC–San Diego deceptively limits consumers' right to refund

12 for overcharges by the purported contractual 30-day notice requirement, the Complaint alleges the

13 billing procedure is "[i]n nearly impossible to read tiny script on the back of [the] monthly billing

14 statement." (Complaint, ¶ 14).  The Complaint does not explain how the billing procedure

15 affected Plaintiff or how it is deceptive under the circumstances alleged in the Complaint.  Nor

16 can it.  The language from the billing statement is clear and unambiguous.  The font is the same

17 size as the rest of the text in the same area on the billing statement.  The placement of the

18 language is directly below an all caps and underlined title "ABOUT YOUR TIME WARNER

19 CABLE AGREEMENT."  The language itself, the size of the font, and the placement of the

20 language on the bill is clearly reasonable notice to TWC–San Diego subscribers that they should

21 review their billing statements for accuracy and notify TWC–San Diego if there are any billing

22 errors.

23       Plaintiff's claim that TWC–San Diego deceptively conceals HOA pricing from HOA

24 subscribers is clearly unsupported and in fact denied by Plaintiff's Complaint.  First, Plaintiff's

25 allegation that TWC–San Diego should publish HOA pricing on its website is clearly unsupported

26 by case law.  TWC–San Diego is not obligated to publish on its website the contract specific

27 terms it has negotiated with each HOA and such an obligation would be particularly inappropriate

28 here where Plaintiff knows (or should know) the terms of his contracts with his HOA.  *See*

GT\6528546.3
325566-11

-11-

1    *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 966 (2003) ("there is no requirement [under

2    Section 17200] that reasonable notice has to be the best possible notice."). Moreover, Plaintiff

3    could have simply contacted TWC–San Diego and asked if there is special pricing for HOA

4    subscribers. *Id.* ("Moreover, a potential parker could ask if there is a charge or a self-parking lot

5    and thus is not forced to use valet parking.")

6        Second, Plaintiff knew that he paid dues to his HOA to pay for TWC–San Diego basic

7    cable service because as alleged in the Complaint "[Plaintiff] pays a fee that covers basic cable

8    services pursuant to an agreement between [TWC–San Diego] and [Plaintiff]'s HOA."

9    (Complaint, ¶ 7.) Under these circumstances, plaintiff cannot make a claim that TWC–San Diego

10    deceptively conceals HOA pricing from HOA subscribers. He has admitted that he was aware his

11    billing statements should not include a charge for basic cable, which it did not, and therefore his

12    claim fails.

13        Because the Complaint fails to set forth any deceptive practices by TWC–San Diego, the

14    demurrer should be sustained. *Khoury,* 14 Cal. App. 4th at 619. Alternatively, in the event that

15    the Court determines that Plaintiff has stated facts with sufficient particularity under Section

16    17200, it should strike all allegations relating to purportedly "deceptive" activities. *See PH II,*

17    *Inc.,* 33 Cal. App. 4th at 1682-83.

18    **D.    The Complaint is Uncertain Because It Selectively Quotes Provisions of the**
        **Contracts, But Fails to Provide The Entire Contract To The Court**
19

20        In California, if an action is based on an alleged breach of written contract, "the terms

21    must be set out verbatim in the body of the complaint or a copy of the written instrument must be

22    attached and incorporated by reference." *Otworth v. Southern Pac. Transportation Corp.*, 166

23    Cal. App. 3d 452, 459 (1985); *see also Wise v. Southern Pacific Co.*, 223 Cal. App. 2d 50, 59

24    (1963) ("Where a written instrument is the foundation of a cause of action, it may be pleaded in

25    *haec verba* by attaching a copy as an exhibit and incorporating it by proper reference."). A

26    complaint is insufficient "[w]hen a party relies upon a contract in writing, and it affirmatively

27    appears that all the terms of the contract are not set forth in *haec verba*, nor stated in their legal

28    effect, but that a portion which may be material has been omitted." 4 Witkin, Cal. Procedure (4th

GT\6528546.3
325566-11                                    -12-

1   ed. 1997), Pleading, §481, p. 573 (quoting *Gilmore v. Lycoming Fire Ins. Co*, 55 Cal. 123, 124

2   (1880)).

3           Here, Plaintiff has failed to attach the HOA Agreement, the service agreement, or the

4   referenced billing statements to his Complaint. Nor does Plaintiff purport to plead word for word

5   or in legal effect all of the relevant terms of these contracts. Instead, Plaintiff generally describes

6   and selectively quotes a few provisions of the contracts. Because the terms of the contracts are at

7   the heart of this action, and the contracts contain the specific terms of the agreements, the Court

8   may take judicial notice of the contracts themselves. *See E.L. White v. City of Huntington Beach*,

9   21 Cal. 3d 497, 504 (1978) (approving taking judicial notice of contract and bidding documents

10  relating thereto on which complaint was based in considering demurrer); *Parrino v. FHP, Inc.*,

11  146 F.3d 699, 705-06 (9th Cir. 1998) *superseded by statute on other grounds as recognized in*

12  *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 681 (9th Cir. 2006) (approving taking

13  judicial notice of documents whose contents are alleged in complaint to "[p]revent [] plaintiffs

14  from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon

15  which their claims are based). Under these circumstances where the contracts lie at the heart of

16  the Complaint, the court may consider the documents referenced or quoted in the complaint

17  without violating the rule that demurrers should be resolved without reference to materials

18  extrinsic to the complaint. A ruling to the contrary would permit a plaintiff to evade a properly

19  argued demurrer simply because plaintiff has chosen not to attach it to the complaint or to

20  incorporate it by reference. In response, TWC–San Diego has provided the Court with a copy of

21  the actual contracts, of which the Court may take judicial notice. (RJN, Exhibits A, B, C & D. ).

22  On their face, the contracts show that TWC–San Diego performed its contractually assumed

23  obligations.

24          It is expected that Plaintiff will oppose judicial notice of the contracts in an attempt to

25  survive demurrer. Such an argument, at best, demonstrates that the Complaint is uncertain and

26  unintelligible, and should be amended. Cal. Civ. Proc. Code §430.10(f). Plaintiff should not be

27  permitted to pursue claims belied by the contracts on which they are based by intentionally using

28  ambiguous and uncertain language to describe the contracts and billing statements at issue in the

1   Complaint. Plaintiff's failure to place all of the relevant portions of the contracts before the court,

2   at a minimum, renders the complaint fatally uncertain and subject to special demurrer.

3   **V.    CONCLUSION.**

4       For the reasons stated, TWC–San Diego respectfully requests that the Court sustain its

5   General Demurrer to Plaintiff's Complaint without leave to amend. At a minimum, the Special

6   Demurrer should be sustained. Alternatively, to the extent that the Court is persuaded that no

7   claim has been stated as to certain "prongs" of section 17200, the Court should grant the motion

8   to strike the relevant portions of the Complaint.

9

10  Dated: April **30**, 2007

11                                  DLA PIPER US LLP

12

13                                  By

                                JEFFREY M. SHOHET

14                                  JULIE L. HUSSEY

                                CARRIE S. DOLTON

15                                  Attorneys for Defendant

                                TIME WARNER ENTERTAINMENT-

16                                  ADVANCE NEWHOUSE PARTNERSHIP,

                                A NEW YORK GENERAL PARTNERSHIP,

17                                  THROUGH ITS SAN DIEGO DIVISION,

                                DBA TIME WARNER CABLE

18

19

20

21

22

23

24

25

26

27

28

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S COMPLAINT

1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)     **COPY**
    **DLA PIPER US LLP**
3   401 B Street, Suite 1700
    San Diego, CA 92101-4297
4   Tel: 619.699.2700
    Fax: 619.699.2701                     **F I L E D**
5                                         Clerk of the Superior Court
    Attorneys for Defendant
6   TIME WARNER ENTERTAINMENT-ADVANCE           **APR 3 0 2007**
    NEWHOUSE PARTNERSHIP, A NEW YORK
7   GENERAL PARTNERSHIP, THROUGH ITS SAN       By: E. Scheitt, Deputy
    DIEGO DIVISION, DBA TIME WARNER CABLE
8

9                    SUPERIOR COURT OF CALIFORNIA

10                     COUNTY OF SAN DIEGO

11

12  LEON ALPERT, an individual, on behalf    CASE NO. GIC881621
    of himself, on behalf of all those similarly
13  situated, and on behalf of the general   **DECLARATION OF ROSS CARR IN**
    public,                                   **SUPPORT OF DEFENDANT'S REQUEST**
14                                            **FOR JUDICIAL NOTICE**
                    Plaintiffs,
15                                            Date      June 1, 2007
            v.                                Time      1:30 p.m.
16                                            Dept:     74
    TIME WARNER CABLE, INC., a                Judge:    Linda B. Quinn
17  Delaware corporation, and DOES 1 TO
    100,                                      Complaint: March 13, 2007
18
                    Defendants.
19

20  I, ROSS CARR, say:

21      1.      I am over eighteen and am competent to testify to the matters set forth herein.

22      2.      I am currently employed as Director of Commercial Development at Time Warner

23  Cable – San Diego, a division of Defendant Time Warner Entertainment-Advance Newhouse

24  Partnership ("TWC – San Diego"), which is the cable operator at issue in the Complaint.

25      3.      Attached as Exhibit A to the Request for Judicial Notice filed concurrently herewith is

26  a true and correct copy of the commercial services agreement between TWC –San Diego and Sea

27  Point Community Association, the Homeowners Association of which Leon Alpert ("Plaintiff") is

28  a member, pursuant to which TWC – San Diego provided basic cable services to Plaintiff.

SD\1735151.1                          -1-
325566-11

DECL. OF ROSS CARR IN SUPPORT OF DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

4.      Attached as Exhibit C to the Request for Judicial Notice filed concurrently herewith is

a true and correct copy of the September 12, 2006 billing statement, pursuant to which Plaintiff is

charged by TWC –San Diego for his cable and cable related services via the a la carte pricing

model.

5.      Attached as Exhibit D to the Request for Judicial Notice filed concurrently herewith is

a true and correct copy of the October 12, 2006 billing statement, pursuant to which Plaintiff is

charged by TWC-San Diego for his cable and cable related services via the bundle pricing model.

6.      These records have been kept in the ordinary course of TWC – San Diego's business,

and it is TWC – San Diego's regular business practice to keep such records.

I declare under penalty of perjury under the laws of the United States and the State of

California that the foregoing is true and correct.

Executed in San Diego County, State of California on the 30th day of April, 2007.

ROSS CARR

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5
   Attorneys for Defendant
6  TIME WARNER ENTERTAINMENT-ADVANCE
   NEWHOUSE PARTNERSHIP, A NEW YORK
7  GENERAL PARTNERSHIP, THROUGH ITS SAN
   DIEGO DIVISION, DBA TIME WARNER CABLE
8

**COPY**

F I L E D
Clerk of the Superior Court

**APR 3 0 2007**

By: E. Scheitt, Deputy

9                    SUPERIOR COURT OF CALIFORNIA

10                     COUNTY OF SAN DIEGO

11 | LEON ALPERT, an individual, on behalf | CASE NO.  GIC881621
   | of himself, on behalf of all those similarly |
12 | situated, and on behalf of the general | **DECLARATION OF HOPE MURRAY IN**
   | public, | **SUPPORT OF DEFENDANT'S REQUEST**
13 | | **FOR JUDICIAL NOTICE**
14 |                    Plaintiffs, |
   | | Date        June 1, 2007
15 |          v. | Time        1:30 p.m.
   | | Dept:       74
16 | TIME WARNER CABLE, INC., a | Judge:      Linda B. Quinn
   | Delaware corporation, and DOES 1 TO |
   | 100, | Complaint:  March 13, 2007
17 | |
18 |                    Defendants. |

19  I, HOPE MURRAY, say:

20      1.      I am over eighteen and am competent to testify to the matters set forth herein.

21      2.      I am currently employed as the Marketing Manager at Time Warner Cable – San

22  Diego, a division of Defendant Time Warner Entertainment-Advance Newhouse Partnership

23  ("TWC – San Diego"), which is the cable operator at issue in the Complaint.

24      3.      Attached as Exhibit B to the Request for Judicial Notice filed concurrently herewith is

25  a true and correct copy of the residential services subscriber agreement, pursuant to which TWC –

26  San Diego provided additional cable and cable related services to Plaintiff.

27      4.      This residential services subscriber agreement is located at the following website:

28  http://help.twcable.com/html/twc_sub_agreement_ca.html.

DLA PIPER US LLP
   SAN DIEGO

GT\6529584.1
325566-11

DECL. OF [NAME] IN SUPPORT OF DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

1      5.     I declare under penalty of perjury under the laws of the United States and the State of

2    California that the foregoing is true and correct.

3        Executed in San Diego County, State of California on the 30th day of April, 2007.

4

5                HOPE MURRAY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel:  619.699.2700
   Fax:  619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

COPY

**F I L E D**
Clerk of the Superior Court

**APR 3 0 2007**

By: E. Scheitt, Deputy

9
                    SUPERIOR COURT OF CALIFORNIA
10
                      COUNTY OF SAN DIEGO
11

12
   LEON ALPERT, an individual, on behalf          CASE NO.  GIC881621
13  of himself, on behalf of all those similarly
   situated, and on behalf of the general         **DEFENDANT'S REQUEST FOR**
14  public,                                        **JUDICIAL NOTICE IN SUPPORT OF**
                                                   **DEMURRER TO AND ALTERNATIVE**
15            Plaintiffs,                          **MOTION TO STRIKE PLAINTIFF'S**
                                                   **COMPLAINT**
16       v.
                                                   Date      June 1, 2007
17  TIME WARNER CABLE, INC., a                     Time      1:30 p.m.
   Delaware corporation, and DOES 1 TO            Dept:     74
18  100,                                           Judge:    Linda B. Quinn

19            Defendants.                          Complaint:  March 13, 2007

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
   SAN DIEGO

GT\6528544.1
325566-11

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

1    In support of its Demurrer and Alternative Motion to Strike, and pursuant to California

2    Evidence Code section 452(h) and *E.L. White v. City of Huntington Beach*, 21 Cal. 3d 497, 504

3    (1978), Defendant Time Warner Entertainment-Advance Newhouse Partnership, a New York

4    general partnership, through its San Diego division, dba Time Warner Cable ("TWC – San

5    Diego"), erroneously sued as Time Warner Cable, Inc., respectfully requests that the Court take

6    judicial notice of the following documents referenced in, and at the heart of, Plaintiff Leon

7    Alpert's ("Plaintiff") Complaint.

8        1. Exhibit A: This exhibit is a true and correct copy of the commercial services agreement

9    between TWC – San Diego and Plaintiff's Homeowners Association, pursuant to which TWC –

10   San Diego provided basic cable services to Plaintiff.

11       2. Exhibit B: This exhibit is a true and correct copy of the residential services subscriber

12   agreement, pursuant to which TWC – San Diego provided additional cable and cable related

13   services to Plaintiff.

14       3. Exhibit C: This exhibit is a true and correct copy of the September 12, 2006 billing

15   statement, pursuant to which Plaintiff is charged by TWC – San Diego for his cable and cable

16   related services via the a la carte pricing model.

17       4. Exhibit D: This exhibit is a true and correct copy of the October 12, 2006 billing

18   statement, pursuant to which Plaintiff is charged by TWC – San Diego for his cable and cable

19   related services via the bundle pricing model.

20       California Evidence Code section 452(h) allows a court to take judicial notice of, inter

21   alia, "[f]acts and propositions that are not reasonably subject to dispute and are capable of

22   immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

23   It is axiomatic that under section 452(h), documents whose contents are alleged in a complaint

24   and whose authenticity no party questions, but which are not physically attached to the pleading,

25   may be considered in ruling on demurrer and motion to dismiss. As a result, courts readily take

26   judicial of contracts referenced in complaints upon which plaintiff's claims are based. *See E.L.*

27   *White v. City of Huntington Beach*, 21 Cal. 3d 497, 504 (1978) (approving taking judicial notice

28   of contract and bidding documents relating thereto on which complaint was based in considering

GT\6528544.1
325566-11

-1-

DLA PIPER US LLP
San Diego

DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

demurrer); *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998) *superseded by statute on*

*other grounds as recognized in Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 681 (9th

Cir. 2006) (approving taking judicial notice of documents whose contents are alleged in

complaint to "[p]revent [] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately

omitting references to documents upon which their claims are based).

Dated: April **30** , 2007

DLA PIPER US LLP

By _____

JEFFREY M. SHOHET
JULIE L. HUSSEY
CARRIE S. DOLTON
Attorneys for Defendant
TIME WARNER ENTERTAINMENT-
ADVANCE NEWHOUSE PARTNERSHIP,
A NEW YORK GENERAL PARTNERSHIP,
THROUGH IT'S SAN DIEGO DIVISION,
DBA TIME WARNER CABLE

**EXHIBIT A**

**Recording Requested By**

And Return To:

    Time Warner Cable
    8949 Ware Court
    San Diego, CA 92121-2275

Transfer Tax:  None

TIME WARNER CABLE

---

# TIME WARNER CABLE
## SYSTEM INSTALLATION AND SERVICE AGREEMENT
### CITY OF SAN DIEGO/SAN DIEGO SYSTEM

EFFECTIVE DATE: **10/1/2005**

## PARTIES:

**Operator:**

**Time Warner Entertainment-Advance Newhouse Partnership, a New York general partnership, dba TIME WARNER CABLE**
8949 Ware Court
San Diego, CA 92121
Contact Person: Janette Larson
Telephone: (858) 635-8418
Facsimile: (858) 536-8729

**HOA:**

**SEA POINT COMMUNITY ASSOCIATION**
13022 Caminito Del Rocio
Del Mar, CA 92014
Contact Person: Dale Cook
Telephone: (858) 755-1918
Facsimile: (858) 755-4929

## PROPERTY:

**SEA POINT TOWNHOMES**
13022 Caminito Del Rocio
Del Mar, CA 92014
Number of Units: 237

## RECITALS

- HOA is the homeowners, condominium owners, or townhome owners association for the multi-unit residential property referred to above and as further described in the legal description set forth on *Exhibit A* (the "**Property**").

- HOA and Operator desire to make the Services available to residents of the Property ("**Residents**") in accordance with the terms and conditions of this Agreement.

## TERMS AND CONDITIONS

In consideration of the Recitals and the mutual covenants contained in this Agreement, HOA and Operator agree as follows:

1.    OPERATOR'S SERVICE OBLIGATIONS.

1.1    Services.  The term "**Services**" means the services described below.

    (A) **Bulk Multi-Channel Video Services.** Upon the Activation Date (as defined below), Operator will offer Bulk Multi-Channel Video Services to Residents. "**Bulk Multi-Channel Video Services**" means the package of multi-channel cable television and other video-and/or-sound services provided over the System (as defined below), as set forth on *Exhibit B*.

    (B) **Additional Services.** Operator may offer and provide Additional Services to Residents on a non-exclusive basis. "**Additional Services**" means any services other than the Bulk Multi-Channel Video Services that can be provided to the Residents over the System, including, but not limited to, premium channels, pay-per-view, music, digital tier, video-on-

Confidential & Proprietary
Residential Bulk Services Agreement

demand, and other video and music services not included in the Bulk Multi-Channel Video Services package, high-speed data and Internet access services, voice services, etc.

**1.2  Installation of System (as Applicable).** To the extent necessary (*e.g.*, there is no, or there is insufficient, existing wiring and facilities) and at Operator's sole expense, Operator will design, construct, install, and/or upgrade the System on the Property in accordance with industry standards, Laws and Regulations (as defined in Section 14.3), and a construction plan, specifications and schedule (the "**Construction Plan**") agreed upon by HOA and Operator within 60 days of the Effective Date. The "**Activation Date**" shall be that date agreed upon by HOA and Operator in the Construction Plan. "**System**" means all equipment, facilities, wiring (including internal building wiring and external building distribution wiring), conduit, and molding that Operator installs or upgrades on the Property, that Operator provides for installation by HOA or a third party at the Property, or that exist on the Activation Date and that Operator uses to deliver the Services, regardless of whether any such components are in use at any given time.

**1.3  Maintenance of System; Restoration of Property.** At Operator's sole expense, Operator will (A) maintain, repair, and operate the System in accordance with industry standards and Laws and Regulations and (B) repair and restore all portions of the Property damaged by Operator (regardless of whether such damage occurred during installation, upgrading, repair, or removal of the System) to its condition immediately prior to such damage.

**1.4  Marketing Materials.** Operator will provide HOA with marketing materials, service-order materials, sales support, and sales training so that HOA can market the Services as provided in Section 4.4.

**2.  RATES AND SERVICES.**

HOA shall pay to Operator a monthly Bulk Multi-Channel Video Services fee as set forth on *Exhibit B*. HOA acknowledges that Operator (and its designated Affiliates (as defined in Section 11.1)) is the sole provider of the Bulk Multi-Channel Video Services under the terms of this Agreement, and that HOA is not a reseller or provider of the Services. Residents will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in conjunction with Additional Services. In no event will HOA be responsible for any fees or

charges incurred by Residents for Additional Services.

**3.  OWNERSHIP AND USE OF SYSTEM DURING TERM.**

During the Term, Operator will own and have the exclusive right to access, control, and operate the System, except for any equipment, facilities, conduit, or wiring owned by HOA or a third party (if any), in which case (as between HOA and Operator) HOA shall own such items, and HOA hereby grants to Operator the exclusive right to access, use, maintain, and upgrade such items during the Term. For purposes of clarity, Operator owns any wiring provided by Operator to HOA for installation by HOA or its contractors. HOA shall not, and HOA shall not permit any third party to, access, move, use, or interfere with any part of the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. HOA will provide the power necessary to operate any of Operator's equipment that is located on the Property.

**4.  HOA'S OBLIGATIONS.**

**4.1  Grant of Easement; Termination of Easement.** At the time of signing this Agreement, HOA will execute an Easement and Memorandum of Agreement in the form of *Exhibit C*, which may be recorded by either party at any time. Upon the expiration or proper earlier termination of this Agreement as permitted hereby, and upon HOA's request, Operator promptly will execute a reasonable Termination of Easement and Memorandum of Agreement that HOA may record to evidence the termination of this Agreement and the Easement and Memorandum of Agreement.

**4.2  Grant of Rights.** HOA acknowledges that Operator will spend substantial time, resources, and money in meeting its obligations under this Agreement, and that Operator is relying on HOA's covenants in this Agreement in order to recoup its investment by providing the Services to the Property and by collecting revenues therefor. Accordingly, HOA hereby grants to Operator (A) the exclusive right for the first five years of the Term, and the non-exclusive right thereafter, to design, construct, install, operate, maintain, upgrade, and remove a system at the Property for the provision of multi-channel video services; (B) the exclusive right during the Term to install, occupy, maintain, and remove the molding and other conduit housing the wiring of the System without alteration by HOA or third parties; (C) the exclusive right for the first

five years of the Term, and the non-exclusive right thereafter, to offer and provide multi-channel video services to Residents; (D) the exclusive right for the Term to market on site at the Property multi-channel video services to Residents; and (E) the non-exclusive right during the Term to market, offer, and provide Additional Services. During the Term, HOA shall not contract with any other provider to purchase services under a bulk-buy arrangement for multi-channel video services, high-speed data or Internet access service, telephone or telephony-related services. If Laws and Regulations in effect as of the Effective Date prohibit HOA from granting or Operator from obtaining exclusive rights under this Section 4.2, then such rights automatically shall be deemed non-exclusive to the extent and only for so long as required by such Laws and Regulations.

4.3    **System Inspection Requirement.** No less than one time per calendar quarter during the Term, HOA shall cause its on-site management to carefully and diligently inspect the pedestals, lockboxes, and other secured or accessible areas housing the components of the System to ensure the integrity thereof and to ensure that no other party has accessed or is using the System. HOA immediately shall notify Operator of (A) any damage to, forced access of, or unauthorized use of, the System (including any pedestal, lockbox, or other secured or accessible area housing the components of the System), and (B) any condition or occurrence that is likely to adversely affect the System or provision of Services.

4.4    **Marketing and Sales.**

(A)    HOA will (i) provide Residents and prospective Residents with Operator's current publications describing Operator's Services and (ii) display Operator's marketing and sales materials relating to Services in HOA's sales office or clubhouse for the Property.

(B)    HOA will allow Operator to periodically host an event on the Property, at Operator's expense, to introduce Services to Residents and prospective Residents. Operator may reasonably try to remarket Services to Residents who order less than all available Services.

5.    **TERM.**

The initial term of this Agreement commences on the Effective Date and shall continue in effect for 5 (five) years. The initial term automatically will be

extended for successive one-year periods unless either party notifies the other at least 90 days before the expiration of the initial term or any renewal term, as the case may be, that it does not wish to extend the Agreement. The initial term and any extensions thereof are collectively referred to as the "Term".

6.    **REPRESENTATIONS AND WARRANTIES.**

6.1    **HOA's Representations and Warranties.** HOA represents, warrants, and covenants to Operator that (A) HOA is the sole legal and equitable owner in fee simple of the areas of the Property where the System will be located; (B) no purchase contracts exist with respect to such areas of the Property (although the parties acknowledge that the individual units will be available for sale to purchasers); (C) the legal description attached to this Agreement is the complete, accurate and current legal description of the Property; (D) the Property is not part of a bankruptcy proceeding, foreclosure action, deed-in-lieu-of-foreclosure transaction, or similar proceeding; (E) HOA has the full power and authority to negotiate, execute, deliver, and perform this Agreement and the Easement and Memorandum of Agreement; (F) the party signing this Agreement and the Easement and Memorandum of Agreement is duly authorized to execute and deliver such documents on behalf of HOA; (G) HOA owns and/or has the right to grant to Operator hereunder the exclusive right to use all parts of the System not owned by Operator (including any third party wiring, molding or components), if any; and (H) there are no agreements, understandings, or intentions with or between HOA and any other party that conflict with this Agreement.

6.2    **Operator's Representations and Warranties.** Operator represents, warrants and covenants to HOA that (A) Operator has the full power and authority to negotiate, execute, deliver, and perform this Agreement; (B) the party signing this Agreement is duly authorized to execute and deliver the Agreement on behalf of Operator; (C) Operator currently has, and will maintain during the Term, all required licenses, permits, and approvals necessary to permit Operator to operate the System and provide the Services; and (D) there are no agreements, understandings, or intentions with or between Operator and any other party that conflict with this Agreement.

7. **DEFAULT AND REMEDIES.**

7.1 **Default.** In addition to the other breaches or defaults specified in this Agreement, a "default" exists under this Agreement upon any of the following events: (A) if HOA fails to meet or perform any payment obligation contained in this Agreement and does not cure such failure within five business days after receiving notice from Operator of such payment default; (B) if HOA or Operator fails to meet or perform any material term, provision, covenant, agreement, or obligation contained in this Agreement (excluding failures to pay subject to (A) above, but including, without limitation, an Assignment Default (as defined in Section 11.2)) and then does not cure such failure within 30 days (or, if applicable, such longer time period as is expressly permitted elsewhere hereunder) after receiving notice from the other party that reasonably details such breach; (C) if HOA or Operator becomes a debtor in a bankruptcy proceeding or similar action or proceeding that is not permanently dismissed within 60 days; or (D) if HOA or Operator becomes insolvent.

7.2 **Remedies.** Except as specifically provided otherwise in this Agreement, the parties shall be entitled to seek all remedies available at law or in equity with respect to a breach or default under this Agreement by the other (including injunctive relief and specific performance, in cases where it is provable that such breach or default is causing or would cause irreparable damage at law is available), and such rights and remedies shall be cumulative. If a party defaults and fails to cure such default as provided in this Agreement, then the nondefaulting party, in addition to all other available remedies, may terminate this Agreement by giving 30 days' notice to the defaulting party. If HOA defaults pursuant to Section 7.1(A), or if HOA fails to make timely payment to Operator more than two times in any 12-month period (notwithstanding any requirement of notice from Operator or opportunity to cure under Section 7.1(A)), then, in addition to any other remedies available to Operator, Operator may elect to terminate the Bulk Multi-Channel Video Services and in lieu thereof to provide its multi-channel video services on an individually billed basis directly to Residents for the remainder of the Term.

8. **LIMITATION OF WARRANTIES AND LIABILITY.**

**EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, OPERATOR MAKES NO REPRESENTATIONS OR WARRANTIES-- EXPRESS OR IMPLIED-- REGARDING THE SYSTEM OR THE SERVICES, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES.**

9. **INDEMNIFICATION.**

9.1 **From Operator.** Operator will defend, indemnify and hold harmless HOA and, as applicable, HOA's shareholders, members, partners, directors, managers, officers, employees, contractors, agents, representatives, and affiliates (collectively, "Related Parties") from and against all claims, liabilities, losses, costs, or damages, including reasonable attorney and other fees and costs relating to the investigation and defense of such matters (collectively, "Losses"), incurred by HOA or its Related Parties that result from (A) Operator's design, construction, installation, operation, or maintenance of the System, (B) Operator's provision of Services, or (C) Operator's breach of its representation and warranties in Section 6.2.

9.2 **From HOA.** HOA will indemnify and hold harmless Operator and, as applicable, Operator's Related Parties from and against all Losses incurred by Operator or its Related Parties that result from (A) damage to any part of the System caused by HOA or its Related Parties, (B) any claim arising out of HOA's operation of the Property, or (C) HOA's breach of its representations and warranties in Section 6.1, or its covenants in Section 4.3 or 11.2.

10. **OWNERSHIP AND REMOVAL OF SYSTEM AFTER TERM.**

10.1 **Ownership and Removal of System after Termination or Expiration.** Subject to Laws and Regulations, upon expiration or proper earlier termination of this Agreement as permitted hereby, Operator shall retain ownership of, and for 90 days after such expiration or termination be entitled at Operator's option, to remove, abandon,

disable, or sell, all of the respective components of the System, unless HOA or a third party owns any such System components, in which case (as between HOA and Operator) HOA shall retain ownership of such components and Operator shall not be entitled to remove or disturb such components not owned by Operator. Operator will pay its removal costs unless this Agreement was terminated as a result of HOA's uncured default, in which case HOA will bear Operator's reasonable removal costs.

10.2   **Mandatory Access Laws and Regulations.** Notwithstanding anything to the contrary in this Article 10 or the Agreement, if Laws and Regulations require HOA to provide Operator with access to the Property for the provision of any service, then Operator shall (A) continue to own and/or be permitted to access and use all System components (as provided in Article 3) to provide service to the Property, and (B) have the right to remove, abandon, disable, or sell the System components (as provided in Section 10.1) within 90 days after Operator no longer is permitted access to the Property by Laws and Regulations to provide such service.

11.   ASSIGNMENT.

Operator may assign this Agreement to (A) any parent, Affiliate (an "Affiliate" means an entity in which Operator, Time Warner Inc., Time Warner Cable Inc., or Time Warner Entertainment Company, L.P. has an ownership interest of 25% or more), successor (by operation of law or otherwise), or subsidiary that Operator may have or (B) any entity that purchases Operator's overall cable television system serving the Property. Upon the new operator's written assumption of all of Operator's obligations and duties under this Agreement, Operator will be relieved of any further liability or obligations to HOA attributable to periods from and after the effective date of such assumption.

12.   CONFIDENTIALITY.

Except as specifically provided in this Agreement, and except for disclosures required by Laws and Regulations, HOA and Operator will (A) keep this Agreement and its terms confidential, (B) keep confidential and not disclose to any other party any information that is provided by one party to the other and that is marked as confidential, (C) not disclose or use any such confidential information for any purpose other than performance of this Agreement, and (D) not make any public

announcement or press release about this Agreement without the other's prior approval. Notwithstanding the foregoing, each party shall be entitled to disclose the terms of this Agreement to its financial, legal, and other advisors and consultants, and to prospective lenders or purchasers of the Property, in each case on a need-to-know basis and provided that such recipients are obligated to maintain the confidentiality of the terms of this Agreement without further disclosure to any other party.

13.   PROPRIETARY NAMES.

Neither party will use any proprietary or trade name of the other except as specifically permitted in writing by the owner of the name.

14.   MISCELLANEOUS PROVISIONS.

14.1   **Notices.** All notices, requests, approvals, demands, consents, and other communications that are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by facsimile, courier, registered, or certified mail (postage prepaid), overnight delivery or in person to a party's address stated at the head of this Agreement. Such notice shall be effective, (A) if sent by facsimile, when confirmation of transmission is received, or (B) otherwise, upon actual receipt or rejection by the intended recipient. Either party may change its address by giving notice to the other party in accordance with this Section.

14.2   **Force Majeure.** Despite anything to the contrary in this Agreement, neither party will be liable or in breach of or default under this Agreement for any delay or failure of performance resulting directly from anything beyond the reasonable control of the non-performing party (a "Force Majeure Event"), including, but not limited to, acts of God; acts of civil or military authority; acts of a public enemy; war; terrorism; severe weather, earthquakes, or floods; fires or explosions; governmental action or regulation; strikes, lockouts, or other work interruptions or labor shortages; supplier shortages; transportation and delivery delays; or blocked access rights. Payment of monies due shall not be subject to Force Majeure Events. So long as the non-performing party diligently and continuously attempts to cure the non-performance caused by the Force Majeure Event (giving consideration to the effect of the Force Majeure Event on such party's overall business operations), the time for performance shall be extended commensurate with the duration of the Force Majeure Event.

**14.3 Compliance with Laws and Regulations; Choice of Law; Waiver of Right to Jury Trial.** The terms of this Agreement shall be subject to, and in the performance of their respective obligations under this Agreement the parties shall comply with, all applicable federal, state, and local laws and regulations (including the rules and regulations of governmental and regulatory authorities with jurisdiction over the parties), and, with respect to Operator only, the requirements of Operator's franchise agreement for the franchise area where the Property is located (collectively, "Laws and Regulations"). Nothing in this Agreement shall prohibit Operator from fully complying with all Laws and Regulations, including any consents, agreements, orders, or other requirements mandated by or entered into with the Federal Communications Commission or other governmental authority, and such compliance shall be deemed not to constitute a breach of or default under this Agreement. This Agreement is governed by and shall be interpreted under the laws of the state in which the Property is located, without regard to its choice-of-law provisions. **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY ENFORCEMENT ACTION OR CLAIM RELATING HERETO.**

**14.4 Severability and Unenforceable Provisions.** If any portion of this Agreement is rendered invalid or otherwise unenforceable under Laws and Regulations or by a governmental, legal or regulatory authority with jurisdiction over the parties, then the remainder of this Agreement will continue in full force unless such continuance will deprive one of the parties of a material benefit intended hereunder or frustrate the main purpose(s) of this Agreement. In such event, the party that has been deprived of such material benefit ("Affected Party") may notify the other, and the parties promptly thereafter shall use their reasonable best efforts to replace or modify the invalid or unenforceable provision with a provision that, to the extent not prohibited by Laws and Regulations, achieves the purposes intended under the invalid or unenforceable provision.

**14.5 Scope of Agreement; Modifications.** This Agreement constitutes the entire agreement between HOA and Operator with respect to, and supersedes all other agreements relating to, the subject matter contained herein. This Agreement can be modified or changed only by a written instrument signed by both parties. A party's waiver of enforcement of any of the terms or conditions of this Agreement will be effective only if in writing. The relationship between HOA and Operator is that of independent contractors, and not one of principal and agent, joint venture, or partnership.

**14.6 Enforcement Costs.** If either party sues or brings any other type of enforcement action in connection with this Agreement, then the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs in connection with such enforcement.

