1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

9

                    SUPERIOR COURT OF CALIFORNIA
10
                      COUNTY OF SAN DIEGO
11

12
   LEON ALPERT, an individual, on behalf      CASE NO. GIC881621
13 of himself, on behalf of all those similarly
   situated, and on behalf of the general    **NOTICE OF MOTION AND MOTION OF**
14 public,                                    **DEFENDANT TIME WARNER CABLE**
                                              **FOR SUMMARY JUDGMENT**
15            Plaintiffs,
                                              Date      April 4, 2008
16        v.                                  Time      10:30 a.m.
                                              Dept:     63
17 TIME WARNER CABLE, INC., a                 Judge:    Luis R. Vargas
   Delaware corporation, and DOES 1 TO
18 100,                                       Complaint: March 13, 2007
                                              FAC:       May 16, 2007
19            Defendants.

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP    SD\1778829.1
  SAN DIEGO

─────────────────────────────────────────────
        NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

FILED
CIVIL BUSINESS OFFICE 19

08 JAN 15 PM 4: 16

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on April 4, 2008 at 10:30 a.m., or as soon thereafter as can

3    be heard, in Department 63 of the above-entitled Court, located at 330 W. Broadway, San Diego,

4    California 92101, Defendant Time Warner Entertainment-Advance/Newhouse Partnership,

5    through its San Diego Division, dba Time Warner Cable ("TWC") will and hereby does move

6    this Court for summary judgment in favor of TWC against Plaintiff Leon Alpert ("Plaintiff").

7        This motion is made pursuant to California Code of Civil Procedure section 437c because

8    Plaintiff's claims lack merit as a matter of law.  Specifically, TWC respectfully requests that the

9    Court grant summary judgment in its favor and against Plaintiff on the following grounds:

10       **Issue #1:**  Plaintiff's cause of action for violation of Business & Professions Code section

11   17200 *et seq.*, based on TWC engaging in unlawful conduct in violation of the Consumer Legal

12   Remedies Act ("CLRA"), lacks merit as a matter of law because Plaintiff cannot prove a violation

13   of the CLRA.

14       **Issue #2:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

15   section 17200 *et seq.*, based on TWC engaging in unlawful conduct by breaching its agreement

16   with Sea Point Townhomes' Home Owners' Association (the "HOA"), lacks merit as a matter of

17   law because TWC did not breach its agreement with the HOA.

18       **Issue #3:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

19   section 17200 *et seq.*, based on TWC engaging in unfair conduct by overcharging Plaintiff, lacks

20   merit as a matter of law because TWC did not overcharge Plaintiff.

21       **Issue #4:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

22   section 17200 *et seq.*, based on TWC engaging in unfair conduct by requiring thirty-day

23   notification of billing errors while failing to disclose HOA pricing that accounted for HOA

24   payments, lacks merit as a matter of law because such notification terms are reasonable.

25       **Issue #5:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

26   section 17200 *et seq.*, based on TWC engaging in unfair conduct by requiring thirty-day

27   notification of billing errors while failing to disclose HOA pricing that accounted for HOA

28   /////

DLA PIPER US LLP
SAN DIEGO

SD\1778829.1                                  -1-

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  payments, lacks merit as a matter of law because the notification term had no effect on Plaintiff,

2  yet has a legitimate business benefit to TWC.

3  **Issue #6:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

4  section 17200 *et seq.*, based on TWC engaging in unfair conduct by requiring thirty-day

5  notification of billing errors while failing to disclose HOA pricing that accounted for HOA

6  payments, lacks merit as a matter of law because TWC did not fail to disclose such pricing.

7  **Issue #7:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

8  section 17200 *et seq.*, based on TWC engaging in unfair conduct by breaching its agreement with

9  the HOA, lacks merit as a matter of law because TWC did not breach its agreement with the

10  HOA.

11  **Issue #8:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

12  section 17200 *et seq.*, based on TWC engaging in misleading conduct by overcharging Plaintiff,

13  lacks merit as a matter of law because TWC did not overcharge Plaintiff.

14  **Issue #9:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

15  section 17200 *et seq.*, based on TWC misleading Plaintiff regarding when he was required to

16  notify TWC of billing errors by hiding notification requirements and failing to disclose HOA

17  pricing that accounted for HOA payments, lacks merit as a matter of law because the notification

18  term was included in Plaintiff's contract and on every invoice sent to Plaintiff.

19  **Issue #10:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

20  section 17200 *et seq.*, based on TWC concealing HOA pricing that accounted for HOA payments,

21  lacks merit as a matter of law because TWC did not fail to disclose such pricing.

22  **Issue #11:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

23  section 17200 *et seq.*, based on TWC misrepresenting its affiliation, connection, or association

24  with the HOA, lacks merit as a matter of law because TWC made no such misrepresentations.

25  **Issue #12:**  Plaintiff's Cause of Action for Violation of Business & Professions Code

26  section 17200 *et seq.*, based on TWC misrepresenting the reason for the decrease in Plaintiff's bill

27  for Additional Services after he changed his services to a bundled package, lacks merit as a matter

28  of law because TWC made no such misrepresentations.

1     **Issue #13:** Plaintiff's Cause of Action for Violation of Business & Professions Code

2 section 17200 *et seq.*, based on TWC engaging in misleading or deceptive conduct, lacks merit as

3 a matter of law because Plaintiff cannot prove the general public would likely be misled or

4 deceived by TWC's conduct.

5     **Issue #14:** Plaintiff's Cause of Action for Violation of Business & Professions Code

6 section 17200 *et seq.* lacks merit as a matter of law because Plaintiff lacks standing since he has

7 not been injured and lost money or property as a result of TWC's purported conduct.

8     This motion is based upon this Notice of Motion, as well as the supporting Memorandum

9 of Points and Authorities, Declaration of Terri Rhodes, Separate Statement of Undisputed Facts,

10 Request for Judicial Notice, and Notice of Lodgment of Exhibits and Non-California Authorities,

11 all of which are served and filed herewith, and the complete records and files of this action, and

12 any argument or additional evidence that is permitted by this Court.

13     Respectfully submitted,

14 Dated: January 15, 2008

15

16 DLA PIPER US LLP

17 By _____

JEFFREY M. SHOHET
JULIE L. HUSSEY
CARRIE S. DOLTON
Attorneys for Time Warner Cable

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
                    FILED
         CIVIL BUSINESS OFFICE 19
             CENTRAL DIVISION

