

COPY

1    JEFFREY M. SHOHET (Bar No. 067529)
     JULIE L. HUSSEY (Bar No. 237711)
2    CARRIE S. DOLTON (Bar No. 234298)
     **DLA PIPER US LLP**
3    401 B Street, Suite 1700
     San Diego, CA  92101-4297
4    Tel: 619.699.2700
     Fax: 619.699.2701
5

     Attorneys for Defendant
6    TIME WARNER ENTERTAINMENT-ADVANCE/
     NEWHOUSE PARTNERSHIP, A NEW YORK
7    GENERAL PARTNERSHIP, THROUGH ITS SAN
     DIEGO DIVISION, DBA TIME WARNER CABLE
8

9          SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

10                      CENTRAL DIVISION

11

12    LEON ALPERT, an individual, on behalf
     of himself, on behalf of all those similarly
13    situated, and on behalf of the general
     public,
14

15             Plaintiff,

16         v.

17    TIME WARNER CABLE, INC., a
     Delaware corporation, and DOES 1 TO
18    100,

19           Defendants.

CASE NO.  GIC881621

**STIPULATED [PROPOSED] PROTECTIVE ORDER**

Dept: 63
Judge:  Luis R. Vargas

20

21

22

23

24

25

26

27

28

1    Plaintiff LEON ALPERT ("Plaintiff") and named Defendant TIME WARNER

2    ENTERTAINMENT-ADVANCE/ NEWHOUSE PARTNERSHIP, a New York General

3    Partnership ("Defendant"), (collectively, the "Parties") assert that they may possess confidential

4    information in the form of trade secrets or other confidential and/or proprietary business, personal

5    and/or technical information related to the subject matter of this litigation and that it may be

6    necessary to disclose such materials during the course of this litigation.  However, the Parties

7    desire to limit disclosure and prevent the use or misuse of such information for purposes other

8    than the prosecution and defense of this action.

9    Subject to the California Rules of Court, as well as the California Code of Civil

10    Procedure, the Parties, by and through their respective counsel of record hereby stipulate and

11    agree to the request, and entry of, the following Protective Order ("Order").  The Parties hereby

12    stipulate and agree that any findings made by the Court pursuant to this Order shall be made

13    pursuant to Rules of Court 2.550 and 2.551.  Consequently, no court proceedings or court

14    transcripts may be sealed in advance pursuant to the Parties' stipulations, alone.  Furthermore, the

15    parties stipulate and agree that this Order shall not bind third parties to this action nor bind any

16    other court.

17    Good cause exists for the Court to enter this Order because the property and privacy

18    interests of the Parties outweighs the public's interest in full and complete access to judicial

19    proceedings and because this Order provides a mechanism by which any Party or interested

20    member of the public may challenge a confidentiality designation.

21    Accordingly, to expedite discovery and pursuant to the stipulation of counsel, and good

22    cause having been shown, the Court hereby ORDERS as follows:

23    1.    Confidential Materials:  At the time of production or disclosure of any documents,

24    discovery responses, testimony, data or other materials, or portions thereof, by any party

25    believing that said materials contain proprietary, trade secret and/or confidential information

26    (hereafter "the Producing Party"), the Producing Party may designate the materials as being

27    subject to this Order by affixing a legend to the materials indicating that said material was

28    produced in this case as "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES

1  ONLY" material which shall be subject to the terms of this Order (hereafter "Protected

2  Materials").

3      2.    Designation and Access to Protected Materials:  Production of Protected Materials

4  shall be subject to the following terms and conditions:

5          A.    All documents and/or materials subject to the terms of this Order shall be

6  clearly marked by the Producing Party in the manner specified in Paragraph 1 above; the marking

7  will be done, insofar as practicable, in a way that does not render illegible the substantive portions

8  of the documents containing Protected Materials;

9          B.    Protected Materials shall only be used in the litigation of this case and any

10  trial or post-trial proceedings in this case and for no other purpose(s) whatsoever and shall not be

11  used by anyone subject to the terms of this Order for any business, commercial, or competitive

12  purposes.  Production of Protected Materials in this action shall not operate as a waiver of the

13  Parties' confidentiality over the Protected Materials.

14          C.    Confidential Material:  Designation of "CONFIDENTIAL" Protected

15  Materials shall be limited to materials that, in a good faith determination by the Producing Party

16  and its counsel, contain proprietary, trade secret and/or confidential information not otherwise

17  available to the public.  Access to CONFIDENTIAL Protected Materials, and the information

18  contained therein (including extracts, copies, notes, and summaries derived from them), shall be

19  restricted to the following:

20              i.    The parties, attorneys of record in this case and personnel assisting

21  and supporting those attorneys in their work in this case (which specifically includes partners,

22  associates and employees of the firm as well as outside attorney services whose assistance is

23  required in the preparation of this case for trial);

24              ii.    Those agents of the party, or other consulted professionals,

25  including attorneys, whose assistance is required in the preparation of this case for trial and who

26  must have access to the material to render assistance in that preparation;

27  /////

28  /////

1              iii.    Experts or consultants retained or consulted in connection with the

2    preparation or trial that have executed the Acknowledgement attached hereto as Exhibit A

3    (hereafter "Acknowledgement");

4              iv.    Any individual who is indicated as an author or wrote the document

5    or information in issue; or any individual who is indicated as a recipient of the document or

6    information in issue;

7              v.    Such other persons as counsel for the Producing Party may

8    authorize in writing, or as ordered by the Court;

9              vi.    Any court reporter or videographer reporting a deposition in this

10   action, and;

11             vii.    The Court and court personnel, including stenographic reporters

12   engaged in such proceedings, as are necessarily incident to the handling, preparation or pre-trial

13   hearings of this case.

14        D.    <u>Confidential—Attorneys-Eyes Only Materials</u>:  Designation of

15   "CONFIDENTIAL—ATTORNEYS EYES ONLY" Protected Materials shall be limited to

16   materials that, in a good faith determination by the Producing Party and its counsel, contain

17   proprietary, trade secret and/or confidential information not otherwise available to the public and

18   which the Producing Party reasonably believes would cause competitive injury to the Producing

19   Party if such information were to be disclosed to the other party or others, thus warranting that

20   disclosure be further limited as set forth herein.  Access to "CONFIDENTIAL—ATTORNEYS

21   EYES ONLY" Protected Materials, and the information contained therein (including extracts,

22   copies, notes, and summaries derived from them), shall be restricted to the following:

23             i.    Outside counsel of record in this case and personnel assisting and

24   supporting those attorneys in their work in this case (which specifically includes partners,

25   associates and employees of the firm as well as outside attorney services whose assistance is

26   required in the preparation of this case for trial);

27             ii.    Experts or consultants retained or consulted in connection with the

28   preparation or trial that have executed the Acknowledgement attached hereto as Exhibit A;

DLA PIPER US LLP          GT\6552663.3                    -3-
   SAN DIEGO

                                                        STIPULATED PROTECTIVE ORDER

1             iii.      Any deponent who has authored or wrote the document or

2 information in issue; or any deponent who is indicated as a recipient of the document or

3 information in issue;

4             iv.      Such other persons as counsel for the Producing Party may

5 authorize in writing, or as ordered by the Court;

6             v.      Any court reporter or videographer reporting a deposition in this

7 action, and;

8             vi.      The Court and court personnel, including stenographic reporters

9 engaged in such proceedings, as are necessarily incident to the handling, preparation or pre-trial

10 hearings of this case.

11         E.      The parties to whom such Protected Materials are made available will not

12 disclose, directly or indirectly, the specific contents of the Protected Materials produced herein

13 (including extracts, copies, notes, and summaries derived from them) to anyone except those

14 persons identified in Paragraphs C and D, immediately above.

15         F.      It shall be the duty of counsel receiving such Protected Materials, prior to

16 its disclosure to those permitted to receive it under this Order, to instruct those persons as to the

17 confidentiality of such Protected Materials and the terms of this Order; before any such person

18 shall receive any Protected Materials produced in this case, each such person shall be required to

19 read this Order and agree in writing, in the Acknowledgment attached hereto as Exhibit A, to be

20 bound by each of the terms of this Order.

21         3.      <u>Use of Protected Materials Subject to Protective Order</u>: All information contained

22 in Protected Materials produced pursuant to this Order, including all information derived there

23 from, shall be used <u>only</u> for the purposes of this litigation and any trial or post-trial proceedings in

24 this case and for no other purpose(s) whatsoever.

25         A.      <u>Use of Protected Materials at Deposition</u>: Counsel shall not disclose

26 Protected Material to a witness testifying at a deposition except in strict conformity with the

27 provisions of this Order or unless the party producing the Protected Materials assents to the

28 disclosure of such information in writing or on the record of the deposition.

1          i.    Designation of Protected Materials at Deposition: To designate a

2    portion or an entire deposition transcript as subject to this Order, counsel may either (a) request

3    on the record, or (b) request within fourteen (14) days of receipt of the transcript of the

4    deposition, that the information disclosed be designated as CONFIDENTIAL or

5    CONFIDENTIAL—ATTORNEYS EYES ONLY as appropriate and considered subject to this

6    Order. Pending such designation by counsel, the entire deposition transcript, including exhibits,

7    shall be deemed "CONFIDENTIAL," except for those portions of the transcript which counsel

8    previously designated as "CONFIDENTIAL—ATTORNEYS EYES ONLY." At the expiration

9    of the fourteen (14) day designation period, only the pertinent pages of the deposition transcript

10   or exhibits so designated will be treated as Protected Materials and will be utilized only as

11   permitted by this Order, unless otherwise ordered by the Court.

12          ii.    Attendance at Depositions: In the event that questions asked or

13   responses provided during depositions require the disclosure of Protected Materials, or if any

14   party desires to make an inquiry into Protected Materials, the attorney shall make such inquiry

15   only in the presence of those persons authorized to access such information under this Order and

16   counsel shall have the right to exclude from oral deposition any person who is not authorized by

17   this Order to receive said information. Such right of exclusion shall be applicable only during the

18   period where such Protected Materials are being discussed.

19          iii.    Treatment of Confidential Material During Inspection of

20   Documents: It is contemplated that a party may make certain files and/or documents available for

21   inspection by the other party, which files may contain confidential material, and that following

22   such inspection, the inspecting party may designate certain documents and/or materials to be

23   copied and produced. All documents and their contents made available for such inspection shall

24   be treated as "CONFIDENTIAL—ATTORNEYS' EYES ONLY" Protected Materials for a

25   period of fourteen (14) days after said inspection to permit the producing party reasonable time to

26   designate and mark those documents which were requested to be produced as either

27   "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES ONLY" pursuant to the terms

28   of this Order.

1    4.    Subsequent Designation of Protected Material:  In the event a party inadvertently

2    fails to stamp or otherwise designate any document, discovery response, summary, testimony or

3    any other material as Protected Materials, such failure shall not operate as a waiver and said party

4    may, as soon as practicable after disclosure, or receipt of the deposition transcript, designate such

5    information as Protected Materials by giving written notice to all parties.  Under such

6    circumstances, however, no receiving party shall have any obligation or liability due to any

7    disclosure of the information which occurred prior to receipt of such notice; provided, however,

8    any subsequent disclosures shall be in accordance with such designations and this Order.

9    5.    Filing of Protected Materials:  Any item(s) designated as Protected Materials, and

10    any memorandum or document(s) purporting to reproduce or reveal the contents of such

11    Protected Materials, that a party intends to file or lodge with the Court will be filed or lodged

12    under seal in accordance with the following procedure:

13        A.    Any party contemplating the filing or use of Protected Materials in a Court

14    proceeding, including trial, other than an ex parte application, shall do so in accordance with

15    California Rule of Court 2.550—2.551, and pursuant to any local rules;

16        B.    Whereafter, the Producing Party shall have ten (10) days pursuant to

17    California Rule of Court 2.551 from the date of receipt of written notice that Protected Material

18    will be filed with the Court, to file a motion or an application to obtain an Order sealing the filing

19    of such Protected Materials in accordance with California Rule of Court 2.551;

20        C.    No Protected Materials will be filed with the Court, other than in

21    connection with an ex parte application (the procedure for which is specified in paragraph D,

22    immediately below), without adherence to the procedure set forth in California Rules of Court

23    2.550 and 2.551;

24        D.    In the event of an ex parte application requiring the Court's consideration

25    of Protected Materials, the moving party will give written notice to the producing party of the

26    intended use of the Protected Materials and either:  (a) will not, in its application, produce or

27    reveal the contents of the Protected Materials, or (b) will lodge the Protected Materials in strict

28    accordance with the procedure specified in California Rules of Court 2.551.

E.    Outside counsel of record for the parties shall have the right to access the Court's files in this case, including materials which have been designated as "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS EYES ONLY." Counsel of record may provide written authorization to an attorney service to access and copy the entire file in this case, including materials which have been filed under seal. The Clerk is directed and authorized to allow access to such attorney service upon presentation of such written authorization.

6.    <u>Pretrial Application Only</u>: This Order shall apply only to pretrial discovery. If the case proceeds to trial, the parties shall raise any issues related to the handling of Protected Materials with the Court at the Trial Readiness Conference and the Court will determine the procedures to be followed regarding the handling of Protected Materials at trial.

7.    <u>Court Proceedings</u>: Nothing herein shall be construed to prejudice any party's right to use before the Court any Protected Materials. However, before doing so, to the extent not otherwise authorized to be so used hereunder, the party intending to use Protected Materials shall so inform the Court, and any party may apply to the Court for appropriate protection, including clearing of the hearing room or courtroom of persons not entitled to receive Protected Materials as authorized herein.

A.    <u>Admissibility and Objections</u>: This Order shall not constitute a waiver of any party's or non-party's right to object to the admissibility into evidence of any Protected Materials as provided by California and/or Federal law. Nothing in this Order shall prejudice the right of a party to (a) object to a request on any ground; (b) seek additional protective treatment for any information; (c) object to the designation of any document as Protected Materials or (d) seek any modification of or relief from any provision of this Order. Nothing in this Order shall abridge the rights of any party to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning issues of the status of Protected Materials.

8.    <u>Meet and Confer</u>: Prior to filing any motion or application to enforce this Order or to challenge the designation of Protected Materials, the moving party shall notify the responding party in writing and meet and confer in good faith in an attempt to resolve the dispute(s).

STIPULATED PROTECTIVE ORDER

1    9.    Challenge to Confidential Designations: If a party objects to the designation of

2    any documents, information, materials and/or deposition testimony as CONFIDENTIAL or

3    CONFIDENTIAL—ATTORNEYS EYES ONLY, that party shall state its objection and the basis

4    therefore in writing to the Producing Party's counsel, and shall maintain the confidentiality of the

5    information unless and until the dispute is resolved by agreement of counsel or court order.

6    Counsel for the parties shall meet and confer within five (5) days after receipt of such written

7    objection in an effort to resolve any such dispute.  If counsel are unable to resolve the dispute, it

8    shall be the obligation of the Producing Party to seek a court order resolving the dispute within

9    ten (10) days after the meet and confer process has concluded.  The burden of proof will be on the

10   Producing Party seeking protection for the materials in question.  The confidential status of the

11   information in dispute shall be maintained until service of a final court order resolving the

12   dispute.  Documents already produced in this litigation (i.e., before the execution of this

13   Protective Order) are subject to the terms of this Order.  Plaintiff retains his right to object to the

14   confidential designation of previously produced documents  and may object to such designation

15   as outlined within this paragraph within ten (10) days of execution of this order by counsel.

16   10.    Disclosure to Unauthorized Persons: If information subject to this Order is

17   disclosed to any unauthorized person either through inadvertence, mistake or otherwise without

18   authorization by the designating party, or other than in a manner authorized by this Order, the

19   person responsible for the disclosure shall immediately (a) inform the Producing Party of all

20   pertinent facts related to such disclosure, including without limitation, the name, address, and

21   telephone number of the recipient and his or her employer; (b) use his or her best efforts to

22   retrieve the disclosed information and all copies thereof; (c) advise the recipient of the improperly

23   disclosed information, in writing, of the terms of this Order; (d) make his or her best efforts to

24   require the recipient to execute an agreement to be bound by the terms of this Order in the form of

25   the Acknowledgement attached as Exhibit A; and (e) take all other reasonable steps to prevent

26   further disclosure by or to the unauthorized person who received the protected information.

27   /////

28   /////

DLA PIPER US LLP
SAN DIEGO

GT\6552663.3                              -8-

1      11.   <u>Return of Confidential Materials Upon Final Resolution</u>: Upon written request of

2 the Producing Party, within sixty (60) days after the entry of a final judgment no longer subject to

3 appeal or the execution of any final agreement between the parties to resolve and settle this case,

4 any party who has received Protected Materials, their counsel, and any person authorized by this

5 Order to receive protected Materials shall, within thirty (30) days from the receipt of the written

6 request, return to the Producing Party, or destroy, all information and documents subject to this

7 Order, and any copies thereof, and any other writing containing, summarizing and/or disclosing

8 the contents of any Protected Materials.

9      A.   Returned materials shall be delivered in sealed envelopes marked

10 "CONFIDENTIAL" to the Producing Parties' respective counsel;

11      B.   Counsel of record shall be entitled to retain a copy of such materials in

12 order to preserve its litigation file in this case;

13      C.   An attorney from the outside law firm of record for each Party who

14 received any Protected Materials in the course of this proceedings shall, upon request, provide a

15 declaration under penalty of perjury certifying that, to the best of his or her knowledge, all

16 Protected Materials (except outside counsel's litigation file) in their possession, custody or

17 control have been destroyed or returned to outside counsel of record for the Producing Party.

18      12.   <u>Disposition of Evidence</u>: At the conclusion of this case, the disposition of all

19 Protected Materials entered into evidence shall be governed by the California Rules of Court or

20 applicable Local Rules and may be withdrawn from evidence and the Court files by the Producing

21 Party as permitted, unless otherwise ordered by the Court.

22      13.   Nothing in this Order shall bar or otherwise restrict any attorney signing herein

23 from rendering advice to his or her client with respect to this litigation and in the course thereof,

24 referring to or relying upon his or her examination of Protected Materials; provided, however,

25 that in rendering such advice the attorney shall not disclose the content or source of information

26 to those persons not authorized to receive it.

27 /////

28 /////

14.    Amendment:  This Order may be amended by the written agreement of counsel for the parties to this agreement in the form of a stipulation that shall be filed in this case; provided such amendment does not impose additional burdens on the Court and is approved by the Court.

15.    Jurisdiction:  The terms of this Order shall survive the conclusion of this action and this Court shall retain jurisdiction of this action, the parties, their attorneys, and all other persons to whom confidential information has been disclosed after its conclusion for the purposes of enforcing the terms of this Order or redressing any violation thereof.

16.    Access and Public Challenge:  The Clerk is authorized to show a copy of this Order to anyone desiring access to any of the papers of this suit and is ordered to deny access to all papers filed pursuant to paragraph 5 of this Order.  Any party or any interested member of the public may seek leave of the Court to challenge the designation of particular documents filed under seal as Protected Materials.  If an interested member of the public makes such a challenge, the Party who designated the material as Protected Materials shall be given the opportunity to oppose any such challenge.

17.    Good Faith:  Each party agrees that designations of Protected Materials as "CONFIDENTIAL" or "CONFIDENTIAL—ATTORNEYS' EYES ONLY" information and any request and responses to permit further disclosure of any such designated information shall be made in good faith and not to (a) impose burden or delay on any party, or (b) to use for tactical purpose or other advantages in litigation.

18.    Right to Further Relief:  Any party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement, may move the Court for an injunction or an Order to Show Cause seeking to hold that party in contempt of Court and seeking such other relief, including sanctions, as may be appropriate under the circumstances.  Pending disposition of the motion by the Court, the party alleged to be in violation of or intending to violate this Order shall discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

/////

19.    Any party signing through counsel, and any party's counsel signing this Order or anyone signing the Acknowledgement attached as Exhibit A after the date that this Order is entered by this Court, will be bound by the terms of this Order.

IT IS SO STIPULATED.

Dated: March 14, 2008

DLA PIPER US LLP

By_____
JULIE L. HUSSEY
Attorneys for Defendant
TIME WARNER ENTERTAINMENT-
ADVANCE/ NEWHOUSE PARTNERSHIP, A
NEW YORK GENERAL PARTNERSHIP,
THROUGH ITS SAN DIEGO DIVISION,
DBA TIME WARNER CABLE

Dated: March 14, 2008

By_____
BARRON E. RAMOS
Attorneys for Plaintiff LEON ALPERT

Dated: March 14, 2008

CLARK AND MARKHAM

By_____
DAVID R. MARKHAM
Attorneys for Plaintiff LEON ALPERT

**IT IS SO ORDERED.**

Dated: _____, 2008

_____
HONORABLE LUIS R. VARGAS.
JUDGE OF THE SUPERIOR COURT

## ACKNOWLEDGEMENT AND AGREEMENT PURSUANT
## TO STIPULATED PROTECTIVE ORDER

I, the undersigned, being duly sworn, agree and acknowledge:

(A)    That I have read and understand the provisions of the STIPULATED PROTECTIVE ORDER entered by the San Diego Superior Court in the action titled *Leon Alpert v. Time Warner Cable, Inc.*, Case No. GIC88162 and agree to be bound thereby;

(B)    For the purpose of enforcing the aforesaid STIPULATED PROTECTIVE ORDER I hereby submit myself to the personal jurisdiction of the Court captioned above;

(C)    I understand that documents and discovery materials produced in this action and designated at Protected Materials may not be disclosed to anyone except as authorized in the STIPULATED PROTECTIVE ORDER and may not be used for any purpose other than this litigation.  I will not disclose, discuss, write, or otherwise convey the Protected Materials which are the subject of the STIPULATED PROTECTIVE ORDER or the contents of or information in such Protected Materials, to anyone other than those authorized in the STIPULATED PROTECTIVE ORDER.

(D)    I shall, at the conclusion of this action, deliver to counsel for the party who has provided such Protected Materials to me, for transmission to counsel for the Producing Party, all documents that constitute Protected Materials which are the subject of the STIPULATED PROTECTIVE ORDER and any and all notes, compilations, photographs, memos, etc., which refer to the documents which are the subject of the STIPULATED PROTECTIVE ORDER, or contents of or information in said documents.

(E)    I understand that a violation of this Acknowledgement and Agreement is a violation of the STIPULATED PROTECTIVE ORDER and may be punishable by sanctions imposed by the Court, including but not limited to, citation for contempt.

/////

/////

/////

1    I declare under penalty of perjury that the foregoing is true and correct and that this

2  Acknowledgement and Agreement is executed this ___ day of _____, at

3  _____.

4

5                                  By:      _____

6                                  Address: _____

7                                           _____

8                                  Phone:   _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

GT\6552663.3                          -13-

STIPULATED PROTECTIVE ORDER

1 | Barron E. Ramos (SBN 179620)
2 | **LAW OFFICES OF BARRON E. RAMOS**
  | 132 N El Camino Real #303
3 | Encinitas, CA 92024
  | Tel:    (760) 274-6438
4 | Fax:    (760) 994-1354

5 | David R. Markham (Bar No. 071814)
6 | R. Craig Clark (Bar No. 129219)
  | James M. Treglio (Bar No. 228077)
7 | **CLARK & MARKHAM, LLP**
  | 401 West "A" Street, Suite 2200
8 | San Diego, CA 92101
  | Telephone: (619) 239-1321
9 | Facsimile:  (619) 239-5888

10 |
11 | Attorneys for the Plaintiff,

12 |
13 | SUPERIOR COURT OF THE STATE OF CALIFORNIA
14 | FOR THE COUNTY OF SAN DIEGO

15 |

| | |
|---|---|
| LEON ALPERT, an individual on behalf of himself, and on behalf of all persons similarly situated, and on behalf of the general public, | Case No.: GIC881621 |
| | **CLASS ACTION** |
| Plaintiff, | **PLAINTIFF LEON ALPERT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TIME WARNER CABLE INC., a Delaware Corporation, and Does 1 to 100, | |
| Defendant | **Hearing** |
| | Date:       April 4, 2008 |
| | Time:       10:30 a.m. |
| | Dept:       63 |
| | Judge:      Luis R. Vargas |
| | Complaint:  March 13, 2007 |
| | FAC:        May 16, 2007 |

# TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

II.   SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

III.  APPLICABLE LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

IV.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

V.   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    i.  TWC Admits It Overcharged Alpert . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    ii.  TWC's Discrimination in Price for Additional Services against HOA members  is

       Unlawful under Federal Law and Section 17200. . . . . . . . . . . . . . . . . . . .12

   iii.  The FCC has Found that Use of an "exclusive" Cable Services Contract with an

       HOA is Unfair Competition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    iv.  TWC Admits It Concealed Its HOA Pricing. . . . . . . . . . . . . . . . . . . . . . . . .15

    v.  TWC Admits It Enforces An Unlawful 30 Day Billing Error Notice. . . . . . . . . .18

VI.  TWC's MSJ FAILS BECAUSE IT IS BASED ON DISPUTED FACTS. . . . . . . . 19

    i.  In 2006, Alpert Did Not Request Additional Services Nor To Be "Bundled". . . . .19

    ii.  TWC Had A Duty to Inform Residents of HOA Pricing. . . . . . . . . . . . . . . . . 19

   iii.  Alpert Did Not Believe He Was Properly Charged. . . . . . . . . . . . . . . . . . . . 20

VII.  TWC RELIES UPON THE SAME INAPPOSITE AUTHORITY ALREADY

      CONSIDERED AND REJECTED BY THIS COURT. . . . . . . . . . . . . . . . . . . . . .21

VIII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## CASES

*Aguilar v. Atlantic Richfield Company*

(2001) 25 Cal. 4th 826, 884 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Barquis v. Merchants Collection Association*

(1972) 7 Cal. 3d 94, 113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Belton v. Comcast Cable Holdings, LLC*

(2007) 151 Cal.App.4th 1224151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Bronco Wine Co. v. Jolley*

(2004) 33 Cal. 4th 943 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Charnay v. Cobert*

(2006) 145 Cal. App. 4th 170 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*

(2001) 90 Cal.App.4th 335, 345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Colgan v. Leatherman Tool Company*

135 Cal. App. 4th 680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Committee on Children's Television v. General Foods Corp*

1983) 35 Cal.3d 197, 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13,15

*Daugherty v. American Honda Motor Co., Inc.*

(2006) 144 Cal.App.4th 824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Freeman v. Wal-Mart Stores, Inc.*

(2003) 111 Cal.App.4th 660, 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Gibson v. World Savings & Loan Assn.*

(2002) 103 Cal. App. 4th 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Hodge v. Superior Court*

   (2006) 145 Cal. App. 4th 278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*

   466 U.S. 2 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Kasky v. Nike, Inc.*

   (2002) 27 Cal.4th 939 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Lavie v. Proctor & Gamble Co.*

   105 Cal. App. 4th 504-509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Massachusetts Mutual Life Insurance v. Superior Court*

   97 Cal. App. 4th at 1292-1293 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Moreno v. Sanchez*

   (2003) 106 Cal.App.4th 1415, 1430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Orkin Exterminating Co., Inc. v. FTC,*

   849 F.2d 1354 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20

*People v. Wahl*

   (1940) 39 Cal. App. Supp. 2d 771, 774) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16,20

*Plotkin v. Sajahtera, Inc.,*

   106 Cal.App.4th 953 (2003) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Schnall v. Hertz Corporation*

   78 Cal.App.4th 1144 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Searle v. Wyndham Internat., Inc.,*

   (2002) 102 Cal.App.4th 1327 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*South Bay Chevrolet v. General Motors Acceptance Corp.*

   (1999) 72 Cal. App. 4th 861, 878 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

1

*Stevens v. Superior Court*

2

(1999) 75 Cal. App. 4th 594, 602-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

3

*Stop Youth Addiction v. Lucky Stores*

4

(1998) 17 Cal. 4th 553, 560. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

5

6

## STATUTES

7

47 U.S.C. 543(8)(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12-13

8

47 U.S.C. 543(8)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9

10

47 U.S.C. 583(8)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11

Business & Professions Code §17200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

12

15 U.S.C. §§45 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      **INTRODUCTION**

This case really presents two unfair practice claims within a single unfair competition case.  The first and simpler claim is whether TWC can bill higher a la carte rates to its HOA customers without notifying them that lower HOA rates are also in effect and when the customer agreement recites that current rates have been disclosed.  This claim covers the time period March 2005 through October 2007.