**14.7 Headings; Exhibits.** Headings are for reference only and do not affect the interpretation of this Agreement. All exhibits are fully incorporated into this Agreement by their reference herein.

**14.8 Survival.** The terms of Articles 8, 9, 10 and 12 and Sections 14.3 and 14.6 will survive the expiration or termination of this Agreement for any reason.

**14.9 Counterparts.** This Agreement may be executed in any number of counterparts, each of which is considered an original.

The parties have caused their duly authorized representatives to sign this Agreement effective as of the Effective Date:

**TIME WARNER CABLE**

Signature: _Ernie Villicana_

By: Ernie Villicana    11/30/05

Title: Vice President – Marketing & Programming

**SEA POINT COMMUNITY ASSOCIATION**

Signature: _Sheldon Krueger_

By: _Sheldon Krueger_

Title: _President_

Confidential & Proprietary
Residential Bulk Services Agreement

**EXHIBIT A**

**TO**

**RESIDENTIAL BULK SERVICES AGREEMENT**

**Legal Description of the Property**

(Attached.)

## ARTICLE I

DESCRIPTION OF LAND AND IMPROVEMENTS

Section 1.01  Project:

The real property subject to said covenants, conditions and restrictions is located in the County of San Diego, State of California, and is more particularly described in Exhibit "A" attached hereto.

The hereinabove described real property consists of approximately 19.039 acres abutting on Carmel Valley Road on the West.  There is being constructed upon said land 231 individual condominiums, each with a living unit, hereinafter designated as "unit", numbered 1 through 231, all as shown on a diagramatic map attached to and made part of the Certificate being recorded just prior hereto, and a common area consisting of the entire project, except therefrom said units 1 through 231, inclusive, to be owned as tenants in common by the owners of said units 1 through 231, inclusive, subject to the terms and conditions hereof.  Said 231 condominiums shall be offered for sale to the public and the grant deeds conveying said interest in said project to the individual purchasers of said condominiums shall expressly incorporate by reference and be made subject to this Declaration of Covenants, Conditions and Restrictions.

Section 1.02  Ownership:

Each of the units granted 1 through 231 shall consist of fee simple interests to the interior suface of the perimeter walls, floors, ceilings, windows and doors of the unit shown on the diagramatic map hereinabove referred to, and the air space so encompassed.  All other parts and portions of said project shall be owned by the owners of said units as tenants in common with the owner or owners of each unit receiving an undivided interest as follows:

| PLAN | UNITS | UNDIVIDED INTEREST PER UNIT |
|------|-------|------------------------------|

## Section 10.4   Supplementary Declarations:

The additions authorized under the foregoing Section shall
be made by filing of record a Supplementary Declaration of
Covenants, Conditions and Restrictions, or similar instru-
ment, with respect to the additional properties which shall
extend the scheme of this Declaration to such properties.
Such Supplementary Declarations contemplated above may
contain such complimentary additions and modifications of
the covenants and restrictions contained in this Declaration
as may be necessary to reflect the different character, if
any, of the added properties and as are not inconsistent
with the scheme of this Declaration.  In no event, however,
shall any such Supplementary Declarations, merge, consolidate,
revoke, modify or add to the covenants established by this
Declaration within the existing property, except as herein-
after otherwise provided.

Owners of units in the property annexed shall become members
of the Association on the same basis as owners of units in
the original PROJECT set out in Exhibit "A".

All assessments for maintenance and other purposes shall
be divided among all of the units including those annexed
at a later date on a percentage basis for each unit, the
percentage to be the square footage of each individual unit
divided by the square footage in all of the units in the
PROJECT including annexed areas.

Upon any such annexation becoming effective, the annexed
property shall become and constitute a part of the PROJECT,
and shall be subject to the PROJECT RESTRICTIONS; and the
ASSOCIATION shall have and shall accept and exercise juris-
diction over such property.

## Section 1.05   Easement for recreation:

When units in property described in Exhibit "A" are conveyed
to owners, there will be reserved an easement for the use
of the common recreational facilities located on the property
described in Exhibit "A" which shall be appurtenant to and
for the benefit of the land set out in Exhibit "E".  This
easement may not be exercised until such time as the property
in Exhibit "E" is annexed to the PROJECT.

**EXHIBIT B**

**TO**

**RESIDENTIAL BULK SERVICES AGREEMENT**


**<u>Description of Bulk Multi-Channel Video Services and Fee</u>**


**<u>BULK MULTI-CHANNEL VIDEO SERVICES</u>**

A channel line-up for the Bulk Multi-Channel Video Services is attached. Subject to Laws and Regulations, Operator shall be entitled to add to, delete from, move channel positions, and otherwise modify the Bulk Multi-Channel Video Services in its sole discretion from time to time, but the level of Bulk Multi-Channel Video Services shall at all times remain reasonably comparable to the level of Bulk Multi-Channel Video Services offered by Operator in the Franchise area.

**<u>BULK MULTI-CHANNEL VIDEO SERVICES FEE</u>**

The Bulk Multi-Channel Video Services fee shall be **$28.77** per home/unit (plus any applicable taxes and franchise fees) per month, regardless of whether such homes/units are occupied. The Bulk Multi-Channel Video Services fee does not include Operator's fees (if applicable) to provide necessary consumer-grade equipment to Residents to receive the Bulk Multi-Channel Video Services, which fees (if applicable) shall be billed for and paid by HOA. Consumer-grade equipment provided to Residents for Additional Services shall be billed to and paid by the individual Resident subscribers. Upon at least 30 days' prior written notice to HOA, Operator shall be entitled to raise the Bulk Multi-Channel Video Services fee, provided that such increases shall not exceed 5% during any calendar year.

During the Term, Operator will bill HOA for the Bulk Multi-Channel Video Services fee on a monthly basis and payment by HOA shall be due within 30 days after the date of such invoice. Operator may bill HOA in advance for the Bulk Multi-Channel Video Services fee, provided that HOA shall not be required to pay any invoice more than 30 days prior to the month to which such invoice applies. If Operator fails to present an invoice prior to the first day of the month for which Bulk Multi-Channel Video Services are being provided, such failure shall not constitute a waiver of the Bulk Multi-Channel Video Services fee, and HOA promptly shall pay such invoice when delivered by Operator.

Any payments not received by Operator within 30 days after the date of invoice automatically shall incur a late payment fee of 1.5% per month (pro-rated on a daily basis), or the maximum monthly amount permitted by Laws and Regulations, whichever is less. The late payment fee shall apply from the due date of such payment until the date such amount is paid in full.



**Expanded Cable Television Service (Advantage Service)**

| | |
|---|---|
| 1 On-Demand | 40 Bravo |
| 2 TBS | 41 Outdoor Life Network |
| 3 WGN | 42 VH1 |
| 4 Cable 4 Padres | 43 American Movie Classics |
| 5 KSWB (69) San Diego (WB) | 44 Discovery Channel |
| 6 XETV (6) San Diego (FOX) | 45 A&E |
| 7 KNSD (39) San Diego (NBC) | 46 International Channel |
| 8 KFMB (8) San Diego (CBS) | TV Guide Channel |
| 9 KUSI (51) San Diego (IND) | 48 EI |
| 10 KGTV (10) San Diego (ABC) | 49 CNBC |
| 11 KPBS (15) San Diego (PBS) | 50 MSNBC |
| 12 San Diego Network | 51 Food Network |
| 13 XUPN (13) San Diego (UPN) | 52 FX Channel |
| 14 KTLA (5) Los Angeles (WB) | 53 Home & Garden TV |
| 15 San Diego News Channel 15 | 54 WE: Women's Entertainment |
| 16 ITVS San Diego's Learning Channel | 55 The Learning Channel |
| 17 KBNT (Univision) | 56 The History Channel |
| 18 UCSD-TV | 57 Sci-Fi Channel |
| 19 CPC Community Programming | 58 MOVIEPlex |
| 20 C-SPAN | 59 Turner Classic Movies |
| 22 County | 60 Hallmark |
| 23 C-SPAN 2 | 61 Lifetime Movie Network |
| 24 Cityscape/NASA | 62 Cartoon Network |
| 25 QVC | 63 The Disney Channel |
| 26 CNN | 64 Animal Planet |
| 27 TNT | 65 TV Land |
| 28 CNN Headline News | 66 Telemundo (XHAS Ch.33) |
| 29 ESPN | 67 Golf Channel |
| 30 ESPN 2 | 68 Comedy Central |
| 31 FOX Sports Net West | 69 National Geographic |
| 32 Lifetime | 70 The Travel Channel |
| 33 Nickelodeon | 71 Leased Access |
| 34 USA Network | 72 Home Shopping Network |
| 35 ABC Family | 73 PAX |
| 36 MTV | 74 Country Music Television |
| 37 Fox News Channel | 75 BET |
| 38 Spike TV | 76 The Weather Channel |
| 39 Court TV | |

**EXHIBIT C**
**TO**
**RESIDENTIAL BULK SERVICES AGREEMENT**


**<u>Form of Easement and Memorandum of Agreement</u>**


Attached.

# EASEMENT AND
# MEMORANDUM OF AGREEMENT

**DOCUMENT PREPARED BY:**

Janette Larson

**AFTER RECORDING, RETURN TO:**

Time Warner Cable
8949 Ware Court
San Diego, CA 92121

1.    **Grant of Easement**

In consideration of the covenants and agreements in the Agreement (as defined below), for $10, and for other good and valuable consideration, the receipt and sufficiency of which **SEA POINT COMMUNITY ASSOCIATION** ("Grantor") grants to **TIME WARNER CABLE** ("Grantee"), its successors and assigns, a non-exclusive easement on Grantor's property and all its improvements (as described in the attached *Exhibit A* hereto) (the "Property"). This Easement is for the purposes of permitting Grantee and its affiliates and contractors to design, construct, install, operate, market, maintain, upgrade, repair, replace, and remove a system (including internal and external wiring, poles, conduits, molding, pipes, antennas, servers, switch equipment, software, central processing units, and other facilities and equipment ("System")) for the offering and delivery of multi-channel video, television, entertainment, Internet, and other services that may be delivered over the System to the Property and any other properties that can be served by such System, as more fully provided in the Residential Bulk Services Agreement between Grantor and Grantee with respect to the Property (the "Agreement"). During the term of the Agreement and this Easement, Grantee shall have the exclusive right to access, control, and operate, the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. Ownership and removal of the System after the expiration of the Agreement and this Easement shall be pursuant to the Agreement. Grantor will also provide reasonable space for Grantee's equipment. Grantor reserves the right to grant other easements on the Property, but will not allow such other easements to cause unreasonable interference with the easement granted to Grantee herein.

Grantee will have and hold the easement, together with every right and appurtenance connected to it, for an initial term of ten years from the Activation Date (as defined in the Agreement) and for so long thereafter as Grantee is providing services to the Property under the Agreement. Upon the natural expiration of the Agreement or proper earlier termination of the Agreement by Grantor for Grantee's uncured breach under the Agreement, this Easement automatically will terminate after an additional 90-day continuation period solely for the purpose of allowing Grantee to remove its System. Grantor, its successors and assigns hereby agree to warrant and forever defend the easement to Grantee--as well as its successors and assigns--against every person who claims any part of it.

This easement and other rights granted to Grantee run with the title to the Property and are binding on Grantor and on all subsequent owners of the Property, as well as on others who may claim an interest in the Property.

2.     **Memorandum of Agreement**

In addition to the rights granted above, the Agreement grants to Grantee certain exclusive rights to market, offer, and provide multi-channel video services and the non-exclusive right to market, offer, and provide additional services to residents of the Property.

DATED EFFECTIVE AS OF: _10/8/2005_

SEA POINT COMMUNITY ASSOCIATION

By: _Sheldon Krieger_

Title: _President_

See Attached CALIFORNIA
ALL-Purpose Acknowledgment
WITNESSED BY:

By:_____

Printed Name:_____

State of _____)
                         ) ss:
County of _____)

This instrument was acknowledged before me by _____ as the __
_____ of _____
_____ on _____
_____, 20___.

Witness my hand and official seal.

_____
                    [SEAL]
Notary Public

My commission expires:_____

State of _____)
                         ) ss:
County of _____)

This instrument was acknowledged before me by _____
_____ as a witness to the execution of this instrument by the above-named Grantor representative on ___
_____, 20___.

Witness my hand and official seal.

_____
                    [SEAL]
Notary Public

My commission expires:_____

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _San Diego_ }ss.

On _October 14, 2005_ before me, _Linda J. Luke_
Date                                    Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Sheldon Krueger_
Name(s) of Signer(s)

☐ personally known to me
☑ proved to me on the basis of satisfactory evidence

LINDA J. LUKE
Commission # 1486500
Notary Public - California
San Diego County
My Comm. Expires May 25, 2008

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Linda J. Luke_
Signature of Notary Public

──────── OPTIONAL ────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _Time Warner Cable System Installation_

Document Date: _10/01/05   Ex "A" + "B" + "C"_   Number of Pages: _____

Signer(s) Other Than Named Above: _Time Warner Cable_

## Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association · 9350 De Soto Ave., P.O. Box 2402 · Chatsworth, CA 91313-2402 · www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

# TIME WARNER CABLE RESIDENTIAL SERVICES SUBSCRIBER AGREEMENT

## IMPORTANT INFORMATION ABOUT YOUR TIME WARNER CABLE SERVICES

The account holder(s) referred to on the accompanying Time Warner Cable Work Order or statement ("I," "me" or "my") agrees that the Work Order (if provided to me on or after January 1, 2006), this Agreement, the Terms of Use referred to below, and any applicable Tariff(s) on file with the state utility commission or comparable state agency in the jurisdiction in which I live, set forth the terms and conditions that govern my receipt of Services from Time Warner Cable, which may include, among others, video, high-speed data and voice Services. The term "Services" and all other capitalized terms used in this Agreement are defined in Section 15.

In consideration of TWC's provision of the Services that I have requested, subject to applicable law, I AGREE AS FOLLOWS:

### 1. Important Information About This Agreement

(a) This Agreement, the Work Order, the Terms of Use and any effective and applicable Tariff(s), each of which TWC may amend as set forth below, constitute the entire agreement between TWC and me. This Agreement supersedes all previous written or oral agreements between TWC and me. I am not entitled to rely on any oral or written statements by TWC's representatives relating to the subjects covered by these documents, whether made prior to the date of my Work Order or thereafter, and TWC will have no liability to me except in respect of its obligations as described in this Agreement and the other documents referred to above. The use of my Services by any person other than me is also subject to the terms of this Agreement, the Terms of Use, and any applicable Tariff(s).

(b) TWC has the right to add to, modify, or delete any term of this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s) at any time. An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my local TWC office.

(c) TWC will notify me of any significant change(s) in this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s). Any such changes shall become effective immediately except where applicable law requires a notice period, in which case the change will become effective at the end of the requisite notice period. Upon effectiveness of any change to any of these documents, my continued use of the Services will constitute my consent to such change and my agreement to be bound by the terms of the document as so changed. If I do not agree to any such change, I will immediately stop using the Services and notify TWC that I am terminating my Services account.

(d) My acceptance of Services constitutes my acceptance of the terms and conditions contained in this Agreement. In the event that a portion of my Services is terminated, or any aspect of it is changed, any remaining service or replacement service will continue to be governed by this Agreement.

## 2. Payment; Charges

(a) I agree to pay TWC for (i) all use of my Services (including, if TWC is the party billing me for ISP or OLP Service, for my subscription to my choice of ISP or OLP, as applicable), (ii) installation and applicable service charges, (iii) TWC Equipment, and (iv) all applicable local, state and federal fees and taxes. Charges for the Services are set forth on a separate price list that I have received. I will be billed monthly in advance for recurring monthly charges. Other charges will be billed in the next practicable monthly billing cycle following use, or as otherwise specified in the price list. TWC may change both the fees and the types of charges (e.g., periodic, time-based, use-based) for my Services. If I participate in a promotional offer that requires a minimum time commitment and I terminate early, I agree that I am responsible for early termination fees associated with such promotion.

(b) Charges for installation Services and related equipment available from TWC for a standard Services installation are as described in TWC's list of charges and any applicable Tariff(s). Non-standard installations, if available, may result in additional charges as described in TWC's list of charges. In addition, I agree to pay charges for repair service calls resulting from my misuse of TWC Equipment or for failures in equipment not supplied by TWC.

(c) If my Services account is past due and TWC sends a collector to my premises, a field collection fee may be charged. The current field collection fee is on the price list or can be provided on request. I will also be responsible for all other expenses (including reasonable attorneys' fees and costs) incurred by TWC in collecting any amounts due under this Agreement and not paid by me.

(d) All charges are payable on the due date specified, or as otherwise indicated, on my bill. I agree that late charges may be assessed, subject to applicable law, on amounts that are past due. My failure to deliver payment by the due date is a breach of this Agreement. The current late fees are on the price list or can be provided upon request and, if applicable, will not exceed the maximum late fees as set forth by applicable law. TWC reserves the right to change the late fees.

(e) I agree that if my Services account with TWC is past due, TWC may terminate any of my Services or accounts, including Digital Phone Service, in accordance with applicable law. If I have a credit due to me or a deposit is being held on any account with TWC, I agree that the credit or deposit may be used to offset amounts past due on any other account I may have with TWC without notice to me. To reconnect any terminated Services, I may be required, in addition to payment of all outstanding balances on all accounts with TWC, to pay reconnect charges or trip charges (where applicable) and/or security deposits before reconnection.

(f) TWC may verify my credit standing with credit reporting agencies and require a deposit based on my credit standing or other applicable criteria. TWC may require a security deposit, or a bank or credit card or account debit authorization from me as a condition of providing or continuing to provide Services. If TWC requires a security deposit, the obligations of TWC regarding such security deposit will be governed by the terms of the deposit receipt provided by TWC to me at the time the deposit is collected. I agree that TWC may deduct amounts from my security deposit, bill any bank or credit card submitted by me, or utilize any other means of payment available to TWC, for any past due amounts payable by me to TWC, including in respect of damaged or unreturned Equipment.

Case 3:08-cv-03052-J... Document... Filed 03/27/2008    Page 73

(g) If I have elected to be billed by credit card, debit card or ACH transfer, I agree that I will automatically be billed each month for any amounts due under this Agreement. If I make payment by check, I authorize TWC and its agents to collect this item electronically.

(h) TWC may charge fees for all returned checks and account debit, bank card or charge card chargebacks. The current return/chargeback fees are listed in the list of charges on the price list or can be provided on request. TWC reserves the right to change return/chargeback fees.

(i) If I subscribe to HSD Service, I acknowledge that, even if TWC is billing for the HSD Service, my ISP or OLP may require a bank or credit card or account debit authorization or other assurance of payment from me, including for charges for additional or continuing Services outside the HSD Service billed by TWC that are payable under the ISP Terms. I agree that TWC or ISP (and, if applicable, OLP) may bill any bank or credit card submitted by me to ISP or OLP, or utilize any other means of payment available to ISP or OLP for any past due amounts payable by me to TWC. I also agree that responsibility for billing for my HSD Service subscription may be changed between TWC and ISP or OLP upon notice to me.

(j) All use of my Services, whether or not authorized by me, will be deemed my use and I will be responsible in all respects for all such use, including for payment of all charges attributable to my account (e.g., for VOD movies, merchandise ordered via Internet, international long distance charges, etc.). TWC is entitled to assume that any communications made through my Services or from the location at which I receive the Services are my communications or have been authorized by me. My Services may contain or make available information, content, merchandise, products and Services provided by third parties and for which there may be charges payable to third parties (which may include my choice of ISP or OLP and/or entities affiliated with TWC). I agree that all such charges incurred by me or attributed to my account will be my sole and exclusive responsibility and agree to pay the same when due, and shall indemnify and hold harmless the TWC Parties for all liability for such charges. I agree that TWC is not responsible or liable for the quality of any content, merchandise, products or Services (or the price thereof) made available to me via the Services, for the representations or warranties made by the seller or manufacturer of any such item, or for damage to or injury, if any, resulting from the use of such item.

(k) I acknowledge that currently, and from time to time, there is uncertainty about the regulatory classification of some of the Services TWC provides and, consequently, uncertainty about what fees, taxes and surcharges are due from TWC and/or its customers. Accordingly, I agree that TWC has the right to determine, in its sole discretion, what fees, taxes and surcharges are due and to collect and remit them to the relevant governmental authorities, and/or to pay and pass them through to me. I further agree to waive any claims I may have regarding TWC's collection or remittance of such fees, taxes and surcharges. I further understand that I may obtain a list of the fees, taxes and surcharges that my local TWC office currently collects or passes through by writing to TWC at the following address and requesting same: Time Warner Cable, 7800 Crescent Executive Drive, Charlotte, North Carolina, 28217; Attention: Subscriber Tax Inquiries.

(l) I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived.

**3. Installation; Equipment and Cabling**

(a) If I am not the owner of the house, apartment or other premises upon which TWC Equipment and Software are to be installed, I warrant that I have obtained the consent of the owner of the premises for TWC personnel and/or its agents to enter the premises for the purposes described in Section 3(d). I agree to indemnify and hold the TWC Parties harmless from and against any claims of the owner of the premises arising out of the performance of this Agreement (including costs and reasonable attorneys' fees).

(b) I authorize TWC to make any preparations to the premises necessary for the installation, maintenance, or removal of equipment. TWC shall not be liable for any effects of normal Services installation and workmanship, such as holes in walls, etc., which may remain after installation or removal of the TWC Equipment, except for damage caused by negligence on the part of TWC.

(c) The TWC Equipment is and at all times shall remain the sole and exclusive personal property of TWC, and I agree that I do not become an owner of any TWC Equipment by virtue of the payments provided for in this Agreement or the Tariff(s) or the attachment of any portion of the TWC Equipment to my residence or otherwise. Upon termination of any Services, subject to any applicable laws or regulations, TWC may, but shall not be obligated to, retrieve any associated TWC Equipment not returned by me as required under Section 3(f) below. TWC will not be deemed to have "abandoned" the TWC Equipment if it does not retrieve such equipment.

(d) I agree to provide TWC and its authorized agents access to my premises during regular business hours upon reasonable notice during the term of this Agreement and after its termination to install, connect, inspect, maintain, repair, replace, alter or disconnect or remove the TWC Equipment, to install Software, to conduct service theft audits, or to check for signal leakage. I agree that TWC may have reasonable access to easements and TWC Equipment located on my grounds.

(e) TWC shall have the right to upgrade, modify and enhance TWC Equipment and Software from time to time through "downloads" from TWC's network or otherwise. Without limiting the foregoing, TWC may, at any time, employ such means to limit or increase the throughput available through individual cable modems whether or not provided by TWC.

(f) If the Services are terminated, I agree that I have no right to possess or use the TWC Equipment related to the terminated Services. As required under Section 10(b), I agree that I must arrange for the return of TWC Equipment to TWC, in the same condition as when received (excepting ordinary wear and tear), upon termination of the Services. If I do not promptly return the TWC Equipment or schedule with TWC for its disconnection and removal, TWC may enter any premises where the TWC Equipment may be located for the purpose of disconnecting and retrieving the TWC Equipment. I will pay any expense incurred by TWC in any retrieval of the unreturned TWC Equipment. TWC may charge me a continuing monthly fee until any outstanding TWC Equipment is returned, collected by TWC or fully paid for by me in accordance with Section 3(g). The current fee is listed in the list of charges on the price list or can be provided on request.

(g) I agree to pay TWC liquidated damages in the amount demanded by TWC, but not to exceed that specified in the then-current price list, for the replacement cost of the TWC Equipment without any deduction for depreciation, wear and tear or physical condition of such TWC Equipment if (i) I tamper with, or permit others to tamper with, TWC Equipment, (ii) the TWC Equipment is destroyed, lost, or stolen, whether or not due to circumstances

beyond my reasonable control, and even if I exercised due care to prevent such destruction, loss, or theft, or (iii) the TWC Equipment is damaged (excluding equipment malfunction through no fault of my own) while in my possession, whether or not due to circumstances beyond my reasonable control, and even if I exercised due care to prevent such damage. I agree that these liquidated damages are reasonable in light of the problem of theft of cable Services; the existence of a "black market" in TWC Equipment; the ability of third parties to steal Services with unlawfully obtained TWC Equipment, causing loss of revenues for installation and service fees; and the difficulty in determining the actual damages that arise from the unauthorized tampering with, loss, destruction, or theft of TWC Equipment. I agree to return any damaged TWC Equipment to TWC.

(h) I agree that TWC may place equipment and cables on my premises to facilitate the provision of Services to me and to other locations in my area. The license granted under this Section 3(h) will survive the termination of this Agreement until the date that is one year from the date on which I first notify TWC in writing that I am revoking such license.

## 4. Use of Services; TWC Equipment and Software

(a) I agree that TWC has the right to add to, modify, or delete any aspect, feature or requirement of the Services (including content, price, equipment and system requirements). I further agree that my ISP (and, if applicable, OLP) has the right to add to, modify, or delete any aspect, feature or requirement of the HSD Service (including content, price and system requirements). If TWC changes its equipment requirements with respect to any Services, I acknowledge that I may not be able to receive such Services utilizing my then-current equipment. Upon any such change, my continued use of Services will constitute my consent to such change and my agreement to continue to receive the relevant Services, as so changed, pursuant to this Agreement, the Terms of Use and the Tariff(s). If I participate in a promotional offer for any Service(s) that covers a specified period of time, I agree that I am assured only that I will be charged the promotional price for such Service(s) during the time specified. I agree that TWC shall have the right to add to, modify, or delete any aspect, feature or requirement of the relevant Service (s), other than the price I am charged, during such promotional period.

(b) I agree that the Services I have requested are residential Services, offered for reasonable personal, non-commercial use only. I will not resell or redistribute (whether for a fee or otherwise) the Services, or any portion thereof, or charge others to use the Services, or any portion thereof. Among other things:

(i) If I receive Video Service, I agree not to use the Services for the redistribution or retransmission of programming or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of the Services to transmit or distribute the Video Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose. I acknowledge that programs and other materials that I receive as part of the Video Service remain part of the Video Service even if I record or capture all or a portion of any such program or material in a data file or on a hard drive, DVR or similar device.

(ii) If I receive Digital Phone Service, I agree not to use the Services for telemarketing, call center, medical transcription or facsimile broadcasting Services or for any enterprise purpose whether or not the enterprise is

directed toward making a profit. I agree that, among other things, my use of the Services to make available my Digital Phone Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose.

(iii) If I receive HSD Service, I agree not to use the HSD Service for operation as an Internet service provider, for the hosting of websites (other than as expressly permitted as part of the HSD Service) or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of any form of transmitter or wide area network that enables persons or entities outside the location identified in the Work Order to use my Services, whether or not a fee is sought, will constitute an enterprise purpose. Furthermore, if I use a wireless network within my residence, I will limit wireless access to the HSD Service (by establishing and using a secure password or similar means) to the members of my household.

(c) Theft or willful damage, alteration, or destruction of TWC Equipment, or unauthorized reception, theft or diversion of Services, or assisting such theft, diversion, or unauthorized reception is a breach of this Agreement and potentially punishable under law (including by way of statutory damages, fine and/or imprisonment). Nothing in this Agreement, including, Section 3(g) above, shall prevent TWC from enforcing any rights it has with respect to theft or unauthorized tampering of Services or TWC Equipment under applicable law.

(d) I will not, nor will I allow others to, open, alter, misuse, tamper with or remove the TWC Equipment as and where installed by TWC or use it contrary to this Agreement, the Terms of Use, or the Tariff(s). I will not, nor will I allow others to, remove any markings or labels from the TWC Equipment indicating TWC ownership or serial or identity numbers. I will safeguard the TWC Equipment from loss or damage of any kind, including accidents, breakage or house fire, and will not permit anyone other than an authorized representative of TWC to perform any work on the TWC Equipment.

(e) I agree that to the extent any Software is licensed (or sublicensed) to me by TWC, such Software is provided for the limited purpose of facilitating my use of the Services as described in this Agreement. I will not engage in, or permit, any additional copying, or any translation, reverse engineering or reverse compiling, disassembly or modification of or preparation of any derivative works based on the Software, all of which are prohibited. I will return or destroy all Software provided by TWC and any related written materials promptly upon termination of the associated Services to me for any reason. Software licensed to me by my ISP or OLP, for instance my ISP's or OLP's client or browser software, is licensed under the ISP Terms or OLP Terms, as applicable, and is not the responsibility of TWC.

(f) I agree that I will use the Services for lawful purposes only, and in accordance with this Agreement, the Terms of Use and the Tariff(s).

(g) I agree to be responsible for protecting the confidentiality of my screen names, passwords, personal identification numbers (PINs), parental control passwords or codes, and any other security measures made available, recommended or required by Time Warner Cable. I also acknowledge that TWC's Services may from time to time include interactive features, the use of which may result in the transmission to, and use by, TWC or certain third parties of information that may constitute personally identifiable information (as such term is used in the Federal Communications Act of 1934) about me

and for which TWC may be required, under the Federal Communications Act of 1934, to obtain my consent. I agree that TWC may seek such consents (or indications of my election to "opt in" to certain TWC programs) electronically, including through the use of a "click through" screen, and that TWC is entitled to assume that any such consent or opt-in election communicated through my Services or from the location at which I receive the Services is my consent or opt-in election or has been authorized by me.

(h) I agree that TWC has no liability for the completeness, accuracy or truth of the programs or information it transmits.

## 5. Special Provisions Regarding Digital Phone Service

(a) I acknowledge that the voice-enabled cable modem used to provide the Digital Phone Service is electrically powered and that the Digital Phone Service, including the ability to access 911 Services and home security and medical monitoring Services, may not operate in the event of an electrical power outage or if my broadband cable connection is disrupted or not operating. I acknowledge that, in the event of a power outage in my home, any battery included in my voice-enabled cable modem may enable back-up service for a limited period of time or not at all, depending on the circumstances, and that inclusion of the battery does not ensure that Digital Phone Service will be available in all circumstances. I also acknowledge that, in the event of a loss of power that disrupts my local TWC cable system, the battery in my voice-enabled cable modem will not provide back-up service and the Digital Phone Service will not be available.

(b) I agree that TWC will not be responsible for any losses or damages arising as a result of the unavailability of the Digital Phone Service, including the inability to reach 911 or other emergency Services, or the inability to contact my home security system or remote medical monitoring service provider. I acknowledge that TWC does not guarantee that the Digital Phone Service will operate with my home security and/or medical monitoring systems, and that I must contact my home security or medical monitoring provider in order to test my system's operation with the Digital Phone Service. I agree that I am responsible for the cost of any such testing or any fees for configuring my home security or medical monitoring system to work with the Digital Phone Service.

(c) The location and address associated with my Digital Phone Service will be the address identified on the Work Order. I acknowledge that, under Section 4 (d) of this Agreement, I am not permitted to move TWC Equipment from the location and address in which it has been installed. Furthermore, if I move my voice-enabled cable modem to an address different than that identified on the Work Order, calls from such modem to 911 will appear to 911 emergency service operators to be coming from the address identified on the Work Order and not the new address.

(d) I acknowledge that the existing telephone wiring inside my home may not support both Digital Phone Service and digital subscriber line (DSL) service. Therefore, if I intend to use Digital Phone Service on all of my phone jacks, I may be required to maintain separate wiring, not provided by TWC, within my home specifically for DSL service or to disconnect my DSL service prior to receiving the Digital Phone Service over my existing in-home wiring.

(e) I agree to provide TWC and its authorized agents with access to my telephone inside wiring at the Network Interface Device or at some other minimum point of entry in order to provide the Digital Phone Service over my

existing in-home wiring.

(f) I acknowledge that the Digital Phone Service may not be compatible with certain data transmission Services, including but not limited to fax transmissions and dial-up Internet access and that I may be required to maintain a separate telephone line, not provided by TWC, in order to access such Services.

## 6. Special Provisions Regarding HSD Service

(a) Speeds and Network Management. I acknowledge that each tier or level of the HSD Service has limits on the maximum speed at which I may send and receive data at any time, as set forth in the price list or Terms of Use. I understand that the actual speeds I may experience at any time will vary based on a number of factors, including the capabilities of my equipment, Internet congestion, the technical properties of the websites, content and applications that I access, and network management tools and techniques employed by TWC. I agree that TWC or ISP may change the speed of any tier by amending the price list or Terms of Use. My continued use of the HSD Service following such a change will constitute my acceptance of any new speed. I also agree that TWC may use technical means, including but not limited to suspending or reducing the speed of my HSD Service, to ensure compliance with its Terms of Use and to ensure that its service operates efficiently. I further agree that TWC and ISP have the right to monitor my usage patterns to facilitate the provision of the HSD Service and to ensure my compliance with the Terms of Use and to efficiently manage its network and the provision of services. TWC or ISP may take such steps as it determines appropriate in the event my usage of the HSD Service does not comply with the Terms of Use. Additionally, TWC may use such tools and techniques as it determines appropriate in order to efficiently manage its network and to ensure a quality user experience for its subscribers ("Network Management Tools"). These Network Management Tools are described in the Terms of Use, which include the Acceptable Use Policy, http://help.twcable.com/html/twc_misp_aup.html.

(b) Republication.

(i) I acknowledge that material posted or transmitted through the HSD Service may be copied, republished or distributed by third parties, and that the TWC Parties will not be responsible for any harm resulting from such actions.

(ii) I grant to TWC, and I represent, warrant and covenant that I have all necessary rights to so grant, the non-exclusive, worldwide, royalty-free, perpetual, irrevocable, right and license to use, reproduce, modify, adapt, publish, translate, distribute, perform and display in any media all

material posted on the public areas of the HSD Service via my account and/or to incorporate the same in other works, but only for purposes consistent with operation and promotion of the HSD Service.

(iii) I agree that unsolicited email, or "spam," is a nuisance and that TWC and my ISP (and, if applicable, my OLP) are entitled to establish limits on the volume of email that I send. Such volume limits may be set by reference to a number of emails per day, week, month or year.

(c) Continuity of Service. In order to provide continuity of service to me, if my choice of ISP is no longer available over my local TWC cable system, I agree that TWC may provide me with an alternative ISP. In such event, TWC will

notify me of the date as of which I will begin receiving service from the alternative ISP, the provision of which shall also be governed by this Agreement, and TWC will provide to me a price list for such alternative ISP service. I will have the right at any time to terminate the alternative ISP or to change my subscription to any other ISP then offered by TWC.

(d) Unfiltered Internet Access. I acknowledge that the ISP Service provides a connection to the Internet that may be unfiltered, and that the TWC Parties neither control nor assume responsibility for any content on the Internet or content that is posted by a subscriber. Although TWC or my ISP or OLP may make available certain parental control features, I acknowledge that such parental control features may not be entirely effective or foolproof and that, notwithstanding such features, I or members of my household may be exposed to unfiltered content.

(e) Use of ISP and OLP Service. I agree that TWC and/or my ISP and/or OLP has the right, but not the obligation, to edit, refuse to post or transmit, request removal of, or remove or block any material transmitted through, submitted to or posted on the HSD Service, if it determines in its discretion that the material is unacceptable or violates the terms of this Agreement, any TWC consumption limits or any other Terms of Use. Such material might include personal home

pages and links to other sites. In addition, I agree that, under such circumstances, TWC may suspend my account, take other action to prevent me from utilizing certain account privileges (e.g., home pages) or cancel my account without prior notification. I also agree that TWC and/or my ISP and/or OLP may suspend or cancel my account for using all or part of the HSD Service to post content to the Internet or to engage in "peer to peer" file exchanges or other forms of file exchanges that violate this Agreement or the Terms of Use.