         08 JAN 15  PM 4: 17

         CLERK-SUPERIOR COURT
         SAN DIEGO COUNTY, CA
```

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

LEON ALPERT, an individual, on behalf of himself, on behalf of all those similarly situated, and on behalf of the general public,

        Plaintiffs,

        v.

TIME WARNER CABLE, INC., a Delaware corporation, and DOES 1 TO 100,

        Defendants.

CASE NO. GIC881621

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT**

Date      April 4, 2008
Time      10:30 a.m.
Dept:      63
Judge:    Luis R. Vargas

Complaint: March 13, 2007
FAC:       May 16, 2007

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION. ........................................................................................................ 1

II.   STATEMENT OF UNCONTROVERTED FACTS. .................................................... 2

    A.    Plaintiff's Homeowners' Association's Contract with TWC. ....................... 2

        1.    The Agreement Between the HOA and TWC is Limited to Basic Cable Services. ................................................................................. 2

        2.    Residents May Contract with TWC for Additional Services. ...................... 3

    B.    Plaintiff's Relationship with TWC. .............................................................. 3

        1.    Plaintiff Orders Several Additional Services from TWC. ............ 3

        2.    Plaintiff Changes His Additional Services to a Bundle Package. ............... 4

        3.    Plaintiff Testifies TWC's Bills for Additional Services Were Correct. ...................................................................................... 5

        4.    Plaintiff Agrees to Notify TWC of Billing Errors. ...................... 5

III.  STANDARD OF REVIEW. ....................................................................................... 5

IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF TWC BECAUSE PLAINTIFF CANNOT PROVE A UCL VIOLATION. ...................... 6

    A.    Plaintiff Cannot Prove That TWC Engaged in Unlawful Conduct. .................... 7

        1.    Standard for "Unlawful Conduct" Under the UCL. ..................... 7

        2.    Plaintiff Cannot Prove TWC Violated of Civil Code Section 1770(a)(3). ................................................................................... 7

        3.    Plaintiff Cannot Prove TWC Violated Civil Code Section 1770(a)(13). ................................................................................. 8

        4.    Plaintiff Cannot Prove TWC Violated Civil Code Section 1770(a)(19). ................................................................................. 9

            a.    Plaintiff Lacks Standing to Challenge the Contract Provision. ....................................................................... 10

            b.    The Contract Provision is Not Unconscionable. ............... 11

        5.    Plaintiff Cannot Prove Unlawful Conduct Due to a Purported Breach of Contract Between TWC and the HOA. ..................... 12

    B.    Plaintiff Cannot Prove that TWC Engaged in Unfair Business Practices. ............. 13

        1.    Standard for Unfair Business Practices Under the UCL. ........................... 13

        2.    TWC Did Not Overcharge Plaintiff. .......................................... 14

        3.    TWC Did Not Unfairly Require Notification of Billing Errors While Failing to Disclose Pricing That Accounted for HOA Payments. .................................................................................. 15

        4.    TWC Did Not Breach its Agreement with the HOA. ................. 16

    C.    Plaintiff Cannot Prove That TWC Engaged in Misleading or Deceptive Business Practices. ................................................................................... 17

        1.    Standard for Misleading or Deceptive Conduct Under the UCL. ............... 17

1

<div align="center">

**TABLE OF CONTENTS**
(continued)

</div>

Page

2. TWC Did Not Overcharge Plaintiff. .......................................................... 18

3. TWC Did Not Misled Plaintiff Regarding Notification of Billing Errors While Failing to Disclose Pricing That Accounted for HOA Payments. ................................................................................................. 18

4. TWC Did Not Deceptively Conceal HOA Pricing. ................................... 18

5. TWC Did Not Misrepresent its Affiliation with the HOA........................ 19

6. TWC Did Not Mislead Plaintiff Regarding the Price Discount for Purchasing a Bundled Package of Additional Services. ........................... 19

7. Plaintiff Cannot Prove that the Public Would Be Misled or Deceived................................................................................................... 19

V.    PLAINTIFF LACKS STANDING TO BRING A CLAIM UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200. ........................................ 19

1

## TABLE OF AUTHORITIES

2
<div align="right">**Page**</div>

3
### CASES

4   *Aguilar v. Atlantic Richfield Co.,*
    25 Cal. 4th 826 (2001) ........................................................................ 6

5

6   *Armendariz v. Foundation Health Pyschcare Services, Inc.,*
    24 Cal. 4th 83 (2000) ........................................................................ 10

7   *Aron v. U-Haul Co. of California,*
    143 Cal. App. 4th 796 (2006)............................................................ 10

8

9   *Belton v. Comcast Cable Holdings, LLC,*
    151 Cal. App. 4th 1224 (2007)..................................................... 10, 16

10  *Brockey v. Moore,*
    107 Cal. App. 4th 86 (2003).......................................................... 17, 19

11

12  *Bushling v. Fremont Medical Ctr.,*
    117 Cal. App. 4th 493 (2004) ............................................................. 6

13  *California Grocers Assn. v. Bank of America,*
    22 Cal. App. 4th 205 (1994) .............................................................. 16

14

15  *Campanano v. Cal. Med. Ctr.,*
    38 Cal. App. 4th 1322 (1995)............................................................. 6

16  *Cel-Tech Communications v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ..................................................................... 13

17

18  *Comm. on Children's Television v. Gen. Foods Corp.,*
    35 Cal. 3d 197 (1983) ...................................................................... 17

19  *Daugherty v. Am. Honda Motor Co., Inc.,*
    144 Cal. App. 4th 824 (2006)............................................................. 8

20

21  *Day v. AT&T Corp.,*
    63 Cal. App. 4th 325 (1998)............................................................. 20

22  *Farmers Ins. Exchange v. Superior Court,*
    2 Cal. 4th 377 (1992) ........................................................................ 7

23

24  *Freeman v. Wal-Mart Stores, Inc.,*
    111 Cal.App.4th 660 (2003)............................................................. 10

25  *Id. see also Bernando v. Planned Parenthood Federation of America,*
    115 Cal. App. 4th 322 (2004) ..................................................... 12, 13

26

27  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
    466 U.S. 2 (1984) ............................................................................. 16

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Klein v. Earth Elements, Inc.,*
    59 Cal. App. 4th 965 (1997)................................................................. 12

*Lavie v. Procter & Gamble Co.,*
    105 Cal. App. 4th 496 (2003)........................................................... 17, 19

*Leahy v. Warden,*
    163 Cal. 178 (1912) ........................................................................... 12

*Lee v. Interinsurance Exchange,*
    50 Cal. App. 4th 694 (1996)................................................................. 14

*Morris v. Redwood Empire Bancorp,*
    128 Cal. App. 4th 1305 (2005)............................................................. 11

*Motors, Inc. v. Times Mirror, Co.,*
    102 Cal. App. 3d 735 (1980)............................................................... 14

*Olsen v. Breeze, Inc.,*
    48 Cal. App. 4th 608 (1996)............................................................... 10

*Perry v. Otay Irr. Dist.,*
    127 Cal. 565 (1900) ........................................................................... 12

*Plotkin v. Sajahtera, Inc.,*
    106 Cal. App. 4th 953 (2003)............................................................. 17

*Podolsky v. First Healthcare Corp.,*
    50 Cal. App. 4th 632 (1996)............................................................... 13

*Riensche v. Cingular Wireless LLC,*
    No. C06-1325Z, 2007 WL 3407137 (W.D. Wash. Nov. 9, 2007)............. 12

*Schnall v. Hertz Corp.,*
    78 Cal. App. 4th 1144 (2000)............................................................. 13

*Scripps Clinic v. Superior Court,*
    108 Cal. App. 4th 917 (2003)............................................................. 13

*Searle v. Wyndham Int'l, Inc.,*
    102 Cal. App. 4th 1327 (2002)........................................................... 17

*Shvarts v. Budget Group, Inc.,*
    81 Cal. App. 4th 1153 (2000)............................................................. 17

*Sierra Inv. Corp. v. County of Sacr.,*
    252 Cal. App. 2d 339 (1967)............................................................... 12

*Smith v. State Farm Mut. Auto. Ins. Co.,*
    93 Cal. App. 4th 700 (2001)............................................................... 12

<center>**TABLE OF AUTHORITIES**
(continued)</center>

<div align="right">**Page**</div>

*State Farm Fire & Casualty Co. v. Superior Court,*
    45 Cal. App. 4th 1093 (1996)........................................................................ 14

*Union Bank v. Sup. Ct.,*
    31 Cal. App. 4th 573 (1995)............................................................................ 6

*Weiss v. Chevron, U.S.A., Inc.,*
    204 Cal. App. 3d 1094 (1988)......................................................................... 6

<center>**STATUTES**</center>

Cal. Bus. & Prof. Code § 17200 ........................................................... 1, 7, 12, 13, 17

Cal. Bus. & Prof. Code § 17204 ............................................................................ 20

Cal. Civ. Code § 1770........................................................................................... 7

Cal. Civ. Code § 1770(a)(1) ............................................................................ 7, 8, 9

Cal. Civ. Code § 1770(a)(3) .................................................................................. 8

Cal. Civ. Code § 1770(a)(13) ................................................................................ 8

Cal. Civ. Code § 1770(a)(19) ................................................................................ 9

Cal. Civ. Proc. Code § 437c(c) ............................................................................. 6

Cal. Civ. Proc. Code § 437c(p)(2) ........................................................................ 6

1   Defendant Time Warner Entertainment-Advance/Newhouse Partnership, a New York

2   general partnership, through its San Diego Division, dba Time Warner Cable ("TWC"), sued

3   erroneously as Time Warner Cable, Inc., respectfully submits the following memorandum of

4   points and authorities in support of its motion for summary judgment.

## I.   INTRODUCTION.

6   Plaintiff's class action lawsuit against TWC is based on his erroneous suspicion, and

7   nothing more, that he was overcharged for his cable and cable related services. Plaintiff stuffs

8   multiple alleged theories of unlawful, unfair, and deceptive conduct into a single cause of action

9   for violation of California Business & Professions Code section 17200, *et seq.* ("Unfair

10  Competition Law" or "UCL"), yet all of Plaintiff's claims are based on the same factual

11  premise—his mistaken belief that TWC charged him for basic cable services.

12  In fact, TWC never charged or received payment from Plaintiff for basic cable (the

13  primary grouping of cable television channels that virtually all cable customers purchase).

14  Rather, basic cable was paid for by Plaintiff's homeowners' association pursuant to a separate

15  bulk agreement providing for the provision of the basic cable channels to all the units within his

16  complex. Pursuant to that agreement, Plaintiff was permitted to (and did) purchase additional

17  cable services (movie channels, digital phone service and internet access) under his own account

18  with TWC. TWC never overcharged Plaintiff by billing Plaintiff for basic cable services (or in

19  any other manner) as Plaintiff contends.

20  The undisputed facts, including Plaintiff's own deposition testimony, show that (1) TWC

21  did not charge or collect any money from Plaintiff for the basic cable services it provided to his

22  residence; (2) TWC charged and was paid by Plaintiff's homeowners' association for the basic

23  cable services; (3) Plaintiff was aware that his homeowners' association paid TWC for his basic

24  cable; and (4) TWC charged Plaintiff the correct price for the additional services (that is, those

25  services other than basic cable) he purchased—both when he initially ordered a variety of

26  individually priced services, and when he later ordered a bundled package of services in order to

27  obtain a discounted price. It was this price reduction that caused Plaintiff to speculate that he had

28  previously been overcharged. However, this price reduction reflects a discount that was available

DLA PIPER US LLP
SAN DIEGO

SD\1777418.11                                    -1-

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1  at that time for ordering such services in a bundle and in no way supports his claim that he had

2  previously been overcharged.

3       All of Plaintiff's claims are based on the incorrect premise that he had somehow been

4  charged for basic cable services even though his homeowners' association was paying for basic

5  cable on his behalf. However, Plaintiff's itemized bills contained no charges for basic cable, and,

6  at all material times, he was aware that his homeowners' association was paying for his basic

7  cable. These theories are based on facts that simply do not exist and, accordingly, cannot be

8  proven. In the end, Plaintiff cannot escape the fact that he received exactly what he paid for from

9  TWC. TWC respectfully requests that the Court grant its motion for summary judgment on the

10  grounds that Plaintiff cannot prove his cause of action for violation of the UCL.

11  **II.**     **STATEMENT OF UNCONTROVERTED FACTS.**

12       **A.**    **Plaintiff's Homeowners' Association's Contract with TWC.**

13       Plaintiff is a resident of Sea Point Townhomes in Del Mar, California. (Separate

14  Statement of Undisputed Facts in Support of Defendant Time Warner Cable's Motion for

15  Summary Judgment ("SS") ¶ 1.) Sea Point Townhomes is a homeowners' association that has

16  contracted with TWC for certain cable services to be provided to the residents of Sea Point

17  Townhomes (the "HOA" or "HOA"). (SS ¶ 2.) This agreement between Sea Point Townhomes

18  and TWC is referred to as a Residential Bulk Services Agreement (the "Agreement"). (SS ¶ 2.)

19           **1.**    **The Agreement Between the HOA and TWC is Limited to Basic Cable**
20                  **Services.**

21       The Agreement provides that TWC will provide 76 cable channels, sometimes referred to

22  as "basic cable," to each home/unit of Sea Point Townhomes, and that Sea Point Townhomes will

23  pay TWC a monthly fee per home/unit for such services. (SS ¶ 3.) Specifically, Section 1 of the

24  Agreement, entitled "Operator's Service Obligations," provides that TWC "*will* offer Bulk Multi-

25  Channel Video Services to Residents." (SS ¶ 4 (emphasis added).) Bulk Multi-Channel Video

26  Services is defined as a "basic cable" package of services that includes 76 cable television

27  channels listed in Exhibit B to the Agreement. (SS ¶ 5.) Section 2 of the Agreement, entitled

28  "Rates and Services," states that the "HOA shall pay to [TWC] a monthly Bulk Multi-Channel

1    Video Services fee" which is set forth in Exhibit B to the Agreement. (SS ¶ 5.) The fee for such

2    basic cable services is to be billed for and paid by the Sea Point Community HOA. (SS ¶ 6.)

3              **2.       Residents May Contract with TWC for Additional Services.**

4              Although basic cable is provided to HOA residents under the Agreement with the HOA,

5    individual residents are free to order additional services from TWC and/or otherwise do business

6    with TWC. (SS ¶ 7.) In that regard, Section 1 of the Agreement provides that TWC "*may* [but is

7    not obligated to] offer and provide Additional Service to Residents on a non-exclusive basis."

8    (SS ¶ 8, 9 (emphasis added).) Additional Services are defined as "any services *other than* the

9    Bulk Multi-Channel Video Services [basic cable], including, but not limited to, premium

10   channels, pay-per-view, music, digital tier, video-on-demand, and other video and music services

11   not included in the Bulk Multi-Channel Video Services package, high speed data and Internet

12   access services, voice services, etc." (SS ¶ 10 (emphasis added).)

13             HOA residents who chose to order Additional Services from TWC are responsible for

14   paying TWC for such services. (SS ¶ 11.) Pursuant to Section 2 of the Agreement, "Residents

15   will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in

16   conjunction with Additional Services." (SS ¶ 12.) No rates or special pricing for Additional

17   Services are provided for in the Agreement. (SS ¶ 13.)

18             **B.      Plaintiff's Relationship with TWC.**

19             Since March 2003, TWC has provided the Bulk Multi-Channel Services ("basic cable") to

20   Plaintiff's residence as set forth in the Agreement between TWC and the HOA. (SS ¶ 14.) TWC

21   has not billed or collected money from Plaintiff for these services, nor has Plaintiff paid anything

22   to TWC for the services. (SS ¶ 15.) Per the Agreement, TWC is paid by the HOA for providing

23   such services. (SS ¶ 16.) Plaintiff knew and understood that the HOA paid TWC for the basic

24   cable he received from TWC. (SS ¶ 17.)

25             **1.       Plaintiff Orders Several Additional Services from TWC.**

26             Since March 2003, Plaintiff has ordered certain Additional Services from TWC under a

27   contract titled "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer

28   Agreement"). (SS ¶ 18.) TWC has billed Plaintiff for the Additional Services he ordered, and

1   Plaintiff has paid TWC directly for such services. (SS ¶ 19.) TWC's bills to Plaintiff for his

2   Additional Services contain a detailed itemization of each Additional Service and associated

3   charge for each such service. (SS ¶ 20.) It is clear from the invoices that he was charged only for

4   the Additional Services he ordered and was not charged for basic cable services. (SS ¶ 21.) As

5   recently as August 2006, the Additional Services ordered by Plaintiff included the following

6   features and pricing:

7             Digital Phone Package ($39.95); iControl Premium Service ($6.95);
              HDTV Converters ($7.00 x 2); Service Protection Plan ($2.95);
8             Premier Digital ($11.00); Any 4 Premium Channels ($24.95);
              Wireless Road Runner ($54.90); special order items such as on-
9             demand movies; as well as applicable taxes and fees.

10  (SS ¶ 22.)

11          **2.      Plaintiff Changes His Additional Services to a Bundle Package.**

12          In 2005, TWC began to offer Additional Services in various bundled packages for bulk

13  customers, such as HOA members, at a discount off the aggregate price of the individual services.

14  (SS ¶ 23.) Plaintiff was generally familiar with TWC advertising relating to bundled packages

15  and knew that customers ordering bundled services received a discount off the a la carte price for

16  the same services. (SS ¶ 24.)

17          In or about August, 2006, Plaintiff became aware that TWC was offering a particular

18  bundled package of Additional Services that included many of the services Plaintiff was

19  individually purchasing. In or about September, 2006, Plaintiff changed his account with TWC to

20  add Additional Services including this bundled package (shown below in item 3) with the

21  following features and pricing:

22            (1) HDTV Converter ($8.00); (2) Service Protection Plan ($2.95);
              (3) Hoa DIGIPiC 4000 Plan ($121.90)—which includes Wireless
23            Roadrunner, Digital Phone Package, Free On Demand, iControl
              Premium Service, Digital Access, Cinemax, HBO, Navigator
24            Screen Guide, Showtime, STARZ, Digital Movie Pack, Digital
              Sports Pack, Digital Variety Pack, Basic Cable Paid by Hoa, and
25            Road Runner High Speed; special order items such as on-demand
              movies; as well as applicable taxes and fees.
26

27  (SS ¶¶ 25, 27.) Plaintiff changed to this bundled package in order to get a better price. (SS ¶ 26.)

28  As a result of Plaintiff modifying his Additional Services, and ordering them in a bundled

DLA PIPER US LLP
SAN DIEGO

SD\1777418.11                                    -4-

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1    package vis-à-vis a la carte, Plaintiff's charges for Additional Services decreased. (SS ¶ 28.)

2         **3.     Plaintiff Testifies TWC's Bills for Additional Services Were Correct.**

3         At deposition, Plaintiff testified that the bills he received for Additional Services were

4    correct both before and after he altered his services and ordered a bundled package in September,

5    2006. (SS ¶ 33.).  Plaintiff also testified that he knew and understood that the HOA was paying

6    for his basic cable at or around the time he first moved into his residence:

7           "Q:  [You] were aware . . . that your HOA was paying Time Warner
       for basic cable service for your service.  Correct?

8           A:  Yes.

9

10          Q:  When do you recall being first aware of the fact that the HOA
       had an agreement with Time Warner, the result of which is basic
       cable was provided by Time Warner—by the HOA?

11

12          A:  I believe it was around the time we moved in."

13   (SS ¶ 37.)

14        **4.     Plaintiff Agrees to Notify TWC of Billing Errors.**

15        As part of the Consumer Agreement under which Additional Services were provided by

16   TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors

17   within thirty days from the receipt of any bill containing such errors, so that service levels and

18   payments can be verified. (SS ¶ 29.)  Plaintiff further agreed to waive any errors that were not

19   reported within thirty days of receipt. (SS ¶ 30.)  Additionally, Plaintiff's monthly invoices from

20   TWC for his Additional Services included conspicuous reminders to report billing errors within

21   thirty days. (SS ¶ 31.)

22        At deposition, Plaintiff responded to questions regarding the reasonableness of asking

23   customers to identify billing errors within thirty days by stating that "I don't think it's

24   unreasonable to make the complaint within 30 days. . . you know – that seems reasonable."  (SS

25   ¶ 32.)  Plaintiff never had occasion to report billing errors to TWC because, as Plaintiff testified

26   in his deposition, the bills he received for Additional Services were correct. (SS ¶ 33.)

27   **III.    STANDARD OF REVIEW.**

28        A motion for summary judgment shall be granted if all the papers submitted show that

1  there is no triable issue as to any material fact and that the moving party is entitled to a judgment

2  as a matter of law.  Cal. Civ. Proc. Code § 437c(c); *see also Union Bank v. Sup. Ct.*, 31 Cal. App.

3  4th 573, 579-80 (1995).  The policies underlying motions for summary judgment and summary

4  adjudication of issues are to "promote and protect the administration of justice, and to expedite

5  litigation by eliminating needless trials." *Campanano v. Cal. Med. Ctr.*, 38 Cal. App. 4th 1322,

6  1326-27 (1995).  The court is entitled to utilize discretion in viewing and weighing questions of

7  substance and materiality of asserted disputed facts. *Weiss v. Chevron, U.S.A., Inc.*, 204 Cal.

8  App. 3d 1094, 1098 (1988).

9      To implement such policies, the Legislature enacted the 1992 and 1993 amendments to

10  section 437c in order to "liberalize the granting of summary judgment motions." *Bushling v.*

11  *Fremont Medical Ctr.*, 117 Cal. App. 4th 493, 506 (2004).  Accordingly, defendants need not

12  conclusively negate an element of a plaintiff's cause of action. *Aguilar v. Atlantic Richfield* Co.,

13  25 Cal. 4th 826, 853 (2001).  Defendants need only show that the plaintiff cannot establish one or

14  more of the elements required by a claim in order to shift the evidentiary burden to the plaintiff to

15  raise a triable issue of fact as to those elements.  *Id.*; Cal. Civ. Proc. Code § 437c(p)(2).

16 | **IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF TWC**
17 | **BECAUSE PLAINTIFF CANNOT PROVE A UCL VIOLATION.**

18      Plaintiff brings one cause of action against TWC under the UCL, alleging that TWC

19  violated the UCL by engaging in the following conduct:

20          (1) overcharging HOA customers for cable services by not
21          providing such customers with HOA pricing that accounts for the
            cable services already provided under TWC's contract with the
22          customers' HOA;

23          (2) attempting to limit customers' right to seek refunds for billing
            errors to thirty days while failing to disclose that HOA pricing is
24          available to HOA subscribers;

25          (3) including an unconscionable clause in customer agreements that
            require customers to notify TWC of billing errors within thirty days
26          in alleged violation of Civil Code 1770(a)(19);

27          (4) misrepresenting to customers its affiliation, connection, or
            association with HOAs with whom it has contracted to provide
28          cable services in alleged violation of Civil Code 1770(a)(1);

1     (5) making false or misleading statements that the reduction in price
         for customers ordering a bundled package of services vis-à-vis a la

2          carte services is due to discounts associated with the bundling of
         services, when in reality the reduction in price is due to HOA

3          pricing that HOA residents are entitled to, in alleged violation of
         Civil Code 1770(a)(13); and

4

5     (6) breaching its agreements with HOAs by charging HOA
         customers directly for services already provided for under
         agreements between TWA and the HOAs and paid for by the

6          HOAs.

7 (First Amended Complaint ¶¶ 38-43.)  These various claims are grounded on Plaintiff's incorrect

8 theories that TWC charged him for basic cable service already being provided by his HOA.  Such

9 theories are entirely incorrect and contradicted by the undisputed facts.  Summary judgment

10 should be granted in favor of TWC because Plaintiff cannot prove that TWC engaged in any

11 unlawful, unfair, or misleading conduct to support his UCL claim.

12       **A.     Plaintiff Cannot Prove That TWC Engaged in Unlawful Conduct.**

13               **1.     Standard for "Unlawful Conduct" Under the UCL.**

14       A business act or practice is "unlawful" under the UCL only if it is "forbidden by law."

15 *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992).  The California Supreme

16 Court has explained that Section 17200 "'borrows' violations of other laws and treats them as

17 unlawful practices independently actionable under section 17200 *et seq.*" *Id.*

18       There is no evidence that TWC engaged in an act or practice considered "unlawful."

19 Plaintiff attempts to create a causes of action under the "unlawful" prong of Section 17200 by

20 alleging violations of the Civil Legal Remedies Act ("CLRA") and a breach of contract between

21 TWC and the HOA.  In particular, Plaintiff argues that TWC violated Civil Code sections

22 1770(a)(3)[1], 1770(a)(13), and 1770(a)(19).  However, such arguments are unsupported by the

23 facts, lack merit, and cannot withstand summary judgment.

24               **2.     Plaintiff Cannot Prove TWC Violated of Civil Code Section 1770(a)(3).**

25       Section 1770(a)(3) of the CLRA prohibits "[m]isrepresenting the affiliation, connection,

---

[1] In the FAC, Plaintiff alleges that TWC misrepresented its affiliation, connection, or association with the HOA in violation of Civil Code section 1770(a)(1).  However, section 1770(a)(1) proscribes "[p]assing off goods or services as those of another."  It is section 1770(a)(3) that prohibits "[m]isrepresenting the affiliation, connection, or association with, or certification by, another."  Cal. Civ. Code § 1770.  Accordingly, Plaintiff's citation to section 1770(a)(1) is in error and should be to section 1770(a)(3).

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1   or associate with, or certification by, another." Cal. Civ. Code § 1770(a)(3). A claim may be

2   stated under CLRA for failure to disclose, but it has been held that "to be actionable the omission

3   must be contrary to a representation actually made by the defendant, or an omission of a fact the

4   defendant was obliged to disclose." *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th

5   824, 835 (2006).

6           Plaintiff alleges that TWC violated section 1770(a)(3) of the CLRA by misrepresenting its

7   affiliation with Plaintiff's HOA. This purported misrepresentation is based on two grounds: (1)

8   TWC not informing Plaintiff of the rates for Additional Services that he was allegedly entitled to

9   as an HOA member and which would have reflected the fact that his basic cable was already

10  being paid through the HOA, and (2) TWC not disclosing to Plaintiff that it was collecting fees

11  for his basic cable service from the HOA. (First Amended Complaint ¶ 14.)

12          Plaintiff's claim that TWC violated section 1770(a)(3) of the CLRA fails as a matter of

13  law because the undisputed facts show that:

14              (1) Plaintiff was not entitled to any particular rates for Additional
                Services (SS ¶ 35.);
15

16              (2) TWC had no duty to inform Plaintiff of all its rates, packages,
                and promotions for Additional Services, which were not even in
                existence at the time Plaintiff originally ordered Additional
17              Services (SS ¶¶ 18, 23, 36.);

18              (3) Plaintiff knew and understood that the HOA paid TWC for his
                basic cable (SS ¶ 37.);
19

20              (4) TWC had no duty to inform Plaintiff that the HOA was paying
                TWC for his basic cable (SS ¶ 38.);

21              (5) TWC did not charge or collect money from Plaintiff for basic
                cable (SS ¶ 39.);
22

23              (6) TWC correctly charged Plaintiff for the Additional Services he
                ordered (SS ¶ 40.).

24  Each one of these undisputed facts alone negates Plaintiff's UCL claim based on purported

25  unlawful conduct by TWC in violation of Civil Code section 1770(a)(3).

26          **3.    Plaintiff Cannot Prove TWC Violated Civil Code Section 1770(a)(13).**

27          Section 1770(a)(13) of the CLRA prohibits "[m]aking false or misleading statements of

28  fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code §

DLA PIPER US LLP
SAN DIEGO

SD\1777418.11                                    -8-

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1    1770(a)(13). Plaintiff alleges that TWC violated this statute by misinforming him that his cable

2    bill was reduced because he ordered a bundle of services rather than individual services, when the

3    real reason for the price reduction was due to TWC already collecting basic cable fees on behalf

4    of Plaintiff. (First Amended Complaint ¶¶ 15, 42.)

5        Similar to Plaintiff's claims for violation of section 1770(a)(3), Plaintiff's attempt to

6    establish a violation of section 1770(a)(13) by TWC fails as a matter of law because it is factually

7    incorrect. Plaintiff has admitted that he was charged the correct price by TWC both when he

8    ordered Additional Services a la carte, and when he later ordered a bundled package for a lower

9    price. (SS ¶ 42.)

10       The real reason that Plaintiff's bill for Additional Services was reduced was because he

11   changed his services and ordered a bundled package rather than a host of individual services. (SS

12   ¶ 43.) Plaintiff's own deposition testimony confirms that the price reduction was due to his

13   switch to a bundled package. Plaintiff testified at deposition that he was familiar with TWC

14   advertising relating to bundled packages and knew that customers ordering bundled services

15   received a discount off the price for the same services ordered a la carte. (SS ¶ 44.) Plaintiff

16   even admitted that he changed his Additional Services to a bundled package in order to get a

17   better price. (SS ¶ 45.) The undisputed evidence shows that Plaintiff's reduction in price was

18   due to the bundled discount, something that he was well aware of, and something that he

19   specifically sought. Accordingly, there is no violation of Civil Code section 1770(a)(13) to

20   support Plaintiff's UCL claim.

21       **4.    Plaintiff Cannot Prove TWC Violated Civil Code Section 1770(a)(19).**

22       Civil Code section 1770(a)(19) proscribes "[i]nserting an unconscionable provision in the

23   contract." Cal. Civ. Code § 1770(a)(19). Plaintiff claims that TWC violated section 1770(a)(19)

24   by requiring customers to report billing errors within thirty days. (First Amended Complaint ¶¶

25   21-23, 40.) That provision of the Consumer Agreement provides: "I agree that it is my

26   responsibility to report TWC billing errors within 30 days from receipt of the bill so that service

27   levels and all payments can be verified. If not reported within 30 days, the errors are waived."