The second and more complex claim covers the entire class period.  It involves the use of exclusive contracts for sale of basic cable channels to HOAs at rates below the basic rates for non-HOA customers, and once the HOA members are locked in, charging them higher, discriminatory rates for additional services as they are added, in violation of 47 U.S.C. §543.  This is done through steering the HOA customers into a la carte pricing, and using bundled pricing for non-HOA customers.

II.     **SUMMARY OF ARGUMENT**

This action is brought under California's Unfair Competition Law ("UCL") to remedy overcharging and discriminatory pricing directed against cable subscribers who are members of homeowners' associations ("HOAs").  Time Warner Cable ("TWC") negotiates "bulk" contracts with HOAs to provide basic 77 channel cable service to all units in a subscribing HOA at prices below the prevailing rates for basic services available to members of the general public, in return locking in all members of the HOA into exclusive contracts which bar the members from getting basic cable service from TWC's competitors.  Each unit owner then reimburses his HOA for the cost of these basic services in monthly assessments.  After the bulk contract is in place, HOA members then purchase "Additional Services" from TWC such as digital cable, premium channels, internet and digital phone service.  According to TWC's PMK witness, the majority of its customers order Additional Services and not just the basic 77 channels.  Decl. of Ramos, Exh. A, Rhodes Dep. at 153:23-154:11.

Not disclosed when the bulk HOA contracts are negotiated is TWC's business strategy of using a pricing structure which charges more to HOA customers for  additional cable services beyond basic service than non-HOA customers are charged.  For HOA subscribers who purchase

1  such additional services, the savings in the bulk contracts disappear and ultimately they pay more

2  for cable service then they would pay had they not been part of an HOA, or if their HOA had not

3  negotiated any bulk contract with TWC at all.

4       Plaintiff, for example, was a member of the SeaPoint HOA which purchased basic 76-

5  channel cable service for each of its 237 units (including plaintiff's) for $28.77 a month, an

6  apparent savings of $23 a month below the $50.97 a non-HOA customer would pay per month

7  for basic 77-channel service.  As plaintiff and other HOA members subscribed for additional

8  services, TWC charged HOA customers a higher price for each additional service than non-HOA

9  customers were being charged.  This was accomplished through steering HOA subscribers to

10  additional services to "a la carte" pricing, while non-HOA customers were priced through a

11  series of "bundles" which included the basic 77 channels but included a lower price increase for

12  each additional service.  In this way, the benefit and savings in the HOA's basic services contract

13  quickly disappeared and, as more services were added, HOA customers ended up paying more

14  for the same basket of services than members of the general public.   For example, Mr. Alpert

15  was charged $25.80 a month more than a member of the public would have paid to upgrade their

16  basic 77 channel cable service to digital and premium channels.

17       Then, in 2005, TWC introduced a new "HOA bundle" pricing structure which eliminated

18  the overcharge for additional services.  However, for HOA customers, it was illusory.  In fact, it

19  was a "stealth" pricing system as it was not advertised anywhere, notices were not sent to HOAs,

20  and the HOA bundle prices were not even posted on TWC's website.  Plaintiff discovered that

21  there was lower pricing by happenstance and demanded his pricing be lowered in September

22  2006 - after the lower pricing had been in effect for 18 months.

23       These practices violate the "deceptive" and "unlawful" prongs of the UCL as follows.

24  First, there was "deception" under section 17200 in not disclosing, at either the time of the

25  signing of the bulk HOA contract or when new HOA customers order additional services, that

26  the HOA prices for additional services would be higher than the prices charged to non-HOA

27  customers.  TWC does not disclose its business strategy of obtaining exclusive service contracts

28  with HOAs by negotiating lower rates for basic services with the intent to recapture margins

1  through higher prices to HOA members for additional services once the HOA members are

2  locked in to TWC for basic television service.

3      Second, price discrimination against HOA customers with exclusive HOA cable service

4  contracts is unlawful as it violates 47 U.S.C. 543(8)(d) which prohibits price discrimination for

5  the same services between customers in the same geographic area.   While bulk *"discounts"* to

6  HOAs are permitted, there is no provision in law or in the HOA agreement for charging a higher

7  price to HOA customers for exactly the same additional services as it charged to non-HOA

8  customers.

9      Third, the FCC has recently held that the use of "exclusivity" provisions in HOA cable

10  service contracts is unfair competition.   Order No. FCC 07-189 of the FCC dated October 31,

11  2007 and lodged herewith.  Request for Judicial Notice, Exhibit 1.

12      In this motion, TWC argues two things: first, that the amounts it collects from HOAs

13  each month for basic service to each unit should not be included in the calculation of the amount

14  each HOA customer pays in determining whether there was an overcharge for additional services

15  – without disputing that the customer ultimately pays this amount.  This is an oversimplification

16  and does not provide a defense to the unlawful and deceptive practices claims.  Second, it argues

17  that it did not have the duty to disclose to any HOA members the new "HOA bundled" pricing it

18  introduced in 2005, and thus that it had no duty to disclose that the same services were available

19  at lower prices to preexisting HOA customers unless and until they somehow discovered and

20  asked for them.  Again, as will be shown, TWC is also wrong on this contention as a matter of

21  law.

22  **III**    **APPLICABLE LEGAL STANDARD**

23      As set forth in *Aguilar v. Atlantic Richfield Company* (2001) 25 Cal.4th 826, 884,

24  California's specific test for either party to successfully move for summary judgment is first, the

25  party moving for summary judgment bears the burden of persuasion that there is no triable issue

26  of material fact and that he is entitled to judgment as a matter of law; and, (*Id.* at 850)  second,

27  the party moving for summary judgment bears an initial burden of production to make a prima

28  facie showing of the nonexistence of any triable issue of material fact; and, third, the party

1   moving for, and opposing, summary judgment may each carry their burden of persuasion and/or

2   production depends on which would bear what burden of proof at trial. *Id.* at 851.  Summary

3   judgment law in this state, unlike federal law, still "requires a defendant moving for summary

4   judgment to present evidence, and not simply point out through argument, that the plaintiff does

5   not possess, and cannot reasonably obtain, needed evidence." *Id.* at 884.   TWC fails to meet this

6   burden.

7   **IV.   STATEMENT OF FACTS**

8           As a resident of SeaPoint Townhomes ("SeaPoint"), Alpert is required to pay monthly

9   HOA dues.  Included in that monthly fee is an assessment paid to TWC for Alpert's monthly

10  cable bill for the basic 77 channels. Decl. Leon Alpert at para. 8.  That fee is $ 28.77 per month

11  and is charged to Alpert in his monthly assessments.  TWC's NOL, Exhibit B at Ex. B.  This

12  represented a savings of about $23 below the $50.97 a non-HOA customer would pay for the

13  basic channels in the simplest bundle called "Advantage Service."  Nutten Decl. Para. 4 and 5.

14          Since at least March of 2003 TWC has had an exclusive contract with SeaPoint to

15  provide basic cable services. Decl. Rhodes at para. 3; TWC's NOL, Exhibit B.  Under Paragraph

16  4.2 of the exclusive contract between SeaPoint HOA and TWC, "Additional Services" (i.e., other

17  than basic cable) would be provided directly from TWC to the consumer and billed separately to

18  the consumer. TWC's NOL, Exhibit B, 1.1(B), 2.  The TWC-SeaPoint contract gives TWC "the

19  exclusive right for the first five years to …install, operate [and] maintain…a system at the

20  Property for the provision of multi-channel video services…." TWC's NOL, Exhibit B,

21  Paragraph 4.2.

22          From the beginning of the class period until March 2005, TWC offered various bundled

23  packages to non-HOA customers in San Diego and Riverside Counties. These included both the

24  basic 77 channels as well as the additional services each customer decided to purchase; as each

25  bundle included progressively more services, its price increased.  However, HOA customers

26  asking for additional services were placed into what TWC calls "a la carte" billing systems

27  which itemized each additional service. Decl. Ramos, Exhibit A, Depo Rhodes at p. 155:20-

28  156:2.  The a la carte increases in price for additional services were higher than the increases

1   between bundles charged to non-HOA customers for the same increases in additional services.

2   Nutten Decl at 6. When the amount TWC billed to each HOA customer was added to the

3   amount he reimbursed his HOA ($28.77 in the case of SeaPoint), the savings ($23.00) an HOA

4   customer enjoyed under the HOA-TWC basic service contract disappeared. For example,

5   analysis by an auditor expert, Wesley Nutten, shows that by 2005 and 2006 Mr. Alpert was

6   paying more for cable services than he would have paid had he not been in an HOA and instead

7   been a member of the general public. Nutten Decl. para. 6. In fact, when determining pricing

8   for HOA customers, TWC admits that it did not consider that Alpert and the other HOA

9   members *are already paying for basic cable at all*. Decl. Ramos, Exhibit A, Depo Rhodes, at

10  p.150:12

11          TWC's business strategy of charging HOA members higher prices for additional services

12  once they were locked into exclusive cable contracts is not disclosed when the HOA contracts

13  are negotiated with HOAs.

14          Then, in March 2005, TWC created a new bundled pricing structure for HOA customers

15  (called Digipic HOA 1000, 2000 and 4000). The bundles reduced the prices to HOA members

16  by about $24 (*though still charging HOA members $15 more for the additional services*).

17  However, the new HOA bundles were not advertised or put on TWC's website with all TWC's

18  other prices, and no notice was sent to existing HOA customers or their association boards or

19  property managers. The new bundle prices were only made available to HOA customers who

20  called and requested new additional services. Decl. Ramos, Exhibit A, Depo Rhodes at pp.

21  163:22-164:9. In its MSJ, TWC argues it had no duty to disclose the new HOA bundle rates to

22  existing HOA customers. At the same time when a new HOA customer signs up for additional

23  services, TWC requires them to adopt and agree to a form contract in which they acknowledge

24  they are aware of its current pricing and rates. (TWC's NOL, Exhibit C) sets forth the terms of

25  the agreement between Alpert and TWC for the "Additional Services" offered over and above

26  basic cable. Paragraph no. 2 governing charges states that "*[c]harges for the Services are set*

27  *forth on a separate price list that I (the subscriber) have received*." In the case of the 2005,

28

1    HOA rates and its existing HOA customers in 2005 and 2006, this recital TWC inserts in its form

2    contracts is false.

3          In the fall of 2006, 18 months after the new HOA rates went into effect, Alpert received a

4    newsletter from his association indicating that HOA pricing was available to SeaPoint residents.

5    Decl. Alpert at para. 11. (It is still not clear how his association discovered the new pricing.)

6    After reviewing the pricing, Alpert realized he was being overcharged for his services. *Ibid.*

7    Once Alpert learned of the correct pricing in the fall of 2006, he called TWC to get his bill

8    adjusted. Decl. Alpert at para. 12. TWC admitted its error to Alpert, apologized, and then

9    adjusted his bill accordingly. *Ibid.* However, TWC refused to credit Alpert for the overcharges,

10   instead limiting the credit to one month's partial service. *Id.* at para. 13.

11         Alpert never requested any additional services and never requested to be bundled. *Id.* at

12   para. 12. He asked that his bill be corrected. *Ibid.* Unfortunately, TWC erased the recording of

13   this conversation while the lawsuit was pending. Decl. Ramos, Exhibit A, Depo Rhodes, at

14   p.200:23. After Alpert called to complain, Alpert's bill dropped to reflect the correct pricing for

15   his services. Decl. Alpert at para. 14. His new bill finally reflected TWC's HOA pricing. *Ibid.*;

16   FAC, Exhibit C; TWC's Amended Separate Statement, Exhibit E.

17   **V.    ARGUMENT**

18         (i)    **TWC Admits It Overcharged Alpert**

19         Before 2006, Alpert was not bundled into TWC's "Digipic" packages used for the

20   general public with an offset or credit for the values of basic cable service his HOA had already

21   subscribed for and which would have cost $50.97 a month to non-HOA customers. (Doing so, of

22   course, would have resulted in an "apples to apples" billing system for HOA and non-HOA

23   customers and avoided discriminatory pricing.) Instead, until 2005, TWC chose to force Alpert

24   and other HOA class members to pay "a la carte" pricing, which charged more for each

25   additional service than non-HOA customers were being charged through progressively larger

26   non-HOA bundles. Because of this, as HOA members like Alpert added additional services, the

27   incremental amount billed by TWC for those services was higher than the incremental amount

28   non-HOA customers for comparable additional services. Decl. Nutten at para. 8.

1    In 2005 TWC began to finally offer bundled packages "designed for bulk [HOA]

2    customers." Decl. Rhodes, para. 8. The only "design" was the lowering of the price since those

3    HOA packages were exactly the same as those for non-HOA customers (e.g., Digipic 4000 vs.

4    Digipic HOA 4000) - the HOA version just had a lower price, but still charged an additional $15

5    for the additional services.

6        (ii)    **TWC's Discrimination in Price for Additional Services against HOA**

7        **members is Unlawful under Federal Law and Section 17200.**

8        TWC's pricing scheme is also unlawful because cable operators "may not discriminate

9    between subscribers to the basic service tier and other subscribers with regard to the rates

10   charged for video programming offered on a per channel or per program basis." 47 U.S.C.

11   §543(8) (a). Further:

12   

13   > A cable operator shall have a rate structure for the provision of cable
> service that is uniform throughout the geographic area in which cable service
> is provided over its cable system . . . Bulk discounts to multiple dwelling units
> shall not be subject to this subsection, except that a cable operator of a cable
> system that is not subject to effective competition may not charge predatory prices
> to a multiple dwelling unit. Upon a prima facie showing by a complainant that
> there are reasonable grounds to believe that the discounted price is predatory, the
> cable system shall have the burden of showing that its discounted price is not
> predatory.

18   *Id.* at section (d).

19       Nothing in 47 U.S.C. §543 permits TWC to charge *more* to MDUs for additional services

20   than to general retail customers. When this happens, the rates are no longer "uniform." Forcing

21   Alpert and the class members to pay "a la carte" or otherwise pay more than non-HOA

22   customers is not only unlawful, unfair and deceptive, it is predatory. That is exactly what TWC

23   admits it did here. Moreover, under 47 U.S.C. §543(d), TWC bears the burden, not the Plaintiff,

24   of proving that its rates are *not* predatory. TWC has not done that. A review of Mr. Alpert's

25   records, and the rate cards reviewed by Plaintiff's expert shows that HOA residents like Mr.

26   Alpert paid a higher price for additional services, with or without the HOA bundle started in

27   2005.

28

1    The California Legislature specifically designed the UCL to enforce the legal obligations

2  imposed by federal laws and regulations such as FCC 07-189, and 47 U.S.C. §583 (8)(d). Any

3  law may serve as the predicate for a UCL claim. *Stevens v. Superior Court* (1999) 75 Cal. App.

4  4th 594, 602-3. As consistent decisions in California have maintained:

5
> [W]hether a private right of action should be implied under [the
6  > predicate] statute... is immaterial since any unlawful business
   > practice... may be redressed by a private action charging unfair
7  > competition... *Stevens, supra*, at 602.

8
   Because the Plaintiff was a victim of the practice and was injured by the invasion of his legal

9  rights, the UCL claim is a valid claim.

10    As discussed above, Mr. Alpert suffered economic injury by paying for products at a

11  higher rate than other, non-HOA residents. TWC cannot now claim that despite this obvious

12  discrimination and disparity, in violation of 47 U.S.C. §583 (8)(d), that there is no cause of

13  action. Plaintiff and the class members have all been harmed by TWC's unlawfully

14  discriminatory pricing. For Mr. Alpert, the benefit of the original bargain, $50.97 of basic

15  services bought for $28.77, is lost as the HOA customer orders additional services. By April of

16  2006, he, in fact, paid more for his services than a non-HOA subscriber. It was only until

17  September 21, 2006, when he received an "HOA bundle," that Mr. Alpert paid less than a non-

18  HOA subscriber for the same services (though still more for the additional services).

19    Under Business & Professions Code §17200, businesses cannot engage in any unlawful

20  practices or acts. As defined, an unlawful practice under the UCL is "anything that properly be

21  called a business practice and that at the same time is forbidden by law." *Barquis v. Merchants

22  Collection Association* (1972) 7 Cal. 3d 94, 113. In *Committee on Children's Television*, supra,

23  35 Cal. 3d at 210-211, a violation of the Sherman Antitrust Act was grounds for claiming

24  defendant's unlawful conduct. Similarly, in *Stop Youth Addiction v Lucky Stores* (1998) 17 Cal.

25  4th 553, 560, the violation was selling cigarettes to minors in violation of the Penal Code section

26  308. In *Hodge v. Superior Court* (2006) 145 Cal. App. 4th 278, the violation of the law was

27  based on the failure to pay overtime, a violation of the California Labor Code. Clearly,

28

1   discriminatory pricing, as prohibited by law under 47 U.S.C. §583 (8)(d) is unlawful. These

2   regulations and laws were created specifically to protect consumers like Alpert.

3        (iii)**The FCC has Found that Use of an "exclusive" Cable Services Contract with an**

4        **HOA Is Unfair Competition.**

5        On October 31, 2007 the Federal Communications Commission, adopted and later

6   published FCC 07-189, which is attached herein as Exhibit 1 to Plaintiff's Request for Judicial

7   Notice. The FCC, in writing this order, specifically found that:

8        That contractual agreements granting such exclusivity to cable operators harm
         competition and broadband deployment and that any benefits to consumers are
9        outweighed by the harms of such clauses . . . In this Order we prohibit the
         enforcement of existing exclusivity clauses and the execution of new ones by
10       cable operators and others subject to the relevant statutory provisions. This
         prohibition will materially advance the Act's goals of enhancing competition and
11       broadband deployment.

12

13  FCC 07-189, Paragraph 1. The FCC further defines exclusivity clauses as follows: "Exclusive

14  contracts are contracts that specify that, for a designated term, only a particular MVPD and no

15  other provider may provide video programming and related services to residents of an MDU."

16  FCC-07-189, Fn 2. The FCC held that exclusivity contracts limited the availability of satellite-

17  based video service in Multi-Dwelling Units (or MDU's), and that based upon the prevalence of

18  such units, and the extent that such clauses prohibit competition, the Commission had no choice

19  but to prohibit these clauses. *Id.* at Paragraphs 3-12. Specifically, the Commission noted that a

20  MDU or the residents of such MDU's have no bargaining power when "when the first cable

21  operator was 'the only game in town.' *Id* at Paragraph 12. Thus, the Commission concludes:

22       Exclusivity clauses deny MDU residents the benefits of increased competition,
         including lower prices and the availability of more channels with more diverse
23       content, as well as access to alternative providers of broadband facilities and the
         triple play of communications services their facilities support.
24

25  *Id.* at Paragraph 26. Exclusivity clauses were specifically held to hold no benefit for any

26  consumer and were unfair competition.

27       As stated above, Business and Professions Code § 17200 was designed by the Legislature

28  to enable victims of unfair competition, such as exclusivity contracts, to recoup their losses. A

1   review of Mr. Alpert's declaration and the declaration of Mr. Nutten indicates that Plaintiff, and

2   other members of the putative class, clearly suffered damages from being locked into these

3   exclusivity contracts by overpaying for additional services.

4          (iv)    **TWC Admits It Concealed Its HOA Pricing**

5         TWC states that it had "no duty" to inform Alpert or the class members of TWC's new

6   HOA bundled pricing which was adopted in March 2005. See TWC's Separate Statement, Nos.

7   36, 78, 103, 106. In other words, TWC is arguing that it can lawfully *conceal* its pricing from its

8   own customers when that pricing may result *in a reduction of charges* to the consumer. That is

9   plainly a *per se* deceptive business practice since such conduct would "likely deceive"

10  consumers into far paying more for the same services that they could otherwise pay had such

11  concealment not taken place. *Committee on Children's Television v. General Foods Corp.*

12  (1983) 35 Cal.3d 197, 211; accord, *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939. Indeed, here, when

13  Alpert learned of the lower pricing available from TWC for exactly the same set of services that

14  he already had, he called and complained and his bill was reduced.

15        This argument is fundamentally undermined by the fact that TWC makes all its

16  customers adopt an agreement under which consumers admit and acknowledge that they are

17  aware of all TWC current pricing, TWC NOL, Ex. C, paragraph 2, *and at the same time TWC*

18  *inconsistently argues now that it had no duty to disclose current pricing.*

19        Even if TWC's argument was correct that it was up to Alpert and the class members to

20  somehow find TWC's "hidden" HOA pricing, TWC's PMK admitted that TWC did not advertise

21  its San Diego HOA rates and did not even inform HOAs of the existence of HOA pricing. Decl.

22  Ramos, Exhibit A, Depo Rhodes, p.163:20, 211:20.

23        It its MSJ, TWC argues that such customers may *now* contact TWC or visit TWC's

24  website and so on. Decl. Rhodes at para. 12. But since TWC no longer offers such HOA pricing

25  as of October 2007, unless the HOA customer ordered it before that time (*Id.* at para. 11:13),

26  contacting TWC *now* would be irrelevant as would looking online. The question is whether,

27  during the class period, TWC made its HOA pricing known to Alpert and the class members.

28  TWC admits it did not.

---

1    The most common expression of the standard of deception is the reasonable consumer

2    standard. *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 504-509. The statement by the

3    defendant need not be false, but "deceptive and misleading in its implications." *Lavie*, at 510

4    (*quoting People v. Wahl*, (1940) 39 Cal. App. Supp. 2d 771, 774). The practice must be such

5    that it is "likely to deceive the reasonable consumer to whom the practice is directed." *South Bay*

6    *Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal. App. 4th 861, 878. Likewise,

7    "[t]he CLRA is to be "'liberally construed and applied to promote its underlying purposes, which

8    are to protect consumers against unfair and deceptive business practices and to provide efficient

9    and economical procedures to secure such protection.'" *Colgan v. Leatherman Tool Company*,

10    135 Cal. App. 4th 680. Where the deception concerns a material fact the court should presume

11    causation. *Massachusetts Mutual Life Insurance v. Superior Court*, 97 Cal. App. 4th at 1292-

12    1293. The Court in *Massachusetts Mutual Life Insurance* held that a misrepresentation of fact is

13    material when it was sufficient to cause the plaintiffs to alter their behavior. *Id.* at 1294.

14    The HOA consumer in this case is deceived when TWC created a bundle or package for

15    its HOA consumers, *and then concealed the HOA bundle pricing from pre-existing HOA*

16    *customers.* Decl. Ramos, Exhibit A, Depo Rhodes, p.163:20; 211:20. Worse yet, even with the

17    bundle, HOA members were *still being overcharged for additional services.* Decl. of Nutten,

18    Para. 6.

19    In *Schnall v. Hertz Corporation*, 78 Cal.App.4th 1144 (2000), the court held that a car

20    rental company's practice of disclosing its otherwise lawful fuel charge in a separate document

21    was deceptive. The court also concluded that:

22       Deception calculated to induce customers to subject themselves to an avoidable
         charge is inimical to the very concept of avoidability. The failure of a rental car
23       company to make it clear to customers that an avoidable charge is considerably
         higher than the retail rate for an item or service … would doubtless encourage
24       some and perhaps many customers to incur a fuel service charge they could and
         would otherwise avoid.
25

26    *Id.* at p.1164.

27    This case is far more egregious than *Hertz* in that TWC claims that it had no duty

28    whatsoever to reveal its HOA pricing to its own HOA customers. Unlike *Hertz*, where the

charge in dispute was fully, though inconspicuously, disclosed, here, TWC admits that it actually concealed its pricing and that it had no duty to disclose it. There was no notice. TWC failed to disclose its MDU bundle pricing to Alpert until a year after it was available all the while overcharging consumers for services that could otherwise have been obtained at a much lower rate.

Moreover, TWC argues that its "Subscriber Agreement" (TWC's NOL, Exhibit C) sets forth the terms of the agreement between Alpert and TWC for the "Additional Services" offered over and above basic cable. Of particular interest is paragraph no. 2 governing charges which states that "[c]harges for the Services are set forth on a separate price list that I (the subscriber) have received." TWC has submitted no evidence that it ever provided Alpert with its HOA price list before September 2006.

Put simply, TWC elected to charge Alpert full "a la carte" pricing when TWC could have, and should have, priced Alpert correctly. Prior to 2005, TWC should have bundled Alpert like any other retail customer who ordered exactly the same set of services, and then credited Alpert's account for the $50.97 value of basic cable which was already paid for and provided to Alpert each month. Then, from 2005 on, TWC should have modified Alpert's price to reflect the change TWC made in pricing for HOAs in San Diego. TWC did neither.

TWC once again argues that its business practices were not deceptive. It cites *Plotkin v. Sajahtera, Inc.*, 106 Cal.App.4th 953 (2003) (Def.'s Memo at p.13:27) for the proposition that reasonable notice does not have to be the best possible notice. Again, in this case, it is not a matter of insufficient notice – it is a matter of *no notice*. In 2005, when TWC offered the discounted price to HOA customers for bundles, TWC did not bother to provide *any* notice to Alpert or the HOA whatsoever. Moreover, unlike *Plotkin* where no one was forced to use the valet service, here, Alpert and the other residents were all *required* to pay TWC a fee through their HOA/MDU for basic cable. It was not an option. TWC was the "exclusive" provider of basic cable.

Similarly, TWC also once again cites *Searle v. Wyndham Internat., Inc.*, 102 Cal.App.4th 1327 (2002) for the proposition that not expressly advising a hotel's patrons that a service charge

1    added to a room bill was paid by the hotel to a server did not violate Section 17200.  *Searle* did

2    not involve an allegation of discriminatory charging or overcharging for the same service(s) as is

3    the case here.  The question is not what TWC is doing with the money it collects, as was the case

4    in *Searle*, but whether TWC is entitled to overcharge for its services.

5              **(v)    TWC Admits It Enforces An Unlawful 30 Day Billing Error Notice**

6              TWC admits that its Consumer Agreement, under which Additional Services were

7    provided by TWC, required Alpert to notify TWC within 30 days of identifying a billing error or

8    he would otherwise "waive" the error.  See TWC's Separate Statement, Nos. 30, 66, 67, 71, 91,

9    92.  TWC's 30-day "waiver" is *per* se unfair, deceptive and unlawful since (1) TWC believes

10   that it may conceal its pricing from its customers, as set forth above, rendering it impossible for

11   consumers to know if they have been overcharged; (2) TWC disclaims the accuracy of its own

12   billing statements in the Consumer Agreement (TWC NOL, Exhibit C, 2 (j), thus consumers

13   have no way of knowing, since TWC apparently does not know either, whether a bill is ever

14   correct; and (3) while contractually shortening a limitations period is generally permitted, it has

15   never been permitted for a period of less than six (6) months without being deemed

16   unconscionable.  See e.g., *Charnay v. Cobert*, 145 Cal. App. 4th 170 (2006)[finding that where a

17   six month contractual limitations period was not unreasonable, there was "no doubt" requiring a

18   client to assert a claim for breach of contract within 10 days of receipt of a billing statement is

19   "inherently unreasonable."]

20            Moreover, contractually shortening limitations periods are only permitted when

21   identifying a breach is "immediate and obvious."  *Moreno v. Sanchez* (2003) 106 Cal.App.4th

22   1415, 1430:

23            ["[A] contractually shortened limitations period has never been recognized
              outside the context of straightforward transactions in which the triggering event
24            for either a breach of a contract or for the accrual of a right is *immediate and
              obvious.* ... Most reported decisions upholding shortened periods involve
25            straightforward commercial contracts plus the unambiguous breaches or accrual
              of rights under those contracts." (Emphasis added)]
26

27   TWC's admitted concealment of its pricing makes detection of its systematic overcharging

28   neither "immediate" nor "obvious."