(f) Responsibility for HSD Service. Each of TWC and my ISP (and, if applicable, my OLP) has responsibilities for the HSD Service. I acknowledge that each of my ISP and OLP may have one or more separate agreements, policies or other terms covering my rights and obligations with regard to the HSD Service ("ISP Terms" or "OLP Terms," as applicable) that are also binding on me. This Agreement does not cover any ISP or OLP features or Services that are not dependent upon distribution over TWC's cable systems (for example, dial up access or my use of ISP or OLP software that enables access to ISP or OLP features or Services through non-TWC access means) or that may otherwise be provided to me by ISP or OLP separately from the HSD Service under the ISP Terms or OLP Terms, as applicable. In the event of termination of the HSD Service, I must also contact my ISP (and, if applicable, my OLP) to ensure that these other features or Services (such as dial-up access) are properly continued or discontinued.

(g) Computer Requirements. I agree that each Computer will need to meet certain minimum hardware and software requirements that will be specified for the HSD Service, and that such requirements may be changed from time to time by TWC or my ISP or OLP.

## 7. Support; Service and Repairs

(a) My Services include the right to request reasonable service and maintenance calls to check and correct problems with the Services. TWC will, at its own expense, repair damage to or, at TWC's option, replace TWC Equipment, and otherwise attempt to correct interruptions of the Services, due

to reasonable TWC Equipment wear and tear, or technical malfunction of the system or network operated by TWC. The Subscriber Materials contain details on contacting

TWC for this support.

(b) Unless I have obtained a TWC service protection plan (if available in my area), I agree that I am responsible for all wiring, equipment and related software installed in my residence that is not TWC Equipment or TWC-licensed Software and TWC will have no obligation to install, connect, support, maintain, repair or replace any Computer, television, telephone or telephone answering device, audiovisual recording or playback device (e.g., VCR, DVR, DVD), audio equipment, any software, or any cable modem, cabling or other equipment (other than TWC Equipment or TWC-licensed Software). TWC will not support, repair, replace, or maintain any Network Interface Card, regardless of whether provided and installed by TWC.

(c) I agree that TWC has no responsibility for the operation of any equipment, software or service other than the Services, the TWC Equipment and the TWC-licensed Software. For instance, I acknowledge that certain commercially available televisions, converter boxes and recording devices, which may be identified by their manufacturers as "cable ready" or "digital cable ready," may not be able to receive or utilize all available Services without the addition of a TWC converter box or other TWC Equipment for which a fee may be charged. If I receive HSD Service, TWC has no responsibility to support, maintain or repair any equipment, software or service that I elect to use in connection with the HSD Service, whether provided by my ISP, my OLP or a third party. For assistance with technical problems arising from such equipment, software or Services, I should refer to the Subscriber Materials for information regarding the technical support provided by my ISP or OLP or to the support area of the ISP or OLP or to the relevant third party's material.

(d) If TWC determines that non-TWC cabling or equipment connecting my residence to TWC Equipment installed on the side of or adjacent to my residence (i.e., at a ground block) is the cause of a service problem, I agree that TWC may charge me to resolve such service problem. If available from TWC in my area, I may subscribe to a TWC service protection plan that covers service related calls within my residence. If any other support Services are available from TWC, such Services will be at additional charges as described in TWC's price list.

**8. Service Interruptions; Force Majeure**

(a) I agree that TWC has no liability for delays in or interruption to my Services, except that if for reasons within TWC's reasonable control, for more than twenty-four (24) consecutive hours, (i) service on all cable channels is interrupted, (ii) there is a complete failure of the HSD Service or (iii) there is a complete failure of the Digital Phone Service, TWC will give me a prorated credit for the period of such interruption or failure if I request one within 30 days of the interruption or failure. Notwithstanding the above, TWC will issue credits for VOD, pay-per-view and pay-per-play events for service problems where a credit request is made within 30 days of the interruption or failure. In no event shall TWC be required to credit me an amount in excess of applicable service fees. TWC will make any such credit on the next practicable bill for my Services. State and local law or regulation may impose other outage credit requirements with respect to some or all of my Services. In such event, the relevant law or regulation will control.

(b) I acknowledge that TWC may conduct maintenance from time to time that may result in interruptions of my Services.

(c) The TWC Parties shall have no liability, except as set forth in Section 8(a), for interruption of the Services due to circumstances beyond its reasonable control, including acts of God, flood, natural disaster, vandalism, terrorism, regulation or governmental acts, fire, civil disturbance, electrical power outage, computer viruses or worms, strike or weather.

(d) TWC is only obligated to provide the above-referenced credits for loss of HSD Service if TWC is billing me for the HSD Service at the time of the outage. If my ISP or OLP is billing me, I will look solely to my ISP or OLP, as applicable, for a credit with respect to the HSD Service.

## 9. Review and Enforcement

(a) TWC may suspend or terminate all or a portion of my Services without prior notification if TWC determines in its discretion that I have violated this Agreement, any of the Terms of Use or any Tariff(s), even if the violation was a one-time event. If all or a portion of my Services are suspended, I will not be charged for the relevant Services during the suspension. If my account is terminated, I will be refunded any pre-paid fees minus any amounts due TWC.

(b) If I receive HSD Service, I acknowledge that TWC has the right, but not the obligation, to review content on public areas of the HSD Service, including chat rooms, bulletin boards and forums, in order to determine compliance with this Agreement and the Terms of Use.

(c) I agree that TWC shall have the right to take any action that TWC deems appropriate to protect the Services, TWC's facilities or TWC Equipment.

## 10. Termination of Service

(a) Either TWC or I may terminate all or any portion of my Services at any time for any or no reason, in its sole discretion, in accordance with applicable law.

(b) If I am moving or wish to terminate all or any portion of my Services for any reason, I will notify TWC by phone or by mail as instructed in the Subscriber Materials in order to set up a disconnect appointment and provide TWC with access to my premises to disconnect the relevant Services and recover the TWC Equipment specified on the Work Order on a DATE PRIOR TO the last day of residency. This also applies if I am receiving a period of free or discounted Services. In other words, at the end of the free or discounted period, TWC is entitled to begin billing me for the usual charges associated with the relevant Services unless I take the appropriate steps to terminate the Services as described in this paragraph.

(c) I cannot terminate my Services by writing "Canceled" (or any other messages) on my bill or check, or by making a disconnect appointment that does not result in TWC's physical recovery of the TWC Equipment. In addition, I agree that any restrictive endorsements (such as "paid in full"), releases or other statements on or accompanying checks or other payments accepted by TWC shall have no legal effect.

(d) If I subscribe to HSD Service, I acknowledge that notice given by me to

TWC of termination of my HSD Service may not be sufficient to terminate billing by my ISP or OLP for additional or continuing Services under the ISP Terms or OLP Terms (for example, "dial up" access). I agree that I am solely responsible for contacting my ISP or OLP in addition to TWC to ensure that all such Services are terminated in accordance with the ISP Terms or OLP Terms, as applicable.

**11. Disclaimer of Warranty; Limitation of Liability**

(a) I AGREE THAT THE SERVICES ARE PROVIDED BY TWC ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF TITLE OR NONINFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES THAT ARE IMPLIED BY, AND INCAPABLE OF EXCLUSION, RESTRICTION OR MODIFICATION UNDER, THE LAWS APPLICABLE TO THIS AGREEMENT. TWC MAKES NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE OR THAT THE TWC EQUIPMENT WILL OPERATE AS INTENDED. IN PARTICULAR, I AGREE THAT MY USE OF THE HSD SERVICE (INCLUDING THE CONTENT, INFORMATION, SERVICES, EQUIPMENT AND SOFTWARE, THE PURCHASE OF MERCHANDISE AND SERVICES, THE TRANSMISSION OF INFORMATION AND OTHER COMMUNICATIONS BY AND TO ME AND THE DOWNLOADING OF COMPUTER FILES) IS AT MY SOLE RISK. I FURTHER AGREE THAT TWC IS NOT RESPONSIBLE FOR THE RECORDING OF OR FAILURE TO RECORD ANY PROGRAM OR PORTION THEREOF, OR FOR THE CONTENT OF ANY PROGRAM OR CONTENT ON MY DVR, WITHOUT LIMITING THE FOREGOING:

(i) ANY AND ALL PRODUCTS AND SERVICES PROVIDED BY TWC AND/OR ISP AND/OR OLP AND/OR ANY LONG DISTANCE PROVIDER TO ME THAT ARE NOT PART OF THE SERVICES AS DEFINED HEREIN ARE OUTSIDE THE SCOPE OF THIS AGREEMENT AND THE TWC PARTIES HAVE NO RESPONSIBILITY OR LIABILITY FOR ANY SUCH PRODUCTS OR SERVICES; AND

(ii) NONE OF THE TWC PARTIES MAKES ANY WARRANTIES AS TO THE SECURITY OF MY COMMUNICATIONS VIA TWC'S FACILITIES OR THE SERVICES (WHETHER SUCH COMMUNICATIONS ARE DIRECTED WITHIN THE SERVICES, OR OUTSIDE THE SERVICE TO OR THROUGH THE INTERNET), OR THAT THIRD PARTIES WILL NOT GAIN UNAUTHORIZED ACCESS TO OR MONITOR MY COMPUTERS(S) OR ONLINE (INCLUDING VOICE) COMMUNICATIONS. I AGREE THAT NONE OF THE TWC PARTIES WILL BE LIABLE FOR ANY SUCH UNAUTHORIZED ACCESS. I HAVE THE SOLE RESPONSIBILITY TO SECURE MY COMPUTER AND ONLINE (INCLUDING VOICE) COMMUNICATIONS.

(b) I ACKNOWLEDGE THAT TWC'S OR MY INSTALLATION, USE, INSPECTION, MAINTENANCE, REPAIR, REPLACEMENT OR REMOVAL OF THE SERVICES, TWC EQUIPMENT AND SOFTWARE MAY RESULT IN DAMAGE TO MY COMPUTER(S), TELEPHONES AND TELEPHONE ANSWERING DEVICES, TELEVISIONS, RECORDING AND PLAYBACK DEVICES, AUDIO EQUIPMENT, OR ANY CABLE MODEM, CABLING OR OTHER EQUIPMENT OR HARDWARE, INCLUDING SOFTWARE AND DATA FILES STORED THEREON. I SHALL BE SOLELY RESPONSIBLE FOR BACKING UP ALL EXISTING COMPUTER OR OTHER SOFTWARE OR DATA FILES PRIOR TO THE PERFORMANCE OF ANY OF THE FOREGOING ACTIVITIES. NONE OF THE TWC PARTIES, OR THEIR

VENDORS, LICENSEES OR PROGRAMMERS, SHALL HAVE ANY LIABILITY, AND EACH EXPRESSLY DISCLAIMS ANY RESPONSIBILITY WHATSOEVER, FOR ANY DAMAGE TO OR LOSS OR DESTRUCTION OF ANY EQUIPMENT, SOFTWARE, HARDWARE, DATA OR FILES.

(c) EXCEPT FOR THE REFUND OR CREDIT AS EXPRESSLY PROVIDED IN SECTIONS 9(a) AND 8(a) RESPECTIVELY, IN NO EVENT (INCLUDING NEGLIGENCE) WILL ANY TWC PARTY OR ANY PERSON OR ENTITY INVOLVED IN CREATING, PRODUCING OR DISTRIBUTING THE SERVICES (INCLUDING THE CONTENT INCLUDED THEREIN OR THE SERVICES ACCESSED THEREBY) OR EQUIPMENT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OR INABILITY TO USE THE SERVICES, INCLUDING THE USE OF OR INABILITY TO USE EMERGENCY 911 SERVICES, OR FOR ANY ACTION TAKEN BY TWC TO PROTECT

THE SERVICES OR THE BREACH BY TWC OF ANY WARRANTY.

(d) I AGREE THAT THE PROVISIONS OF THIS SECTION 11 SHALL APPLY TO ALL CONTENT OR SERVICES INCLUDED IN, OR ACCESSIBLE THROUGH, THE SERVICES, AND ARE FOR THE BENEFIT OF, AND MAY BE ENFORCED BY, ALL OF THE TWC PARTIES.

## 12. Privacy

(a) My privacy interests, including my ability to limit disclosure of certain information to third parties, are addressed by, among other laws, the Federal Communications Act of 1934, as amended, and the Electronic Communications Privacy Act. Personally identifiable information that may be collected, used or disclosed in accordance with applicable laws is described in the Subscriber Privacy Notice delivered to me by TWC on its own behalf and on behalf of its Affiliated ISPs. I acknowledge receipt of the Subscriber Privacy Notice, which is deemed to form a part of this Agreement, and expressly consent to the collection, use and disclosure of personally identifiable and other information as described in the Subscriber Privacy Notice, as it may be amended from time to time.

(b) I agree that, in addition to actions and disclosures specifically authorized by law or statute or authorized elsewhere in this Agreement, TWC and its Affiliated ISPs shall each have the right (except where prohibited by law notwithstanding my consent), but not the obligation, to disclose any information to protect their respective rights, property and/or operations, or where circumstances suggest that individual or public safety is in peril. I consent to such actions or disclosures.

(c) If I am a Digital Phone customer, I consent to TWC's disclosure of my name, address and/or telephone number to the general public in connection with Caller ID functions, telephone directories, and 411 and 911 Services. I also consent to TWC's disclosure of personally identifiable information to the telephone companies serving those end users to whom I make calls so that the calls can be completed. If I wish to have TWC remove this information from one or more of these Services, I understand that I may notify TWC to do so, subject to any applicable fees.

## 13. Consent to Phone and Email Contact

(a) I consent to TWC calling the phone numbers I supply to it for any purpose,

including the marketing of its current and future Services. I agree that these phone calls may be made using any method, including an automatic dialing system or an artificial or recorded voice. Upon my request, the phone numbers I have previously provided will be removed from TWC's phone marketing list. I can make this request by calling or writing my local TWC office and asking to be placed on TWC's Do Not Call List.

(b) I acknowledge that being included in any state or federal "do not call" registry will not be sufficient to remove me from TWC's phone marketing list.

(c) I consent to TWC emailing me, at any email address, including that of a wireless or mobile device, that I provide to TWC (or that TWC issues to me in connection with the HSD Service), for any purpose, including the marketing of TWC's current and future Services. If my wireless or mobile provider charges me for receipt of such messages, I acknowledge and agree that I am responsible for paying such charges. I may revoke this authorization insofar as it relates to marketing messages at any time by calling or writing my local TWC office.

## 14. Arbitration

EXCEPT FOR CLAIMS FOR INJUNCTIVE RELIEF AND CLASS ACTION LAWSUITS, AS DESCRIBED BELOW, ANY PAST, PRESENT, OR FUTURE CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL ARBITRATION RULES, INCLUDING, IF APPLICABLE, THE SUPPLEMENTARY PROCEDURES FOR THE RESOLUTION OF CONSUMER RELATED DISPUTES. CONSOLIDATED OR CLASS ACTION ARBITRATIONS SHALL NOT BE PERMITTED, AND THE ARBITRATOR OF ANY DISPUTE OR CLAIM BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT HAVE THE POWER TO AWARD INJUNCTIVE RELIEF. INJUNCTIVE RELIEF MAY BE SOUGHT, AND CLASS ACTION LAWSUITS MAY BE BROUGHT, SOLELY IN AN APPROPRIATE COURT OF LAW. NO CLAIM SUBJECT TO ARBITRATION UNDER THIS AGREEMENT MAY BE COMBINED WITH A CLAIM SUBJECT TO RESOLUTION BEFORE A COURT OF LAW. THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR, EXCEPT THAT THE ARBITRABILITY OF ANY DISPUTE PURPORTING TO CONSTITUTE A CLASS ACTION SHALL BE DETERMINED BY A COURT OF COMPETENT JURISDICTION. JUDGMENT UPON AN AWARD MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. IF ANY PORTION OF THIS SECTION IS HELD TO BE UNENFORCEABLE, THE REMAINDER SHALL CONTINUE TO BE ENFORCEABLE.

## 15. Definitions

(a) "Affiliated ISP" means Road Runner and any other ISP in which any TWC Party holds an ownership interest.

(b) "Agreement" means this Services Subscription Agreement, as it may be amended from time to time by TWC.

(c) "Computer" means the personal computer(s) located at my residence that will be used to access the HSD Service, as specified on the accompanying Work Order.

(d) "Digital Phone Service" means the TWC phone service that provides users with the ability to send and receive local and/or long distance calls and to access additional related features and functions through TWC's cable systems.

(e) "DVR" means a set-top box or other device enabled with a digital video recorder that is provided to me by TWC.

(f) "HSD Service" and "High Speed Data Service" mean the online content, features, functions and Services (which may include Internet access) of the ISP or OLP selected by me, as provided over TWC's cable systems.

(g) "including" or "include" shall mean inclusion, without limitation.

(h) "ISP" means the Internet service provider selected by me from among those offered now or in the future by TWC for the HSD Service. My ISP is the entity that provides my Internet connectivity.

(i) "Me," "My," and "I" mean the account holder identified on the Work Order who is authorized by TWC to access and use the Services.

(j) "OLP" or "On-line Provider" means a provider of on-line content, features, functions and Services that are used in conjunction with my ISP Service (and whose service may be purchased with an ISP Service as part of a combined offering) but that does not itself provide Internet connectivity.

(k) "Services" means any and all Services provided to me by TWC, which may include Video Service, High Speed Data Service, Digital Phone Service and equipment based Services such as digital video recorder Services.

(l) "Software" means the computer software, if any, licensed by ISP or OLP to me to access the HSD Service, or licensed by TWC to me to facilitate installation or use of my ISP's or OLP's service or any other Services. Software also refers to any executable code that may be included in, downloaded to, or utilized by, any TWC Equipment.

(m) "Subscriber Materials" means the handbooks, manuals and other guide materials provided by TWC or any third party (including my ISP or OLP) regarding use of the Services.

(n) "Subscriber Privacy Notice" means the Subscriber Privacy Notice described in Section 12(a), as it may be amended from time to time by TWC.

(o) "Tariff(s)" means the materials describing the terms upon which TWC offers Digital Phone Service, which have been filed at the Public Service Commission or comparable state agency serving the jurisdiction in which I live.

(p) "Terms of Use" shall mean all rules, terms and conditions set forth in this Agreement or otherwise established now or hereafter by TWC regarding permissible or impermissible uses of or activities related to, the HSD Service.

(q) "TWC" means the local Time Warner Cable-affiliated cable operator that is providing the Services over its cable system, or any cable operator to whom TWC assigns this Agreement.

Case 3.08-cv-00562-H-NMC    Document 1    Filed 03/27/2008    Page 86 of 196

(r) "TWC Equipment" means any equipment provided by TWC to me including, but not limited to, wire, cable, cable conduit, splitters, junction boxes, converter boxes (also known as "set top" boxes), decoders, CableCARD™, terminals, cable modems, voice-enabled cable modems, remote control units, and any other equipment or materials provided to me by TWC for use in connection with the receipt of Services. TWC Equipment does not include any Network Interface Card ("NIC") installed in my Computer.

(s) "TWC Parties" means TWC and its corporate parents, affiliates and subsidiaries and their respective directors, officers, employees and agents.

(t) "Video Service" means video and/or audio programming Services such as basic, standard, digital and premium Services, Services provided on a per-channel or per-program basis, pay-per-play, pay-per-view or VOD.

(u) "VOD" means video on demand.

(v) "Work Order" means the Time Warner Cable work order provided to me on or after January 1, 2006 in connection with the installation or commencement of my Service(s).

## 16. Indemnification

I agree to defend, indemnify and hold harmless the TWC Parties from and against any and all claims and expenses, including reasonable attorneys' fees, arising out of or related in any way to my use of the Services or otherwise arising out of the use of my account or any equipment or facilities in connection therewith, or my use of any other TWC products or Services or any ISP's or OLP's products or Services.

## 17. Term

This Agreement will remain in effect until terminated by either party or superseded by a revised Subscription Agreement.

## 18. Interpretation; Severability

This Agreement is, and shall be interpreted as, subject to applicable law and regulation and to any applicable franchise agreement between a governmental authority and TWC. In the event that any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion shall be construed in accordance with applicable law as nearly as possible to reflect the original intentions of the parties as set forth herein, and the remainder of this Agreement shall remain in full force and effect.

## 19. Consent to Electronic Notice

I agree that unless otherwise specified, all notices required or contemplated hereunder will be provided by TWC by such means as TWC shall determine in its discretion. Without limiting the foregoing, I agree that TWC may provide any notices required or contemplated hereunder or by applicable law, including notice of changes to this Agreement, the Terms of Use, the Tariff(s) or the Privacy Notice, by electronic means (for example, email or online posting). An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my

local TWC office.

## 20. Waiver

I agree that failure by TWC to enforce any of its rights hereunder shall not constitute a waiver of any such rights. No waiver by either party of any breach or default shall be deemed to be a waiver of any preceding or subsequent breach or default.

## 21. Assignment

I understand that my Services are being provided only to the location identified on my Work Order and that I am not allowed to transfer all or any portion of the Services, or TWC's Equipment, to any other person, entity or location, including a new residence. I agree that I may not assign or transfer this Agreement. TWC may transfer or assign any portion or all of this Agreement at any time without notice to me, and I waive any such notice which may be required.

## 22. Effect of Applicable Law; Reservation of Rights

This Agreement, the Work Order and the Terms of Use are subject to all applicable federal, state or local laws and regulations in effect in the relevant jurisdiction(s) in which I receive my Services. If any provision of this Agreement, the Work Order or the Terms of Use contravene or are in conflict with any such law or regulation, or if I am entitled to more favorable rights under any such law or regulation than are set forth in any provision in this Agreement, the Work Order or the Terms of Use, then the terms of such law or regulation, or the rights to which I am entitled under such law or regulation, shall take priority over the relevant provision of this Agreement, the Work Order or the Terms of Use. If the relevant law or regulation applies to some but not all of my Service(s), then such law or regulation will take priority over the relevant provision of this Agreement, the Work Order or the Terms of Use only for purposes of those Service(s) to which the law or regulation applies. Except as explicitly stated in this Agreement, nothing contained in this Agreement shall constitute a waiver by me or TWC of any rights under applicable laws or regulations pertaining to the installation, operation, maintenance or removal of the Services, facilities or equipment.

## 23. Parental Control Device

I acknowledge that I have been advised of the availability of TWC's parental control device which can filter or block certain programming. Additional information about the device is available at the TWC contact number in the Subscriber Materials.

## 24. Conflicting Terms

In the event of a conflict in the terms and conditions between this Residential Services Subscriber Agreement and the accompanying Work Order, then the terms and conditions of this Agreement shall control.

**EXHIBIT  C**

Page 1 of 3

8949 WARE COURT SAN DIEGO CA
92121-2275          8340 1000 NX 7 12     0004721

Billing Date:                    September 12, 2006
Account Number:     834010 110 0088309

#BWNKTKR
#165989889911696#
LEON ALPERT
12968 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

How to reach us ....
☎  CUSTOMER SERVICE (858) 695-3220
    TECHNICAL SUPPORT OPEN 24 HOURS
    BILLING OR SALES 8-8 M-F & 8-5 SAT

## *Account Snapshot*

| | |
|---|---|
| Previous Balance | $ 180.66 |
| Payments | - 180.66 |
| Monthly Charges | 156.70 |
| Pay-Per-View Charges | 7.94 |
| Taxes & Fees | 7.66 |
| Amount Due | $ 172.30 |
| Payment Due Date | 10/02/06 |

*(See additional page(s) for account details.)*

## *Important Viewer News*



Showtime will offer a Free Preview Oct. 6-9 to Time Warner Cable digital customers on channels 640, 642-650, 661 and 662. An HD converter and an HD TV are required to receive Showtime HD. Some programs may contain PG, PG-13, TV14, TVMA and R rated programs.

The Showtime Free preview can be blocked by using your Parental Control features. Tune to channel 100 and follow the tutorial instructions. You may also visit our website at www.twcsd.com or call us at 858-695-3220.



To view the call detail for all of your Digital Phone calls, go to http://www.twcdigitalphone.com and select the "My Account" link.

## Payment Coupon

LEON ALPERT
Billing Date:                    September 12, 2006
Account Number:     834010 110 0088309

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE .*
Allow 4-5 days for your mailed payment to be credited.

CUSTOMER SERVICE (858) 695-3220

| | |
|---|---|
| Amount Due | $ 172.30 |
| Payment Due Date | 10/02/06 |
| Amount Enclosed | $ |

*Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX AZ 85038-9390

834010110008830900172304

LEON ALPERT
Billing Date:
Account Number:

8340 1000 NX 7 12    0004721

Page 2 of 3
September 12, 2006
834010 110 0088309

## Account Details

This statement is for service from 9\12\06 to 10\11\06
Payments received after September 12, 2006 will be reflected on your next bill.

| | | | |
|---|---|---|---|
| **Previous Balance** | | | **$ 180.66** |
| **Payments** | | | **Amount** |
| 09/01 | Payment - Thank You | | - 180.66 |
| **Monthly Charges** | | | **Amount** |
| 09/12 - 10/11 | Digital Phone Package -- Includes Unlimited Local And | | 39.95 |
| | Long Distance Calling Within The United States, | | |
| | Us Territories And Canada | | |
| 09/12 - 10/11 | iCONTROL Premium Service | | 6.95 |
| | Your Pay Service(s) On Demand | | |
| 09/12 - 10/11 | HDTV Converter          (Includes Digital Remote) | | 8.00 |
| 09/12 - 10/11 | HDTV Converter          (Includes Digital Remote) | | 8.00 |
| 09/12 - 10/11 | Service Protection Plan | | 2.95 |
| 09/12 - 10/11 | Premier Digital | | 11.00 |
| | Digital Movie Pack | $4.00 | |
| | Digital Variety Pack | $4.00 | |
| | Navigator Screen Guide | $3.00 | |
| 09/12 - 10/11 | Any 4 Premium Channels | | 24.95 |
| | Cinemax | $6.24 | |
| | HBO | $6.24 | |
| | Showtime | $6.24 | |
| | STARZ | $6.23 | |
| 09/12 - 10/11 | Wireless Road Runner | | 54.90 |
| 09/12 - 10/11 | Navigator Screen Guide | | .00 |
| **Pay-Per-View Charges** | | | **Amount** |
| 08/26 | The Matador | Start 09:01 P.M. | 3.95 |
| 09/02 | Angels With Dirty Fa | Start 08:41 P.M. | 0.00 |
| 09/02 | 16 Blocks Widescreen | Start 09:09 P.M. | 3.99 |

### ADDITIONAL DETAILS CONTINUED ON NEXT PAGE

---

ABOUT YOUR TIME WARNER CABLE AGREEMENT

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question.  If we are not notified of the discrepancy the statement will be considered correct.  Our billing number is (858) 695-3220, or (619) 435-0157.
Payments: Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill.  If we do not receive your payment by this date, your service may be interrupted.  If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet.  Advance payment of a deposit and your next month's service fee may also be required.  You may request your deposit refunded after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically.
Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company.
Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted.  If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment.  If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund.  However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
Franchising Authority Information:

| City of San Diego: | County of San Diego | City of Poway: | City of Coronado: | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | Coronado, CA 92118 | San Diego, Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92064 | (619) 522-7335 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 668-4590 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0428 | (619) 595-4650 | Comm ID# CA0572 | | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or at www.cpuc.ca.gov, or call (800) 649-7570 or TTY (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming"). The California consumer protection rules are available online at www.cpuc.ca.gov.

ec080127

8340 1000 NX 7 12    0004721

**LEON ALPERT**
Billing Date:
Account Number:

Page 3 of 3
September 12, 2006
834010 110 0088309

## *Account Details*

This statement is for service from 9\12\06 to 10\11\06
Payments received after September 12, 2006 will be reflected on your next bill.

**Taxes & Fees**

| | | *Amount* |
|---|---|---|
| 09/12 | Cable Franchise Fee | 3.67 |
| 09/12 | CA Relay Service & Comm. Device Fund | .09 |
| 09/12 | CA Universal Lifeline Tel Serv Surcharge | .31 |
| 09/12 | CA High Cost Fund A | .05 |
| 09/12 | CA High Cost Fund B | .63 |
| 09/12 | Emergency Telephone Users Surcharge Tax | .19 |
| 09/12 | Federal Universal Service Fund | 2.72 |

**Amount Due**                                          **$ 172.30**

Page 1 of 3

8949 WARE COURT SAN DIEGO CA
92121-2275        8340 1000 NX 7 12      0004700

Billing Date:                    October 12, 2006
Account Number:        834010 110 0088309

#BWNKTKR
#1659898999911696#
LEON ALPERT
12968 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

How to reach us ....
☎    CUSTOMER SERVICE (858) 695-3220
TECHNICAL SUPPORT OPEN 24 HOURS
BILLING OR SALES 8-8 M-F & 8-5 SAT

## Account Snapshot

| | |
|---|---:|
| Previous Balance | $ 172.30 |
| Payments | - 99.00 |
| Monthly Charges | 109.00 |
| Pay-Per-View Charges | 3.99 |
| Adjustments | - 42.95 |
| Taxes & Fees | 6.42 |
| Amount Due | $ 149.76 |
| Payment Due Date | 11/01/06 |

*(See additional page(s) for account details.)*

## Important Viewer News

Section 14 of your Subscriber Agreement has been amended. The new version is available at http://help.twcable.com/html/policies.html.

To view the call detail for all of your Digital Phone calls, go to http://www.twcdigitalphone.com and select the "My Account" link.

## Payment Coupon

LEON ALPERT
Billing Date:                    October 12, 2006
Account Number:        834010 110 0088309

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE .*
Allow 4-5 days for your mailed payment to be credited.

CUSTOMER SERVICE (858) 695-3220

| | |
|---|---:|
| Amount Due | $ 149.76 |
| Payment Due Date | 11/01/06 |

Amount Enclosed    $

*Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX  AZ 85038-9390

834010110008830900149765

LEON ALPERT
Billing Date:
Account Number:

Page 2 of 3
October 12, 2006
834010 110 0088309

8340 1000 NX 7 12    0004700

## Account Details

This statement is for service from 10\12\06 to 11\11\06
Payments received after October 12, 2006 will be reflected on your next bill.

| Previous Balance | | $ 172.30 |
|---|---|---|

| Payments | | Amount |
|---|---|---|
| 10/03 | Payment - Thank You | - 99.00 |

| Monthly Charges | | | Amount |
|---|---|---|---|
| 09/21 | Digital Phone Package -- | Partial Month(s) 09/12-10/11 | - 39.95 |
| 09/21 | iCONTROL Premium Service | Partial Month(s) 09/12-10/11 | - 6.95 |
| 09/21 | HDTV Converter | Partial Month(s) 09/12-10/11 | - 8.00 |
| 09/21 | Premier Digital | Partial Month(s) 09/12-10/11 | - 11.00 |
| 09/21 | Any 4 Premium Channels | Partial Month(s) 09/12-10/11 | - 24.95 |
| 09/21 | Wireless Road Runner | Partial Month(s) 09/12-10/11 | - 54.90 |
| 09/21 | Hoa DIGIPiC 4000 Trio | Partial Month(s) 09/12-10/11 | 121.90 |
| 10/12 - 11/11 | HDTV Converter | (Includes Digital Remote) | 8.00 |
| 10/12 - 11/11 | Service Protection Plan | | 2.95 |
| 10/12 - 11/11 | Hoa DIGIPiC 4000 Trio | | 121.90 |
| | Wireless Road Runner | | |
| | Digital Phone Package -- | | |
| | Free On Demand | | |
| | iCONTROL Premium Service | | |
| | Digital Access | | |
| | Cinemax | | |
| | HBO | | |
| | Navigator Screen Guide | | |
| | Showtime | | |
| | STARZ | | |
| | Digital Movie Pack | | |
| | Digital Sports Pack | | |
| | Digital Variety Pack | | |
| | Hoa Standard Service | | |
| | Road Runner High Speed | | |

## ADDITIONAL DETAILS CONTINUED ON NEXT PAGE

### ABOUT YOUR TIME WARNER CABLE AGREEMENT

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
**Note:** If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3220, or (619) 435-0157.
**Payments:** Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically. **Equipment:** Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
**Franchising Authority Information:**

| City of San Diego: | County of San Diego | City of Poway: | City of Coronado: | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | Coronado, CA 92118 | San Diego, Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92064 | (619) 522-7335 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 668-4590 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0428 | (619) 595-4650 | Comm ID# CA0572 | | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns international or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming"). The California consumer protection rules are available online at www.cpuc.ca.gov.

sc080127

LEON ALPERT                      Page 3 of 3
Billing Date:                 October 12, 2006
Account Number:          834010 110 0088309

8340 1000 NX 7 12      0004700

## Account Details

This statement is for service from 10\12\06 to 11\11\06
Payments received after October 12, 2006 will be reflected on your next bill.

**Pay-Per-View Charges**

| | | | Amount |
|---|---|---|---|
| 10/08 | Syriana | Start 09:08 P.M. | 3.99 |

**Adjustments**

| | | | Amount |
|---|---|---|---|
| 09/15 | Oper/Dir Assistance | | .99 |
| 09/02 | 16 Blocks Widscreen | - Adjustment | - 3.99 |
| 09/20 | Digital Phone | - Adjustment | - 39.95 |

**Taxes & Fees**

| | | Amount |
|---|---|---|
| 10/12 | Cable Franchise Fee | 2.41 |
| 10/12 | CA Relay Service & Comm. Device Fund | .01 |
| 10/12 | CA Universal Lifeline Tel Serv Surcharge | .38 |
| 10/12 | CA High Cost Fund A | .06 |
| 10/12 | CA High Cost Fund B | .58 |
| 10/12 | Emergency Telephone Users Surcharge Tax | .19 |
| 10/12 | Federal Universal Service Fund | 2.79 |

**Amount Due**                                       **$ 149.76**

1   JEFFREY M. SHOHET (Bar No. 067529)
      JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)
      **DLA PIPER US LLP**
3   401 B Street, Suite 1700
      San Diego, CA  92101-4297
4   Tel: 619.699.2700
      Fax: 619.699.2701

**COPY**

F I L E D
Clerk of the Superior Court

APR 3 0 2007

By: E. Scheitt, Deputy

5

6   Attorneys for Defendant
      TIME WARNER CABLE, INC.

7

8                 SUPERIOR COURT OF CALIFORNIA

9                   COUNTY OF SAN DIEGO

10

11   LEON ALPERT, an individual, on behalf
      of himself, on behalf of all those similarly
12   situated, and on behalf of the general
      public,

13               Plaintiffs,

14

15           v.

16   TIME WARNER CABLE, INC., a
      Delaware corporation, and DOES 1 TO
17   100,

18            Defendants.

CASE NO.  GIC881621

**PROOF OF SERVICE**

Date       June 1, 2007
Time      1:30 p.m.
Dept:     74
Judge:    Linda B. Quinn

Complaint:  March 13, 2007

19

20

21

22

23

24

25

26

27

28

SD\1735197.1
325566-11

PROOF OF SERVICE

1    I am a resident of the State of California, over the age of eighteen years, and not a party to

2    the within action. My business address is DLA Piper US LLP, 401 B Street, Suite 1700, San

3    Diego, California 92101. On April 30, 2007, I served the within document(s):

**SEE ATTACHED LIST OF DOCUMENTS**

6    ☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set
         forth below on this date before 5:00 p.m.