28   (SS ¶ 47.) A reminder is also included in each TWC invoice, conspicuously stating:

1         "Note: If you believe this statement contains a billing error, we
2         must hear from you within 30 days of receipt of the statement in
        question. If we are not notified of the discrepancy the statement
3         will be considered correct."

4   (SS ¶ 48.)

5       A court may deem a contract provision unconscionable only if it is both procedurally and

6   substantively unconscionable. *See Armendariz v. Foundation Health Pyschcare Services, Inc.*, 24

7   Cal. 4th 83, 114 (2000). The procedural element of unconscionability focuses on two factors:

8   oppression and surprise. *Id.* Oppression arises where there is an inequality of bargaining power

9   resulting in no real negotiation and an absence of meaningful choice. *Aron v. U-Haul Co. of*

10   *California*, 143 Cal. App. 4th 796, 808 (2006). Surprise "involves the extent to which the

11   supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the

12   party seeking to enforce the disputed terms." *Id.* The substantive element of unconscionability

13   deals with the "actual terms of the agreement and evaluates whether they create 'overly harsh' or

14   'one-sided' results as to 'shock the conscience.'" *Id.*

15       Any claim of oppression is defeated if there an availability of alternative sources from

16   which to obtain the desired service. *See, e.g., Freeman v. Wal-Mart Stores, Inc.*, 111 Cal.App.4th

17   660, 670 (2003). Moreover, when the challenged term is in a contract concerning a nonessential

18   recreational activity, the consumer always has the option of simply foregoing the activity. *Belton*

19   *v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224 (2007) (requirement that plaintiff

20   purchase basic cable tier to listen to music or FM radio is not unconscionable because listening to

21   music or FM radio is a nonessential recreational activity that Plaintiff could simply have

22   forgone); *Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608, 621-22 (1996) (ski repair company's

23   contract provision releasing company from liability for injury resulting from its work is not

24   unconscionable because skiing is a nonessential recreational activity).

25          **a.**     **Plaintiff Lacks Standing to Challenge the Contract Provision.**

26       Plaintiff's assertion that this provision is unconscionable is nothing more than a red

27   herring argument which, in any event, he lacks standing to raise. TWC's requirement of thirty-

28   day notification of billing errors is entirely inapplicable to Plaintiff's allegations—which do not

1    involve a billing error.  Plaintiff admits that he was correctly charged for the Additional Services

2    he ordered both before and after he switched to a bundled package.  (SS ¶ 50.)  Accordingly,

3    there were no billing errors for Plaintiff to report and the provision does not come into play.  The

4    fact that Plaintiff received a better price after changing to a package of bundled services does not

5    render TWC's earlier a la carte pricing "erroneous."  In any event, Plaintiff was not denied a

6    retroactive credit because he failed to report an "error" within 30 days.  Rather, it was denied

7    because he was not entitled to it.

8                    **b.    The Contract Provision is Not Unconscionable.**

9            Furthermore, Plaintiff cannot prove that this common billing provision is unconscionable

10    for several reasons.  First, Plaintiff did not lack a meaningful choice in bargaining for TWC to

11    provide him with Additional Services.  Plaintiff had other means of obtaining the entertainment

12    provided by his ordering Additional Services from TWC, such as renting movies, reading books,

13    using a satellite service, using another telephone provider, and using another internet provider.

14    (SS ¶ 52.)  Furthermore, Plaintiff could have simply foregone the nonessential recreational

15    activity altogether.  (SS ¶ 53.)  On this ground alone, TWC's contract provision is not oppressive.

16            Second, there was no element of "surprise" because the requirement that Plaintiff report

17    billing errors within thirty days was not hidden.  Not only is the provision in the contract itself—

18    which Plaintiff admitted that he reviewed prior to purchasing Additional Services from TWC—

19    but it is also conspicuously included in every billing statement directly below an all caps and

20    underlined title "<u>ABOUT YOUR TIME WARNER CABLE AGREEMENT</u>."  (SS ¶ 48.)  The

21    font is the same size as the rest of the text in the same area on the billing statement.  (SS ¶ 49.)

22    The language from the contract and billing statements is clear and unambiguous.  This provision

23    is not hidden, but is conspicuously displayed on a regular basis to customers, including Plaintiff.

24            Third, the provision at issue is not substantively unconscionable.  Plaintiff testified in his

25    deposition that requiring customers to report billing errors within thirty days is reasonable.  (SS

26    ¶ 51.)  Accordingly, Plaintiff cannot prove that such a term creates "overly harsh" or "one-sided"

27    results that "shock the conscience."  Plaintiff cannot even prove that the contract provision is

28    unreasonable, a much lower standard.  *Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th

1   ,1305, 1322-23 (2005) (finding that unreasonableness of terms does not equate to

2   unconscionability, rather terms must be such an extreme departure from common business

3   practice as to shock the conscience).

4         Finally, the notice requirement about which Plaintiff complains is supported by the

5   voluntary payment doctrine which, as the name implies, provides that payments made voluntarily

6   to another with knowledge of the facts cannot be recovered. *Sierra Inv. Corp. v. County of Sacr.*,

7   252 Cal. App. 2d 339, 342 (1967); *Leahy v. Warden*, 163 Cal. 178, 181 (1912); *Perry v. Otay Irr.*

8   *Dist.*, 127 Cal. 565, 570 (1900); *see also Riensche v. Cingular Wireless LLC*, No. C06-1325Z,

9   2007 WL 3407137, (W.D. Wash. Nov. 9, 2007) (Notice of Lodgment of Exhibits and Non-

10  California Authorities in Support of Defendant Time Warner Cable's Motion for Summary

11  Judgment, Ex. F.). The "voluntary payment" doctrine reflects the policy that requiring timely

12  notification of billing errors is reasonable and lawful, and cannot be found to be unconscionable.

13        **5.    Plaintiff Cannot Prove Unlawful Conduct Due to a Purported Breach
            of Contract Between TWC and the HOA.**
14

15        The "unlawful" prong of Section 17200 proscribes engaging in business practices that are

16  forbidden by law. *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001).

17  However, mere civil claims, such as a breach of contract claim, do not give rise to a cause of

18  action under the "unlawful" prong of Section 17200. *See Klein v. Earth Elements, Inc.*, 59 Cal.

19  App. 4th 965, 969 (1997). In *Klein*, the California Court of Appeal rejected a plaintiff's assertion

20  that the "liability imposed under the doctrines of 'strict products liability and…breach of the

21  implied warranty of fitness' will support an independent action under the 'unlawful' prong of

22  section 17200." *Id.* The court explained that, "[w]hile these doctrines do provide for civil

23  liability upon proof of their elements they do not, by themselves, describe acts or practices that

24  are illegal or otherwise forbidden by law." *Id.; see also Bernando v. Planned Parenthood*

25  *Federation of America*, 115 Cal. App. 4th 322 (2004) (plaintiff's allegations that websites

26  contained misleading statements failed to provide basis for unlawfulness under Section 17200).

27        Plaintiff argues that he is a third party beneficiary of a contract between TWC and

28  Plaintiff's HOA, and that TWC breached that agreement by charging him directly for services

DLA PIPER US LLP    SD\1777418.11                    -12-
SAN DIEGO

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1    already provided and paid for under the HOA agreement. (First Amended Complaint ¶¶ 29(g),

2    43.) Even if they were true, these allegations cannot form the basis of a claim under the

3    "unlawful" prong of the UCL because, as discussed above, a UCL "unlawful" claim cannot be

4    based on a breach of contract. But as we demonstrate herein, the suggestion that TWC breached

5    its contract with either plaintiff or the HOA is patently false. In that regard, (1) the HOA

6    Agreement provides that TWC would provide basic cable to HOA residents (SS ¶ 55.), (2) TWC

7    provided basic cable services to HOA residents (SS ¶ 56.), (3) TWC charged the HOA for such

8    services, and the HOA paid TWC for the services (SS ¶¶ 57, 58.), (4) TWC never charged

9    Plaintiff or other HOA residents for their basic cable services (SS ¶ 59.) and, (5) TWC was not

10   contractually bound to offer Additional Services to Plaintiff at any particular prices (SS ¶ 60.).

11        **B.    Plaintiff Cannot Prove that TWC Engaged in Unfair Business Practices.**

12              **1.    Standard for Unfair Business Practices Under the UCL.**

13        An action may be deemed a violation of Section 17200 if it is "unfair," even if it is not

14   specifically proscribed by some other law. *Cel-Tech Communications v. Los Angeles Cellular*

15   *Tel. Co.,* 20 Cal. 4th 163, 180 (1999). In *Cel-Tech,* the California Supreme Court explained that

16   under the "unfair" prong of Section 17200, "[c]ourts may not simply impose their own notions of

17   the day as to what is fair or unfair." *Id.* at 182. "We must require that any finding of unfairness

18   to competitors under section 17200 be tethered to some legislatively declared policy or proof of

19   some actual or threatened impact on competition." *Id.* at 186-87. Although the Supreme Court in

20   *Cel-Tech* limited that holding to cases involving injury to "competitors" as opposed to

21   "consumers," *id.* at 187 n. 12, subsequent decisions have extended the analysis of *Cel-Tech* to

22   consumer cases. *Bernardo v. Planned Parenthood Fed'n of Am.*, 115 Cal App. 4th 322, 353

23   (2004) ("*Cel-Tech* ... may signal a narrower interpretation of the prohibition of unfair acts or

24   practices in *all* unfair competition claims."); *Scripps Clinic v. Superior Court,* 108 Cal. App. 4th

25   917, 940 (2003); *Schnall v. Hertz Corp.,* 78 Cal. App. 4th 1144, 1166 (2000).

26        Furthermore, the test of whether TWC's business practices are "unfair" "involves an

27   examination of [that practice's] impact on its alleged victim, balanced against the reasons,

28   justifications and motives of the alleged wrongdoer." *Podolsky v. First Healthcare Corp.*, 50 Cal.

1    App. 4th 632, 647 (1996) (quoting *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal.

2    App. 4th 1093, 1103-04 (1996).

3          Because a corporation has a contractual right to manage its business as it sees fit, there

4    exists a "business justification" defense to a claim brought under 17200. *See Lee v.*

5    *Interinsurance Exchange*, 50 Cal. App. 4th 694 (1996); *see also Motors, Inc. v. Times Mirror,*

6    *Co.*, 102 Cal. App. 3d 735, 740 (1980) (defendant's reasons, justifications, and motives" should

7    be taken into account when weighing the "utility of the defendant's conduct"). In *Lee*, the

8    plaintiffs were subscribers of an insurance carrier attempting to force the company to pay out a

9    surplus of the fund, but the court held that the action was barred by the "business judgment rule."

10   The court stated, "[A]ctions which are reasonable exercises of business judgment, are not

11   forbidden by law, and fall within the discretion of the directors of a business under the business

12   judgment rule cannot constitute unlawful business practices." *Lee*, 50 Cal. App. 4th at 713-14.

13         Plaintiff claims that TWC engaged in unfair business conduct in violation of the UCL by

14   (1) overcharging HOA customers for cable services and not providing pricing that reflected

15   services already provided for under TWC's contract with the HOA; (2) requiring Plaintiff to

16   notify it of billing errors within thirty days of receiving erroneous charges while failing to

17   disclose that "HOA pricing" is available to HOA subscribers that properly accounts for the basic

18   cable paid for by the HOA; and (3) by breaching its agreement with the HOA by charging

19   Plaintiff for services already provided for under TWC's agreement with the HOA. (First

20   Amended Complaint ¶¶ 38, 39, 43.) Each of these three claims is contradicted by undisputed

21   facts and cannot be proven by Plaintiff, as discussed below.

22              **2.    TWC Did Not Overcharge Plaintiff.**

23         Plaintiff's overcharging theory is completely erroneous and cannot be proven on several

24   grounds. First, TWC did not overcharge Plaintiff for cable services. As Plaintiff acknowledged

25   in his deposition, TWC correctly billed Plaintiff for the Additional Services he ordered from

26   TWC both before and after he changed such services to a bundled package. (SS ¶ 62.) Secondly,

27   the HOA Agreement provides only that basic cable services will be provided to HOA residents

28   and does not contain, suggest, or require pricing for any Additional Services that may be ordered

1    by residents. (SS ¶ 63.)  TWC's pricing to Plaintiff, both before and after he switched his

2    programming to a bundled package, properly accounted for the services already provided under

3    the Agreement between TWC and the HOA because it did not charge Plaintiff for basic cable—

4    the services provided per the HOA Agreement.  (SS ¶ 64.)  Plaintiff was not unfairly

5    "overcharged" for the Additional Services that he ordered a la carte simply because he later

6    requested and was given a better price on a bundled package of services.

7              3.    **TWC Did Not Unfairly Require Notification of Billing Errors While**
                     **Failing to Disclose Pricing That Accounted for HOA Payments.**
8

9         Plaintiff's theory that TWC acted unfairly in requiring notification of billing errors within

10    thirty days while failing to disclose pricing that accounted for HOA payments is similarly

11    incorrect and without merit for several, independent reasons.  First, as explained above, Plaintiff

12    lacks standing to assert claims based on TWC's thirty-day notification requirement for billing

13    errors because there were no errors on Plaintiff's bills, nor was he in any way affected by the

14    notification provision.  (*See supra*, Part IV.A.4.a.)

15         Second, the practice of requiring timely notification of billing errors is not inherently

16    unfair or harmful to competition or consumers.  At deposition, Plaintiff acknowledged that

17    requiring customers to notify TWC of billing errors within thirty days is reasonable.  (SS ¶ 69.)

18    Third, the justification for such a provision greatly outweighs the impact of the provision on

19    Plaintiff.  As explained in the notification provision, TWC requires customers to notify it of

20    billing errors within thirty days so that service levels and payments can be verified.  (SS ¶ 71.)

21    While this provision allows TWC to effectively and efficiently resolve any billing issues, the

22    provision has had no harmful effect—or any effect at all—on Plaintiff.  As Plaintiff admitted in

23    his deposition, TWC correctly charged Plaintiff for the Additional Services he ordered both

24    before and after he changed his services to a bundled package.  (SS ¶ 72.)  Accordingly, there

25    were no billing errors for Plaintiff to report.

26         Fourth, the factual premise of the claim is entirely wrong—TWC did not unfairly fail to

27    disclose pricing to Plaintiff that properly considered basic cable payments made by the HOA.  As

28    explained above, TWC's pricing for Additional Services included only the proper charges for

1    such services and did not include any charges for basic cable. (*See supra*, Part IV.B.2.)

2    Accordingly, TWC could not have possibly failed to disclose such "improper" pricing because

3    there was no improper pricing. Although Plaintiff has not claimed otherwise, it is worth noting

4    that TWC was under no obligation to provide special pricing for Additional Services, nor was it

5    obligated to notify Plaintiff of all potential packages and prices for its Additional Services, which

6    were not even in existence at the time Plaintiff originally ordered Additional Services (SS ¶¶ 18,

7    23, 77, 78.)

8         There is certainly nothing unfair about TWC's offering bundled services packages at a

9    discounted rate. Furthermore, and although Plaintiff's complaint does not assert otherwise, there

10   is nothing "unfair" about offering such discount packages to those customers who specifically

11   order the bundle without attempting to determine if certain other customers might want to

12   consider switching to the bundled pricing because the services they are currently ordering are

13   similar to those contained in the bundle. TWC made a decision to offer bundled pricing packages

14   to bulk residents, including members of homeowners' associations. It is not uncommon for

15   businesses to package discrete goods or services together, nor is the practice necessarily

16   undesirable from the standpoint of the consumer. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,

17   466 U.S. 2, 11-12 (1984). In the absence of some restraint upon competition, the mere practice of

18   packaging services together is not inherently anticompetitive or harmful to consumers. *Id.* TWC

19   is entitled to exercise its business discretion in making choices regarding the pricing and bundling

20   of its products, an area of economic policy in which courts have refrained from being involved.

21   *Belton*, 151 Cal. App. 4th at 1247, citing *California Grocers Assn. v. Bank of America*, 22 Cal.

22   App. 4th 205, 218 (1994).

23        **4.    TWC Did Not Breach its Agreement with the HOA.**

24        Plaintiff cannot prove a UCL violation based on the theory that TWC breached its

25   Agreement with the HOA by charging Plaintiff for basic cable services already provided for

26   under TWC's Agreement with the HOA. The undisputed facts show that TWC did not breach its

27   Agreement with the HOA or charge Plaintiff for services provided under the Agreement. (*See*

28   *supra*, Part IV.A.5.)

C.    **Plaintiff Cannot Prove That TWC Engaged in Misleading or Deceptive Business Practices.**

1.    **Standard for Misleading or Deceptive Conduct Under the UCL.**

A business act or practice is misleading or deceptive under the UCL if a plaintiff can show that members of the public are likely to be deceived. *Comm. on Children's Television v. Gen. Foods Corp.*, 35 Cal. 3d 197, 211 (1983); *Shvarts v. Budget Group, Inc.*, 81 Cal. App. 4th 1153, 1160 (2000). "Likely to deceive" means that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably under the circumstances, could be misled. *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003). This requires more than a "mere possibility that the [purportedly misleading matter] might conceivably be misunderstood by some few consumers." *Id.* Where the subject matter is not deceptive on its face, the plaintiff must produce more evidence than just the purported misleading statements and his testimony, or a few isolated examples of misled consumers, in order to meet the burden of showing a significant number of reasonable consumers would be misled. *Brockey v. Moore*, 107 Cal. App. 4th 86, 99-100 (2003).

The "deceptive" prong of Section 17200 does not impose an affirmative obligation for businesses to provide the "best possible notice" to prevent any possible misleading of the public. For example, in *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 966 (2003), the Court of Appeal held that although a sign at a hotel warning patrons about a $21 charge for valet parking might have been better than the notice provided, "there is no requirement [under the UCL] that reasonable notice has to be the best possible notice." The court added "[m]oreover, a potential parker could ask if there is a charge or a self-parking lot and thus is not forced to use valet parking." *Id.* Likewise in *Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1334 (2002) the court held that a hotel's practice of not expressly advising patrons that service charges on room service bills were paid to their servers did not violate the UCL.

Similar to his claims for unfair business practices, Plaintiff claims that TWC engaged in misleading and deceptive conduct in violation of the UCL by: (1) overcharging HOA customers for cable services and not providing pricing that reflected services already provided for under

1    TWC's contract with the HOA; (2) requiring Plaintiff to notify it of billing errors within thirty

2    days of receiving erroneous charges while failing to disclose that "HOA pricing" is available to

3    HOA subscribers that properly accounts for the basic cable paid for by the HOA; (3) deceptively

4    concealing HOA pricing; (4) misrepresenting TWC's affiliation with the HOA; and (5) making

5    false or misleading statements that Plaintiff's cable bill was reduced due to the bundling of

6    services when the real reason for the decrease in price was that Plaintiff obtained "HOA pricing

7    to which [he] and the HOA residents were entitled all along." (First Amended Complaint ¶¶

8    29(b), 29(e), 38, 39, 43.) Each of these three claims is contradicted by undisputed facts and

9    cannot be proven by Plaintiff, as discussed below.

10              **2.      TWC Did Not Overcharge Plaintiff.**

11         As explained above, TWC could not have misled Plaintiff based on Plaintiff's

12    overcharging theory because TWC did not overcharge Plaintiff, nor did its pricing to Plaintiff fail

13    to account for the HOA's payments to TWC for Plaintiff's basic cable. (*See supra*, Part IV.B.2.)

14              **3.      TWC Did Not Misled Plaintiff Regarding Notification of Billing Errors
                          While Failing to Disclose Pricing That Accounted for HOA Payments.**

15

16         As explained above, TWC did not mislead Plaintiff regarding when he was required to

17    notify TWC of billing errors, nor did TWC fail to disclose pricing that reflected the HOA's

18    payments to TWC for Plaintiff's basic cable. (*See supra*, Part IV.B.3.)

19              **4.      TWC Did Not Deceptively Conceal HOA Pricing.**

20         There are no facts to support Plaintiff's theory that TWC deceptively concealed "HOA

21    Pricing" from Plaintiff. The undisputed facts show that the only pricing agreed to between TWC

22    and the HOA related to the pricing for basic cable. (SS ¶ 97.) Furthermore, Plaintiff was aware

23    that the HOA paid TWC for his basic cable. (SS ¶ 99.) TWC and the HOA had no agreement

24    regarding Additional Services. (SS ¶¶ 97, 100, 102.)

25         The "HOA Pricing" referred to by Plaintiff is merely the pricing of one bundle of

26    Additional Services that was made available to HOA residents who were prepared to purchase all

27    of the services in the bundle. (SS ¶ 100.) TWC had no duty to inform Plaintiff of this or any

28    other rates, packages, or promotions for Additional Services that were available to Plaintiff. (SS

1    ¶ 103.) Nor was TWC obligated to offer any particular bundle packages or pricing to Plaintiff for

2    his Additional Services.  (SS ¶ 102.)  Under Plaintiff's theory, businesses would have an

3    affirmative duty to inform all their customers regarding every available option for purchase, and

4    would then be retroactively liable if the customers later chose a different product at a lesser price.

5    Such a theory is simply ridiculous.  Plaintiff was not misled by purportedly concealed pricing

6    because he understood businesses bundle products at a discounted rate, and he could have asked

7    TWC at any point if any options were available for a bundle of Additional Services.  (SS ¶ 101.)

8          **5.    TWC Did Not Misrepresent its Affiliation with the HOA.**

9          As explained above, TWC did not misrepresent or mislead Plaintiff regarding its

10   affiliation, connection, or association with the HOA.  (*See supra*, Part IV.A.2.)

11         **6.    TWC Did Not Mislead Plaintiff Regarding the Price Discount for
           Purchasing a Bundled Package of Additional Services.**

12

13         As explained above, TWC did not misrepresent or mislead Plaintiff regarding his

14   decreased bill for Additional Services upon ordering a bundled package of services vis-à-vis a

15   variety of a la carte services.  (*See supra*, Part IV.A.3.)

16         **7.    Plaintiff Cannot Prove that the Public Would Be Misled or Deceived.**

17         As noted above, it is clear that Plaintiff himself was not deceived or misled by any

18   conduct from or associated with TWC.  Furthermore, Plaintiff cannot prove that the general

19   public would likely be misled or deceived, as is required to support his claims under the UCL's

20   "misleading" prong. *Lavie*, 105 Cal. App. 4th at 508.  To succeed on his claims, Plaintiff must

21   produce more evidence than just the purported misleading statements and his testimony, or a few

22   isolated examples of misled consumers. *Brockey*, 107 Cal. App. 4th at 99-100.  Rather, he must

23   present evidence showing a significant number of reasonable consumers were or would be

24   misled.  *Id.*  Plaintiff cannot present such evidence.  (SS ¶ 116.)  For this reason, Plaintiff cannot

25   prove any of his claims that TWC engaged in misleading or deceptive conduct under the UCL.

26   **V.    PLAINTIFF LACKS STANDING TO BRING A CLAIM UNDER CALIFORNIA
       BUSINESS AND PROFESSIONS CODE SECTION 17200.**

27

28         In addition to the above, Plaintiff's action fails as a matter of law for lack of standing to

DLA PIPER US LLP
SAN DIEGO

SD\1777418.11                                    -19-

DEFENDANT'S MEMO OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1   bring a UCL claim.  Following passage of Proposition 64, the UCL limits standing to individuals

2   who have been injured and lost money or property as a result of the alleged unfair competition.

3   Cal. Bus. & Prof. Code § 17204.  The undisputed facts show that Plaintiff has received exactly

4   what he paid for by purchasing his cable related services and has not been injured.

5       The UCL "operates only to return to a person those measurable amounts which are

6   wrongfully taken by means of an unfair business practice...[I]n the absence of a measurable loss

7   the section does not allow the imposition of a monetary sanction merely to achieve [a] deterrent

8   effect."  *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 339 (1998).  In *Day*, purchasers of calling

9   cards brought a UCL action against the telephone company because the cards claimed to have ten

10  minutes of calling time when in fact calls were rounded up to the nearest minute.  *Id.* at 329.  The

11  *Day* court dismissed the section 17200 claim because purchasers were on notice of the rounding

12  practice, and even if misled into purchasing the cards by the representations, they "received

13  exactly what they paid for" when using the cards after purchased.  *Id.* at 339.

14      Restitution under the UCL requires both that the offending party received something it

15  would not have received but for the unfair business practice, and that the victim gave up

16  something they were entitled to keep.  *Id.* at 340.  For this reason, consumers who receive the

17  "benefit of their bargain" cannot sustain a UCL claim.  The undisputed facts show that Plaintiff

18  received exactly what he paid for when purchasing Additional Services from TWC.  Plaintiff

19  admitted that he purchased and paid for Additional Services, that TWC's billings for the

20  Additional Services he ordered were correct, and that he received the Additional Services that he

21  ordered.  (SS ¶¶ 118-120.)  Therefore, Plaintiff received exactly what he paid for and has no

22  measurable loss to support a UCL claim.  Any attempt to calculate a monetary amount to be paid

23  by Plaintiff would result in a refund or rebate of properly collected fees for services.

24  Dated: January 15, 2008

25                      DLA PIPER US LLP

26

27  By _____
                        JEFFREY M. SHOHET
28                      Attorney for Time Warner Cable

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

9

                    SUPERIOR COURT OF CALIFORNIA
10
                       COUNTY OF SAN DIEGO
11

12
   LEON ALPERT, an individual, on behalf         CASE NO.  GIC881621
13 of himself, on behalf of all those similarly
   situated, and on behalf of the general        **DECLARATION OF TERRI RHODES IN**
14 public,                                        **SUPPORT OF DEFENDANT TIME**
                                                  **WARNER CABLE'S MOTION FOR**
15            Plaintiffs,                         **SUMMARY JUDGMENT**

16        v.                                      Date      April 4, 2008
                                                  Time      10:30 a.m.
17 TIME WARNER CABLE, INC., a                     Dept:     63
   Delaware corporation, and DOES 1 TO           Judge:    Luis R. Vargas
18 100,
                                                  Complaint: March 13, 2007
19            Defendants.                         FAC:       May 16, 2007

20

21

22

23

24

25

26

27

28
DLA PIPER US LLP   SD\1778862.6
  SAN DIEGO
─────────────────────────────────────────────────────────────────
       DECLARATION OF TERRI RHODES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1       I, Terri Rhodes, declare:

2       1.     I am Director of Marketing at Time Warner Entertainment-Advance/Newhouse

3 Partnership, a New York general partnership, through its San Diego Division, dba Time Warner

4 Cable ("TWC"). I have personal knowledge of the facts set forth herein and, if called to testify, I

5 could and would testify competently thereto.

6       2.     Attached to the Notice of Lodgment of Exhibits and Non-California Authorities in

7 Support of Defendant Time Warner Cable's Motion for Summary Judgment ("Notice of

8 Lodgment") as Exhibit B is a true and correct copy of the Residential Bulk Services Agreement

9 (the "Agreement") between Sea Point Townhomes (the "HOA") and TWC.

10       3.     Since March 2003, TWC has provided the Bulk Multi-Channel Services ("Basic

11 Cable") to Plaintiff Leon Alpert's ("Plaintiff") residence as set forth in the Agreement between

12 TWC and the HOA.

13       4.     TWC has not billed or collected money from Plaintiff or any other member of the

14 HOA for Basic Cable. TWC has charged the HOA for providing Basic Cable to Plaintiff and

15 other members of the HOA. The HOA has paid TWC for providing such services.

16       5.     Attached to the Notice of Lodgment as Exhibit C is a true and correct copy of the

17 "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer Agreement")

18 between TWC and Plaintiff.

19       6.     TWC has billed Plaintiff each month for the services he has ordered under the

20 Consumer Agreement (hereafter referred to as "Additional Services").

21       7.     Attached to the Notice of Lodgment as Exhibit D is a true and correct copy of the

22 Plaintiff's August 2006 bill from TWC for the Additional Services he ordered under the

23 Consumer Agreement. The prices in Plaintiff's August 2006 bill from TWC reflect TWC's

24 published and/or established rates for the a la carte services Plaintiff ordered.

25       8.     In or about 2005, TWC began to offer Additional Services in various bundled

26 packages designed for its bulk customers (including apartment and homeowners'

27 association customers such as Plaintiff whose landlord or homeowners' association contracts for

28 basic cable at a discounted "bulk rate"). Prior to 2005, TWC permitted bulk customers like

DECLARATION OF TERRI RHODES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1 | Plaintiff to purchase Additional Services at the bundled rates generally available to retail

2 | customers but did not offer bundled packages designed for bulk customers.

3 |      9.      Attached to the Notice of Lodgment as Exhibit E is a true and correct copy of the

4 | Plaintiff's September 2006 bill from TWC for the Additional Services he ordered under the

5 | Consumer Agreement.

6 |      10.      The reduction in price between Plaintiff's August 2006 bill from TWC and his

7 | September 2006 bill from TWC is due to the fact that he changed his Additional Services and

8 | ordered a bundled package rather than a host of individual services.

9 |      11.      The "HOA Pricing" referred to by Plaintiff in his allegations and claims against

10 | TWC is merely the pricing of one bundle of Additional Services that was available to bulk

11 | customers, including HOA residents, who were willing to purchase all of the bundled services.

12 | As of October 15, 2007, TWC withdrew such pricing, except for customers who ordered it prior

13 | to October 15, 2007.

14 |      12.      TWC's customers may contact TWC through its toll-free telephone number,

15 | website, or by visiting one of its many retail centers and request a list of available products,

16 | including bundled options that are available for Additional Services.

17 |      I declare under penalty of perjury under the laws of the State of California and the United

18 | States of America that the foregoing is true and correct and that this declaration was executed on

19 | January 15, 2008, in San Diego, California.

20

21 | _Terri Rhodes_
 | Terri Rhodes

22

23

24

25

26

27

28

1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)
    **DLA PIPER US LLP**
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297
4   Tel:  619.699.2700
    Fax:  619.699.2701
5

6   Attorneys for Defendant
    TIME WARNER ENTERTAINMENT-ADVANCE/
7   NEWHOUSE PARTNERSHIP, A NEW YORK
    GENERAL PARTNERSHIP, THROUGH ITS SAN
8   DIEGO DIVISION, DBA TIME WARNER CABLE

9

                   SUPERIOR COURT OF CALIFORNIA
10
                      COUNTY OF SAN DIEGO
11

12
    LEON ALPERT, an individual, on behalf        CASE NO.  GIC881621