1    Significantly, waivers in form consumer adhesion contracts of obligations under federal

2 statute are void as against public policy. 15 U.S.C. §§45 et seq.. *Orkin Exterminating Company,*

3 *Inc. v. Federal Trade Commission* (11th Cir. 1988) 849 F.2d 1354, 1367, *cert. denied*, 488 U.S.

4 1041 (1989).

5 **VI.** **TWC's MSJ FAILS BECAUSE IT IS BASED ON DISPUTED FACTS**

6    **(i) In 2006, Alpert Did Not Request Additional Services Nor To Be "Bundled"**

7    TWC's MSJ is premised almost entirely on one central and repeated "fact": that in late

8 2006 Alpert specifically requested that TWC *change* his services and *bundle* him to thereby

9 lower his bill. See, e.g., TWC's Separate Statement, Nos. 25, 26, 27, 28, 40, 42, 43, 45, 62, 64,

10 72, 74, 76, 87, 89, 96, 98, 110, 112, 113, 115. He did not. In fact, Alpert *never* testified that he

11 asked TWC to bundle him for a discount in late 2006. Rather, Alpert testified that he called to

12 complain to TWC that his bill was too high and that TWC must lower it: "It's my sworn

13 testimony that I have no recollection about speaking about bundles with the Time Warner rep,

14 only about my bill and what I thought I should be paying." Decl. Alpert at para. 4 citing

15 Deposition Alpert at p.106, Decl. Ramos, Exhibit D. He did *not* ask for any bundle, nor did he

16 ask to change his services. He just wanted his bill to be corrected to the proper HOA rate, and it

17 was. Decl. Alpert at para. 5.

18    Significantly, of all the recordings TWC made of its multiple interactions with Alpert

19 over the years, the <u>only</u> recording missing (TWC records all of its conversations with customers)

20 was the one where Alpert called TWC in late 2006 and demanded that his bill be corrected.

21 According to TWC, that recording was "destroyed," even though this lawsuit had been pending

22 for at least six (6) months at the time. Decl. Ramos, Exhibit A, Depo Rhodes, p.200:23. Since

23 TWC destroyed this evidence, it is now Alpert's word against TWC's – which is necessarily a

24 disputed issue of fact which cannot be resolved in a motion for summary judgment.

25 Additionally, TWC's destruction of that evidence necessarily leads to a legal presumption in

26 Alpert's favor as to the content of that conversation. Evid. Code sections 412 and 413.

27    **(ii) TWC Had A Duty to Inform Residents of HOA Pricing**

28

1    TWC argues that it had no duty to inform Alpert or the other HOA residents of TWC's

2  HOA pricing. TWC is wrong. As discussed above, TWC requires each subscriber to agree he

3  has been given TWC's pricing rates (TWC NOL Exhibit C at para. 2). It cannot at the same time

4  refuse to give out applicable pricing rates. Under the Service Agreement (TWC NOL Exhibit B

5  at paras. 1.4 and 4.4), TWC was to inform Alpert's HOA and, in turn, the residents though the

6  HOA, of TWC's current marketing materials.

7    At a minimum, TWC had a duty to act in good faith when dealing with Alpert and his

8  HOA co-residents for whom the contract was intended to benefit. "Every contract imposes on

9  each party an implied duty of good faith and fair dealing." *Chateau Chamberay Homeowners*

10  *Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345. TWC obviously did not

11  act in good faith or deal fairly by concealing its HOA pricing.

12    TWC once again, as it did in its demurrer, argues that B&P Code section 17200 claim

13  cannot be based on a breach of contract. Again, TWC is wrong. In *Orkin Exterminating Co.,*

14  *Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988), the FTC successfully sued Orkin over systematic

15  breach of a form contract used in hundreds of consumer transactions.[1] *See Gibson v. World*

16  *Savings & Loan Assn.* (2002) 103 Cal. App. 4th 1291 [lender's systematic breach of form

17  consumer contracts actionable under "unlawful" clause of section 17200]. *See also Bronco Wine*

18  *Co. v. Jolley* (2004) 33 Cal. 4th 943.

19    (iii) **Alpert Did Not Believe He Was Properly Charged**

20    TWC argues in its MSJ and likewise asserts in its Separate Statement (at Nos. 40, 72, 74,

21  87, 96,11, 112, and 120) that Alpert believed he was previously being charged the correct sum

22  for his TWC services before TWC put Alpert into the HOA bundle in late 2006. That is false.

23  First, the cited testimony does not indicate Alpert's agreement that TWC's bills were correct

24  before he was put into HOA pricing. See e.g., TWC's NOL, Exhibit A, at p.144:15-18; 148:17;

25  151:21; 155:25; 158:2. Agreeing that a bill was received is obviously not the same as agreeing a

26  bill was accurate.

27

28  ─────────────

[1] Decisions by federal courts in construing the FTC Act are "more than ordinarily persuasive" in guiding the California courts in construing Section 17200. *People ex rel. Mosk v. National Research Co. of Calif.*, 201 Cal.App.2d 765, 772 (1962).

1        Second, each cited instance in the deposition transcript where Alpert was actually asked

2    to speculate whether his bill was "accurate" is preceded by a "speculation" objection asserted by

3    Alpert's counsel. See e.g., TWC's NOL, Exhibit A at p,.148:21; 151:16. These objections,

4    coupled with the fact that when Alpert learned he was being overcharged in late 2006 he called

5    TWC and demanded a correction to his bill, and that the bill was, in fact, corrected, all

6    undermine TWC's entire argument that Alpert believed his bills were accurate. Decl. Alpert at

7    para. 11, 12.

8    **VII.    TWC RELIES UPON THE SAME INAPPOSITE AUTHORITY ALREADY
9              CONSIDERED AND REJECTED BY THIS COURT**

10        Parroting the same argument made in its demurrer, TWC once again argues that the

11    CLRA requires that an action based upon omission must be contrary to a representation made by

12    the defendant or an omission of a fact that defendant was required to disclose, citing *Daugherty*

13    *v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824. TWC's MSJ at p.8:4. The

14    *Daugherty* court stated that nondisclosure is not actionable under the CLRA in the absence of a

15    related representation or disclosure obligation. *Id.* at 835. Here, the related representation is the

16    posting of regular retail a la carte rates by TWC in notices and on its website without any

17    disclosure whatsoever of pricing for HOA residents where the HOAs have an existing contract

18    with TWC. The representation of wrong pricing, coupled with the nondisclosure of the correct

19    pricing applicable to HOA customers, is a violation of the CLRA.

20        TWC also argues again, as it did in its demurrer, that the "voluntary payment doctrine"

21    and applies *Leahy v. Warden* (1912) 163 Cal. 178, 181. But for the doctrine to apply such

22    payments be made "with knowledge of the facts." TWC's MSJ at p.12:6; Since Alpert had no

23    knowledge of the facts before September 2006, the "voluntary payment doctrine" is obviously

24    irrelevant.

25        TWC also argues that its 30 day notice requirement is not unconscionable since there

26    were "alternative sources from which to obtain the desired service." TWC's MSJ citing

27    *Freeman v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4[th] 660, 670. Similarly, TWC also claims

28    that the additional services ordered by Alpert amount to nothing more than "recreational

1   activities," thus, again, Alpert had the "option of simply foregoing the activity" citing *Belton v.*

2   *Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4[th] 1224.

3          In *Wal-Mart,* plaintiffs alleged that Wal-Mart's gift cards unconscionably charged a $ 1

4   per month fee for every month after 24 months the card has not been fully used.  The court

5   concluded that consumers did not have to buy the card in the first place defeating a claim of

6   unconscionability in the terms of the card.  *Id.* at 670.

7          In *Wal-Mart*, there obviously was no preexisting "exclusive" contract as there is here.

8   While a Wal-Mart customer was free to pay any retailer for a gift card, here, Alpert and the other

9   class members had no choice in the matter: they were all required to pay TWC a monthly fee

10  through their HOA's exclusive contract for basic cable.

11         In *Comcast Cable*, a legally blind plaintiff sued Comcast for requiring that he purchase a

12  basic cable package in order to get Comcast's music channels.  The court concluded that it was

13  not oppressive to require the purchase of basic cable to obtain additional services like music

14  since there were many music alternatives available to plaintiff such as online streaming audio

15  from radio stations or simply using a radio itself.  *Comcast*, 151 Cal.App.4[th] at 1246.

16         Again, in *Comcast* as in *Wal-Mart*, there was no pre-existing "exclusive" contract and the

17  customer in *Comcast* was free to obtain music from other outlets, some of which were *free*, such

18  as radio.  Alpert had no choice but to pay TWC for his basic cable through his HOA/MDU.

19  Moreover, there were technical reasons supporting Comcast's position that it could not offer its

20  music channels without basic cable thereby rendering plaintiff's claim that music channels be

21  offered "a la carte" potentially impossible.  *Id.* at p.1242.  Moreover, if Alpert purchased digital

22  services from any one else, it would have had to include basic cable, as per *Comcast*, and *Alpert*

23  *would have violated the exclusivity clause.*

24         TWC's citation to *Comcast* unwittingly supports Alpert's claims in that it is clear from

25  the *Comcast* decision that basic cable is required to obtain additional services from other cable

26  companies.  TWC asks this Court to just assume, without any supporting evidence, that Alpert

27  could have obtained additional cable related services from another vendor. *Few consumers buy*

28  *their first 76 channels from a cable company and the rest from a satellite service or other cable*

1   *provider. Comcast* stands for the contrary position: one must have basic cable to obtain

2   additional services. Here, the "exclusive" contract for basic cable locked Alpert into a

3   relationship with TWC. That is the point and why the FCC has recently ruled such agreements

4   are unlawful and unfair.

5         TWC asks the Court to "judicially notice" that Alpert could have alternatively rented

6   movies, read books, used a satellite service, used another phone provider, and used another

7   Internet provider. TWC's RJN, paras 1 and 2. But since Alpert was already paying TWC each

8   month for basic cable service through his HOA, it would make little sense to pay another cable

9   or satellite provider for the same service just to get additional services. Decl. Alpert at para. 20.

10   There was never a meaningful choice to select another provider for additional services while

11   simultaneously paying TWC each month. *Ibid.*

12         TWC also cites to *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) for

13   the proposition that bundling is not necessarily undesirable for consumers, nor is it inherently

14   anticompetitive. TWC's MSJ, p.16:16-18. Alpert does not argue that it is undesirable to bundle.

15   He argues that TWC consistently charged him a higher rate for additional services.

16   **VIII.  CONCLUSION**

17         As the above authorities show, and for the foregoing reasons, TWC's practices are

18   unlawful, deceptive and unfair, and summary judgment should be denied.

19

20   Dated: March 21, 2008             **CLARK & MARKHAM LLP**

21

22                           By:_____
                                David R. Markham, Esq.

23                     LAW OFFICES OF BARRON E. RAMOS
                        Barron E. Ramos, Esq.

24

25                     Attorneys for the Plaintiff and the Class.

26

27

28

1   **BARRON E. RAMOS**
    Attorney at Law, A Professional Corporation
2   Barron E. Ramos (State Bar No. 179620)
    132 N. El Camino Real, # 303
3   Encinitas, California 92024
    Telephone: (760) 274-6438
4   Facsimile: (760) 994-1354

5   **CLARK & MARKHAM**
    David R. Markham (State Bar No. 071814)
6   R. Craig Clark (State Bar No. 129219)
    James M. Treglio (State Bar No. 228077)
7   401 West "A" Street, Suite 2200
    San Diego, CA 92101
8   Telephone: (619) 239-1321
    Facsimile: (619) 239-5888
9
    Attorneys for Plaintiff and the Class
10

11

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                        **COUNTY OF SAN DIEGO**

14   LEON ALPERT, an individual, on behalf          CASE NO.  GIC881621
     of himself, on behalf of all those similarly
15   situated, and on behalf of the general        **PLAINTIFF AND OPPOSING PARTY,**
     public,                                        **LEON ALPERT'S  STATEMENT OF**
16                                                  **DISPUTED AND UNDISPUTED FACTS IN**
                                                    **SUPPORT OF HIS OPPOSITION TO**
17                    Plaintiffs,                   **DEFENDANT TIME WARNER CABLE'S**
                                                    **MOTION FOR SUMMARY JUDGMENT**
18          v.

19   TIME WARNER CABLE, INC., a               Date      April 4, 2008
     Delaware corporation, and DOES 1 TO     Time      10:30 a.m.
20   100,                                     Dept:     63
                                              Judge:    Luis R. Vargas
21                    Defendants.
                                              Complaint: March 13, 2007
22                                            FAC:       May 16, 2007

23

24

25

26

27

28

CLARK & MARKHAM
  SAN DIEGO
              PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN
              SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

1        Plaintiff Leon Alpert respectfully submits the following statement of disputed and

2  undisputed material facts in opposition to Time Warner Cable, Inc.'s (TWC) motion for summary

3  judgment.

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
| --- | --- |
| 1.  Plaintiff Leon Alpert ("Plaintiff") is a resident of Sea Point Townhomes in Del Mar, California. | Undisputed. |
| 2.  Sea Point Townhomes is a Home Owners' Association ("HOA" or the "HOA") that has contracted with TWC, under an agreement referred to as a Residential Bulk Services Agreement, for certain cable services to be provided to the residents of Sea Point Townhomes (the "Agreement"). | Undisputed. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 3. The Agreement provides that TWC will provide 76 cable channels, sometimes referred to as "basic cable," to each home/unit of Sea Point Townhomes, and that Sea Point Townhomes will pay TWC a monthly fee per home/unit for such services. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 4. Section 1 of the Agreement, entitled "Operator's Service Obligations," provides that TWC "will offer Bulk Multi-Channel Video Services to Residents." | Undisputed. |
| 5. Section 2 of the Agreement, entitled "Rates and Services," states that the "HOA shall pay to [TWC] a monthly Bulk Multi-Channel Video Services fee" which is set forth in Exhibit B to the Agreement. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 6. The fee for basic cable services is to be billed for and paid by the Sea Point Community HOA. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 7. Although basic cable is provided to HOA residents through the HOA, individual residents are free to order additional services from TWC and/or otherwise do business with TWC. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 8. TWC may, but is not obligated to, offer the residents of Sea Point Townhomes services *other than* the 76 cable channels provided for in the Agreement (hereafter "Additional Service" or "Additional Services"). | Undisputed, but incomplete. Under the Agreement, basic cable is provided on an "exclusive" basis, meaning there is no competition for those services. Agreement at para. 4.2 [TWC has "the exclusive right … to offer and provide multi-channel video services to Residents."] Since residents like Leon Alpert must pay for basic cable to TWC through the HOA, there is no other meaningful |

CLARK & MARKHAM
San Diego

-2-

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | economic choice in selecting a provider of "Additional Services." Decl. Alpert at para. 19. For example, homeowners were not going to buy channels above 76 from a satellite provider when they were "locked in" to buying the first 76 channels from TWC. |
| 9. Section 1 of the Agreement provides that TWC "may offer and provide Additional Service to Residents on a non-exclusive basis." | Undisputed, but incomplete. Under the Agreement, basic cable is provided on an "exclusive" basis, meaning there is no competition for those services. Agreement at para. 4.2 [TWC has "the exclusive right … to offer and provide multi-channel video services to Residents."] Since residents like Leon Alpert must pay for basic cable to TWC through the HOA, there is no other meaningful economic choice in selecting a provider of "Additional Services." Decl. Alpert at para. 19. |
| 10. Additional Services are defined as "any services other than the Bulk Multi-Channel Video Services, including, but not limited to, premium channels, pay-per-view, music, digital tier, video-on-demand, and other video and music services not included in the Bulk Multi-Channel Video Services package, high speed data and Internet access services, voice services, etc." | Undisputed. |
| 11. HOA residents who chose to order Additional Services from TWC are responsible for paying TWC for such services. | Undisputed, but incomplete. Alpert must pay TWC for basic cable through monthly assessments by his HOA. Decl. Alpert at para. 8. Under the Agreement, basic cable is provided on an "exclusive" basis, meaning there is no competition for those services. Agreement at para. 4.2 [TWC has "the exclusive right … to offer and provide multi-channel video services to Residents."] Since residents like Leon Alpert must pay for basic cable to TWC through the HOA, there is no other meaningful economic choice in selecting a provider of "Additional Services." Decl. |

-3-

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| | Alpert at para. 19. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 12. Pursuant to Section 2 of the Agreement, "Residents will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in conjunction with Additional Services." | Undisputed, but incomplete. Alpert must pay TWC for basic cable through monthly assessments by his HOA. Decl. Alpert at para. 8. Under the Agreement, basic cable is provided on an "exclusive" basis, meaning there is no competition for those services. Agreement at para. 4.2 [TWC has "the exclusive right … to offer and provide multi-channel video services to Residents."] Since residents like Leon Alpert must pay for basic cable to TWC through the HOA, there is no other meaningful economic choice in selecting a provider of "Additional Services." Decl. Alpert at para. 19. |
| 13. No rates or special pricing for Additional Services are provided for in the Agreement. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. |
| 14. Since March 2003, TWC has provided the Bulk Multi-Channel Services ("basic cable") to Plaintiff's residence as set forth in the Agreement between TWC and the HOA. | Disputed. TWC has provided basic cable to plaintiff since the 1990s. Decl. Alpert at para. 9. |
| 15. TWC has not billed or collected money from Plaintiff for these services, nor has Plaintiff paid anything to TWC for the services. | Disputed. Alpert must pay TWC for basic cable through monthly assessments collected by his HOA. Decl. Alpert at para. 8. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 16. TWC is paid by the HOA for providing basic cable services to Plaintiff's residence. | Disputed. Alpert must pay TWC for basic cable through monthly assessments collected by his HOA. Decl. Alpert at para. 8. |
| 17. Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Disputed. Alpert must pay TWC for basic cable through monthly assessments collected by his HOA. Decl. Alpert at para. 8. |
| 18. Since March 2003, Plaintiff has ordered certain Additional Services from TWC under a contract titled "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer Agreement"). | Disputed. Alpert has ordered Additional Services but does not recall ever being provided a "Subscriber Agreement." Decl. Alpert at para. 10. TWC was Alpert's basic cable provider, thus he ordered Additional Services from that provider. *Id.* at para. 19. |
| 19. TWC has billed Plaintiff for the Additional Services he ordered, and Plaintiff has paid TWC directly for such services. | Undisputed, but incomplete. Alpert must also pay TWC for basic cable through monthly assessments collected by his HOA. Decl. Alpert at para. 8. |
| 20. TWC's bills to Plaintiff for his Additional Services contain a detailed itemization of each Additional Service and associated charge for each such service. | Disputed. TWC's bill itemization is deceptive in that it did not disclose the existence of HOA pricing applicable to Alpert. Decl. Alpert at para. 16; see also TWC's NOL, Exhibits D and E (Alpert's bills from TWC). |
| 21. The invoices show that Plaintiff was charged only for the Additional Services he ordered and was not charged for basic cable services. | Disputed. TWC's bill itemization is deceptive in that it did not disclose the existence of HOA pricing applicable to Alpert. Decl. Alpert at para. 16; see also TWC's NOL, Exhibits D and E (Alpert's bills from TWC). As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |

CLARK & MARKHAM
San Diego

-6-

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 22. As recently as August 2006, the Additional Services ordered by Plaintiff included the following features and pricing:<br><br>Digital Phone Package ($39.95); iControl Premium Service ($6.95); HDTV Converters ($7.00 x 2); Service Protection Plan ($2.95); Premier Digital ($11.00); Any 4 Premium Channels ($24.95); Wireless Road Runner ($54.90); special order items such as on-demand movies; as well as applicable taxes and fees.<br><br>These prices reflect TWC's published and/or established rates for such a la carte services. | Disputed.  The prices did not reflect TWC's rates for HOA members.  Decl. Ramos, Exhibit C, TWC's 2006 HOA rate sheet.  Since TWC did not advertise its HOA pricing, Alpert had no way of knowing what the correct charges were for the services he was receiving.  Decl. Alpert at para. 18.  TWC did not advertise its San Diego HOA rates.  Decl. Ramos, Exhibit A, Depo. of TWC's PMK, Terri Rhodes, at p.163:20.  TWC did not even inform HOAs of the existence of HOA pricing.  *Id.* at p.211:20.  Alpert never ordered any of his services "a la carte."  Decl. Alpert at para. 17.  TWC had always put Alpert into various bundles, but did not put him into an HOA bundle.  *Id.* at para. 17.  As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services.  Decl. Wesley L. Nutten, CPA, at para. 8. |
| 23. In 2005, TWC began to offer Additional Services in various bundled packages for bulk customers, such as HOA members, at a discount off the aggregate price of the individual services. | Disputed.  Prior to 2005, TWC "permitted bulk [HOA] customers to purchase Additional Services" at the full retail rates (i.e., without accounting for for having already collected for basic cable).  Decl. Rhodes in support of MSJ, para.8.  In the 2005/2006 time frame, HOA customers like Alpert paid $ 55 to get the Digipic 4000 whereas non-HOA customers only paid an additional $ 40.  Decl. Ramos, Exhibit A, Depo Rhodes, p.106:22-107:2.  Alpert and other HOA customers paid more for Additional Services such as the Digipic 4000 than non-HOA customers. Id. at p.150:8.  TWC doesn't consider that Alpert and the other HOA members are even paying for basic cable at all.  *Id.* at p.150:12. |
| 24. Plaintiff was familiar with TWC advertising relating to bundled packages and knew that customers ordering bundled services received a discount off the a la carte price for the same services. | Disputed.  TWC's San Diego HOA pricing was concealed from Alpert.  Decl. Alpert at para. 18.  TWC did not advertise its HOA pricing.  Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.163:20; Decl. Alpert at para. 15.  TWC did |

CLARK & MARKHAM<br>San Diego

-7-

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
|  | not even inform HOAs of the existence of HOA pricing. Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.211:20. TWC did not notify HOAs in writing or otherwise of the new, special HOA rates, nor post them on its website among its other published rates where customers could be aware of them. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 25. In or about September 2006, having become aware that TWC was offering a bundled package of Additional Services that included many of the services Plaintiff was purchasing a la carte, Plaintiff switched his Additional Services to order new services, including a bundled package. | Disputed. Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12. After discovering from another source that lower HOA rates were available, Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. *Ibid.* Alpert did not request any new services or to be bundled. *Ibid.* |
| 26. Plaintiff changed his Additional Services to a bundled package in order to get a better price. | Disputed. Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12. Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. Ibid. Alpert did not request any new services or to be bundled. *Ibid.* |
| 27. Plaintiff's new Additional Services included a bundled package with the following features and pricing:<br><br>HDTV Converter ($8.00); Service Protection Plan ($2.95); Hoa DIGIPiC 4000 Plan ($121.90)—which includes Wireless Roadrunner, Digital Phone Package, Free On Demand, iControl Premium Service, Digital Access, Cinemax, HBO, Navigator Screen Guide, Showtime, STARZ, Digital Movie Pack, Digital Sports Pack, Digital Variety Pack, Basic Cable Paid by Hoa, and Road Runner High Speed; special order items such as on-demand movies; as well as applicable taxes and fees. | Disputed. Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12. Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. *Ibid.* Alpert did not request any new services or to be bundled. *Ibid.* |

CLARK & MARKHAM
San Diego

-9-

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 28. As a result of Plaintiff modifying the Additional Services ordered, and ordering them in a bundled package vis-à-vis a la carte, Plaintiff's charges for Additional Services decreased. | Disputed. Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12. Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. *Ibid*. Alpert did not request any new services or to be bundled. *Ibid*. |
| 29. As part of the Consumer Agreement under which Additional Services were provided by TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors within thirty days from the receipt of any bill containing such errors, so that service levels and payments can be verified. | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. Also, Alpert DID demand the lower rates and correction of the concealed overcharge within 30 days after his discovery thereof |
| 30. Plaintiff further agreed to waive any errors that were not reported within thirty days of receipt. | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 31. Plaintiff's monthly invoices from TWC for his Additional Services included the following language under a heading titled "ABOUT YOUR TIME WARNER CABLE AGREEMENT:"<br><br>"Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct." | Undisputed, but incomplete. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |

CLARK & MARKHAM
San Diego

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 32. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. Also, Alpert did demand correction of his bill within 30 days after his discovery of the overcharge. |
| 33. Plaintiff testified in his deposition that the bills he received for Additional Services were correct both before and after he altered his services and ordered a bundled package. | Disputed. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. TWC's Amended Sep. Statement, Exhibit E; Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. The cited testimony does not indicate Alpert's agreement that TWC's bills were correct before he was put into HOA pricing. See e.g., TWC's NOL, Exhibit A, at p.144:15-18; 148:17; 151:21; 155:25; 158:2. Agreeing that a bill was received is obviously not the same as agreeing a bill was accurate. Each cited instance in the deposition transcript where Alpert was actually asked to speculate whether his bill was "accurate" is preceded by a "speculation" objection asserted by Alpert's counsel. See e.g., TWC's NOL, Exhibit A at p,.148:21; 151:16. These objections, coupled with the fact that when Alpert learned he was being overcharged in late 2006 he called TWC and demanded a correction to his bill, and that the bill was, in fact, corrected, all undermine TWC's entire argument that Alpert believed his bills were accurate. Decl. Alpert at paras. 11, 12. |
| 34. Plaintiff Leon Alpert claims that TWC has violated section 1770(a)(3) of the CLRA | Undisputed. |

-11-

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| by (1) not informing him of the rates for Additional Services that he was allegedly entitled to as member of Sea Point Townhomes' Home Owners' Association (the "HOA"), and (2) not disclosing to Plaintiff that TWC was collecting fees for his basic cable service from the HOA. | |
| 35. Plaintiff was not entitled to any particular rates for Additional Services. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a ***higher*** price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |
| 36. TWC had no duty to inform Plaintiff of all its rates, packages, and promotions for Additional Services. | Disputed. The Agreement requires TWC to provide its pricing to SeaPoint Residents. TWC's NOL, Exhibit B, Agreement at paras. 1.4, 4.4. |
| 37. Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 38. TWC had no duty to inform Plaintiff that the HOA was paying TWC for his basic cable. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those |

CLARK & MARKHAM
San Diego

-12-

| MOVING PARTY'S MATERIAL "FACTS" AND SUPPORTING "EVIDENCE" | OPPOSING PARTY'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
|  | members. Decl. Leon Alpert at para. 8. |
| 39. TWC did not charge or collect money from Plaintiff for basic cable. | Disputed. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 40. TWC correctly charged Plaintiff for the Additional Services he ordered. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |

|  |  |
|---|---|
| 41. Plaintiff claims that TWC has violated section 1770(a)(13) of the CLRA by misinforming him that his cable bill was reduced because he ordered a bundle of services vis-à-vis individual services, when the real reason for the price reduction was due to TWC already collecting basic cable fees on behalf of Plaintiff. | Undisputed. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 42. Plaintiff was charged the correct price by TWC both when he ordered Additional Services a la carte, and when he later ordered a bundled package for a lower price. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |
| 43. Plaintiff's bill for Additional Services was reduced because he changed his services and ordered a bundled package rather than a host of individual services. | Disputed. Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12. Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. *Ibid.* Alpert did not request any new services or to be bundled. *Ibid.* |
| 44. Plaintiff testified at deposition that he was familiar with TWC advertising relating to bundled packages and knew that customers ordering bundled services received a discount vis-à-vis ordering the same services a la carte. | Disputed. TWC's San Diego HOA pricing was concealed from Alpert. Decl. Alpert at para. 18. TWC did not advertise its HOA pricing. Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.163:20; Decl. Alpert at para. 15. Decl. Alpert at para. 15. TWC did not even inform HOAs of the existence of HOA pricing. Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.211:20. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 45. Plaintiff testified at deposition that he changed his Additional Services to a bundled package in order to get a better price. | Disputed. Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12. Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. *Ibid.* Alpert did not request any new services or to be bundled. *Ibid.* |
| | |
| 46. Plaintiff claims that TWC has violated section 1770(a)(19) of the CLRA, which precludes inserting an unconscionable provision into a contract, by requiring customers to report billing errors within thirty days. | Undisputed. |
| 47. The billing provision at issue provides:<br><br>"I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 48. Each TWC invoice also states the following text directly below a capitalized and underlined title "ABOUT YOUR TIME WARNER CABLE AGREEMENT":<br><br>"Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |

CLARK & MARKHAM
San Diego

-15-

| | |
|---|---|
| 49. TWC's invoices use the same font size for the reminder regarding reporting billing errors within thirty days as is used in the same area on the billing statement. | Disputed. The font size of the 30 day billing error notice is significantly smaller than most of the TWC billing statement, particularly those parts identifying the sum due on the bill and the "Important Viewer News." TWC's NOL, Exhibits D and E. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN
SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 50. Plaintiff testified in his deposition that the bills he received for Additional Services were correct both before and after he altered his services and ordered a bundled package. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. The cited testimony does not indicate Alpert's agreement that TWC's bills were correct before he was put into HOA pricing. See e.g., TWC's NOL, Exhibit A, at p.144:15-18; 148:17; 151:21; 155:25; 158:2. Agreeing that a bill was received is obviously not the same as agreeing a bill was accurate. Each cited instance in the deposition transcript where Alpert was actually asked to speculate whether his bill was "accurate" is preceded by a "speculation" objection asserted by Alpert's counsel. See e.g., TWC's NOL, Exhibit A at p,.148:21; 151:16. These objections, coupled with the fact that when Alpert learned he was being overcharged in late 2006 he called TWC and demanded a correction to his bill, and that the bill was, in fact, corrected, all undermine TWC's entire argument that Alpert believed his bills were accurate. Decl. Alpert at paras. 11, 12. |

-17-

CLARK & MARKHAM
San Diego

| | |
|---|---|
| 51. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Disputed.  Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 52. Plaintiff had other means of obtaining the entertainment provided by his ordering Additional Services from TWC, such as renting movies, using a satellite service, using another telephone provider, and using another internet provider. | Disputed.  Under the Agreement, basic cable is provided on an "exclusive" basis, meaning there is no competition for those services. Agreement at para. 4.2 [TWC has "the exclusive right … to offer and provide multi-channel video services to Residents."]  Since residents like Leon Alpert must pay for basic cable to TWC through the HOA, there is no other meaningful economic choice in selecting a provider of "Additional Services."  Decl. Alpert at para. 19.  Alpert is not aware of any other cable company that offers movies on demand and other cable television related services (e.g., telephone or Internet service) without the consumer purchasing basic cable service from that provider.  *Ibid.* |
| 53. Plaintiff could have simply foregone ordering Additional Services from TWC. | Disputed.  Under the Agreement, basic cable is provided on an "exclusive" basis, meaning there is no competition for those services. Agreement at para. 4.2 [TWC has "the exclusive right … to offer and provide multi-channel video services to Residents."]  Since residents like Leon Alpert must pay for basic cable to TWC through the HOA, there is no other meaningful economic choice in selecting a provider of "Additional Services."  Decl. Alpert at para. 19.  Alpert is not aware of any other cable company that offers movies on demand and other cable television related services (e.g., telephone or Internet service) without the consumer purchasing basic cable service from that provider.  *Ibid.* |
| | |

CLARK & MARKHAM
San Diego

-18-

| | |
|---|---|
| 54. Plaintiff claims that TWC breached its agreement with the HOA by charging him directly for services already provided and paid for under the HOA agreement. | Undisputed. |
| 55. The contract between TWC and the HOA provided that TWC would provide basic cable to HOA residents. | Undisputed. |
| 56. TWC provided basic cable services to HOA residents. | Undisputed. |
| 57. TWC charged the HOA for providing basic cable services to HOA residents. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 58. The HOA paid TWC for providing basic cable services to HOA residents. | Undisputed, but incomplete. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |
| 59. TWC has not billed or collected money from Plaintiff or other HOA residents for their basic cable services. | Disputed. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |

-19-

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 60. TWC was not contractually bound to offer Additional Services to Plaintiff at any particular prices. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |
| 61. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by overcharging HOA customers for cable services and not providing pricing that reflected services already provided for under TWC's contract with the HOA. | Undisputed. |

-20-

:LARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 62. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |
| 63. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |

CLARK & MARKHAM
San Diego

-21-

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 64. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Agreement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. |
| 65. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | Undisputed. |
| 66. As part of the Consumer Agreement under which Additional Services were provided by TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors within thirty days from the receipt of any bill containing such errors, so that service levels and payments can be verified. | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 67. Plaintiff further agreed to waive any errors that were not reported within thirty days of receipt. | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |

CLARK & MARKHAM
San Diego

| | |
|---|---|
| 68. Plaintiff's monthly invoices from TWC for his Additional Services included the following language under a heading titled "ABOUT YOUR TIME WARNER CABLE AGREEMENT:"<br><br>"Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 69. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 70. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | Undisputed. |
| 71. TWC requires customers to notify it of billing errors within thirty days so that service levels and payments can be verified. | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 72. TWC correctly charged Plaintiff for the Additional Services he ordered both before and after he changed his services to a bundled package. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |
| 73. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | Undisputed. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 74. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers.  Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006.  Decl. Alpert at para. 14.  As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services.  Decl. Wesley L. Nutten, CPA, at para. 8. |
| 75. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers.  Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006.  Decl. Alpert at para. 14. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 76. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Agreement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. |
| 77. TWC was under no obligation to provide special pricing for Additional Services. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 78. TWC was not obligated to notify Plaintiff of all potential packages and prices for its Additional Services. | Disputed.  The Agreement requires TWC to provide its pricing to SeaPoint Residents. TWC's NOL, Exhibit B, Agreement at paras. 1.4, 4.4. |
| 79. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by breaching its Agreement with the HOA via charging Plaintiff for services already provided for under TWC's Agreement with the HOA. | Undisputed. |
| 80. The contract between TWC and the HOA provided that TWC would provide basic cable to HOA residents. | Undisputed. |
| 81. TWC provided basic cable services to HOA residents. | Undisputed. |
| 82. TWC charged the HOA for providing basic cable services to HOA residents. | Undisputed, but incomplete.  TWC is paid by monies collected from members of the HOA through monthly assessments to those members.  Decl. Leon Alpert at para. 8. |
| 83. The HOA paid TWC for providing basic cable services to HOA residents. | Undisputed, but incomplete.  TWC is paid by monies collected from members of the HOA through monthly assessments to those members.  Decl. Leon Alpert at para. 8. |
| 84. TWC has not billed or collected money from Plaintiff or other HOA residents for their basic cable services. | Disputed.  TWC is paid by monies collected from members of the HOA through monthly assessments to those members.  Decl. Leon Alpert at para. 8. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 85. TWC was not contractually bound to offer Additional Services to Plaintiff at any particular prices. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *discounts* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. |
| 86. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by overcharging Plaintiff for Additional Services. | Undisputed. |
| 87. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *discounts* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | Wesley L. Nutten, CPA, at para. 8. |
| 88. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *discounts* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. |
| 89. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Agreement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *discounts* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. |
| 90. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by requiring notification of billing errors within thirty days while failing to disclose pricing that accounted for HOA payments. | Undisputed. |

-29-

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 91. As part of the Consumer Agreement under which Additional Services were provided by TWC to Plaintiff, Plaintiff agreed that it was his responsibility to report TWC billing errors within thirty days from the receipt of any bill containing such errors, so that service levels and payments can be verified. | Disputed. Alpert did not agree to limit his claims against TWC to only those claims errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 92. Plaintiff further agreed to waive any errors that were not reported within thirty days of receipt. | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 93. Plaintiff's monthly invoices from TWC for his Additional Services included the following language under a heading titled <u>"ABOUT YOUR TIME WARNER CABLE AGREEMENT:"</u><br><br>"Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 94. At deposition, Plaintiff responded to questions regarding the reasonableness of asking customers to identify billing errors within thirty days by stating that "I don't think it's unreasonable to make the complaint within 30 days. . . you know – that seems reasonable." | Disputed. Alpert did not agree to limit his claims against TWC to only those billing errors he could ascertain within 30 days of receiving the bill when those errors were concealed from him as a result of TWC concealing its HOA pricing. Decl. Alpert at para. 16. |
| 95. Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by concealing HOA pricing that accounted for HOA payments.<br><br>First Amended Complaint ¶ 29(b). | Undisputed. |

CLARK & MARKHAM<br>San Diego

-30-

| | |
|---|---|
| 96. TWC correctly billed Plaintiff for the Additional Services he ordered from TWC both before and after he changed such services to a bundled package. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers.  Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006.  Decl. Alpert at para. 14.  Alpert never "switched" anything and did not request or order any "bundle."  Decl. Alpert at para. 12.  Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services.  *Ibid.*  Alpert did not request any new services or to be bundled.  *Ibid.*  As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services.  Decl. Wesley L. Nutten, CPA, at para. 8. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 97. TWC's contract with the HOA provides only for basic cable services to be provided to HOA residents and does not contain, suggest, or require pricing for any Additional Services that may be ordered by residents. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. |
| 98. TWC's pricing of Additional Services to Plaintiff, both before and after he switched his programming to a bundled package, properly reflected the services already provided under the Agreement between TWC and the HOA because it did not charge Plaintiff for basic cable—the services provided per the Agreement. | Disputed. The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area. Agreement at paras. 1.1(B), 2. Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers. 47 USC 543(8)(a). While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. Decl. Alpert at para. 14. |
| 99. Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Disputed. TWC is paid by monies collected from members of the HOA through monthly assessments to those members. Decl. Leon Alpert at para. 8. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 100.    The "HOA Pricing" referred to by Plaintiff is merely the pricing of one bundle of Additional Services that, until recently, was available to HOA residents who were willing to purchase all of the bundled services. | Disputed.  HOA Pricing refers to both TWC's concealed HOA pricing effective in 2005 and to TWC's pricing prior to that which should have reflected the fact that Alpert was already paying for basic cable.  Decl. Alpert at para. 22. |
| 101.    Plaintiff could have asked TWC at any point if any bundled options were available for his Additional Services. | Disputed.  Alpert was unaware of TWC's HOA pricing because TWC did not advertise such pricing and instead concealed it.  Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.163:20, 211:20,; Decl. Alpert at para. 18.  TWC had already placed Alpert into various bundles, just not the appropriate HOA bundle.  Decl. Alpert at para. 17. |
| 102.    TWC was not contractually bound to offer Additional Services to Plaintiff at any particular prices. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. |
| 103.    TWC was not obligated to notify Plaintiff of all potential packages and prices for its Additional Services. | Disputed.  The Agreement requires TWC to provide its pricing to SeaPoint Residents.  TWC's NOL, Exhibit B, Agreement at paras. 1.4, 4.4. |

CLARK & MARKHAM
San Diego

| | |
|---|---|
| 104.    Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by misrepresenting its affiliation, connection, or association with the HOA.  Plaintiff claims that TWC (1) failed to inform him of the rates for Additional Services that he was allegedly entitled to as member of Sea Point Townhomes' Home Owners' Association (the "HOA"), and (2) failed to disclose to Plaintiff that TWC was collecting fees for his basic cable service from the HOA. | Undisputed. |
| 105.    Plaintiff was not entitled to any particular rates for Additional Services. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers. |
| 106.    TWC had no duty to inform Plaintiff of all its rates, packages, and promotions for Additional Services. | Disputed.  The Agreement requires TWC to provide its pricing to SeaPoint Residents.  TWC's NOL, Exhibit B, Agreement at paras. 1.4, 4.4. |
| 107.    Plaintiff knew and understood that the HOA paid TWC for the basic cable he received from TWC. | Disputed.  TWC is paid by monies collected from members of the HOA through monthly assessments to those members.  Decl. Leon Alpert at para. 8. |

| | |
|---|---|
| 108.    TWC had no duty to inform Plaintiff that the HOA was paying TWC for his basic cable. | Disputed.  TWC is paid by monies collected from members of the HOA through monthly assessments to those members.  Decl. Leon Alpert at para. 8.  The Agreement requires TWC to provide its pricing to SeaPoint Residents.  TWC's NOL, Exhibit B, Agreement at paras. 1.4, 4.4. |
| 109.    TWC did not charge Plaintiff for basic cable. | Disputed.  TWC is paid by monies collected from members of the HOA through monthly assessments to those members.  Decl. Leon Alpert at para. 8. |
| 110.    TWC correctly charged Plaintiff for the Additional Services he ordered. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk "*discounts*" to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers.  Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006.  Decl. Alpert at para. 14.  As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services.  Decl. Wesley L. Nutten, CPA, at para. 8. |

-35-

CLARK & MARKHAM
SAN DIEGO

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN
SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 111.    Plaintiff claims that TWC engaged in unfair business conduct in violation of Business & Professions Code section 17200 *et seq.* by misrepresenting that the reason for the decrease in his bill for Additional Services was due to ordering a bundled package, when the real reason for the price reduction was due to TWC already collecting basic cable fees on behalf of Plaintiff. | Undisputed. |
| 112.    Plaintiff was charged the correct price by TWC both when he ordered Additional Services a la carte, and when he later ordered a bundled package for a lower price. | Disputed.  The Agreement does not provide that TWC may charge more than its published rate card pricing or more than TWC's HOA pricing for the San Diego area.  Agreement at paras. 1.1(B), 2.  Moreover, to the extent applicable, anti-discrimination regulations prohibit TWC from charging consumers in the same geographic region more than other consumers.  47 USC 543(8)(a).  While bulk *"discounts"* to HOAs and other MDUs are permitted (*Ibid.*), there is no provision in law or in the Agreement for charging a higher price to HOA/MDU customers for exactly the same services available to non-HOA/MDU customers.  Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006.  Decl. Alpert at para. 14.  As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services.  Decl. Wesley L. Nutten, CPA, at para. 8. |
| 113.    Plaintiff's bill for Additional Services was reduced was because he changed his services and ordered a bundled package rather than a host of individual services. | Disputed.  Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12.  Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services.  *Ibid.* Alpert did not request any new services or to be bundled.  *Ibid.* |

CLARK & MARKHAM
San Diego

| | |
|---|---|
| 114.    Plaintiff testified at deposition that he was familiar with TWC advertising relating to bundled packages and knew that customers ordering bundled services received a discount vis-à-vis ordering the same services a la carte. | Disputed.  TWC's San Diego HOA pricing was concealed from Alpert.  Decl. Alpert at para. 18.  TWC did not advertise its HOA pricing. Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.163:20; Decl. Alpert at para. 15.  TWC did not even inform HOAs of the existence of HOA pricing.  Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.211:20. |
| 115.    Plaintiff testified at deposition that he changed his Additional Services to a bundled package in order to get a better price. | Disputed.  Alpert never "switched" anything and did not request or order any "bundle." Decl. Alpert at para. 12.  Alpert called TWC and demanded that his bill be corrected and demanded a refund for all the months TWC has been overcharging him for his services. *Ibid.* Alpert did not request any new services or to be bundled. *Ibid.* |
| 116.    Plaintiff lacks evidence to show that the general public would likely be misled or deceived by TWC's purported conduct. | Objection.  This is a legal conclusion by TWC and unsupported by any cited evidence.  Legal conclusions are not "undisputed" facts.  TWC's San Diego HOA pricing was concealed from Alpert.  Decl. Alpert at para. 18.  TWC did not advertise its HOA pricing.  Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.163:20; Decl. Alpert at para. 15.  TWC did not even inform HOAs of the existence of HOA pricing. Decl. Ramos, Exhibit A, Depo. Terri Rhodes at p.211:20.  As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services.  Decl. Wesley L. Nutten, CPA, at para. 8. |
| 117.    Since March 2003, Plaintiff has ordered certain Additional Services from TWC under a contract titled "Time Warner Cable Residential Services Subscriber Agreement" ("Consumer Agreement"). | Undisputed. |

CLARK & MARKHAM
San Diego

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 118.    Plaintiff has received the Additional Services that he ordered from TWC. | Undisputed. |
| 119.    TWC has billed Plaintiff for the Additional Services he ordered, and Plaintiff has paid TWC directly for such services. | Undisputed. |
| 120.    Plaintiff testified in his deposition that the bills he received for Additional Services were correct. | Disputed. Alpert's billing statements did not reflect HOA pricing until after he called TWC and complained in September 2006. TWC's Amended Sep. Statement, Exhibit E; Decl. Alpert at para. 14. As HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than for non-HOA customers for comparable services. Decl. Wesley L. Nutten, CPA, at para. 8. The cited testimony does not indicate Alpert's agreement that TWC's bills were correct before he was put into HOA pricing. See e.g., TWC's NOL, Exhibit A, at p:144:15-18; 148:17; 151:21; 155:25; 158:2. Agreeing that a bill received is obviously not the same as agreeing a bill was accurate. Each cited instance in the deposition transcript where Alpert was actually asked to speculate whether his bill was "accurate" is preceded by a "speculation" objection asserted by Alpert's counsel. See e.g., TWC's NOL, Exhibit A at p,.148:21; 151:16. These objections, coupled with the fact that when Alpert learned he was being overcharged in late 2006 he called TWC and demanded a correction to his bill, and that the bill was, in fact, corrected, all undermine TWC's entire argument that Alpert believed his bills were accurate. Decl. Alpert at paras. 11, 12. |

PLAINTIFF AND OPPOSING PARTY, LEON ALBERT'S STATEMENT OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION FOR SUMMARY JUDGMENT

1

2

Dated: March _3/_ , 2008

By _____
DAVID R. MARKHAM
CLARK & MARKHAM

BARRON E. RAMOS
ATTORNEY AT LAW

Attorneys for Leon Alpert and the Class

CLARK & MARKHAM
San Diego

-39-

1  Barron E. Ramos (SBN 179620)
**LAW OFFICES OF BARRON E. RAMOS**
2  132 N El Camino Real #303
Encinitas, CA 92024
3  Tel:    (760) 274-6438
Fax:    (760) 994-1354
4

5  David R. Markham (Bar No. 071814)
R. Craig Clark (Bar No. 129219)
6  James M. Treglio (Bar No. 228077)
**CLARK & MARKHAM, LLP**
7  401 West "A" Street, Suite 2200
San Diego, CA 92101
8  Telephone: (619) 239-1321
Facsimile: (619) 239-5888
9

10 Attorneys for the Plaintiff,

11

12

13            SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                 FOR THE COUNTY OF SAN DIEGO

15

16  LEON ALPERT, an individual on behalf of    )  Case No.: GIC881621
himself, and on behalf of all persons similarly )
17  situated, and on behalf of the general public, )  **CLASS ACTION**
                                                  )
18                Plaintiff,                       )
                                                  )  REQUEST FOR JUDICIAL NOTICE IN
19        vs.                                      )  OPPOSITION TO DEFENDANT'S MOTION
                                                  )  FOR SUMMARY JUDGMENT
20  TIME WARNER CABLE INC., a Delaware            )
Corporation, and Does 1 to 100,                  )
21                                                )  **Hearing**
                                                  )  Date:       April 4, 2008
22                Defendant                        )  Time:       10:30 a.m.
                                                  )  Dept:       63
23                                                )  Judge:      Luis R. Vargas
                                                  )
24                                                )
                                                  )  Complaint:  March 13, 2007
25                                                )  FAC:        May 16, 2007
                                                  )
26                                                )
                                                  )
27  _____)

28

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

2        **PLEASE TAKE NOTICE** that, pursuant to Evidence Code §§451 and 452, Plaintiffs

3    hereby request that the Court take Judicial Notice of the following document lodged as an exhibit

4    in support of Plaintiffs' Opposition to the Motion for Summary Judgment:

5        EX. 1: FCC 07-189, FCC **REPORT AND ORDER AND FURTHER NOTICE OF**
     **PROPOSED RULEMAKING** Exclusive Service Contracts for Provision of Video
6    Services in Multiple Dwelling Units and Other Real Estate Developments, October 31,
7    2007.

8        To the extent the instant request for judicial notice is objected to and/or denied, Plaintiffs

9    further request that the Court permit Plaintiffs the opportunity to present information to the Court

10   pursuant to Evidence Code §§454, 455.

11

12   Dated: March 21, 2008                              **CLARK & MARKHAM LLP**

13

14                                                      By: _____
15                                                           James M. Treglio, Esq.

16                                                      LAW OFFICES OF BARRON E. RAMOS
17                                                           Barron E. Ramos, Esq.

18                                                      Attorneys for the Plaintiff and the Class.

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

Federal Communications Commission                    FCC 07-189

Before the
Federal Communications Commission
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Exclusive Service Contracts for Provision of | ) | MB Docket No. 07-51 |
| Video Services in Multiple Dwelling Units and | ) | |
| Other Real Estate Developments | ) | |

REPORT AND ORDER
AND
FURTHER NOTICE OF PROPOSED RULEMAKING

Adopted: October 31, 2007                    Released: November 13, 2007

Comment Date: (30 days after date of publication in the Federal Register)
Reply Comment Date: (60 days after date of publication in the Federal Register)

By the Commission: Chairman Kevin J. Martin, Commissioners Michael J. Copps, Jonathan S. Adelstein and Deborah Taylor Tate issuing separate statements; Commissioner Robert M. McDowell concurring and issuing a statement.

TABLE OF CONTENTS

Heading                                                                 Paragraph #

I.    INTRODUCTION .................................................................................................1
II.   BACKGROUND ...................................................................................................3
III.  DISCUSSION .....................................................................................................16
      A.  Harms and Benefits of Exclusivity Clauses.................................................17
      B.  Prohibition of Exclusivity Clauses...............................................................30
IV.  LEGAL AUTHORITY .......................................................................................40
V.   FURTHER NOTICE OF PROPOSED RULEMAKING ....................................61
VI.  PROCEDURAL MATTERS ...............................................................................67
      A.  Filing Requirements.....................................................................................67
      B.  Regulatory Flexibility Analysis ...................................................................70
      C.  Paperwork Reduction Act Analysis .............................................................71
      D.  Congressional Review Act............................................................................72
      E.  Additional Information .................................................................................73
VII.   ORDERING CLAUSES .....................................................................................74

I.    INTRODUCTION

1.  The Notice of Proposed Rulemaking ("*Notice*") in this proceeding solicited comment on the need to regulate contracts containing clauses granting one multichannel video programming distributor (an "MVPD") exclusive access for the provision of video services ("exclusivity clauses") to multiple dwelling units ("MDUs") and other real estate developments.[1]  Approximately 30 percent of Americans

---

[1] *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units & Other Real Estate Developments,* Notice of Proposed Rulemaking, 22 FCC Rcd 5935 (2007).

1

live in MDUs, and their numbers are growing. In this *Report and Order*, we find that contractual agreements granting such exclusivity to cable operators harm competition and broadband deployment and that any benefits to consumers are outweighed by the harms of such clauses.[2] Accordingly, we conclude that such clauses are proscribed by Section 628[3] of the Communications Act of 1934, as amended.[4] That Section prohibits unfair methods of competition that have the purpose or effect of hindering significantly or preventing MVPDs from providing "satellite cable" and/or "satellite broadcast" programming to subscribers and consumers. Thus, in this Order we prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators and others subject to the relevant statutory provisions. This prohibition will materially advance the Act's goals of enhancing competition and broadband deployment.[5]

2.    The record in this proceeding does not contain much information regarding the use of exclusivity clauses by providers of Direct Broadcast Satellite ("DBS") or other MVPDs that are not cable operators subject to Section 628 of the Act.[6] In the interests of developing a fuller record, and in the interests of regulatory parity, we also issue a *Further Notice of Proposed Rulemaking* ("*Further Notice*") concerning MVPDs not subject to Section 628. In this *Further Notice*, we also seek comment on whether the Commission should prohibit exclusive marketing and bulk billing arrangements.

---

[2] Previous decisions about this subject have discussed "exclusivity contracts." Exclusive contracts are "contracts that specify that, for a designated term, only a particular MVPD and no other provider may provide video programming and related services to residents of an MDU." *See Telecommunications Services Inside Wiring*, First Order on Reconsideration & Second Report & Order ("*2003 Inside Wiring Order*"), 18 FCC Rcd 1342, 1364 ¶ 59 (2003), *rev'd in part on other grounds*, *NCTA v. FCC*, 89 Fed. Appx. 743 (D.C. Cir. 2004). *See also Telecommunications Services Inside Wiring*, Report & Order & Second Further Notice of Proposed Rulemaking ("*1997 Inside Wiring Order*"), 13 FCC Rcd 3659, 3748-53, ¶¶ 191-203 (1997) In this *Report and Order*, we use the more focused term "exclusivity clauses," while meaning no change in substance. Exclusivity clauses appear in contracts between MVPDs and MDU owners or other real estate developments. The most exclusionary exclusivity clauses prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development. *See* AT&T Comments at 11. These are called 'building exclusivity' clauses. Other exclusivity clauses grant only "wire exclusivity," which allows more MVPDs in a MDU or real estate development but prohibits them from using the existing wires in the MDU or real estate development (which may be owned by the MVPD or by the MDU owner). *See* Real Access Alliance ("RAA") Comments at 13. Still other exclusivity clauses allow other MVPDs into a MDU or real estate development but prohibit the owner from marketing their services. These provide for what is called "marketing exclusivity." Comcast Comments at 19-20; Community Ass'ns Inst. ("CAI") Comments at 3; Embarq Comments at 1 n.1; Qwest Comments at iii; RAA Comments at 8-11; Verizon Comments at 7 n.4. As these latter kinds of exclusivity clauses do not absolutely deny new entrants access to MDUs or real estate developments and thus do not cause the harms to consumers that building exclusivity clauses cause, they are not the focus of this proceeding. This *Report & Order* affects building exclusivity clauses, which for simplicity's sake we refer to hereafter as "exclusivity clauses."

[3] 47 U.S.C. § 548; *see also infra* Section IV.

[4] 47 U.S.C. §§ 151 *et seq.* (the "Act" or the "1934 Act").

[5] As explained in Section IV below, the purpose of Section 628 of the Act, 47 U.S.C. § 548 is to "promote the public interest, convenience, and necessity by increasing competition and diversity in the [MVP] market, . . . and to spur the development of communications technologies." These purposes coincide with the broader purposes of the Cable Television Consumer Protection & Competition Act of 1992 (Pub. L. No. 102-385, 106 Stat. 1460 (1992), codified at 47 U.S.C. §§ 521 *et seq*, (the "1992 Cable Act")) and the 1934 Act generally.

[6] 47 U.S.C. § 548.

2

## II.    BACKGROUND

3.    This Section reviews the history of this proceeding and makes several important findings of fact.  Among these findings are that a large and growing number of Americans live in MDUs and that a significant number of those MDUs are subject to exclusivity clauses.  The beneficiaries of most of those clauses are incumbent cable operators.  Although Commission rules ensure that many residents of MDUs and other real estate developments may receive satellite-based video service,[7] exclusivity clauses protect cable operators from competition in MDUs from new entrants into the MVPD business, chiefly incumbent local exchange carriers ("LECs") and other wire-based MVPDs that bring satellite cable and satellite broadcast programming to their subscribers.  We also find that the entry of incumbent LECs into the MVPD business has led incumbent cable operators to increase their use of exclusivity clauses in order to bar or deter the new entrants.

4.    These practices are reached primarily by our authority under Section 628.  That Section, in brief, makes it unlawful for cable operators to engage in certain unfair acts and methods of competition.  Specifically, Section 628(b) prohibits cable operators from engaging in unfair practices that have the purpose or effect of hindering significantly or preventing their competitors from providing satellite cable programming or satellite broadcast programming to subscribers or consumers.  Such video programming is made for broadcast or cable systems and is delivered by satellite to MVPDs,[8] who in turn deliver it to their subscribers.  This programming comprises the substantial majority of programming carried by MVPDs.  In Section IV below, we conclude that clauses that grant cable operators exclusive access to MDUs and other real estate developments fall within the scope of Section 628(b), because those clauses effectively prohibit new entrants into the MVPD market from providing satellite-delivered programming to consumers who live in MDUs and other real estate developments.