8    ☒    by placing a sealed envelope or package designated by UPS, with delivery fees
         paid or provided for, a true copy of each documents(s) above, in DLA Piper US
         LLP's mail room for collection, processing and delivery this same day to a deposit
         box or other facility regularly maintained by the express service carrier, or
         delivered to an authorized courier or driver authorized by the express service
         carrier to receive documents. I further declare that I am readily familiar with the
         business' practice for collection and processing of correspondence for delivery
         with express service carriers (i.e., FedEx, DHL, etc.); and that the correspondence
         shall be deposited with an express service carrier this same day in the ordinary
         course of business, to each addressee as set forth below.

14   ☐    by placing the document(s) listed above in a sealed envelope with postage thereon
         fully prepaid, in the United States mail at San Diego, California addressed as set
         forth below.

16   ☐    by personally delivering the document(s) listed above to the person(s) at the
         address(es) set forth below.

18   Barron E. Ramos, Esq.
     Kristen E. Caverly
19   Henderson & Caverly LLP
     P.O. Box 9144
20   16236 San Dieguito Road, Suite 4-13
     Rancho Santa Fe, CA 92067
21   Phone: (858) 756-6342
     Fax: (858) 756-4732

22

23   I am readily familiar with the firm's practice of collection and processing correspondence

24   for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same

25   day with postage thereon fully prepaid in the ordinary course of business. I am aware that on

26   motion of the party served, service is presumed invalid if postal cancellation date or postage

27   meter date is more than one day after date of deposit for mailing affidavit.

28

DLA PIPER US LLP
SAN DIEGO

SD\1735197.1
325566-11

-2-

PROOF OF SERVICE

1     I declare under penalty of perjury under the laws of the State of California that the above

2     is true and correct.

3         Executed on April 30, 2007, at San Diego, California.

4

5                           Sarah Van

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

SD\1735197.1
325566-11

-3-

PROOF OF SERVICE

1

## LIST OF DOCUMENTS

2

3   **DEFENDANT TIME WARNER ENTERTAINMENT-ADVANCE NEWHOUSE
    PARTNERSHIP, A NEW YORK GENERAL PARTNERSHIP, THROUGH ITS SAN
4   DIEGO DIVISION, DBA TIME WARNER CABLE'S NOTICE OF DEMURRER TO
    AND ALTERNATIVE MOTION TO STRIKE, DEMURRER, AND ALTERNATIVE
5   MOTION TO STRIKE PORTIONS OF PLAINTIFF LEON ALPERT'S COMPLAINT**

6   **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT
    TIME WARNER ENTERTAINMENT-ADVANCE NEWHOUSE PARTNERSHIP'S
    DEMURRER TO AND ALTERNATIVE MOTION TO STRIKE PORTIONS OF
7   PLAINTIFF LEON ALPERT'S COMPLAINT**

8   **DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
    DEMURRER TO AND ALTERNATIVE MOTION TO STRIKE PLAINTIFF'S
9   COMPLAINT**

10  **DECLARATION OF ROSS CARR IN SUPPORT OF DEFENDANT'S REQUEST
    FOR JUDICIAL NOTICE**
11

12  **DECLARATION OF HOPE MURRAY IN SUPPORT OF DEFENDANT'S REQUEST
    FOR JUDICIAL NOTICE**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# Shipment Receipt

(Keep this for your records.)

**Transaction Date** 30 Apr 2007

## Address Information

**Ship To:**
Henderson & Caverly LLP
Barron E. Ramos
16236 San Dieguito Road
Suite 4-13
RANCHO SANTA FE CA 92091-9802

**Shipper:**
DLA Piper US LLP
Sarah Van
6196992700
401 B Street, Ste 1700
San Diego CA 92101

## Shipment Information

| | |
|---|---|
| **Service:** | UPS Next Day Air |
| *Guaranteed By: | 10:30 AM, Tues. 1 May 2007 |
| **Quantum View Notify** [SM] **1:** | sarah.van@dlapiper.com |
|   Delivery; Exception | |
| **E-mail Failure Notification:** | sarah.van@dlapiper.com |

## Package Information

**Package 1 of 1**

| | |
|---|---|
| Tracking Number: | 1Z02Y7470198703378 |
| Package Type: | UPS PAK |
| Actual Weight: | 1.0 lbs |
| Billable Weight: | 2.0 lbs |
| Client-Matter: | 325566-000011 |
| Attorney ID: | 13671 |

## Billing Information

**Bill Shipping Charges to:**      Shipper's Account UPS Account

**All Shipping Charges in USD**

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

**Responsibility for Loss or Damage**
Unless a greater value is recorded in the declared value field as appropriate for the UPS shipping system used, the shipper agrees that the released value of each package covered by this receipt is no greater than $100, which is a reasonable value under the circumstances surrounding the transportation. If additional protection is desired, a shipper may increase UPS's limit of liability by declaring a higher value and paying an additional charge. UPS does not accept for transportation and shipper's requesting service through the Internet are prohibited from shipping packages with a value of more than $50,000. The maximum liability per package assumed by UPS shall not exceed $50,000, regardless of value in excess of the maximum. Claims not made within nine months after delivery of the package (sixty days for international shipments), or in the case of failure to make delivery, nine months after a reasonable time for delivery has elapsed (sixty days for international shipments), shall be deemed waived. The entry of a C.O.D. amount is not a declaration of value for carriage purposes. All checks or other negotiable instruments tendered in payment of C.O.D. will be accepted by UPS at shipper's risk. UPS shall not be liable for any special, incidental, or consequential damages. All shipments are subject to the terms and conditions contained in the UPS Tariff and the UPS Terms and Conditions of Service, which can be found at www.ups.com.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
330 W. Broadway, Dept. 63
San Diego, CA 92101
619-685-6021

**TO:**

BARRON E RAMOS      #179620
HENDERSON & CAVERLY LLP
PO BOX 9144, 16236 SAN DIEGUITO RD STE 4-13
RANCHO SANTA FE, CA 92067-9144

---

| | |
|---|---|
| LEON ALPERT <br><br> Plaintiff(s) <br><br> vs. <br><br> TIME WARNER CABLE INC <br><br> Defendant(s) | Case No.: **GIC881621** <br><br> **NOTICE OF CASE REASSIGNMENT** <br> **DUE TO CHALLENGE, RECUSAL** <br> **OR SPECIAL ASSIGNMENT** |

**COMPLAINT FILED** 03/13/07

**EFFECTIVE IMMEDIATELY, THE ABOVE-ENTITLED CASE HAS BEEN REASSIGNED TO THE INDEPENDENT CALENDAR PROGRAM WITH JUDGE**
LUIS R. VARGAS, DEPARTMENT 63, 619-685-6021.

ALL SUBSEQUENT DOCUMENTS FILED IN THIS CASE MUST INCLUDE THE NAME OF THE NEW JUDGE AND THE DEPARTMENT NUMBER ON THE FIRST PAGE IMMEDIATELY BELOW THE NUMBER OF THE CASE. ALL COUNSEL AND PARTIES IN PRO PER ARE ADVISED THAT DIVISION II OF THE SUPERIOR COURT RULES IS STRICTLY ENFORCED. IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

UNLESS NOTIFIED OTHERWISE. ALL PENDING DATES ARE VACATED. PLEASE RESCHEDULE ANY CURRENTLY PENDING MOTIONS OR EX PARTE HEARINGS IN THE NEW DEPARTMENT.

**CERTIFICATE OF SERVICE**

I certify that: I am not a party to the above-entitled case; on the date shown below, I served this notice on the parties shown by placing a true copy in a separate envelope, addressed as shown; each envelope was then sealed and, with postage thereon fully prepaid, deposited in the United States Postal Service at San Diego California.

DATED: 03/23/07                                    BY: CLERK OF THE SUPERIOR COURT

BARRON E RAMOS  (P)

---

SUPCT CIV-723(Rev 2-00)              REA-NOTICE OF CASE REASSIGNMENT

1  BARRON E. RAMOS *Of Counsel* (State Bar No. 179620)
   KRISTEN E. CAVERLY (State Bar No. 175070)
2  **HENDERSON & CAVERLY LLP**
   P.O. Box 9144 (all U.S. Mail)
3  16236 San Dieguito Road, Suite 4-13
   Rancho Santa Fe, CA 92067
4  Telephone: (858) 756-6342
   Facsimile: (858) 756-4732
5
   Attorneys for plaintiff and the Class
6

7

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                      **COUNTY OF SAN DIEGO**

11

12  LEON ALPERT, an individual,                ) Case No. GIC 881621
    on behalf of himself, on behalf of all those )
13  similarly situated, and on behalf of the general ) **CLASS ACTION**
    public,                                      )
14                                               ) **FIRST AMENDED** COMPLAINT
          Plaintiffs,                            ) FOR UNLAWFUL, UNFAIR AND
15  v.                                           ) DECEPTIVE BUSINESS PRACTICES
                                                 ) (BUSINESS & PROFESSIONS CODE
16  TIME WARNER CABLE, INC., a Delaware) SECTION 17200)
    corporation, and DOES 1 TO 100,             )
17                                               )
          Defendants.                            )
18                                               )
                                                 ) Case Filed: March 13, 2007
19                                               ) Dept: 63
                                                 ) Judge: Hon. Luis R. Vargas
20                                               ) Trial Date: None Set
                                                 )
21                                               )
                                                 )
22  ———————————————————————

23

24

25

26

27        Plaintiff, on behalf of himself, on behalf of all those similarly situated in the State of

28  California, and on behalf of the general public, complains and alleges as follows:

                                          1

COPY

1.    Plaintiff LEON ALPERT ("ALPERT") is an individual residing in the State of California, County of San Diego. This action is filed by ALPERT on behalf of himself, on behalf of all those similarly situated in the State of California, and on behalf of the general public.

2.    Defendant TIME WARNER CABLE, INC. (hereinafter "TIME WARNER") is incorporated in Delaware and maintains its main corporate office in Stamford, CT. TIME WARNER is a division of Time Warner Inc. (NYSE: TWX). TIME WARNER provides cable and cable related services to consumers throughout the County of San Diego and the State of California.

3.    DOES 1 to 50 are, and all relevant times hereto were, corporations and/or business entities organized and existing under and by virtue of the laws of the State of California, qualified to do business in California, and doing business in California; and DOES 51 to 100 were the agents of and/or employees of the defendants, and were at all times herein mentioned acting within the course and scope of such agency and employment.

4.    The class in this case is comprised of all TIME WARNER subscribers in the State of California during the four (4) years prior to the filing of this complaint who were members of homeowners associations (HOAs) and/or tenants of such members, where the subscriber's HOA had contracted with TIME WARNER for basic cable services (also sometimes called "bulk multi-channel video services") and where the subscriber purchased additional cable and cable related services directly from TIME WARNER but was not provided a credit for already paying the for basic cable services ("HOA Standard Service") through the subscriber's HOA.

5.    On its website, www.timewarnercable.com, TIME WARNER states that it is "the second-largest cable operator in the U.S. and an industry leader in developing and launching innovative video, data and voice services…[d]eliver[ing] services to customers over technologically-advanced, well-clustered cable systems." TIME WARNER claims to be the "first or among the first cable operators to offer high speed data service, IP-based telephony service and a range of advanced digital video services, such as VOD, high definition television and set-top boxes equipped with DVRs." TIME WARNER also claims that its service "passes more than 26 million

2

1    U.S. homes, and serves 13.5 million basic video customers."

2    6.      TIME WARNER further claims that through its "family of products, Cable, High-Speed

3   Online and Digital Phone, we bring the most innovative and rewarding digital solutions home to

4   you. But we don't stop there. We also empower our employees to provide the best possible

5   customer service…" See http://www.timewarnercable.com/corporate/aboutus/whoweare.html. As

6   set forth below, TIME WARNER's "best possible customer service" does not include providing

7   the correct pricing for HOA subscribers where the HOA has contracted with TIME WARNER to

8   provide basic cable services. Nor does it include providing an opportunity for those subscribers

9   that catch TIME WARNER overcharging them to obtain a refund.

10   7.      Plaintiff ALPERT has been a subscriber to TIME WARNER cable and cable related

11   services at all times during the four years preceding the filing of this complaint. As part of his

12   HOA dues, ALPERT pays a fee that covers basic cable services pursuant to an agreement between

13   TIME WARNER and ALPERT's HOA. It is estimated that his monthly payment to TIME

14   WARNER for basic cable which is paid through his HOA dues is approximately $ 28.77. A copy

15   of the HOA agreement between ALPERT's HOA and TIME WARNER is attached hereto as

16   Exhibit "A."

17   8.      HOA agreements with TIME WARNER provide significant financial and competitive

18   benefits to TIME WARNER. For example, such agreements result in payments to TIME

19   WARNER for each unit in an HOA, regardless of whether any individual homeowner or tenant

20   will ever use those services. Such agreements also give TIME WARNER a foothold in each

21   respective HOA's homeowner's unit which provides not only a competitive advantage, including

22   requiring the HOA to affirmatively market TIME WARNER's services and products to its

23   members, but also serves as a platform to offer additional cable and cable related services to those

24   homeowners such as high speed cable Internet, movies on demand, and digital telephone services.

25   9.      The specific HOA agreement between ALPERT's HOA and TIME WARNER is referred to

26   as a form "Residential Bulk Services Agreement." The HOA agreement states in its "Recitals" that

27   ALPERT's "HOA and [TIME WARNER] desire to make Services available to residents of the

28

<div align="center">3</div>

1    Property." The HOA agreement also provides under "Rates and Services" that the HOA "shall pay

2    to [TIME WARNER] a monthly bulk Multi-Channel Video Services fee..." for the services

3    provided to Residents. ALPERT, who is "resident" of the property managed by the HOA, is thus a

4    third party beneficiary of the HOA agreement which exists "to make Services available to

5    residents."

6    10.    To further clarify the relationship between the HOA and TIME WARNER, the HOA

7    agreement also provides under "Rates and Services" that the "HOA is not a reseller or provider of

8    the Services" and that "Residents will be billed directly for all service charges … assessed in

9    conjunction with Additional Services." In other words, the HOA agreement makes plain that it is

10    TIME WARNER, not the HOA, that is the "provider of Services," and that "Additional Services"

11    (if any) will be billed to the Resident directly.

12    11.    Lastly, under the heading "HOA's Obligations," the HOA agreement states that "HOA

13    hereby grants to [TIME WARNER] the exclusive right for the first five years of the Term, and the

14    non-exclusive right thereafter, to design, construct, install, operate, maintain, upgrade, and remove

15    a system at the Property for the provision of multi-channel video services..." Thus, TIME

16    WARNER clearly enjoys a significant competitive advantage by entering into such agreements.

17    12.    In the fall of 2006, noticing that his cable bill seemed unusually high, ALPERT contacted

18    TIME WARNER asking whether his bill reflected the fact that he was already paying for basic

19    cable services in his monthly HOA dues. A copy of that bill is attached hereto as Exhibit "B."

20    TIME WARNER concluded that it did not and subsequently changed his billing statement to

21    reflect HOA pricing that should have been charged to ALPERT all along. A copy of the revised

22    billing statement is attached hereto as Exhibit "C." Since the filing of the original complaint in this

23    matter, TIME WARNER has altered ALPERT's bill yet again, this time specifically breaking out

24    the basic cable fee as: "Basic Cable Paid By HOA" A copy of the newly revised billing statement

25    is attached hereto as Exhibit "D." Thus, despite being an HOA subscriber and therefore entitled to

26    HOA pricing, ALPERT had been unknowingly paying TIME WARNER the full cost of cable and

27    cable related services as if he had no existing service with TIME WARNER and as if he was not

28

4

FIRST AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES
(BUSINESS & PROFESSIONS CODE SECTION 17200)

1   already an existing basic cable subscriber.

2   13.   Despite its admitted error in ALPERT's billing, TIME WARNER refused to credit

3   ALPERT for the years of overpayment to TIME WARNER which amounted to hundreds of

4   dollars.  ALPERT has since learned TIME WARNER's practice of not properly billing HOA

5   subscribers was not unique to him and happens all too frequently.

6   14.   Misrepresenting the association affiliation, connection, or association with another is

7   unlawful under Civil Code section 1770(a)(1).   Here, TIME WARNER systematically

8   misrepresented its affiliation with HOAs such as ALPERT's by failing to inform ALPERT and

9   other HOA customers who elect to purchase additional services from TIME WARNER of the rates

10   to which they are entitled and which should have reflected the fact that ALPERT and other HOA

11   customers are already paying for basic cable services.  Rather, TIME WARNER treats such

12   customers as any other and fails to disclose the fact that TIME WARNER is already collecting

13   basic cable fees on behalf of that consumer.

14   15.   Likewise, making false or misleading statements concerning the reasons for, existence of,

15   or amounts of price reductions is a violation of Civil Code section 1770(a)(13).  Here, TIME

16   WARNER systematically misinforms consumers like ALPERT that the reason his cable bill is

17   being reduced after complaint to TIME WARNER is because of purported "bundling" of services,

18   when the real reason is because TIME WARNER is already collecting fees on behalf of such

19   consumers from the HOA for basic cable services.

20   16.   A comparison of ALPERT's billing statements demonstrates that TIME WARNER was

21   overcharging ALPERT by at least $ 21 each and every month for additional cable and cable related

22   services.  Prior to the change in his billing statement to properly reflect his HOA pricing for the

23   same services (identified on his bill as "HOA Standard Service"), ALPERT had been paying

24   approximately $ 154 per month for various cable and cable related services such as basic cable,

25   wireless "Road Runner" Internet access, a digital phone package, four premium channels (e.g.,

26   HBO, Showtime, etc.), and other services.  See Exhibit "B."  Once TIME WARNER priced

27   ALPERT correctly to reflect his HOA's existing agreement with TIME WARNER for basic cable

28

5

FIRST AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES
(BUSINESS & PROFESSIONS CODE SECTION 17200)

1  service (i.e., the "HOA Standard Service"), his bill for the exact same services (so called "Monthly

2  Charges") dropped to approximately $ 133. See Exhibits "C" and "D."

3  17.     The monthly difference of $ 21 was unfairly and deceptively pocketed by TIME WARNER

4  each and every month over a period of several years, all while ALPERT was already paying for his

5  basic cable services through his HOA.   TIME WARNER never informed him that as a Resident of

6  an HOA with whom TIME WARNER had an HOA agreement, was already paying for his basic

7  cable services and therefore entitled to HOA pricing which reflected that fact.

8  18.     In addition to TIME WARNER's failure to properly price HOA customers such as

9  ALPERT for cable and cable related services, TIME WARNER also fails to inform such customers

10  of HOA pricing on TIME WARNER's website, www.timewarnercable.com.  When referring to

11  TIME WARNER's website, a subscriber that is also a member of an HOA which is under contract

12  with TIME WARNER would have no idea that there is HOA pricing for such subscribers which

13  properly accounts for the cable services already provided under TIME WARNER's contract with

14  the subscriber's HOA.  Rather, a consumer in such a situation would likely be deceived that they

15  are required to pay full pricing for cable related services despite already paying for basic cable

16  through their HOA.

17  19.     Indeed, as of the filing of the original complaint in this action, on TIME WARNER's San

18  Diego website there was no mention whatsoever of HOA pricing for those subscribers that are

19  members of HOA's under contract with TIME WARNER. (www.timewarnercable.com/SanDiego).

20  Likewise, on TIME WARNER's Los Angeles website, there were numerous pricing schedules

21  applicable   to   various   cities   listed,   but   none   on   the   list   have   HOA   pricing.

22  (http://www.timewarnerla.com/pricingguides) On TIME WARNER's Desert Cities' website, there

23  was reference to HOA pricing packages, but was nearly impossible to locate or navigate to on

24  TIME WARNER's website and there was no pricing provided if a subscriber ever found it.

25  (www.timewarnercable/dsertcties).   The only pricing provided on any of the TIME WARNER

26  websites in California is for ordinary subscribers that are not HOA members and are not already

27  paying for basic cable through their HOAs.

28

6

20. Thus, while TIME WARNER enjoys the significant benefits of the reduction in competition by offering entire HOAs basic cable services to all their respective members and likewise enjoys the substantial fees generated thereby, TIME WARNER all but conceals HOA pricing from such subscribers for additional services offered by TIME WARNER. As in the case of ALPERT, TIME WARNER treats HOA subscribers as if those subscribers were not already paying for basic cable through their HOA and therefore entitled to pricing that reflects that fact. Such conduct is both unfair and deceptive and results in systematically overcharging HOA customers.

21. TIME WARNER's conduct with regard to overcharging HOA customers is further aggravated by TIME WARNER's unlawful and unfair billing procedure which is set forth on the back of every TIME WARNER bill and also appears in TIME WARNER's online subscriber agreement. In nearly impossible to read tiny script on the back of TIME WARNER's monthly billing statements appears the following: "Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct."

22. In the online subscriber agreement, TIME WARNER states the following: "2.(l) I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived." A contractually shortened limitations period has never been recognized outside the context of straightforward transactions in which the triggering event for either a breach of a contract or for the accrual of a right is "immediate and obvious." There is nothing immediate or obvious about TIME WARNER's billing practices.

23. Moreover, such a 30 "waiver" clause is unconscionable under Civil Code section 1770(a)(19), particularly in light of TIME WARNER's concealment of its true HOA pricing. Including an unlawful contract provision is a violation of the unlawful prong of Business & Professions Code section 17200, even if TIME WARNER never actually enforced it. In this case, TIME WARNER actually *did* enforce the "waiver" clause by refusing to credit ALPERT all of the overcharges he incurred as a result of TIME WARNER's unlawful, unfair and deceptive business

7

1  practices.

2  24.    To further frustrate a subscriber's ability to detect billing errors before they are "waived,"

3  TIME WARNER disclaims any responsibility in its online subscriber agreement for the accuracy

4  of its own pricing: "2.(j) … I agree that TWC is not responsible or liable for the quality of any

5  content, merchandise, products or Services (or the price thereof) made available to me …" The

6  online subscriber agreement is attached hereto as Exhibit "E." Thus, TIME WARNER disclaims

7  any liability for erroneous billing statements while limiting the subscriber to 30 days to discover

8  TIME WARNER's over charges.    This fact alone renders the 30 day "waiver" clause

9  unconscionable on its face since TIME WARNER takes no responsibility for the accuracy of prices

10  charged for its own services.

11  25.    In sum, using these contractual provisions, TIME WARNER puts the burden on the HOA

12  subscriber to determine whether TIME WARNER's bill is "correct" within 30 days of receipt

13  while concealing from the HOA subscriber HOA pricing that properly accounts for the cable

14  services already provided under TIME WARNER's contract with the subscriber's HOA and while

15  not taking responsibility for the accuracy of its own billing. Such conduct is plainly unfair and

16  deceptive.

17  26.    Such conduct is also unlawful because contrary to TIME WARNER's self-styled 30 day

18  statute of limitations on billing disputes, the law does not so limit challenges to overbilling

19  practices. Indeed, the statute of limitations under Business & Professions Code section 17200, as it

20  is for a simple breach of written contract, is four years, which is 48 times the length of time TIME

21  WARNER provides to challenge TIME WARNER's improper overcharges. Such a limitation on a

22  consumer's rights and remedies is contrary to law and is unfair and deceptive. While shortening a

23  statute of limitations to six (6) months has been held permissible under certain limited

24  circumstances, thirty (30) days most certainly has not. Moreover, such a limitation creates an

25  incentive for TIME WARNER to overcharge its HOA subscribers and to conceal HOA pricing for

26  as long as possible since TIME WARNER will only credit 30 days' worth of overcharges back to

27  the subscriber.

28

---

**8**

27.     This class action suit is filed on behalf of the plaintiff individually and on behalf of all members of the class defined in paragraph four (4) above under the provisions of California Code of Civil Procedure section 382, which provides that a class action may be brought when the question is one of common interest to many persons, or when the number of persons is numerous and it is impracticable to bring them all before the court.  This action is properly maintainable as a class action for the reasons set forth below.

28.     The class of persons for whose benefit this case is brought consists of thousands of individuals whose claims, except as to amount of restitution, are otherwise identical, and whose repetitive testimony at trial would be impracticable, unnecessary, and an inefficient use of judicial resources.  Moreover, the exhaustive list of class members is now within the exclusive possession and control of defendants, and is not now known to plaintiffs, although the list may readily be obtained using statutory discovery procedures.

29.     There are questions of law and fact common to members of the class and which predominate over questions involving individual class members.  The common questions include the following:

(a) Whether defendant TIME WARNER unlawfully, unfairly and/or deceptively overcharges HOA subscribers for cable and cable related services by not providing such customers HOA pricing that properly accounts for the cable services already provided under TIME WARNER's contract with the subscriber's HOA;

(b) Whether defendant TIME WARNER deceptively conceals HOA pricing from HOA subscribers;

(c) Whether defendant TIME WARNER unlawfully, unfairly and/or deceptively attempts to limit consumers' right to refunds for TIME WARNER overcharges by the purported contractual 30 day limit TIME WARNER requires to challenge billing errors;

(d) Whether defendant TIME WARNER's 30 "waiver" clause is unconscionable under Civil Code section 1770(a)(19), particularly in light of TIME WARNER's concealment of its true HOA pricing;

9

1  (e) Whether defendant TIME WARNER systematically misrepresented to HOA Residents like

2  ALPERT the affiliation, connection, or association with HOAs with whom it had contracted in

3  violation of Civil Code section 1770(a)(1);

4  (f) Whether defendant TIME WARNER systematically made false or misleading statements

5  concerning the reasons for, existence of, or amounts of price reductions in violation of Civil Code

6  section 1770(a)(13) by claiming the reason a cable bill is being reduced after complaint to TIME

7  WARNER because of purported "bundling" of services, when the real reason is because of the

8  HOA pricing to which ALPERT and the HOA Residents were entitled all along;

9  (g) Whether ALPERT and all other HOA Residents of HOAs with whom TIME WARNER has an

10  HOA agreement are third party beneficiaries of the HOA agreements which exist "to make

11  Services available to residents," and, if so, whether defendant TIME WARNER systematically

12  breached those agreements by charging Residents directly for services already provided and paid

13  for under the HOA agreements.

14  30.     The claims of the representative plaintiff are typical of the claims of the members of the

15  class.

16  31.     A class action is superior to other methods for the fair and efficient adjudication of this

17  controversy.  Since the practices defendant engaged in are common to all members of the class,

18  judicial economy is not served by multiple actions with duplicative and repetitive testimony.

19  32.     Plaintiff is aware of no difficulty which will be encountered in the management of this

20  litigation which would preclude its maintenance as a class action.

21  33.     The names and addresses of all class members are readily ascertainable from the records of

22  TIME WARNER and can be obtained in discovery.

23  34.  ·  The representative plaintiff will fairly and adequately protect the interests of the class and

24  has retained counsel competent and experienced in class action litigation.

25  35.     Plaintiff is entitled to an award of attorneys' fees and costs in prosecuting this action against

26  TIME WARNER because:

27  (a)     A successful outcome in this action will result in the enforcement of important rights

28

10

1  affecting the public interest by maintaining the integrity of businesses that operate in the State of

2  California;

3  (b)    This action will result in a significant benefit by causing the return of significant

4  overcharges paid to TIME WARNER which monies should not have been charged or collected,

5  together with interest on those monies;

6  (c)    Unless this action is prosecuted, the class and the general public will not recover those

7  monies, and many members of the general public would not be aware that they were injured by

8  TIME WARNER's wrongful practices; and

9  (d)    Unless the attorneys' fees and costs are awarded against TIME WARNER, the general

10  public will not be fully redressed.

11                          **FIRST CAUSE OF ACTION**

12                    (Violation of Business & Professions Code section 17200)

13  36.    Plaintiff realleges and incorporates herein by reference each and every allegation contained

14  in Paragraphs 1 through 35, inclusive, as though set forth in full herein.

15  37.    Business & Professions Code section 17200 proscribes any business activity that is

16  "unlawful" or "deceptive" or "unfair." An "unlawful" business practice is anything that can

17  properly be called a business practice and that at the same time is forbidden by law. A business

18  practice is prohibited if it is 'unfair' or 'deceptive' even if not 'unlawful' and vice versa. The

19  standard is intentionally broad allowing courts maximum discretion to prohibit new schemes to

20  defraud.

21  38.    TIME WARNER has systematically violated Business & Professions Code section 17200

22  by unlawfully, unfairly and/or deceptively overcharging HOA customers for cable and cable

23  related services by not providing such customers HOA pricing that properly accounts for the cable

24  services already provided under TIME WARNER's contract with the subscriber's HOA.

25  39.    TIME WARNER has systematically violated Business & Professions Code section 17200

26  by unlawfully, unfairly and/or deceptively attempting to limit subscribers' rights to seek refunds

27  for overcharges to a mere 30 days after receipt of a bill, all while TIME WARNER fails to

28

11

FIRST AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES
(BUSINESS & PROFESSIONS CODE SECTION 17200)

1   disclose that HOA pricing is available to HOA subscribers that properly accounts for the basic

2   cable services already provided under TIME WARNER's contract with the subscriber's HOA.

3   40.    TIME WARNER has systematically violated Business & Professions Code section 17200

4   through its inclusion in its online subscriber agreement of an unconscionable 30 "waiver" clause in

5   violation of Civil Code section 1770(a)(19), particularly in light of TIME WARNER's

6   concealment of its true HOA pricing;

7   41.    TIME WARNER has systematically violated Business & Professions Code section 17200

8   by misrepresented to HOA Residents like ALPERT the association affiliation, connection, or

9   association with HOAs with whom it had contracted in violation of Civil Code section 1770(a)(1).

10  42.    TIME WARNER has systematically violated Business & Professions Code section 17200

11  by systematically making false or misleading statements concerning the reasons for, existence of,

12  or amounts of price reductions in violation of Civil Code section 1770(a)(13) by claiming the

13  reason a cable bill is being reduced after complaint to TIME WARNER is because of purported

14  "bundling" of services, when the real reason is because of the HOA pricing to which ALPERT and

15  the HOA Residents were entitled all along.

16  43.    TIME WARNER has systematically violated Business & Professions Code section 17200

17  by systematically breaching its HOA agreements which exist "to make Services available to

18  residents" by charging Residents directly for services already provided for and paid for under the

19  HOA agreements.

20  44.    Plaintiff ALPERT seeks restitution for himself and for all those California consumers

21  similarly situated.  Plaintiff ALPERT, as an existing HOA subscriber, and who may again be

22  overcharged by TIME WARNER at any time in the future under TIME WARNER's scheme, also

23  seeks to enjoin such unlawful, unfair and deceptive business practices.

24                                           **PRAYER**

25  WHEREFORE, plaintiff requests judgment against defendants and each of them as follows:

26  1. For restitution of the overcharges unlawfully collected in violation of Business & Professions

27  Code section 17200 for plaintiff and all members of the plaintiff class in the State of California

28

---

12

FIRST AMENDED CLASS ACTION COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS PRACTICES
(BUSINESS & PROFESSIONS CODE SECTION 17200)

1    during the four years preceding the filing of the complaint in this matter, all according to proof;

2    2. For interest at the legal rate of interest on the foregoing sum;

3    3. For an injunction prohibiting TIME WARNER from engaging in such unlawful, unfair and

4    deceptive business practices;

5    4. For costs of suit herein incurred;

6    5. For reasonable attorneys' fees; and

7    6. For such other and further relief as the Court deems just and proper.

8

9    Dated: May 16, 2007

                    HENDERSON & CAVERLY LLP

                    Barron E. Ramos
                    Kristen E. Caverly
                    Attorneys for plaintiff and the Class

13

1  **PROOF OF SERVICE**

2    I am employed in the County of San Diego, California.  I am over the age of 18 years and

3  not a party to the within action.  My business address is Henderson & Caverly LLP, P.O. Box

4  9144, 16236 San Dieguito Road, Suite 4-13, Rancho Santa Fe, California 92067.

5    On May 16, 2007, I served the following document:

6

7    1. **FIRST AMENDED** COMPLAINT FOR UNLAWFUL, UNFAIR AND DECEPTIVE
       BUSINESS PRACTICES (BUSINESS & PROFESSIONS CODE SECTION 17200)

8    2. NOTICE OF CASE REASSIGNMENT DUE TO CHALLENGE, RECUSAL, OR
9       SPECIAL ASSIGNMENT

10  on the parties in this action by placing a true copy thereof in a sealed envelope, addressed as

11  follows:

12  Jeffrey M. Shohet                     *Attorneys for Time Warner Entertainment-*
    Julie L. Hussey                       *Advance NewHouse Partnership, A New York*
13  Carrie S. Dolton                      *General Partnership, Through its San Diego*
    **DLA PIPER US LLP**                  *Division d.b.a. Time Warner Cable*
14  401 B Street, Suite 1700
15  San Diego, CA 92101-4297

16

17  ☑  (BY MAIL) I placed each such sealed envelope, with postage thereon fully prepaid for first-
       class mail, for collection and mailing at Henderson & Caverly LLP, Rancho Santa Fe,
18     California, following ordinary business practices.  I am familiar with the practice of
       Henderson & Caverly LLP for collection and processing of correspondence, said practice
19     being that in the ordinary course of business, correspondence is deposited in the United States
       Postal service the same day as it is placed for collection.

20

21    I declare under penalty of perjury under the laws of the State of California that the

22  foregoing is true and correct.

23    Executed at Rancho Santa Fe, California on May 16, 2007.

24

25                                        Leia Villasenor

26

27

28

                                          1                    CASE NO. GIC 881621
                                                               PROOF OF SERVICE

EXHIBIT A

# EXHIBIT A

**Recording Requested By**

And Return To:
    Time Warner Cable
    8949 Ware Court
    San Diego, CA 92121-2275

Transfer Tax:  None

**TIME WARNER CABLE**

---

# TIME WARNER CABLE
## SYSTEM INSTALLATION AND SERVICE AGREEMENT
### CITY OF SAN DIEGO/SAN DIEGO SYSTEM

**EFFECTIVE DATE:** 10/1/05

## PARTIES:

**Operator:**

**Time Warner Entertainment-Advance Newhouse Partnership, a New York general partnership, dba TIME WARNER CABLE**
8949 Ware Court
San Diego, CA 92121
Contact Person: Janette Larson
Telephone: (858) 635-8418
Facsimile: (858) 536-8729

**HOA:**

**SEA POINT COMMUNITY ASSOCIATION**
13022 Caminito Del Rocio
Del Mar, CA 92014
Contact Person: Dale Cook
Telephone: (858) 755-1918
Facsimile: (858) 755-4929

## PROPERTY:

**SEA POINT TOWNHOMES**
13022 Caminito Del Rocio
Del Mar, CA 92014
Number of Units: 237

## RECITALS

- HOA is the homeowners, condominium owners, or townhome owners association for the multi-unit residential property referred to above and as further described in the legal description set forth on *Exhibit A* (the "Property").

- HOA and Operator desire to make the Services available to residents of the Property ("Residents") in accordance with the terms and conditions of this Agreement.

## TERMS AND CONDITIONS

In consideration of the Recitals and the mutual covenants contained in this Agreement, HOA and Operator agree as follows:

1. **OPERATOR'S SERVICE OBLIGATIONS.**

1.1    Services. The term "Services" means the services described below.

(A) **Bulk Multi-Channel Video Services.** Upon the Activation Date (as defined below), Operator will offer Bulk Multi-Channel Video Services to Residents. "Bulk Multi-Channel Video Services" means the package of multi-channel cable television and other video-and/or-sound services provided over the System (as defined below), as set forth on *Exhibit B*.