13  of himself, on behalf of all those similarly
    situated, and on behalf of the general       **DECLARATION OF TERRI RHODES IN**
14  public,                                      **SUPPORT OF DEFENDANT TIME**
                                                 **WARNER CABLE'S MOTION FOR**
15              Plaintiffs,                       **SUMMARY JUDGMENT**

16         v.                                    Date        April 4, 2008
                                                 Time        10:30 a.m.
17  TIME WARNER CABLE, INC., a                   Dept:       63
    Delaware corporation, and DOES 1 TO          Judge:      Luis R. Vargas
18  100,
                                                 Complaint:  March 13, 2007
19              Defendants.                      FAC:        May 16, 2007

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP    SD\1778862.6
   SAN DIEGO

─────────────────────────────────────────────────────────
DECLARATION OF TERRI RHODES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I, Terri Rhodes, declare:

1.     I am Director of Marketing at Time Warner Entertainment-Advance/Newhouse Partnership, a New York general partnership, through its San Diego Division, dba Time Warner Cable ("TWC"). I have personal knowledge of the facts set forth herein and, if called to testify, I could and would testify competently thereto.

2.     Attached to the Notice of Lodgment of Exhibits and Non-California Authorities in Support of Defendant Time Warner Cable's Motion for Summary Judgment ("Notice of Lodgment") as Exhibit B is a true and correct copy of the Residential Bulk Services Agreement (the "Agreement") between Sea Point Townhomes (the "HOA") and TWC.

3.     Since March 2003, TWC has provided the Bulk Multi-Channel Services ("Basic Cable") to Plaintiff Leon Alpert's ("Plaintiff") residence as set forth in the Agreement between TWC and the HOA.

4.     TWC has not billed or collected money from Plaintiff or any other member of the HOA for Basic Cable. TWC has charged the HOA for providing Basic Cable to Plaintiff and other members of the HOA. The HOA has paid TWC for providing such services.

5.     Attached to the Notice of Lodgment as Exhibit C is a true and correct copy of the "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer Agreement") between TWC and Plaintiff.

6.     TWC has billed Plaintiff each month for the services he has ordered under the Consumer Agreement (hereafter referred to as "Additional Services").

7.     Attached to the Notice of Lodgment as Exhibit D is a true and correct copy of the Plaintiff's August 2006 bill from TWC for the Additional Services he ordered under the Consumer Agreement. The prices in Plaintiff's August 2006 bill from TWC reflect TWC's published and/or established rates for the a la carte services Plaintiff ordered.

8.     In or about 2005, TWC began to offer Additional Services in various bundled packages designed for its bulk customers (including apartment and homeowners' association customers such as Plaintiff whose landlord or homeowners' association contracts for basic cable at a discounted "bulk rate"). Prior to 2005, TWC permitted bulk customers like

1    Plaintiff to purchase Additional Services at the bundled rates generally available to retail

2    customers but did not offer bundled packages designed for bulk customers.

3         9.    Attached to the Notice of Lodgment as Exhibit E is a true and correct copy of the

4    Plaintiff's September 2006 bill from TWC for the Additional Services he ordered under the

5    Consumer Agreement.

6         10.   The reduction in price between Plaintiff's August 2006 bill from TWC and his

7    September 2006 bill from TWC is due to the fact that he changed his Additional Services and

8    ordered a bundled package rather than a host of individual services.

9         11.   The "HOA Pricing" referred to by Plaintiff in his allegations and claims against

10   TWC is merely the pricing of one bundle of Additional Services that was available to bulk

11   customers, including HOA residents, who were willing to purchase all of the bundled services.

12   As of October 15, 2007, TWC withdrew such pricing, except for customers who ordered it prior

13   to October 15, 2007.

14        12.   TWC's customers may contact TWC through its toll-free telephone number,

15   website, or by visiting one of its many retail centers and request a list of available products,

16   including bundled options that are available for Additional Services.

17        I declare under penalty of perjury under the laws of the State of California and the United

18   States of America that the foregoing is true and correct and that this declaration was executed on

19   January 15, 2008, in San Diego, California.

20

21                                              Terri Rhodes

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

SD\1778862.6                          -2-

DECLARATION OF TERRI RHODES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

                                    FILED
                          CIVIL BUSINESS OFFICE 19

                          08 JAN 15  PM 4: 17

                          CLERK-SUPERIOR COURT
                          SAN DIEGO COUNTY, CA

9

                    SUPERIOR COURT OF CALIFORNIA
10
                        COUNTY OF SAN DIEGO
11

12
   LEON ALPERT, an individual, on behalf          CASE NO.  GIC881621
13 of himself, on behalf of all those similarly
   situated, and on behalf of the general         **REQUEST FOR JUDICIAL NOTICE IN**
14 public,                                         **SUPPORT OF DEFENDANT TIME**
                                                   **WARNER CABLE'S MOTION FOR**
15              Plaintiffs,                        **SUMMARY JUDGMENT**

16         v.                                      Date        April 4, 2008
                                                   Time        10:30 a.m.
17 TIME WARNER CABLE, INC., a                      Dept:       63
   Delaware corporation, and DOES 1 TO            Judge:      Luis R. Vargas
18 100,
                                                   Complaint:  March 13, 2007
19              Defendants.                        FAC:        May 16, 2007

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP      SD\1778813.1
   SAN DIEGO
─────────────────────────────────────────────────────────────────────
        REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1    Pursuant to California Evidence Code sections 451(f), 452(g) and (h), and 453, Defendant

2    Time Warner Entertainment-Advance/Newhouse Partnership, through its San Diego Division,

3    dba Time Warner Cable ("TWC") hereby respectfully requests that the Court take judicial notice

4    of the following facts:

5        1.    Plaintiff Leon Alpert ("Plaintiff") had other means of obtaining the entertainment

6    provided by his ordering additional cable services, other than basic cable, from Time Warner

7    Cable, such as renting movies, reading books, using a satellite service, using another telephone

8    provider, and using another Internet provider.

9        2.    Plaintiff could have simply foregone ordering additional cable services, other than

10    basic cable, from Time Warner Cable.

11        Judicial notice of these facts is authorized by the Evidence Code.  Evidence Code section

12    451(f) provides that judicial notice shall be taken of "[f]acts and propositions of generalized

13    knowledge that are so universally known that they cannot be reasonably the subject of dispute."

14    Furthermore, to the extent that matters are not embraced under the mandatory provisions of

15    Evidence Code section 451, Evidence Code section 452(g) provides for permissive judicial notice

16    for "[f]acts and propositions that are of such common knowledge within the territorial jurisdiction

17    of the court that they cannot reasonably be the subject of dispute."  Also, Evidence Code section

18    452(h) allows a court to take judicial notice of "[f]acts and propositions that are not reasonably

19    subject to dispute and are capable of immediate and accurate determination by resort to sources of

20    reasonably indisputable accuracy."

21        TWC respectfully requests the Court take judicial notice of the aforementioned facts and

22    propositions because they are of such common or generalized knowledge that they cannot

23    /////

24    /////

25    /////

26    /////

27    /////

28    /////

1    reasonably be the subject of dispute, or, at the very least, are capable of immediate and accurate

2    determination by resort to resources of reasonably indisputable accuracy.

3    Dated: January *15*, 2008

        DLA PIPER US LLP

        By _____
           JEFFREY M. SHOHET
           JULIE L. HUSSEY
           CARRIE S. DOLTON
           Attorneys for Time Warner Cable

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

FILED
CIVIL BUSINESS OFFICE 19
CENTRAL DIVISION

08 JAN 15 PM 4: 16

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

9

10                    SUPERIOR COURT OF CALIFORNIA

                          COUNTY OF SAN DIEGO
11

12

13  LEON ALPERT, an individual, on behalf      CASE NO.  GIC881621
    of himself, on behalf of all those similarly
    situated, and on behalf of the general      **SEPARATE STATEMENT OF**
14  public,                                     **UNDISPUTED FACTS IN SUPPORT OF**
                                                **DEFENDANT TIME WARNER CABLE'S**
15              Plaintiffs,                      **MOTION FOR SUMMARY JUDGMENT**

16        v.                                     Date        April 4, 2008
                                                 Time        10:30 a.m.
17  TIME WARNER CABLE, INC., a                   Dept:       63
    Delaware corporation, and DOES 1 TO         Judge:      Luis R. Vargas
18  100,
                                                 Complaint:  March 13, 2007
19              Defendants.                      FAC:        May 16, 2007

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
  SAN DIEGO

SD\1778388.3

DEFENDANT'S SEPARATE STATEMENT OF FACTS ISO MOTION FOR SUMMARY JUDGMENT

1    Defendant Time Warner Entertainment-Advance/Newhouse Partnership, a New York

2    general partnership, through its San Diego Division, dba Time Warner Cable ("TWC"), sued

3    erroneously as Time Warner Cable, Inc., respectfully submits the following statement of

4    undisputed material facts in support of its motion for summary judgment.

5    **Issue #1:  Plaintiff's Cause of Action for Violation of Business & Professions Code**

6    **section 17200 *et seq.*, based on TWC engaging in unlawful conduct in violation of the**

7    **Consumer Legal Remedies Act ("CLRA"), lacks merit as a matter of law because Plaintiff**

8    **cannot prove a violation of the CLRA.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 1.  Plaintiff Leon Alpert ("Plaintiff") is a resident of Sea Point Townhomes in Del Mar, California. | Deposition of Leon Alpert ("Alpert Deposition"), p. 123, lines 12-15,  Notice of Lodgment of Exhibits and Non-California Authorities in Support of Defendant Time Warner Cable's Motion for Summary Judgment ("NOL"), Ex. A. |
| 2.  Sea Point Townhomes is a Home Owners' Association ("HOA" or the "HOA") that has contracted with TWC, under an agreement referred to as a Residential Bulk Services Agreement, for certain cable services to be provided to the residents of Sea Point Townhomes (the "Agreement"). | Declaration of Terri Rhodes in Support of Defendant Time Warner Cable's Motion for Summary Judgment ("Rhodes Decl."), ¶ 2, NOL Ex. B. |
| 3.  The Agreement provides that TWC will provide 76 cable channels, sometimes referred to as "basic cable," to each home/unit of Sea Point Townhomes, and that Sea Point Townhomes will pay TWC a monthly fee per home/unit for such services. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 4.  Section 1 of the Agreement, entitled "Operator's Service Obligations," provides that TWC "will offer Bulk Multi-Channel Video Services to Residents." | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 5.  Section 2 of the Agreement, entitled "Rates and Services," states that the "HOA shall pay to [TWC] a monthly Bulk Multi-Channel Video Services fee" which is set forth in Exhibit B to the Agreement. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 6.  The fee for basic cable services is to be billed for and paid by the Sea Point Community HOA. | Rhodes Decl. ¶ 2, NOL Ex. B; Alpert Deposition, p. 32, lines 17-20,  NOL Ex. A. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 7. Although basic cable is provided to HOA residents through the HOA, individual residents are free to order additional services from TWC and/or otherwise do business with TWC. | Rhodes Decl. ¶ 2, NOL Ex. B; Alpert Deposition, p. 124, lines 17-23; p. 126, lines 2-25, NOL Ex. A. |
| 8. TWC may, but is not obligated to, offer the residents of Sea Point Townhomes services *other than* the 76 cable channels provided for in the Agreement (hereafter "Additional Service" or "Additional Services"). | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 9. Section 1 of the Agreement provides that TWC "may offer and provide Additional Service to Residents on a non-exclusive basis." | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 10. Additional Services are defined as "any services other than the Bulk Multi-Channel Video Services, including, but not limited to, premium channels, pay-per-view, music, digital tier, video-on-demand, and other video and music services not included in the Bulk Multi-Channel Video Services package, high speed data and Internet access services, voice services, etc." | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 11. HOA residents who chose to order Additional Services from TWC are responsible for paying TWC for such services. | Rhodes Decl. ¶ 2, NOL Ex. B; Alpert Deposition, p. 124, lines 17-23; p. 126, lines 2-25, NOL Ex. A. |
| 12. Pursuant to Section 2 of the Agreement, "Residents will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in conjunction with Additional Services." | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 13. No rates or special pricing for Additional Services are provided for in the Agreement. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 14. Since March 2003, TWC has provided the Bulk Multi-Channel Services ("basic cable") to Plaintiff's residence as set forth in the Agreement between TWC and the HOA. | Rhodes Decl. ¶ 3. |
| 15. TWC has not billed or collected money from Plaintiff for these services, nor has Plaintiff paid anything to TWC for the services. | Rhodes Decl. ¶ 4; Alpert Deposition, p. 32, lines 17-20, NOL Ex. B. |
| 16. TWC is paid by the HOA for providing basic cable services to Plaintiff's residence. | Rhodes Decl. ¶ 2, NOL Ex. B; Alpert Deposition, p. 32, lines 17-20, NOL Ex. A. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 17. Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Alpert Deposition, p. 32, line 17—p. 33, line 6; p. 86, lines 18-22, NOL Ex. B. |
| 18. Since March 2003, Plaintiff has ordered certain Additional Services from TWC under a contract titled "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer Agreement"). | Rhodes Decl. ¶ 5, NOL Ex. C; Alpert Deposition, p. 88, lines 8-13, NOL Ex. B. |
| 19. TWC has billed Plaintiff for the Additional Services he ordered, and Plaintiff has paid TWC directly for such services. | Rhodes Decl. ¶ 6; Alpert Deposition, p. 136, lines 1-18; p. 140, lines 8-12, NOL Ex. B. |
| 20. TWC's bills to Plaintiff for his Additional Services contain a detailed itemization of each Additional Service and associated charge for each such service. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 21. The invoices show that Plaintiff was charged only for the Additional Services he ordered and was not charged for basic cable services. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 22. As recently as August 2006, the Additional Services ordered by Plaintiff included the following features and pricing:<br><br>Digital Phone Package ($39.95); iControl Premium Service ($6.95); HDTV Converters ($7.00 x 2); Service Protection Plan ($2.95); Premier Digital ($11.00); Any 4 Premium Channels ($24.95); Wireless Road Runner ($54.90); special order items such as on-demand movies; as well as applicable taxes and fees.<br><br>These prices reflect TWC's published and/or established rates for such a la carte services. | Rhodes Decl. ¶ 7, NOL Ex. D. |
| 23. In 2005, TWC began to offer Additional Services in various bundled packages for bulk customers, such as HOA members, at a discount off the aggregate price of the individual services. | Rhodes Decl. ¶ 8. |
| 24. Plaintiff was familiar with TWC advertising relating to bundled packages and knew that customers ordering bundled services received a discount off the a la carte price for the same services. | Alpert Deposition, p. 96, line 18—p. 99, line 15, NOL Ex. B. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 25. In or about September 2006, having become aware that TWC was offering a bundled package of Additional Services that included many of the services Plaintiff was purchasing a la carte, Plaintiff switched his Additional Services to order new services, including a bundled package. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E; Alpert Deposition, p. 26, lines 4-11, NOL Ex. B. |
| 26. Plaintiff changed his Additional Services to a bundled package in order to get a better price. | Alpert Deposition, p. 96, line 18—p. 99, line 15, NOL Ex. B. |
| 27. Plaintiff's new Additional Services included a bundled package with the following features and pricing:<br><br>HDTV Converter ($8.00); Service Protection Plan ($2.95); Hoa DIGIPiC 4000 Plan ($121.90)—which includes Wireless Roadrunner, Digital Phone Package, Free On Demand, iControl Premium Service, Digital Access, Cinemax, HBO, Navigator Screen Guide, Showtime, STARZ, Digital Movie Pack, Digital Sports Pack, Digital Variety Pack, Basic Cable Paid by Hoa, and Road Runner High Speed; special order items such as on-demand movies; as well as applicable taxes and fees. | Rhodes Decl. ¶ 9, NOL Ex. E. |
| 28. As a result of Plaintiff modifying the Additional Services ordered, and ordering them in a bundled package vis-à-vis a la carte, Plaintiff's charges for Additional Services decreased. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 29. As part of the Consumer Agreement under which Additional Services were provided by TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors within thirty days from the receipt of any bill containing such errors, so that service levels and payments can be verified. | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 30. Plaintiff further agreed to waive any errors that were not reported within thirty days of receipt. | Rhodes Decl. ¶ 5, NOL Ex. C. |

/////

/////

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 31. Plaintiff's monthly invoices from TWC for his Additional Services included the following language under a heading titled "ABOUT YOUR TIME WARNER CABLE AGREEMENT:"<br><br>"Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct." | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 32. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Alpert Deposition, p. 165, lines 4-17, NOL Ex. B. |
| 33. Plaintiff testified in his deposition that the bills he received for Additional Services were correct both before and after he altered his services and ordered a bundled package. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |

### TWC Has Not Violated section 1770(a)(3) of the CLRA

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 34. Plaintiff Leon Alpert claims that TWC has violated section 1770(a)(3) of the CLRA by (1) not informing him of the rates for Additional Services that he was allegedly entitled to as member of Sea Point Townhomes' Home Owners' Assocation (the "HOA"), and (2) not disclosing to Plaintiff that TWC was collecting fees for his basic cable service from the HOA. | First Amended Complaint ¶ 14. |
| 35. Plaintiff was not entitled to any particular rates for Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 36. TWC had no duty to inform Plaintiff of all its rates, packages, and promotions for Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |
| 37. Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Alpert Deposition, p. 32, line 17—p. 33, line 6; p. 86, lines 18-22, NOL Ex. B. |

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 38. TWC had no duty to inform Plaintiff that the HOA was paying TWC for his basic cable. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |
| 39. TWC did not charge or collect money from Plaintiff for basic cable. | Rhodes Decl. ¶ 4, NOL Exs. D, E. |
| 40. TWC correctly charged Plaintiff for the Additional Services he ordered. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |

**TWC Has Not Violated section 1770(a)(13) of the CLRA**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 41. Plaintiff claims that TWC has violated section 1770(a)(13) of the CLRA by misinforming him that his cable bill was reduced because he ordered a bundle of services vis-à-vis individual services, when the real reason for the price reduction was due to TWC already collecting basic cable fees on behalf of Plaintiff. | First Amended Complaint ¶¶ 15, 42. |
| 42. Plaintiff was charged the correct price by TWC both when he ordered Additional Services a la carte, and when he later ordered a bundled package for a lower price. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |
| 43. Plaintiff's bill for Additional Services was reduced because he changed his services and ordered a bundled package rather than a host of individual services. | Rhodes Decl. ¶¶ 7, 9, 10, NOL Exs. D, E. |
| 44. Plaintiff testified at deposition that he was familiar with TWC advertising relating to bundled packages and knew that customers ordering bundled services received a discount vis-à-vis ordering the same services a la carte. | Alpert Deposition, p. 96, line 18—p. 99, line 15, NOL Ex. B. |
| 45. Plaintiff testified at deposition that he changed his Additional Services to a bundled package in order to get a better price. | Alpert Deposition, p. 96, line 18—p. 99, line 15, NOL Ex. B. |

/////

/////

1

2

**TWC Has Not Violated section 1770(a)(19) of the CLRA**

3

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 46. Plaintiff claims that TWC has violated section 1770(a)(19) of the CLRA, which precludes inserting an unconscionable provision into a contract, by requiring customers to report billing errors within thirty days. | First Amended Complaint ¶¶ 21-23, 40. |
| 47. The billing provision at issue provides:<br><br>"I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived." | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 48. Each TWC invoice also states the following text directly below a capitalized and underlined title "ABOUT YOUR TIME WARNER CABLE AGREEMENT":<br><br>"Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct." | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 49. TWC's invoices use the same font size for the reminder regarding reporting billing errors within thirty days as is used in the same area on the billing statement. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 50. Plaintiff testified in his deposition that the bills he received for Additional Services were correct both before and after he altered his services and ordered a bundled package. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |
| 51. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Alpert Deposition, p. 165, lines 4-17, NOL Ex. B. |

/////

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 52. Plaintiff had other means of obtaining the entertainment provided by his ordering Additional Services from TWC, such as renting movies, using a satellite service, using another telephone provider, and using another internet provider. | Request for Judicial Notice in Support of Defendant Time Warner Cable's Motion for Summary Judgment ("RJN"), ¶ 1. |
| 53. Plaintiff could have simply foregone ordering Additional Services from TWC. | RJN ¶ 2. |

**Issue #2:  Plaintiff's Cause of Action for Violation of Business & Professions Code section 17200 *et seq.*, based on TWC engaging in unlawful conduct by breaching its agreement with Sea Point Townhomes' Home Owners' Association (the "HOA"), lacks merit as a matter of law because TWC did not breach its agreement with the HOA.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 54. Plaintiff claims that TWC breached its agreement with the HOA by charging him directly for services already provided and paid for under the HOA agreement. | First Amended Complaint ¶¶ 29(g), 43. |
| 55. The contract between TWC and the HOA provided that TWC would provide basic cable to HOA residents. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 56. TWC provided basic cable services to HOA residents. | Rhodes Decl. ¶ 3. |
| 57. TWC charged the HOA for providing basic cable services to HOA residents. | Rhodes Decl. ¶ 4. |
| 58. The HOA paid TWC for providing basic cable services to HOA residents. | Rhodes Decl. ¶ 4. |
| 59. TWC has not billed or collected money from Plaintiff or other HOA residents for their basic cable services. | Rhodes Decl. ¶¶ 4, 7, 9, NOL Exs. D, E; Alpert Deposition, p. 32, lines 17-20, NOL Ex. B |
| 60. TWC was not contractually bound to offer Additional Services to Plaintiff at any particular prices. | Rhodes Decl. ¶ 2, NOL Ex. B. |

/////

/////

/////

/////

/////

/////

**Issue #3:  Plaintiff's Cause of Action for Violation of Business & Professions Code section 17200 *et seq.*, based on TWC engaging in unfair conduct by overcharging Plaintiff, lacks merit as a matter of law because TWC did not overcharge Plaintiff.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 61. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by overcharging HOA customers for cable services and not providing pricing that reflected services already provided for under TWC's contract with the HOA. | First Amended Complaint ¶ 38. |
| 62. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E; Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |
| 63. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 64. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Agreement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |

///// 

///// 

///// 

///// 

///// 

///// 

///// 

/////

1   **Issue #4:  Plaintiff's Cause of Action for Violation of Business & Professions Code**

2   **section 17200 *et seq.*, based on TWC engaging in unfair conduct by requiring thirty-day**

3   **notification of billing errors while failing to disclose HOA pricing that accounted for HOA**

4   **payments, lacks merit as a matter of law because such notification terms are reasonable.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 65. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | First Amended Complaint ¶ 39. |
| 66. As part of the Consumer Agreement under which Additional Services were provided by TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors within thirty days from the receipt of any bill containing such errors, so that service levels and payments can be verified. | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 67. Plaintiff further agreed to waive any errors that were not reported within thirty days of receipt. | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 68. Plaintiff's monthly invoices from TWC for his Additional Services included the following language under a heading titled "ABOUT YOUR TIME WARNER CABLE AGREEMENT:"  "Note:  If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question.  If we are not notified of the discrepancy the statement will be considered correct." | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 69. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Alpert Deposition, p. 165, lines 4-17, NOL Ex. B. |

/////

/////

/////

DLA Piper US LLP
San Diego

SD\1778388.3                    -10-

DEFENDANT'S SEPARATE STATEMENT OF FACTS ISO MOTION FOR SUMMARY JUDGMENT

1   **Issue #5:  Plaintiff's Cause of Action for Violation of Business & Professions Code**

2   **section 17200 et seq., based on TWC engaging in unfair conduct by requiring thirty-day**

3   **notification of billing errors while failing to disclose HOA pricing that accounted for HOA**

4   **payments, lacks merit as a matter of law because the notification term had no effect on**

5   **Plaintiff, yet has a legitimate business benefit to TWC.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 70. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 et seq. by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | First Amended Complaint ¶ 39. |
| 71. TWC requires customers to notify it of billing errors within thirty days so that service levels and payments can be verified. | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 72. TWC correctly charged Plaintiff for the Additional Services he ordered both before and after he changed his services to a bundled package. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |

16   **Issue #6:  Plaintiff's Cause of Action for Violation of Business & Professions Code**

17   **section 17200 et seq., based on TWC engaging in unfair conduct by requiring thirty-day**

18   **notification of billing errors while failing to disclose HOA pricing that accounted for HOA**

19   **payments, lacks merit as a matter of law because TWC did not fail to disclose such pricing.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 73. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 et seq. by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | First Amended Complaint ¶ 39. |
| 74. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |

DLA PIPER US LLP
SAN DIEGO

SD\1778388.3

-11-

DEFENDANT'S SEPARATE STATEMENT OF FACTS ISO MOTION FOR SUMMARY JUDGMENT

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 75. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 76. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Areement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 77. TWC was under no obligation to provide special pricing for Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |
| 78. TWC was not obligated to notify Plaintiff of all potential packages and prices for its Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |

**Issue #7:  Plaintiff's Cause of Action for Violation of Business & Professions Code section 17200 *et seq.*, based on TWC engaging in unfair conduct by breaching its agreement with the HOA, lacks merit as a matter of law because TWC did not breach its agreement with the HOA.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 79. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by breaching its Agreement with the HOA via charging Plaintiff for services already provided for under TWC's Agreement with the HOA. | First Amended Complaint ¶ 43. |
| 80. The contract between TWC and the HOA provided that TWC would provide basic cable to HOA residents. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 81. TWC provided basic cable services to HOA residents. | Rhodes Decl. ¶ 3. |
| 82. TWC charged the HOA for providing basic cable services to HOA residents. | Rhodes Decl. ¶ 4. |
| 83. The HOA paid TWC for providing basic cable services to HOA residents. | Rhodes Decl. ¶ 4. |

/////

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 84. TWC has not billed or collected money from Plaintiff or other HOA residents for their basic cable services. | Rhodes Decl. ¶¶ 4, 7, 9, NOL Exs. D, E; Alpert Deposition, p. 32, lines 17-20, NOL Ex. B |
| 85. TWC was not contractually bound to offer Additional Services to Plaintiff at any particular prices. | Rhodes Decl. ¶ 2, NOL Ex. B. |

**Issue #8:  Plaintiff's Cause of Action for Violation of Business & Professions Code section 17200 *et seq.*, based on TWC engaging in misleading conduct by overcharging Plaintiff, lacks merit as a matter of law because TWC did not overcharge Plaintiff.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 86. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by overcharging Plaintiff for Additional Services. | First Amended Complaint ¶ 38. |
| 87. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E; Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |
| 88. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 89. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Areement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |

///// 
///// 
/////

1    **Issue #9:  Plaintiff's Cause of Action for Violation of Business & Professions Code**

2    **section 17200 *et seq.*, based on TWC misleading Plaintiff regarding when he was required to**

3    **notify TWC of billing errors by hiding notification requirements and failing to disclose**

4    **HOA pricing that accounted for HOA payments, lacks merit as a matter of law because the**

5    **notification term was included in Plaintiff's contract and on every invoice sent to Plaintiff.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 90. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | First Amended Complaint ¶ 39. |
| 91. As part of the Consumer Agreement under which Additional Services were provided by TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors within thirty days from the receipt of any bill containing such errors, so that service levels and payments can be verified. | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 92. Plaintiff further agreed to waive any errors that were not reported within thirty days of receipt. | Rhodes Decl. ¶ 5, NOL Ex. C. |
| 93. Plaintiff's monthly invoices from TWC for his Additional Services included the following language under a heading titled "ABOUT YOUR TIME WARNER CABLE AGREEMENT:"<br><br>"Note:  If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question.  If we are not notified of the discrepancy the statement will be considered correct." | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 94. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Alpert Deposition, p. 165, lines 4-17, NOL Ex. B. |

27    /////

28    /////

1  **Issue #10: Plaintiff's Cause of Action for Violation of Business & Professions Code**

2  **section 17200 *et seq.*, based on TWC concealing HOA pricing that accounted for HOA**

3  **payments, lacks merit as a matter of law because TWC did not fail to disclose such pricing.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 95. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by concealing HOA pricing that accounted for HOA payments. | First Amended Complaint ¶ 29(b). |