5.    The Commission last considered issues concerning exclusivity clauses in its 2003 Inside Wiring Order.[9]  At that time, the Commission decided that exclusivity clauses had both pro-competitive and anti-competitive effects, and that the record before the Commission made it unclear what their net effect was.  The Commission therefore decided to take no action regarding exclusivity clauses at that time,[10] but it did not close the door to action if new circumstances arose in which such clauses had new anti-competitive effects.  The Notice of March 2007 re-opened the issue and prompted the submission of much new evidence.[11]  The Notice raised several questions concerning exclusivity clauses.  These

---

[7] 47 C.F.R. § 1.4000.

[8] Section 628 concerns two kinds of programming in particular.  One is "satellite cable programming," which is video programming (not including satellite broadcast programming) that is transmitted by satellite to cable operators for retransmission to cable subscribers.  See 47 U.S.C. §§ 548(i)(1), 605(d)(1).  The other is "satellite broadcast programming," which is broadcast video programming that is retransmitted by satellite by an entity other than the broadcaster or an entity under the broadcaster's control.  See 47 U.S.C. § 548(i)(3).

[9] 2003 Inside Wiring Order, 18 FCC Rcd 1342 (2003), rev'd in part on other grounds, NCTA v. FCC, 89 Fed. Appx. 743 (D.C. Cir. 2004).

[10] 2003 Inside Wiring Order, 18 FCC Rcd at 1345, ¶ 4 ("the record does not demonstrate a need for government intervention with marketplace forces and privately negotiated contracts"); id. at 1369, ¶ 68 ("the record developed in this proceeding indicates little support for government interference with privately negotiated exclusive MDU contracts"); id. at 1369, ¶ 69 ("The record does not indicate the extent to which exclusive contracts have been utilized, and, more importantly, does not demonstrate that such contracts have thwarted alternative providers' entrance into the MDU market, so as to warrant imposition of limits on such contracts."); id. at 1370, ¶ 71 ("We cannot state, based on the record, that exclusive contracts are predominantly anti-competitive.").

[11] We are mindful of the admonition of the U.S. Court of Appeals for the District of Columbia Circuit that the Commission "must always stand ready to hear new argument and to reexamine the basic propositions undergirding"

(continued....)

3

included the Commission's legal authority to regulate such clauses; the prevalence of such clauses; the possible increase in their number and scope at the instigation of incumbent cable operators with the impending entry of LECs into the MVPD marketplace; the benefits and harms to competition and consumers of exclusivity clauses; and the extent of any prohibition of such clauses, and other remedial action, that we should impose.

6. The *Notice* attracted filings from large and small cable operators and LECs, other providers of MVPD services (including so-called private cable operators or "PCOs"[12]), builders and managers of MDUs and other dwellings, elected officials, two state government entities and many local governments, academic institutions, consumer groups, labor unions, and subscribers to MVPD and other services.

7. For purposes of this *Report and Order*, we define the term "MDU" to include the kinds of dwellings that we have defined as being MDUs in past decisions implementing the Act.[13] That is, MDUs include apartment, cooperative, and condominium buildings. For purposes of this *Report and Order*, we adopt this definition but expand it to include other centrally managed real estate developments. Thus, the term MDUs, for purposes of this *Report and Order*, also includes gated communities, mobile home parks, garden apartments, and other centrally managed residential real estate developments.[14] All of these are collections of private individual households with residents remaining for lengthy, indefinite periods of time, each in a dwelling space that is distinctly separate but shares some common spaces requiring central management. For purposes of this proceeding, MDUs do not include time share units, academic campuses and dormitories,[15] military bases, hotels, rooming houses, jails, prisons, halfway houses, hospitals, nursing and other assisted living places, and other group quarters characterized by institutional living, high transience and, in some cases, a high need for security. These

---

(...continued from previous page)
its policies. *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C. Cir. 1993) (quotation marks omitted), citing *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir.1988); *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 603 (1981).

[12] PCOs are also known as Satellite Master Antenna Television providers or "SMATVs." They are video distribution facilities that use closed transmission paths without using any public right-of-way. PCOs acquire video programming and distribute it via terrestrial wiring in urban and suburban MDUs and commercial multiple tenant units such as hotels and office buildings. They are small compared to major incumbent cable operators and incumbent LECs.

[13] 47 U.S.C. §§ 543(l)(1); 47 C.F.R. § 76.800(a) (defining MDU as "[a] multiple dwelling unit building (*e.g.*, an apartment building, condominium building or cooperative")); *Telecommunications Services Inside Wiring, Customer Premises Equipment, Implementation of the Cable Television Consumer Protection & Competition Act of 1992: Cable Home Wiring, Clarification of the Commission's Rules & Policies Regarding Unbundled Access to Incumbent Local Exchange Carriers' Inside Wire Subloop*, Report & Order & Declaratory Ruling, 22 FCC Rcd 10640, 10642, ¶ 4 n.6 (2007) ("*2007 Inside Wiring Order*") ("An MDU is a building or buildings with two or more residences, such as an apartment building, condominium building, or cooperative."); *Implementation of Sections of the Cable Television Consumer Protection & Competition Act of 1992: Rate Regulation, Buy-Through Prohibition*, Third Order on Reconsideration, 9 FCC Rcd 4316, 4324, ¶ 17 (1994) (addressing "dwelling units that are empty for a significant portion of the year" and observing that "[p]eople who are not present cannot be presumed to be choosing local competitive alternatives"); *see also* U.S. Census Bureau, *Decennial Management Division Glossary*, http://www.census. gov/dmd/www/glossary.html (visited Aug. 13, 2007) (defining "multi-unit structure" as "A building that contains more than one housing unit (for example, an apartment building). Townhouses are not considered to be multi-unit structures for census purposes.").

[14] Concerning the growth of exclusivity clauses governing such dwellings, *see* SureWest Commun. Comments at 6 n.7.

[15] Comments of Ass'n for Telecommun. Professionals in Higher Education at 6-12.

Federal Communications Commission                    FCC 07-189

latter institutions do not have most of the key defining attributes of MDUs that we have just described, including voluntary long-term residency and significant control by the resident over uses of the private dwelling space. These attributes give the resident a strong interest in making his or her own choice of a MVPD provider and thus warrant regulatory action to preserve the resident's ability to do so.

8.    The record in this proceeding indicates that approximately 30 percent of Americans live in MDUs[16] and that this percentage is growing.[17] The percentage of minorities living in MDUs is larger than that of the general population.[18] The majority of incumbent MVPDs serving MDUs pursuant to exclusivity clauses are incumbent providers of cable television service to the surrounding local community.[19] A few of the incumbent MVPDs that have executed contracts with exclusivity clauses are PCOs or small providers of fiber-based communications services.[20] Some incumbent LECs have requested exclusivity clauses from MDUs.[21] There is no evidence in the record that providers of DBS service use exclusivity clauses.

---

[16] AT&T Comments at 7 (citing Census data that 32 percent of U.S. households are occupied by renters and that 24.6 million U.S. households are in buildings with more than one unit); Qwest Commun. Int'l, Inc. Comments at 2 n.6 (citing 2005 Census data that 31.6 percent "of the 111 million households in the United States live in multifamily units"); SureWest Comments at 5-6 (citing 2005 Census data that "approximately 25% of total occupied housing units in the nation . . . are" MDUs); see also Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, Order on Reconsideration, 19 FCC Rcd 15856, 15859, ¶ 7 (2004) ("millions of Americans today live in MDUs, constituting perhaps as much as one-third of the population").

[17] AT&T Comments at 7; Robert Currey, Vice Chairman of RCN Corporation, Prepared Testimony, Hearing before the U.S. Senate Judiciary Committee, Subcommittee on Antitrust, Business Rights, & Competition: "Cable and Video: Competitive Choices," at 4 (Apr. 4, 2001) (about 30-35 percent of U.S. population resides in MDUs), available at http://judiciary.senate.gov/oldsite.te040401rjc.pdf (visited July 31, 2007).

[18] Verizon Comments at 6 ("40% of minority households . . . are located in MDUs with 50 or more residents."), citing U.S. Departments of Commerce & Housing & Urban Development, AMERICAN HOUSING SURVEY FOR THE UNITED STATES: 2005 at 106, Table 2-25 (Aug. 2006), available at http://www.census.gov/prod/2006.pubs/h150-05.pdf (visited Aug. 29, 2007); Letter from David Honig, Executive Director, Minority Media & Telecommun. Council, to Ms. Marlene H. Dortch, Commission Secretary (Oct. 11, 2007) ("Honig Ex Parte") (27.7% of all American households are located in MDUs with 50 or more residents, but 40% of all households headed by people of color (including Hispanics racially identifying as White) live in such MDUs.).

According to United States Telecom Association, a disproportionately large percentage of senior and low-income Americans also live in MDUs. Letter from Glenn T. Reynolds, Vice President, Policy, United States Telecom Ass'n, to Ms. Dortch (Oct. 24, 2007) ("USTelecom Ex Parte") (in Los Angeles, 15.6% of all families are low income, but 19.2% of families in MDUs with 20 or more units are low income; in Atlanta, 19.2% of all families are low income, but 22.3% of families in MDUs with 50 or more units are low income; id. at 4: "[F]or each of the six cities that USTelecom examined, the percentage of senior citizens residing in larger MDUs exceeded the local averages by a ratio of at least 2 to 1, and in one instance (Atlanta) by a ratio of almost 6 to 1. . . . [S]enior citizens are voracious – and growing – consumers of video and broadband offerings.").

[19] Independent Multifamily Commun. Council ("IMCC") Comments at 23 ("franchised cable companies us[e] exclusive MDU access agreements to foreclose significant portions of the MVPD market to new entrants") and 24 (describing how "franchised cable company[ies] . . . lock in virtually all MDU properties in the area through the use of long-term exclusive MDU contracts"); SureWest Comments at 3-4 (in SureWest territory, 85.7 percent of the exclusivity clauses run in favor of Comcast); Verizon Comments at 12.  "Cable service" is defined in 47 U.S.C. § 522(6).

[20] See Comcast Comments, Attachment A (Declaration of William F. Revell, Comcast Vice President of MDU Sales Operations, Exh. A (Agreement between MVPD Knology and a MDU containing an exclusivity clause) at 1 § 1.1.

[21] See RAA Comments at 48, 51-52.

9.   Exclusivity clauses that run in favor of cable operators typically are a complete bar to entry into MDUs by fiber-deploying LECs such as Verizon, AT&T, and Qwest, as well as PCOs. These competitors in the MVPD marketplace receive much of their programming, both cable and broadcast, via satellite for retransmission directly to their subscribers. Although exclusivity clauses do not prevent MDU residents from installing receiving dishes and receiving DBS service where the Commission's "Over the Air Reception Devices" rules apply,[22] they bar new wire-based competitors from MDUs.

10.   The record herein reveals that exclusivity clauses are widespread in agreements between MVPDs and MDU owners, and that the overwhelming majority of them grant exclusive access to incumbent cable operators.[23]   Exclusivity clauses between MVPDs and MDU owners have the clear effect of barring new entry into MDUs by wire-based MVPDs. The evidence before us shows that this effect occurs on a large scale. Verizon provided examples of exclusivity clauses, most of them in favor of incumbent cable operators, that provoked requests to cease and desist the marketing of its FiOS cable service.[24]   Verizon has "repeatedly encountered exclusive access arrangements which have prevented it from providing cable services to significant numbers of residents."[25]   Early in its offering of FiOS, Verizon encountered exclusivity clauses running in favor of incumbent cable operators, which barred it from serving more than 3,000 residential units in the Dallas, Texas, area and many other places, all totaling "tens of thousands of units in five separate states."[26]   Other examples of exclusion, again mostly

---

[22] Our "OTARD" rules generally prohibit MDU owners from unreasonably restricting residents' use of receiving dishes for DBS service. 47 C.F.R. § 1.4000, *adopted in Preemption of Local Zoning Regulation of Satellite Earth Stations; Implementation of Section 207 of the Telecommunications Act of 1996; & Restrictions on Over-the-Air Reception Devices: Television Broadcast Service & Multichannel Multipoint Distribution Service, Report & Order, Memorandum Opinion & Order, & Further Notice of Proposed Rulemaking,* 11 FCC Rcd 19276 (1996); *see also* Qwest Comments at 5 n.13; Ygnition Networks Comments at 3; American Cable Ass'n ("ACA") Reply Comments at 2 ("the small and rural markets served by ACA's members are already intensely competitive"), 3 ("competition – especially DBS competition – is booming in the markets served by ACA's members").

[23] AT&T Comments at 8-9 (at 8, "these agreements are between cable incumbents and building owners" and "exclusive access arrangements with MDUs have become prevalent and are becoming more so"; survey finding that at least 90 percent of MDU residents in Raleigh and Charlotte, North Carolina, were subject to "exclusive access arrangements"); Comcast Comments at 18 ("MVPDs of all sizes have entered into these types of agreements, and continue to do so."); SureWest Comments at 3-4 (at least 28 percent of 40,000 MDU units passed by SureWest are subject to some form of exclusivity (presumably marketing, wire, or building); in SureWest's "historic core" territory, the number is 35.8 percent; the status of another substantial percent in each case is unclear, but some of them are likely also subject to some form of exclusivity; 85.7 percent of the exclusivity clauses run in favor of Comcast)); Letter from Jeffrey J. Gee, Fletcher, Heald & Hildreth, P.L.C., counsel for SureWest, to Ms. Dortch (May 16, 2007) (MVPDs other than SureWest "had exclusive agreements with approximately fifty percent of the multiple dwelling units passed by SureWest's network," some of which provided only for marketing exclusivity).

[24] Letter from Leora Hochstein, Executive Director, Federal Regulatory, Verizon, to Ms. Dortch, MB Docket No. 05-311 (July 6, 2006) ("Verizon July 6 Ex Parte") at 3 (discussing various examples, including a cease and desist letter from Bright House Networks regarding marketing of FiOS in the River Chase apartment complex in Tampa, Florida; a letter from BDR Broadband, LLC, regarding the provision of FiOS in apartment complexes in Plano and Carrollton, Texas; and negotiations with Armiger Management in Maryland that have an exclusivity clause with Comcast).

[25] Verizon July 6 Ex Parte at 3.

[26] Verizon Comments at 11-12.

involving incumbent cable operators, are in the record from would-be MVPDs,[27] a local government,[28] and a MDU owner who agreed to exclusivity clauses in the past and now is prohibited from offering its residents new and improved communications services.[29]  AT&T states that "efforts to lock-up MDUs have occurred in California, Texas, and virtually every market where AT&T has begun to enter the video service market"[30] – efforts that are "plainly intended to block competition and . . . not designed to address aesthetics or congestion in a MDU's common areas."[31]  The exclusivity clauses that AT&T has recently encountered typically last between five and 15 years, often with automatic renewal, or are perpetual.[32]  Hargray CATV Inc., an affiliate of the incumbent LEC in Hilton Head, South Carolina, began to provide cable service there as a new entrant.[33]  It was forced to stop serving or marketing to 20,000 of the 25,000 homes in the community, however, due to exclusivity clauses entered into by real estate developers and the incumbent cable operator (originally Adelphia, whose systems later were acquired by Time Warner), decades ago in some cases..[34]

11. Consumer groups are also concerned about exclusive agreements.  As noted by several consumer groups, a disproportionately large number of communities of color live within MDUs.[35]  Consumer groups are concerned that these residents are unable to enjoy the benefits of competition in

---

[27] AT&T Comments at 10-12 (incidents in California (Exhs. A & E), Florida (Exh. C), and North Carolina (Exh. B)); SureWest Comments at 4-5; *see also* SureWest Comments in MM Docket No. 06-189 (*Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*) at 3.

[28] Manatee County Comments in MB Docket No. 05-311 (*Implementation of Section 621(a) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection & Competition Act of 1992*) at 16 (exclusivity clauses are common within its borders).

[29] Comments of Warner Properties, LLC, and Warner Properties Commun., LLC, at 2 ("[p]roperty owners, such as WP, could offer their tenants more cable choices if they were not prohibited from doing so [by] . . . existing exclusive contracts").

[30] AT&T Comments at 10.

[31] *Id.* at 11.

[32] *Id.* at 12.

[33] Letter from David Armistead, Esq., General Counsel, Hargray CATV Inc., to Ms. Dortch (Oct. 12, 2007) ("Hargray Oct. 12 Ex Parte") at 1-5, under cover of Letter from Joshua S. Turner, Esq., Wiley Rein, LLP, counsel for Hargray, to Ms. Dortch (Oct. 12, 2007); Letter from Brian C. Pitts, Esq., Smoot, Pitts, Elliott & Biel, counsel for Palmetto Dunes Property Owners Ass'n, Inc. (Oct. 19, 2007) ("Palmetto Ex Parte"); Letter from Mr. Armistead to Ms. Dortch (Oct. 24, 2007) ("Hargray Oct. 24 Ex Parte").

[34] Time Warner asserts that it does not seek perpetual exclusivity clauses in agreements it originates, and that it only obtained the agreements through inheritance.  Letter from Matthew A. Brill, Esq., Latham & Watkins LLP, counsel for Time Warner, to Ms. Dortch (Oct. 18, 2007) ("Time Warner Ex Parte") at 1 ("TWC does not enter into perpetual exclusive contracts under any circumstances.  Indeed, soon after inheriting a few such agreements in Hilton Head (and the attendant litigation) from Adelphia, TWC set out to shorten the exclusivity period to two years through settlement negotiations.").  We note that one suit has been settled and the exclusivity period shortened to two years (along with other adjustments in the agreements between Time Warner and the MDUs). *Id.*

[35] *See generally* Ex Parte Comments of Consumer Federation of America, Consumers Union, New America Foundation, Free Press, Public Knowledge, and U.S. PIRG (filed by Media Access Project) (Oct. 24, 2007) ("CFA *et al.* Ex Parte"); Letter from Chris Murray, Senior Counsel, Consumers Union, to Ms. Dortch (Oct. 23, 2007) ("Consumers Union Ex Parte"); Honig Ex Parte.

the video marketplace, and ask that the Commission act to ensure that all consumers can reap the benefits of competition.[36]

12. The record indicates that the evidence before us understates the frequency of exclusivity clauses because many MDU owners are unwilling or legally unable to make public the contracts containing them.[37] Also, many exclusivity clauses date from the time when cable operators had a *de facto* or *de jure* monopoly on wire-based MVPD service.[38] In those market conditions, a MDU owner might have thought that agreeing to exclusivity was not giving the cable operator anything of significance.[39] Some commenters state that a MDU owner can bargain for good service, low prices, and other concessions in exchange for exclusives.[40] But the owner had no such bargaining power when the first cable operator was "the only game in town."[41]

13. More recent developments were not part of the record the Commission compiled in the proceeding that culminated in the *2003 Inside Wiring Order*.[42] Significantly, LECs and other wire-based providers have begun entering the video service business on a large scale.[43] In this environment, exclusivity clauses executed by incumbent cable operators are causing an important loss of potential competition within MDUs and thereby depriving MDU residents of recognized benefits generated by competition in the form of price and service options. Exclusivity clauses may also be deterring new entry into the MVPD market in many areas because they put a significant number of new customers off limits to new entrants.

---

[36] *Id.*

[37] *See, e.g.,* AT&T Comments at 7-8; Verizon Comments at 8-9; Letter from Leora Hochstein, Executive Director, Federal Regulatory, Verizon, to Ms. Dortch, MB Docket No. 05-311 (Aug. 9, 2006) at 3 (Verizon survey of MDU units in and around Tampa, Florida showing that 42 percent of them were "subject to . . . exclusive access arrangements"; the actual percent is probably higher because 15 percent of building owners did not know or would not say whether their buildings were subject to exclusivity clauses; in most cases cited, the beneficiary of exclusivity was an incumbent cable operator). *Cf.* SureWest Comments at 3 n.2.

[38] Hotwire Commun., LLC, Comments at 7; IMCC Comments at 27 (stating that old contracts are more likely to contain exclusivity clauses that are perpetual); Qwest Comments at 4; Verizon Comments at 4. Concerning perpetual contracts, *see infra* note 105.

[39] *See, e.g.,* AT&T Comments and 13; IMCC Comments at 27.

[40] *See, e.g.,* ACA Comments at 3; Comcast Comments at 15, 19.

[41] Hotwire Comments at 7.

[42] *See supra* note 2.

[43] *FCC eases way for telephone companies to offer TV*, Reuters in USA TODAY (Dec. 20, 2006) ("The telephone carriers see offering television as a necessary component to their bundle of communications services to better compete against cable operators, who now offer their own telephone and high-speed Internet services."), http://www.usatoday.com/money/industries/telecom/2006-12-20-FCCtelevision_x.htm (visited Oct. 29, 2007); Tom Bawden, *Dolans bid $19bn for control of Cablevision*, Times (UK) at 57 (Oct. 10, 2006) ("Cablevision is being squeezed by telephone companies, which are launching rival cable services"); *Verizon Pursues Local Cable Franchises*, WASH. POST NEWSBYTES (July 19, 2005) ("Verizon's television initiative [is] underway in 15 states . . . In 2004, Verizon invested $1 billion in its nationwide television initiative, and it has accelerated construction this year."); *Microsoft Sees Commercial IPTV Ready for Delivery by Year-End*, TELECOMMUN. REP. DAILY (July 1, 2005), available at 2005 WLNR 25545059 ("Microsoft's IPTV platform is used by several major telephone companies getting into the IPTV business, including SBC Communications, Inc., Verizon Communications, Inc., [and] BellSouth Corp.")

14. Moreover, AT&T, Lafayette Utilities in Louisiana, United States Telecom Association, and Verizon report that, with the imminent entry of LECs into the multichannel video marketplace, incumbent cable operators have increased the use of exclusivity clauses in their agreements with MDU owners.[44] As one commenter noted, "[i]ncumbent providers commonly engage in a flurry of activity to lock up MDUs and other real estate developments in exclusive arrangements as soon as it becomes clear that a new entrant will be coming to town."[45] Sometimes these clauses are inserted in fine print, in "legalese," and without adequate notice to the MDU owner.[46]

15. In sum, the record demonstrates that exclusivity clauses bar entry into MDUs by new providers of multichannel video service. It also shows that, in reaction to the recent competitive challenge posed by LEC entry into the video marketplace, incumbent providers (chiefly incumbent cable operators) are increasingly using exclusivity clauses in new agreements with MDU owners to bar the entry of their new rivals and potential rivals. These developments constitute a substantial change to the record the Commission compiled in the period leading up to the *2003 Inside Wiring Order*.

## III.    DISCUSSION

### A.    Harms and Benefits of Exclusivity Clauses

16. In this Section, we first describe the harms and benefits of exclusivity clauses. We conclude that the harms significantly outweigh the benefits in ways they did not at the time of the Commission's *2003 Inside Wiring Order*. Specifically, they bar new entry and competition for both MVPD services and the so-called "triple play" of voice, video, and broadband Internet access services. They also discourage the deployment of broadband facilities to American consumers. This, in turn, has the effect of significantly hindering or preventing new MVPDs from providing to MDU residents video programming services that are within the scope of Section 628(b).[47] We therefore conclude that cable

---

[44] AT&T Comments at 5, 9-10 (at 9, "Incumbents have recently sought to increase their use of exclusive access contracts, especially in response to the threat of entry by wireline video entrants"; at 10, "efforts to lock-up MDUs have occurred in California, Texas, and virtually every market where AT&T has begun to enter the video service market"); United States Telecom Ass'n ("USTA") Comments at 6-8 (at 6, "cable incumbents are aggressively pursuing exclusive agreements with MDU owners"); Verizon Comments at 1-2 (many agreements continuing exclusivity clauses "have been entered into recently – indicating that incumbent providers are resorting to exclusive access arrangements as a means of 'locking up' [MDUs] immediately prior to the entry of a new competitor."), 3 ("cable incumbents have countered this competitive threat in many instances by entering into exclusive access contracts that shield incumbent providers from competition"), and at 10-11 (recounting several specific incidents in Florida of exclusivity granted shortly before Verizon began marketing). We find these descriptions of recent events more convincing than the contrary description in RAA's Comments Exh. C (Declaration of Chris Acker, Director of Building Technology Services Group for Forest City Residential Group, Inc.), ¶ 5. One reply commenter challenges some details of Verizon's characterizations of a few incidents, but does not dispute that an incumbent cable operator effected exclusivity clauses close in time to Verizon's entry. Reply Comments of Advance/Newhouse Commun. at 10-11.

[45] Lafayette Comments at 9.

[46] AT&T Comments at 12-13; Verizon Comments at 8, 12-13.

[47] 47 U.S.C. § 548(b). Section 628(b) of the Act makes it unlawful for cable operators and their vertically integrated programmers to engage in certain practices that hinder or prevent MVPDs from providing "satellite cable programming" or "satellite broadcast programming" to subscribers. "Satellite cable programming" is video programming (not including satellite broadcast programming) that is transmitted by satellite to cable operators for retransmission to cable subscribers. *See id.* §§ 548(i)(1), 605(d)(1). "Satellite broadcast programming" is broadcast video programming that is retransmitted by satellite by an entity other than the broadcaster or an entity under the broadcaster's control. *See id.* § 548(i)(3).

operators' use of exclusivity clauses in contracts for the provision of video services to MDUs constitutes an unfair method of competition or an unfair act or practice proscribed by Section 628(b).[48]

17. Harms Caused by Exclusivity Clauses. By far the greatest harm that exclusivity clauses cause residents of MDUs is that they deny those residents another choice of MVPD service and thus deny them the benefits of increased competition.[49] Congress and the Commission have repeatedly found, and few parties dispute here, that entry by LECs and other providers of wire-based video service into various segments of the multichannel video marketplace will produce major benefits for consumers.[50] A significant increase in multichannel competition usually results in lower prices, more channels, and a greater diversity of information and entertainment from more sources.[51] Notably, our most recent Cable Price Survey Reports show that the presence of a second wire-based MVPD competitor clearly holds prices down more effectively than is the case where DBS is the only alternative.[52] The fact that an incumbent cable operator may face competitive pressures on its pricing in a franchise area surrounding or adjacent to a MDU does not mean that the residents of a MDU served by the same cable operator will reap the benefits of such competition, including the option to choose among

---

[48] Id. § 548(b).

[49] See Corning Comments at 5 ("exclusive access contracts discourage [fiber to the premises] deployment, impede competition, and discourage innovation."); SureWest Comments at 3 ("exclusive service contracts constitute significant barriers to entry and thus greatly impede competition in the MVPD service market."); see also Consumers Union Ex Parte at 2 (noting the disproportionately large impact of exclusivity clauses on "communities of color").

[50] 47 U.S.C. § 548(a) ("The purpose of this section is to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market, to increase the availability of satellite cable programming and satellite broadcast programming to persons in rural and other areas not currently able to receive such programming, and to spur the development of communications technologies."); see also Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television & Consumer Protection Act of 1992, Report & Order & Further Notice of Proposed Rulemaking ("Franchise Reform Order"), 22 FCC Rcd 5101, 5103, ¶ 2 ("competition for delivery of bundled services will benefit consumers by driving down prices and improving the quality of service offerings"), 5126, ¶ 50 ("new cable competition reduces rates far more than competition from DBS") (2006), appeal pending sub nom. Alliance for Cmty. Media v. FCC, No. 07-3391 (6th Cir.); S. Rep. No. 102-92 at 47 (1991) available at 1992 U.S.C.C.A.N. 1133, 1146 & 1991 WL 125145 at 14 (Leg. Hist.) ("it is clear that there are benefits from competition between two cable systems"); H.R. Rep. 102-628 at 46 (1992), available at 1992 WL 166238 at 46 (Leg. Hist.) ("consumers would benefit greatly from the existence of two competing cable systems operating in a given market"). These predictions have been borne out in the Commission's recent Cable Price Survey Reports. See infra note 52.