(B) **Additional Services.** Operator may offer and provide Additional Services to Residents on a non-exclusive basis. "Additional Services" means any services other than the Bulk Multi-Channel Video Services that can be provided to the Residents over the System, including, but not limited to, premium channels, pay-per-view, music, digital tier, video-on-

demand, and other video and music services not included in the Bulk Multi-Channel Video Services package, high-speed data and Internet access services, voice services, etc.

1.2 **Installation of System (as Applicable).** To the extent necessary (*e.g.*, there is no, or there is insufficient, existing wiring and facilities) and at Operator's sole expense, Operator will design, construct, install, and/or upgrade the System on the Property in accordance with industry standards, Laws and Regulations (as defined in Section 14.3), and a construction plan, specifications and schedule (the "**Construction Plan**") agreed upon by HOA and Operator within 60 days of the Effective Date. The "**Activation Date**" shall be that date agreed upon by HOA and Operator in the Construction Plan. "**System**" means all equipment, facilities, wiring (including internal building wiring and external distribution wiring), conduit, and molding that Operator installs or upgrades on the Property, that Operator provides for installation by HOA or a third party at the Property, or that exist on the Activation Date and that Operator uses to deliver the Services, regardless of whether any such components are in use at any given time.

1.3 **Maintenance of System; Restoration of Property.** At Operator's sole expense, Operator will (A) maintain, repair, and operate the System in accordance with industry standards and Laws and Regulations and (B) repair and restore all portions of the Property damaged by Operator (regardless of whether such damage occurred during installation, upgrading, repair, or removal of the System) to its condition immediately prior to such damage.

1.4 **Marketing Materials.** Operator will provide HOA with marketing materials, service-order materials, sales support, and sales training so that HOA can market the Services as provided in Section 4.4.

2. **RATES AND SERVICES.**

HOA shall pay to Operator a monthly Bulk Multi-Channel Video Services fee as set forth on *Exhibit B*. HOA acknowledges that Operator (and its designated Affiliates (as defined in Section 11.1)) is the sole provider of the Bulk Multi-Channel Video Services under the terms of this Agreement, and that HOA is not a reseller or provider of the Services. Residents will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in conjunction with Additional Services. In no event will HOA be responsible for any fees or charges incurred by Residents for Additional Services.

3. **OWNERSHIP AND USE OF SYSTEM DURING TERM.**

During the Term, Operator will own and have the exclusive right to access, control, and operate the System, except for any equipment, facilities, conduit, or wiring owned by HOA or a third party (if any), in which case (as between HOA and Operator) HOA shall own such items, and HOA hereby grants to Operator the exclusive right to access, use, maintain, and upgrade such items during the Term. For purposes of clarity, Operator owns any wiring provided by Operator to HOA for installation by HOA or its contractors. HOA shall not, and HOA shall not permit any third party to, access, move, use, or interfere with any part of the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. HOA will provide the power necessary to operate any of Operator's equipment that is located on the Property.

4. **HOA'S OBLIGATIONS.**

4.1 **Grant of Easement; Termination of Easement.** At the time of signing this Agreement, HOA will execute an Easement and Memorandum of Agreement in the form of *Exhibit C*, which may be recorded by either party at any time. Upon the expiration or proper earlier termination of this Agreement as permitted hereby, and upon HOA's request, Operator promptly will execute a reasonable Termination of Easement and Memorandum of Agreement that HOA may record to evidence the termination of this Agreement and the Easement and Memorandum of Agreement.

4.2 **Grant of Rights.** HOA acknowledges that Operator will spend substantial time, resources, and money in meeting its obligations under this Agreement, and that Operator is relying on HOA's covenants in this Agreement in order to recoup its investment by providing the Services to the Property and by collecting revenues therefor. Accordingly, HOA hereby grants to Operator (A) the exclusive right for the first five years of the Term, and the non-exclusive right thereafter, to design, construct, install, operate, maintain, upgrade, and remove a system at the Property for the provision of multi-channel video services; (B) the exclusive right during the Term to install, occupy, maintain, and remove the molding and other conduit housing the wiring of the System without alteration by HOA or third parties; (C) the exclusive right for the first

five years of the Term, and the non-exclusive right thereafter, to offer and provide multi-channel video services to Residents; (D) the exclusive right for the Term to market on site at the Property multi-channel video services to Residents; and (E) the non-exclusive right during the Term to market, offer, and provide Additional Services. During the Term, HOA shall not contract with any other provider to purchase services under a bulk-buy arrangement for multi-channel video services, high-speed data or Internet access service, telephone or telephony–related services. If Laws and Regulations in effect as of the Effective Date prohibit HOA from granting or Operator from obtaining exclusive rights under this Section 4.2, then such rights automatically shall be deemed non-exclusive to the extent and only for so long as required by such Laws and Regulations.

4.3    **System Inspection Requirement.** No less than one time per calendar quarter during the Term, HOA shall cause its on-site management to carefully and diligently inspect the pedestals, lockboxes, and other secured or accessible areas housing the components of the System to ensure the integrity thereof and to ensure that no other party has accessed or is using the System. HOA immediately shall notify Operator of (A) any damage to, forced access of, or unauthorized use of, the System (including any pedestal, lockbox, or other secured or accessible area housing the components of the System), and (B) any condition or occurrence that is likely to adversely affect the System or provision of Services.

4.4    **Marketing and Sales.**

(A)    HOA will (i) provide Residents and prospective Residents with Operator's current publications describing Operator's Services and (ii) display Operator's marketing and sales materials relating to Services in HOA's sales office or clubhouse for the Property.

(B)    HOA will allow Operator to periodically host an event on the Property, at Operator's expense, to introduce Services to Residents and prospective Residents. Operator may reasonably try to remarket Services to Residents who order less than all available Services.

5.    **TERM.**

The initial term of this Agreement commences on the Effective Date and shall continue in effect for 5 (five) years. The initial term automatically will be extended for successive one-year periods unless either party notifies the other at least 90 days before the expiration of the initial term or any renewal term, as the case may be, that it does not wish to extend the Agreement. The initial term and any extensions thereof are collectively referred to as the "**Term**".

6.    **REPRESENTATIONS AND WARRANTIES.**

6.1    **HOA's Representations and Warranties.** HOA represents, warrants, and covenants to Operator that (A) HOA is the sole legal and equitable owner in fee simple of the areas of the Property where the System will be located; (B) no purchase contracts exist with respect to such areas of the Property (although the parties acknowledge that the individual units will be available for sale to purchasers); (C) the legal description attached to this Agreement is the complete, accurate and current legal description of the Property; (D) the Property is not part of a bankruptcy proceeding, foreclosure action, deed-in-lieu-of-foreclosure transaction, or similar proceeding; (E) HOA has the full power and authority to negotiate, execute, deliver, and perform this Agreement and the Easement and Memorandum of Agreement; (F) the party signing this Agreement and the Easement and Memorandum of Agreement is duly authorized to execute and deliver such documents on behalf of HOA; (G) HOA owns and/or has the right to grant to Operator hereunder the exclusive right to use all parts of the System not owned by Operator (including any third party wiring, molding or components), if any; and (H) there are no agreements, understandings, or intentions with or between HOA and any other party that conflict with this Agreement.

6.2    **Operator's Representations and Warranties.** Operator represents, warrants and covenants to HOA that (A) Operator has the full power and authority to negotiate, execute, deliver, and perform this Agreement; (B) the party signing this Agreement is duly authorized to execute and deliver the Agreement on behalf of Operator; (C) Operator currently has, and will maintain during the Term, all required licenses, permits, and approvals necessary to permit Operator to operate the System and provide the Services; and (D) there are no agreements, understandings, or intentions with or between Operator and any other party that conflict with this Agreement.

## 7. DEFAULT AND REMEDIES.

**7.1**  **Default.** In addition to the other breaches or defaults specified in this Agreement, a "default" exists under this Agreement upon any of the following events: (A) if HOA fails to meet or perform any payment obligation contained in this Agreement and then does not cure such failure within five business days after receiving notice from Operator of such payment default; (B) if HOA or Operator fails to meet or perform any material term, provision, covenant, agreement, or obligation contained in this Agreement (excluding failures to pay subject to (A) above, but including, without limitation, an Assignment Default (as defined in Section 11.2)) and then does not cure such failure within 30 days (or, if applicable, such longer time period as is expressly permitted elsewhere hereunder) after receiving notice from the other party that reasonably details such breach; (C) if HOA or Operator becomes a debtor in a bankruptcy proceeding or similar action or proceeding that is not permanently dismissed within 60 days; or (D) if HOA or Operator becomes insolvent.

**7.2**  **Remedies.** Except as specifically provided otherwise in this Agreement, the parties shall be entitled to seek all remedies available at law or in equity with respect to a breach or default under this Agreement by the other (including injunctive relief and specific performance, in cases where it is provable that such breach or default is causing or would cause irreparable damage or where no adequate remedy at law is available), and such rights and remedies shall be cumulative. If a party defaults and fails to cure such default as provided in this Agreement, then the nondefaulting party, in addition to all other available remedies, may terminate this Agreement by giving 30 days' notice to the defaulting party.  If HOA defaults pursuant to Section 7.1(A), or if HOA fails to make timely payment to Operator more than two times in any 12-month period (notwithstanding any requirement of notice from Operator or opportunity to cure under Section 7.1(A)), then, in addition to any other remedies available to Operator, Operator may elect to terminate the Bulk Multi-Channel Video Services and in lieu thereof  to provide its multi-channel video services  on an individually billed basis directly to Residents for the remainder of the Term.

## 8. LIMITATION OF WARRANTIES AND LIABILITY.

EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, OPERATOR MAKES NO REPRESENTATIONS OR WARRANTIES-- EXPRESS OR IMPLIED-- REGARDING THE SYSTEM OR THE SERVICES, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES.

## 9. INDEMNIFICATION.

**9.1**  **From Operator.** Operator will defend, indemnify and hold harmless HOA and, as applicable, HOA's shareholders, members, partners, directors, managers, officers, employees, contractors, agents, representatives, and affiliates (collectively, "Related Parties") from and against all claims, liabilities, losses, costs, or damages, including reasonable attorney and other fees and costs relating to the investigation and defense of such matters (collectively, "Losses"), incurred by HOA or its Related Parties that result from (A) Operator's design, construction, installation, operation, or maintenance of the System, (B) Operator's provision of Services, or (C) Operator's breach of its representation and warranties in Section 6.2.

**9.2**  **From HOA.** HOA will indemnify and hold harmless Operator and, as applicable, Operator's Related Parties from and against all Losses incurred by Operator or its Related Parties that result from (A) damage to any part of the System caused by HOA or its Related Parties, (B) any claim arising out of HOA's operation of the Property, or (C) HOA's breach of its representations and warranties in Section 6.1, or its covenants in Section 4.3 or 11.2.

## 10. OWNERSHIP AND REMOVAL OF SYSTEM AFTER TERM.

**10.1**  **Ownership and Removal of System after Termination or Expiration.**  Subject to Laws and Regulations, upon expiration or proper earlier termination of this Agreement as permitted hereby, Operator shall retain ownership of, and for 90 days after such expiration or termination be entitled at Operator's option, to remove, abandon,

disable, or sell, all of the respective components of the System, unless HOA or a third party owns any such System components, in which case (as between HOA and Operator) HOA shall retain ownership of such components and Operator shall not be entitled to remove or disturb such components not owned by Operator. Operator will pay its removal costs unless this Agreement was terminated as a result of HOA's uncured default, in which case HOA will bear Operator's reasonable removal costs.

10.2    **Mandatory Access Laws and Regulations.** Notwithstanding anything to the contrary in this Article 10 or the Agreement, if Laws and Regulations require HOA to provide Operator with access to the Property for the provision of any service, then Operator shall (A) continue to own and/or be permitted to access and use all System components (as provided in Article 3) to provide service to the Property, and **(B)** have the right to remove, abandon, disable, or sell the System components (as provided in Section 10.1) within 90 days after Operator no longer is permitted access to the Property by Laws and Regulations to provide such service.

11.    **ASSIGNMENT.**

Operator may assign this Agreement to **(A)** any parent, Affiliate (an **"Affiliate"** means an entity in which Operator, Time Warner Inc., Time Warner Cable Inc., or Time Warner Entertainment Company, L.P. has an ownership interest of 25% or more), successor (by operation of law or otherwise), or subsidiary that Operator may have or **(B)** any entity that purchases Operator's overall cable television system serving the Property. Upon the new operator's written assumption of all of Operator's obligations and duties under this Agreement, Operator will be relieved of any further liability or obligations to HOA attributable to periods from and after the effective date of such assumption.

12.    **CONFIDENTIALITY.**

Except as specifically provided in this Agreement, and except for disclosures required by Laws and Regulations, HOA and Operator will **(A)** keep this Agreement and its terms confidential, **(B)** keep confidential and not disclose to any other party any information that is provided by one party to the other and that is marked as confidential, **(C)** not disclose or use any such confidential information for any purpose other than performance of this Agreement, and **(D)** not make any public

announcement or press release about this Agreement without the other's prior approval. Notwithstanding the foregoing, each party shall be entitled to disclose the terms of this Agreement to its financial, legal, and other advisors and consultants, and to prospective lenders or purchasers of the Property, in each case on a need-to-know basis and provided that such recipients are obligated to maintain the confidentiality of the terms of this Agreement without further disclosure to any other party.

13.    **PROPRIETARY NAMES.**

Neither party will use any proprietary or trade name of the other except as specifically permitted in writing by the owner of the name.

14.    **MISCELLANEOUS PROVISIONS.**

14.1    **Notices.** All notices, requests, approvals, demands, consents, and other communications that are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by facsimile, courier, registered, or certified mail (postage prepaid), overnight delivery or in person to a party's address stated at the head of this Agreement. Such notice shall be effective, **(A)** if sent by facsimile, when confirmation of transmission is received, or **(B)** otherwise, upon actual receipt or rejection by the intended recipient. Either party may change its address by giving notice to the other party in accordance with this Section.

14.2    **Force Majeure.** Despite anything to the contrary in this Agreement, neither party will be liable or in breach of or default under this Agreement for any delay or failure of performance resulting directly from anything beyond the reasonable control of the non-performing party (a **"Force Majeure Event"**), including, but not limited to, acts of God; acts of civil or military authority; acts of a public enemy; war; terrorism; severe weather, earthquakes, or floods; fires or explosions; governmental action or regulation; strikes, lockouts, or other work interruptions or labor shortages; supplier shortages; transportation and delivery delays; or blocked access rights. Payment of monies due shall not be subject to Force Majeure Events. So long as the non-performing party diligently and continuously attempts to cure the non-performance caused by the Force Majeure Event (giving consideration to the effect of the Force Majeure Event on such party's overall business operations), the time for performance shall be extended commensurate with the duration of the Force Majeure Event.

**14.3  Compliance with Laws and Regulations; Choice of Law; Waiver of Right to Jury Trial.** The terms of this Agreement shall be subject to, and in the performance of their respective obligations under this Agreement the parties shall comply with, all applicable federal, state, and local laws and regulations (including the rules and regulations of governmental and regulatory authorities with jurisdiction over the parties), and, with respect to Operator only, the requirements of Operator's franchise agreement for the franchise area where the Property is located (collectively, **"Laws and Regulations"**). Nothing in this Agreement shall prohibit Operator from fully complying with all Laws and Regulations, including any consents, agreements, orders, or other requirements mandated by or entered into with the Federal Communications Commission or other governmental authority, and such compliance shall be deemed not to constitute a breach of or default under this Agreement. This Agreement is governed by and shall be interpreted under the laws of the state in which the Property is located, without regard to its choice-of-law provisions. **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY ENFORCEMENT ACTION OR CLAIM RELATING HERETO.**

**14.4  Severability and Unenforceable Provisions.** If any portion of this Agreement is rendered invalid or otherwise unenforceable under Laws and Regulations or by a governmental, legal or regulatory authority with jurisdiction over the parties, then the remainder of this Agreement will continue in full force unless such continuance will deprive one of the parties of a material benefit intended hereunder or frustrate the main purpose(s) of this Agreement. In such event, the party that has been deprived of such material benefit (**"Affected Party"**) may notify the other, and the parties promptly thereafter shall use their reasonable best efforts to replace or modify the invalid or unenforceable provision with a provision that, to the extent not prohibited by Laws and Regulations, achieves the purposes intended under the invalid or unenforceable provision.

**14.5  Scope of Agreement; Modifications.** This Agreement constitutes the entire agreement between HOA and Operator with respect to, and supersedes all other agreements relating to, the subject matter contained herein. This Agreement can be modified or changed only by a written instrument signed by both parties. A party's waiver of enforcement of any of the terms or conditions of this Agreement will be effective only if in writing. The relationship between HOA and Operator is that of independent contractors, and not one of principal and agent, joint venture, or partnership.

**14.6  Enforcement Costs.** If either party sues or brings any other type of enforcement action in connection with this Agreement, then the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs in connection with such enforcement.

**14.7  Headings; Exhibits.** Headings are for reference only and do not affect the interpretation of this Agreement. All exhibits are fully incorporated into this Agreement by their reference herein.

**14.8  Survival.** The terms of Articles 8, 9, 10 and 12 and Sections 14.3 and 14.6 will survive the expiration or termination of this Agreement for any reason.

**14.9  Counterparts.** This Agreement may be executed in any number of counterparts, each of which is considered an original.

The parties have caused their duly authorized representatives to sign this Agreement effective as of the Effective Date.

**TIME WARNER CABLE**

Signature: _Ernie Villicana_     11/30/05

By: Ernie Villicana

Title: Vice President – Marketing & Programming

**SEA POINT COMMUNITY ASSOCIATION**

Signature: _Sheldon Krueger_

By: SHELDON KRUEGER

Title: PRESIDENT

Confidential & Proprietary
Residential Bulk Services Agreement

# EXHIBIT A
## TO
## RESIDENTIAL BULK SERVICES AGREEMENT

## Legal Description of the Property

(Attached.)

# EXHIBIT B
## TO
## RESIDENTIAL BULK SERVICES AGREEMENT

## Description of Bulk Multi-Channel Video Services and Fee

### BULK MULTI-CHANNEL VIDEO SERVICES

A channel line-up for the Bulk Multi-Channel Video Services is attached.  Subject to Laws and Regulations, Operator shall be entitled to add to, delete from, move channel positions, and otherwise modify the Bulk Multi-Channel Video Services in its sole discretion from time to time, but the level of Bulk Multi-Channel Video Services shall at all times remain reasonably comparable to the level of Bulk Multi-Channel Video Services offered by Operator in the Franchise area.

### BULK MULTI-CHANNEL VIDEO SERVICES FEE

The Bulk Multi-Channel Video Services fee shall be **$28.77** per home/unit (plus any applicable taxes and franchise fees) per month, regardless of whether such homes/units are occupied.  The Bulk Multi-Channel Video Services fee does not include Operator's fees (if applicable) to provide necessary consumer-grade equipment to Residents to receive the Bulk Multi-Channel Video Services, which fees (if applicable) shall be billed for and paid by HOA. Consumer-grade equipment provided to Residents for Additional Services shall be billed to and paid by the individual Resident subscribers.  Upon at least 30 days' prior written notice to HOA, Operator shall be entitled to raise the Bulk Multi-Channel Video Services fee, provided that such increases shall not exceed 5% during any calendar year.

During the Term, Operator will bill HOA for the Bulk Multi-Channel Video Services fee on a monthly basis and payment by HOA shall be due within 30 days after the date of such invoice.  Operator may bill HOA in advance for the Bulk Multi-Channel Video Services fee, provided that HOA shall not be required to pay any invoice more than 30 days prior to the month to which such invoice applies.  If Operator fails to present an invoice prior to the first day of the month for which Bulk Multi-Channel Video Services are being provided, such failure shall not constitute a waiver of the Bulk Multi-Channel Video Services fee, and HOA promptly shall pay such invoice when delivered by Operator.

Any payments not received by Operator within 30 days after the date of invoice automatically shall incur a late payment fee of 1.5% per month (pro-rated on a daily basis), or the maximum monthly amount permitted by Laws and Regulations, whichever is less.  The late payment fee shall apply from the due date of such payment until the date such amount is paid in full.



**Expanded Cable Television Service (Advantage Service)**

| | |
|---|---|
| 1 On-Demand | 40 Bravo |
| 2 TBS | 41 Outdoor Life Network |
| 3 WGN | 42 VH1 |
| 4 Cable 4 Padres | 43 American Movie Classics |
| 5 KSWB (69) San Diego (WB) | 44 Discovery Channel |
| 6 XETV (6) San Diego (FOX) | 45 A&E |
| 7 KNSD (39) San Diego (NBC) | 46 International Channel |
| 8 KFMB (8) San Diego (CBS) | TV Guide Channel |
| 9 KUSI (51) San Diego (IND) | 48 E! |
| 10 KGTV (10) San Diego (ABC) | 49 CNBC |
| 11 KPBS (15) San Diego (PBS) | 50 MSNBC |
| 12 San Diego Network | 51 Food Network |
| 13 XUPN (13) San Diego (UPN) | 52 FX Channel |
| 14 KTLA (5) Los Angeles (WB) | 53 Home & Garden TV |
| 15 San Diego News Channel 15 | 54 WE: Women's Entertainment |
| 16 ITVS San Diego's Learning Channel | 55 The Learning Channel |
| 17 KBNT (Univision) | 56 The History Channel |
| 18 UCSD-TV | 57 Sci-Fi Channel |
| 19 CPC Community Programming | 58 MOVIEPlex |
| 20 C-SPAN | 59 Turner Classic Movies |
| 22 County | 60 Hallmark |
| 23 C-SPAN 2 | 61 Lifetime Movie Network |
| 24 Cityscape/NASA | 62 Cartoon Network |
| 25 QVC | 63 The Disney Channel |
| 26 CNN | 64 Animal Planet |
| 27 TNT | 65 TV Land |
| 28 CNN Headline News | 66 Telemundo (XHAS Ch.33) |
| 29 ESPN | 67 Golf Channel |
| 30 ESPN 2 | 68 Comedy Central |
| 31 FOX Sports Net West | 69 National Geographic |
| 32 Lifetime | 70 The Travel Channel |
| 33 Nickelodeon | 71 Leased Access |
| 34 USA Network | 72 Home Shopping Network |
| 35 ABC Family | 73 PAX |
| 36 MTV | 74 Country Music Television |
| 37 Fox News Channel | 75 BET |
| 38 Spike TV | 76 The Weather Channel |
| 39 Court TV | |

# Exhibit C
## To
## Residential Bulk Services Agreement

### Form of Easement and Memorandum of Agreement

Attached.

# EASEMENT AND
## MEMORANDUM OF AGREEMENT

**DOCUMENT PREPARED BY:**

Janette Larson

**AFTER RECORDING, RETURN TO:**

Time Warner Cable
8949 Ware Court
San Diego, CA 92121


1.    **Grant of Easement**

        In consideration of the covenants and agreements in the Agreement (as defined below), for $10, and for other good and valuable consideration, the receipt and sufficiency of which **SEA POINT COMMUNITY ASSOCIATION** ("Grantor") grants to **TIME WARNER CABLE** ("Grantee"), its successors and assigns, a non-exclusive easement on Grantor's property and all its improvements (as described in the attached *Exhibit A* hereto) (the "Property"). This Easement is for the purposes of permitting Grantee and its affiliates and contractors to design, construct, install, operate, market, maintain, upgrade, repair, replace, and remove a system (including internal and external wiring, poles, conduits, molding, pipes, antennas, servers, switch equipment, software, central processing units, and other facilities and equipment ("System")) for the offering and delivery of multi-channel video, television, entertainment, Internet, and other services that may be delivered over the System to the Property and any other properties that can be served by such System, as more fully provided in the Residential Bulk Services Agreement between Grantor and Grantee with respect to the Property (the "Agreement"). During the term of the Agreement and this Easement, Grantee shall own, and Grantee shall have the exclusive right to access, control, and operate, the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. Ownership and removal of the System after the expiration of the Agreement and this Easement shall be pursuant to the Agreement. Grantor will also provide reasonable space for Grantee's equipment.
        Grantor reserves the right to grant other easements on the Property, but will not allow such other easements to cause unreasonable interference with the easement granted to Grantee herein.

        Grantee will have and hold the easement, together with every right and appurtenance connected to it, for an initial term of ten years from the Activation Date (as defined in the Agreement) and for so long thereafter as Grantee is providing services to the Property under the Agreement. Upon the natural expiration of the Agreement or proper earlier termination of the Agreement by Grantor for Grantee's uncured breach under the Agreement, this Easement automatically will terminate after an additional 90-day continuation period solely for the purpose of allowing Grantee to remove its System. Grantor, its successors and assigns hereby agree to warrant and forever defend the easement to Grantee--as well as its successors and assigns--against every person who claims any part of it.

        This easement and other rights granted to Grantee run with the title to the Property and are binding on Grantor and on all subsequent owners of the Property, as well as on others who may claim an interest in the Property.

## 2.    Memorandum of Agreement

In addition to the rights granted above, the Agreement grants to Grantee certain exclusive rights to market, offer, and provide multi-channel video services and the non-exclusive right to market, offer, and provide additional services to residents of the Property.

DATED EFFECTIVE AS OF: _10/1/2005_

**SEA POINT COMMUNITY ASSOCIATION**                    **WITNESSED BY:**

By: _Sheldon Krueger_                                   By:_____

Title: _President_                                      Printed Name:_____

State of _California_ )
                        ) ss:    (See attached: CALIFORNIA ALL-PURPOSE
County of _San Diego_ )          ACKNOWLEDGMENT

This instrument was acknowledged before me by _____ as the __
_____ of _____
_____ on _____
_____, 20___.

Witness my hand and official seal.

_____
                    [SEAL]
Notary Public

My commission expires:_____

State of _____)
                         ) ss:
County of _____)

This instrument was acknowledged before me by _____
_____ as a witness to the execution of this instrument by the above-named Grantor representative on ___
_____, 20___.

Witness my hand and official seal.

_____
                    [SEAL]
Notary Public

My commission expires:_____

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _San Diego_ } ss.

On _October 14, 2005_ before me, _Linda J. Luke, Notary Public,_
Date ............................................... Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Sheldon Krueger_
......................................................................... Name(s) of Signer(s)

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence

```
┌────────────────────────────────┐
│          LINDA J. LUKE          │
│       Commission # 1486500      │
│     Notary Public - California   │
│         San Diego County         │
│    My Comm. Expires May 25, 2008 │
└────────────────────────────────┘
```

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Linda J. Luke_
............................................
Signature of Notary Public

───────────── OPTIONAL ─────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _Time Warner Cable System Installation_

Document Date: _10/01/05_  _Ex "A" & "B" & "C"_ ...... Number of Pages: _____

Signer(s) Other Than Named Above: _Time Warner Cable_

## Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

```
┌──────────────────────┐
│  RIGHT THUMBPRINT     │
│     OF SIGNER         │
│   Top of thumb here   │
│                       │
│                       │
│                       │
│                       │
└──────────────────────┘
```

© 1999 National Notary Association · 9350 De Soto Ave., P.O. Box 2402 · Chatsworth, CA 91313-2402 · www.nationalnotary.org     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

# EXHIBIT B

**TIME WARNER CABLE**

Page 1 of 3

Bill Date: February 12, 2006
Account Number: 834010 110 0088309

How to reach us ....
**CUSTOMER SERVICE (858) 695-3220**
**OPEN DAILY 24 HOURS**

#BWNKTNR
#16508800206110968
LEON ALPERT
1206 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

## Account Snapshot

| | |
|---|---|
| Previous Balance | $ 163.44 |
| Payments | - 163.44 |
| Monthly Charges | 154.70 |
| Adjustments | 6.61 |
| Taxes & Fees | 7.13 |
| Amount Due | $168.44 |
| Payment Due Date | 03/04/06 |

*(See additional page(s) for account details.)*

## Important Viewer News



Don't miss Vargas vs. Mosley live on IN Demand, Saturday, February 25, 2006. A digital converter is required. Digital customers-Easy ordering using your remote control! Fight cards are subject to change.

Time Warner Cable offers a choice of High Speed Internet Services. We have services for both commercial and residential customers. Visit twcsd.com for details.

Do you live basketball? Then you need NBA League Pass on Time Warner digital cable. Order today for just $109 and catch the games you can't see anywhere else. Call 888-SPORTS-IN now.



To view the call details for all of your Digital Phone calls, go to http://www.twcdigitalphone.com and select the 'My Account' link.

## Payment Coupon

LEON ALPERT
Billing Date: February 12, 2006
Account Number: 834010 110 0088309

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE*
Allow 4-5 days for your mailed payment to be credited.

**CUSTOMER SERVICE** (858) 695-3220

| | |
|---|---|
| Amount Due | $ 168.44 |
| Payment Due Date | 03/04/06 |
| Amount Enclosed | $ |

*Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX AZ 85038-9390

LEON ALPERT

8340 1000 NX 7 12     0005295

Statement Date: February 12, 2006
Account Number: 834010 110 0088309

## *Account Details*

This statement is for service from 2\12\06 to 3\11\06
Payments received after February 12, 2006 will be reflected on your next bill.

| Previous Balance | | | $ 163.44 |
|---|---|---|---|

| Payments | | | Amount |
|---|---|---|---|
| 02/01 | Payment - Thank You | | - 163.44 |

| Monthly Charges | | | Amount |
|---|---|---|---|
| 02/12 - 03/11 | Digital Phone Package -- Includes Unlimited Local And Long Distance Calling Within The United States, Us Territories And Canada | | 39.95 |
| 02/12 - 03/11 | iCONTROL Premium Service Your Pay Service(s) On Demand | | 6.95 |
| 02/12 - 03/11 | HDTV Converter     (Includes Digital Remote) | | 7.00 |
| 02/12 - 03/11 | HDTV Converter     (Includes Digital Remote) | | 7.00 |
| 02/12 - 03/11 | Service Protection Plan | | 2.95 |
| 02/12 - 03/11 | Premier Digital | | 11.00 |
| | Digital Movie Pack | $4.00 | |
| | Digital Variety Pack | $4.00 | |
| | Navigator Screen Guide | $3.00 | |
| 02/12 - 03/11 | Any 4 Premium Channels | | 24.95 |
| | Cinemax | $6.24 | |
| | HBO | $6.24 | |
| | Showtime | $6.24 | |
| | STARZ | $6.23 | |
| 02/12 - 03/11 | Wireless Road Runner | | 54.90 |
| 02/12 - 03/11 | Navigator Screen Guide | | .00 |

| Adjustments | | | Amount |
|---|---|---|---|
| 01/13 | Oper/Dir Assistance | | 3.00 |
| 01/14 | International L.D. Calls | | 1.61 |
| 02/10 | Oper/Dir Assistance | | 2.00 |

**ADDITIONAL DETAILS CONTINUED ON NEXT PAGE**

---

**ABOUT YOUR TIME WARNER CABLE AGREEMENT**

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
**Note:** If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3220, or (619) 435-0157.
**Payments:** Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically.
**Equipment:** Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company.
Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
**Franchising Authority Information:**

| City of San Diego: | County of San Diego | City of Poway: | City of Coronado: | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | Coronado, CA 92118 | San Diego, Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92064 | (619) 522-7335 | Box 367056 |
| (619) 238-6010 | San Diego, CA 92101 | (858) 668-4590 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0478 | (619) 595-4500 | Comm ID# CA0572 | | (619) 532-1381 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of

TIME WARNER
CABLE

8340 1000 NX 7 12      0005295

LEON ALPERT

Page 3 of 3
Billing Date: February 12, 2006
Account Number: 834010 110 0088309

## Account Details

This statement is for service from 2\12\06 to 3\11\06
Payments received after February 12, 2006 will be reflected on your next bill.

**Taxes & Fees**

| | | Amount |
|---|---|---|
| 02/12 | Cable Franchise Fee | 2.99 |
| 02/12 | CA Relay Service & Comm. Device Fund | .10 |
| 02/12 | CA Universal Lifeline Tel Serv Surcharge | .35 |
| 02/12 | CA High Cost Fund A | .05 |
| 02/12 | CA High Cost Fund B | .71 |
| 02/12 | Emergency Telephone Users Surcharge Tax | .21 |
| 02/12 | Federal Excise Tax | 1.40 |
| 02/12 | Federal Universal Service Fund | 1.32 |

**Amount Due** $ 168.44

**EXHIBIT C**

# EXHIBIT C

Case 3:08-cv-00582-W-AJB Document 1 Filed 03/27/2008 Page 140 of 196

# TIME WARNER CABLE

8949 W... RT SAN DIEGO CA
92121-2770          8340 1000 NX 7 12          0004943

Billing Date:          December 12, 2006
Account Number:          834010 110 0088309

**How to reach us ....**
☎ CUSTOMER SERVICE (858) 695-3220
TECHNICAL SUPPORT OPEN 24 HOURS
BILLING OR SALES 8-8 M-F & 8-5 SAT

#BWNKTKR
#165989889999116968#
LEON ALPERT
12968 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

Il.l....ll.lll.....ll.l.l..ll.l...l.l.ll..l.l.ll.l.l.l.l

## *Account Snapshot*

| | |
|---|---|
| Previous Balance | $ 148.60 |
| Payments | - 148.60 |
| Monthly Charges | 132.85 |
| Pay-Per-View Charges | 3.99 |
| Adjustments | 1.98 |
| Taxes & Fees | 6.53 |
| Amount Due | $145.35 |
| Payment Due Date | 01/01/07 |

*(See additional page(s) for account details.)*

## *Important Viewer News*

 Tune to Answers On Demand channel 100 for information on how your equipment works. Topics include Getting Started, Using Parental Controls, Changing Pin Numbers, and more. Visit twcsd.com for details.

 Do you live basketball? Then you need NBA LEAGUE PASS on Time Warner Digital Cable. Catch the games you can't see anywhere else. Call 888-SPORTS-iN now. Blockout restrictions apply.

 To view the call detail for all of your Digital Phone calls, go to http://www.twcdigitalphone.com and select the "My Account" link.

## *Payment Coupon*

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE .*
Allow 4-5 days for your mailed payment to be credited.

**CUSTOMER SERVICE (858) 695-3220**

LEON ALPERT
Billing Date:          December 12, 2006
Account Number:          834010 110 0088309

| | |
|---|---|
| Amount Due | $ 145.35 |
| Payment Due Date | 01/01/07 |

Amount Enclosed [ $          ]

*Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX AZ 85038-9390

## Account Details

This statement is for service from 12\12\06 to 1\11\07
Payments received after December 12, 2006 will be reflected on your next bill.

| Previous Balance | | | $ 148.60 |
|---|---|---|---|

**Payments**

| | | | Amount |
|---|---|---|---|
| 12/01 | Payment - Thank You | | - 148.60 |

**Monthly Charges**

| | | | Amount |
|---|---|---|---|
| 12/12 - 01/11 | HDTV Converter (Includes Digital Remote) | | 8.00 |
| 12/12 - 01/11 | Service Protection Plan | | 2.95 |
| 12/12 - 01/11 | Hoa DIGIPiC 4000 Trio | | 121.90 |
| | Wireless Road Runner | | |
| | Digital Phone Package -- | | |
| | Free On Demand | | |
| | iCONTROL Premium Service | | |
| | Digital Access | | |
| | Cinemax | | |
| | HBO | | |
| | Navigator Screen Guide | | |
| | Showtime | | |
| | STARZ | | |
| | Digital Movie Pack | | |
| | Digital Sports Pack | | |
| | Digital Variety Pack | | |
| | Hoa Standard Service | | |
| | Road Runner High Speed | | |

**Pay-Per-View Charges**

| | | | Amount |
|---|---|---|---|
| 11/19 | Lucky Number Slevin | Start 06:48 P.M. | 3.99 |

**Adjustments**

| | | | Amount |
|---|---|---|---|
| 11/14 | Oper/Dir Assistance | | 1.98 |

### ADDITIONAL DETAILS CONTINUED ON NEXT PAGE

**ABOUT YOUR TIME WARNER CABLE AGREEMENT**

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
**Note:** If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3228, or (619) 435-0157.
**Payments:** Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically.
**Equipment:** Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
**Franchising Authority Information:**

| City of San Diego | County of San Diego | City of Poway | City of Coronado | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | City of Coronado | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | 1825 Strand Way | San Diego, Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92064 | Coronado, CA 92118 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 668-4590 | (619) 522-7335 | San Diego, CA 92135-7056 |
| Comm ID# CA0426 | (619) 595-4860 | Comm ID# CA0572 | Comm ID# CA0431 | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0426 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave.