| 96. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |
| 97. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 98. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Areement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E. |
| 99. Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Alpert Deposition, p. 32, line 17—p. 33, line 6; p. 86, lines 18-22, NOL Ex. B. |
| 100. The "HOA Pricing" referred to by Plaintiff is merely the pricing of one bundle of Additional Services that, until recently, was available to HOA residents who were willing to purchase all of the bundled services. | Rhodes Decl. ¶ 11. |
| 101. Plaintiff could have asked TWC at any point if any bundled options were available for his Additional Services. | Rhodes Decl. ¶ 12. |
| 102. TWC was not contractually bound to offer Additional Services to Plaintiff at any particular prices. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |
| 103. TWC was not obligated to notify Plaintiff of all potential packages and prices for its Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |

DLA PIPER US LLP
SAN DIEGO

DEFENDANT'S SEPARATE STATEMENT OF FACTS ISO MOTION FOR SUMMARY JUDGMENT

1    Issue #11:  Plaintiff's Cause of Action for Violation of Business & Professions Code

2    section 17200 *et seq.*, based on TWC misrepresenting its affiliation, connection, or

3    association with the HOA, lacks merit as a matter of law because TWC made no such

4    misrepresentations.

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 104.    Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by misrepresenting its affiliation, connection, or association with the HOA.  Plaintiff claims that TWC (1) failed to inform him of the rates for Additional Services that he was allegedly entitled to as member of Sea Point Townhomes' Home Owners' Assocation (the "HOA"), and (2) failed to disclose to Plaintiff that TWC was collecting fees for his basic cable service from the HOA. | First Amended Complaint ¶ 14, 41. |
| 105.    Plaintiff was not entitled to any particular rates for Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B. |
| 106.    TWC had no duty to inform Plaintiff of all its rates, packages, and promotions for Additional Services. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |
| 107.    Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Alpert Deposition, p. 32, line 17—p. 33, line 6; p. 86, lines 18-22, NOL Ex. B. |
| 108.    TWC had no duty to inform Plaintiff that the HOA was paying TWC for his basic cable. | Rhodes Decl. ¶ 2, NOL Ex. B; Rhodes Decl. ¶ 5, NOL Ex. C. |
| 109.    TWC did not charge Plaintiff for basic cable. | Rhodes Decl. ¶¶ 4, 7, 9, NOL Exs. D, E. |
| 110.    TWC correctly charged Plaintiff for the Additional Services he ordered. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |

/////

/////

/////

/////

/////

**Issue #12:  Plaintiff's Cause of Action for Violation of Business & Professions Code section 17200 _et seq._, based on TWC misrepresenting the reason for the decrease in Plaintiff's bill for Additional Services after he changed his services to a bundled package, lacks merit as a matter of law because TWC made no such misrepresentations.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 111.    Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 _et seq._ by misrepresenting that the reason for the decrease in his bill for Additional Services was due to ordering a bundled package, when the real reason for the price reduction was due to TWC already collecting basic cable fees on behalf of Plaintiff. | First Amended Complaint ¶ 42. |
| 112.    Plaintiff was charged the correct price by TWC both when he ordered Additional Services a la carte, and when he later ordered a bundled package for a lower price. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |
| 113.    Plaintiff's bill for Additional Services was reduced was because he changed his services and ordered a bundled package rather than a host of individual services. | Rhodes Decl. ¶¶ 7, 9, 10, NOL Exs. D, E. |
| 114.    Plaintiff testified at deposition that he was familiar with TWC advertising relating to bundled packages and knew that customers ordering bundled services received a discount vis-à-vis ordering the same services a la carte. | Alpert Deposition, p. 96, line 18—p. 99, line 15, NOL Ex. B. |
| 115.    Plaintiff testified at deposition that he changed his Additional Services to a bundled package in order to get a better price. | Alpert Deposition, p. 96, line 18—p. 99, line 15, NOL Ex. B. |

**Issue #13:  Plaintiff's Cause of Action for Violation of Business & Professions Code section 17200 _et seq._, based on TWC engaging in misleading or deceptive conduct, lacks merit as a matter of law because Plaintiff cannot prove the general public would likely be misled or deceived by TWC's conduct.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 116.    Plaintiff lacks evidence to show that the general public would likely be misled or deceived by TWC's purported conduct. |  |

1       **Issue #14: Plaintiff's Cause of Action for Violation of Business & Professions Code**

2     **section 17200 *et seq*. lacks merit as a matter of law because Plaintiff lacks standing since he**

3     **has not been injured and lost money or property as a result of TWC's purported conduct.**

| UNDISPUTED FACT | SUPPORTING EVIDENCE |
|---|---|
| 117.   Since March 2003, Plaintiff has ordered certain Additional Services from TWC under a contract titled "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer Agreement"). | Rhodes Decl. ¶ 5, NOL Ex. C; Alpert Deposition, p. 88, lines 8-13, NOL Ex. B. |
| 118.   Plaintiff has received the Additional Services that he ordered from TWC. | Alpert Deposition, p. 151, l21—p. 152, line 4, NOL Ex. B. |
| 119.   TWC has billed Plaintiff for the Additional Services he ordered, and Plaintiff has paid TWC directly for such services. | Rhodes Decl. ¶¶ 7, 9, NOL Exs. D, E; Alpert Deposition, p. 136, lines 1-18; p. 151, l21—p. 152, line 4; NOL Ex. B. |
| 120.   Plaintiff testified in his deposition that the bills he received for Additional Services were correct. | Alpert Deposition, p. 144, lines 15-18; p. 148, line 17—p. 149, line 1; p. 151, line 21—p. 152, line 4; p. 155, line 25—p. 157, line 18; p. 158, line 2—p. 159, line 6, NOL Ex. B. |

Dated: January **15**, 2008       DLA PIPER US LLP

By _____
    JEFFREY M. SHOHET
    JULIE L. HUSSEY
    CARRIE S. DOLTON
    **Attorneys for Time Warner Cable**

| | |
|---|---|
| 1 | JEFFREY M. SHOHET (Bar No. 067529)<br>JULIE L. HUSSEY (Bar No. 237711) |
| 2 | CARRIE S. DOLTON (Bar No. 234298)<br>**DLA PIPER US LLP** |
| 3 | 401 B Street, Suite 1700<br>San Diego, CA  92101-4297 |
| 4 | Tel:  619.699.2700<br>Fax:  619.699.2701 |
| 5 | |

FILED
CIVIL ... ... ...CE 19
...

08 JAN 15  PM 4: 17

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY. CA

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE

9

SUPERIOR COURT OF CALIFORNIA

10

COUNTY OF SAN DIEGO

11

12

LEON ALPERT, an individual, on behalf
13  of himself, on behalf of all those similarly
    situated, and on behalf of the general
14  public,

15          Plaintiffs,

16     v.

17  TIME WARNER CABLE, INC., a
    Delaware corporation, and DOES 1 TO
18  100,

19          Defendants.

CASE NO.  GIC881621

**NOTICE OF LODGMENT OF EXHIBITS
AND NON-CALIFORNIA AUTHORITIES
IN SUPPORT OF DEFENDANT TIME
WARNER CABLE'S MOTION FOR
SUMMARY JUDGMENT**

Date       April 4, 2008
Time       10:30 a.m.
Dept:      63
Judge:     Luis R. Vargas

Complaint: March 13, 2007
FAC:       May 16, 2007

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
   SAN DIEGO

SD\1778985.1

NOTICE OF LODGMENT OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1        Defendant Time Warner Entertainment-Advance/Newhouse Partnership, through its San

2    Diego Division, dba Time Warner Cable ("TWC") respectfully submits this Notice of Lodgment

3    of true and correct copies of the following exhibits and non-California authority in support of its

4    Motion for Summary Judgment:

5    Exhibit A:         Excerpts from the Deposition of Plaintiff Leon Alpert ("Plaintiff"), November
                      6, 2007.

6    Exhibit B:         Residential Bulk Services Agreement between Sea Point Townhomes and

7                          TWC.

     Exhibit C:         Time Warner Cable Residential Services Subscriber Agreement between

8                          Plaintiff and TWC.

     Exhibit D:         Plaintiff's August 2006 bill from TWC for cable services TWC provided

9                          under the Time Warner Cable Residential Services Subscriber Agreement.

10   Exhibit E:         Plaintiff's September 2006 bill from TWC for cable services TWC provided
                      under the Time Warner Cable Residential Services Subscriber Agreement.

11   Exhibit F:         *Riensche v. Cingular Wireless LLC*, No. C06-1325Z, 2007 WL 3407137,
                      (W.D. Wash. Nov. 9, 2007).

12

13   Dated: January _15_, 2008           DLA PIPER US LLP

14

15                                   By _____

16                                     JEFFREY M. SHOHET
                                JULIE L. HUSSEY

17                                     CARRIE S. DOLTON
                                Attorneys for Time Warner Cable

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF LODGMENT OF EXHIBITS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT



# **TABLE OF CONTENTS**

| **EXHIBIT** | **DESCRIPTION/TITLE** |
|---|---|
| Exhibit A: | Excerpts from the Deposition of Plaintiff Leon Alpert ("Plaintiff"), November 6, 2007 |
| Exhibit B: | Residential Bulk Services Agreement between Sea Point Townhomes and TWC |
| Exhibit C: | Time Warner Cable Residential Services Subscriber Agreement between Plaintiff and TWC |
| Exhibit D: | Plaintiff's August 2006 bill from TWC for cable services TWC provided under the Time Warner Cable Residential Services Subscriber Agreement |
| Exhibit E: | Plaintiff's September 2006 bill from TWC for cable services TWC provided under the Time Warner Cable Residential Services Subscriber Agreement |
| Exhibit F: | *Riensche v. Cingular Wireless LLC*, No. C06-1325Z, 2007 WL 3407137, (W.D. Wash. Nov. 9, 2007) |

**EXHIBIT  A**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CENTRAL DIVISION

LEON ALPERT, an individual, on
behalf of himself, on behalf of
all those similarly situated,
and on behalf of the general
public,

              Plaintiff,

   vs.                    Case No. GIC881621

TIME WARNER CABLE, INC., a
Deleware corporation, and DOES
1 TO 100,

          Defendants.

**CERTIFIED**
# COPY

---

VIDEOTAPED DEPOSITION OF LEON SETH ALPERT

VOLUME 1

SAN DIEGO, CALIFORNIA

TUESDAY, NOVEMBER 6, 2007

Reported by:
R. Denise Marlow
CSR No. 11631

Job No. 75324

LEON SETH ALPERT                                    11/06/07

| | | |
|---|---|---|
| 10:02:21 | 1 | Q    Okay.  Well, let's take those in pieces.  I |
| 10:02:24 | 2 | want to understand the sequence of that. |
| 10:02:25 | 3 | A    Sure. |
| 10:02:26 | 4 | Q    You have in mind the conversation that you had |
| 10:02:29 | 5 | with Time Warner in which you -- the result of which was |
| 10:02:33 | 6 | that your billing was changed.  Do you have that |
| 10:02:36 | 7 | conversation in mind? |
| 10:02:37 | 8 | A    Yes. |
| 10:02:38 | 9 | Q    Okay.  I will represent to you that that |
| 10:02:40 | 10 | conversation occurred in September of 2006.  Is that -- |
| 10:02:44 | 11 | A    Sounds correct. |
| 10:02:47 | 12 | Q    -- consistent with your recollection? |
| 10:02:48 | 13 | A    Yes. |
| 10:02:49 | 14 | Q    Okay.  Now, you mentioned that sometime before |
| 10:02:51 | 15 | that you received a notification from your homeowner, |
| 10:02:54 | 16 | some letter or some notification, about billing |
| 10:02:57 | 17 | packages? |
| 10:02:58 | 18 | A    Yeah, services offered from Time Warner. |
| 10:02:59 | 19 | Q    Okay.  When did you receive that material? |
| 10:03:02 | 20 | A    Well, if I -- if the conversation -- if I |
| 10:03:05 | 21 | called Time Warner September 2006, then it was pretty |
| 10:03:08 | 22 | much immediately after I received my -- the note from |
| 10:03:13 | 23 | the -- I mean the newsletter from the association, so |
| 10:03:16 | 24 | probably within a few days. |
| 10:03:17 | 25 | Q    Do you still have a copy of that newsletter |

26

| | | | |
|---|---|---|---|
| 10:08:15 | 1 | A | As far as I recall, yes. |
| 10:08:17 | 2 | Q | How much after that? |
| 10:08:18 | 3 | A | I don't recall. |
| 10:08:18 | 4 | Q | Was it within days? |
| 10:08:20 | 5 | A | I -- I have no recollection -- |
| 10:08:22 | 6 | Q | All right. |
| 10:08:23 | 7 | A | -- of when.  I'm sorry. |
| 10:08:24 | 8 | Q | That's all right. |

10:08:25  9          Before that date, that is, before the date you

10:08:27 10   received the HOA agreement sometime after your

10:08:31 11   conversation with Time Warner, had you ever seen it

10:08:34 12   before?

10:08:34 13       A     No.

10:08:34 14       Q     Had you ever discussed its terms before that

10:08:38 15   date?

10:08:38 16       A     No.

10:08:39 17       Q     Were -- you were aware, though, before that

10:08:42 18   date that your HOA was paying Time Warner for basic

10:08:47 19   cable service for your service.   Correct?

10:08:49 20       A     Yes.

10:08:49 21       Q     And you were aware of that for some period of

10:08:54 22   time.  Were you aware of that for as -- withdraw that

10:08:58 23   question.

10:08:58 24          When do you recall being first aware of the

10:09:01 25   fact that the HOA had an agreement with Time Warner, the

32

| | | |
|---|---|---|
| 10:09:05 | 1 | result of which is basic cable was provided by Time |
| 10:09:08 | 2 | Warner -- by the HOA? |
| 10:09:10 | 3 |     A   I believe it was around the time we moved in. |
| 10:09:13 | 4 | It was probably just represented to me by the seller or |
| 10:09:17 | 5 | someone else.  I don't recall.  Someone -- someone told |
| 10:09:20 | 6 | me or I read it.  I don't remember. |
| 10:09:22 | 7 |     Q   Okay.  And other than the fact that the HOA |
| 10:09:32 | 8 | paid Time Warner for the service, the basic service, |
| 10:09:36 | 9 | before you received a copy of the agreement, were you |
| 10:09:39 | 10 | aware of any of the other terms or provisions of the |
| 10:09:43 | 11 | agreement between your HOA and Time Warner? |
| 10:09:45 | 12 |     A   No. |
| 10:09:46 | 13 |     Q   And just to close this line of questioning out, |
| 10:09:51 | 14 | other than the newsletter that you got sometime shortly |
| 10:09:55 | 15 | before you had the conversation with Time Warner Cable, |
| 10:09:59 | 16 | did you ever receive any information in the form of a |
| 10:10:01 | 17 | newsletter, bulletin, conversations with members of the |
| 10:10:06 | 18 | HOA, or otherwise regarding or relating to the terms of |
| 10:10:09 | 19 | the agreement between the HOA and Time Warner Cable? |
| 10:10:12 | 20 |     A   Not that I recall. |
| 10:10:14 | 21 |     Q   Did you ever serve -- serve on the board of the |
| 10:10:17 | 22 | HOA? |
| 10:10:18 | 23 |     A   I think I went to a meeting.  I think they -- |
| 10:10:30 | 24 | they wanted me to serve or perhaps I attended one |
| 10:10:33 | 25 | meeting of one committee, and I don't remember which |

33



11:26:16  1        So after some conversation and whatever she

11:26:19  2   reviewed, she says, "Okay." So they gave me -- she

11:26:25  3   agreed she's going to give me one free month of

11:26:29  4   telephone and lower the price that -- starting that

11:26:33  5   minute. And that was basically the conversation.

11:26:39  6        MR. SHOHET: Would you mind reading that back

11:26:41  7   for me.

11:28:02  8        (Record read)

11:28:03  9        THE WITNESS: May I add something?

11:28:04 10   BY MR. SHOHET:

11:28:04 11     Q    Sure.

11:28:04 12     A    I was also paying my basic cable through the

11:28:07 13   association, which was another indicator in my mind that

11:28:10 14   I had to go through the association to get Time Warner

11:28:12 15   services. And the customer service rep didn't argue

11:28:14 16   with me, didn't argue that point at all with me, so I

11:28:19 17   just assumed I was correct.

11:28:22 18     Q    You were aware at that time that the basic

11:28:26 19   cable service that you were receiving, which was the

11:28:28 20   basic and the expanded tier channels, were being paid

11:28:31 21   for by your HOA?

11:28:33 22     A    I don't know what the expanded tier is, but I

11:28:36 23   just know that the HOA paid the -- I mean my -- part of

11:28:38 24   my HOA fees went to pay for the basic cable.

11:28:41 25     Q    Okay. I have a couple questions about some of

86

| | | |
|---|---|---|
| 11:30:01 | 1 | not discontinue my basic cable through the association |
| 11:30:04 | 2 | and contract separately with Time Warner for service, |
| 11:30:09 | 3 | but as far as which individual services I did get from |
| 11:30:12 | 4 | Time Warner, that's just between me and them. |
| 11:30:15 | 5 | Q    That's what confused me. |
| 11:30:17 | 6 | A    The wiring and, you know, the basic cable and |
| 11:30:19 | 7 | whatever. |
| 11:30:19 | 8 | Q    Right.  You understood at that point that the |
| 11:30:22 | 9 | basic cable was provided by your HOA under an agreement |
| 11:30:25 | 10 | with Time Warner and your HOA and that you were then |
| 11:30:28 | 11 | negotiating or dealing directly with Time Warner Cable |
| 11:30:34 | 12 | for your additional services. |
| 11:30:35 | 13 | A    I ordered the services, yeah. |
| 11:30:37 | 14 | Q    All right.  And you believed -- well, did you |
| 11:30:44 | 15 | think about whether you had the right to just simply |
| 11:30:47 | 16 | contract independently for the basic service if you |
| 11:30:50 | 17 | wanted to and just forget about your deal with the HOA, |
| 11:30:53 | 18 | or did you not think about that? |
| 11:30:54 | 19 | A    Please rephrase that, or just ask me that one |
| 11:30:59 | 20 | more time. |
| 11:30:59 | 21 | Q    Did you consider whether you would be able to |
| 11:31:04 | 22 | purchase, if you chose to, the basic package plus any |
| 11:31:08 | 23 | additional services you wanted as a -- as a non-HOA |
| 11:31:14 | 24 | resident in the same way that I or anybody else could |
| 11:31:17 | 25 | purchase that package from Time Warner? |

88

| | | |
|---|---|---|
| 11:38:27 | 1 | packages and they break it down.  So one -- one section, |
| 11:38:32 | 2 | you know, the headers would be the Digipac 2000, 3000, |
| 11:38:36 | 3 | 4000, whatever it is.  And then they have a section on |
| 11:38:38 | 4 | cable services, so each -- each one has maybe more |
| 11:38:42 | 5 | premium channels or whatever.  Mine's a basic.  And |
| 11:38:46 | 6 | then -- then there's adding Road Runner to that, how |
| 11:38:49 | 7 | much more it would be to add Road Runner and how much |
| 11:38:51 | 8 | more it would be to add a digital phone line.  I -- |
| 11:38:54 | 9 | that's my -- that's my state of mind.  And I compared |
| 11:38:55 | 10 | the two documents. |
| 11:38:56 | 11 | Q    And the document that you received from your |
| 11:38:58 | 12 | HOA had all of the services that you were looking at |
| 11:39:02 | 13 | under the Digipac 4000 for a single price, did it not? |
| 11:39:04 | 14 | MR. RAMOS:  Same objection.  Best evidence. |
| 11:39:06 | 15 | THE WITNESS:  I think so.  I don't know.  I |
| 11:39:08 | 16 | have to look at it. |
| 11:39:09 | 17 | BY MR. SHOHET: |
| 11:39:09 | 18 | Q    And as of that point in time, Mr. Alpert, you |
| 11:39:12 | 19 | knew what a bundled package of services was, didn't you? |
| 11:39:16 | 20 | A    Well, they advertised it or use a strong |
| 11:39:18 | 21 | marketing campaign, or they did at the time, about |
| 11:39:21 | 22 | bundling.  So, I guess, you know, I understood that if |
| 11:39:23 | 23 | you buy more of their services collectively, you get a |
| 11:39:26 | 24 | better rate. |
| 11:39:26 | 25 | Q    That was my point.  That was not a mystery to |

96

| | |
|---|---|
| 11:39:29 | 1 |
| 11:39:32 | 2 |
| 11:39:35 | 3 |
| 11:39:36 | 4 |
| 11:39:37 | 5 |
| 11:39:39 | 6 |
| 11:39:43 | 7 |
| 11:39:44 | 8 |
| 11:39:48 | 9 |
| 11:39:51 | 10 |
| 11:39:53 | 11 |
| 11:39:56 | 12 |
| 11:40:00 | 13 |
| 11:40:02 | 14 |
| 11:40:04 | 15 |
| 11:40:06 | 16 |
| 11:40:06 | 17 |
| 11:40:08 | 18 |
| 11:40:08 | 19 |
| 11:40:10 | 20 |
| 11:40:12 | 21 |
| 11:40:13 | 22 |
| 11:40:16 | 23 |
| 11:40:18 | 24 |
| 11:40:22 | 25 |

you that there were bundles that you could purchase
which would price the components of that bundle better
than if you bought them individually.  Correct?

A    Correct.

Q    In fact, the subcomponents or some portions of
your existing billing had that feature to it.  Correct?

A    As far as I recall.

Q    You had several of your movie channels -- I
mean, there was a package, and we'll get into this in a
minute, but there were -- there was a package of movie
channels where you bought four that were individually
priced at maybe 6.95 or whatever they were, and you got
them as a package for $11.  Correct?

MR. RAMOS:  Objection.  Best evidence.  I mean,
if you've got the document, let's see it.

BY MR. SHOHET:

Q    Yes?  Isn't that your recollection?  That you
had --

A    You're asking -- you're -- you're -- you're
giving me specific numbers, and I can't recall what the
specific numbers are.

Q    I'm not asking about the specific numbers.  I'm
asking the concept, that if you buy and commit to
purchase a bundle of services, you get a better price on
the bundle than you get if you buy each of the

97

LEON SETH ALPERT                          11/06/07

11:40:25  1    components individually.  Right?

11:40:27  2         MR. RAMOS:  Well, I'll object.  It's vague and

11:40:28  3    ambiguous.

11:40:30  4    BY MR. SHOHET:

11:40:30  5         Q    You understand, don't you?

11:40:31  6         A    I understand that I purchased what I purchased

11:40:34  7    to get a better rate collectively than individually.

11:40:37  8         Q    But I'm asking you about the concept.  You

11:40:40  9    understand about the concept with Time Warner Cable and

11:40:43 10    with other companies, car rental companies -- Time

11:40:45 11    Warner isn't the first company to invent the concept

11:40:48 12    that if you commit to a package of services, you get a

11:40:52 13    lower rate than you get if you buy them individually.

11:40:54 14    You're familiar with that.  As an economist, you

11:40:56 15    understand that, don't you?

11:40:58 16         MR. RAMOS:  I'll object.  He's not an

11:41:00 17    economist.

11:41:00 18         THE WITNESS:  Yeah, I'm not an economist.  I

11:41:03 19    have a degree in economy.

11:41:03 20    BY MR. SHOHET:

11:41:04 21         Q    I thought you were.

11:41:06 22         It's not a surprise to you that that's a

11:41:09 23    practice that Time Warner engages in and other companies

11:41:10 24    engage in.  That's my question.

11:41:10 25         MR. RAMOS:  I'll object to the form of the

98

LEON SETH ALBERT                    11/06/07

| | |
|---|---|
| 11:41:13 | 1 |
| 11:41:16 | 2 |
| 11:41:19 | 3 |
| 11:41:22 | 4 |
| 11:41:22 | 5 |
| 11:41:22 | 6 |
| 11:41:24 | 7 |
| 11:41:27 | 8 |
| 11:41:30 | 9 |
| 11:41:33 | 10 |
| 11:41:37 | 11 |
| 11:41:39 | 12 |
| 11:41:42 | 13 |
| 11:41:47 | 14 |
| 11:41:49 | 15 |
| 11:41:52 | 16 |
| 11:41:53 | 17 |
| 11:41:56 | 18 |
| 11:41:57 | 19 |
| 11:42:00 | 20 |
| 11:42:00 | 21 |
| 11:42:01 | 22 |
| 11:42:04 | 23 |
| 11:42:06 | 24 |
| 11:42:07 | 25 |

1  question that we don't know Time Warner engages in that.

2         MR. SHOHET:  Yeah, we do.  We do because it's

3  on his bill before he changed to the Digipac 4000.

4         MR. RAMOS:  Vague and ambiguous.

5  BY MR. SHOHET:

6     Q    I'm not -- I'm not trying to argue with you.

7  I'm trying to get your answer to the question.

8         Is the concept that you can buy a bundle or

9  package of services and commit to that bundle and get a

10  cheaper price than you would get if you ordered each of

11  the components separately, is that a concept with which

12  you were familiar in September 2006?

13     A    Yes, I believe so.  I -- I ordered a certain

14  package to get a better rate.  So I guess if that's what

15  you're saying, yes, that's what I did.

16         MR. SHOHET:  Okay.  Let's take a short break.

17  Do you want to break for the noon hour now, or do you

18  want to continue?  What's your preference?

19         MR. RAMOS:  Depends on how long you have.

20         MR. SHOHET:  You know, I don't know.  I've got

21  some documents to go through.  I would say we're not

22  going to get done, in any event, much before 3:00 or

23  4:00 o'clock this afternoon.

24         THE WITNESS:  I have a problem.  I have to pick

25  up my daughter from school.  I have to leave no later

99

| | |
|---|---|
| 12:34:02 1 | MR. RAMOS:  I'll object to the extent you're |
| 12:34:04 2 | asking him for a legal opinion or legal conclusion. |
| 12:34:06 3 | THE WITNESS:  Well -- |
| 12:34:07 4 | MR. SHOHET:  I'm just asking for his own |
| 12:34:11 5 | position both individually and as a representative of a |
| 12:34:14 6 | purported class, what his position is.  I think I'm |
| 12:34:17 7 | entitled to do that.  You can object.  Your objection is |
| 12:34:17 8 | noted. |
| 12:34:19 9 | MR. RAMOS:  Right.  My objection is you're |
| 12:34:21 10 | asking for a legal position, which his legal position |
| 12:34:26 11 | has been set forth in the complaint. |
| 12:34:28 12 | THE WITNESS:  My position and my understanding |
| 12:34:32 13 | is that Time Warner agreed to provide services to the |
| 12:34:37 14 | HOA members of Seapointe townhomes, and I'm a resident, |
| 12:34:42 15 | for a certain rate.  And when I got the notice from the |
| 12:34:48 16 | homeowners association, it wasn't that rate. |
| 12:34:49 17 | And when I called and spoke with the customer |
| 12:34:55 18 | service, they lowered the price, so that confirmed the |
| 12:34:57 19 | fact -- and the price is still lower -- and that |
| 12:35:00 20 | confirmed the fact that I think I was correct in |
| 12:35:03 21 | assuming that they owed me a lower rate. |
| 12:35:05 22 | And I don't really -- I didn't negotiate this |
| 12:35:10 23 | agreement, and I really didn't study it, and I don't see |
| 12:35:13 24 | how it really completely affected me, because when I |
| 12:35:19 25 | called Time Warner, I asked them I think I'm due a lower |

123

**LEON SETH ALPERT**                                                    11/06/07

| | |
|---|---|
| 12:35:22 | 1 |
| 12:35:24 | 2 |
| 12:35:27 | 3 |
| 12:35:29 | 4 |
| 12:35:32 | 5 |
| 12:35:34 | 6 |
| 12:35:34 | 7 |
| 12:35:39 | 8 |
| 12:35:40 | 9 |
| 12:35:41 | 10 |
| 12:35:42 | 11 |
| 12:35:45 | 12 |
| 12:35:47 | 13 |
| 12:35:49 | 14 |
| 12:35:54 | 15 |
| 12:35:57 | 16 |
| 12:35:57 | 17 |
| 12:35:59 | 18 |
| 12:36:00 | 19 |
| 12:36:00 | 20 |
| 12:36:03 | 21 |
| 12:36:08 | 22 |
| 12:36:10 | 23 |
| 12:36:12 | 24 |
| 12:36:13 | 25 |

rate.  And if they would have said, No, you're not

because let's look at page 1 of this agreement, it says

blah, blah, blah, then fine.  But they didn't say that,

so I just assumed that I was correct because they

lowered the price when I said I was being overcharged.

BY MR. SHOHET:

    Q    With whom did they agree to provide services at

a certain rate?

        MR. RAMOS:  Objection.  Calls for speculation.

        MR. SHOHET:  Well, he just said that they

agreed to provide services at a certain rate, and I

think I'm quoting from his answer and I'm asking --

        THE WITNESS:  Well, I don't know exactly

because I -- I'm not -- I wasn't -- I'm assuming to the

homeowners of the HOA, through the HOA.

BY MR. SHOHET:

    Q    All right.  So, well, this is the agreement

here --

    A    Okay.

    Q    -- with the HOA.  Do you see anything in

Subsection 1.1B where they say they may offer and

provide additional services, do you see anything that

says they will do so at a particular rate?

        MR. RAMOS:  Objection.  Best evidence, document

speaks for itself, and you're asking him to make a legal

124

| | | |
|---|---|---|
| 12:37:13 | 1 | layperson. |
| 12:37:13 | 2 | THE WITNESS:  Operator may offer to provide |
| 12:37:17 | 3 | additional services to residents on a nonexclusive |
| 12:37:19 | 4 | basis.  Okay.  So additional services, nonexclusive. |
| 12:37:21 | 5 | Additional services means any services other than the |
| 12:37:24 | 6 | bulk multichannel video.  Services that can be provided |
| 12:37:27 | 7 | to the residents over the system including but not |
| 12:37:30 | 8 | limited to premium channels, Pay-Per-View, blah, blah, |
| 12:37:34 | 9 | blah. |
| 12:37:34 | 10 | So my understanding of this would be any |
| 12:37:41 | 11 | services other than the bulk, so I'm assuming that the |
| 12:37:44 | 12 | bulk -- because when I called Time Warner and talked to |
| 12:37:47 | 13 | their customer service representative, I was only |
| 12:37:50 | 14 | speaking of the services that matched over to the |
| 12:37:52 | 15 | homeowners association pricing that I got from the -- in |
| 12:37:56 | 16 | the newsletter.  I never discussed any of the extra |
| 12:38:00 | 17 | services that I got such as the extra cable box or the |
| 12:38:06 | 18 | wireless Internet. |
| 12:38:06 | 19 | So my understanding of this would be that, you |
| 12:38:08 | 20 | know, whatever they agreed to they agreed to, but it's |
| 12:38:11 | 21 | nonexclusive.  It means if I want to order an extra |
| 12:38:14 | 22 | cable box or something else that's maybe outside the |
| 12:38:16 | 23 | scope of this agreement, then we can negotiate and Time |
| 12:38:21 | 24 | Warner will charge me whatever they charge me; I'll |
| 12:38:24 | 25 | agree to pay or not pay.  That's how I understand it. |

126

| | | |
|---|---|---|
| 12:48:02 | 1 | Q    Mr. Alpert, I'm not quarreling that you are the |
| 12:48:06 | 2 | ultimate economic source of that payment.   I simply want |
| 12:48:10 | 3 | you to agree with me on a fact that I think is not in |
| 12:48:13 | 4 | dispute.   And that is the package of services that are |
| 12:48:16 | 5 | in the bulk multichannel video service group are |
| 12:48:18 | 6 | services that are provided to you through the HOA |
| 12:48:22 | 7 | payment that you make, and the additional services you |
| 12:48:27 | 8 | have to write a check for.   That's all I'm trying to get |
| 12:48:30 | 9 | to.   You agree with me on that, don't you? |
| 12:48:32 | 10 | A    I -- |
| 12:48:32 | 11 | MR. RAMOS:   Sorry.   Let me just object.   The |
| 12:48:34 | 12 | document speaks for itself, and it's vague and |
| 12:48:36 | 13 | ambiguous. |
| 12:48:37 | 14 | THE WITNESS:   If the scope of your question is |
| 12:48:39 | 15 | that outside of that -- excuse me -- that 28.77 I wrote |
| 12:48:44 | 16 | a check for to Time Warner every month, there is no |
| 12:48:48 | 17 | dispute because I, in fact, wrote a check for it every |
| 12:48:51 | 18 | month. |
| 12:48:51 | 19 | BY MR. SHOHET: |
| 12:48:51 | 20 | Q    And those are the additional services above and |
| 12:48:53 | 21 | beyond the services that your HOA provides to you. |
| 12:48:57 | 22 | MR. RAMOS:   Let me just object. |
| 12:48:58 | 23 | BY MR. SHOHET: |
| 12:48:58 | 24 | Q    Correct? |
| 12:48:59 | 25 | MR. RAMOS:   That calls for speculation because |

136

LEON SETH ALPERT                                11/06/07

| | |
|---|---|
| 12:51:28 | 1 |
| 12:51:29 | 2 |
| 12:51:33 | 3 |
| 12:51:36 | 4 |
| 12:51:39 | 5 |
| 12:51:41 | 6 |
| 12:51:43 | 7 |
| 12:51:44 | 8 |
| 12:51:49 | 9 |
| 12:51:55 | 10 |
| 12:51:58 | 11 |
| 12:52:04 | 12 |
| 12:52:05 | 13 |
| 12:52:07 | 14 |
| 12:52:09 | 15 |
| 12:52:09 | 16 |
| 12:52:12 | 17 |
| 12:52:15 | 18 |
| 12:52:19 | 19 |
| 12:52:23 | 20 |
| 12:52:25 | 21 |
| 12:52:27 | 22 |
| 12:52:27 | 23 |
| 12:52:32 | 24 |
| | 25 |

being overcharged for that also.

Q   So you think that for the $28.77 price that the HOA was paying on your behalf to Time Warner that you might have been entitled to digital phone service?  Is that your sworn testimony?

A   I don't know what I was entitled to exactly.

Q   I'm asking your belief.

A   You know, my belief was, you know, I paid the bill separately from the HOA -- okay.  My belief.  Had I not paid any additional money to Time Warner Cable, then I would have those 76 channels coming through the cable with no box and no anything.

Q   And you didn't think that the --

A   And I understood -- I understand that completely.

Q   And you didn't think that for that price that the HOA was paying on your behalf, which I agree came out of your pocket originally or ultimately, that you got premium movie channels, Road Runner service, or digital phone service, do you?

MR. RAMOS:  That calls for speculation as to what would be included.

THE WITNESS:  Well, you know, I ordered the stuff and they sent me a bill and I paid for it.

140

LEON SETH ALPERT                                    11/06/07

12:55:53  1    your understanding that there was some obligation on the

12:55:58  2    part of Time Warner to charge you lower price than it

12:56:01  3    was, other than the fact that after you made a call to

12:56:04  4    them in September, they lowered the price?

12:56:07  5        A    The thing in the newsletter, that was my source

12:56:11  6    of the understanding, not this, because I never saw this

12:56:15  7    before.

12:56:15  8        Q    Okay.  Fair enough.

12:56:24  9            Let me show you exhibit -- what I will mark as

12:56:29 10    Exhibit 3.

12:56:42 11            (Exhibit 3 marked)

12:56:42 12            THE WITNESS:  Thank you.

12:56:42 13    BY MR. SHOHET:

12:56:42 14        Q    You're welcome.

12:56:44 15            Now, you recognize this, Mr. Alpert, as a copy

12:56:53 16    of the Time Warner invoice dated as of February 12th,

12:56:59 17    2006.

12:56:59 18        A    That's what it says.

12:57:02 19        Q    And you recognize it as such, don't you?

12:57:04 20        A    Yeah, I do.

12:57:05 21        Q    All right.  Thank you.

12:57:07 22            Now, let's turn to the second page.  By the

12:57:15 23    way, you paid this bill in the ordinary course at the

12:57:18 24    time you received it, didn't you?

12:57:19 25        A    Yes, I did.

144

LEON SETH ALPERT                                    11/06/07

| | |
|---|---|
| 13:00:53 | 1 |  THE WITNESS:  I didn't really think about it. |
| 13:00:54 | 2 | BY MR. SHOHET: |
| 13:00:54 | 3 |  Q    And just to clarify the record, you received |
| 13:00:58 | 4 | the services that are identified in this heading |
| 13:01:02 | 5 | "Digital Phone Package" as of the billing date of |