[51] See, e.g., New Jersey Division of Rate Counsel ("NJDRC") Comments at 8 ("The prohibition on exclusive contracts in New Jersey [under state law] encourages lower prices . . . and provides consumers with a greater number of alternatives."); Verizon Comments at 5-6 (stating that when it began to enter two Florida counties, Comcast announced that it would not raise its cable rates (for the first time in a decade); six months after Verizon entered into competition with the incumbent cable operator in three areas in Texas, consumers saved almost $27 a month on the average cable TV bill.).

[52] Implementation of Section 3 of the Cable Television Consumer Protection & Competition Act of 1992; Statistical Report on Average Rates for Basic Service, Cable Programming Service, and Equipment, Report on Cable Industry Prices, 21 FCC Rcd 15087, ¶ 2 (2006) ("Prices are 17 percent lower where wireline cable competition is present."), 20 FCC Rcd 2718, 2721, ¶ 12 (2005) (the degree by which cable rates (monthly rates and price per channel) were lower in competitive areas compared to non-competitive areas was greatest where there was "wireline overbuild competition"), 18 FCC Rcd 13284, 13286-87, ¶ 5 (2003) (areas with competition from a wireline, overbuild, or municipal cable system had a lower average rate per channel than areas that had no competition or only DBS competition).

competitive providers, some of which may provide a reduced-priced bundled package. This is particularly true when incumbent cable operators and MDU owners sign contracts before a competitive provider enters the market, a practice that the record in this proceeding indicates is quite common. Within the MDU, the incumbent, protected by its exclusivity clause from any competition it may face outside the MDU's boundaries, would have no incentive to hold down its prices within the MDU. The MDU's residents would also be denied the benefits of taking service from the new entrant, with potentially lower rates and better features than the incumbent's.

18. In addition, a new provider of MVPD services such as a LEC is likely to bring into a MDU some satellite-delivered cable programming that the incumbent beneficiary of the exclusivity clause does not. Absent the new entrant, the MDU's residents who favor that programming will be denied the programming of their choice. This denial will fall disproportionately on minorities and low-income families (and on programmers specializing in programming oriented to those groups), and all residents will be denied increased competition in programming among MVPD providers.[53] We agree with Consumers Union that we should ensure that the "no segment of the population is denied the benefits of video competition."[54]

19. LEC entry is also likely to result in increased deployment of fiber to American homes at lower cost per residence,[55] and a new competitor offering the "triple play" bundle of video, voice, and Internet access service. An exclusivity clause in a MDU's agreement with a MVPD denies all these benefits to the MDU's residents.[56] Even if exclusivity clauses do not completely bar new entrants from the MVPD market everywhere, they foreclose new entrants from many millions of households, a significant part of the national marketplace. Such clauses could therefore deter new entrants from attempting to enter the market in many areas. More important, exclusivity clauses deny consumers in a part of the market the benefits that could flow to them, and exclusivity clauses confer few, if any, benefits on those consumers. These harms to consumers are greater than they were several years ago, when new entry by LECs had not begun on a large scale, the recent increase in fiber construction had not yet materialized,[57] and the popularity of the triple play was unproven.

20. The effect of exclusivity clauses on broadband deployment and "triple play" services merits further discussion. We have stated that broadband deployment and entry into the MVPD business are "inextricably linked."[58] One basis for this observation is the recent emergence of LECs, cable operators, and some other providers offering consumers a "triple play" of voice, MVPD, and broadband Internet access services.[59] The offering of, and competition in, the triple play brings to consumers not just

---

[53] See generally CFA et al. Ex Parte; Consumers Union Ex Parte; Honig Ex Parte; USTelecom Ex Parte.

[54] Consumers Union Ex Parte at 2.

[55] Corning Incorporated Comments at 1, 4-9; NJDRC Comments at 8 ("The prohibition of exclusive contracts [under state law] encourages . . . technological development and deployment"); see also Letter from Larry Cohen, President, Communications Workers of America, to Ms. Dortch (Oct. 24, 2007) ("Commission action to prohibit these arrangements – not only in the future but also those already negotiated – will support investment in competing high-speed broadband networks and the growth of good jobs associated with that investment.").

[56] See RAA Comments at 22 ("some property owners might welcome the opportunity to void some existing contracts to introduce competitors for new services").

[57] Corning Comments at 3.

[58] Franchise Reform Order, 22 FCC Rcd at 5126, ¶ 51.

[59] Id., 22 FCC Rcd at 5103, ¶ 2 ("We believe this competition for delivery of bundled services will benefit consumers by driving down prices and improving the quality of service offerings."); Comcast Corp. Comments at 6
(continued....)

Federal Communications Commission                          FCC 07-189

advanced telecommunications capability, but also a simplicity and efficiency that is proving to be highly attractive in the marketplace.[60]

21. In a MDU where an incumbent has the exclusive right to provide MVPD service, no other provider can offer residents the triple play today on its own facilities.[61] Any new entrant that could offer all three parts of the triple play but for the existence of an exclusivity clause, which limits its offerings to voice and broadband Internet access, would find entry less attractive.[62] The new entrant might not enter at all. Or, if the new entrant enters despite that handicap and provides MDU residents with only voice and Internet access services, leaving MVPD service to the beneficiary of an exclusivity clause, the new entrant's wire is inefficiently underutilized.[63] Thus, exclusivity clauses reduce competition in the provision of triple play services and result in inefficient use of communications facilities.

22. Exclusivity clauses can cause other harms to MDU residents. A MDU owner may grant exclusivity to one MVPD based on the available choice of service providers at a given time, and in doing so bar entry into the MDU by a more desirable but later-arriving MVPD.[64] Or, the person who grants exclusivity to one MVPD may be the developer or builder of a MDU, who may grant exclusivity against the long-term interests of the residents and soon thereafter relinquish control of the MDU.[65] In addition, exclusivity clauses can insulate the incumbent MVPD from any need to improve its service;[66] Manatee

(...continued from previous page)
("One of the most significant changes since the Commission last sought comment on this issue is the ability of cable operators to deliver multiple services over a single wire."), 13; USTA Comments at 10.

[60] Comcast Comments at 7; USTA Comments at 10.

[61] *Franchise Reform Order*, 22 FCC Rcd at 5126, ¶ 51 ("broadband deployment is not profitable without the ability to compete with the bundled services that cable companies provide"); *see also* Embarq Comments at 1-3; Qwest Comments at 6-7. We are aware that some LECs are partnering with DBS Providers to offer triple plays. *See, e.g.,* DirecTV, http://www.directv.com/DTVAPP/discover/broadband Bundle.jsp (visited Aug. 14, 2007). We see no reason to deny wire-based MVPDs, however, the opportunity to provide all parts of the triple play on one facility. That may be more efficient and convenient, both for the subscriber and the provider – saving the subscriber the need to install a dish and sparing the LEC dependence on a second network and a second work force.

[62] Qwest Comments at 2 ("the creation of a new revenue stream from multichannel video service is driving wireline broadband deployment nationwide"); USTA Comments at 10-11; Verizon Comments at 7-8.

[63] *See* SureWest Comments at 7-8.

[64] USTA Reply Comments at 4 (noting that a certain new entrant "offer[s] residential . . . users broadband speeds up to 60 Mbps – far greater then [sic] available from cable competitors. But this technology is being denied to residents of MDUs with exclusive access arrangements."); Warner Properties, Comments at 2 ("[p]roperty owners, such as WP, could offer their tenants more cable choices if they were not prohibited from doing so [by] . . . existing exclusive contracts"); *see also* Verizon July 6 Ex Parte at 4 (stating that some landlords would like to give tenants a greater variety of cable choices, but are unable to do so because of exclusivity clauses); Hargray Oct. 12 Ex Parte at 1.

[65] Verizon Comments at 8 (quoting the government of Manatee County, Florida), 8, 9 n.5; Manatee County Comments in MB Docket No. 05-311 at 12 ("it is often a developer who strikes an agreement that will not impact that developer once the development is completed"); *see also* Letter from Paul J. Feldman, Esq., Fletcher, Heald & Hildreth, P.L.C., counsel to SureWest, to Ms. Dortch (Oct. 11, 2007), Attachment (Presentation of SureWest Communications on MDU Exclusive Service Contracts") at 1 (exclusivity clauses are "[g]enerally negotiated by developers, not residents"); Hargray Oct. 12 Ex Parte at 1.

[66] SureWest Comments at 25 n.50 ("once the exclusive contracts are in place, [incumbent] providers have little incentive to respond to non-existent competition with better services or lower rates."); Warner Properties Comments at 2; Manatee County Comments, MB Docket No. 05-311, at 12.

County, Florida, aptly describes incumbent beneficiaries of exclusivity clauses as "sitting on these 'fiefdoms.'"[67]

23. Finally, the record indicates that exclusivity clauses are not always in the best interest of MDUs owners, either.[68] Technologically advanced buildings are important for attracting and retaining residents, and a lack of competition for providing new communications services can negatively affect a residential development.[69] A MDU owner may not see a benefit in an exclusivity clause that bars entry by new providers that were not in the market when the clause was written.[70]

24. Benefits of Exclusivity Clauses. When the Commission last considered issues concerning exclusivity clauses in its *2003 Inside Wiring Order*, it determined that exclusivity clauses had some pro-competitive effects.[71] In some cases, exclusivity clauses, or at least those of a limited duration, may help a MVPD to obtain financing to wire an entire building for cable and other services and to recover its investment over the term of exclusivity.[72] Similarly, some commenters claim that exclusivity clauses are especially necessary to attract investment in marginally attractive MDUs.[73]

25. Some commenters argue in support of the use of exclusivity clauses that, with the decline of LECs' and cable operators' traditional duty to serve all homes in an area, an exclusivity clause may be necessary to attract a MVPD into a new real estate development.[74] Other commenters state that a MDU owner, needing to attract buyers or tenants, may be counted on to represent them and will agree to an

---

[67] Manatee County Comments, MB Docket No. 05-311, at 16.

[68] *See, e.g.,* Palmetto Ex Parte at 2 (urging Commission action in order to eliminate the need to "further protracted litigation," against Time Warner in order to obtain competition in its community).

[69] Lennar Corp. Comments at 1 ("As one of the nation's largest developers and builders of new, large-scale residential communities, Lennar has a strong interest in ensuring that the buyers of its homes have available the widest possible range of competing advanced broadband services, including multichannel video, broadband data, and other evolving new service offerings"); RAA Comments at 3 ("Owners must be sure that access to reliable voice, video, and broadband services is available because potential apartment residents demand them"); Warner Properties Comments at 2 ("Property owners, such as WP, could offer their tenants more cable choices if they were not prohibited from doing so because of often perpetual existing exclusive contracts").

[70] *See infra* ¶ 28.

[71] *2003 Inside Wiring Order* at 1366, ¶ 63 (noting that exclusive agreements may "enable alternative providers to recoup the investment required to enter MDUs and thus to become or remain viable."). Despite this, the alternative providers of the time, which we refer to as PCOs in this proceeding, have a small market share and do not have a significant effect on MVPD competition.

[72] ACA Comments at 2-3; Charter Commun., Inc., Comments at 3-4; Comcast Comments at 18-19; Greenfield Service Provider Coalition ("GSPC") Comments at 3, 6-9; IMCC Comments at 5, 7-10; Microwave Satellite Technologies Inc. ("MSTI") Comments at 1; OpenBand MultiMedia, L.L.C., Comments at 3-4; Pavlov Media, Inc., Comments at 1; Qwest Comments at 2-3; RAA Comments at 5; WorldNet Telecommun., Inc., Comments at 1-3; Ygnition Networks Comments at 1-2; Time Warner Ex Parte at 2; Letter from Megan M. Delany, Esq., Vice President & Senior Counsel, Charter, to Ms. Dortch ("Charter Oct. 16 Ex Parte") (Oct. 16, 2007).

[73] Letter from Matthew C. Ames, Esq., Miller & Van Eaton, P.L.L.C., counsel for RAA (Sept. 5, 2007), Attachment ("The Real Access Alliance Opposes FCC Regulation . . . ," hereinafter "RAA Sept. 5 Attachment"); *see also, e.g.,* Letter from Robert G. de Posada, President, The Latino Coalition, to Chairman Martin *et al.* (Oct. 14, 2007); Letter from the Honorable Sheryl Williams Stapleton to Commission Chairman Kevin J. Martin *et al.* (Oct. 23, 2007); Letter from Dr. Luke E. Torian, Pastor, First Mount Zion Baptist Church, to the Commission (Oct. 24, 2007).

[74] Lennar Comments at 7; RAA Comments at 48-51, 62.

exclusivity clause only if it is in their interests.[75] The rational owner, these commenters claim, will give exclusive access to the one of several bidding MVPDs that offers the best mix of low price, quality service, promised improvements and in some cases, specialized program offerings.[76] An exclusivity clause, in this view, substitutes competition for the MDU for competition for individual residents, and the resulting benefits may be passed on to the residents.[77] In the same vein, some commenters deny that exclusivity clauses allow MVPDs to become complacent and provide inferior service; these entities believe that the high turnover in MDUs requires building owners to maintain and constantly improve their service so that the building or development will attract new residents who will become its subscribers.[78]

26. <u>Conclusion.</u> We conclude that exclusivity clauses cause significant harm to competition and consumers that the record did not reflect at the time of our 2003 *Inside Wiring Order.* We further find that although exclusivity clauses may in certain cases be beneficial, at least in the short term, to consumers, the harms of exclusivity clauses outweigh their benefits. The evidence described in the preceding paragraphs demonstrates that exclusivity clauses, especially when used in current market conditions by incumbent cable operators, are a barrier to new entry into the multichannel video marketplace and the provision of triple play offerings. Such exclusivity clauses inhibit competition in these markets and slow the deployment of broadband facilities. In doing so, exclusivity clauses deny MDU residents the benefits of increased competition, including lower prices[79] and the availability of more channels with more diverse content, as well as access to alternative providers of broadband facilities and the triple play of communications services their facilities support. These harms to consumers are traceable to the incumbent cable operators' practice, increased recently, of using exclusivity clauses, sometimes in fine print and without adequate notice to MDU owners, to forestall

---

[75] IMCC Comments at 18.

[76] Hotwire Comments at 3-4 (at 4, exclusivity clauses can enable "deep discounts . . . on a bulk basis."); IMCC Comments at 18-19 ("where sufficient volume can be secured through exclusivity, PCOs typically offer services at rates approximately 10 percent below the next highest competitive rate"); Lennar Comments at 3; OpenBand Comments at 6; RAA Comments at 17-18; WorldNet Comments at 3-5; Letter from Rev. Miguel Rivera, President, National Coalition of Latino Clergy & Christian Leaders, to Chairman Martin *et al.* (Oct. 18, 2007); *see also* AT&T Comments, Exh. A (Letter from Eric Minoski, Account Executive, Comcast Cable, South Bay, to Kara Patterson, Remi Co. (June 27, 2006) (offering significant discounts in exchange for exclusivity); Bandwidth Consulting Comments at 2; GSPC Comments at 14 ("Some new competitive entrants also offer television channels dedicated specifically to the communities they serve including channels for user-created content."), 17; Hotwire Comments at 4; Shentel Comments at 10-11 ("Consumers served under an [exclusive service contract or] ESC often make up a relatively narrow customer base, typically with shared demographic traits. As a result, entities that provide services under ESCs are able to customize their service offerings to meet the particular needs of that customer base. . . . In locations with a high ratio of Spanish speaking residents, for example, Shentel has customized its offering to provide additional Spanish language channels on the basic tier. In Johnson City, Tennessee, where Shentel serves a MDU in which a significant number of the residents happen to be Lebanese, Shentel offers a premium package of seven Arabic and Lebanese programming channels to residents in the building.").

[77] Comcast Comments at 19; CAI Comments at 3, 5-8; GSPC Comments at 15-17; IMCC Comments at 17; OpenBand Comments at 4-5; ShenTel Comments at 6.

[78] Charter Comments at 3 & n.7; RAA Comments, Exh. E (Declaration of Kent McDonald, Director of Communications Services for Apartment & Investment Management Co.) at ¶ 9. Indeed, Charter claims that exclusivity clauses appear not because of cable operators' market power, but because of MDU owners' power over cable operators needing access to their MDUs. Charter Comments at 2-3; *see also* Comcast Comments at 19.

[79] Consumers Union Ex Parte at 2. It is also noteworthy that there is no evidence in the record that MDU residents pay higher rates for MVPD services in states whose laws prohibit or limit exclusivity.

competition, particularly when new competitors are about to enter the market. We do not wish to deny MDU residents these benefits based on incumbents' alleged need to be shielded from additional competition,[80] or to subject them to something resembling the exclusive franchises of an earlier era.[81]

27. Moreover, we find that cable operators' use of exclusivity clauses in contracts for the provision of video services to MDUs constitutes an unfair method of competition or an unfair act or practice proscribed by Section 628(b).[82] Section 628 is designed to increase "competition and diversity" in the multichannel video marketplace, increase the availability of satellite cable and satellite broadcast programming to persons in "areas not currently able to receive such programming," and "spur the development of communications technologies."[83] That provision specifically prohibits cable operators from engaging in unfair methods of competition or unfair acts or practices that have the purpose or effect of hindering significantly or preventing any MVPD from providing satellite cable programming or satellite broadcast programming to consumers. We have found above that a significant percentage of consumers live in MDUs. We also found that, with the increasing entry of wire-based competitors, such as LECs, into the MVPD marketplace, incumbent cable operators have increased their use of exclusivity clauses with MDU owners, particularly when new competitors are on the verge of entering a particular market.[84] The record shows that these exclusivity clauses have the purpose or effect of preventing other MVPDs from providing the kind of programming covered by Section 628 – satellite cable and/or broadcast programming – to certain consumers; indeed, that is the intended and inevitable effect of exclusivity clauses.[85] Exclusivity clauses prevent new entrant MVPDs from competing with entrenched incumbent providers on the basis of service offerings, including programming, and on price. Foreclosing competition in the MDU market in this way is unfair because it deprives consumers residing in MDUs of the opportunity to choose a MVPD provider. Cable operators' execution of exclusivity clauses, which foreclose the competitive provision of MVPD service, the triple play, broadband deployment, and satellite-delivered programming to MDUs, thus constitutes an unfair method of competition in violation of Section 628(b).

28. We reject arguments that exclusivity clauses mostly work to the benefit of MDU owners and residents. First, as explained in paragraph 22 above, the person signing an exclusivity clause for a MDU may be a builder or manager whose interests do not coincide with those of the MDU's residents, especially after a few years.[86] Second, the cable operator may have induced the MDU owner to accept an exclusivity clause before any wire-based competitor was on the horizon, in which case there was no

---

[80] Letter from William H. Johnson, Esq., Ass't General Counsel, Verizon, to Ms. Dortch (Oct. 23, 2007) ("Verizon Oct. 23 Ex Parte") at 9.

[81] Consumers Union Ex Parte at 2.

[82] 47 U.S.C. § 548(b).

[83] 47 U.C.S. § 548.

[84] AT&T Comments at 5, 9-10; Lafayette Comments at 9; USTA Comments at 6-8; Verizon Comments at 1-2.

[85] See e.g., Verizon Comments at 11-12; AT&T Comments at 10-12.

[86] Verizon Comments at 8 (quoting the government of Manatee County, Florida), 9 n.5; Manatee County Comments in MB Docket No. 05-311 at 12 ("it is often a developer who strikes an agreement that will not impact that developer once the development is completed"); see also Letter from Paul J. Feldman, Esq., Fletcher, Heald & Hildreth, P.L.C., counsel to SureWest, to Ms. Dortch (Oct. 11, 2007), Attachment (Presentation of SureWest Communications on MDU Exclusive Service Contracts") at 1 (exclusivity clauses are "[g]enerally negotiated by developers, not residents"); Hargray Oct. 12 Ex Parte at 1.

"competition for the MDU" at the time and no prospect of it in the future.[87] Third, the exclusivity clause may be in "legalese" and in fine print and the MDU owner may be unaware of it.[88] Fourth, the fact that a new entrant wants to serve the MDU undercuts any claim that only one wire-based provider can serve the building profitably – if new entry would be unprofitable, it is unlikely that the new entrant would want to enter. Fifth, there is no evidence in the record, other than generalities and anecdotes, that incumbent MVPD providers couple exclusivity clauses with significant new investments that they do not make elsewhere, such as in states whose laws prohibit exclusivity.[89] Sixth, SureWest states that the triple play, which offers a provider revenue from three services, reduces any need for exclusivity that it may have had in the past, when MVPD revenue was the only way it could recover its investment.[90] Finally, other agreements between incumbent MVPDs and MDU owners, perhaps providing for marketing exclusivity or bulk discounts, can provide benefits similar to those alleged for exclusivity clauses without causing the latter clauses' entry-foreclosing harms to consumers.[91] Therefore, although "competition for the MDU" may have some theoretical advantages in some cases over competition for individual consumers, it may not describe reality in many cases. Even if it does, in general we find that the best results for consumers come from preserving their ability to play an active role in making an individual choice rather than allowing cable operators using exclusivity clauses to foreclose individual choice. In addition, as noted above, exclusivity clauses tend to insulate the incumbent from any need to improve its service. Thus, we conclude that exclusivity clauses generally do not benefit MDU residents.[92]

29. The record contains claims that exclusivity clauses may lead to lower prices.[93] Although we cannot rule out the possibility that those claims may be true in some cases, such assertions are outweighed by the numerous studies showing that a second wire-based MVPD lowers prices.[94] We also reject arguments that "exclusivity is not really a problem"[95] because many MDUs are not subject to

---

[87] Hotwire Commun., LLC, Comments at 7; IMCC Comments at 27; Qwest Comments at 4; Verizon Comments at 4.

[88] AT&T Comments at 12-13; Verizon Comments at 8, 12-13.

[89] IMCC Comments at 14 (stating that there are 15 such states). *But cf.* Charter Oct. 16 Ex Parte (listing MDUs with exclusivity clauses where Charter upgraded services).

[90] SureWest Comments at iv, 25 n.50; SureWest Reply Comments at 2 n.2.

[91] AT&T Reply Comments at 10-11; Verizon Reply Comments at 9-10; Verizon Oct. 23 Ex Parte at 10.

[92] Two commenters note that MDU residents may not appreciate the disruption caused by a second MVPD in the building when it installs its facilities. CAI Comments at 9; RAA Comments at 6-7. We do not doubt the validity of that observation. Nothing herein, however, imposes a duty or rule on a MDU owner to allow multiple MVPD providers within its premises.

[93] CAI Comments at 9; RAA Comments at 18; AT&T Comments, Exh. A (Letter from Eric Minoski, Account Executive, Comcast Cable, South Bay, to Kara Patterson, Remi Co. (June 27, 2006), (offering significant discounts in exchange for exclusivity).

[94] *See supra* note 52; *see also* CFA *et al.* Ex Parte at 2 ("exclusive contracts may, under some circumstances, serve the interests of competition. . . . [But] nothing in the record demonstrates that they are so widespread that the millions of consumers in [MDUs] should be denied their choice of provider for the sake of these relatively few instances").

[95] RAA Sept. 5 Ex Parte, Attachment at 2 (emphasis deleted).

exclusivity clauses and such clauses expire.[96]  A practice that harms a significant number of households in this country warrants remedial action even if it does not harm everyone.[97]

**B.    Prohibition of Exclusivity Clauses**

30. For the reasons set forth above, we prohibit cable operators and other entities that are subject to Section 628 from enforcing existing exclusivity clauses and executing contracts containing new ones. These other entities are LECs and open video systems and are discussed in Section IV below.

31. Specifically, 30 days after publication of this *Report and Order* in the Federal Register, no cable operator or multichannel video programming distributor subject to Section 628 of the Act[98] shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU . Any such exclusivity clause shall be null and void.

32. We fashion the prohibition pursuant to Section 628 for several reasons. First, that provision is a basis of our statutory authority to regulate exclusivity clauses.[99]  Second, incumbent cable operators, which are subject to Section 628, are the beneficiaries of the vast majority of exclusivity clauses. As described in paragraph 10 above, incumbent cable operators are primarily responsible for the recent increase in newly executed exclusivity clauses. Also, the evidence in the record indicates that incumbent cable operators are using them to impede the entry of new competitors into the MVPD market in many areas. Incumbent cable operators are still by far the dominant force in the MVPD business, with a market share most recently measured at 67 percent[100] and the ability to impose steadily rising prices.[101] Our prohibition is limited to those MVPDs covered by Section 628(b). It does not reach PCOs or DBS providers because we do not have an adequate record on which to decide whether such a prohibition is warranted for non-cable operators. Nevertheless, we are adopting the *Further Notice of Proposed Rulemaking* below in order to develop such a record and, based on it, evaluate whether action is called for.

33. We put no time limit on the prohibition we adopt in the instant order and we do not exempt from it any kind of MDU or any geographic location. We do, however, limit our prohibition to those residential real estate developments that we define as MDUs as discussed in paragraph 7 above.

34. The rule we adopt in this proceeding is consistent with the longstanding Congressional prohibition of exclusive franchises for cable service[102] and the statement in our most recent *Inside Wiring*

---

[96] RAA Reply Comments at 6-12.

[97] Letter from Stephen Weinstein (Oct. 9, 2007).

[98] *See* 47 U.S.C. §§ 548(b) (cable operators), 548(j) (common carriers or their affiliates that provide video programming by any means to their subscribers), 573(c)(1)(A) (open video systems).

[99] *See infra* Section IV.

[100] *See* Docket MB No. 07-29, *Implementation of the Cable Television Consumer Protection & Competition Act of 1992, Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act: Sunset of Exclusive Contract Prohibition,* Cablevision Comments at 2 (stating that cable's market share is 67 percent); Comcast Comments at 8 (stating that cable's market share is 67.8 percent as of the end of 2006); NCTA Comments at 4 (stating that cable's market share is 66.9 percent).

[101] *Implementation of Section 3 of the Cable Television Consumer Protection & Competition Act of 1992: Statistical Report on Average Rates,* Report on Cable Industry Prices, 21 FCC Rcd 15087, 15090, ¶ 10 (2006).

[102] *See* 47 U.S.C. § 541(a)(1).

*Order* that "[n]ew entrants to the video services and telephony markets should not be foreclosed from competing for consumers in multi-unit buildings."[103]

35. The rule we adopt in this proceeding prohibits both the enforcement of existing exclusivity clauses and the execution of new ones.[104] Both have the same competition- and broadband-deterring effect that harms consumers. A rule that left exclusivity clauses in effect would allow the vast majority of the harms caused by such clauses to continue for years, and we believe that it is strongly.in the public interest to prohibit such clauses from being enforced. Those harms would continue indefinitely in the cases of exclusivity clauses that last perpetually or contemplate automatic renewal upon the renewal of the incumbent cable operator's franchise.[105]

36. Our prohibition of the enforcement of existing exclusivity clauses does not disturb legitimate expectations of investors in MDUs and the video service providers affected by this Order. The lawfulness of exclusivity clauses has been under our active scrutiny for a decade, making the parties to them aware that such clauses may be prohibited.[106] Although we have not prohibited enforcement of them until now, we had previously recognized the reasons for doing so but had lacked an adequate record on which to base such a decision.[107] We have prohibited the enforcement of exclusivity clauses for satellite-delivered programming before. For example, the Commission prohibits, with respect to distribution to persons in areas served by cable operators and other MVPDs covered by Section 628(b), exclusivity clauses for satellite cable programming and satellite broadcast programming between a cable operator and a vendor of such programming in which a cable operator has an attributable interest, unless the Commission determines that such contracts are in the public interest.[108] Also, in the context of

---

[103] *2007 Inside Wiring Order*, 22 FCC Rcd at 10641, at ¶ 3.

[104] Comments supporting prohibiting the enforcement of some or all existing exclusivity clauses include AT&T Comments at 15; Lafayette Comments at 10; SureWest Comments at 1, 8-10; Verizon Comments at 2, 13; Warner Properties Comments at 2. Comments favoring the continued validity of exclusivity clauses include ACA Comments at 2-5; Charter Comments at 6-7; Comcast Comments at 33-35; Hotwire Comments at 5-7; National Cable & Telecommun. Ass'n ("NCTA") Comments at 11-13; OpenBand Comments at 8; Shentel Comments at 4, 18; Time Warner Comments at 2-3; and Advance/Newhouse Commun. Reply Comments at 18.