## *Account Details*

**This statement is for service from 12\12\06 to 1\11\07**
**Payments received after December 12, 2006 will be reflected on your next bill.**

**Taxes & Fees**

| | | *Amount* |
|---|---|---|
| 12/12 | Cable Franchise Fee | 3.04 |
| 12/12 | CA Relay Service & Comm. Device Fund | .01 |
| 12/12 | CA Universal Lifeline Tel Serv Surcharge | .19 |
| 12/12 | CA High Cost Fund A | .06 |
| 12/12 | CA High Cost Fund B | .60 |
| 12/12 | Emergency Telephone Users Surcharge Tax | .15 |
| 12/12 | Federal Universal Service Fund | 2.48 |

**Amount Due** **$ 145.35**

# EXHIBIT D



# TIME WARNER CABLE

8949 WARE COURT SAN DIEGO CA
92121-2275        8340 1000 NX 7 12        0004254

**Billing Date:** April 12, 2007
**Account Number:** 834010 110 0088309

#BWNKTKR
#1659898899911696#
LEON ALPERT
12968 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

**How to reach us ....**

☎  CUSTOMER SERVICE (858) 695-3220
TECHNICAL SUPPORT OPEN 24 HOURS
BILLING OR SALES 8-8 M-F & 8-5 SAT

## *Account Snapshot*

| | |
|---|---:|
| Previous Balance | $ 145.51 |
| Payments | - 145.51 |
| Monthly Charges | 132.85 |
| Pay-Per-View Charges | 7.98 |
| Adjustments | 1.97 |
| Taxes & Fees | 5.71 |
| **Amount Due** | **$ 148.51** |
| **Payment Due Date** | **05/02/07** |

*(See additional page(s) for account details.)*

## *Important Viewer News*

To view the call detail for all of your Digital Phone calls, go to http://www.twcdigitalphone.com and select the "My Account" link.

## Payment Coupon

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE .*
Allow 4-5 days for your mailed payment to be credited.

**CUSTOMER SERVICE (858) 695-3220**

LEON ALPERT
**Billing Date:** April 12, 2007
**Account Number:** 834010 110 0088309

| | |
|---|---:|
| **Amount Due** | **$ 148.51** |
| **Payment Due Date** | **05/02/07** |

**Amount Enclosed** | $ |

### *Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX AZ 85038-9390

834010110008830900148510

## Account Details

This statement is for service from 4\12\07 to 5\11\07
Payments received after April 12, 2007 will be reflected on your next bill.

| Previous Balance | | $ 145.51 |
|---|---|---|

**Payments**

| | | Amount |
|---|---|---|
| 03/30 | Payment - Thank You | - 145.51 |

**Monthly Charges**

| | | Amount |
|---|---|---|
| 04/12 - 05/11 | HDTV Converter        (Includes Digital Remote) | 8.00 |
| 04/12 - 05/11 | Service Protection Plan | 2.95 |
| 04/12 - 05/11 | Hoa DIGIPiC 4000 Trio | 121.90 |
| | Wireless Road Runner | |
| | Digital Phone Package -- | |
| | Free On Demand | |
| | iCONTROL Premium Service | |
| | Digital Access | |
| | Cinemax | |
| | HBO | |
| | Navigator Screen Guide | |
| | Showtime | |
| | STARZ | |
| | Digital Movie Pack | |
| | Digital Sports Pack | |
| | Digital Variety Pack | |
| | Basic Cable Paid By Hoa | |
| | Road Runner High Speed | |

**Pay-Per-View Charges**

| | | | Amount |
|---|---|---|---|
| 03/24 | Scoop | Start 07:45 P.M. | 3.99 |
| 03/29 | A Good Year | Start 08:48 P.M. | 3.99 |

**Adjustments**

| | | Amount |
|---|---|---|
| 03/13 | International L.D. Calls | 1.97 |

### ADDITIONAL DETAILS CONTINUED ON NEXT PAGE

**ABOUT YOUR TIME WARNER CABLE AGREEMENT**

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA, 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:38am-Noon.
Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3220, or (619) 435-0157.
Payments: Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically. Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return the equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220, or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.

**Franchising Authority Information:**

| City of San Diego: | County of San Diego | City of Poway: | City of Coronado: | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits) | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | Coronado, CA 92118 | San Diego. Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92084 | (619) 522-7335 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 668-4590 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0428 | (619) 595-4650 | Comm ID# CA0572 | | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnect on of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming"). The California consumer protection rules are available on line at www.cpuc.ca.gov.

sc060127

TIME WARNER
CABLE

8340 1        12        0004254

LEON ALPERT
Billing Date:        April 12, 2009
Account Number:        010 110 0088309

Page 3 of 3

## Account Details

This statement is for service from 4\12\07 to 5\11\07.
Payments received after April 12, 2007 will be reflected on your next bill.

### Taxes & Fees

| | | Amount |
|---|---|---|
| 4/12 | Cable Franchise Fee | 3.25 |
| 4/12 | CA Relay Service & Comm. Device Fund | .11 |
| 4/12 | CA Universal Lifeline Tel Serv Surcharge | .34 |
| 4/12 | CA High Cost Fund A | .06 |
| 4/12 | CA High Cost Fund B | .38 |
| 4/12 | Emergency Telephone Users Surcharge Tax | .15 |
| 4/12 | Federal Universal Service Fund | 1.42 |

**Amount Due** $ 148.51

**EXHIBIT E**

# EXHIBIT E

# TIME WARNER CABLE RESIDENTIAL SERVICES SUBSCRIBER AGREEMENT

## IMPORTANT INFORMATION ABOUT YOUR TIME WARNER CABLE SERVICES

The account holder(s) referred to on the accompanying Time Warner Cable Work Order or statement ("I," "me" or "my") agrees that the Work Order (if provided to me on or after January 1, 2006), this Agreement, the Terms of Use referred to below, and any applicable Tariff(s) on file with the state utility commission or comparable state agency in the jurisdiction in which I live, set forth the terms and conditions that govern my receipt of Services from Time Warner Cable, which may include, among others, video, high-speed data and voice Services. The term "Services" and all other capitalized terms used in this Agreement are defined in Section 15.

In consideration of TWC's provision of the Services that I have requested, subject to applicable law, I AGREE AS FOLLOWS:

## 1. Important Information About This Agreement

(a) This Agreement, the Work Order, the Terms of Use and any effective and applicable Tariff(s), each of which TWC may amend as set forth below, constitute the entire agreement between TWC and me. This Agreement supersedes all previous written or oral agreements between TWC and me. I am not entitled to rely on any oral or written statements by TWC's representatives relating to the subjects covered by these documents, whether made prior to the date of my Work Order or thereafter, and TWC will have no liability to me except in respect of its obligations as described in this Agreement and the other documents referred to above. The use of my Services by any person other than me is also subject to the terms of this Agreement, the Terms of Use, and any applicable Tariff(s).

(b) TWC has the right to add to, modify, or delete any term of this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s) at any time. An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my local TWC office.

(c) TWC will notify me of any significant change(s) in this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s). Any such changes shall become effective immediately except where applicable law requires a notice period, in which case the change will become effective at the end of the requisite notice period. Upon effectiveness of any change to any of these documents, my continued use of the Services will constitute my consent to such change and my agreement to be bound by the terms of the document as so changed. If I do not agree to any such change, I will immediately stop using the Services and notify TWC that I am terminating my Services account.

(d) My acceptance of Services constitutes my acceptance of the terms and conditions contained in this Agreement. In the event that a portion of my Services is terminated, or any aspect of it is changed, any remaining service or replacement service will continue to be governed by this Agreement.

## 2. Payment; Charges

(a) I agree to pay TWC for (i) all use of my Services (including, if TWC is the party billing me for ISP or OLP Service, for my subscription to my choice of ISP or OLP, as applicable), (ii) installation and applicable service charges, (iii) TWC Equipment, and (iv) all applicable local, state and federal fees and taxes. Charges for the Services are set forth on a separate price list that I have received. I will be billed monthly in advance for recurring monthly charges. Other charges will be billed in the next practicable monthly billing cycle following use, or as otherwise specified in the price list. TWC may change both the fees and the types of charges (e.g., periodic, time-based, use-based) for my Services. If I participate in a promotional offer that requires a minimum time commitment and I terminate early, I agree that I am responsible for early termination fees associated with such promotion.

(b) Charges for installation Services and related equipment available from TWC for a standard Services installation are as described in TWC's list of charges and any applicable Tariff(s). Non-standard installations, if available, may result in additional charges as described in TWC's list of charges. In addition, I agree to pay charges for repair service calls resulting from my misuse of TWC Equipment or for failures in equipment not supplied by TWC.

(c) If my Services account is past due and TWC sends a collector to my premises, a field collection fee may be charged. The current field collection fee is on the price list or can be provided on request. I will also be responsible for all other expenses (including reasonable attorneys' fees and costs) incurred by TWC in collecting any amounts due under this Agreement and not paid by me.

(d) All charges are payable on the due date specified, or as otherwise indicated, on my bill. I agree that late charges may be assessed, subject to applicable law, on amounts that are past due. My failure to deliver payment by the due date is a breach of this Agreement. The current late fees are on the price list or can be provided upon request and, if applicable, will not exceed the maximum late fees as set forth by applicable law. TWC reserves the right to change the late fees.

(e) I agree that if my Services account with TWC is past due, TWC may terminate any of my Services or accounts, including Digital Phone Service, in accordance with applicable law. If I have a credit due to me or a deposit is being held on any account with TWC, I agree that the credit or deposit may be used to offset amounts past due on any other account I may have with TWC without notice to me. To reconnect any terminated Services, I may be required, in addition to payment of all outstanding balances on all accounts with TWC, to pay reconnect charges or trip charges (where applicable) and/or security deposits before reconnection.

(f) TWC may verify my credit standing with credit reporting agencies and require a deposit based on my credit standing or other applicable criteria. TWC may require a security deposit, or a bank or credit card or account debit authorization from me as a condition of providing or continuing to provide Services. If TWC requires a security deposit, the obligations of TWC regarding such security deposit will be governed by the terms of the deposit receipt provided by TWC to me at the time the deposit is collected. I agree that TWC may deduct amounts from my security deposit, bill any bank or credit card submitted by me, or utilize any other means of payment available to TWC, for any past due amounts payable by me to TWC, including in respect of damaged or unreturned Equipment.

(g) If I have elected to be billed by credit card, debit card or ACH transfer, I agree that I will automatically be billed each month for any amounts due under this Agreement. If I make payment by check, I authorize TWC and its agents to collect this item electronically.

(h) TWC may charge fees for all returned checks and account debit, bank card or charge card chargebacks. The current return/chargeback fees are listed in the list of charges on the price list or can be provided on request. TWC reserves the right to change return/chargeback fees.

(i) If I subscribe to HSD Service, I acknowledge that, even if TWC is billing for the HSD Service, my ISP or OLP may require a bank or credit card or account debit authorization or other assurance of payment from me, including for charges for additional or continuing Services outside the HSD Service billed by TWC that are payable under the ISP Terms. I agree that TWC or ISP (and, if applicable, OLP) may bill any bank or credit card submitted by me to ISP or OLP, or utilize any other means of payment available to ISP or OLP for any past due amounts payable by me to TWC. I also agree that responsibility for billing for my HSD Service subscription may be changed between TWC and ISP or OLP upon notice to me.

(j) All use of my Services, whether or not authorized by me, will be deemed my use and I will be responsible in all respects for all such use, including for payment of all charges attributable to my account (e.g., for VOD movies, merchandise ordered via Internet, international long distance charges, etc.). TWC is entitled to assume that any communications made through my Services or from the location at which I receive the Services are my communications or have been authorized by me. My Services may contain or make available information, content, merchandise, products and Services provided by third parties and for which there may be charges payable to third parties (which may include my choice of ISP or OLP and/or entities affiliated with TWC). I agree that all such charges incurred by me or attributed to my account will be my sole and exclusive responsibility and agree to pay the same when due, and shall indemnify and hold harmless the TWC Parties for all liability for such charges. I agree that TWC is not responsible or liable for the quality of any content, merchandise, products or Services (or the price thereof) made available to me via the Services, for the representations or warranties made by the seller or manufacturer of any such item, or for damage to or injury, if any, resulting from the use of such item.

(k) I acknowledge that currently, and from time to time, there is uncertainty about the regulatory classification of some of the Services TWC provides and, consequently, uncertainty about what fees, taxes and surcharges are due from TWC and/or its customers. Accordingly, I agree that TWC has the right to determine, in its sole discretion, what fees, taxes and surcharges are due and to collect and remit them to the relevant governmental authorities, and/or to pay and pass them through to me. I further agree to waive any claims I may have regarding TWC's collection or remittance of such fees, taxes and surcharges. I further understand that I may obtain a list of the fees, taxes and surcharges that my local TWC office currently collects or passes through by writing to TWC at the following address and requesting same: Time Warner Cable, 7800 Crescent Executive Drive, Charlotte, North Carolina, 28217; Attention: Subscriber Tax Inquiries.

(l) I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived.

## 3. Installation; Equipment and Cabling

(a) If I am not the owner of the house, apartment or other premises upon which TWC Equipment and Software are to be installed, I warrant that I have obtained the consent of the owner of the premises for TWC personnel and/or its agents to enter the premises for the purposes described in Section 3(d). I agree to indemnify and hold the TWC Parties harmless from and against any claims of the owner of the premises arising out of the performance of this Agreement (including costs and reasonable attorneys' fees).

(b) I authorize TWC to make any preparations to the premises necessary for the installation, maintenance, or removal of equipment. TWC shall not be liable for any effects of normal Services installation and workmanship, such as holes in walls, etc., which may remain after installation or removal of the TWC Equipment, except for damage caused by negligence on the part of TWC.

(c) The TWC Equipment is and at all times shall remain the sole and exclusive personal property of TWC, and I agree that I do not become an owner of any TWC Equipment by virtue of the payments provided for in this Agreement or the Tariff(s) or the attachment of any portion of the TWC Equipment to my residence or otherwise. Upon termination of any Services, subject to any applicable laws or regulations, TWC may, but shall not be obligated to, retrieve any associated TWC Equipment not returned by me as required under Section 3(f) below. TWC will not be deemed to have "abandoned" the TWC Equipment if it does not retrieve such equipment.

(d) I agree to provide TWC and its authorized agents access to my premises during regular business hours upon reasonable notice during the term of this Agreement and after its termination to install, connect, inspect, maintain, repair, replace, alter or disconnect or remove the TWC Equipment, to install Software, to conduct service theft audits, or to check for signal leakage. I agree that TWC may have reasonable access to easements and TWC Equipment located on my grounds.

(e) TWC shall have the right to upgrade, modify and enhance TWC Equipment and Software from time to time through "downloads" from TWC's network or otherwise. Without limiting the foregoing, TWC may, at any time, employ such means to limit or increase the throughput available through individual cable modems whether or not provided by TWC.

(f) If the Services are terminated, I agree that I have no right to possess or use the TWC Equipment related to the terminated Services. As required under Section 10(b), I agree that I must arrange for the return of TWC Equipment to TWC, in the same condition as when received (excepting ordinary wear and tear), upon termination of the Services. If I do not promptly return the TWC Equipment or schedule with TWC for its disconnection and removal, TWC may enter any premises where the TWC Equipment may be located for the purpose of disconnecting and retrieving the TWC Equipment. I will pay any expense incurred by TWC in any retrieval of the unreturned TWC Equipment. TWC may charge me a continuing monthly fee until any outstanding TWC Equipment is returned, collected by TWC or fully paid for by me in accordance with Section 3(g). The current fee is listed in the list of charges on the price list or can be provided on request.

(g) I agree to pay TWC liquidated damages in the amount demanded by TWC, but not to exceed that specified in the then-current price list, for the replacement cost of the TWC Equipment without any deduction for depreciation, wear and tear or physical condition of such TWC Equipment if (i) I tamper with, or permit others to tamper with, TWC Equipment, (ii) the TWC Equipment is destroyed, lost, or stolen, whether or not due to circumstances

beyond my reasonable control and even if I exercised due care to prevent such destruction, loss, or theft, or (iii) the TWC Equipment is damaged (excluding equipment malfunction through no fault of my own) while in my possession, whether or not due to circumstances beyond my reasonable control, and even if I exercised due care to prevent such damage. I agree that these liquidated damages are reasonable in light of the problem of theft of cable Services; the existence of a "black market" in TWC Equipment; the ability of third parties to steal Services with unlawfully obtained TWC Equipment, causing loss of revenues for installation and service fees; and the difficulty in determining the actual damages that arise from the unauthorized tampering with, loss, destruction, or theft of TWC Equipment. I agree to return any damaged TWC Equipment to TWC.

(h) I agree that TWC may place equipment and cables on my premises to facilitate the provision of Services to me and to other locations in my area. The license granted under this Section 3(h) will survive the termination of this Agreement until the date that is one year from the date on which I first notify TWC in writing that I am revoking such license.

## 4. Use of Services; TWC Equipment and Software

(a) I agree that TWC has the right to add to, modify, or delete any aspect, feature or requirement of the Services (including content, price, equipment and system requirements). I further agree that my ISP (and, if applicable, OLP) has the right to add to, modify, or delete any aspect, feature or requirement of the HSD Service (including content, price and system requirements). If TWC changes its equipment requirements with respect to any Services, I acknowledge that I may not be able to receive such Services utilizing my then-current equipment. Upon any such change, my continued use of Services will constitute my consent to such change and my agreement to continue to receive the relevant Services, as so changed, pursuant to this Agreement, the Terms of Use and the Tariff(s). If I participate in a promotional offer for any Service(s) that covers a specified period of time, I agree that I am assured only that I will be charged the promotional price for such Service(s) during the time specified. I agree that TWC shall have the right to add to, modify, or delete any aspect, feature or requirement of the relevant Service (s), other than the price I am charged, during such promotional period.

(b) I agree that the Services I have requested are residential Services, offered for reasonable personal, non-commercial use only. I will not resell or redistribute (whether for a fee or otherwise) the Services, or any portion thereof, or charge others to use the Services, or any portion thereof. Among other things:

(i) If I receive Video Service, I agree not to use the Services for the redistribution or retransmission of programming or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of the Services to transmit or distribute the Video Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose. I acknowledge that programs and other materials that I receive as part of the Video Service remain part of the Video Service even if I record or capture all or a portion of any such program or material in a data file or on a hard drive, DVR or similar device.

(ii) If I receive Digital Phone Service, I agree not to use the Services for telemarketing, call center, medical transcription or facsimile broadcasting Services or for any enterprise purpose whether or not the enterprise is

directed toward making a profit) I agree that, among other things, my use of the Services to make available my Digital Phone Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose.

(iii) If I receive HSD Service, I agree not to use the HSD Service for operation as an Internet service provider, for the hosting of websites (other than as expressly permitted as part of the HSD Service) or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of any form of transmitter or wide area network that enables persons or entities outside the location identified in the Work Order to use my Services, whether or not a fee is sought, will constitute an enterprise purpose. Furthermore, if I use a wireless network within my residence, I will limit wireless access to the HSD Service (by establishing and using a secure password or similar means) to the members of my household.

(c) Theft or willful damage, alteration, or destruction of TWC Equipment, or unauthorized reception, theft or diversion of Services, or assisting such theft, diversion, or unauthorized reception is a breach of this Agreement and potentially punishable under law (including by way of statutory damages, fine and/or imprisonment). Nothing in this Agreement, including, Section 3(g) above, shall prevent TWC from enforcing any rights it has with respect to theft or unauthorized tampering of Services or TWC Equipment under applicable law.

(d) I will not, nor will I allow others to, open, alter, misuse, tamper with or remove the TWC Equipment as and where installed by TWC or use it contrary to this Agreement, the Terms of Use, or the Tariff(s). I will not, nor will I allow others to, remove any markings or labels from the TWC Equipment indicating TWC ownership or serial or identity numbers. I will safeguard the TWC Equipment from loss or damage of any kind, including accidents, breakage or house fire, and will not permit anyone other than an authorized representative of TWC to perform any work on the TWC Equipment.

(e) I agree that to the extent any Software is licensed (or sublicensed) to me by TWC, such Software is provided for the limited purpose of facilitating my use of the Services as described in this Agreement. I will not engage in, or permit, any additional copying, or any translation, reverse engineering or reverse compiling, disassembly or modification of or preparation of any derivative works based on the Software, all of which are prohibited. I will return or destroy all Software provided by TWC and any related written materials promptly upon termination of the associated Services to me for any reason. Software licensed to me by my ISP or OLP, for instance my ISP's or OLP's client or browser software, is licensed under the ISP Terms or OLP Terms, as applicable, and is not the responsibility of TWC.

(f) I agree that I will use the Services for lawful purposes only, and in accordance with this Agreement, the Terms of Use and the Tariff(s).

(g) I agree to be responsible for protecting the confidentiality of my screen names, passwords, personal identification numbers (PINs), parental control passwords or codes, and any other security measures made available, recommended or required by Time Warner Cable. I also acknowledge that TWC's Services may from time to time include interactive features, the use of which may result in the transmission to, and use by, TWC or certain third parties of information that may constitute personally identifiable information (as such term is used in the Federal Communications Act of 1934) about me

and for which TWC may be required, under the Federal Communications Act of 1934, to obtain my consent. I agree that TWC may seek such consents (or indications of my election to "opt in" to certain TWC programs) electronically, including through the use of a "click through" screen, and that TWC is entitled to assume that any such consent or opt-in election communicated through my Services or from the location at which I receive the Services is my consent or opt-in election or has been authorized by me.

(h) I agree that TWC has no liability for the completeness, accuracy or truth of the programs or information it transmits.

## 5. Special Provisions Regarding Digital Phone Service

(a) I acknowledge that the voice-enabled cable modem used to provide the Digital Phone Service is electrically powered and that the Digital Phone Service, including the ability to access 911 Services and home security and medical monitoring Services, may not operate in the event of an electrical power outage or if my broadband cable connection is disrupted or not operating. I acknowledge that, in the event of a power outage in my home, any battery included in my voice-enabled cable modem may enable back-up service for a limited period of time or not at all, depending on the circumstances, and that inclusion of the battery does not ensure that Digital Phone Service will be available in all circumstances. I also acknowledge that, in the event of a loss of power that disrupts my local TWC cable system, the battery in my voice-enabled cable modem will not provide back-up service and the Digital Phone Service will not be available.

(b) I agree that TWC will not be responsible for any losses or damages arising as a result of the unavailability of the Digital Phone Service, including the inability to reach 911 or other emergency Services, or the inability to contact my home security system or remote medical monitoring service provider. I acknowledge that TWC does not guarantee that the Digital Phone Service will operate with my home security and/or medical monitoring systems, and that I must contact my home security or medical monitoring provider in order to test my system's operation with the Digital Phone Service. I agree that I am responsible for the cost of any such testing or any fees for configuring my home security or medical monitoring system to work with the Digital Phone Service.

(c) The location and address associated with my Digital Phone Service will be the address identified on the Work Order. I acknowledge that, under Section 4 (d) of this Agreement, I am not permitted to move TWC Equipment from the location and address in which it has been installed. Furthermore, if I move my voice-enabled cable modem to an address different than that identified on the Work Order, calls from such modem to 911 will appear to 911 emergency service operators to be coming from the address identified on the Work Order and not the new address.

(d) I acknowledge that the existing telephone wiring inside my home may not support both Digital Phone Service and digital subscriber line (DSL) service. Therefore, if I intend to use Digital Phone Service on all of my phone jacks, I may be required to maintain separate wiring, not provided by TWC, within my home specifically for DSL service or to disconnect my DSL service prior to receiving the Digital Phone Service over my existing in-home wiring.

(e) I agree to provide TWC and its authorized agents with access to my telephone inside wiring at the Network Interface Device or at some other minimum point of entry in order to provide the Digital Phone Service over my

existing in-home wiring.

(f) I acknowledge that the Digital Phone Service may not be compatible with certain data transmission Services, including but not limited to fax transmissions and dial-up Internet access and that I may be required to maintain a separate telephone line, not provided by TWC, in order to access such Services.

## 6. Special Provisions Regarding HSD Service

(a) Speeds and Network Management. I acknowledge that each tier or level of the HSD Service has limits on the maximum speed at which I may send and receive data at any time, as set forth in the price list or Terms of Use. I understand that the actual speeds I may experience at any time will vary based on a number of factors, including the capabilities of my equipment, Internet congestion, the technical properties of the websites, content and applications that I access, and network management tools and techniques employed by TWC. I agree that TWC or ISP may change the speed of any tier by amending the price list or Terms of Use. My continued use of the HSD Service following such a change will constitute my acceptance of any new speed. I also agree that TWC may use technical means, including but not limited to suspending or reducing the speed of my HSD Service, to ensure compliance with its Terms of Use and to ensure that its service operates efficiently. I further agree that TWC and ISP have the right to monitor my usage patterns to facilitate the provision of the HSD Service and to ensure my compliance with the Terms of Use and to efficiently manage its network and the provision of services. TWC or ISP may take such steps as it determines appropriate in the event my usage of the HSD Service does not comply with the Terms of Use. Additionally, TWC may use such tools and techniques as it determines appropriate in order to efficiently manage its network and to ensure a quality user experience for its subscribers ("Network Management Tools"). These Network Management Tools are described in the Terms of Use, which include the Acceptable Use Policy, http://help.twcable.com/html/twc_misp_aup.html.

(b) Republication.

(i) I acknowledge that material posted or transmitted through the HSD Service may be copied, republished or distributed by third parties, and that the TWC Parties will not be responsible for any harm resulting from such actions.

(ii) I grant to TWC, and I represent, warrant and covenant that I have all necessary rights to so grant, the non-exclusive, worldwide, royalty-free, perpetual, irrevocable, right and license to use, reproduce, modify, adapt, publish, translate, distribute, perform and display in any media all

material posted on the public areas of the HSD Service via my account and/or to incorporate the same in other works, but only for purposes consistent with operation and promotion of the HSD Service.

(iii) I agree that unsolicited email, or "spam," is a nuisance and that TWC and my ISP (and, if applicable, my OLP) are entitled to establish limits on the volume of email that I send. Such volume limits may be set by reference to a number of emails per day, week, month or year.

(c) Continuity of Service. In order to provide continuity of service to me, if my choice of ISP is no longer available over my local TWC cable system, I agree that TWC may provide me with an alternative ISP. In such event, TWC will

notify me of the date as of when I will begin receiving service from the alternative ISP, the provision of which shall also be governed by this Agreement, and TWC will provide to me a price list for such alternative ISP service. I will have the right at any time to terminate the alternative ISP or to change my subscription to any other ISP then offered by TWC.

(d) Unfiltered Internet Access. I acknowledge that the ISP Service provides a connection to the Internet that may be unfiltered, and that the TWC Parties neither control nor assume responsibility for any content on the Internet or content that is posted by a subscriber. Although TWC or my ISP or OLP may make available certain parental control features, I acknowledge that such parental control features may not be entirely effective or foolproof and that, notwithstanding such features, I or members of my household may be exposed to unfiltered content.

(e) Use of ISP and OLP Service. I agree that TWC and/or my ISP and/or OLP has the right, but not the obligation, to edit, refuse to post or transmit, request removal of, or remove or block any material transmitted through, submitted to or posted on the HSD Service, if it determines in its discretion that the material is unacceptable or violates the terms of this Agreement, any TWC consumption limits or any other Terms of Use. Such material might include personal home

pages and links to other sites. In addition, I agree that, under such circumstances, TWC may suspend my account, take other action to prevent me from utilizing certain account privileges (e.g., home pages) or cancel my account without prior notification. I also agree that TWC and/or my ISP and/or OLP may suspend or cancel my account for using all or part of the HSD Service to post content to the Internet or to engage in "peer to peer" file exchanges or other forms of file exchanges that violate this Agreement or the Terms of Use.

(f) Responsibility for HSD Service. Each of TWC and my ISP (and, if applicable, my OLP) has responsibilities for the HSD Service. I acknowledge that each of my ISP and OLP may have one or more separate agreements, policies or other terms covering my rights and obligations with regard to the HSD Service ("ISP Terms" or "OLP Terms," as applicable) that are also binding on me. This Agreement does not cover any ISP or OLP features or Services that are not dependent upon distribution over TWC's cable systems (for example, dial up access or my use of ISP or OLP software that enables access to ISP or OLP features or Services through non-TWC access means) or that may otherwise be provided to me by ISP or OLP separately from the HSD Service under the ISP Terms or OLP Terms, as applicable. In the event of termination of the HSD Service, I must also contact my ISP (and, if applicable, my OLP) to ensure that these other features or Services (such as dial-up access) are properly continued or discontinued.

(g) Computer Requirements. I agree that each Computer will need to meet certain minimum hardware and software requirements that will be specified for the HSD Service, and that such requirements may be changed from time to time by TWC or my ISP or OLP.

## 7. Support; Service and Repairs

(a) My Services include the right to request reasonable service and maintenance calls to check and correct problems with the Services. TWC will, at its own expense, repair damage to or, at TWC's option, replace TWC Equipment, and otherwise attempt to correct interruptions of the Services, due

to reasonable TWC Equipment wear and tear, or technical malfunction of the system or network operated by TWC. The Subscriber Materials contain details on contacting

TWC for this support.

(b) Unless I have obtained a TWC service protection plan (if available in my area), I agree that I am responsible for all wiring, equipment and related software installed in my residence that is not TWC Equipment or TWC-licensed Software and TWC will have no obligation to install, connect, support, maintain, repair or replace any Computer, television, telephone or telephone answering device, audiovisual recording or playback device (e.g., VCR, DVR, DVD), audio equipment, any software, or any cable modem, cabling or other equipment (other than TWC Equipment or TWC-licensed Software). TWC will not support, repair, replace, or maintain any Network Interface Card, regardless of whether provided and installed by TWC.

(c) I agree that TWC has no responsibility for the operation of any equipment, software or service other than the Services, the TWC Equipment and the TWC-licensed Software. For instance, I acknowledge that certain commercially available televisions, converter boxes and recording devices, which may be identified by their manufacturers as "cable ready" or "digital cable ready," may not be able to receive or utilize all available Services without the addition of a TWC converter box or other TWC Equipment for which a fee may be charged. If I receive HSD Service, TWC has no responsibility to support, maintain or repair any equipment, software or service that I elect to use in connection with the HSD Service, whether provided by my ISP, my OLP or a third party. For assistance with technical problems arising from such equipment, software or Services, I should refer to the Subscriber Materials for information regarding the technical support provided by my ISP or OLP or to the support area of the ISP or OLP or to the relevant third party's material.

(d) If TWC determines that non-TWC cabling or equipment connecting my residence to TWC Equipment installed on the side of or adjacent to my residence (i.e., at a ground block) is the cause of a service problem, I agree that TWC may charge me to resolve such service problem. If available from TWC in my area, I may subscribe to a TWC service protection plan that covers service related calls within my residence. If any other support Services are available from TWC, such Services will be at additional charges as described in TWC's price list.

## 8. Service Interruptions; Force Majeure

(a) I agree that TWC has no liability for delays in or interruption to my Services, except that if for reasons within TWC's reasonable control, for more than twenty-four (24) consecutive hours, (i) service on all cable channels is interrupted, (ii) there is a complete failure of the HSD Service or (iii) there is a complete failure of the Digital Phone Service, TWC will give me a prorated credit for the period of such interruption or failure if I request one within 30 days of the interruption or failure. Notwithstanding the above, TWC will issue credits for VOD, pay-per-view and pay-per-play events for service problems where a credit request is made within 30 days of the interruption or failure. In no event shall TWC be required to credit me an amount in excess of applicable service fees. TWC will make any such credit on the next practicable bill for my Services. State and local law or regulation may impose other outage credit requirements with respect to some or all of my Services. In such event, the relevant law or regulation will control.

(b) I acknowledge that TWC may conduct maintenance from time to time that may result in interruptions of my Services.

(c) The TWC Parties shall have no liability, except as set forth in Section 8(a), for interruption of the Services due to circumstances beyond its reasonable control, including acts of God, flood, natural disaster, vandalism, terrorism, regulation or governmental acts, fire, civil disturbance, electrical power outage, computer viruses or worms, strike or weather.

(d) TWC is only obligated to provide the above-referenced credits for loss of HSD Service if TWC is billing me for the HSD Service at the time of the outage. If my ISP or OLP is billing me, I will look solely to my ISP or OLP, as applicable, for a credit with respect to the HSD Service.

## 9. Review and Enforcement

(a) TWC may suspend or terminate all or a portion of my Services without prior notification if TWC determines in its discretion that I have violated this Agreement, any of the Terms of Use or any Tariff(s), even if the violation was a one-time event. If all or a portion of my Services are suspended, I will not be charged for the relevant Services during the suspension. If my account is terminated, I will be refunded any pre-paid fees minus any amounts due TWC.

(b) If I receive HSD Service, I acknowledge that TWC has the right, but not the obligation, to review content on public areas of the HSD Service, including chat rooms, bulletin boards and forums, in order to determine compliance with this Agreement and the Terms of Use.

(c) I agree that TWC shall have the right to take any action that TWC deems appropriate to protect the Services, TWC's facilities or TWC Equipment.

## 10. Termination of Service

(a) Either TWC or I may terminate all or any portion of my Services at any time for any or no reason, in its sole discretion, in accordance with applicable law.

(b) If I am moving or wish to terminate all or any portion of my Services for any reason, I will notify TWC by phone or by mail as instructed in the Subscriber Materials in order to set up a disconnect appointment and provide TWC with access to my premises to disconnect the relevant Services and recover the TWC Equipment specified on the Work Order on a DATE PRIOR TO the last day of residency. This also applies if I am receiving a period of free or discounted Services. In other words, at the end of the free or discounted period, TWC is entitled to begin billing me for the usual charges associated with the relevant Services unless I take the appropriate steps to terminate the Services as described in this paragraph.

(c) I cannot terminate my Services by writing "Canceled" (or any other messages) on my bill or check, or by making a disconnect appointment that does not result in TWC's physical recovery of the TWC Equipment. In addition, I agree that any restrictive endorsements (such as "paid in full"), releases or other statements on or accompanying checks or other payments accepted by TWC shall have no legal effect.

(d) If I subscribe to HSD Service, I acknowledge that notice given by me to

TWC of termination of my HSD Service may not be sufficient to terminate billing by my ISP or OLP for additional or continuing Services under the ISP Terms or OLP Terms (for example, "dial up" access). I agree that I am solely responsible for contacting my ISP or OLP in addition to TWC to ensure that all such Services are terminated in accordance with the ISP Terms or OLP Terms, as applicable.