| 13:01:05 | 6 | February 12th, 2006.  Correct? |
| 13:01:06 | 7 |  A    Correct. |
| 13:01:07 | 8 |  Q    And then for your iControl premium service, |
| 13:01:11 | 9 | that's your digital or your -- your pay services on |
| 13:01:15 | 10 | demand subscription of $6.95, do you have any reason to |
| 13:01:19 | 11 | believe that there was a lower charge available to you |
| 13:01:23 | 12 | for that premium service ordered on -- on a standalone |
| 13:01:29 | 13 | or nonbundled basis? |
| 13:01:30 | 14 |  MR. RAMOS:  Same objection.  It calls for |
| 13:01:32 | 15 | speculation. |
| 13:01:32 | 16 | BY MR. SHOHET: |
| 13:01:32 | 17 |  Q    In other words, the question really is, Do you |
| 13:01:34 | 18 | have any understanding that that is not the proper rate |
| 13:01:37 | 19 | that Time Warner charges for that service as part of a |
| 13:01:41 | 20 | nonbundled package? |
| 13:01:42 | 21 |  MR. RAMOS:  Calls for speculation. |
| 13:01:43 | 22 |  THE WITNESS:  No.  I -- I mean, all I |
| 13:01:45 | 23 | understood was that I asked for, you know, a bundle of |
| 13:01:48 | 24 | those services, and then -- and they quoted me a rate or |
| 13:01:55 | 25 | I saw it on the ad or a combination, and that's the bill |

148

LEON SETH AL____    11/06/07

| 13:01:58 | 1 | and that's what I paid. |
| 13:01:59 | 2 | BY MR. SHOHET: |
| 13:01:59 | 3 | Q    You say you asked for a bundle of services. |
| 13:02:05 | 4 | And I understand -- well, tell me when you asked for the |
| 13:02:09 | 5 | bundle of services? |
| 13:02:10 | 6 | A    I think when I first upgraded to the digital |
| 13:02:17 | 7 | phone and the wireless -- and the Road Runner, I -- I |
| 13:02:22 | 8 | wanted -- you know, wanted the extra movie channels and |
| 13:02:26 | 9 | the other stuff, so I believe that's when the whole |
| 13:02:28 | 10 | thing came up that way. |
| 13:02:29 | 11 | Q    I never remember you -- when you answered my |
| 13:02:31 | 12 | questions about that, I don't remember your stating that |
| 13:02:34 | 13 | you specifically asked the customer service |
| 13:02:36 | 14 | representative about a bundle or bundled rate.  Is it |
| 13:02:39 | 15 | your testimony that you did have that conversation with |
| 13:02:42 | 16 | the customer service rep? |
| 13:02:44 | 17 | A    I may have.  I may not have used the word |
| 13:02:47 | 18 | "bundle," or I may have.  I just saw -- responded to the |
| 13:02:51 | 19 | ad in wishing to upgrade my services. |
| 13:02:52 | 20 | Q    This is now going back to the 2004/2005 -- |
| 13:02:56 | 21 | A    Yeah.  No, I understand. |
| 13:02:58 | 22 | Q    I just wanted to be sure we were talking |
| 13:03:00 | 23 | about -- |
| 13:03:00 | 24 | A    No.  I understand exactly what you're talking |
| 13:03:02 | 25 | about. |

149

LEON SETH ALPERT                          11/06/07

| | | |
|---|---|---|
| 13:04:18 | 1 | A    Yeah.  Any four premium channels, yeah. |
| 13:04:20 | 2 | Q    Okay.  Now, you received all of those services |
| 13:04:22 | 3 | that are shown on this bill at the time of this billing. |
| 13:04:26 | 4 | Correct? |
| 13:04:27 | 5 | A    As far as I recall, yes. |
| 13:04:29 | 6 | Q    And then there was the Wireless Road Runner for |
| 13:04:42 | 7 | $54.90.  You see that? |
| 13:04:42 | 8 | A    Yes, I do. |
| 13:04:43 | 9 | Q    And you received that at the time as well. |
| 13:04:44 | 10 | Correct? |
| 13:04:44 | 11 | A    When it worked, yes. |
| 13:04:46 | 12 | Q    And you don't -- and as you sit here today, do |
| 13:04:48 | 13 | you have any understanding or belief that that was |
| 13:04:52 | 14 | available to you at some lower price than is charged |
| 13:04:55 | 15 | here for that service? |
| 13:04:56 | 16 | MR. RAMOS:  Calls for speculation. |
| 13:04:57 | 17 | THE WITNESS:  I didn't think about it.  I mean, |
| 13:05:00 | 18 | I just saw the ad, talked to the customer service, and |
| 13:05:04 | 19 | decided that's what I wanted and paid for it. |
| 13:05:05 | 20 | BY MR. SHOHET: |
| 13:05:05 | 21 | Q    All right.  So you agree with me, then, that |
| 13:05:11 | 22 | you received all of the services -- when they were good, |
| 13:05:14 | 23 | when you got the signals, you did receive all the |
| 13:05:17 | 24 | services that are shown on your February 12th, 2006, |
| 13:05:19 | 25 | bill.  Correct? |

151

LEON SETH ALPERT                    11/06/07

13:05:20  1        A    Yes.

13:05:21  2        Q    And you received them and paid the price that's

13:05:24  3    shown on this bill.  Correct?

13:05:25  4        A    Correct.

13:05:26  5        Q    Now, do you recall seeing rate cards or rate

13:05:29  6    sheets being sent to you periodically from Time Warner

13:05:33  7    Cable regarding what the current pricing or rates were

13:05:37  8    for Time Warner services?

13:05:38  9        A    Hmm.  You know, they -- they continually

13:05:47 10    advertise stuff, so -- and they -- there's always

13:05:51 11    inserts of one sort or another in the billing and I see

13:05:55 12    ads.  So, you know, on a broad, broad sense, yeah, I was

13:06:03 13    aware that they advertised rates.

13:06:05 14        Q    So you did from time to time receive some

13:06:09 15    information from some source about rates and rate

13:06:12 16    changes from Time Warner?

13:06:13 17        A    I imagine so.  I can't point to anything

13:06:17 18    specifically but just in the normal course of how they

13:06:19 19    do business.

13:06:19 20        Q    And at any time between the time you started

13:06:25 21    contracting with Time Warner Cable for additional

13:06:29 22    services as a homeowner resident -- homeowners

13:06:34 23    association resident, do you recall that the rates

13:06:36 24    changed, again, before the September rate change?

13:06:39 25        A    Not specifically.

152

LEON SETH ALPERT                                    11/06/07

13:08:43  1        Q     Exactly.  Exhibit 3 and Exhibit --

13:08:43  2        A     No, not that I recall.

13:08:43  3        Q     Or a document similar to Exhibit 4.  Did you

13:08:48  4    ever do a comparison of the rates that you were being

13:08:51  5    charged to a rate sheet or the rate card that you were

13:08:52  6    given?

13:08:52  7        A     Not that I recall.

13:08:54  8        Q     Turn to the second page.

13:08:55  9        A     Okay.

13:08:56  10       Q     You see it's 39.95 for digital phone?

13:09:01  11       A     Yes.

13:09:01  12       Q     With digital cable and Road Runner.  Do you see

13:09:04  13   that?

13:09:04  14       A     Digital phone with digital cable and Road

13:09:07  15   Runner, 39.95 per month.

13:09:09  16       Q     You see that?

13:09:10  17       A     Yeah.

13:09:10  18       Q     And --

13:09:11  19       A     But there's two lines.  One says -- or Road

13:09:15  20   Runner.  Okay.

13:09:16  21       Q     In other words, if you buy the bundle of

13:09:18  22   digital phone along with Road Runner, you get the

13:09:20  23   digital phone for 39.95.  Do you see that?

13:09:24  24       A     Yes.

13:09:25  25       Q     And does that refresh your recollection that

155



**LEON SETH ALPERT**                                    11/06/07

| | | |
|---|---|---|
| 13:09:27 | 1 | you ever made a comparison with the rate for your |
| 13:09:29 | 2 | digital phone service to any published or rate card rate |
| 13:09:34 | 3 | to determine whether you were properly being charged for |
| 13:09:36 | 4 | that? |
| 13:09:36 | 5 | MR. RAMOS:  Objection.  Asked and answered. |
| 13:09:37 | 6 | THE WITNESS:  I -- you know, when I first |
| 13:09:41 | 7 | ordered these services in a bundle, I believe I probably |
| 13:09:46 | 8 | checked my bill against what I was told, and it was |
| 13:09:49 | 9 | probably correct, and then I never -- |
| 13:09:51 | 10 | BY MR. SHOHET: |
| 13:09:51 | 11 | Q    All right. |
| 13:09:51 | 12 | A    I look at my bill every month, but I never -- |
| 13:09:54 | 13 | you know, I didn't notice any big changes, so -- |
| 13:09:58 | 14 | Q    And then at the bottom of the first page where |
| 13:10:03 | 15 | it says high-speed Internet service -- |
| 13:10:05 | 16 | A    Yeah. |
| 13:10:05 | 17 | Q    -- Road Runner 44.95, and then the wireless is |
| 13:10:09 | 18 | 9.95, which totals 54.90, do you see that? |
| 13:10:13 | 19 | A    Yes. |
| 13:10:14 | 20 | Q    And did you ever make that comparison against |
| 13:10:16 | 21 | what you were being charged for Wireless Road Runner to |
| 13:10:19 | 22 | see if you were being charged the correct rate card |
| 13:10:23 | 23 | rate? |
| 13:10:23 | 24 | A    I most likely compared it on the first bill |
| 13:10:27 | 25 | after I ordered the services to make sure I was being |

156

| | |
|---|---|
| 13:10:29 | 1 | charged correctly, but I don't recall anytime since |
| 13:10:31 | 2 | then. |
| 13:10:31 | 3 |     Q    Okay. |
| 13:10:32 | 4 |     A    But I don't recall ever seeing this rate card. |
| 13:10:34 | 5 |     Q    What did you compare it to then? |
| 13:10:37 | 6 |     A    Either -- maybe I wrote it down, what I was |
| 13:10:40 | 7 | told by the customer service rep, or maybe I had an -- I |
| 13:10:43 | 8 | had an ad or something that -- |
| 13:10:44 | 9 |     Q    Okay. |
| 13:10:45 | 10 |     A    -- an insert or something else.  But I don't |
| 13:10:47 | 11 | recall specifically a detail rate card. |
| 13:10:49 | 12 |     Q    All right.  Whatever comparison you were making |
| 13:10:51 | 13 | to, whether it was the ad or the rate card or some other |
| 13:10:54 | 14 | document, you did that kind of a comparison when you |
| 13:10:56 | 15 | first received the bill, and you were satisfied that the |
| 13:11:00 | 16 | rates were as they were advertised or represented to be? |
| 13:11:03 | 17 |     A    Yes, because I paid the bill without dispute |
| 13:11:07 | 18 | every month. |
| 13:11:08 | 19 |     Q    Okay.  And then just to complete the line of |
| 13:11:19 | 20 | questioning on this, let me show you Exhibit 4 -- |
| 13:11:32 | 21 |         THE REPORTER:  5. |
| 13:11:32 | 22 |         MR. SHOHET:  5.  Excuse me.  Exhibit 5.  Thank |
| 13:11:32 | 23 | you. |
| 13:11:32 | 24 |         (Exhibit 5 marked) |
| 13:11:32 | 25 |         THE WITNESS:  All right.  Thank you. |

157

| | |
|---|---|
| 13:11:39 | 1 |

BY MR. SHOHET:

13:11:44  2     Q    This is, for the record, a bill to you for your

13:11:59  3  Caminito del Canto residence, dated December 12th, 2006.

13:12:03  4  Do you recognize it as such?

13:12:04  5     A    Yes.

13:12:04  6     Q    And on the second page it identifies the HOA

13:12:10  7  Digipac 4000 Trio.  Correct?

13:12:12  8     A    Yes.

13:12:12  9     Q    And this is a bill that is similar to, in terms

13:12:17  10  of the identification of the Digipac 4000 Trio combo,

13:12:23  11  that is a bill -- this bill represents the billing after

13:12:26  12  the change as a result of your conversation with Time

13:12:30  13  Warner in or about September.  Correct?

13:12:32  14     A    Yeah.

13:12:33  15     Q    Now, it -- and in your -- in your complaint in

13:12:43  16  paragraph 12 of your complaint, you state that this

13:12:46  17  changed the billing to reflect what it should have been

13:12:49  18  all along.  Right?

13:12:50  19     A    Believe so, yes.

13:12:51  20     Q    So you don't dispute the correctness of this

13:12:54  21  bill from this point forward.

13:12:57  22     A    The new -- you mean Exhibit --

13:13:00  23     Q    The bill -- the billing that's reflected in

13:13:03  24  Exhibit 12 -- I'm sorry -- in Exhibit 5 --

13:13:05  25     A    Exhibit 5.

158

LEON SETH ALPERT                                    11/06/07

13:13:06  1        Q    -- which is dated December 12th, which you

13:13:08  2    identified as similar to the billings that you began to

13:13:12  3    receive after the phone call in September with Time

13:13:14  4    Warner Cable, this now correctly, in your view, charges

13:13:18  5    you for these services.  Is that right?

13:13:19  6        A    I believe so, yes.

13:13:20  7        Q    All right.  And now I want to understand one

13:13:26  8    thing that I've been confused about, I have to tell you,

13:13:29  9    since I first began this case --

13:13:30 10        A    Okay.

13:13:31 11        Q    -- in reading the complaint.  Is it your

13:13:36 12    contention that the reduction in the bill is somehow

13:13:39 13    because before the change you were being charged for

13:13:45 14    services to which you were already entitled because your

13:13:48 15    HOA contracted for those services and paid $28.77 on

13:13:54 16    your behalf?  Is that your testimony?

13:13:56 17        A    My understanding is that I understood that I

13:14:00 18    was being overcharged because there's -- had been some

13:14:05 19    sort of an agreement on pricing reflected by the notice

13:14:09 20    in the homeowners association newsletter and I was being

13:14:13 21    overcharged for that, purely just overcharged.

13:14:16 22        Q    Okay.  And the agreement related some special

13:14:19 23    pricing for the additional services above and beyond

13:14:23 24    what the HOA was paying on your behalf for as basic

13:14:28 25    services.  Is that your understanding?

                                                              159

| | | |
|---|---|---|
| 13:28:27 | 1 | BY MR. SHOHET: |
| 13:28:27 | 2 | Q    If you know. |
| 13:28:28 | 3 | A    Probably not. |
| 13:28:30 | 4 | Q    Do you think there's anything unreasonable in |
| 13:28:33 | 5 | asking the customer to identify promptly to the service |
| 13:28:37 | 6 | provider discrepancies in their bill? |
| 13:28:39 | 7 | MR. RAMOS:  I'll -- I'll just object to the |
| 13:28:41 | 8 | extent that has been already articulated in the |
| 13:28:46 | 9 | complaint. |
| 13:28:46 | 10 | BY MR. SHOHET: |
| 13:28:46 | 11 | Q    Well, I'm asking him if you think that's an |
| 13:28:50 | 12 | unreasonable thing to do. |
| 13:28:51 | 13 | A    Soon as I found out I was being overcharged, I |
| 13:28:54 | 14 | did complain.  And I don't think it's unreasonable to |
| 13:28:57 | 15 | make the complaint within 30 days.  But if she's, you |
| 13:29:01 | 16 | know -- that seems to be reasonable, and I did complain |
| 13:29:05 | 17 | within 30 days. |
| 13:29:06 | 18 | Q    Okay.  So your point is when you -- when you |
| 13:29:08 | 19 | first had knowledge or information about your problem, |
| 13:29:13 | 20 | you complained within a prompt period of time, and you |
| 13:29:15 | 21 | don't think there's anything unreasonable about |
| 13:29:18 | 22 | requiring customers to behave as you did. |
| 13:29:22 | 23 | A    Asking to -- to voice your complaint in the |
| 13:29:27 | 24 | same time frame as when you have the complaint |
| 13:29:30 | 25 | generated, yeah, I suppose that's reasonable. |

165

1                        **PENALTY OF PERJURY**

2

3

4

5

6

7

8

9

10              I, LEON SETH ALPERT, do hereby declare under

11    penalty of perjury that I have read the foregoing

12    transcript; that I have made any corrections as appear

13    noted, in ink, initialed by me, or attached hereto; that

14    my testimony as contained herein, as corrected,

15    is true and correct.

16

17              EXECUTED this _____ day of _____,

18    2007, at _____, _____.
                      (City)                (State)

19

20

21                        _____

22                        LEON SETH ALPERT
                          Volume 1

23

24

25

172

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11          Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [  ] was [  ] was not requested.

15          I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated: _____NOV 1 2 2007_____

22

23                        R. Denise Marlow
                          _____
                          R. DENISE MARLOW

24                        CSR No. 11631

25

**Recording Requested By**

And Return To:
> Time Warner Cable
> 8949 Ware Court
> San Diego, CA 92121-2275

Transfer Tax: None

TIME WARNER CABLE

---

## TIME WARNER CABLE
### SYSTEM INSTALLATION AND SERVICE AGREEMENT
### CITY OF SAN DIEGO/SAN DIEGO SYSTEM

EFFECTIVE DATE: _10/1/05_

### PARTIES:

Operator:

**Time Warner Entertainment-Advance Newhouse
Partnership, a New York general partnership,
dba TIME WARNER CABLE**
8949 Ware Court
San Diego, CA 92121
Contact Person: Janette Larson
Telephone: (858) 635-8418
Facsimile: (858) 536-8729

HOA:

**SEA POINT COMMUNITY ASSOCIATION**
13022 Caminito Del Rocio
Del Mar, CA 92014
Contact Person: Dale Cook
Telephone: (858) 755-1918
Facsimile: (858) 755-4929

### PROPERTY:

**SEA POINT TOWNHOMES**
13022 Caminito Del Rocio
Del Mar, CA 92014
Number of Units: 237

### RECITALS

- HOA is the homeowners, condominium owners, or townhome owners association for the multi-unit residential property referred to above and

as further described in the legal description set forth on *Exhibit A* (the "**Property**").

- HOA and Operator desire to make the Services available to residents of the Property ("**Residents**") in accordance with the terms and conditions of this Agreement.

### TERMS AND CONDITIONS

In consideration of the Recitals and the mutual covenants contained in this Agreement, HOA and Operator agree as follows:

1. **OPERATOR'S SERVICE OBLIGATIONS.**

1.1 **Services.** The term "Services" means the services described below.

(A) **Bulk Multi-Channel Video Services.** Upon the Activation Date (as defined below), Operator will offer Bulk Multi-Channel Video Services to Residents. "**Bulk Multi-Channel Video Services**" means the package of multi-channel cable television and other video-and/or-sound services provided over the System (as defined below), as set forth on *Exhibit B*.

(B) **Additional Services.** Operator may offer and provide Additional Services to Residents on a non-exclusive basis. "**Additional Services**" means any services other than the Bulk Multi-Channel Video Services that can be provided to the Residents over the System, including, but not limited to, premium channels, pay-per-view, music, digital tier, video-on-

demand, and other video and music services not included in the Bulk Multi-Channel Video Services package, high-speed data and Internet access services, voice services, etc.

**1.2  Installation of System (as Applicable).** To the extent necessary (*e.g.*, there is no, or there is insufficient, existing wiring and facilities) and at Operator's sole expense, Operator will design, construct, install, and/or upgrade the System on the Property in accordance with industry standards, Laws and Regulations (as defined in Section 14.3), and a construction plan, specifications and schedule (the **"Construction Plan"**) agreed upon by HOA and Operator within 60 days of the Effective Date. The **"Activation Date"** shall be that date agreed upon by HOA and Operator in the Construction Plan. **"System"** means all equipment, facilities, wiring (including internal building wiring and external distribution wiring), conduit, and molding that Operator installs or upgrades on the Property, that Operator provides for installation by HOA or a third party at the Property, or that exist on the Activation Date and that Operator uses to deliver the Services, regardless of whether any such components are in use at any given time.

**1.3  Maintenance of System; Restoration of Property.** At Operator's sole expense, Operator will (A) maintain, repair, and operate the System in accordance with industry standards and Laws and Regulations and (B) repair and restore all portions of the Property damaged by Operator (regardless of whether such damage occurred during installation, upgrading, repair, or removal of the System) to its condition immediately prior to such damage.

**1.4  Marketing Materials.** Operator will provide HOA with marketing materials, service-order materials, sales support, and sales training so that HOA can market the Services as provided in Section 4.4.

**2.  RATES AND SERVICES.**

HOA shall pay to Operator a monthly Bulk Multi-Channel Video Services fee as set forth in *Exhibit B*. HOA acknowledges that Operator (and its designated Affiliates (as defined in Section 11.1)) is the sole provider of the Bulk Multi-Channel Video Services under the terms of this Agreement, and that HOA is not a reseller or provider of the Services. Residents will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in conjunction with Additional Services. In no event will HOA be responsible for any fees or

charges incurred by Residents for Additional Services.

**3.  OWNERSHIP AND USE OF SYSTEM DURING TERM.**

During the Term, Operator will own and have the exclusive right to access, control, and operate the System, except for any equipment, facilities, conduit, or wiring owned by HOA or a third party (if any), in which case (as between HOA and Operator) HOA shall own such items, and HOA hereby grants to Operator the exclusive right to access, use, maintain, and upgrade such items during the Term. For purposes of clarity, Operator owns any wiring provided by Operator to HOA for installation by HOA or its contractors. HOA shall not, and HOA shall not permit any third party to, access, move, use, or interfere with any part of the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. HOA will provide the power necessary to operate any of Operator's equipment that is located on the Property.

**4.  HOA'S OBLIGATIONS.**

**4.1  Grant of Easement; Termination of Easement.** At the time of signing this Agreement, HOA will execute an Easement and Memorandum of Agreement in the form of *Exhibit C*, which may be recorded by either party at any time. Upon the expiration or proper earlier termination of this Agreement as permitted hereby, and upon HOA's request, Operator promptly will execute a reasonable Termination of Easement and Memorandum of Agreement that HOA may record to evidence the termination of this Agreement and the Easement and Memorandum of Agreement.

**4.2  Grant of Rights.** HOA acknowledges that Operator will spend substantial time, resources, and money in meeting its obligations under this Agreement, and that Operator is relying on HOA's covenants in this Agreement in order to recoup its investment by providing the Services to the Property and by collecting revenues therefor. Accordingly, HOA hereby grants to Operator (A) the exclusive right for the first five years of the Term, and the non-exclusive right thereafter, to design, construct, install, operate, maintain, upgrade, and remove a system at the Property for the provision of multi-channel video services; (B) the exclusive right during the Term to install, occupy, maintain, and remove the molding and other conduit housing the wiring of the System without alteration by HOA or third parties; (C) the exclusive right for the first

five years of the Term, and the non-exclusive right thereafter, to offer and provide multi-channel video services to Residents; (D) the exclusive right for the Term to market on site at the Property multi-channel video services to Residents; and (E) the non-exclusive right during the Term to market, offer, and provide Additional Services. During the Term, HOA shall not contract with any other provider to purchase services under a bulk-buy arrangement for multi-channel video services, high-speed data or Internet access service, telephone or telephony–related services. If Laws and Regulations in effect as of the Effective Date prohibit HOA from granting or Operator from obtaining exclusive rights under this Section 4.2, then such rights automatically shall be deemed non-exclusive to the extent and only for so long as required by such Laws and Regulations.

4.3     **System Inspection Requirement.** No less than one time per calendar quarter during the Term, HOA shall cause its on-site management to carefully and diligently inspect the pedestals, lockboxes, and other secured or accessible areas housing the components of the System to ensure the integrity thereof and to ensure that no other party has accessed or is using the System. HOA immediately shall notify Operator of (A) any damage to, forced access of, or unauthorized use of, the System (including any pedestal, lockbox, or other secured or accessible area housing the components of the System), and (B) any condition or occurrence that is likely to adversely affect the System or provision of Services.

4.4     **Marketing and Sales.**

(A)     HOA will (i) provide Residents and prospective Residents with Operator's current publications describing Operator's Services and (ii) display Operator's marketing and sales materials relating to Services in HOA's sales office or clubhouse for the Property.

(B)     HOA will allow Operator to periodically host an event on the Property, at Operator's expense, to introduce Services to Residents and prospective Residents. Operator may reasonably try to remarket Services to Residents who order less than all available Services.

5.     **TERM.**

The initial term of this Agreement commences on the Effective Date and shall continue in effect for 5 (five) years. The initial term automatically will be

extended for successive one-year periods unless either party notifies the other at least 90 days before the expiration of the initial term or any renewal term, as the case may be, that it does not wish to extend the Agreement. The initial term and any extensions thereof are collectively referred to as the "**Term**".

6.     **REPRESENTATIONS AND WARRANTIES.**

6.1     **HOA's Representations and Warranties.** HOA represents, warrants, and covenants to Operator that (A) HOA is the sole legal and equitable owner in fee simple of the areas of the Property where the System will be located; (B) no purchase contracts exist with respect to such areas of the Property (although the parties acknowledge that the individual units will be available for sale to purchasers); (C) the legal description attached to this Agreement is the complete, accurate and current legal description of the Property; (D) the Property is not part of a bankruptcy proceeding, foreclosure action, deed-in-lieu-of-foreclosure transaction, or similar proceeding; (E) HOA has the full power and authority to negotiate, execute, deliver, and perform this Agreement and the Easement and Memorandum of Agreement; (F) the party signing this Agreement and the Easement and Memorandum of Agreement is duly authorized to execute and deliver such documents on behalf of HOA; (G) HOA owns and/or has the right to grant to Operator hereunder the exclusive right to use all parts of the System not owned by Operator (including any third party wiring, molding or components), if any; and (H) there are no agreements, understandings, or intentions with or between HOA and any other party that conflict with this Agreement.

6.2     **Operator's Representations and Warranties.** Operator represents, warrants and covenants to HOA that (A) Operator has the full power and authority to negotiate, execute, deliver, and perform this Agreement; (B) the party signing this Agreement is duly authorized to execute and deliver the Agreement on behalf of Operator; (C) Operator currently has, and will maintain during the Term, all required licenses, permits, and approvals necessary to permit Operator to operate the System and provide the Services; and (D) there are no agreements, understandings, or intentions with or between Operator and any other party that conflict with this Agreement.

7.  **DEFAULT AND REMEDIES.**

7.1  **Default.** In addition to the other breaches or defaults specified in this Agreement, a "default" exists under this Agreement upon any of the following events: (A) if HOA fails to meet or perform any payment obligation contained in this Agreement and then does not cure such failure within five business days after receiving notice from Operator of such payment default; (B) if HOA or Operator fails to meet or perform any material term, provision, covenant, agreement, or obligation contained in this Agreement (excluding failures to pay subject to (A) above, but including, without limitation, an Assignment Default (as defined in Section 11.2)) and then does not cure such failure within 30 days (or, if applicable, such longer time period as is expressly permitted elsewhere hereunder) after receiving notice from the other party that reasonably details such breach; (C) if HOA or Operator becomes a debtor in a bankruptcy proceeding or similar action or proceeding that is not permanently dismissed within 60 days; or (D) if HOA or Operator becomes insolvent.

7.2  **Remedies.** Except as specifically provided otherwise in this Agreement, the parties shall be entitled to seek all remedies available at law or in equity with respect to a breach or default under this Agreement by the other (including injunctive relief and specific performance, in cases where it is provable that such breach or default is causing or would cause irreparable damage or where no adequate remedy at law is available), and such rights and remedies shall be cumulative. If a party defaults and fails to cure such default as provided in this Agreement, then the nondefaulting party, in addition to all other available remedies, may terminate this Agreement by giving 30 days' notice to the defaulting party. If HOA defaults pursuant to Section 7.1(A), or if HOA fails to make timely payment to Operator more than two times in any 12-month period (notwithstanding any requirement of notice from Operator or opportunity to cure under Section 7.1(A)), then, in addition to any other remedies available to Operator, Operator may elect to terminate the Bulk Multi-Channel Video Services and in lieu thereof to provide its multi-channel video services on an individually billed basis directly to Residents for the remainder of the Term.

8.  **LIMITATION OF WARRANTIES AND LIABILITY.**

EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, OPERATOR MAKES NO REPRESENTATIONS OR WARRANTIES-- EXPRESS OR IMPLIED-- REGARDING THE SYSTEM OR THE SERVICES, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES.

9.  **INDEMNIFICATION.**

9.1  **From Operator.** Operator will defend, indemnify and hold harmless HOA and, as applicable, HOA's shareholders, members, partners, directors, managers, officers, employees, contractors, agents, representatives, and affiliates (collectively, "Related Parties") from and against all claims, liabilities, losses, costs, or damages, including reasonable attorney and other fees and costs relating to the investigation and defense of such matters (collectively, "Losses"), incurred by HOA or its Related Parties that result from (A) Operator's design, construction, installation, operation, or maintenance of the System, (B) Operator's provision of Services, or (C) Operator's breach of its representation and warranties in Section 6.2.

9.2  **From HOA.** HOA will indemnify and hold harmless Operator and, as applicable, Operator's Related Parties from and against all Losses incurred by Operator or its Related Parties that result from (A) damage to any part of the System caused by HOA or its Related Parties, (B) any claim arising out of HOA's operation of the Property, or (C) HOA's breach of its representations and warranties in Section 6.1, or its covenants in Section 4.3 or 11.2.

10.  **OWNERSHIP AND REMOVAL OF SYSTEM AFTER TERM.**

10.1  **Ownership and Removal of System after Termination or Expiration.** Subject to Laws and Regulations, upon expiration or proper earlier termination of this Agreement as permitted hereby, Operator shall retain ownership of, and for 90 days after such expiration or termination be entitled at Operator's option, to remove, abandon,

disable, or sell, all of the respective components of the System, unless HOA or a third party owns any such System components, in which case (as between HOA and Operator) HOA shall retain ownership of such components and Operator shall not be entitled to remove or disturb such components not owned by Operator. Operator will pay its removal costs unless this Agreement was terminated as a result of HOA's uncured default, in which case HOA will bear Operator's reasonable removal costs.

10.2 **Mandatory Access Laws and Regulations.** Notwithstanding anything to the contrary in this Article 10 or the Agreement, if Laws and Regulations require HOA to provide Operator with access to the Property for the provision of any service, then Operator shall **(A)** continue to own and/or be permitted to access and use all System components (as provided in Article 3) to provide service to the Property, and **(B)** have the right to remove, abandon, disable, or sell the System components (as provided in Section 10.1) within 90 days after Operator no longer is permitted access to the Property by Laws and Regulations to provide such service.

11. **ASSIGNMENT.**

Operator may assign this Agreement to **(A)** any parent, Affiliate (an "Affiliate" means an entity in which Operator, Time Warner Inc., Time Warner Cable Inc., or Time Warner Entertainment Company, L.P. has an ownership interest of 25% or more), successor (by operation of law or otherwise), or subsidiary that Operator may have or **(B)** any entity that purchases Operator's overall cable television system serving the Property. Upon the new operator's written assumption of all of Operator's obligations and duties under this Agreement, Operator will be relieved of any further liability or obligations to HOA attributable to periods from and after the effective date of such assumption.

12. **CONFIDENTIALITY.**

Except as specifically provided in this Agreement, and except for disclosures required by Laws and Regulations, HOA and Operator will **(A)** keep this Agreement and its terms confidential, **(B)** keep confidential and not disclose to any other party any information that is provided by one party to the other and that is marked as confidential, **(C)** not disclose or use any such confidential information for any purpose other than performance of this Agreement, and **(D)** not make any public

announcement or press release about this Agreement without the other's prior approval. Notwithstanding the foregoing, each party shall be entitled to disclose the terms of this Agreement to its financial, legal, and other advisors and consultants, and to prospective lenders or purchasers of the Property, in each case on a need-to-know basis and provided that such recipients are obligated to maintain the confidentiality of the terms of this Agreement without further disclosure to any other party.

13. **PROPRIETARY NAMES.**

Neither party will use any proprietary or trade name of the other except as specifically permitted in writing by the owner of the name.