[105] AT&T Comments at 12; Hotwire Comments at 7-8; IMCC Comments at 14 (estimating that 10-15 percent of all MDU units are governed by perpetual exclusivity, and that the number is declining), 23 (complaining of *de facto* perpetuity in automatic renewal at franchise renewal), 27; MSTI Comments at 2; RAA Comments at 23-24; Verizon Comments at 2; Warner Properties Comments at 2.

[106] *Telecommunications Services Inside Wiring: Customer Premises Equipment*, Notice of Proposed Rulemaking, 11 FCC Rcd 2747, 2773-76, ¶¶ 58-64 (1996); Report & Order & Second Further Notice of Proposed Rulemaking ("*1997 Inside Wiring Order*"), 13 FCC Rcd 3659, 3778-80, ¶¶ 258-66 (1997) (subsequent history omitted); *2003 Inside Wiring Order*, 18 FCC Rcd at 1364-70, ¶¶ 59-71; *see also* authority cited *supra* note 2.

[107] *1997 Inside Wiring Order*, 13 FCC Rcd at 3664, ¶ 3 ("We believe that the record would benefit from additional comment on the following issues . . . . : (1) exclusive service contracts between service providers and MDU owners"); *id.* at 3754, ¶ 203; 18 FCC Rcd at 1370, ¶ 71 ("In sum, we find that the record does not support a prohibition on exclusive contracts for video services in MDUs . . . . The parties have identified both pro-competitive and anti-competitive aspects of exclusive contracts. We cannot state, based on the record, that exclusive contracts are predominantly anti-competitive.") (footnote omitted); *see also* authorities & quotations *supra* note 10.

[108] *Implementations of the Cable Television Consumer Protection & Competition Act of 1992: Development of Competition & Diversity in Video Programming Distribution & Carriage*, Memorandum Opinion & Order on Reconsideration of the First Report & Order ("*1994 Memorandum Opinion & Order*"), 10 FCC Rcd 1902, 1941, ¶ 88 (1994); First Report & Order ("*Section 628 Report & Order*"), 8 FCC Rcd 3359, 3364, ¶ 16; *id.* at 3424-25, ¶¶ 120-21 (1993).

commercial telecommunications services, the Commission has prohibited the execution of exclusive access arrangements in multiple tenant environments and has sought comment on whether to prohibit the enforcement of existing exclusive access provisions.[109]  Some states have given some or all MVPD providers rights of access to MDUs.[110]

37. Moreover, incumbent cable operators will still be able to use their equipment in MDUs to provide service to residents who wish to continue to subscribe to their services.  Finally, we note that the rule we adopt today does not require that any new entrant be given access to any MDU.  A MDU owner still retains the rights it has under relevant state law to deny a particular provider the right to provide service to its property.[111]  We merely prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators.  While this Order prohibits the enforcement of existing exclusivity clauses, it does not, on its own terms, purport to affect other provisions in contracts containing exclusivity clauses.[112]

38. We reject proposals that we should exempt contracts with exclusivity clauses from this prohibition on a case-by-case basis[113] or that we should allow exclusivity clauses for small cable operators,[114] cable operators in rural areas,[115] MVPDs that are found to lack "market power,"[116] MVPDs other than incumbent cable operators,[117] "planned communities,"[118] and new real estate developments.[119]

---

[109] *See Promotion of Competitive Networks in Local Telecommunications Markets*, First Report & Order & Further Notice of Proposed Rulemaking, 15 FCC Rcd 22983, 23000, ¶ 36 (2000).  We recognize that the Commission has yet to address the issue raised in the *Competitive Networks FNPRM* regarding the enforceability of exclusivity clauses for telecommunications services in residential MDUs.  In light of the competitive parity implications, we will resolve that issue within the next two months.

[110] *See, e.g.*, IMCC Comments at 14.

[111] RAA Comments at iv, 26 ("the Communications Act does not authorize the Commission to regulate the real estate industry.").

[112] The treatment of such provisions will be determined by the terms of particular contracts, which may, for example, contain change of law clauses, as well as state law.  *See* Verizon Oct. 23 Ex Parte at 8, Attachment A at 4 (containing example of contract between MDU and Comcast including clause stating that "[i]f any provision of this Agreement is found to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Agreement will not be affected or impaired."); Verizon Comments, Attachment 6 at 5 (containing example of contact between MDU and Bright House stating that if any portion of the agreement is rendered invalid or unenforceable by a "government, legal, or regulatory authority," then "the remainder of this Agreement will continue in full force unless such continuance will deprive one of the parties of a material benefit hereunder or frustrate the main purpose(s) of this Agreement" -- in that event, parties shall make "their reasonable best efforts to replace or modify the invalid or unenforceable provision" but any party may terminate the Agreement upon 60 days notice if such efforts are unsuccessful).

[113] Lafayette Comments at 10; *see also* ShenTel Comments at 17 (advocating allowing exclusivity for 20 years for new real estate developments in which the beneficiary of exclusivity installs fiber to the home).

[114] 47 C.F.R. § 76.901(f) (definition of "small cable operator"); Hotwire Comments at 5-7; MSTI Comments at 2.

[115] ShenTel Comments *passim*.

[116] ACA Comments *passim*; Comcast Comments at 12; GSPC Comments at 10; IMCC Comments at 5-6, 25; OpenBand Comments at 2, 7-8 (advocating a lack of "effective competition," 47 U.S.C. § 543(l)(1), as the measure of effective competition); Qwest Comments at ii (advocating a prohibition of exclusivity clauses "until such time as [the Commission] determines that competition among [MVPDs] has rendered the prohibition unnecessary"), 3.

[117] GSPC Comments at 1-2; Hotwire Comments at 2; OpenBand Comments at 8; *see also* ShenTel Comments at 18-19.

Federal Communications Commission                    FCC 07-189

We are reluctant to deny any large class of MDU residents the benefits of increased competition or to allow any cable operator to engage in future harmful conduct. Finally, we wish to avoid the burden that would be imposed by numerous individual adjudications about whether market power or some other undesirable condition exists in an individual MDU or community,[120] or whether a particular entity in an allegedly unique situation is exempted from the prohibition. In addition, as discussed in Section IV, restrictions adopted pursuant to Section 628(b) apply automatically to certain categories of MVPDs pursuant to Sections 602(7), 628(j), and 653(c)(1)(A).[121]

39. Some commenters have suggested that we allow exclusivity clauses for a period of years[122] or that we put a time limit on our prohibition of them, such as a specific term of years, the end of the current franchise of the incumbent cable operator, until "effective competition" is found to exist in an area, or until some other measure of competition is shown.[123] We decline these suggestions. We are reluctant to grant any communications companies an artificial period of immunity from pro-competitive regulation during which the recovery of their investment is guaranteed; companies in communications markets regularly invest billions of dollars without any such guarantees.[124] Chiefly, we wish to avoid the burden of individualized adjudications and measurements because we believe that they would burden us and the industry, and we believe that the limited benefits that such clauses confer are outweighed by their deleterious long-term effects on the provision of competitive services to consumers.

## IV.    LEGAL AUTHORITY

40. Several sources afford the Commission ample authority to prohibit exclusivity clauses in contracts between cable operators and owners of MDUs. First, consistent with our tentative conclusion in the *Notice*, we conclude that we have authority under Section 628(b) of the Act to adopt rules prohibiting cable operators from enforcing or executing contracts that give them the exclusive right to provide video programming services (alone or in combination with other services) to MDUs.[125] Moreover, we conclude that pursuant to the Act the same prohibition will apply to common carriers or their affiliates that provide video programming directly to subscribers under Section 628(j) of the Act and to operators of open video systems under Section 653(c)(1).[126] Finally, we conclude that, even in the

---

(...continued from previous page)
[118] *See* OpenBand Comments at 5.

[119] *See* Lennar Comments at 11.

[120] *See* RAA Comments at ii ("There are over 500,000 apartment buildings in the United States, with hundreds more being built every year."); ShenTel Reply Comments at 10.

[121] 47 U.S.C. §§ 522(7), 548(j), 573(c)(1)(A).

[122] ShenTel Comments at 17 (10 years for MDUs); Verizon Comments at 2, 13-14 (5 years).

[123] *See, e.g.,* Qwest Comments at 7-8 (at 8, advocating a prospective prohibition of exclusivity clauses "until such time as [the Commission] determines that competition among MVPDs has rendered the prohibition unnecessary. . . . when . . . terrestrial competitors have had a full and fair opportunity to obtain franchises, build out facilities, and obtain the critical mass of subscribers necessary to establish a foothold in the market."); *see also* ¶ 38 *supra.*

[124] *See, e.g.,* Mark Jewell, *Proposed bill would move cable franchises to state level,* PROVIDENCE J. BULL. at D 3 (June 6, 2007), available at 2007 WLNR 10624299 (visited Oct. 26, 2007) ("Verizon's push comes as the company invests billions of dollars for its so-called 'FiOS' project to rewire more than half of its copper telephone network so it can sell cable TV and superfast Internet connections.").

[125] *Notice,* 22 FCC Rcd at 5939, ¶ 9.

[126] 47 U.S.C. §§ 548(j), 573(c)(1). "Cable operator" is defined as "any person or group of persons (A) who provides cable service over a cable system . . . ." 47 U.S.C. § 522(5). "Cable system" is defined to exclude "a facility of a
(continued....)

Federal Communications Commission                           FCC 07-189

absence of this explicit statutory authority, we have ancillary authority to prohibit incumbent cable operators from entering into contracts that are for the provision of video services to MDUs and that contain exclusivity clauses.

41. Turning first to cable operators, the plain language of the statute provides a solid legal foundation for the rule adopted today. Section 628(b) broadly states that:

> "[i]t shall be unlawful for a cable operator . . . to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers."[127]

42. Section 628(c)(1), in turn, directs the Commission, "in order to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market and the continuing development of communications technologies," to promulgate rules specifying the conduct prohibited by Section 628(b).[128]

43. The plain language of Section 628(b) encompasses the conduct at issue here.[129] First, although we have never specifically defined what constitutes an "unfair method of competition" or "unfair . . .act or practice" beyond that conduct specifically proscribed in Section 628(c)(2), we have recognized that there is additional conduct that could be proscribed under Section 628(b).[130] As discussed above, the use of an exclusivity clause by a cable operator to "lock up" a MDU owner is an unfair method of competition or unfair act or practice because it can be used to impede the entry of competitors into the market and foreclose competition based on the quality and price of competing service offerings.[131] Moreover, as we have shown above, such a contract clearly has the effect of preventing a MVPD from providing satellite programming to consumers. Indeed, by its very nature, such an exclusivity clause prevents other MVPDs from providing service to the consumers who live in the MDU.[132] Thus, we have explicit authority under Section 628(b) to prohibit cable operators from entering into exclusivity clauses with MDU owners.[133]

---

(...continued from previous page)
common carrier which is subject, in whole or in part, to the provisions of title II of this Act, *except* that such facility shall be considered a cable system (other than for purposes of Section 621(c)) to the extent such facility is used in the transmission of video programming directly to subscribers . . . ." 47 U.S.C. § 522(7)(C) (emphasis added).

[127] 47 U.S.C. § 548(b).

[128] 47 U.S.C. § 548(c)(1).

[129] *See Limtiaco v. Camacho*, 549 U.S. __, __, 127 S. Ct. 1413, 1418 (2007) ("As always, we begin with the text of the statute.").

[130] *Section 628 Report & Order*, 8 FCC Rcd at 3373-3374, ¶¶ 40-41(recognizing that the objectives of Section 628(b) "provide a mechanism for addressing those types of conduct . . . that inhibit the development of multichannel video distribution competition . . . [and] emerge as barriers to competition").

[131] *See supra* Sections II-III.

[132] We reject Advance/Newhouse Communications's suggestion that this interpretation of Section 628(b) suffers a logical flaw – why would Congress only focus on "satellite" programming if it sought to vest the Commission with the authority to "curb unfair practices in the cable industry generally." Advance/Newhouse Commun. Reply Comments at 18. First, we are not finding that Section 628(b) vests the Commission with some unlimited authority to limit unfair practices in the cable industry. Rather, we are finding that the language of Section 628(b) prohibits unfair methods of competition with the purpose or effect of hindering significantly or preventing MVPDs from

(continued....)

21

44. Contrary to commenters' suggestions,[134] the Commission's authority under Section 628(b) is not restricted to unfair methods of competition or unfair or deceptive practices that deny MVPDs access to programming. Section 628(b) is not so narrowly drawn. Anticompetitive practices can hinder or prevent MVPDs from providing programming to consumers either by blocking their access to programming or by blocking their access to consumers, and there is nothing in Section 628(b) that suggests that the Commission's authority is limited to the former. Although NCTA argues that the language "from providing satellite cable programming or satellite broadcast programming to subscribers or consumers" indicates that Section 628(b) was "squarely directed at practices that unfairly denied MVPDs access to *programming*,"[135] the better reading is the one based on the clear and complete terms of the provision: any practices that unfairly deny MVPDs the ability to provide such programming to consumers are prohibited. Had Congress wanted Section 628(b) to proscribe only practices denying MVPDs access to programming it could easily have done so by focusing that provision explicitly on conduct that impairs MVPDs' access to programming.[136] Congress knew how to draft narrowly drawn provisions of that kind as evidenced by another subsection, Section 628(c)(2), which proscribes specific conduct hindering MVPDs' access to programming. Thus, we believe that our interpretation of Section 628(b) gives meaning to the broad, plain language of the statutory provision.

45. We recognize, as commenters point out,[137] that much of Section 628's legislative history focuses on MVPDs' access to programming.[138] However, the legislative history indicates that a primary concern underlying Section 628 was fostering competition among cable operators and enhancing

---

(...continued from previous page)
providing satellite cable and broadcast programming to consumers. Moreover, we acknowledge that Section 628 was primarily, but not exclusively, concerned about the vertical integration of cable operators and satellite programming vendors, and thus Section 628 significantly focuses on those relationships. In addition, we note that our decision to prohibit exclusivity clauses for the provision of video services to MDU owners is consistent with the focus on satellite programming because most programming is delivered via satellite.

[133] We note that the New Jersey Division of Rate Counsel raises a number of issues, including the argument that the Commission's regulation of exclusivity clauses for MDUs violates the Tenth Amendment of the U.S. Constitution, that hinge on its view that the Commission lacks any authority to adopt the prohibition on exclusivity clauses described herein. New Jersey Division of Rate Counsel Comments at 6-8, New Jersey Division of Rate Counsel Reply Comments at 2-6. We need not address these tangential issues because, as explained herein, we find that we have specific statutory authority to adopt the prohibition.

[134] *See, e.g.,* Comcast Comments at 27; RAA Comments at 29-30; NCTA Comments at 4.

[135] NCTA Comments at 4.

[136] Notably, the House of Representatives considered and rejected a proposal, in the context of a more comprehensive amendment, that prohibited "any video programming vendor [owned or controlled by] a multichannel video system operator . . . from refusing to deal with any [MVPD] with respect to the *provision of video programming.*" *See* 138 Cong. Rec. H6545-01 (July 23, 1992); Verizon Comments at 16. We cannot agree with NCTA that the House's rejection of this proposal suggests nothing of relevance; it provides support for the proposition that Congress could have drafted narrowly tailored language directed solely at MVPD access to programming but did not. *See* NCTA Reply Comments at 4.

[137] *See* RAA Comments at 30; NCTA Comments at 4-5; Comcast Comments at 27.

[138] *See e.g.,* 138 Cong. Rec. H6487, H6533 (July 23, 1992)("[t]he Tauzin Amendment, very simply put, requires the [cable industry] to stop refusing to sell its products to other distributors of television programs").

consumer choice.[139]  For example, the Conference Report on Section 628 reflects a concern that is broader than MVPDs' access to programming:

> "[T]he conferees expect the Commission to address and resolve the problems of unreasonable cable industry practices, *including* restricting the availability of programming and charging discriminatory prices to non-cable technologies.  The conferees intend that the Commission shall encourage arrangements which promote the development of new technologies providing facilities based competition to cable and extending programming to areas not served by cable."[140]

46.  Our adoption of a rule prohibiting exclusivity clauses addresses the Congressional concerns underlying Section 628(b).  The rule will prohibit the continuation and proliferation of an anticompetitive cable practice that has erected a barrier to the provision of competitive video services.  It also will promote the development of new technologies that will provide facilities-based competition to existing cable operators, and thus serves the purposes set forth in Section 628(a) (as well as other provisions of law, such as Section 706 of the Telecommunications Act of 1996[141]).  As Verizon points out, fiber optic services and interactive video are new facilities-based technologies that competitors seek to deploy.[142]  Exclusivity clauses prevent competitive MVPDs from providing satellite cable and broadcast programming to consumers by means of such new technologies.  SureWest similarly argues that, because the deployment of broadband networks and the provision of video service are intrinsically linked, exclusivity clauses that prevent it from providing video services compromise its ability to deploy other advanced telecommunications services, by inhibiting its ability to market a package of services that consumers demand and reducing the revenues it needs to support investment in new and innovative services.[143]

47.  More broadly, prohibiting exclusivity clauses for the provision of video services will further the purposes of the 1992 Cable Act and the 1934 Act.[144]  As several commenters point out,[145] the 1992 Cable Act sought to promote competition and consumer choice in cable communications.[146]  In addition, the purpose of the Communications Act of 1934, as amended, is "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide and world-wide wire and radio

---

[139] *Id.* (Congressman Tauzin stating that "[w]e can give [Americans] competition in television . . . We can give them choice.  What do Americans want most in a free enterprise system?  Two stores in town . . . . With the Tauzin amendment we will create two stores in the television marketplace."); *id.* at H6503 (Congressman Tauzin stating that "real heart and soul of this bill ought to be to create competition").

[140] H.R. Conf. Rep. 102-862 at 92 (1992) (Conf. Rep.), *as reprinted in* 1992 U.S.C.C.A.N. 1231, 1275 (emphasis added).

[141] *See* 47 U.S.C. § 157 nt ("The Commission . . . shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.").

[142] Verizon Comments at 2.

[143] SureWest Comments at 22.

[144] *See* 47 U.S.C. §§ 151, 157 nt.

[145] AT&T Comments at 19; SureWest Communications Comments at 13; Verizon Comments at 16.

[146] 47 U.S.C.§ 521(6).  *See also* Verizon Comments at 16 ("overall purpose of the 1992 Act . . . [was] to 'encourage the further development of robust competition in the video programming marketplace.'"); *see also supra* note 130.

Federal Communications Commission                    FCC 07-189

communication service with adequate facilities at reasonable charges."[147] Moreover, Section 706 of the Telecommunications Act of 1996 directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans. . . ."[148] Removing barriers to allow access to a broad segment of consumers in the multichannel video programming distribution market by prohibiting exclusivity clauses for the provision of video services will further these statutory purposes. As Verizon notes, once a MDU owner is "locked" into an exclusivity clause, "residents are prevented from choosing alternative services that they might prefer – on the basis of price, quality, and innovative and technologically advanced service offerings."[149] Thus, contrary to some commenters' arguments,[150] our interpretation of Section 628(b) to prohibit exclusivity clauses for the provision of video services is not only consistent with the plain language of that statutory provision and confirmed by that provision's legislative history, but also furthers the broader purposes of the Act.[151]

48. We disagree with those commenters who argue that the regulatory requirements outlined in Section 628(c) circumscribe the Commission's authority to prohibit exclusivity clauses for the provision of video services.[152] For example, Real Access Alliance ("RAA") states that the specific provisions of Sections 628(c)(2)(A),(B),(C), and (D) establish the full scope of the Commission's authority under Section 628.[153] However, nothing in these provisions indicate that they were intended to establish the outer limits of the Commission's authority under Section 628(b). In fact, the very title of Section 628(c)(2), "Minimum Contents of Regulations," strongly suggests that the rules the Commission was required to implement had to cover the conduct described in Sections 628(c)(2) at the *least*, but that the Commission's authority under Section 628(b) was broader.[154] This interpretation is confirmed by Section 628(c)(1), which grants the Commission wide latitude to "specify particular conduct that is prohibited by [Section 628(b)]."[155] Other commenters' suggestions along the same lines are unconvincing for the same reasons.[156]

---

[147] 47 U.S.C. § 151.

[148] 47 U.S.C. § 157 nt.

[149] Verizon Comments at 4.

[150] *See, e.g.,* RAA Comments at 29-31; NCTA Comments at 4-5; Comcast Comments at 27; CAI Comments at 13-14.

[151] We also find that Congress's failure *in 1984* to include a provision that would have mandated access to MDUs for cable service has no bearing on our interpretation of the subsequent legislation that became the 1992 Cable Act, particularly since there is no evidence that Congress's failure to act in 1984 is at all related to the action it did take in adopting Section 628(b) in 1992. *See* Comcast Comments at 25.

[152] *See e.g.,* RAA Comments at 30-31; Comcast Comments at 27-28; Time Warner Comments at 8; CAI Comments at 13-14.

[153] RAA Comments at 30-31; *see also* CAI Comments at 13-14.

[154] The term "minimum" indicates that more could be covered since it is defined as "the least quantity assignable, admissible, or possible." Webster's *New Collegiate Dictionary* (1977).

[155] 47 U.S.C. § 548(c)(1).

[156] Time Warner Cable states that the Commission has recognized that Section 628(b) cannot be read in isolation, but "must be interpreted in connection with Sections 628(c)(2)(D) and 628(h) which specifically address the legality of exclusive *programming* contracts." Time Warner Comments at 8, *citing American Cable Co. & Jay Copeland v. Telecable of Columbus, Inc.,* Memorandum Opinion & Order, 11 FCC Rcd 10090, 10114-15, ¶ 55 (CSB 1996) (*CSB Order*). First, we note that the decision cited by Time Warner is a Cable Services Bureau decision upon which the Commission did not pass. Moreover, the quoted language, although accurate, was made in the context of a

(continued....)

Federal Communications Commission                              FCC 07-189

49. As pointed out by several commenters, the Commission's implementation of this provision to date has focused on ensuring MVPD access to the programming they need to provide a viable and competitive multichannel alternative to consumers, *i.e.*, on the regulations adopted pursuant to Section 628(c)(2).[157] In the decision initially implementing Section 628, the Commission described the provision as "intended to increase competition and diversity in the multichannel video programming market, as well as to foster the development of competition to traditional cable systems, by prescribing regulations that govern the access by competing multichannel systems to cable programming services."[158] Nevertheless, the Commission stated:

> "Neither the record of this proceeding nor the legislative history offer much insight into the types of practices that might constitute a violation of the statute with respect to the unspecified "unfair practices" prohibited by Section 628(b) beyond those more specifically referenced in Section 628(c). The objectives of the provision, however, are clearly to provide a mechanism for addressing those types of conduct, primarily associated with horizontal and vertical concentration within the cable and satellite cable programming field, that inhibit the development of multichannel video distribution competition. . . . [A]lthough the types of conduct more specifically referenced in the statute . . . appear to be the primary areas of congressional concern, Section 628(b) is a clear repository of Commission jurisdiction to adopt additional rules or to take additional actions to accomplish the statutory objectives should additional types of conduct emerge as barriers to competition and obstacles to the broader distribution of satellite cable and broadcast video programming."[159]

Viewing the implementation history as a whole, the Commission's early focus on program access is not surprising. It was shaped both by the specific provisions of Section 628(c)(2) – since these regulations were statutorily required and thus appeared to be of the most pressing concern to Congress[160] – and the policy goal in the 1992 Cable Act of "'rely[ing] on the marketplace, to the maximum extent feasible' in

---

(...continued from previous page)
programming access dispute. Thus, it was reasonable for the Cable Services Bureau to look to these more specific programming access provisions to determine if they were relevant to the dispute at hand. *CSB Order*, 11 FCC Rcd at 10110, ¶ 43. In addition, Time Warner cites to the Commission's decision not to extend the exclusivity clause prohibition found in Section 628(c)(2)(D) to non-vertically integrated satellite-delivered programming as further evidence of the Commission's view that Section 628(b) is limited in scope to program access issues. Time Warner Comments at 8, *citing Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, Report & Order, 17 FCC Rcd 12124, 12157-12158, ¶¶ 71-74 (2002). The Commission's decision there was specifically focused on Section 628(c)(2)(D)'s express limitations as to exclusivity clauses and program access.

Comcast suggests that Section 628(d), which allows MVPDs to seek redress of a violation of Section 628(b) through an adjudicatory proceeding before the Commission, limits the Commission ability to adopt rules to enforce Section 628(b). Comcast Comments at 27-28. This argument is without merit because Section 628(c)(1) expressly grants the Commission rulemaking authority to "prescribe regulations to specify particular conduct that is prohibited by [628(b)]." 47 U.S.C. § 548(c)(1).

[157] *See e.g.*, RAA Comments at 31-34; Time Warner Comments at 8.

[158] Section 628 Report & Order, 8 FCC Rcd at 3360, ¶ 1. Subsequent Commission decisions have also focused on the narrow issue of MVPD access to programming. *See e.g., Application for Consent to the Transfer of Control of Licenses & Section 214 Authorizations by Time Warner Inc. & America Online, Inc., Transferors, to AOL Time Warner, Transferee*, Memorandum Opinion & Order, 16 FCC Rcd 6547, 6650, ¶ 253 (2001).

[159] Section 628 Report & Order, 8 FCC Rcd at 3373-3374, ¶¶ 40-41.

[160] See supra ¶ 45.

promoting the availability of programming to the public."[161] But the Commission's prior attention to these requirements in no way precludes its exercise of clear statutory authority to regulate unfair practices, beyond program access, which have the purpose or effect of hindering significantly or preventing the provision of certain programming to subscribers or consumers. The Commission has imposed no such artificial limitation on the scope of its authority, and Section 628(b) does not require it.[162]

50. The Commission has authority to delineate by rule conduct prohibited under Section 628(b) in order to promote the public interest through increased competition and diversity in the MVPD market and continued development of communications technologies.[163] We have explained how a rule prohibiting exclusivity clauses for the provision of video services promotes the public interest here because it will likely increase competition in the MVPD market and promote continued development of communications technologies. Thus, we find that we may by rule prohibit cable operators from executing exclusivity clauses for the provision of video services to MDUs.

51. This prohibition necessarily also applies to common carriers and open video systems. Although Section 628(b) extends only to cable operators, Section 628(j) explicitly states that "[a]ny provision that applies to a cable operator under this section shall apply to a common carrier or its affiliate that provides video programming by any means directly to subscribers."[164] In addition, Section 653(c)(1)(A) provides that "[a]ny provision that applies to a cable operator under (A) section[] . . . 628 . . . of this title shall apply . . . to any operator of an open video system."[165] Thus, pursuant to Sections 628(j) and 653(c)(1)(A), our prohibition on exclusivity clauses for the provision of video services applies to both any common carrier or its affiliate and also to OVS operators to the extent that these entities provide video programming to subscribers or consumers.

52. Although we believe that we have specific statutory authority to adopt this prohibition, as described above, we note that our ancillary authority, under titles I and III of the 1934 Act, also provides a sufficient basis to prohibit cable operators from enforcing or executing exclusivity clauses for the provision of video service to MDUs.[166] Courts have long recognized that, even in the absence of explicit statutory authority, the Commission has authority to promulgate regulations to effectuate the goals and provisions of the Act if the regulations are "reasonably ancillary to the effective performance of the

---

[161] *Implementation of Sections 12 and 19 of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution and Carriage*, Notice of Proposed Rulemaking, 8 FCC Rcd 194, 197, ¶ 12 (1992), *citing* 1992 Cable Act, Section 2(b)(2).