## 11. Disclaimer of Warranty; Limitation of Liability

(a) I AGREE THAT THE SERVICES ARE PROVIDED BY TWC ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF TITLE OR NONINFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES THAT ARE IMPLIED BY, AND INCAPABLE OF EXCLUSION, RESTRICTION OR MODIFICATION UNDER, THE LAWS APPLICABLE TO THIS AGREEMENT. TWC MAKES NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE OR THAT THE TWC EQUIPMENT WILL OPERATE AS INTENDED. IN PARTICULAR, I AGREE THAT MY USE OF THE HSD SERVICE (INCLUDING THE CONTENT, INFORMATION, SERVICES, EQUIPMENT AND SOFTWARE, THE PURCHASE OF MERCHANDISE AND SERVICES, THE TRANSMISSION OF INFORMATION AND OTHER COMMUNICATIONS BY AND TO ME AND THE DOWNLOADING OF COMPUTER FILES) IS AT MY SOLE RISK. I FURTHER AGREE THAT TWC IS NOT RESPONSIBLE FOR THE RECORDING OF OR FAILURE TO RECORD ANY PROGRAM OR PORTION THEREOF, OR FOR THE CONTENT OF ANY PROGRAM OR CONTENT ON MY DVR, WITHOUT LIMITING THE FOREGOING:

(i) ANY AND ALL PRODUCTS AND SERVICES PROVIDED BY TWC AND/OR ISP AND/OR OLP AND/OR ANY LONG DISTANCE PROVIDER TO ME THAT ARE NOT PART OF THE SERVICES AS DEFINED HEREIN ARE OUTSIDE THE SCOPE OF THIS AGREEMENT AND THE TWC PARTIES HAVE NO RESPONSIBILITY OR LIABILITY FOR ANY SUCH PRODUCTS OR SERVICES; AND

(ii) NONE OF THE TWC PARTIES MAKES ANY WARRANTIES AS TO THE SECURITY OF MY COMMUNICATIONS VIA TWC'S FACILITIES OR THE SERVICES (WHETHER SUCH COMMUNICATIONS ARE DIRECTED WITHIN THE SERVICES, OR OUTSIDE THE SERVICE TO OR THROUGH THE INTERNET), OR THAT THIRD PARTIES WILL NOT GAIN UNAUTHORIZED ACCESS TO OR MONITOR MY COMPUTERS(S) OR ONLINE (INCLUDING VOICE) COMMUNICATIONS. I AGREE THAT NONE OF THE TWC PARTIES WILL BE LIABLE FOR ANY SUCH UNAUTHORIZED ACCESS. I HAVE THE SOLE RESPONSIBILITY TO SECURE MY COMPUTER AND ONLINE (INCLUDING VOICE) COMMUNICATIONS.

(b) I ACKNOWLEDGE THAT TWC'S OR MY INSTALLATION, USE, INSPECTION, MAINTENANCE, REPAIR, REPLACEMENT OR REMOVAL OF THE SERVICES, TWC EQUIPMENT AND SOFTWARE MAY RESULT IN DAMAGE TO MY COMPUTER(S), TELEPHONES AND TELEPHONE ANSWERING DEVICES, TELEVISIONS, RECORDING AND PLAYBACK DEVICES, AUDIO EQUIPMENT, OR ANY CABLE MODEM, CABLING OR OTHER EQUIPMENT OR HARDWARE, INCLUDING SOFTWARE AND DATA FILES STORED THEREON. I SHALL BE SOLELY RESPONSIBLE FOR BACKING UP ALL EXISTING COMPUTER OR OTHER SOFTWARE OR DATA FILES PRIOR TO THE PERFORMANCE OF ANY OF THE FOREGOING ACTIVITIES. NONE OF THE TWC PARTIES, OR THEIR

VENDORS, LICENSEES OR PROGRAMMERS, SHALL HAVE ANY LIABILITY, AND EACH EXPRESSLY DISCLAIMS ANY RESPONSIBILITY WHATSOEVER, FOR ANY DAMAGE TO OR LOSS OR DESTRUCTION OF ANY EQUIPMENT, SOFTWARE, HARDWARE, DATA OR FILES.

(c) EXCEPT FOR THE REFUND OR CREDIT AS EXPRESSLY PROVIDED IN SECTIONS 9(a) AND 8(a) RESPECTIVELY, IN NO EVENT (INCLUDING NEGLIGENCE) WILL ANY TWC PARTY OR ANY PERSON OR ENTITY INVOLVED IN CREATING, PRODUCING OR DISTRIBUTING THE SERVICES (INCLUDING THE CONTENT INCLUDED THEREIN OR THE SERVICES ACCESSED THEREBY) OR EQUIPMENT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE THE SERVICES, INCLUDING THE USE OF OR INABILITY TO USE EMERGENCY 911 SERVICES, OR FOR ANY ACTION TAKEN BY TWC TO PROTECT

THE SERVICES OR THE BREACH BY TWC OF ANY WARRANTY.

(d) I AGREE THAT THE PROVISIONS OF THIS SECTION 11 SHALL APPLY TO ALL CONTENT OR SERVICES INCLUDED IN, OR ACCESSIBLE THROUGH, THE SERVICES, AND ARE FOR THE BENEFIT OF, AND MAY BE ENFORCED BY, ALL OF THE TWC PARTIES.

## 12. Privacy

(a) My privacy interests, including my ability to limit disclosure of certain information to third parties, are addressed by, among other laws, the Federal Communications Act of 1934, as amended, and the Electronic Communications Privacy Act. Personally identifiable information that may be collected, used or disclosed in accordance with applicable laws is described in the Subscriber Privacy Notice delivered to me by TWC on its own behalf and on behalf of its Affiliated ISPs. I acknowledge receipt of the Subscriber Privacy Notice, which is deemed to form a part of this Agreement, and expressly consent to the collection, use and disclosure of personally identifiable and other information as described in the Subscriber Privacy Notice, as it may be amended from time to time.

(b) I agree that, in addition to actions and disclosures specifically authorized by law or statute or authorized elsewhere in this Agreement, TWC and its Affiliated ISPs shall each have the right (except where prohibited by law notwithstanding my consent), but not the obligation, to disclose any information to protect their respective rights, property and/or operations, or where circumstances suggest that individual or public safety is in peril. I consent to such actions or disclosures.

(c) If I am a Digital Phone customer, I consent to TWC's disclosure of my name, address and/or telephone number to the general public in connection with Caller ID functions, telephone directories, and 411 and 911 Services. I also consent to TWC's disclosure of personally identifiable information to the telephone companies serving those end users to whom I make calls so that the calls can be completed. If I wish to have TWC remove this information from one or more of these Services, I understand that I may notify TWC to do so, subject to any applicable fees.

## 13. Consent to Phone and Email Contact

(a) I consent to TWC calling the phone numbers I supply to it for any purpose,

including the marketing of its current and future Services. I agree that these phone calls may be made using any method, including an automatic dialing system or an artificial or recorded voice. Upon my request, the phone numbers I have previously provided will be removed from TWC's phone marketing list. I can make this request by calling or writing my local TWC office and asking to be placed on TWC's Do Not Call List.

(b) I acknowledge that being included in any state or federal "do not call" registry will not be sufficient to remove me from TWC's phone marketing list.

(c) I consent to TWC emailing me, at any email address, including that of a wireless or mobile device, that I provide to TWC (or that TWC issues to me in connection with the HSD Service), for any purpose, including the marketing of TWC's current and future Services. If my wireless or mobile provider charges me for receipt of such messages, I acknowledge and agree that I am responsible for paying such charges. I may revoke this authorization insofar as it relates to marketing messages at any time by calling or writing my local TWC office.

## 14. Arbitration

EXCEPT FOR CLAIMS FOR INJUNCTIVE RELIEF AND CLASS ACTION LAWSUITS, AS DESCRIBED BELOW, ANY PAST, PRESENT, OR FUTURE CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL ARBITRATION RULES, INCLUDING, IF APPLICABLE, THE SUPPLEMENTARY PROCEDURES FOR THE RESOLUTION OF CONSUMER RELATED DISPUTES. CONSOLIDATED OR CLASS ACTION ARBITRATIONS SHALL NOT BE PERMITTED, AND THE ARBITRATOR OF ANY DISPUTE OR CLAIM BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT HAVE THE POWER TO AWARD INJUNCTIVE RELIEF. INJUNCTIVE RELIEF MAY BE SOUGHT, AND CLASS ACTION LAWSUITS MAY BE BROUGHT, SOLELY IN AN APPROPRIATE COURT OF LAW. NO CLAIM SUBJECT TO ARBITRATION UNDER THIS AGREEMENT MAY BE COMBINED WITH A CLAIM SUBJECT TO RESOLUTION BEFORE A COURT OF LAW. THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR, EXCEPT THAT THE ARBITRABILITY OF ANY DISPUTE PURPORTING TO CONSTITUTE A CLASS ACTION SHALL BE DETERMINED BY A COURT OF COMPETENT JURISDICTION. JUDGMENT UPON AN AWARD MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. IF ANY PORTION OF THIS SECTION IS HELD TO BE UNENFORCEABLE, THE REMAINDER SHALL CONTINUE TO BE ENFORCEABLE.

## 15. Definitions

(a) "Affiliated ISP" means Road Runner and any other ISP in which any TWC Party holds an ownership interest.

(b) "Agreement" means this Services Subscription Agreement, as it may be amended from time to time by TWC.

(c) "Computer" means the personal computer(s) located at my residence that will be used to access the HSD Service, as specified on the accompanying Work Order.

(d) "Digital Phone Service" means the TWC phone service that provides users with the ability to send and receive local and/or long distance calls and to access additional related features and functions through TWC's cable systems.

(e) "DVR" means a set-top box or other device enabled with a digital video recorder that is provided to me by TWC.

(f) "HSD Service" and "High Speed Data Service" mean the online content, features, functions and Services (which may include Internet access) of the ISP or OLP selected by me, as provided over TWC's cable systems.

(g) "including" or "include" shall mean inclusion, without limitation.

(h) "ISP" means the Internet service provider selected by me from among those offered now or in the future by TWC for the HSD Service. My ISP is the entity that provides my Internet connectivity.

(i) "Me," "My," and "I" mean the account holder identified on the Work Order who is authorized by TWC to access and use the Services.

(j) "OLP" or "On-line Provider" means a provider of on-line content, features, functions and Services that are used in conjunction with my ISP Service (and whose service may be purchased with an ISP Service as part of a combined offering) but that does not itself provide Internet connectivity.

(k) "Services" means any and all Services provided to me by TWC, which may include Video Service, High Speed Data Service, Digital Phone Service and equipment based Services such as digital video recorder Services.

(l) "Software" means the computer software, if any, licensed by ISP or OLP to me to access the HSD Service, or licensed by TWC to me to facilitate installation or use of my ISP's or OLP's service or any other Services. Software also refers to any executable code that may be included in, downloaded to, or utilized by, any TWC Equipment.

(m) "Subscriber Materials" means the handbooks, manuals and other guide materials provided by TWC or any third party (including my ISP or OLP) regarding use of the Services.

(n) "Subscriber Privacy Notice" means the Subscriber Privacy Notice described in Section 12(a), as it may be amended from time to time by TWC.

(o) "Tariff(s)" means the materials describing the terms upon which TWC offers Digital Phone Service, which have been filed at the Public Service Commission or comparable state agency serving the jurisdiction in which I live.

(p) "Terms of Use" shall mean all rules, terms and conditions set forth in this Agreement or otherwise established now or hereafter by TWC regarding permissible or impermissible uses of or activities related to, the HSD Service.

(q) "TWC" means the local Time Warner Cable-affiliated cable operator that is providing the Services over its cable system, or any cable operator to whom TWC assigns this Agreement.

(r) "TWC Equipment" means any equipment provided by TWC to me including, but not limited to, wire, cable, cable conduit, splitters, junction boxes, converter boxes (also known as "set top" boxes), decoders, CableCARD™, terminals, cable modems, voice-enabled cable modems, remote control units, and any other equipment or materials provided to me by TWC for use in connection with the receipt of Services. TWC Equipment does not include any Network Interface Card ("NIC") installed in my Computer.

(s) "TWC Parties" means TWC and its corporate parents, affiliates and subsidiaries and their respective directors, officers, employees and agents.

(t) "Video Service" means video and/or audio programming Services such as basic, standard, digital and premium Services, Services provided on a per-channel or per-program basis, pay-per-play, pay-per-view or VOD.

(u) "VOD" means video on demand.

(v) "Work Order" means the Time Warner Cable work order provided to me on or after January 1, 2006 in connection with the installation or commencement of my Service(s).

## 16. Indemnification

I agree to defend, indemnify and hold harmless the TWC Parties from and against any and all claims and expenses, including reasonable attorneys' fees, arising out of or related in any way to my use of the Services or otherwise arising out of the use of my account or any equipment or facilities in connection therewith, or my use of any other TWC products or Services or any ISP's or OLP's products or Services.

## 17. Term

This Agreement will remain in effect until terminated by either party or superseded by a revised Subscription Agreement.

## 18. Interpretation; Severability

This Agreement is, and shall be interpreted as, subject to applicable law and regulation and to any applicable franchise agreement between a governmental authority and TWC. In the event that any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion shall be construed in accordance with applicable law as nearly as possible to reflect the original intentions of the parties as set forth herein, and the remainder of this Agreement shall remain in full force and effect.

## 19. Consent to Electronic Notice

I agree that unless otherwise specified, all notices required or contemplated hereunder will be provided by TWC by such means as TWC shall determine in its discretion. Without limiting the foregoing, I agree that TWC may provide any notices required or contemplated hereunder or by applicable law, including notice of changes to this Agreement, the Terms of Use, the Tariff(s) or the Privacy Notice, by electronic means (for example, email or online posting). An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my

local TWC office.

## 20. Waiver

I agree that failure by TWC to enforce any of its rights hereunder shall not constitute a waiver of any such rights. No waiver by either party of any breach or default shall be deemed to be a waiver of any preceding or subsequent breach or default.

## 21. Assignment

I understand that my Services are being provided only to the location identified on my Work Order and that I am not allowed to transfer all or any portion of the Services, or TWC's Equipment, to any other person, entity or location, including a new residence. I agree that I may not assign or transfer this Agreement. TWC may transfer or assign any portion or all of this Agreement at any time without notice to me, and I waive any such notice which may be required.

## 22. Effect of Applicable Law; Reservation of Rights

This Agreement, the Work Order and the Terms of Use are subject to all applicable federal, state or local laws and regulations in effect in the relevant jurisdiction(s) in which I receive my Services. If any provision of this Agreement, the Work Order or the Terms of Use contravene or are in conflict with any such law or regulation, or if I am entitled to more favorable rights under any such law or regulation than are set forth in any provision in this Agreement, the Work Order or the Terms of Use, then the terms of such law or regulation, or the rights to which I am entitled under such law or regulation, shall take priority over the relevant provision of this Agreement, the Work Order or the Terms of Use. If the relevant law or regulation applies to some but not all of my Service(s), then such law or regulation will take priority over the relevant provision of this Agreement, the Work Order or the Terms of Use only for purposes of those Service(s) to which the law or regulation applies. Except as explicitly stated in this Agreement, nothing contained in this Agreement shall constitute a waiver by me or TWC of any rights under applicable laws or regulations pertaining to the installation, operation, maintenance or removal of the Services, facilities or equipment.

## 23. Parental Control Device

I acknowledge that I have been advised of the availability of TWC's parental control device which can filter or block certain programming. Additional information about the device is available at the TWC contact number in the Subscriber Materials.

## 24. Conflicting Terms

In the event of a conflict in the terms and conditions between this Residential Services Subscriber Agreement and the accompanying Work Order, then the terms and conditions of this Agreement shall control.

COPY

1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)              F I L E D
    **DLA PIPER US LLP**                           Clerk of the Superior Court
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297                      JUN 2 0 2007
4   Tel:  619.699.2700
    Fax:  619.699.2701                             By_____,Deputy
5

6   Attorneys for Defendant
    TIME WARNER ENTERTAINMENT-ADVANCE
7   NEWHOUSE PARTNERSHIP, A NEW YORK
    GENERAL PARTNERSHIP, THROUGH ITS SAN
8   DIEGO DIVISION, DBA TIME WARNER CABLE

9                   SUPERIOR COURT OF CALIFORNIA

10                      COUNTY OF SAN DIEGO

11

12  LEON ALPERT, an individual, on behalf       CASE NO.  GIC881621
    of himself, on behalf of all those similarly
13  situated, and on behalf of the general      **DEFENDANT TIME WARNER
    public,                                      ENTERTAINMENT-ADVANCE
14                                               NEWHOUSE PARTNERSHIP, A NEW
                                                 YORK GENERAL PARTNERSHIP,
15            Plaintiffs,                         THROUGH ITS SAN DIEGO DIVISION,
                                                 DBA TIME WARNER CABLE'S NOTICE
16        v.                                     OF DEMURRER TO AND ALTERNATIVE
                                                 MOTION TO STRIKE, DEMURRER, AND
17  TIME WARNER CABLE, INC., a                   ALTERNATIVE MOTION TO STRIKE
    Delaware corporation, and DOES 1 TO         PORTIONS OF PLAINTIFF LEON
18  100,                                         ALPERT'S FIRST AMENDED
                                                 COMPLAINT**
19            Defendants.

20                                               Date       August 3, 2007
                                                 Time       10:30 a.m.
21                                               Dept:      63
                                                 Judge:     Luis R. Vargas
22
                                                 Complaint: March 13, 2007
23                                               FAC:       May 16, 2007

24

25

26

27

28

DLA PIPER US LLP     GT\6535567.1
  SAN DIEGO
─────────────────────────────────────────────────────────────────────
        DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLTF'S FIRST AMENDED COMPLAINT

1    TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on August 3, 2007 at 10:30 a.m., or as soon thereafter as

3    the matter may be heard, in Department 74 of the above-entitled court, located at 330 West

4    Broadway, San Diego, California, Defendant Time Warner Entertainment-Advance Newhouse

5    Partnership, a New York general partnership, through its San Diego Division, dba Time Warner

6    Cable ("Defendant"), sued erroneously as Time Warner Cable, Inc., will and hereby does demur

7    to Plaintiff's First Amended Complaint ("FAC") and alternatively moves to strike portions of

8    Plaintiff's FAC.

9    Defendant generally demurs to Plaintiff's only and First Cause of Action for Violation of

10    Business & Professions Code section 17200, Unfair Business Practices on the grounds that it fails

11    to state facts sufficient to constitute a cause of action.  Cal. Civ. Proc. Code § 430.10(e).

12    In the alternative to the demurrer, Defendant moves to strike specific allegations from the

13    Complaint on the grounds that they are irrelevant, false, or improper and are not drawn in

14    conformity with the laws of this state.  Cal. Civ. Proc. Code §§ 435, 436.

15    In the event that the Court determines that each of Plaintiff's specific allegations related to

16    the **"unlawful" prong** of Section 17200 is substantively defective, but otherwise determines that

17    Plaintiff has stated facts with sufficient particularly under Section 17200, the Court should strike

18    all language relating to these specific allegations related to **"unlawful"** business practices,

19    including:

20    • Page 5, paragraphs 14 and 15, in their entirety.

21    • Page 7, paragraph 21, line 9, word "unlawful".

22    • Pages 7 and 8, paragraphs 23 and 24, in their entirety.

23    • Page 8, paragraph 26, in its entirety.

24    • Page 9, paragraph 29, subparagraph (a), line 16, the word and comma

25    "unlawfully,".

26    • Page 9, paragraph 29, subparagraph (c), line 22, the word and comma

27    "unlawfully,".

28    • Page 9, paragraph 29, subparagraph (d), in its entirety.

1    • Page 10, paragraph 29, subparagraph (e), (f) and (g) in their entirety.

2    • Page 11 paragraph 38, line 22, the word and comma "unlawfully,".

3    • Page 11, paragraph 39, line 26, the word and comma "unlawfully,".

4    • Page 12, paragraphs 40, 41, 42, and 43, in their entirety.

5    • Page 12, paragraph 44, line 23, the word and comma "unlawful,".

6    • Page 12, PRAYER clause, line 26, the word "unlawfully".

7    • Page 13, PRAYER clause, line 3, the word and comma "unlawful,".

8    In the event that the Court determines that each of Plaintiff's specific allegations related to

9    the **"unfair" prong** of Section 17200 is substantively defective, but otherwise determines that

10   Plaintiff has stated facts with sufficient particularly under Section 17200, the Court should strike

11   all language relating to these specific allegations related to **"unfair"** business practices,

12   including:

13   • Page 6, paragraph 17, line 3, the word "unfairly".

14   • Page 7, paragraph 20, line 7, the word "unfair".

15   • Page 7, paragraph 21, line 9, the word "unfair".

16   • Page 7, paragraph 23, line 27, the word "unfair".

17   • Page 8, paragraph 25, line 15, the word "unfair".

18   • Page 8, paragraph 26, line 22, the word "unfair".

19   • Page 9, paragraph 29, subparagraph (a), line 16, the word "unfairly".

20   • Page 9, paragraph 29, subparagraph (c), line 22, the word "unfairly".

21   • Page 11, paragraph 38, line 22, the word "unfairly".

22   • Page 11, paragraph 39, line 26, the word "unfairly".

23   • Page 12, paragraph 44, line 23, the word "unfair".

24   • Page 13, PRAYER clause, line 3, the word "unfair".

25   In the event that the Court determines that each of Plaintiff's specific allegations related to

26   the **"deceptive" prong** of Section 17200 is substantively defective, but otherwise determines that

27   Plaintiff has stated facts with sufficient particularly under Section 17200, the Court should strike

28   all language relating to these specific allegations related to **"deceptive"** business practices,

DLA PIPER US LLP    GT\6535567.1                    -2-
SAN DIEGO

DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLTF'S FIRST AMENDED COMPLAINT

1 | including:

2 | • Page 6, paragraph 17, line 3, word "deceptively".

3 | • Page 6, paragraph 18, in its entirety.

4 | • Page 7, paragraph 20, line 7, the word "deceptive".

5 | • Page 7, paragraph 23, line 27, the word "deceptive".

6 | • Page 8, paragraph 25, line 16, the word "deceptive".

7 | • Page 8, paragraph 26, line 22, the word "deceptive".

8 | • Page 9, paragraph 29, subparagraph (a), line 16, the word "deceptively".

9 | • Page 9, paragraph 29, subparagraph (b), in its entirety.

10 | • Page 9, paragraph 29, subparagraph (c), line 22, the word "deceptively".

11 | • Page 11, paragraph 38, line 22, the word "deceptively".

12 | • Page 11, paragraph 39, line 26, the word "deceptively".

13 | • Page 12, paragraph 44, line 23, the word "deceptive".

14 | • Page 13, PRAYER clause, line 4, the word "deceptive".

15 | Defendant's Demurrer to and Alternative Motion to Strike is based upon this Notice and

16 | Demurrer and Alternative Motion to Strike, the accompanying Memorandum of Points and

17 | Authorities, the complete records and files of this action, and any argument or additional evidence

18 | that is permitted by this Court.

19 |

20 | Dated: June 20, 2007

21 | DLA PIPER US LLP

22 |

23 | By

JEFFREY M. SHOHET
24 | JULIE L. HUSSEY
CARRIE S. DOLTON
25 | Attorneys for Defendant
TIME WARNER ENTERTAINMENT-
26 | ADVANCE NEWHOUSE PARTNERSHIP,
A NEW YORK GENERAL PARTNERSHIP,
27 | THROUGH ITS SAN DIEGO DIVISION,
DBA TIME WARNER CABLE

28 |

DLA PIPER US LLP
SAN DIEGO

GT\6535567.1

-3-

DEFENDANT'S NOTICE OF DEMURRER AND DEMURRER TO PLTF'S FIRST AMENDED COMPLAINT

1 | JEFFREY M. SHOHET (Bar No. 067529)
2 | JULIE L. HUSSEY (Bar No. 237711)
   | CARRIE S. DOLTON (Bar No. 234298)
   | **DLA PIPER US LLP**
3 | 401 B Street, Suite 1700
   | San Diego, CA  92101-4297
4 | Tel:  619.699.2700
   | Fax:  619.699.2701
5 |

**COPY**

F I L E D

Clerk of the Superior Court

JUN 2 0 2007

By _____,Deputy

6 | Attorneys for Defendant
7 | TIME WARNER ENTERTAINMENT-ADVANCE
   | NEWHOUSE PARTNERSHIP, A NEW YORK
   | GENERAL PARTNERSHIP, THROUGH ITS SAN
8 | DIEGO DIVISION, DBA TIME WARNER CABLE

9 |

10 | SUPERIOR COURT OF CALIFORNIA

11 | COUNTY OF SAN DIEGO

12 |

13 | LEON ALPERT, an individual, on behalf
    | of himself, on behalf of all those similarly
    | situated, and on behalf of the general
14 | public,
15 |             Plaintiffs,
16 |        v.
17 | TIME WARNER CABLE, INC., a
    | Delaware corporation, and DOES 1 TO
18 | 100,
19 |             Defendants.

CASE NO.  GIC881621

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TIME WARNER ENTERTAINMENT-ADVANCE NEWHOUSE PARTNERSHIP, THROUGH ITS SAN DIEGO DIVISION, DBA TIME WARNER CABLE'S DEMURRER TO AND ALTERNATIVE MOTION TO STRIKE PORTIONS OF PLAINTIFF LEON ALPERT'S FIRST AMENDED COMPLAINT**

Date:        August 3, 2007
Time:       10:30 a.m.
Dept:       63
Judge:     Luis R. Vargas

Complaint:  March 13, 2007
FAC:          May 16, 2007

DLA PIPER US LLP
SAN DIEGO

GT\6534351.3

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...........................................................................................................1

II.  PROCEDURAL AND FACTUAL BACKGROUND ...................................................2

    A.   Procedural Background.......................................................................................2

    B.   Factual Background ............................................................................................3

III. STANDARD FOR DEMURRER.................................................................................5

IV.  ARGUMENT................................................................................................................6

    A.   The FAC Fails to State Facts Sufficient to Constitute a Cause of Action for
        "Unlawful" Business Practices .........................................................................6

        1.   The FAC Fails to State Facts Sufficient to Support a Cause of
            Action Based on a Violation of Civil Code Sections 1770(a)(3) &
            (13).......................................................................................................7

        2.   The FAC Fails to State Facts Sufficient to Support a Cause of
            Action Based on a Violation of Civil Code Sections 1770(a)(19) ..............8

        3.   The FAC Fails to State Facts Sufficient to Support a Cause of
            Action Based on Breach of Contract ........................................................10

    B.   The FAC Fails to State Facts Sufficient to Constitute a Cause of Action for
        "Unfair" Business Practices...............................................................................11

    C.   The FAC Fails to State Facts Sufficient to Constitute a Cause of Action for
        "Deceptive" Business Practices .........................................................................13

V.   CONCLUSION.............................................................................................................15

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4    *Aubry v. Tri-City Hosp. Dist.*,
        2 Cal. 4th 962 (1992)...................................................................6
5
    *Barnett v. Fireman's Fund Ins. Co.*,
6        90 Cal. App. 4th 500 (2001) .........................................................6

7    *Bernardo v. Planned Parenthood Fed'n of Am.*,
        115 Cal App. 4th 322 (2004)........................................................11
8
    *Blank v. Kirwin*,
9        39 Cal. 3d 311 (1985) ..................................................................6

10   *Branick v. Downey Sav. and Loan Ass'n*,
        39 Cal. 4th 235 (2006) .................................................................9
11
    *Cel-Tech Communications v. Los Angeles Cellular Tel. Co.*,
12       20 Cal. 4th 163 (1999)..............................................................7, 11

13   *Comm. on Children's Television v. Gen. Foods Corp.*,
        35 Cal. 3d 197 (1983).................................................................13
14
    *Daugherty v. Am. Honda Motor Co., Inc.*,
15       144 Cal. App. 4th 824 (2006) .......................................................8

16   *Farmers Ins. Exchange v. Superior Court*,
        2 Cal. 4th 377 (1992)....................................................................6
17
    *Harris v. Rudin, Richman & Appel*,
18       74 Cal. App. 4th 299 (1999) .......................................................10

19   *Khoury v. Maly's of California, Inc.*,
        14 Cal. App. 4th 612 (1993) ..............................................11, 13, 15
20
    *Lavie v. Procter & Gamble Co.*,
21       105 Cal. App. 4th 496 (2003) .....................................................13

22   *Leahy v. Warden*,
        163 Cal. 178 (1912) .....................................................................9
23
    *Lodi v. Lodi*,
24       173 Cal. App. 3d 628 (1985) ........................................................6

25   *Lortz v. Connell*,
        273 Cal. App. 2d 286 (1969) .......................................................10
26
    *Melikian v. Truck Ins. Exch.*,
27       133 Cal. App. 2d 113 (1955) ........................................................6

28

-ii-

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Moore v. Regents of Univ. of California,*
  51 Cal. 3d 120 (1990) ...................................................................................6

*Nat'l Rural Telecomms. Co-op. v. DIRECTV, Inc.,*
  319 F. Supp. 2d 1059 (C.D. Cal. 2003) ..........................................................10

*Otworth v. S. Pac. Transp. Co.,*
  166 Cal. App. 3d 452 (1985) ..........................................................................10

*PH II, Inc. v. Superior Court,*
  33 Cal. App. 4th 1680 (1995) ...........................................................6, 11, 13, 15

*People v. McKale,*
  25 Cal. 3d 626 (1979) .....................................................................................7

*Perry v. Otay Irr. Dist.,*
  127 Cal. 565 (1900) ........................................................................................9

*Plotkin v. Sajahtera, Inc.,*
  106 Cal. App. 4th 953 (2003) ....................................................................13, 14

*Samura v. Kaiser Found. Health Plan, Inc.,*
  17 Cal. App. 4th 1284 (1993) ..........................................................................8

*Saunders v. Superior Court,*
  27 Cal. App. 4th 832 (1994) ..........................................................................10

*Schnall v. Hertz Corp.,*
  78 Cal. App. 4th 1144 (2000) .........................................................................11

*Scripps Clinic v. Superior Court,*
  108 Cal. App. 4th 917 (2003) .........................................................................11

*Searle v. Wyndham Int'l, Inc.,*
  102 Cal. App. 4th 1327 (2002) .......................................................................14

*Serrano v. Priest,*
  5 Cal. 3d 584 (1971) .......................................................................................6

*Shvarts v. Budget Group, Inc.,*
  81 Cal. App. 4th 1153 (2000) .........................................................................13

*Smith v. State Farm Mut. Auto. Ins. Co.,*
  93 Cal. App. 4th 700 (2001) ..........................................................................10

*State Farm Fire & Casualty Co. v. Superior Court,*
  45 Cal. App. 4th 1093 (1996) ..........................................................................7

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,*
  17 Cal. 4th 553 (1998), *overruled on other grounds by Californians For Disability Rights v. Mervyn's, LLC,* 39 Cal. 4th 223 (2006) ...........................................7

DLA PIPER US LLP
SAN DIEGO

1

**TABLE OF AUTHORITIES**
(continued)

2
**Page**

3                            **STATUTES**

4  Cal. Bus. & Prof. Code § 17200 ..........................................................................passim

5  Cal. Bus. & Prof. Code § 17204 .................................................................................9, 10

6  Cal. Bus. & Prof. Code § 17535 .................................................................................10

7  Cal. Civ. Code § 1770(a)(3)..........................................................................................5, 7

8  Cal. Civ. Code § 1770(a)(13).........................................................................................7

9  Cal. Civ. Code § 1770(a)(19).........................................................................................8

10  Cal. Code Civ. P. § 430.10(e)........................................................................................5, 6

11  Cal. Code Civ. P. §§ 435, 436(b)...................................................................................6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA Piper US LLP
San Diego

1  Defendant Time Warner Entertainment-Advance Newhouse Partnership, a New York

2  general partnership, through its San Diego Division, dba Time Warner Cable ("TWC"), sued

3  erroneously as Time Warner Cable, Inc., respectfully submits the following memorandum of

4  points and authorities in support of its demurrer to or, in the alternative, motion to strike portions

5  of Leon Alpert's ("Plaintiff") First Amended Complaint ("FAC").

6  **I.     INTRODUCTION.**

7  This lawsuit is a classic case of the wild west motto of "shoot first, ask questions later."

8  Happily, San Diego is part of the new west and the courts do not allow this type of litigation to

9  continue past the demurrer stage.

10  The essence of the FAC by Plaintiff is that he believes he was charged by TWC for the

11  standard tier of cable service, sometimes referred to as basic cable service, and that he should not

12  have been, as basic cable service was being provided to him through his homeowner's association

13  ("HOA"). The problem with Plaintiff's theory is that it is 100% factually incorrect. Plaintiff has

14  never been charged for this standard tier of service. This issue can be decided on a demurrer as

15  the documents that clearly show the facts are attached to Plaintiff's FAC – Plaintiff's TWC

16  billing statements.

17  In addition to basic cable service, TWC offers multiple programming and other cable

18  services including specialty channels, internet access, and digital phone service. These products

19  can be purchased a la carte or as part of a bundle. Much like a prix fixe meal at a restaurant, with

20  the bundle comes a reduction in price compared to a la carte pricing. Plaintiff attaches his TWC

21  billing statements in an attempt to demonstrate that TWC has charged him for basic cable service.

22  However, the TWC billing statements clearly demonstrate that TWC has never charged Plaintiff

23  for basic cable service. Instead, the TWC billing statements demonstrate that on February 12,

24  2006, Plaintiff purchased his cable and cable related services a la carte. On December 12, 2006,

25  Plaintiff purchased his cable and cable related services as a bundle at a discounted price. The

26  price decrease that Plaintiff experienced is nothing more than the savings of the bundle.

27  This fact precludes Plaintiff from successfully pleading any cause of action against TWC

28  for violation of California Business & Professions Code section 17200, *et seq.* ("Section 17200").

DLA PIPER US LLP
SAN DIEGO

GTV6534351.3                                  -1-

1    Plaintiff has not alleged and cannot allege that TWC engaged in unlawful, unfair, or deceptive

2    conduct. Plaintiff has not established and cannot establish that TWC engaged in any violation of

3    the law. Plaintiff has not established and cannot establish that TWC acted "unfairly" because

4    TWC never charged Plaintiff for basic cable service. Finally, Plaintiff cannot state a claim under

5    the "deceptive" prong of Section 17200 because Plaintiff admits that he was not deceived.

6          Through its Demurrer and Motion to Strike, TWC respectfully requests that the Court

7    sustain without leave to amend its Demurrer to Plaintiff's FAC. Alternatively, if the Court

8    determines that Plaintiff has stated a claim as to any of the "prongs" of Section 17200, TWC

9    moves to strike the allegations as to the "prongs" for which Plaintiff fails to state a claim.

10   **II.    PROCEDURAL AND FACTUAL BACKGROUND.**

11         **A.    Procedural Background.**

12         On or about March 13, 2007, Plaintiff filed a class action complaint purportedly on behalf

13   of himself and on behalf of all California TWC subscribers: (1) who were members of HOAs

14   and/or tenants of such members; (2) where the subscriber's HOA had contracted with TWC for

15   basic cable services; and (3) where the subscriber purchased additional cable and cable related

16   services directly from TWC but allegedly was not provided a credit for the basic cable services

17   provided through the subscriber's HOA. (FAC ¶ 4.) Plaintiff alleged a single cause of action for

18   violations of Section 17200.

19         On or about May 16, 2007, Plaintiff filed his FAC in response to TWC's Demurrer to the

20   original Complaint. The FAC is essentially the same as Plaintiff's original Complaint. Like the

21   original, the FAC still stuffs multiple alleged theories of unlawful, unfair, and deceptive conduct

22   into a single cause of action premised on the allegation that Plaintiff was overcharged for basic

23   cable service. The FAC restates almost verbatim the factual allegations asserted in the original

24   Complaint while adding legal contentions in a failed attempt to save his claims premised on

25   "unlawful" practices. In that regard, Plaintiff's original Complaint did not allege the law TWC

26   was alleged to have violated – a fatal pleading defect to such claims. The FAC attempts (but

27   fails) to cure that fatal defect by alleging that TWC violated three provisions of the Consumer

28   Legal Remedies Act ("CLRA") and by alleging that TWC breached its contract with Plaintiff's

DLA PIPER US LLP
SAN DIEGO

GT6534351.3                                    -2-

1  HOA.  Plaintiff attempts to cure another fatal flaw in his contract based claim by attaching the

2  contracts at issue.

3      In any event, these additional allegations do nothing to address the other deficiencies

4  highlighted in Defendant's Demurrer to the original Complaint.  Those deficiencies are fatal to

5  Plaintiff's FAC, and TWC's Demurrer should be sustained without leave to amend.

6      **B.    Factual Background.**

7      TWC regularly contracts with HOAs to provide basic cable services for each unit

8  governed by the HOA.  (FAC ¶¶ 7-11.)  As part of these HOA contracts, members of the HOAs

9  are provided basic cable services paid for out of a portion of the dues collected from the

10  homeowners.  (*Id.* at ¶ 7.)  These HOA contracts "require[e] the HOA to affirmatively market

11  [TWC]'s services and products to its members."  (*Id.* at ¶ 8.)  Plaintiff is alleged to have paid a

12  fee for basic cable as part of his HOA dues of approximately $28.77.  (*Id.* at ¶ 7.)

13      Plaintiff alleges his TWC cable bill did not credit him for the basic cable services he was,

14  in effect, already paying for through his monthly HOA dues.  He purports to base this claim on

15  his billing statements.  In that regard, he alleges: "[a] comparison of [Plaintiff]'s billing

16  statements demonstrates that [TWC] was overcharging [Plaintiff] by at least $21 each and every

17  month for additional cable and cable related services."  (*Id.* at ¶ 16.)  The FAC alleges that

18  Plaintiff had been paying approximately $154 per month for various cable and cable related

19  services, and that once TWC correctly priced these services to reflect his HOA's existing

20  agreement with TWC for basic cable services, his bill for the exact same services dropped to

21  approximately $133.  (*Id.*)  Plaintiff is simply wrong – the reduction in price is the result of his

22  election to purchase extra services as a single package with special pricing rather than on an a la

23  carte basis.  Importantly, for purposes of this demurrer, Plaintiff's conclusory allegations of

24  overcharge are inconsistent with the three TWC billing statements he attached to his FAC as

25  Exhibits B, C, and D.

26      Exhibit B is Plaintiff's February 12, 2006, billing statement which clearly shows that

27  TWC has never charged Plaintiff for basic cable service.  Instead, Exhibit B demonstrates that on

28  February 12, 2006, Plaintiff purchased additional cable and cable related services over and above

DLA PIPER US LLP
SAN DIEGO

GT\6534351.3                    -3-

1   the basic cable service on an a la carte basis. This is clearly shown in the itemized charges for

2   each cable and cable related service Plaintiff purchased (i.e., "Digital Phone Package" is $39.95,

3   "iCONTROL Premium Service" is $6.95). (FAC Ex. B.) Nowhere on this billing statement is a

4   charge for standard or basic cable service. In fact, all of the "cable" charges are for "premier" or

5   "premium" services.

6        Exhibit C is Plaintiff's December 12, 2006 billing statement which again clearly shows

7   that TWC has never charged Plaintiff for basic cable service. Instead, Exhibit C demonstrates

8   that on December 12, 2006, Plaintiff purchased his cable and cable related services as a bundle.

9   This is clearly shown in the single fixed price for all of the listed cable and cable related services

10  Plaintiff previously purchased separately (i.e., "Hoa DIDGIPiC 4000 Trio" is $121.90). (FAC

11  Ex. C.) Unlike the February 12, 2006, billing statement, this statement does not break out the

12  price for each cable and cable related service – just like a prix fixe meal at a restaurant includes

13  one price for all of the items included in the meal and does not break out the price for each item

14  included in the meal. Plaintiff alleges that the price decrease is a result of TWC "correctly"

15  charging Plaintiff to reflect his HOA's existing agreement with TWC for basic cable service. But

16  Plaintiff is incorrect. Plaintiff switched from a menu of individually priced services to a single

17  new product – a package of services priced as a bundle. The price decrease that Plaintiff

18  experienced is nothing more than the savings of the bundle – a savings experienced by many

19  TWC subscribers who have changed from a la carte pricing to bundled pricing.

20        In addition to challenging the charges on his TWC billing statements, Plaintiff also alleges

21  that TWC fails to inform TWC subscribers of HOA pricing on TWC's website. (FAC ¶ 18.)

22  Plaintiff claims that because TWC's website does not include HOA pricing, a member of an HOA

23  "would likely be deceived that they are required to pay full pricing for cable related services

24  despite already paying for basic cable through their HOA." (*Id.* at ¶ 18.) Finally, Plaintiff alleges

25  that TWC's "contractual provisions" on TWC's monthly billing statements and online subscriber

26  agreement limits consumers' right to refund for billing errors. (*Id.* at ¶¶ 21-26.)

27        Based on these allegations, Plaintiff pleads a single cause of action under Section 17200.

28  Although Plaintiff organizes his FAC into a single titled cause of action, this cause of action

1    contains seven distinct causes of action predicated on distinct legal theories, and should be

2    analyzed as such.  In the original Complaint and FAC, Plaintiff alleges that two business practices

3    are "unlawful, unfair and/or deceptive" and alleges that another business is only "deceptive."

4    These allegations include:  (1) unlawfully, unfairly, and/or deceptively overcharging members of

5    HOAs who are subscribers for cable and cable related services by not providing HOA subscribers

6    HOA pricing that properly accounts for the basic cable services already provided under TWC's

7    contract with the subscriber's HOA; (2) unlawfully, unfairly, and/or deceptively attempting to

8    limit subscribers' rights to seek refunds for overcharges to 30 days after receipt of a bill; and (3)

9    failing to adequately disclose HOA pricing to HOA subscribers that accounts for the cable

10   services already provided under TWC's contract with the subscriber's HOA.  (*Id.* at ¶¶ 37-39.)

11         In an attempt to save Plaintiff's fatally flawed "unlawful practices" allegations in the

12   original Complaint for failure to state what law was violated, Plaintiff asserts four additional

13   causes of action in the FAC related to the "unlawful" prong including:  (1) failing to inform

14   Plaintiff that TWC is already collecting basic cable fees on behalf of Plaintiff through its

15   affiliation with Plaintiff's HOA in violation of California Civil Code section 1770(a)(3);[1] (2)

16   making false or misleading statements concerning the reasons for, existence of, or amounts of

17   price reductions in the cable bill in violation of California Civil Code section 1770(a)(13); (3)

18   including in its online subscriber agreement an unconscionable 30-day "waiver" clause in

19   violation of California Civil Code section 1770(a)(19); and (4) breaching its HOA agreements

20   which exist "to make Services available to residents" by charging residents directly for services

21   already provided for and paid for under the HOA agreements.  (*Id.* at ¶¶ 41-43.)

22   **III.    STANDARD FOR DEMURRER.**

23         A general demurrer is proper where the complaint or any cause of action therein fails "to

24   state facts sufficient to constitute a cause of action."  Cal. Code Civ. P. § 430.10(e).  While the

25

---

26   [1] Plaintiff incorrectly cites to California Civil Code section 1770(a)(1) in support of Plaintiff's
     allegations for that TWC misrepresented the affiliation, connection, or association with, or
27   certification by, another.  California Civil Code section 1770(a)(1) prohibits "passing off goods or
     services as those of another."  Plaintiff does not allege that TWC passes off goods or services as
28   those of another, so TWC does not address section 1770(a)(1).

1   reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as

2   admitting all material facts properly pleaded, *Aubry v. Tri-City Hosp. Dist.,* 2 Cal. 4th 962, 966-

3   67 (1992), the court does not "assume the truth of contentions, deductions, or conclusions of fact

4   or law." *Moore v. Regents of Univ. of California,* 51 Cal. 3d 120, 125 (1990); *Serrano v. Priest,*

5   5 Cal. 3d 584, 591 (1971). In ruling on a demurrer, the court may consider only the factual

6   allegations in the complaint and matters subject to judicial notice. Cal. Code Civ. P. § 430.10(e);

7   *Blank v. Kirwin,* 39 Cal. 3d 311, 318 (1985). Facts appearing in exhibits attached to the

8   complaint will also be accepted as true and, if contrary to the allegations in the pleading, will be

9   given precedence. *Barnett v. Fireman's Fund Ins. Co.,* 90 Cal. App. 4th 500, 505 (2001).

10  Presumptions and inferences are always against the pleader and all doubts resolved against him

11  because the pleader is presumed to have stated his case as favorably as possible. *Melikian v.*

12  *Truck Ins. Exch.,* 133 Cal. App. 2d 113, 115 (1955).

13          Alternatively, TWC moves to strike those portions of Plaintiff's labeled single "Cause of

14  Action" that are not sufficient to state a cause of action. Where a single cause of action is

15  premised on multiple theories or scenarios, any legally insufficient portions of the cause of action

16  are properly subject to a motion to strike. Cal. Code Civ. P. §§ 435, 436(b); *PH II, Inc. v.*

17  *Superior Court,* 33 Cal. App. 4th 1680, 1682-83 (1995) (holding where a single malpractice cause

18  of action was based on several incidents, motion to strike was properly granted where one

19  incident was not actionable as a matter of law); *Lodi v. Lodi,* 173 Cal. App. 3d 628, 631 (1985)

20  (holding insufficient portion of cause of action properly stricken as "not drawn in conformity with

21  the laws of this state").

22  **IV.    ARGUMENT.**

23          **A.    The FAC Fails to State Facts Sufficient to Constitute a Cause of Action for
24                  "Unlawful" Business Practices.**

25          A business act or practice is "unlawful" under Section 17200 only if it is "forbidden by

26  law." *Farmers Ins. Exchange v. Superior Court,* 2 Cal. 4th 377, 383 (1992). Section 17200

27  "'borrows' violations of other laws and treats these violations, when committed pursuant to

28  business activity, as unlawful practices independently actionable under [Section] 17200." *Id.*



1    Thus the pleadings must allege the law that is "borrowed" and "without supporting facts

2    demonstrating the illegality of a rule or regulation, an allegation that [the practice] is in violation

3    of specific statute is purely conclusionary and insufficient to withstand demurrer." *People v.*

4    *McKale*, 25 Cal. 3d 626, 635 (1979). Likewise, a complaint is insufficient to state a cause of

5    action if it fails to state what other law was violated. *See Stop Youth Addiction, Inc. v. Lucky*

6    *Stores, Inc.*, 17 Cal. 4th 553, 566-67 (1998), *overruled on other grounds by Californians For*

7    *Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223 (2006); *State Farm Fire & Casualty Co. v.*

8    *Superior Court*, 45 Cal. App. 4th 1093,1103 (1996).[2]

9        Plaintiff attempts to save his "unlawful" causes of action premised on allegations that he

10   was overcharged and limited in his right to seek refunds by asserting three additional causes of

11   action borrowing violations of the CLRA. But these three additional causes of action fail to state

12   facts sufficient to support a cause of action.

13            1.    **The FAC Fails to State Facts Sufficient to Support a Cause of Action**

                     **Based on a Violation of Civil Code Sections 1770(a)(3) & (13).**

14

15        Plaintiff alleges that TWC misrepresented its affiliation with Plaintiff's HOA by failing to

16   inform Plaintiff of the rates to which he is entitled and which should have reflected the fact that

17   Plaintiff is already paying for basic cable service in violation of California Civil Code section

18   1770(a)(3). Section 1770(a)(3) of the CLRA prohibits "[m]isrepresentating the affiliation,

19   connection, or associate with, or certification by, another." Cal. Civ. Code § 1770(a)(3). Plaintiff

20   also alleges that TWC misinformed Plaintiff that the reason his cable bill was reduced is because

21   of purported "bundling" of services, when the real reason is because TWC is already collecting

22   fees on behalf of Plaintiff for basic cable service, in violation of California Civil Code section

23   1770(a)(13). Section 1770(a)(13) of the CLRA prohibits "[m]aking false or misleading

24   statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ.

25   Code § 1770(a)(13). These provisions are clearly inapplicable because they prohibit

26

27   [2] Other language in this case has been disapproved by the Supreme Court in a discussion
expressly limited to the context of "an action by a competitor alleging anticompetitive practices."

28   *Cel-Tech Communications v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 187 n.12
(1999).

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

1  misrepresentations and false or misleading statements.  To the contrary, the FAC does not allege a

2  single affirmative representation by TWC regarding its affiliation, connection, or association with

3  Plaintiff's HOA and does not allege a single statement concerning the reasons for, existence of, or

4  amounts of price reductions.  While a claim may be stated under the CLRA in terms of failure to

5  disclose, it has been held that "to be actionable the omission must be contrary to a representation

6  actually made by the defendant, or an omission of a fact the defendant was obliged to disclose."

7  *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835 (2006).  Absent such

8  allegations, Plaintiff cannot state a cause of action under either section 1770(a)(3) or (13).

9        Furthermore, there is a more fundamental flaw in this claim – as discussed above, the

10  billing statements attached to the FAC clearly show that TWC was not and is not charging

11  Plaintiff for basic cable.  Plaintiff's allegations that TWC "unlawfully" overcharged Plaintiff are

12  directly contradicted by the billing statements and must be disregarded.

13             2.    **The FAC Fails to State Facts Sufficient to Support a Cause of Action
14                   Based on a Violation of Civil Code Sections 1770(a)(19)**

15        Plaintiff also attempts to state a violation of section 1770(a)(19), which proscribes

16  "[i]nserting an unconscionable provision in the contract."  Cal. Civ. Code § 1770(a)(19).  A

17  provision "may be unconscionable if it is hidden, oppressive, overly harsh, and results in a one-

18  sided application of risks or costs not justified by the circumstances."  *Samura v. Kaiser Found.*

19  *Health Plan, Inc.*,  17 Cal. App. 4th 1284, 1296 (1993).

20        Plaintiff claims that the contract provision requiring customers to report billing errors

21  within 30 days is unconscionable.  The provision provides that: "Note:  If you believe this

22  statement contains a billing error, we must hear from you within 30 days of receipt of the

23  statement in question.  If we are not notified of the discrepancy the statement will be considered

24  correct."  (FAC ¶ 21.)

25        This provision is not, as Plaintiff alleges, an attempt by TWC to shorten the statute of

26  limitations and Plaintiff has incorrectly characterized it as a "self-styled 30 day statute of

27  limitations."  (FAC ¶ 26.)  In that regard, it does not purport to limit a subscriber's right to file a

28  lawsuit challenging the billing statements if he fails to meet the 30-day requirement.  Rather, it

DLA Piper US LLP    GT\6534351.3                    -8-
San Diego

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

1    simply provides that "if [TWC is] not notified of the discrepancy the statement will be considered

2    correct." (FAC ¶ 21.)  TWC provides subscribers a means to settle disputes without litigation by

3    requiring a subscriber who contests a statement to promptly notify TWC of the concerns

4    regarding the bill.  After such notification, TWC has an opportunity to investigate and, if

5    appropriate, adjust the bill.

6            This principle of obligating a party to a contract to provide notice of a dispute proximate

7    to the time of payment is embodied in the voluntary payment doctrine which, as the name

8    implies, provides that payments made voluntarily to another with knowledge of the facts cannot

9    be recovered. *Perry v. Otay Irr. Dist.*, 127 Cal. 565, 570 (1900); *Leahy v. Warden*, 163 Cal. 178,

10    181 (1912).  TWC's 30-day notice provision is not unlawful—in fact, it is supported by the

11    common law "voluntary payment" doctrine.

12            Plaintiff also criticizes the location and the size of the font of the provision on the bill .

13    Plaintiff alleges the billing procedure is "[i]n nearly impossible to read tiny script on the back of

14    [the] monthly billing statement." (FAC ¶ 19).  The font is the same size as the rest of the text in

15    the same area on the billing statement.  The placement of the language is in a logical part of the

16    billing statement directly below an all caps and underlined title "ABOUT YOUR TIME

17    WARNER CABLE AGREEMENT."  The language from the billing statement is clear and

18    unambiguous.  The language itself, the size of the font, and the placement of the language on the

19    bill is clearly reasonable notice to TWC subscribers that they should review their billing

20    statements for accuracy and notify TWC if there are any billing errors.  In any event, the inclusion

21    of this provision on the billing statement is simply a courtesy reminder to TWC customers of the

22    30-day notice provision, which Plaintiff admits is already set forth in section 2(l) of the online

23    subscriber agreement (attached as Exhibit E to the FAC).  (FAC ¶ 22).

24            Again, as with the overcharge claim, there is a more fundamental defect in this claim.

25    Because Plaintiff was not overcharged, he was not injured by any provision affecting his right to

26    recover for an overcharge and lacks standing to assert this claim. *See* Cal. Bus. & Prof. Code §

27    17204 (providing that Section 17200 actions may be prosecuted "by any person who has suffered

28    injury in fact and has lost money or property as a result of such unfair competition"); *Branick v.*

1    *Downey Sav. and Loan Ass'n,* 39 Cal. 4th 235, 240 (2006) ("After Proposition 64, only those

2    private persons 'who [have] suffered injury in fact and [have] lost money or property' (§§ 17204,

3    17535) may sue to enforce the unfair competition and false advertising laws.").

4                3.    **The FAC Fails to State Facts Sufficient to Support a Cause of Action**
                       **Based on Breach of Contract**
5

6            The "unlawful" prong of Section 17200 proscribes "anything that can be properly be

7    called a business practice and that at the same time is forbidden by law." *Smith v. State Farm*

8    *Mut. Auto. Ins. Co.,* 93 Cal. App. 4th 700, 717-18 (2001) (internal quotations omitted).  The

9    "unlawful" practices prohibited by Section 17200 "are any practices forbidden by law, be it civil

10   or criminal, federal, state, or municipal, statutory, regulatory or court-made." *Saunders v.*

11   *Superior Court,* 27 Cal. App. 4th 832, 838-39 (1994).  The "unlawful" practices prohibited by

12   Section 17200 do not include simple tort and breach of contract claims.  *Nat'l Rural Telecomms.*

13   *Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074-75 (C.D. Cal. 2003).

14           Plaintiff argues that he is a third party beneficiary of a contract between TWC and

15   Plaintiff's HOA and that TWC breached that agreement by charging him directly for services

16   already provided and paid for under the HOA agreement.  First as discussed above, the billing

17   statements Plaintiff attached to the FAC demonstrate that TWC has never charged Plaintiff for

18   services already provided and paid for under the HOA agreement.  Second, a Section 17200

19   "unlawful" claim may not be based on a breach of contract a claim.  And third, Plaintiff fails to

20   allege the essential elements of a breach of contract claim.  To establish a prima facie cause of

21   action for breach of contract, Plaintiff must plead (1) the existence of the contract, (2) his

22   performance of the contract, (3) defendant's breach, and (4) damages.  *See, e.g., Harris v. Rudin,*

23   *Richman & Appel* , 74 Cal. App. 4th 299, 307 (1999); *Otworth v. S. Pac. Transp. Co.,* 166 Cal.

24   App. 3d 452, 458 (1985); *Lortz v. Connell*, 273 Cal. App. 2d 286, 290 (1969).  Plaintiff's single

25   conclusory allegation that TWC "systematically breach[ed] its HOA agreements" falls far short of

26   these pleading requirements.  Again, more fundamentally, the FAC demonstrates there was no

27   breach of the contract – Plaintiff was not overcharged.

28   */////*

1    Insofar as the FAC fails to set forth any unlawful practices by TWC, the demurrer should

2    be sustained. *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 619 (1993).

3    Alternatively, in the event that the Court otherwise determines that Plaintiff has stated facts with

4    sufficient particularity under Section 17200, it should strike all allegations relating to purportedly

5    "unlawful" activities. *See PH II, Inc.*,  33 Cal. App. 4th at 1682-83.

6    **B.    The FAC Fails to State Facts Sufficient to Constitute a Cause of Action for
7    "Unfair" Business Practices.**

8    An action may be deemed a violation of Section 17200 if it is "unfair," even if it is not

9    specifically proscribed by some other law. *Cel-Tech Communications v. Los Angeles Cellular*

10   *Tel. Co.,* 20 Cal. 4th 163, 180 (1999). In *Cel-Tech,* the California Supreme Court explained that

11   under the "unfair" prong of Section 17200, "[c]ourts may not simply impose their own notions of

12   the day as to what is fair or unfair." *Id.* at 182. "We must require that any finding of unfairness

13   to competitors under section 17200 be tethered to some legislatively declared policy or proof of

14   some actual or threatened impact on competition." *Id.* at 186-87. Although the Supreme Court in

15   *Cel-Tech* limited that holding to cases involving injury to "competitors" as opposed to

16   "consumers," *id.*  at 187 n. 12, subsequent decisions have extended the analysis of *Cel-Tech* to

17   cases involving allegations of harm to consumers. *Bernardo v. Planned Parenthood Fed'n of*

18   *Am.*, 115 Cal App. 4th 322, 353 (2004) ("*Cel-Tech* ... may signal a narrower interpretation of the

19   prohibition of unfair acts or practices in *all* unfair competition claims."); *Scripps Clinic v.*

20   *Superior Court,* 108 Cal. App. 4th 917, 940 (2003); *Schnall v. Hertz Corp.,*  78 Cal. App. 4th

21   1144, 1166 (2000).

22   Plaintiff claims that TWC "unfairly overcharges HOA subscribers" for cable and cable

23   related services.  In support of this claim, Plaintiff alleges his TWC cable bill did not credit him

24   for the basic cable services he was, in effect, already paying for through his monthly HOA dues

25   and that TWC unfairly "pocketed" the monthly difference. (FAC ¶ 17.)  But as is discussed

26   above, it is clear on the face of the billing statements that Plaintiff attached to the FAC that TWC

27   has never charged Plaintiff for the basic cable services that are covered by the HOA agreement.

28   /////

1  Plaintiff's allegations that TWC "unfairly" overcharged him are directly contradicted by the

2  billing statements and must be disregarded.

3          The February 12, 2006, billing statement includes a detailed itemized listing of the precise

4  charge for each separate cable and cable related service. Notably, this billing statement clearly

5  shows no charge for basic cable (FAC Ex. B). Likewise, the billing statement dated

6  December 12, 2006, shows no charge for basic cable.[3] As shown on the face of the bill, during

7  the December 12, 2006, billing period, Plaintiff purchased his services as a bundle, reflected by

8  the description of "Hoa DIGIPiC 4000 Trio." (FAC Ex. C.)  The implication is that this is special

9  HOA pricing of the bundle.  Plaintiff was charged one price for a bundle of cable and cable

10  related services priced at a discount.

11          The approximate $21 difference in the billing statements from the February 12, 2006, and

12  December 12, 2006, billing statements simply reflects the fact that Plaintiff changed how he

13  purchased his services.  Plaintiff's February billing statement reflects a la carte pricing, meaning

14  that each additional cable and cable related service was added to his billing statement separately.

15  Plaintiff's December billing statement reflects the special discount pricing for the services he

16  purchased as a bundle.  Notably, neither the a la carte pricing nor the bundle pricing includes a

17  charge for basic cable service.  The price decrease that Plaintiff experienced is nothing more than

18  the bundled price discount and does not reflect that Plaintiff was previously charged for basic

19  cable or otherwise overcharged in any way.

20          Plaintiff also claims that TWC unfairly requires HOA subscribers to determine whether

21  bills are "correct" within 30 days of receipt.  But Plaintiff has not and cannot point to a any law,

22  or legislative or other policy to the effect that this common practice of requiring timely notice of

23  billing discrepancies is "unfair."  On the contrary, it is a common and reasonable business

24  practice especially appropriate where the charges may vary from month to month and one party is

25

26  [3] The billing statement does note that the "Hoa DIGIPic 4000 Trio" includes "Hoa Standard
27  Service," but this simply reflects the fact that standard cable service paid for by the HOA is
    included in this bundle of services.  Plaintiff is not alleging that TWC overcharged him on his
    December 12, 2006, billing statement.  Plaintiff admits that the December 12, 2006, billing
28  statement properly reflects his HOA pricing.  (FAC ¶ 16.)

DLA PIPER US LLP    GT\6534351.3                                        -12-
SAN DIEGO

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

1    in the best position to know whether the charges accurately reflect the services he ordered during

2    that period. Moreover, it affords the other party an opportunity to investigate and remedy the

3    discrepancy in a timely manner.

4        More importantly the time limit for challenging the "correctness" of the billing statement

5    is not implicated by Plaintiff's situation. The $21 reduction in the price for his service has

6    nothing to do with the "correctness" of his February billing statement or any prior invoice. The

7    February billing statement correctly priced his service based on the a la carte pricing, which did

8    not include a charge for basic cable service. The later lower pricing correctly reflected a bundle

9    pricing discount that also did not include a charge for basic cable service.

10       Insofar as the FAC fails to set forth any "unfair" practices by TWC, the demurrer should

11    be sustained. *Khoury,* 14 Cal. App. 4th at 619. Alternatively, in the event that the Court

12    otherwise determines that Plaintiff has stated facts with sufficient particularity under

13    Section 17200, it should strike all allegations relating to purportedly "unfair" activities. *See PH*

14    *II, Inc.,* 33 Cal. App. 4th at 1682-83.

15
16       C.    **The FAC Fails to State Facts Sufficient to Constitute a Cause of Action for "Deceptive" Business Practices.**

17       A business act or practice is "deceptive" under Section 17200 if Plaintiff can show that

18    members of the public are likely to be deceived. *Comm. on Children's Television v. Gen. Foods*

19    *Corp.*, 35 Cal. 3d 197 (1983); *Shvarts v. Budget Group, Inc.*, 81 Cal. App. 4th 1153 (2000).

20    "Likely to deceive" means that it is probable that a significant portion of the general consuming

21    public or of targeted consumers, acting reasonably under the circumstances, could be misled.

22    *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003). The ordinary or "reasonable

23    consumer" standard is typically used to determine whether the advertisements were likely to

24    mislead the public. *Id.*

25       The "deceptive" prong of Section 17200 does not impose an affirmative obligation for

26    businesses to provide the "best possible notice" to prevent any possible misleading of the public.

27    For example, in *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 966 (2003), the Court of

28    Appeal held that although a sign at a hotel warning patrons about a $21 charge for valet parking

1   might have been better, "there is no requirement [under Section 17200] that reasonable notice has

2   to be the best possible notice." The court added "[m]oreover, a potential parker could ask if there

3   is a charge or a self-parking lot and thus is not forced to use valet parking." *Id.* Likewise in

4   *Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1334 (2002) the court held that a hotel's

5   practice of not expressly advising patrons that a service charge added to room service bills gets

6   paid to the server, does not violate Section 17200.

7        Identical to its claims for unfair business practices, Plaintiff claims that TWC deceptively

8   overcharges HOA subscribers for cable and cable related services and deceptively limits

9   consumers' right to refund for overcharges. Plaintiff also alleges that TWC deceptively conceals

10   HOA pricing from HOA subscribers.

11        As discussed above, the billing statements clearly show that TWC did not overcharge

12   Plaintiff. The billing statements show that Plaintiff was not and is not being charged for basic

13   cable. Plaintiff's allegations that TWC "deceptively overcharged" him are directly contradicted

14   by the billing statements and must be disregarded.

15        As to Plaintiffs' claim that TWC deceptively limits consumers' right to refund for

16   overcharges by the purported contractual 30-day notice requirement, the FAC does not explain

17   how the billing procedure affected Plaintiff or how it is deceptive under the circumstances alleged

18   in the FAC. Nor can it. As discussed above, the language itself, the size of the font, and the

19   placement of the language on the bill is clearly reasonable notice to TWC subscribers that they

20   should review their billing statements for accuracy and notify TWC if there are any billing errors.

21        Plaintiff's claim that TWC deceptively conceals HOA pricing from HOA subscribers is

22   clearly unsupported and in fact denied by Plaintiff. First, Plaintiff's allegation that TWC should

23   publish HOA pricing on its website is clearly unsupported by case law. TWC is not obligated to

24   publish on its website the contract specific terms it has negotiated with each HOA and such an

25   obligation would be particularly inappropriate here where Plaintiff knows (or should know) the

26   terms of his contracts with his HOA. *See Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 966

27   (2003) ("there is no requirement [under Section 17200] that reasonable notice has to be the best

28   possible notice."). Moreover, Plaintiff could have simply contacted TWC and asked if there is

DLA PIPER US LLP
SAN DIEGO

GT\6534351.3                              -14-

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

1  special pricing for HOA subscribers. *Id.* ("Moreover, a potential parker could ask if there is a

2  ·charge or a self-parking lot and thus is not forced to use valet parking.")

3      Second, Plaintiff knew that he paid dues to his HOA to pay for TWC basic cable service

4  because as alleged in the FAC "[Plaintiff] pays a fee that covers basic cable services pursuant to

5  an agreement between [TWC] and [Plaintiff]'s HOA." (FAC ¶ 7.)  Under these circumstances,

6  Plaintiff cannot make a claim that TWC deceptively conceals HOA pricing from HOA

7  subscribers.  Plaintiff has admitted that he was aware his billing statements should not include a

8  charge for basic cable, which it did not, and therefore his claim fails.

9      Because the FAC fails to set forth any "deceptive" practices by TWC, the demurrer should

10  be sustained. *Khoury,* 14 Cal. App. 4th at 619.  Alternatively, in the event that the Court

11  determines that Plaintiff has stated facts with sufficient particularity under Section 17200, it

12  should strike all allegations relating to purportedly "deceptive" activities. *See PH II, Inc.,* 33 Cal.

13  App. 4th at 1682-83.

14  **V.    CONCLUSION.**

15      For the reasons stated, TWC respectfully requests that the Court sustain its Demurrer to

16  Plaintiff's FAC without leave to amend.  Alternatively, to the extent that the Court is persuaded

17  that no claim has been stated as to certain "prongs" of Section 17200, the Court should grant the

18  motion to strike the relevant portions of the FAC.

19  Dated: June  *20* , 2007

20                                      DLA PIPER US LLP

21

22                                      By _____
                                           JEFFREY M. SHOHET
23                                         JULIE L. HUSSEY
                                           CARRIE S. DOLTON
24                                         Attorneys for Defendant
                                           TIME WARNER ENTERTAINMENT-
25                                         ADVANCE NEWHOUSE PARTNERSHIP,
                                           A NEW YORK GENERAL PARTNERSHIP,
26                                         THROUGH ITS SAN DIEGO DIVISION,
                                           DBA TIME WARNER CABLE
27

28

DLA PIPER US LLP
SAN DIEGO

GT\6534351.3                        -15-

P&AS IN SUPPORT OF DEFENDANT'S DEMURRER/MOTION TO STRIKE PLTF'S FIRST AMENDED COMPLAINT

COPY

1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)
    **DLA PIPER US LLP**
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297
4   Tel:  619.699.2700
    Fax:  619.699.2701
5

6   Attorneys for Defendant
    TIME WARNER CABLE, INC.
7

F   I    L    E   D
Clerk of the Superior Court

JUN 2 0 2007

By_____,Deputy

8                       SUPERIOR COURT OF CALIFORNIA

9                          COUNTY OF SAN DIEGO

10

11  LEON ALPERT, an individual, on behalf       CASE NO.  GIC881621
    of himself, on behalf of all those similarly
12  situated, and on behalf of the general        **PROOF OF SERVICE**
    public,
13                                                Date      June 1, 2007
                    Plaintiffs,                  Time      1:30 p.m.
14                                                Dept:     74
            v.                                   Judge:    Linda B. Quinn
15
    TIME WARNER CABLE, INC., a                   Complaint:  March 13, 2007
16  Delaware corporation, and DOES 1 TO
    100,
17
                    Defendants.
18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
  SAN DIEGO

SD\1735197.1
325566-11

PROOF OF SERVICE

1        I am a resident of the State of California, over the age of eighteen years, and not a party to

2    the within action.  My business address is DLA Piper US LLP, 401 B Street, Suite 1700, San

3    Diego, California  92101.  On June 20, 2007, I served the within document(s):

4    

5        **SEE ATTACHED LIST OF DOCUMENTS**

6    ☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set
        forth below on this date before 5:00 p.m.

7    

8    ☐    by placing a sealed envelope or package designated by UPS, with delivery fees
        paid or provided for, a true copy of each documents(s) above, in DLA Piper US

9            LLP's mail room for collection, processing and delivery this same day to a deposit
        box or other facility regularly maintained by the express service carrier, or

10            delivered to an authorized courier or driver authorized by the express service
        carrier to receive documents.  I further declare that I am readily familiar with the

11            business' practice for collection and processing of correspondence for delivery
        with express service carriers (i.e., FedEx, DHL, etc.); and that the correspondence

12            shall be deposited with an express service carrier this same day in the ordinary
        course of business, to each addressee as set forth below.

13    

14    ☒    by placing the document(s) listed above in a sealed envelope with postage thereon
        fully prepaid, in the United States mail at San Diego, California addressed as set

15            forth below.

16    ☐    by personally delivering the document(s) listed above to the person(s) at the
        address(es) set forth below.

17    

18    Barron E. Ramos, Esq.
Kristen E. Caverly

19    Henderson & Caverly LLP
P.O. Box 9144

20    16236 San Dieguito Road, Suite 4-13
Rancho Santa Fe, CA 92067

21    Phone: (858) 756-6342
Fax: (858) 756-4732

22    

23        I am readily familiar with the firm's practice of collection and processing correspondence

24    for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same

25    day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on

26    motion of the party served, service is presumed invalid if postal cancellation date or postage

27    meter date is more than one day after date of deposit for mailing affidavit.

28

1    I declare under penalty of perjury under the laws of the State of California that the above

2 is true and correct.

3    Executed on June 20, 2007, at San Diego, California.

4

5    Sarah Van

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**LIST OF DOCUMENTS**

2

**DEFENDANT TIME WARNER ENTERTAINMENT-ADVANCE NEWHOUSE PARTNERSHIP, A NEW YORK GENERAL PARTNERSHIP, THROUGH ITS SAN DIEGO DIVISION, DBA TIME WARNER CABLE'S NOTICE OF DEMURRER TO AND ALTERNATIVE MOTION TO STRIKE, DEMURRER, AND ALTERNATIVE MOTION TO STRIKE PORTIONS OF PLAINTIFF LEON ALPERT'S FIRST AMENDED COMPLAINT**

3

4

5

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TIME WARNER ENTERTAINMENT-ADVANCE NEWHOUSE PARTNERSHIP, THROUGH ITS SAN DIEGO DIVISION, DBA TIME WARNER CABLE'S DEMURRER TO AND ALTERNATIVE MOTION TO STRIKE PORTIONS OF PLAINTIFF LEON ALPERT'S FIRST AMENDED COMPLAINT**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

SD\1735197.1
325566-11

-4-

PROOF OF SERVICE