14. **MISCELLANEOUS PROVISIONS.**

14.1 **Notices.** All notices, requests, approvals, demands, consents, and other communications that are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by facsimile, courier, registered, or certified mail (postage prepaid), overnight delivery or in person to a party's address stated at the head of this Agreement. Such notice shall be effective, **(A)** if sent by facsimile, when confirmation of transmission is received, or **(B)** otherwise, upon actual receipt or rejection by the intended recipient. Either party may change its address by giving notice to the other party in accordance with this Section.

14.2 **Force Majeure.** Despite anything to the contrary in this Agreement, neither party will be liable or in breach of or default under this Agreement for any delay or failure of performance resulting directly from anything beyond the reasonable control of the non-performing party (a "Force Majeure Event"), including, but not limited to, acts of God; acts of civil or military authority; acts of a public enemy; war; terrorism; severe weather, earthquakes, or floods; fires or explosions; governmental action or regulation; strikes, lockouts, or other work interruptions or labor shortages; supplier shortages; transportation and delivery delays; or blocked access rights. Payment of monies due shall not be subject to Force Majeure Events. So long as the non-performing party diligently and continuously attempts to cure the non-performance caused by the Force Majeure Event (giving consideration to the effect of the Force Majeure Event on such party's overall business operations), the time for performance shall be extended commensurate with the duration of the Force Majeure Event.

Confidential & Proprietary
Residential Bulk Services Agreement

14.3 **Compliance with Laws and Regulations; Choice of Law; Waiver of Right to Jury Trial.** The terms of this Agreement shall be subject to, and in the performance of their respective obligations under this Agreement the parties shall comply with, all applicable federal, state, and local laws and regulations (including the rules and regulations of governmental and regulatory authorities with jurisdiction over the parties), and, with respect to Operator only, the requirements of Operator's franchise agreement for the franchise area where the Property is located (collectively, "Laws and Regulations"). Nothing in this Agreement shall prohibit Operator from fully complying with all Laws and Regulations, including any consents, agreements, orders, or other requirements mandated by or entered into with the Federal Communications Commission or other governmental authority, and such compliance shall be deemed not to constitute a breach of or default under this Agreement. This Agreement is governed by and shall be interpreted under the laws of the state in which the Property is located, without regard to its choice-of-law provisions. **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY ENFORCEMENT ACTION OR CLAIM RELATING HERETO.**

14.4 **Severability and Unenforceable Provisions.** If any portion of this Agreement is rendered invalid or otherwise unenforceable under Laws and Regulations or by a governmental, legal or regulatory authority with jurisdiction over the parties, then the remainder of this Agreement will continue in full force unless such continuance will deprive one of the parties of a material benefit intended hereunder or frustrate the main purpose(s) of this Agreement. In such event, the party that has been deprived of such material benefit ("Affected Party") may notify the other, and the parties promptly thereafter shall use their reasonable best efforts to replace or modify the invalid or unenforceable provision with a provision that, to the extent not prohibited by Laws and Regulations, achieves the purposes intended under the invalid or unenforceable provision.

14.5 **Scope of Agreement; Modifications.** This Agreement constitutes the entire agreement between HOA and Operator with respect to, and supersedes all other agreements relating to, the subject matter contained herein. This Agreement can be modified or changed only by a written instrument signed by both parties. A party's waiver of enforcement of

any of the terms or conditions of this Agreement will be effective only if in writing. The relationship between HOA and Operator is that of independent contractors, and not one of principal and agent, joint venture, or partnership.

14.6 **Enforcement Costs.** If either party sues or brings any other type of enforcement action in connection with this Agreement, then the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs in connection with such enforcement.

14.7 **Headings; Exhibits.** Headings are for reference only and do not affect the interpretation of this Agreement. All exhibits are fully incorporated into this Agreement by their reference herein.

14.8 **Survival.** The terms of Articles 8, 9, 10 and 12 and Sections 14.3 and 14.6 will survive the expiration or termination of this Agreement for any reason.

14.9 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which is considered an original.

The parties have caused their duly authorized representatives to sign this Agreement effective as of the Effective Date.

**TIME WARNER CABLE**

Signature: _Ernie Villicana_

By: Ernie Villicana                11/30/05

Title: Vice President – Marketing & Programming


**SEA POINT COMMUNITY ASSOCIATION**

Signature: _Sheldon Krueger_

By: SHELDON KRUEGER

Title: PRESIDENT

**EXHIBIT A**
**TO**
**RESIDENTIAL BULK SERVICES AGREEMENT**

**Legal Description of the Property**

(Attached.)

**EXHIBIT B**
TO
**RESIDENTIAL BULK SERVICES AGREEMENT**

## Description of Bulk Multi-Channel Video Services and Fee

**BULK MULTI-CHANNEL VIDEO SERVICES**

A channel line-up for the Bulk Multi-Channel Video Services is attached. Subject to Laws and Regulations, Operator shall be entitled to add to, delete from, move channel positions, and otherwise modify the Bulk Multi-Channel Video Services in its sole discretion from time to time, but the level of Bulk Multi-Channel Video Services shall at all times remain reasonably comparable to the level of Bulk Multi-Channel Video Services offered by Operator in the Franchise area.

**BULK MULTI-CHANNEL VIDEO SERVICES FEE**

The Bulk Multi-Channel Video Services fee shall be **$28.77** per home/unit (plus any applicable taxes and franchise fees) per month, regardless of whether such homes/units are occupied. The Bulk Multi-Channel Video Services fee does not include Operator's fees (if applicable) to provide necessary consumer-grade equipment to Residents to receive the Bulk Multi-Channel Video Services, which fees (if applicable) shall be billed for and paid by HOA. Consumer-grade equipment provided to Residents for Additional Services shall be billed to and paid by the individual Resident subscribers. Upon at least 30 days' prior written notice to HOA, Operator shall be entitled to raise the Bulk Multi-Channel Video Services fee, provided that such increases shall not exceed 5% during any calendar year.

During the Term, Operator will bill HOA for the Bulk Multi-Channel Video Services fee on a monthly basis and payment by HOA shall be due within 30 days after the date of such invoice. Operator may bill HOA in advance for the Bulk Multi-Channel Video Services fee, provided that HOA shall not be required to pay any invoice more than 30 days prior to the month to which such invoice applies. If Operator fails to present an invoice prior to the first day of the month for which Bulk Multi-Channel Video Services are being provided, such failure shall not constitute a waiver of the Bulk Multi-Channel Video Services fee, and HOA promptly shall pay such invoice when delivered by Operator.

Any payments not received by Operator within 30 days after the date of invoice automatically shall incur a late payment fee of 1.5% per month (pro-rated on a daily basis), or the maximum monthly amount permitted by Laws and Regulations, whichever is less. The late payment fee shall apply from the due date of such payment until the date such amount is paid in full.



**Expanded Cable Television Service (Advantage Service)**

1 On-Demand
2 TBS
3 WGN
4 Cable 4 Padres
5 KSWB (69) San Diego (WB)
6 XETV (6) San Diego (FOX)
7 KNSD (39) San Diego (NBC)
8 KFMB (8) San Diego (CBS)
9 KUSI (51) San Diego (IND)
10 KGTV (10) San Diego (ABC)
11 KPBS (15) San Diego (PBS)
12 San Diego Network
13 XUPN (13) San Diego (UPN)
14 KTLA (5) Los Angeles (WB)
15 San Diego News Channel 15
16 ITVS San Diego's Learning Channel
17 KBNT (Univision)
18 UCSD-TV
19 CPC Community Programming
20 C-SPAN
22 County
23 C-SPAN 2
24 Cityscape/NASA
25 QVC
26 CNN
27 TNT
28 CNN Headline News
29 ESPN
30 ESPN 2
31 FOX Sports Net West
32 Lifetime
33 Nickelodeon
34 USA Network
35 ABC Family
36 MTV
37 Fox News Channel
38 Spike TV
39 Court TV

40 Bravo
41 Outdoor Life Network
42 VH1
43 American Movie Classics
44 Discovery Channel
45 A&E
46 International Channel
TV Guide Channel
48 E!
49 CNBC
50 MSNBC
51 Food Network
52 FX Channel
53 Home & Garden TV
54 WE: Women's Entertainment
55 The Learning Channel
56 The History Channel
57 Sci-Fi Channel
58 MOVIEPlex
59 Turner Classic Movies
60 Hallmark
61 Lifetime Movie Network
62 Cartoon Network
63 The Disney Channel
64 Animal Planet
65 TV Land
66 Telemundo (XHAS Ch.33)
67 Golf Channel
68 Comedy Central
69 National Geographic
70 The Travel Channel
71 Leased Access
72 Home Shopping Network
73 PAX
74 Country Music Television
75 BET
76 The Weather Channel

**EXHIBIT C**
**TO**
**RESIDENTIAL BULK SERVICES AGREEMENT**

<u>**Form of Easement and Memorandum of Agreement**</u>

Attached.

## EASEMENT AND
## MEMORANDUM OF AGREEMENT

**DOCUMENT PREPARED BY:**

Janette Larson

**AFTER RECORDING, RETURN TO:**

Time Warner Cable
8949 Ware Court
San Diego, CA 92121

1.    **Grant of Easement**

        In consideration of the covenants and agreements in the Agreement (as defined below), for $10, and for other good and valuable consideration, the receipt and sufficiency of which **SEA POINT COMMUNITY ASSOCIATION** ("Grantor") grants to **TIME WARNER CABLE** ("Grantee"), its successors and assigns, a non-exclusive easement on Grantor's property and all its improvements (as described in the attached *Exhibit A* hereto) (the "Property"). This Easement is for the purposes of permitting Grantee and its affiliates and contractors to design, construct, install, operate, market, maintain, upgrade, repair, replace, and remove a system (including internal and external wiring, poles, conduits, molding, pipes, antennas, servers, switch equipment, software, central processing units, and other facilities and equipment ("System")) for the offering and delivery of multi-channel video, television, entertainment, Internet, and other services that may be delivered over the System to the Property and any other properties that can be served by such System, as more fully provided in the Residential Bulk Services Agreement between Grantor and Grantee with respect to the Property (the "Agreement"). During the term of the Agreement and this Easement, Grantee shall own, and Grantee shall have the exclusive right to access, control, and operate, the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. Ownership and removal of the System after the expiration of the Agreement and this Easement shall be pursuant to the Agreement. Grantor will also provide reasonable space for Grantee's equipment.
        Grantor reserves the right to grant other easements on the Property, but will not allow such other easements to cause unreasonable interference with the easement granted to Grantee herein.

        Grantee will have and hold the easement, together with every right and appurtenance connected to it, for an initial term of ten years from the Activation Date (as defined in the Agreement) and for so long thereafter as Grantee is providing services to the Property under the Agreement. Upon the natural expiration of the Agreement or proper earlier termination of the Agreement by Grantor for Grantee's uncured breach under the Agreement, this Easement automatically will terminate after an additional 90-day continuation period solely for the purpose of allowing Grantee to remove its System. Grantor, its successors and assigns hereby agree to warrant and forever defend the easement to Grantee--as well as its successors and assigns--against every person who claims any part of it.

    This easement and other rights granted to Grantee run with the title to the Property and are binding on Grantor and on all subsequent owners of the Property, as well as on others who may claim an interest in the Property.

2.      **Memorandum of Agreement**

   In addition to the rights granted above, the Agreement grants to Grantee certain exclusive rights to market, offer, and provide multi-channel video services and the non-exclusive right to market, offer, and provide additional services to residents of the Property.

DATED EFFECTIVE AS OF: _10/1/2005_

**SEA POINT COMMUNITY ASSOCIATION**                    **WITNESSED BY:**

By: _Sheldon Krueger_                                By:_____

_____

Title:_President_____                      Printed Name:_____

State of _California_ )
                     ) ss:    ( See attached: CALIFORNIA ALL-PURPOSE )
County of _San Diego_)          ( ACKNOWLEDGMENT )

   This instrument was acknowledged before me by _____ as the __
_____ of _____
_____ on _____
_____, 20___.

Witness my hand and official seal.

_____
                        [SEAL]
Notary Public

My commission expires:_____

State of _____)
                        ) ss:
County of _____)

   This instrument was acknowledged before me by _____
_____ as a witness to the execution of this instrument by the above-named Grantor representative on ___
_____, 20___.

Witness my hand and official seal.

_____
                        [SEAL]
Notary Public

My commission expires:_____

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _San Diego_ } ss.

On _October 14, 2005_ before me, _Linda J. Luke, Notary Public._
Date        Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _Sheldon Krueger_
                     Name(s) of Signer(s)

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence

**LINDA J. LUKE**
Commission # 1486500
Notary Public - California
San Diego County
My Comm. Expires May 25, 2008

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Linda J. Luke_
Signature of Notary Public

---

## OPTIONAL

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Time Warner Cable System Installation_

Document Date: _10/01/05_   _EX "A" + "B" + "C"_    Number of Pages: _____

Signer(s) Other Than Named Above: _Time Warner Cable_

**Capacity(ies) Claimed by Signer**

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER

Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

**EXHIBIT C**

# TIME WARNER CABLE RESIDENTIAL SERVICES SUBSCRIBER AGREEMENT

## IMPORTANT INFORMATION ABOUT YOUR TIME WARNER CABLE SERVICES

The account holder(s) referred to on the accompanying Time Warner Cable Work Order or statement ("I," "me" or "my") agrees that the Work Order (if provided to me on or after January 1, 2006), this Agreement, the Terms of Use referred to below, and any applicable Tariff(s) on file with the state utility commission or comparable state agency in the jurisdiction in which I live, set forth the terms and conditions that govern my receipt of Services from Time Warner Cable, which may include, among others, video, high-speed data and voice Services. The term "Services" and all other capitalized terms used in this Agreement are defined in Section 15.

In consideration of TWC's provision of the Services that I have requested, subject to applicable law, I AGREE AS FOLLOWS:

### 1. Important Information About This Agreement

(a) This Agreement, the Work Order, the Terms of Use and any effective and applicable Tariff(s), each of which TWC may amend as set forth below, constitute the entire agreement between TWC and me. This Agreement supersedes all previous written or oral agreements between TWC and me. I am not entitled to rely on any oral or written statements by TWC's representatives relating to the subjects covered by these documents, whether made prior to the date of my Work Order or thereafter, and TWC will have no liability to me except in respect of its obligations as described in this Agreement and the other documents referred to above. The use of my Services by any person other than me is also subject to the terms of this Agreement, the Terms of Use, and any applicable Tariff(s).

(b) TWC has the right to add to, modify, or delete any term of this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s) at any time. An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my local TWC office.

(c) TWC will notify me of any significant change(s) in this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s). Any such changes shall become effective immediately except where applicable law requires a notice period, in which case the change will become effective at the end of the requisite notice period. Upon effectiveness of any change to any of these documents, my continued use of the Services will constitute my consent to such change and my agreement to be bound by the terms of the document as so changed. If I do not agree to any such change, I will immediately stop using the Services and notify TWC that I am terminating my Services account.

(d) My acceptance of Services constitutes my acceptance of the terms and conditions contained in this Agreement. In the event that a portion of my Services is terminated, or any aspect of it is changed, any remaining service or replacement service will continue to be governed by this Agreement.

http://help.twcable.com/html/twc_sub_agreement_ca.html                    4/26/2007

## 2. Payment; Charges

(a) I agree to pay TWC for (i) all use of my Services (including, if TWC is the party billing me for ISP or OLP Service, for my subscription to my choice of ISP or OLP, as applicable), (ii) installation and applicable service charges, (iii) TWC Equipment, and (iv) all applicable local, state and federal fees and taxes. Charges for the Services are set forth on a separate price list that I have received. I will be billed monthly in advance for recurring monthly charges. Other charges will be billed in the next practicable monthly billing cycle following use, or as otherwise specified in the price list. TWC may change both the fees and the types of charges (e.g., periodic, time-based, use-based) for my Services. If I participate in a promotional offer that requires a minimum time commitment and I terminate early, I agree that I am responsible for early termination fees associated with such promotion.

(b) Charges for installation Services and related equipment available from TWC for a standard Services installation are as described in TWC's list of charges and any applicable Tariff(s). Non-standard installations, if available, may result in additional charges as described in TWC's list of charges. In addition, I agree to pay charges for repair service calls resulting from my misuse of TWC Equipment or for failures in equipment not supplied by TWC.

(c) If my Services account is past due and TWC sends a collector to my premises, a field collection fee may be charged. The current field collection fee is on the price list or can be provided on request. I will also be responsible for all other expenses (including reasonable attorneys' fees and costs) incurred by TWC in collecting any amounts due under this Agreement and not paid by me.

(d) All charges are payable on the due date specified, or as otherwise indicated, on my bill. I agree that late charges may be assessed, subject to applicable law, on amounts that are past due. My failure to deliver payment by the due date is a breach of this Agreement. The current late fees are on the price list or can be provided upon request and, if applicable, will not exceed the maximum late fees as set forth by applicable law. TWC reserves the right to change the late fees.

(e) I agree that if my Services account with TWC is past due, TWC may terminate any of my Services or accounts, including Digital Phone Service, in accordance with applicable law. If I have a credit due to me or a deposit is being held on any account with TWC, I agree that the credit or deposit may be used to offset amounts past due on any other account I may have with TWC without notice to me. To reconnect any terminated Services, I may be required, in addition to payment of all outstanding balances on all accounts with TWC, to pay reconnect charges or trip charges (where applicable) and/or security deposits before reconnection.

(f) TWC may verify my credit standing with credit reporting agencies and require a deposit based on my credit standing or other applicable criteria. TWC may require a security deposit, or a bank or credit card or account debit authorization from me as a condition of providing or continuing to provide Services. If TWC requires a security deposit, the obligations of TWC regarding such security deposit will be governed by the terms of the deposit receipt provided by TWC to me at the time the deposit is collected. I agree that TWC may deduct amounts from my security deposit, bill any bank or credit card submitted by me, or utilize any other means of payment available to TWC, for any past due amounts payable by me to TWC, including in respect of damaged or unreturned Equipment.

(g) If I have elected to be billed by credit card, debit card or ACH transfer, I agree that I will automatically be billed each month for any amounts due under this Agreement. If I make payment by check, I authorize TWC and its agents to collect this item electronically.

(h) TWC may charge fees for all returned checks and account debit, bank card or charge card chargebacks. The current return/chargeback fees are listed in the list of charges on the price list or can be provided on request. TWC reserves the right to change return/chargeback fees.

(i) If I subscribe to HSD Service, I acknowledge that, even if TWC is billing for the HSD Service, my ISP or OLP may require a bank or credit card or account debit authorization or other assurance of payment from me, including for charges for additional or continuing Services outside the HSD Service billed by TWC that are payable under the ISP Terms. I agree that TWC or ISP (and, if applicable, OLP) may bill any bank or credit card submitted by me to ISP or OLP, or utilize any other means of payment available to ISP or OLP for any past due amounts payable by me to TWC. I also agree that responsibility for billing for my HSD Service subscription may be changed between TWC and ISP or OLP upon notice to me.

(j) All use of my Services, whether or not authorized by me, will be deemed my use and I will be responsible in all respects for all such use, including for payment of all charges attributable to my account (e.g., for VOD movies, merchandise ordered via Internet, international long distance charges, etc.). TWC is entitled to assume that any communications made through my Services or from the location at which I receive the Services are my communications or have been authorized by me. My Services may contain or make available information, content, merchandise, products and Services provided by third parties and for which there may be charges payable to third parties (which may include my choice of ISP or OLP and/or entities affiliated with TWC). I agree that all such charges incurred by me or attributed to my account will be my sole and exclusive responsibility and agree to pay the same when due, and shall indemnify and hold harmless the TWC Parties for all liability for such charges. I agree that TWC is not responsible or liable for the quality of any content, merchandise, products or Services (or the price thereof) made available to me via the Services, for the representations or warranties made by the seller or manufacturer of any such item, or for damage to or injury, if any, resulting from the use of such item.

(k) I acknowledge that currently, and from time to time, there is uncertainty about the regulatory classification of some of the Services TWC provides and, consequently, uncertainty about what fees, taxes and surcharges are due from TWC and/or its customers. Accordingly, I agree that TWC has the right to determine, in its sole discretion, what fees, taxes and surcharges are due and to collect and remit them to the relevant governmental authorities, and/or to pay and pass them through to me. I further agree to waive any claims I may have regarding TWC's collection or remittance of such fees, taxes and surcharges. I further understand that I may obtain a list of the fees, taxes and surcharges that my local TWC office currently collects or passes through by writing to TWC at the following address and requesting same: Time Warner Cable, 7800 Crescent Executive Drive, Charlotte, North Carolina, 28217; Attention: Subscriber Tax Inquiries.

(l) I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived.

### 3. Installation; Equipment and Cabling



(a) If I am not the owner of the house, apartment or other premises upon which TWC Equipment and Software are to be installed, I warrant that I have obtained the consent of the owner of the premises for TWC personnel and/or its agents to enter the premises for the purposes described in Section 3(d). I agree to indemnify and hold the TWC Parties harmless from and against any claims of the owner of the premises arising out of the performance of this Agreement (including costs and reasonable attorneys' fees).

(b) I authorize TWC to make any preparations to the premises necessary for the installation, maintenance, or removal of equipment. TWC shall not be liable for any effects of normal Services installation and workmanship, such as holes in walls, etc., which may remain after installation or removal of the TWC Equipment, except for damage caused by negligence on the part of TWC.

(c) The TWC Equipment is and at all times shall remain the sole and exclusive personal property of TWC, and I agree that I do not become an owner of any TWC Equipment by virtue of the payments provided for in this Agreement or the Tariff(s) or the attachment of any portion of the TWC Equipment to my residence or otherwise. Upon termination of any Services, subject to any applicable laws or regulations, TWC may, but shall not be obligated to, retrieve any associated TWC Equipment not returned by me as required under Section 3(f) below. TWC will not be deemed to have "abandoned" the TWC Equipment if it does not retrieve such equipment.

(d) I agree to provide TWC and its authorized agents access to my premises during regular business hours upon reasonable notice during the term of this Agreement and after its termination to install, connect, inspect, maintain, repair, replace, alter or disconnect or remove the TWC Equipment, to install Software, to conduct service theft audits, or to check for signal leakage. I agree that TWC may have reasonable access to easements and TWC Equipment located on my grounds.

(e) TWC shall have the right to upgrade, modify and enhance TWC Equipment and Software from time to time through "downloads" from TWC's network or otherwise. Without limiting the foregoing, TWC may, at any time, employ such means to limit or increase the throughput available through individual cable modems whether or not provided by TWC.

(f) If the Services are terminated, I agree that I have no right to possess or use the TWC Equipment related to the terminated Services. As required under Section 10(b), I agree that I must arrange for the return of TWC Equipment to TWC, in the same condition as when received (excepting ordinary wear and tear), upon termination of the Services. If I do not promptly return the TWC Equipment or schedule with TWC for its disconnection and removal, TWC may enter any premises where the TWC Equipment may be located for the purpose of disconnecting and retrieving the TWC Equipment. I will pay any expense incurred by TWC in any retrieval of the unreturned TWC Equipment. TWC may charge me a continuing monthly fee until any outstanding TWC Equipment is returned, collected by TWC or fully paid for by me in accordance with Section 3(g). The current fee is listed in the list of charges on the price list or can be provided on request.

(g) I agree to pay TWC liquidated damages in the amount demanded by TWC, but not to exceed that specified in the then-current price list, for the replacement cost of the TWC Equipment without any deduction for depreciation, wear and tear or physical condition of such TWC Equipment if (i) I tamper with, or permit others to tamper with, TWC Equipment, (ii) the TWC Equipment is destroyed, lost, or stolen, whether or not due to circumstances

beyond my reasonable control, and even if I exercised due care to prevent such destruction, loss, or theft, or (iii) the TWC Equipment is damaged (excluding equipment malfunction through no fault of my own) while in my possession, whether or not due to circumstances beyond my reasonable control, and even if I exercised due care to prevent such damage. I agree that these liquidated damages are reasonable in light of the problem of theft of cable Services; the existence of a "black market" in TWC Equipment; the ability of third parties to steal Services with unlawfully obtained TWC Equipment, causing loss of revenues for installation and service fees; and the difficulty in determining the actual damages that arise from the unauthorized tampering with, loss, destruction, or theft of TWC Equipment. I agree to return any damaged TWC Equipment to TWC.

(h) I agree that TWC may place equipment and cables on my premises to facilitate the provision of Services to me and to other locations in my area. The license granted under this Section 3(h) will survive the termination of this Agreement until the date that is one year from the date on which I first notify TWC in writing that I am revoking such license.

**4. Use of Services; TWC Equipment and Software**

(a) I agree that TWC has the right to add to, modify, or delete any aspect, feature or requirement of the Services (including content, price, equipment and system requirements). I further agree that my ISP (and, if applicable, OLP) has the right to add to, modify, or delete any aspect, feature or requirement of the HSD Service (including content, price and system requirements). If TWC changes its equipment requirements with respect to any Services, I acknowledge that I may not be able to receive such Services utilizing my then-current equipment. Upon any such change, my continued use of Services will constitute my consent to such change and my agreement to continue to receive the relevant Services, as so changed, pursuant to this Agreement, the Terms of Use and the Tariff(s). If I participate in a promotional offer for any Service(s) that covers a specified period of time, I agree that I am assured only that I will be charged the promotional price for such Service(s) during the time specified. I agree that TWC shall have the right to add to, modify, or delete any aspect, feature or requirement of the relevant Service (s), other than the price I am charged, during such promotional period.

(b) I agree that the Services I have requested are residential Services, offered for reasonable personal, non-commercial use only. I will not resell or redistribute (whether for a fee or otherwise) the Services, or any portion thereof, or charge others to use the Services, or any portion thereof. Among other things:

(i) If I receive Video Service, I agree not to use the Services for the redistribution or retransmission of programming or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of the Services to transmit or distribute the Video Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose. I acknowledge that programs and other materials that I receive as part of the Video Service remain part of the Video Service even if I record or capture all or a portion of any such program or material in a data file or on a hard drive, DVR or similar device.

(ii) If I receive Digital Phone Service, I agree not to use the Services for telemarketing, call center, medical transcription or facsimile broadcasting Services or for any enterprise purpose whether or not the enterprise is

directed toward making a profit. I agree that, among other things, my use of the Services to make available my Digital Phone Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose.

(iii) If I receive HSD Service, I agree not to use the HSD Service for operation as an Internet service provider, for the hosting of websites (other than as expressly permitted as part of the HSD Service) or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of any form of transmitter or wide area network that enables persons or entities outside the location identified in the Work Order to use my Services, whether or not a fee is sought, will constitute an enterprise purpose. Furthermore, if I use a wireless network within my residence, I will limit wireless access to the HSD Service (by establishing and using a secure password or similar means) to the members of my household.

(c) Theft or willful damage, alteration, or destruction of TWC Equipment, or unauthorized reception, theft or diversion of Services, or assisting such theft, diversion, or unauthorized reception is a breach of this Agreement and potentially punishable under law (including by way of statutory damages, fine and/or imprisonment). Nothing in this Agreement, including, Section 3(g) above, shall prevent TWC from enforcing any rights it has with respect to theft or unauthorized tampering of Services or TWC Equipment under applicable law.

(d) I will not, nor will I allow others to, open, alter, misuse, tamper with or remove the TWC Equipment as and where installed by TWC or use it contrary to this Agreement, the Terms of Use, or the Tariff(s). I will not, nor will I allow others to, remove any markings or labels from the TWC Equipment indicating TWC ownership or serial or identity numbers. I will safeguard the TWC Equipment from loss or damage of any kind, including accidents, breakage or house fire, and will not permit anyone other than an authorized representative of TWC to perform any work on the TWC Equipment.

(e) I agree that to the extent any Software is licensed (or sublicensed) to me by TWC, such Software is provided for the limited purpose of facilitating my use of the Services as described in this Agreement. I will not engage in, or permit, any additional copying, or any translation, reverse engineering or reverse compiling, disassembly or modification of or preparation of any derivative works based on the Software, all of which are prohibited. I will return or destroy all Software provided by TWC and any related written materials promptly upon termination of the associated Services to me for any reason. Software licensed to me by my ISP or OLP, for instance my ISP's or OLP's client or browser software, is licensed under the ISP Terms or OLP Terms, as applicable, and is not the responsibility of TWC.

(f) I agree that I will use the Services for lawful purposes only, and in accordance with this Agreement, the Terms of Use and the Tariff(s).

(g) I agree to be responsible for protecting the confidentiality of my screen names, passwords, personal identification numbers (PINs), parental control passwords or codes, and any other security measures made available, recommended or required by Time Warner Cable. I also acknowledge that TWC's Services may from time to time include interactive features, the use of which may result in the transmission to, and use by, TWC or certain third parties of information that may constitute personally identifiable information (as such term is used in the Federal Communications Act of 1934) about me

and for which TWC may be required, under the Federal Communications Act of 1934, to obtain my consent. I agree that TWC may seek such consents (or indications of my election to "opt in" to certain TWC programs) electronically, including through the use of a "click through" screen, and that TWC is entitled to assume that any such consent or opt-in election communicated through my Services or from the location at which I receive the Services is my consent or opt-in election or has been authorized by me.

(h) I agree that TWC has no liability for the completeness, accuracy or truth of the programs or information it transmits.

## 5. Special Provisions Regarding Digital Phone Service

(a) I acknowledge that the voice-enabled cable modem used to provide the Digital Phone Service is electrically powered and that the Digital Phone Service, including the ability to access 911 Services and home security and medical monitoring Services, may not operate in the event of an electrical power outage or if my broadband cable connection is disrupted or not operating. I acknowledge that, in the event of a power outage in my home, any battery included in my voice-enabled cable modem may enable back-up service for a limited period of time or not at all, depending on the circumstances, and that inclusion of the battery does not ensure that Digital Phone Service will be available in all circumstances. I also acknowledge that, in the event of a loss of power that disrupts my local TWC cable system, the battery in my voice-enabled cable modem will not provide back-up service and the Digital Phone Service will not be available.

(b) I agree that TWC will not be responsible for any losses or damages arising as a result of the unavailability of the Digital Phone Service, including the inability to reach 911 or other emergency Services, or the inability to contact my home security system or remote medical monitoring service provider. I acknowledge that TWC does not guarantee that the Digital Phone Service will operate with my home security and/or medical monitoring systems, and that I must contact my home security or medical monitoring provider in order to test my system's operation with the Digital Phone Service. I agree that I am responsible for the cost of any such testing or any fees for configuring my home security or medical monitoring system to work with the Digital Phone Service.

(c) The location and address associated with my Digital Phone Service will be the address identified on the Work Order. I acknowledge that, under Section 4 (d) of this Agreement, I am not permitted to move TWC Equipment from the location and address in which it has been installed. Furthermore, if I move my voice-enabled cable modem to an address different than that identified on the Work Order, calls from such modem to 911 will appear to 911 emergency service operators to be coming from the address identified on the Work Order and not the new address.

(d) I acknowledge that the existing telephone wiring inside my home may not support both Digital Phone Service and digital subscriber line (DSL) service. Therefore, if I intend to use Digital Phone Service on all of my phone jacks, I may be required to maintain separate wiring, not provided by TWC, within my home specifically for DSL service or to disconnect my DSL service prior to receiving the Digital Phone Service over my existing in-home wiring.

(e) I agree to provide TWC and its authorized agents with access to my telephone inside wiring at the Network Interface Device or at some other minimum point of entry in order to provide the Digital Phone Service over my

existing in-home wiring.

(f) I acknowledge that the Digital Phone Service may not be compatible with certain data transmission Services, including but not limited to fax transmissions and dial-up Internet access and that I may be required to maintain a separate telephone line, not provided by TWC, in order to access such Services.

## 6. Special Provisions Regarding HSD Service

(a) Speeds and Network Management. I acknowledge that each tier or level of the HSD Service has limits on the maximum speed at which I may send and receive data at any time, as set forth in the price list or Terms of Use. I understand that the actual speeds I may experience at any time will vary based on a number of factors, including the capabilities of my equipment, Internet congestion, the technical properties of the websites, content and applications that I access, and network management tools and techniques employed by TWC. I agree that TWC or ISP may change the speed of any tier by amending the price list or Terms of Use. My continued use of the HSD Service following such a change will constitute my acceptance of any new speed. I also agree that TWC may use technical means, including but not limited to suspending or reducing the speed of my HSD Service, to ensure compliance with its Terms of Use and to ensure that its service operates efficiently. I further agree that TWC and ISP have the right to monitor my usage patterns to facilitate the provision of the HSD Service and to ensure my compliance with the Terms of Use and to efficiently manage its network and the provision of services. TWC or ISP may take such steps as it determines appropriate in the event my usage of the HSD Service does not comply with the Terms of Use. Additionally, TWC may use such tools and techniques as it determines appropriate in order to efficiently manage its network and to ensure a quality user experience for its subscribers ("Network Management Tools"). These Network Management Tools are described in the Terms of Use, which include the Acceptable Use Policy, http://help.twcable.com/html/twc_misp_aup.html.

(b) Republication.

(i) I acknowledge that material posted or transmitted through the HSD Service may be copied, republished or distributed by third parties, and that the TWC Parties will not be responsible for any harm resulting from such actions.

(ii) I grant to TWC, and I represent, warrant and covenant that I have all necessary rights to so grant, the non-exclusive, worldwide, royalty-free, perpetual, irrevocable, right and license to use, reproduce, modify, adapt, publish, translate, distribute, perform and display in any media all

material posted on the public areas of the HSD Service via my account and/or to incorporate the same in other works, but only for purposes consistent with operation and promotion of the HSD Service.

(iii) I agree that unsolicited email, or "spam," is a nuisance and that TWC and my ISP (and, if applicable, my OLP) are entitled to establish limits on the volume of email that I send. Such volume limits may be set by reference to a number of emails per day, week, month or year.

(c) Continuity of Service. In order to provide continuity of service to me, if my choice of ISP is no longer available over my local TWC cable system, I agree that TWC may provide me with an alternative ISP. In such event, TWC will

http://help.twcable.com/html/twc_sub_agreement_ca.html

4/26/2007

notify me of the date as of which I will begin receiving service from the alternative ISP, the provision of which shall also be governed by this Agreement, and TWC will provide to me a price list for such alternative ISP service. I will have the right at any time to terminate the alternative ISP or to change my subscription to any other ISP then offered by TWC.

(d) Unfiltered Internet Access. I acknowledge that the ISP Service provides a connection to the Internet that may be unfiltered, and that the TWC Parties neither control nor assume responsibility for any content on the Internet or content that is posted by a subscriber. Although TWC or my ISP or OLP may make available certain parental control features, I acknowledge that such parental control features may not be entirely effective or foolproof and that, notwithstanding such features, I or members of my household may be exposed to unfiltered content.

(e) Use of ISP and OLP Service. I agree that TWC and/or my ISP and/or OLP has the right, but not the obligation, to edit, refuse to post or transmit, request removal of, or remove or block any material transmitted through, submitted to or posted on the HSD Service, if it determines in its discretion that the material is unacceptable or violates the terms of this Agreement, any TWC consumption limits or any other Terms of Use. Such material might include personal home

pages and links to other sites. In addition, I agree that, under such circumstances, TWC may suspend my account, take other action to prevent me from utilizing certain account privileges (e.g., home pages) or cancel my account without prior notification. I also agree that TWC and/or my ISP and/or OLP may suspend or cancel my account for using all or part of the HSD Service to post content to the Internet or to engage in "peer to peer" file exchanges or other forms of file exchanges that violate this Agreement or the Terms of Use.

(f) Responsibility for HSD Service. Each of TWC and my ISP (and, if applicable, my OLP) has responsibilities for the HSD Service. I acknowledge that each of my ISP and OLP may have one or more separate agreements, policies or other terms covering my rights and obligations with regard to the HSD Service ("ISP Terms" or "OLP Terms," as applicable) that are also binding on me. This Agreement does not cover any ISP or OLP features or Services that are not dependent upon distribution over TWC's cable systems (for example, dial up access or my use of ISP or OLP software that enables access to ISP or OLP features or Services through non-TWC access means) or that may otherwise be provided to me by ISP or OLP separately from the HSD Service under the ISP Terms or OLP Terms, as applicable. In the event of termination of the HSD Service, I must also contact my ISP (and, if applicable, my OLP) to ensure that these other features or Services (such as dial-up access) are properly continued or discontinued.

(g) Computer Requirements. I agree that each Computer will need to meet certain minimum hardware and software requirements that will be specified for the HSD Service, and that such requirements may be changed from time to time by TWC or my ISP or OLP.

## 7. Support; Service and Repairs

(a) My Services include the right to request reasonable service and maintenance calls to check and correct problems with the Services. TWC will, at its own expense, repair damage to or, at TWC's option, replace TWC Equipment, and otherwise attempt to correct interruptions of the Services, due

to reasonable TWC Equipment wear and tear, or technical malfunction of the system or network operated by TWC. The Subscriber Materials contain details on contacting

TWC for this support.

(b) Unless I have obtained a TWC service protection plan (if available in my area), I agree that I am responsible for all wiring, equipment and related software installed in my residence that is not TWC Equipment or TWC-licensed Software and TWC will have no obligation to install, connect, support, maintain, repair or replace any Computer, television, telephone or telephone answering device, audiovisual recording or playback device (e.g., VCR, DVR, DVD), audio equipment, any software, or any cable modem, cabling or other equipment (other than TWC Equipment or TWC-licensed Software). TWC will not support, repair, replace, or maintain any Network Interface Card, regardless of whether provided and installed by TWC.

(c) I agree that TWC has no responsibility for the operation of any equipment, software or service other than the Services, the TWC Equipment and the TWC-licensed Software. For instance, I acknowledge that certain commercially available televisions, converter boxes and recording devices, which may be identified by their manufacturers as "cable ready" or "digital cable ready," may not be able to receive or utilize all available Services without the addition of a TWC converter box or other TWC Equipment for which a fee may be charged. If I receive HSD Service, TWC has no responsibility to support, maintain or repair any equipment, software or service that I elect to use in connection with the HSD Service, whether provided by my ISP, my OLP or a third party. For assistance with technical problems arising from such equipment, software or Services, I should refer to the Subscriber Materials for information regarding the technical support provided by my ISP or OLP or to the support area of the ISP or OLP or to the relevant third party's material.

(d) If TWC determines that non-TWC cabling or equipment connecting my residence to TWC Equipment installed on the side of or adjacent to my residence (i.e., at a ground block) is the cause of a service problem, I agree that TWC may charge me to resolve such service problem. If available from TWC in my area, I may subscribe to a TWC service protection plan that covers service related calls within my residence. If any other support Services are available from TWC, such Services will be at additional charges as described in TWC's price list.

8. Service Interruptions; Force Majeure

(a) I agree that TWC has no liability for delays in or interruption to my Services, except that if for reasons within TWC's reasonable control, for more than twenty-four (24) consecutive hours, (i) service on all cable channels is interrupted, (ii) there is a complete failure of the HSD Service or (iii) there is a complete failure of the Digital Phone Service, TWC will give me a prorated credit for the period of such interruption or failure if I request one within 30 days of the interruption or failure. Notwithstanding the above, TWC will issue credits for VOD, pay-per-view and pay-per-play events for service problems where a credit request is made within 30 days of the interruption or failure. In no event shall TWC be required to credit me an amount in excess of applicable service fees. TWC will make any such credit on the next practicable bill for my Services. State and local law or regulation may impose other outage credit requirements with respect to some or all of my Services. In such event, the relevant law or regulation will control.

(b) I acknowledge that TWC may conduct maintenance from time to time that may result in interruptions of my Services.

(c) The TWC Parties shall have no liability, except as set forth in Section 8(a), for interruption of the Services due to circumstances beyond its reasonable control, including acts of God, flood, natural disaster, vandalism, terrorism, regulation or governmental acts, fire, civil disturbance, electrical power outage, computer viruses or worms, strike or weather.

(d) TWC is only obligated to provide the above-referenced credits for loss of HSD Service if TWC is billing me for the HSD Service at the time of the outage. If my ISP or OLP is billing me, I will look solely to my ISP or OLP, as applicable, for a credit with respect to the HSD Service.

## 9. Review and Enforcement

(a) TWC may suspend or terminate all or a portion of my Services without prior notification if TWC determines in its discretion that I have violated this Agreement, any of the Terms of Use or any Tariff(s), even if the violation was a one-time event. If all or a portion of my Services are suspended, I will not be charged for the relevant Services during the suspension. If my account is terminated, I will be refunded any pre-paid fees minus any amounts due TWC.

(b) If I receive HSD Service, I acknowledge that TWC has the right, but not the obligation, to review content on public areas of the HSD Service, including chat rooms, bulletin boards and forums, in order to determine compliance with this Agreement and the Terms of Use.

(c) I agree that TWC shall have the right to take any action that TWC deems appropriate to protect the Services, TWC's facilities or TWC Equipment.

## 10. Termination of Service

(a) Either TWC or I may terminate all or any portion of my Services at any time for any or no reason, in its sole discretion, in accordance with applicable law.

(b) If I am moving or wish to terminate all or any portion of my Services for any reason, I will notify TWC by phone or by mail as instructed in the Subscriber Materials in order to set up a disconnect appointment and provide TWC with access to my premises to disconnect the relevant Services and recover the TWC Equipment specified on the Work Order on a DATE PRIOR TO the last day of residency. This also applies if I am receiving a period of free or discounted Services. In other words, at the end of the free or discounted period, TWC is entitled to begin billing me for the usual charges associated with the relevant Services unless I take the appropriate steps to terminate the Services as described in this paragraph.

(c) I cannot terminate my Services by writing "Canceled" (or any other messages) on my bill or check, or by making a disconnect appointment that does not result in TWC's physical recovery of the TWC Equipment. In addition, I agree that any restrictive endorsements (such as "paid in full"), releases or other statements on or accompanying checks or other payments accepted by TWC shall have no legal effect.

(d) If I subscribe to HSD Service, I acknowledge that notice given by me to

TWC of termination of my HSD Service may not be sufficient to terminate billing by my ISP or OLP for additional or continuing Services under the ISP Terms or OLP Terms (for example, "dial up" access). I agree that I am solely responsible for contacting my ISP or OLP in addition to TWC to ensure that all such Services are terminated in accordance with the ISP Terms or OLP Terms, as applicable.

**11. Disclaimer of Warranty; Limitation of Liability**

(a) I AGREE THAT THE SERVICES ARE PROVIDED BY TWC ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF TITLE OR NONINFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES THAT ARE IMPLIED BY, AND INCAPABLE OF EXCLUSION, RESTRICTION OR MODIFICATION UNDER, THE LAWS APPLICABLE TO THIS AGREEMENT. TWC MAKES NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE OR THAT THE TWC EQUIPMENT WILL OPERATE AS INTENDED. IN PARTICULAR, I AGREE THAT MY USE OF THE HSD SERVICE (INCLUDING THE CONTENT, INFORMATION, SERVICES, EQUIPMENT AND SOFTWARE, THE PURCHASE OF MERCHANDISE AND SERVICES, THE TRANSMISSION OF INFORMATION AND OTHER COMMUNICATIONS BY AND TO ME AND THE DOWNLOADING OF COMPUTER FILES) IS AT MY SOLE RISK. I FURTHER AGREE THAT TWC IS NOT RESPONSIBLE FOR THE RECORDING OF OR FAILURE TO RECORD ANY PROGRAM OR PORTION THEREOF, OR FOR THE CONTENT OF ANY PROGRAM OR CONTENT ON MY DVR. WITHOUT LIMITING THE FOREGOING:

(i) ANY AND ALL PRODUCTS AND SERVICES PROVIDED BY TWC AND/OR ISP AND/OR OLP AND/OR ANY LONG DISTANCE PROVIDER TO ME THAT ARE NOT PART OF THE SERVICES AS DEFINED HEREIN ARE OUTSIDE THE SCOPE OF THIS AGREEMENT AND THE TWC PARTIES HAVE NO RESPONSIBILITY OR LIABILITY FOR ANY SUCH PRODUCTS OR SERVICES; AND

(ii) NONE OF THE TWC PARTIES MAKES ANY WARRANTIES AS TO THE SECURITY OF MY COMMUNICATIONS VIA TWC'S FACILITIES OR THE SERVICES (WHETHER SUCH COMMUNICATIONS ARE DIRECTED WITHIN THE SERVICES, OR OUTSIDE THE SERVICE TO OR THROUGH THE INTERNET), OR THAT THIRD PARTIES WILL NOT GAIN UNAUTHORIZED ACCESS TO OR MONITOR MY COMPUTERS(S) OR ONLINE (INCLUDING VOICE) COMMUNICATIONS. I AGREE THAT NONE OF THE TWC PARTIES WILL BE LIABLE FOR ANY SUCH UNAUTHORIZED ACCESS. I HAVE THE SOLE RESPONSIBILITY TO SECURE MY COMPUTER AND ONLINE (INCLUDING VOICE) COMMUNICATIONS.

(b) I ACKNOWLEDGE THAT TWC'S OR MY INSTALLATION, USE, INSPECTION, MAINTENANCE, REPAIR, REPLACEMENT OR REMOVAL OF THE SERVICES, TWC EQUIPMENT AND SOFTWARE MAY RESULT IN DAMAGE TO MY COMPUTER(S), TELEPHONES AND TELEPHONE ANSWERING DEVICES, TELEVISIONS, RECORDING AND PLAYBACK DEVICES, AUDIO EQUIPMENT, OR ANY CABLE MODEM, CABLING OR OTHER EQUIPMENT OR HARDWARE, INCLUDING SOFTWARE AND DATA FILES STORED THEREON. I SHALL BE SOLELY RESPONSIBLE FOR BACKING UP ALL EXISTING COMPUTER OR OTHER SOFTWARE OR DATA FILES PRIOR TO THE PERFORMANCE OF ANY OF THE FOREGOING ACTIVITIES. NONE OF THE TWC PARTIES, OR THEIR

VENDORS, LICENSEES OR PROGRAMMERS, SHALL HAVE ANY LIABILITY, AND EACH EXPRESSLY DISCLAIMS ANY RESPONSIBILITY WHATSOEVER, FOR ANY DAMAGE TO OR LOSS OR DESTRUCTION OF ANY EQUIPMENT, SOFTWARE, HARDWARE, DATA OR FILES.

(c) EXCEPT FOR THE REFUND OR CREDIT AS EXPRESSLY PROVIDED IN SECTIONS 9(a) AND 8(a) RESPECTIVELY, IN NO EVENT (INCLUDING NEGLIGENCE) WILL ANY TWC PARTY OR ANY PERSON OR ENTITY INVOLVED IN CREATING, PRODUCING OR DISTRIBUTING THE SERVICES (INCLUDING THE CONTENT INCLUDED THEREIN OR THE SERVICES ACCESSED THEREBY) OR EQUIPMENT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE THE SERVICES, INCLUDING THE USE OF OR INABILITY TO USE EMERGENCY 911 SERVICES, OR FOR ANY ACTION TAKEN BY TWC TO PROTECT

THE SERVICES OR THE BREACH BY TWC OF ANY WARRANTY.

(d) I AGREE THAT THE PROVISIONS OF THIS SECTION 11 SHALL APPLY TO ALL CONTENT OR SERVICES INCLUDED IN, OR ACCESSIBLE THROUGH, THE SERVICES, AND ARE FOR THE BENEFIT OF, AND MAY BE ENFORCED BY, ALL OF THE TWC PARTIES.

**12. Privacy**

(a) My privacy interests, including my ability to limit disclosure of certain information to third parties, are addressed by, among other laws, the Federal Communications Act of 1934, as amended, and the Electronic Communications Privacy Act. Personally identifiable information that may be collected, used or disclosed in accordance with applicable laws is described in the Subscriber Privacy Notice delivered to me by TWC on its own behalf and on behalf of its Affiliated ISPs. I acknowledge receipt of the Subscriber Privacy Notice, which is deemed to form a part of this Agreement, and expressly consent to the collection, use and disclosure of personally identifiable and other information as described in the Subscriber Privacy Notice, as it may be amended from time to time.

(b) I agree that, in addition to actions and disclosures specifically authorized by law or statute or authorized elsewhere in this Agreement, TWC and its Affiliated ISPs shall each have the right (except where prohibited by law notwithstanding my consent), but not the obligation, to disclose any information to protect their respective rights, property and/or operations, or where circumstances suggest that individual or public safety is in peril. I consent to such actions or disclosures.

(c) If I am a Digital Phone customer, I consent to TWC's disclosure of my name, address and/or telephone number to the general public in connection with Caller ID functions, telephone directories, and 411 and 911 Services. I also consent to TWC's disclosure of personally identifiable information to the telephone companies serving those end users to whom I make calls so that the calls can be completed. If I wish to have TWC remove this information from one or more of these Services, I understand that I may notify TWC to do so, subject to any applicable fees.

**13. Consent to Phone and Email Contact**

(a) I consent to TWC calling the phone numbers I supply to it for any purpose,

including the marketing of its current and future Services. I agree that these phone calls may be made using any method, including an automatic dialing system or an artificial or recorded voice. Upon my request, the phone numbers I have previously provided will be removed from TWC's phone marketing list. I can make this request by calling or writing my local TWC office and asking to be placed on TWC's Do Not Call List.

(b) I acknowledge that being included in any state or federal "do not call" registry will not be sufficient to remove me from TWC's phone marketing list.

(c) I consent to TWC emailing me, at any email address, including that of a wireless or mobile device, that I provide to TWC (or that TWC issues to me in connection with the HSD Service), for any purpose, including the marketing of TWC's current and future Services. If my wireless or mobile provider charges me for receipt of such messages, I acknowledge and agree that I am responsible for paying such charges. I may revoke this authorization insofar as it relates to marketing messages at any time by calling or writing my local TWC office.

## 14. Arbitration

EXCEPT FOR CLAIMS FOR INJUNCTIVE RELIEF AND CLASS ACTION LAWSUITS, AS DESCRIBED BELOW, ANY PAST, PRESENT, OR FUTURE CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL ARBITRATION RULES, INCLUDING, IF APPLICABLE, THE SUPPLEMENTARY PROCEDURES FOR THE RESOLUTION OF CONSUMER RELATED DISPUTES. CONSOLIDATED OR CLASS ACTION ARBITRATIONS SHALL NOT BE PERMITTED, AND THE ARBITRATOR OF ANY DISPUTE OR CLAIM BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT HAVE THE POWER TO AWARD INJUNCTIVE RELIEF. INJUNCTIVE RELIEF MAY BE SOUGHT, AND CLASS ACTION LAWSUITS MAY BE BROUGHT, SOLELY IN AN APPROPRIATE COURT OF LAW. NO CLAIM SUBJECT TO ARBITRATION UNDER THIS AGREEMENT MAY BE COMBINED WITH A CLAIM SUBJECT TO RESOLUTION BEFORE A COURT OF LAW. THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR, EXCEPT THAT THE ARBITRABILITY OF ANY DISPUTE PURPORTING TO CONSTITUTE A CLASS ACTION SHALL BE DETERMINED BY A COURT OF COMPETENT JURISDICTION. JUDGMENT UPON AN AWARD MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. IF ANY PORTION OF THIS SECTION IS HELD TO BE UNENFORCEABLE, THE REMAINDER SHALL CONTINUE TO BE ENFORCEABLE.

## 15. Definitions

(a) "Affiliated ISP" means Road Runner and any other ISP in which any TWC Party holds an ownership interest.

(b) "Agreement" means this Services Subscription Agreement, as it may be amended from time to time by TWC.

(c) "Computer" means the personal computer(s) located at my residence that will be used to access the HSD Service, as specified on the accompanying Work Order.

(d) "Digital Phone Service" means the TWC phone service that provides users with the ability to send and receive local and/or long distance calls and to access additional related features and functions through TWC's cable systems.

(e) "DVR" means a set-top box or other device enabled with a digital video recorder that is provided to me by TWC.

(f) "HSD Service" and "High Speed Data Service" mean the online content, features, functions and Services (which may include Internet access) of the ISP or OLP selected by me, as provided over TWC's cable systems.

(g) "including" or "include" shall mean inclusion, without limitation.

(h) "ISP" means the Internet service provider selected by me from among those offered now or in the future by TWC for the HSD Service. My ISP is the entity that provides my Internet connectivity.

(i) "Me," "My," and "I" mean the account holder identified on the Work Order who is authorized by TWC to access and use the Services.

(j) "OLP" or "On-line Provider" means a provider of on-line content, features, functions and Services that are used in conjunction with my ISP Service (and whose service may be purchased with an ISP Service as part of a combined offering) but that does not itself provide Internet connectivity.

(k) "Services" means any and all Services provided to me by TWC, which may include Video Service, High Speed Data Service, Digital Phone Service and equipment based Services such as digital video recorder Services.

(l) "Software" means the computer software, if any, licensed by ISP or OLP to me to access the HSD Service, or licensed by TWC to me to facilitate installation or use of my ISP's or OLP's service or any other Services. Software also refers to any executable code that may be included in, downloaded to, or utilized by, any TWC Equipment.

(m) "Subscriber Materials" means the handbooks, manuals and other guide materials provided by TWC or any third party (including my ISP or OLP) regarding use of the Services.

(n) "Subscriber Privacy Notice" means the Subscriber Privacy Notice described in Section 12(a), as it may be amended from time to time by TWC.

(o) "Tariff(s)" means the materials describing the terms upon which TWC offers Digital Phone Service, which have been filed at the Public Service Commission or comparable state agency serving the jurisdiction in which I live.

(p) "Terms of Use" shall mean all rules, terms and conditions set forth in this Agreement or otherwise established now or hereafter by TWC regarding permissible or impermissible uses of or activities related to, the HSD Service.

(q) "TWC" means the local Time Warner Cable-affiliated cable operator that is providing the Services over its cable system, or any cable operator to whom TWC assigns this Agreement.



(r) "TWC Equipment" means any equipment provided by TWC to me including, but not limited to, wire, cable, cable conduit, splitters, junction boxes, converter boxes (also known as "set top" boxes), decoders, CableCARD™, terminals, cable modems, voice-enabled cable modems, remote control units, and any other equipment or materials provided to me by TWC for use in connection with the receipt of Services. TWC Equipment does not include any Network Interface Card ("NIC") installed in my Computer.

(s) "TWC Parties" means TWC and its corporate parents, affiliates and subsidiaries and their respective directors, officers, employees and agents.

(t) "Video Service" means video and/or audio programming Services such as basic, standard, digital and premium Services, Services provided on a per-channel or per-program basis, pay-per-play, pay-per-view or VOD.

(u) "VOD" means video on demand.

(v) "Work Order" means the Time Warner Cable work order provided to me on or after January 1, 2006 in connection with the installation or commencement of my Service(s).

### 16. Indemnification

I agree to defend, indemnify and hold harmless the TWC Parties from and against any and all claims and expenses, including reasonable attorneys' fees, arising out of or related in any way to my use of the Services or otherwise arising out of the use of my account or any equipment or facilities in connection therewith, or my use of any other TWC products or Services or any ISP's or OLP's products or Services.

### 17. Term

This Agreement will remain in effect until terminated by either party or superseded by a revised Subscription Agreement.

### 18. Interpretation; Severability

This Agreement is, and shall be interpreted as, subject to applicable law and regulation and to any applicable franchise agreement between a governmental authority and TWC. In the event that any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion shall be construed in accordance with applicable law as nearly as possible to reflect the original intentions of the parties as set forth herein, and the remainder of this Agreement shall remain in full force and effect.

### 19. Consent to Electronic Notice

I agree that unless otherwise specified, all notices required or contemplated hereunder will be provided by TWC by such means as TWC shall determine in its discretion. Without limiting the foregoing, I agree that TWC may provide any notices required or contemplated hereunder or by applicable law, including notice of changes to this Agreement, the Terms of Use, the Tariff(s) or the Privacy Notice, by electronic means (for example, email or online posting). An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my

local TWC office.

**20. Waiver**

I agree that failure by TWC to enforce any of its rights hereunder shall not
constitute a waiver of any such rights. No waiver by either party of any breach
or default shall be deemed to be a waiver of any preceding or subsequent
breach or default.

**21. Assignment**

I understand that my Services are being provided only to the location
identified on my Work Order and that I am not allowed to transfer all or any
portion of the Services, or TWC's Equipment, to any other person, entity or
location, including a new residence. I agree that I may not assign or transfer
this Agreement. TWC may transfer or assign any portion or all of this
Agreement at any time without notice to me, and I waive any such notice
which may be required.

**22. Effect of Applicable Law; Reservation of Rights**

This Agreement, the Work Order and the Terms of Use are subject to all
applicable federal, state or local laws and regulations in effect in the relevant
jurisdiction(s) in which I receive my Services. If any provision of this
Agreement, the Work Order or the Terms of Use contravene or are in conflict
with any such law or regulation, or if I am entitled to more favorable rights
under any such law or regulation than are set forth in any provision in this
Agreement, the Work Order or the Terms of Use, then the terms of such law
or regulation, or the rights to which I am entitled under such law or regulation,
shall take priority over the relevant provision of this Agreement, the Work
Order or the Terms of Use. If the relevant law or regulation applies to some
but not all of my Service(s), then such law or regulation will take priority over
the relevant provision of this Agreement, the Work Order or the Terms of Use
only for purposes of those Service(s) to which the law or regulation applies.
Except as explicitly stated in this Agreement, nothing contained in this
Agreement shall constitute a waiver by me or TWC of any rights under
applicable laws or regulations pertaining to the installation, operation,
maintenance or removal of the Services, facilities or equipment.

**23. Parental Control Device**

I acknowledge that I have been advised of the availability of TWC's parental
control device which can filter or block certain programming. Additional
information about the device is available at the TWC contact number in the
Subscriber Materials.

**24. Conflicting Terms**

In the event of a conflict in the terms and conditions between this Residential
Services Subscriber Agreement and the accompanying Work Order, then the
terms and conditions of this Agreement shall control.