[162] Even if Commission precedent could be read to suggest that Section 628(b) was limited to programming access, we would find such an interpretation incorrect. For the reasons discussed above, ¶¶ 43-47, the interpretation that Section 628(b) covers the conduct we prohibit herein is more consistent with the language and purpose of Section 628(b). *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Moreover, we agree with AT&T that the Commission's decision not to extend Section 628 to MVPDs' ability to offer terrestrially delivered cable programming does not address the issue raised here: whether exclusivity clauses for the provision of video services to MDU owners are unfair methods of competition in the provision of satellite cable and broadcast programming to consumers. *See* AT&T Reply Comments at 20.

[163] 47 U.S.C. § 628(a-c).

[164] 47 U.S.C. § 548(j).

[165] 47 U.S.C. § 573(c)(1)(A).

[166] 47 U.S.C. §§ 151, 152(a), 154(i), 335.

Commission's various responsibilities" under the Act.[167] The Supreme Court has established a two-part ancillary jurisdiction test: (1) the regulation must cover interstate or foreign communication by wire or radio; and (2) the regulation must be reasonably ancillary to the Commission's statutory responsibilities.[168] The prohibition we adopt here applies to "interstate and foreign communication by wire or radio," advances the purposes of both the 1992 Cable Act and Section 706 of the 1996 Telecommunications Act, and serves the public interest.

53. Title I confers on the Commission regulatory jurisdiction over all interstate radio and wire communication.[169] The multichannel video services provided by cable operators are interstate in nature[170] and are covered by the Act's definitions of "radio communications" and "wire communication."[171] In addition, these services fall within the definition of "cable service."[172] Thus, cable services are within the scope of our subject matter jurisdiction granted in Title I.

54. In addition, we find that applying the prohibition against exclusivity clauses for the provision of video services to cable operators is reasonably ancillary to our statutory responsibilities under the Act. As we have explained, prohibiting exclusivity clauses for the provision of video services to MDUs will prohibit an anticompetitive cable practice that has erected a barrier to the provision of competitive video services. It also will promote the development of new technologies that will provide facilities-based competition to existing cable operators, and thus serves the purposes set forth in Section 628(a).[173] In addition, for the same reasons explained above,[174] applying this prohibition to cable operators will ensure the furtherance of the broad goals of the 1992 Cable Act and the 1934 Act generally.

55. Because several commenters raise concerns about the treatment of exclusivity clauses in existing MDU contracts,[175] we take particular care to observe that the law affords us wide authority to

---

[167] *United States v. Southwestern Cable Co.*, 392 U.S. 157, 178 (1968) (upholding Commission regulation of cable television systems as a valid exercise of ancillary jurisdiction); *see also Rural Tel. Coalition v. FCC*, 838 F.2d 1307, 1315 (D.C. Cir. 1988) (upholding Commission authority to establish a "Universal Service Fund" in the absence of specific statutory authority as ancillary to FCC responsibilities under Sections 1 and 4(i) of the Act); *GTE Serv. Corp. v. FCC*, 474 F.2d 724, 731 (2d Cir. 1973) ("even absent explicit reference in the statute, the expansive power of the Commission in the electronic communications field includes the jurisdictional authority to regulate carrier activities in an area as intimately related to the communications industry as that of computer services, where such activities may substantially affect the efficient provision of reasonably priced communications service").

[168] *See American Library Ass'n v. FCC*, 406 F.3d 689, 700 (D.C. Cir. 2005), *citing Southwestern Cable*, 392 U.S. at 177-78.

[169] 47 U.S.C. §§ 151, 152(a).

[170] *Southwestern Cable*, 392 U.S. at 168-69.

[171] 47 U.S.C. §§ 153(33), (52).

[172] 47 U.S.C. § 522(6). Section 2 of the Act, as amended, states that "the provisions of this Act shall apply with respect to cable service . . . ." 47 U.S.C. § 152(a). For example, by definition, cable operators provide cable service. 47 U.S.C. § 522(5).

[173] 47 U.S.C. § 548(a).

[174] *See supra* ¶ 42-43.

[175] *See* Comcast Comments at 35 (asserting that the Commission's "legal authority to abrogate existing contracts is simply non-existent"); ACA Comments at 4-5 (same); NCTA Comments at 11-14 (same); Time Warner Comments at 11-13 (same).

27

prohibit the enforcement of such clauses where, as here, the public interest so requires.[176] Indeed, as the Commission has previously stated, "Congress intended that rules promulgated pursuant to implement Section 628 should be applied prospectively to existing contracts, except as specifically provided for in Section 628(h)."[177] In addition, the Fifth Amendment's Takings Clause[178] presents no obstacle to prohibiting the enforcement of existing exclusivity clauses. To begin with, such a step obviously does not involve the permanent condemnation of physical property and thus does not constitute a *per se* taking.[179]

56. Nor does the proposed rule represent a regulatory taking. The Supreme Court has outlined the framework for evaluating regulatory takings claims as follows: "In all of these cases, we have eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case. To aid in this determination, however, we have identified three factors which have particular significance: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."[180] None of these factors counsels in favor of finding a regulatory taking here.

57. First, prohibiting the enforcement of exclusivity clauses will have minimal adverse economic impact on affected MVPDs. Nothing in the rule precludes MVPDs from utilizing the wires they own to provide services to MDUs or requires them to jettison capitalized investments. Neither does it prohibit the enforcement of other types of agreements between MDUs or MVPDs, such as exclusive marketing agreements. The rule merely prohibits clauses that serve as a bar to other MVPDs that seek to provide services to a MDU. The record in this proceeding demonstrates that in some cases, exclusivity clauses in existing MDU contracts impose adverse *and* absolute impacts upon would-be competitors who are otherwise ready and able to provide customers the benefits of increased competition.[181]

---

[176] *See, e.g., BellSouth Telecom, Inc. v. MCImetro Access Transmission Servs., LLC,* 425 F.3d 964, 969-70 (11th Cir. 2005); *Western Union Tel. Co. v. FCC,* 815 F.2d 1501 (D.C. Cir. 1987).

[177] *1994 Memorandum Opinion & Order,* 10 FCC Rcd at 1939; *see also Section 628 First Report & Order,* 8 FCC Rcd at 3365.

[178] U.S. CONST., amend V ("nor shall private property be taken for public use, without just compensation.").

[179] *Cf. Loretto v. Teleprompter Manhattan City Corp.,* 458 U.S. 419, 427 (1982) ("When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking."); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.").

[180] *Connolly v. Pension Ben. Guaranty Corp.,* 475 U.S. 211, 224-25 (1986) (citations and internal quotation marks omitted).

[181] *See supra* ¶¶ 1 note 2, 8-9, 17; AT&T Comments at 11 ("The breadth of these clauses – particularly that they apply to alternative providers that already have deployed facilities to the MDU – demonstrates that these exclusive arrangements are plainly intended to block competition and are not designed to address aesthetics or congestion in an MDU's common areas."); AT&T Reply Comments at 8 (in discussing entry by wireline competitors that are Carriers of Last Resort, stating that "carriers such as AT&T are obligated to build facilities in certain areas to new and greenfield developments to comply with their obligations to provide voice services when no other carrier is willing to do so. Exclusive access arrangements for video services are particularly inappropriate under these circumstances because they deprive MDU tenants with competitive choices and favorable rates offered by COLR carriers.").

Federal Communications Commission                                    FCC 07-189

58. Second, the rule does not improperly interfere with investment-backed expectations. As previously stated in footnote 7 and paragraph 36, exclusivity clauses in MDU contracts have been under active scrutiny for over a decade, and the Commission has prohibited the enforcement of such clauses in similar contexts. States have also taken action to prohibit such clauses. Moreover, to the extent that MVPDs have used exclusivity clauses to "lock up" MDUs in anticipation of competitive entry or to obstruct competition, as described in Section II above, any underlying investment-backed expectations are not sufficiently longstanding or pro-competitive in nature to warrant immunity from regulation.[182]

59. Finally, with respect to the character of governmental action, the rule's prohibition of the enforcement of exclusivity clauses in existing MDU contracts substantially advances the legitimate governmental interest in protecting consumers of programming from "unfair methods of competition or unfair acts or practices" -- an interest Congress explicitly has recognized and protected by statute, see 47 U.S.C. § 628(b), and commanded the Commission to vindicate by adopting appropriate regulations, see id. § 628(c)(1). The rule we adopt today is based upon the Commission's detailed analysis of the harms and benefits of exclusive MDU contracts, discussed above in Section III, and is carefully calibrated to promote this interest.[183] In short, the rule at issue here does not invoke Justice Holmes' observation that "if regulation goes too far it will be recognized as a taking."[184]

60. Because the prohibition that we adopt today applies only to cable operators, common carriers or their affiliates that provide video programming directly to subscribers, and operators of open video systems, and does not require MDU owners to provide access to all MVPDs, we do not address comments raising concerns about the Commission's authority to mandate such access.[185] However, we reject arguments suggesting that the Commission has no authority to regulate such entities' contractual conduct because of the tangential effect of such regulation on MDU owners. As explained above, Sections 628(b), 628(j), and our ancillary jurisdiction provide ample bases for regulating these specific

---

[182] Cf. Connolly, 475 U.S. at 226-27 (declining to find interference with investment-backed expectations where subjects of regulation long had been "objects of legislative concern"; where "it was clear" that agency discretion to regulate, if exercised, would result in liability; and where affected entities had "more than sufficient notice" of possibility of regulation); FHA v. The Darlington, Inc., 358 U.S. 84, 91 (1958) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."). Furthermore, we do not believe that any MVPD has a legitimate investment-backed expectation in profits obtained through anticompetitive behavior such as that found to exist in this Order. Cf. Otter Tail Power Co. v. United States, 410 U.S. 366, 380 (1973) (antitrust law proscribing monopolies "assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency," and a monopolist may not "substitute for competition anticompetitive uses of its dominant power"); Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990) ("A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits."). To the extent that Comcast and Time-Warner argue otherwise, we reject their arguments. See Comcast Comments at 33-35; Time-Warner Comments at 11-13.

[183] Cf. Connolly, 475 U.S. at 225 (upholding governmental "interference with . . . property rights . . . [because it] arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation").

[184] Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). In addition, the Contract Clause of the U.S. Constitution does not limit our authority in this regard, because as Verizon points out, "by its terms [it] applies only to state, not federal, enactments." Verizon Comments at 18, citing Washington Star Co. v. International Typographical Union Negotiated Pension Plan, 729 F.2d 1502, 1507 (D.C. Cir. 1984).

[185] See e.g., RAA Comments at 26-28; CAI Comments at 11-12.

29

MVPDs. Moreover, Sections 4(i), 201(b), and 303(r) supply the Commission with strong authority to enforce the full scope of the Cable Act prohibition at issue.[186]

## V.     FURTHER NOTICE OF PROPOSED RULEMAKING

61. The *Report and Order* is limited to those MVPDs covered by Section 628. In this regard, we note that the record in this proceeding predominantly addressed exclusivity clauses involving cable operators.[187] Therefore, in order to assess whether we should take action to address exclusivity clauses entered into by DBS providers, PCOs, and other MVPDs who are not subject to Section 628, we ask for comment on several matters.[188] Do DBS service providers, PCOs, and other MVPD providers not subject to Section 628 use any or all forms of exclusivity clauses (building, wire, and/or marketing)? If they do, what kinds of exclusivity do those clauses provide? Is it likely that an MVPD provider subject to Section 628, in reaction to the foregoing *Report and Order* and seeking to avoid its effects, would partner with a DBS provider or PCO? What are the effects of the use of exclusivity clauses by MVPD providers not subject to Section 628 on consumer choice, competition for multi-channel video and other services, and on the deployment of broadband and other advanced communications facilities? Are those effects and the balance of benefits and harms the same as we have found with respect to the use of exclusivity clauses by providers that are subject to Section 628?

62. If the net effect of the use of exclusivity clauses by MVPD providers not subject to Section 628 is harmful to consumers, what remedy should we impose – the same kind of prohibition we adopt in the *Report and Order*, or something different? We also ask for comment about two legal matters. First, do our OTARD rules[189] affect the remedy we should impose on DBS providers? Second, we ask for comment about our legal authority. Does the Commission have the authority to regulate the use of exclusivity clauses by MVPD providers not subject to Section 628. Does the Commission have

---

[186] *See National Cable & Telecommun. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("Congress has delegated to the Commission the authority to 'execute and enforce' the Communications Act, § 151, and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act, § 201(b)."); *City of New York v. FCC*, 486 U.S. 57, 70 n.5 (The Commission has "broad rulemaking power 'as may be necessary to carry out the provisions of this chapter,' 47 U.S.C. § 303(r), which includes the body of the Cable Act as one of its subchapters."); *see also* 47 U.S.C. § 154(i) ("The Commission may . . . make such rules and regulations, and issue such orders, not inconsistent with this chapter, which may be necessary in the execution of its functions."). It bears noting that the Commission previously has exercised its authority under Sections 4(i) and 303(r) to regulate cable wiring inside MDUs. *See 1997 Inside Wiring Order*, 13 FCC Rcd at 3700, ¶ 83, 3703, ¶ 87 (1997) (adopting rules for the disposition of cable "home run" wiring inside MDUs pursuant to Sections 4(i) and 303(r)).

[187] *See supra* ¶¶ 9-10, 14-15.

[188] *See generally supra* note 12; Bandwidth Consulting Comments at 2 (without exclusivity, a PCO's "ability to offer a customized product would not exist" and "only the large monopolies . . . will be able to survive"); Charter Comments at 1, 4 ("if the Commission were to impose any limitations on . . . exclusive contracts it must do so for all bidders"); Comcast Comments at 10-11 (similar to Charter); Consolidated Smart Systems Comments at 1-2 (similar to Bandwidth Consulting); IMCC Comments at 5, 7-11 (similar to Bandwidth Consulting); Lafayette Comments at 10 (similar to Charter); MSTI Comments at 1 (similar to Bandwidth Consulting); NCTA Comments at 8-9 (similar to Charter); SureWest Comments at 8 (similar to Charter); Time Warner Comments at 5-8 (similar to Charter); Ygnition Networks Comments at 1-2 (similar to Bandwidth Consulting); Letter from Terry L. Clifford, Sr., Astro Telecommun. Inc., to the Commission (June 30, 2007) (PCOs "do not have the unlimited resources to funding like the major cable competitors have").

[189] *See supra* note 27.

authority over DBS providers under Section 335 of the Act?[190]  Does the Commission have authority over DBS and other providers under Title III generally, Title VI, its ancillary authority, or some other source?  We ask for comment on all the foregoing factual, analytical, and legal issues.

63.  We also seek comment on whether the Commission should prohibit exclusive marketing and bulk billing arrangements.  For example, we are aware that certain clauses in contracts allow one MVPD into a MDU or real estate development but constrain the ability of competitive MVPDs to market their services directly to MDU residents.  These arrangements provide for what is called "marketing exclusivity,"[191] and may be anticompetitive.  Some argue that in order for MDU residents to exercise freely their choice, they must know about their MVPD options.

64.  In particular, we seek comment on a number of questions.  How pervasive are these exclusive marketing arrangements?  What is the typical scope of such arrangements?  In other words, we seek comment on how the Commission should define them for regulatory purposes.  Have they been used to impede competition in the video marketplace?  Can other MVPDs effectively communicate with MDU residents in those MDUs that have signed exclusive marketing agreements?  Do the costs of marketing, promotions and sales substantially increase when a competitive video provider confronts exclusive marketing arrangements?  Do these arrangements constitute an unfair method of competition or an unfair act or practice in violation of Section 628(b) of the Act?  If so, how should the Commission act to address this problem?  Should we prohibit the enforcement of all existing exclusive marketing arrangements as well as the execution of new ones?  That is, should we treat them in the same manner as we treat exclusive access arrangements in the item we adopt today?  Is our legal authority to address such agreements the same as our legal authority for addressing exclusive access arrangements?

65.  We also seek comment on these same questions with respect to "bulk billing" arrangements.  Some have argued that bulk contracts are anti-competitive.[192]  As we understand them, bulk billing arrangements may be exclusive contracts because MDU owners agree to these arrangements with only one MVPD, barring others from a similar arrangement.  Such arrangements may not prohibit MDU residents from selecting a competitive video provider.  However, because of the "bulk billing" nature of the contract, residents would have to continue paying a fee to the provider with the bulk billing contract as well as pay a subscription fee to the new service provider.  We seek comment on whether these "bulk billing" arrangements are typically formalized as agreements between cable operators and MDUs or between MDUs and residents (or both)?  Do these arrangements have the same practical effect as exclusive access arrangements in that most customers would be dissuaded from switching video providers?

66.  The Commission will conclude this rulemaking and release an order within six months of publication of this *Order*.

## VI.    PROCEDURAL MATTERS

### A.    Filing Requirements

67.  *Ex Parte Rules.*  The *Further Notice of Proposed Rulemaking* in this proceeding will be treated as a "permit-but-disclose" subject to the "permit-but-disclose" requirements under Section

---

[190] 47 U.S.C. § 335.

[191] Comcast Comments at 19-20; CAI Comments at 3; Embarq Comments at 1 n.1; Qwest Comments at iii; RAA Comments at 8-9; Verizon Comments at 7 n.4.

[192] Lafayette Comments at 5; SureWest Reply Comments at 5.

Federal Communications Commission     FCC 07-189

1.1206(b) of the Commission's rules.[193]  *Ex parte* presentations are permissible if disclosed in accordance with Commission rules, except during the Sunshine Agenda period when presentations, *ex parte* or otherwise, are generally prohibited.  Persons making oral *ex parte* presentations are reminded that a memorandum summarizing a presentation must contain a summary of the substance of the presentation and not merely a listing of the subjects discussed.  More than a one- or two-sentence description of the views and arguments presented is generally required.[194]  Additional rules pertaining to oral and written presentations are set forth in Section·1.1206(b).

68.  *Comments and Reply Comments.*  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using:  (1) the Commission's Electronic Comment Filing System (ECFS), (2) the Federal Government's eRulemaking Portal, or (3) by filing paper copies.[195]

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://www.fcc.gov/cgb/ecfs/ or the Federal eRulemaking Portal: http://www.regulations.gov.  Filers should follow the instructions provided on the website for submitting comments.

  - For ECFS filers, if multiple docket or rulemaking numbers appear in the caption of this proceeding, filers must transmit one electronic copy of the comments for each docket or rulemaking number referenced in the caption.  In completing the transmittal screen, filers should include their full name, U.S. Postal Service mailing address, and the applicable docket or rulemaking number.  Parties may also submit an electronic comment by Internet e-mail.  To get filing instructions, filers should send an e-mail to ecfs@fcc.gov, and include the following words in the body of the message, "get form."  A sample form and directions will be sent in response.

- Paper Filers:  Parties who choose to file by paper must file an original and four copies of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

  Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail (although we continue to experience delays in receiving U.S. Postal Service mail).  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

  - The Commission's contractor will receive hand-delivered or messenger-delivered paper filings for the Commission's Secretary at 236 Massachusetts Avenue, NE, Suite 110, Washington, DC  20002.  The filing hours at this location are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes must be disposed of before entering the building.

---

[193] *See* 47 C.F.R. § 1.1206(b), as revised.

[194] *See id.* § 1.1206(b)(2).

[195] *See Electronic Filing of Documents in Rulemaking Proceedings,* 63 FR 24121 (1998).

---

Federal Communications Commission                    FCC 07-189

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

**People with Disabilities:** To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

69.    *Availability of Documents.* Comments, reply comments, and *ex parte* submissions will be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 445 12th Street, S.W., CY-A257, Washington, D.C., 20554. Persons with disabilities who need assistance in the FCC Reference Center may contact Bill Cline at (202) 418-0267 (voice), (202) 418-7365 (TTY), or bill.cline@fcc.gov. These documents also will be available from the Commission's Electronic Comment Filing System. Documents are available electronically in ASCII, Word 97, and Adobe Acrobat. Copies of filings in this proceeding may be obtained from Best Copy and Printing, Inc., Portals II, 445 12th Street, S.W., Room CY-B402, Washington, D.C., 20554; they can also be reached by telephone, at (202) 488-5300 or (800) 378-3160; by e-mail at fcc@bcpiweb.com; or via their website at http://www.bcpiweb.com. To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY).

**B.    Regulatory Flexibility Analysis**

70. Pursuant to the Regulatory Flexibility Act of 1980, as amended,[196] the Commission has prepared a Final Regulatory Flexibility Analysis ("FRFA") of the possible significant economic impact on small entities of the policies and rules addressed in this document. The FRFA is set forth in Appendix B.

**C.    Paperwork Reduction Act Analysis**

71. This document does not contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. In addition, therefore, it does not contain any new or modified "information collection burdens for small business concerns with fewer than 25 employees," pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

**D.    Congressional Review Act**

72. The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[197] In addition, the Commission will send a copy of the *Report and Order*, including the FRFA, to the Chief Counsel for Advocacy of the Small Business Administration. A copy of the *Report and Order* and the FRFA (or summaries thereof) will also be published in the Federal Register.[198]

---

[196] 5 U.S.C. §§ 601 *et seq.*

[197] *See* 5 U.S.C. § 801(a)(1)(A).

[198] *See* 5 U.S.C. § 604(b).

Federal Communications Commission                                    FCC 07-189

### E.    Additional Information

73. For additional information on this proceeding, please contact John W. Berresford, (202) 418-1886, or Holly Saurer, (202) 418-7283, both of the Policy Division, Media Bureau.

## VII.    ORDERING CLAUSES

74. Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i) 157 nt., 303(r),335, 601(6), 628(b, c), and 653(c)(1) of the Communications Act of 1934, as amended; 47 U.S.C. §§ 151, 152(a), 154(i), 157 nt., 303(r), 335, 521(6), 548(b, c), and 573(c)(1), this *Report and Order* **IS ADOPTED**.

75. **IT IS FURTHER ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i) 157 nt., 303(r), 335, 601(6), 628(b, c), and 653(c)(1) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 157 nt., 303(r), 335, 521(6), 548(b, c), and 573(c)(1), 47 C.F.R. Part 76.2000 of the Commission's Rules **IS AMENDED**, as set forth in Appendix D. It is our intention in adopting these rule changes that, if any provision of the rules is held invalid by any court of competent jurisdiction, the remaining provisions shall remain in effect to the fullest extent permitted by law.

76. **IT IS FURTHER ORDERED** that the following documents shall be made part of the record in this proceeding: (a) Letter from Leora Hochstein, Executive Director, Federal Regulatory, Verizon, to Marlene H. Dortch, Commission Secretary, MB Docket No. 05-311 (Aug. 9, 2006); (b) Letter from Ms. Hochstein to Ms. Dortch, MB Docket No. 05-311 (July 6, 2006); (c) Comments of SureWest Communications in MM Docket No. 06-189; (d) Comments of Manatee County, Florida, in MB Docket No. 05-311; and (e) the Comments of Cablevision and Comcast in MB Docket No. 07-29.

77. **IT IS FURTHER ORDERED** that the rule contained herein **SHALL BECOME EFFECTIVE** 30 days after publication of this **REPORT AND ORDER** in the Federal Register.

78. **IT IS FURTHER ORDERED** that, pursuant to Sections 1, 4(i), 303(r), 335, 623 and 628(b, c) of the Communications Act of 1934, as amended, and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. §§ 151, 154(i), 303(r), 335, 543, and 548(b, c), this Further Notice of Proposed Rulemaking **IS HEREBY ADOPTED**.

79. **IT IS FURTHER ORDERED** that the Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

34

Federal Communications Commission    FCC 07-189

## APPENDIX A

### List of Commenters

American Cable Association

Association for Telecommunications Professionals in Higher Education

AT&T, Inc.

Bandwidth Consulting

Charter Communications, Inc.

Comcast Corporation

Community Associations Institute

Community Home Entertainment

Consolidated Smart Systems

Corning Incorporated

Embarq

Greenfield Service Provider Coalition

Independent Multifamily Communications Council

Lafayette Utilities System

Lennar Corporation

Litestream Holdings, LLC

Microwave Satellite Technologies Inc.

National Association of Telecommunications Officers and Advisors

National Cable & Telecommunications Association

New Jersey Division of Rate Counsel

OpenBand Multimedia, L.L.C.

Pavlov Media, Inc.

Real Access Alliance

Qwest Communications International, Inc.

Shenandoah Telecommunications Company ("Shentel")

SureWest Communications

Time Warner Cable

United States Telecom Association

Verizon Communications, Inc.

Warner Properties, LLC, and Warner Properties Communications, LLC

Stephen Weinstein

Video Associates

WorldNet Telecommunications, Inc.

Ygnition Networks


### List of Reply Commenters

Access Media 3

Advance/Newhouse Communications

American Cable Association

AT&T Inc.

Charter Communications, Inc.

Comcast Corporation

Conexus Networks LLC

Convergent Broadband Communications, Inc.

Digital Streets

DirecPath

Mr. Pat Hagan

Hotwire Communications, LLC

Independent Multifamily Communications Council

Litestream Holdings, LLC

Microwave Satellite Technologies Inc.

Multiband Corporation

National Association of Telecommunications Officers and Advisors

National Cable & Telecommunications Association

New Jersey Division of Rate Counsel

Paradigm Marketing Group

Pavlov Media, Inc.

Privatel Incorporated

Real Access Alliance

SDL Ventures, LLC

Shenandoah Telecommunications Company

SureWest Communications

United States Telecom Association

Verizon Communications, Inc.

Stephen Weinstein

WorldNet Telecommunications, Inc.

## APPENDIX B

### Final Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended ("RFA"),[1] an Initial Regulatory Flexibility Analysis ("IRFA") was incorporated in the *Notice of Proposed Rulemaking* (the "*Notice*") to this proceeding.[2] The Commission sought written public comment on the proposals in the NPRM, including comment on the IRFA. The Commission received one comment on the IRFA, from the Real Access Alliance. This Final Regulatory Flexibility Analysis ("FRFA") conforms to the RFA.[3]

### A. Need for, and Objectives of, the Report and Order

2.    This Report and Order adopts rules and provides guidance to implement Sections 1, 2(a), 4(i) 157 nt., 303(r), 335, 601(6), 628, and 653(c)(1) of the Communications Act of 1934, as amended (the "Act").[4] Those Sections of the Act authorize the Commission to prohibit cable operators and other providers subject to Section 628[5] of the Act from enforcing or executing clauses in contracts for video service in MDUs that grant to a single service provider the exclusive right to have access to the premises of a MDU for the purpose of providing such service (alone or in combination with other services). The Commission has found that existing and future exclusivity clauses constitute an unreasonable barrier to entry for competitive entrants that would impede enhanced cable competition and accelerated broadband deployment, and that they constitute an unfair method of competition that has the purpose or effect of hindering significantly or preventing video service providers from providing satellite-delivered programming to subscribers and consumers as set forth in Section 628 of the Act.

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

3.    Only one commenter, the Real Access Alliance ("RAA"), submitted a comment that specifically responded to the IRFA. RAA asserts that the IRFA was defective because it did not address the effects of possible outcomes on apartment building owners.[6]

4.    We disagree with RAA's assertion. In fact, the IRFA discussed apartment building owners specifically in paragraph 15.[7] Moreover, an IRFA need only address the concerns of entities directly regulated by the Commission.[8] The Commission does not directly regulate apartment building operators.

---

[1] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 *et. seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996). The SBREFA was enacted as Title II of the Contract With America Advancement Act of 1996.

[2] *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units & Other Real Estate Developments*, Notice of Proposed Rulemaking, 22 FCC Rcd 5935 (2007).

[3] *See* 5 U.S.C. § 604.

[4] 47 U.S.C. §§ 151, 152(a), 154(i), 157 nt., 303(r), 521(6), 548(b), 573(c)(1).

[5] 47 U.S.C. § 548.

[6] RAA Joint Regulatory Flexibility Act Comments at 2.

[7] *Notice*, 22 FCC Rcd at 5947, ¶ 15 ("The SBA has developed definitions of small entities for operators of . . . apartment buildings").

[8] *Mid-Tex Elec. Co-Op., Inc. v. FERC*, 773 F.2d 327, 343 (D.C. Cir. 1985) (inferring that "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy").