Accordingly, even if the IRFA had not addressed the concerns of apartment building owners, it would not be defective. Finally, the IRFA correctly concluded that the kind of rule adopted herein would not impose any direct burden on apartment building owners.[9] When an agency finds that there is no significant impact on a substantial number of small entities, then no discussion of alternatives, less costly than the proposed rule, is required.[10]

## C. Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

### Entities Directly Affected By Proposed Rules

5.   The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted herein.[11]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small government jurisdiction."[12]   In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[13]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[14]

6.   The rule adopted by this *Report and Order* will ease the entry of newcomers into the MVPD business and the business of providing the "triple play" of voice, MVPD, and broadband Internet access service. The Commission has determined that the group of small entities directly affected by the rules adopted herein consists of MVPDs (some of which are also incumbent local exchange carriers). Therefore, in the *Report and Order*, we consider the impact of the rules on MVPDs.  A description of such small entities, as well as an estimate of the number of such small entities, is provided below.

### Cable Operators

7.   The "Cable and Other Program Distribution" census category includes cable systems operators, closed circuit television services, direct broadcast satellite services, multipoint distribution systems, satellite master antenna systems, and subscription television services. The SBA has developed small business size standard for this census category, which includes all such companies generating

---

[9] *Notice*, 22 FCC Rcd at 5945, ¶ 8 ("The Commission has determined that the group of small entities possibly directly affected by our action consists of small governmental entities.").

[10] *United Distribution Cos. v. FERC*, 88 F.3d 1105, 1170 (D.C. Cir. 1996) ("no analysis is necessary when an agency determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule.") (internal quotation marks and italics omitted).

[11] 5 U.S.C. § 603(b)(3).

[12] 5 U.S.C. § 601(6).

[13] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." 5 U.S.C. § 601(3).

[14] 15 U.S.C. § 632. Application of the statutory criteria of dominance in its field of operation and independence are sometimes difficult to apply in the context of broadcast television. Accordingly, the Commission's statistical account of television stations may be over-inclusive.

$13.0 million or less in revenue annually.[15] According to Census Bureau data for 1997, there were a total of 1,311 firms in this category that had operated for the entire year.[16] Of this total, 1,180 firms had annual receipts of under $10 million and an additional 52 firms had receipts of $10 million or more but less than $25 million. Consequently, the Commission estimates that the majority of providers in this service category are small businesses that may be affected by the rules and policies adopted herein.

8. Cable System Operators (Rate Regulation Standard). The Commission has developed its own small-business-size standard for cable system operators, for purposes of rate regulation. Under the Commission's rules, a "small cable company" is one serving fewer than 400,000 subscribers nationwide.[17] The most recent estimates indicate that there were 1,439 cable operators who qualified as small cable system operators at the end of 1995.[18] Since then, some of those companies may have grown to serve over 400,000 subscribers, and others may have been involved in transactions that caused them to be combined with other cable operators. Consequently, the Commission estimates that there are now fewer than 1,439 small entity cable system operators that may be affected by the rules and policies adopted herein.

9. Cable System Operators (Telecom Act Standard). The Act also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[19] The Commission has determined that there are 67,700,000 subscribers in the United States.[20] Therefore, an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[21] Based on available data, the Commission estimates that the number of cable operators serving 677,000 subscribers or fewer, totals 1,450.[22] The Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[23] and therefore is unable, at this time, to estimate more accurately the number of cable system operators that would qualify as small cable operators under the size standard contained in the Communications Act of 1934.

---

[15] 13 C.F.R. § 121.201, North American Industry Classification System (NAICS) code 517510.

[16] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 513220 (issued October 2000).

[17] 47 C.F.R. § 76.901(e). The Commission developed this definition based on its determination that a small cable system operator is one with annual revenues of $100 million or less. See Implementation of Sections of the 1992 Cable Act: Rate Regulation, Sixth Report & Order & Eleventh Order on Reconsideration, 10 FCC Rcd 7393 (1995).

[18] Paul Kagan Associates, Inc., Cable TV Investor, February 29, 1996 (based on figures for December 30, 1995).

[19] 47 U.S.C. § 543(m)(2).

[20] See FCC Announces New Subscriber Count for the Definition of Small Cable Operator, Public Notice DA 01-158 (2001).

[21] 47 C.F.R. § 76.901(f).

[22] See FCC Announces New Subscriber Count for the Definition of Small Cable Operator, Public Notice DA 01-158 (2001).

[23] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.

10. *Open Video Services.* Open Video Service ("OVS") systems provide subscription services.[24] As noted above, the SBA has created a small business size standard for Cable and Other Program Distribution.[25] This standard provides that a small entity is one with $13.0 million or less in annual receipts. The Commission has certified approximately 25 OVS operators to serve 75 areas, and some of these are currently providing service.[26] Affiliates of Residential Communications Network, Inc. (RCN) received approval to operate OVS systems in New York City, Boston, Washington, D.C., and other areas. RCN has sufficient revenues to assure that they do not qualify as a small business entity. Little financial information is available for the other entities that are authorized to provide OVS and are not yet operational. Given that some entities authorized to provide OVS service have not yet begun to generate revenues, the Commission concludes that up to 24 OVS operators (those remaining) might qualify as small businesses that may be affected by the rules and policies adopted herein.

### Telecommunications Service Entities

11. As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation."[27] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent local exchange carriers are not dominant in their field of operation because any such dominance is not "national" in scope.[28] We have therefore included small incumbent local exchange carriers in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

12. *Incumbent Local Exchange Carriers.* Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[29] According to Commission data,[30] 1,303 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action. In addition, limited

---

[24] *See* 47 U.S.C. § 573.

[25] 13 C.F.R. § 121.201, NAICS code 517510.

[26] *See* FCC, Media Bureau, *Archived*, http://www.fcc.gov/mb/ovs/csovsarc.html (visited Aug. 7, 2007).

[27] 15 U.S.C. § 632.

[28] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999). The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business." *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis. *See* 13 C.F.R. § 121.102(b).

[29] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[30] FCC, Wireline Competition Bureau, Industry Analysis & Technology Division, "Trends in Telephone Service," Table 5.3 at 5-5 (June 2005) ("Trends in Telephone Service"). This source uses data that are current as of October 1, 2004.

preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[31]

## D. Description of Projected Reporting, Record Keeping and other Compliance Requirements

13. The rule adopted in the *Report and Order* will require no additional reporting, record keeping, and other compliance requirements.

## E. Steps Taken to Minimize Significant Impact on Small Entities, and Significant Alternatives Considered

14. The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[32]

15. Because the *Report and Order* imposes no compliance on reporting requirements on any entity, only the last of the foregoing alternatives is material. The *Report and Order* describes in paragraphs 16-29 and 38 that the Commission considered, but rejected after due consideration, exempting small MVPDs from the rule that the *Report and Order* adopts.

---

[31] *See* U.S. Census Bureau, *2002 Economic Census, Industry Series: "Information,"* Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513310 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" increased from 20,815 to 27, 891. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[32] 5 U.S.C. §§ 603(c)(1)-(c)(4).

Federal Communications Commission                                        FCC 07-189

## APPENDIX C

### Initial Regulatory Flexibility Analysis

1.  As required by the Regulatory Flexibility Act of 1980, as amended (the "RFA"),[1] the Commission has prepared this Initial Regulatory Flexibility Analysis ("IRFA") of the possible significant economic impact of the policies and rules proposed in the Further Notice of Proposed Rulemaking ("FNPRM") on a substantial number of small entities. Written public comments are requested on this IRFA. Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the FNPRM provided on the first page of the item. The Commission will send a copy of the FNPRM, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration ("SBA").[2] In addition, the FNPRM and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### Need for, and Objectives of, the Proposed Rules

2.  The FNPRM initiates a proceeding to investigate the effects on competition and consumers of certain practices that occur in the provison of MVPD[4] service in MDUs.[5] Specifically, the FNPRM solicits comment on the use of all kinds of exclusivity clauses[6] by providers of Direct Broadcast Satellite ("DBS") service and PCOs[7] and the use, by all kinds of MVPD service providers, of marketing exclusivity[8] and bulk billing arrangements.[9] The FNPRM also asks for comment on whether the Commission has authority to prohibit the use of such clauses and agreements by DBS service providers, PCOs, and other MVPDs.

### Legal Basis

3.  The FNPRM also asks whether the Commission has authority to regulate the above-mentioned practices of MVPD service providers. It specifically asks whether such authority can be found in Sections 335 (for DBS service providers), 628, and Titles I and III of the Communications Act of 1934, as amended, and the Commission's ancillary authority.[10]

---

[1] The RFA, *see* 5 U.S.C. §§ 601 -- 612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *See* 5 U.S.C. § 603(a).

[4] *See* 47 U.S.C. § 522(13).

[5] *See supra* ¶ 7.

[6] *See supra* note 2.

[7] *See supra* note 12.

[8] *See supra* note 2.

[9] *See supra* ¶ 65.

[10] 47 U.S.C. §§ 151 *et seq.*, 335, 521 *et seq.* (especially 548).

**Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

4. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[11] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[12] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[13] A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration ("SBA").[14]

5. Small Businesses. Nationwide, there are a total of approximately 22.4 million small businesses, according to SBA data.[15]

6. Small Organizations. Nationwide, there are approximately 1.6 million small organizations.[16]

7. Small Governmental Jurisdictions. The term "small governmental jurisdiction" is defined generally as "governments of cities, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[17] Census Bureau data for 2002 indicate that there were 87,525 local governmental jurisdictions in the United States.[18] We estimate that, of this total, 84,377 entities were "small governmental jurisdictions."[19] Thus, we estimate that most governmental jurisdictions are small.

8. The Commission has determined that the group of small entities possibly directly affected by our action consists of small governmental entities. In addition the Commission voluntarily provides, below, descriptions of certain entities that may be merely indirectly affected by any rules that may ultimately result from the FNPRM.

---

[11] 5 U.S.C. § 603(b)(3).

[12] 5 U.S.C. § 601(6).

[13] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[14] 15 U.S.C. § 632.

[15] See SBA, Programs and Services, SBA Pamphlet No. CO-0028, at 40 (July 2002).

[16] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

[17] 5 U.S.C. § 601(5).

[18] U.S. Census Bureau, Statistical Abstract of the United States: 2006, Section 8, page 272, Table 415.

[19] We assume that the villages, school districts, and special districts are small, and total 48,558. See U.S. Census Bureau, Statistical Abstract of the United States: 2006, section 8, page 273, Table 417. For 2002, Census Bureau data indicate that the total number of county, municipal, and township governments nationwide was 38,967, of which 35,819 were small. Id.

43

**Cable Operators**

9. *Cable and Other Program Distribution.* The Census Bureau defines this category as follows: "This industry comprises establishments primarily engaged as third-party distribution systems for broadcast programming. The establishments of this industry deliver visual, aural, or textual programming received from cable networks, local television stations, or radio networks to consumers via cable or direct-to-home satellite systems on a subscription or fee basis. These establishments do not generally originate programming material."[20] The SBA has developed a small business size standard for Cable and Other Program Distribution, which is: all such firms having $13.5 million or less in annual receipts.[21] According to Census Bureau data for 2002, there were a total of 1,191 firms in this category that operated for the entire year.[22] Of this total, 1,087 firms had annual receipts of under $10 million, and 43 firms had receipts of $ 10 million or more but less than $25 million.[23] Thus, under this size standard, the majority of firms can be considered small.

10. *Cable Companies and Systems.* The Commission has also developed its own small business size standards, for the purpose of cable rate regulation. Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers, nationwide.[24] Industry data indicate that, of 1,076 cable operators nationwide, all but eleven are small under this size standard.[25] In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[26] Industry data indicate that, of 7,208 systems nationwide, 6,139 systems have under 10,000 subscribers, and an additional 379 systems have 10,000-19,999 subscribers.[27] Thus, under this second size standard, most cable systems are small.

11. *Cable System Operators.* The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[28] The Commission has determined that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total

[20] U.S. Census Bureau, 2002 NAICS Definitions, "517510 Cable and Other Program Distribution"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.

[21] 13 C.F.R. § 121.201, NAICS code 517510.

[22] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, Table 4, Receipts Size of Firms for the United States: 2002, NAICS code 517510 (issued November 2005).

[23] *Id.* An additional 61 firms had annual receipts of $25 million or more.

[24] 47 C.F.R. § 76.901(e). The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues. Implementation of Sections of the 1992 Cable Act: Rate Regulation, Sixth Report and Order and Eleventh Order on Reconsideration, 10 FCC Rcd 7393, 7408 (1995).

[25] These data are derived from: R.R. Bowker, Broadcasting & Cable Yearbook 2006, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, Television & Cable Factbook 2006, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[26] 47 C.F.R. § 76.901(c).

[27] Warren Communications News, Television & Cable Factbook 2006, "U.S. Cable Systems by Subscriber Size," page F-2 (data current as of Oct. 2005). The data do not include 718 systems for which classifying data were not available.

[28] 47 U.S.C. § 543(m)(2); *see* 47 C.F.R. § 76.901(f) & nn. 1-3.

Federal Communications Commission                                    FCC 07-189

annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[29] Industry data indicate that, of 1,076 cable operators nationwide, all but ten are small under this size standard.[30] We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[31] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under this size standard.

12. **Open Video Services.** Open Video Service ("OVS") systems provide subscription services.[32] As noted above, the SBA has created a small business size standard for Cable and Other Program Distribution.[33] This standard provides that a small entity is one with $13.5 million or less in annual receipts. The Commission has certified approximately 25 OVS operators to serve 75 areas, and some of these are currently providing service.[34] Affiliates of Residential Communications Network, Inc. (RCN) received approval to operate OVS systems in New York City, Boston, Washington, B.C., and other areas. RCN has sufficient revenues to assure that they do not qualify as a small business entity. Little financial information is available for the other entities that are authorized to provide OVS and are not yet operational. Given that some entities authorized to provide OVS service have not yet begun to generate revenues, the Commission concludes that up to 24 OVS operators (those remaining) might qualify as small businesses that may be affected by our action.

**Telecommunications Service Entities**

13. As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation."[35] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent local exchange carriers are not dominant in their field of operation because any such dominance is not "national" in scope.[36] We have therefore included small incumbent local exchange carriers in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

---

[29] 47 C.F.R. § 76.901(f); *see* Public Notice, FCC Announces New Subscriber Count for the Definition of Small Cable Operator, DA 01-158 (Cable Services Bureau, Jan. 24, 2001).

[30] These data are derived from: R.R. Bowker, Broadcasting & Cable Yearbook 2006, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, Television & Cable Factbook 2006, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[31] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules. *See* 47 C.F.R. § 76.909(b).

[32] *See* 47 U.S.C. § 573.

[33] 13 C.F.R. § 121.201, NAICS code 517510.

[34] *See* http://www.fcc.gov/mb/ovs/csovscer.html (visited December 19, 2006), http://www.fcc.gov/mb/ovs/csovsarc.html (visited December 19, 2006).

[35] 15 U.S.C. § 632.

[36] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999). The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business." *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis. *See* 13 C.F.R. § 121.102(b).

14. *Incumbent Local Exchange Carriers.* Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[37] According to Commission data,[38] 1,303 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action. In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[39]

15. *Wired Telecommunications Carriers.* The SBA has developed a small business size standard for wireline firms within the broad economic census category, "Wired Telecommunications Carriers."[40] Under this category, the SBA deems a wireline business to be small if it has 1,500 or fewer employees. Census Bureau data for 2002 show that there were 2,432 firms that operated for the entire year.[41] Of this total, 2,395 firms had employment of 999 or fewer employees, and 37 firms had employment of 1,000 employees or more.[42] Thus, under this category and associated small business size standard, the majority of firms can be considered small.

**Dwelling Units**

16. *MDU Operators.* The SBA has developed definitions of small entities for operators of nonresidential buildings, apartment buildings, and dwellings other than apartment buildings, which include all such companies generating $6 million or less in revenue annually.[43] According to the Census Bureau, there were 31,584 operators of nonresidential buildings generating less than $6 million in revenue that were in operation for at least one year at the end of 1997.[44] Also according to the Census Bureau, there were 51,275 operators of apartment dwellings generating less than $6 million in revenue

---

[37] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[38] FCC, Wireline Competition Bureau, Industry Analysis & Technology Division, "Trends in Telephone Service," Table 5.3 at 5-5 (June 2005) ("Trends in Telephone Service"). This source uses data that are current as of October 1, 2004.

[39] *See* U.S. Census Bureau, *2002 Economic Census, Industry Series: "Information,"* Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513310 (issued Nov. 2004). The preliminary data indicate that the total number of "establishments" increased from 20,815 to 27,891. In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control. The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[40] 13 C.F.R. § 121.201, NAICS code 517110.

[41] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 5, NAICS code 517110 (issued Nov. 2005).

[42] *Id.* The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[43] 13 C.F.R. § 121.601 (NAICS Code 531110, 531311, 531312).

[44] 1997 Economic Census: Comparative Statistics for the United States; 1987 SIC Basis: Financial, Insurance, and Real Estate Industries, SIC 6512.

that were in operation for at least one year at the end of 1997.[45] The Census Bureau provides no separate data regarding operators of dwellings other than apartment buildings, and we are unable at this time to estimate the number of such operators that would qualify as small entities.

**Description of Projected Reporting, Recordkeeping and Other Compliance Requirements**

17. We anticipate that any rules that result from this action would have at most a *de minimis* compliance burden on cable operators and telecommunications service entities. Any rules that might be adopted pursuant to this FNPRM likely would not require any reporting or recordkeeping requirements.

**Steps Taken to Minimize Significant Economic Impact on Small Entities and Significant Alternatives Considered**

18. The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[46]

19. As discussed in the FNPRM, the Commission has initiated this proceeding to ensure that use of exclusivity clauses of all kinds and bulk billing for the provision of video services to MDUs and other real estate developments are pro-competitive. As noted above, applying any rules regarding the use of such practices in the provision of video services to MDUs or other real estate developments likely would have at most a *de minimis* impact on small governmental jurisdictions. We seek comment on the impact that any rules might have on such small governmental entities, as well as the other small entities described, and on what effect alternative rules would have on those entities. For instance, if marketing exclusivity clauses were forbidden – for DBS providers, PCOs, or all MVPD service providers – would there be any effect on the regulatory activities of small government jurisdictions? We also invite comment on ways in which the Commission might impose restrictions of the use of exclusivity clauses and bulk billing arrangements while at the same time imposing lesser burdens on small entities.

**Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

20. None.

---

[45] 1997 Economic Census: Comparative Statistics for the United States; 1987 SIC Basis: Financial, Insurance, and Real Estate Industries, SIC 6513.

[46] 5 U.S.C. §§ 603(c)(1)-(4).

Federal Communications Commission                                    FCC 07-189

## APPENDIX D

### Final Rule

Subpart X – Access to Multiple Dwelling Units and Centrally Managed Real Estate Developments

47 C.F.R. § 76.2000.  Exclusive Access to Multiple Dwelling Units Generally

(a) Prohibition.  No cable operator or other provider of MVPD service subject to 47 U.S.C. § 548 shall enforce or execute any provision in a contract that grants to it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU.  All such exclusivity clauses are null and void.

(b) Definition.  For purposes of this rule, MDU shall include a multiple dwelling unit building (such as an apartment building, condominium building or cooperative) and any other centrally managed residential real estate development (such as a gated community, mobile home park, or garden apartment); provided however, that MDU shall not include time share units, academic campuses and dormitories, military bases, hotels, rooming houses, prisons, jails, halfway houses, hospitals, nursing homes or other assisted living facilities."

48

## STATEMENT OF
## CHAIRMAN KEVIN J. MARTIN

*Re: In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

All consumers, regardless of where they live, should enjoy the benefits competition in the video marketplace. Exclusive contracts between incumbent cable operators and owners of "multiple dwelling units" (MDUs) have been a significant barrier to competition. Today's order removes this barrier. Specifically, the item we adopt today finds that the use of exclusivity clauses in contracts for the provision of video services to MDUs constitutes an unfair method of competition or an unfair act or practice in violation of Section 628(b) of the Act. Thus, we prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators.

Fostering greater competition in the market for video services is a primary and long-standing goal of federal communications policy. Congress recognized that competition in the video services market benefits consumers. Indeed, one of the Communications Act's explicit purposes is to "promote competition in cable communications." Competition and choice in the video services market results in lower prices, higher quality of services, and generally enhances the consumers' experience by giving them greater choice over the purchased video programming.

As the Commission has found, from 1995 to 2005, cable rates have risen 93%. In 1995, cable service cost $22.37 per month. Prices for expanded basic cable service have now almost doubled. The trend in pricing of cable services is of particular importance to consumers. Since 1996 the prices of every other communications service (such as long distance and wireless calling) have declined while cable rates have risen year after year after year.

The Commission has been working hard to take steps to introduce greater competition in the video market for the benefit of consumers. For example, last year we removed regulatory barriers by giving meaning to the words Congress wrote in section 621 of the Cable Act. This item found that local franchise authorities must not "*unreasonably refuse to award an additional competitive franchise*" to new companies seeking to enter the video marketplace. And, more recently, we took action to make sure that new entrants, in addition to existing players, will continue to have access to critical programming on a nondiscriminatory basis. In that same item, we also began an inquiry into the "tying" practices of programmers where broadcast and cable programmers routinely tie marquee programming, such as premium channels or regional sports programming, with unwanted or less desirable programming. These practices have been identified by cable operators as increasing the cost and decreasing choice in video programming.

I believe that people that live in apartment buildings deserve to have the same choices as people that live in the suburbs. In today's item, the Commission found that people who live in apartment buildings often have no choice of companies when it comes to their video service provider. This is because building owners often strike exclusive deals with one cable operator to serve the entire building, eliminating competition. There is no reason that consumers living in apartment buildings should be locked into one service provider. This phenomenon is particularly problematic given the large number of Americans that live in apartment buildings. Right now over one quarter of all Americans lives in apartment buildings. And, according to the American Housing Survey Report, 40% of all households headed by Hispanics or African-Americans live in apartments. Thus, because a greater percentage of minority-headed households live in apartment buildings, I believe minorities in particular will benefit from today's ruling.

49

I am pleased that the Commission has taken action that will not only enhance video competition but advance broadband deployment by encouraging the deployment of facilities by new entrants. The Commission will continue to look for ways to remove barriers to competition across all platforms and with respect to all services that we regulate. The public interest demands that all Americans reap the benefits of competition.

## STATEMENT OF
## COMMISSIONER MICHAEL J. COPPS

Re:    *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

Thanks to this item, Americans who live in multiple dwelling units (MDUs) will be able to reap the benefits of competition and consumer choice just like those who live in single-family homes. It's a lot of people – nearly thirty percent of our total population and an even higher percentage of the overall minority population.

Today's decision is a significant step forward not just for what it does, but also for what it does not do. It does not prevent a property owner from negotiating a bulk discount for its residents or bargaining for heightened customer service requirements. Nor does it give any video provider the right to enter an MDU over the objection of the property owner. It simply removes a large obstacle to providing residents of MDUs with the ability to choose among alternative providers serving the surrounding community.

We could have gone even further. I am particularly concerned about the potential of tipping the playing field in favor of particular services or particular competitors. Markets can move quickly in response to regulatory changes, and it may be that some MVPDs not covered by today's decision will attempt to fill the vacuum by marketing themselves as the only exclusive game in town. Happily we will be addressing these competitive parity issues in the next six months. In the meantime, I would caution any MVPDs seeking to take advantage of this regulatory lag time that they do so at their own risk. I agree with several public interest commenters in this record who argued, "the Commission should apply the policy of access with an equal and impartial hand."[1] In this regard, I'm pleased that my colleagues have agreed to conclude within the next two months the open proceeding examining the permissibility of exclusive contracts for telecommunications services in residential MDUs. I am also pleased that we will be looking at expanding the multi-channel video service providers (MVPDs) covered by the rule we adopt today. The sooner we complete action on all this, the better off consumers will be.

This is a good and significant step forward, I thank the Bureau and my colleagues for their hard work on it, and I am pleased to support the item.

---

[1] *See Ex Parte Comments of Consumer Federation of America, Consumers Union, New America Foundation, Free Press, Public Knowledge, and U.S. PIRG*, dated October 24, 2007.

Federal Communications Commission                                    FCC 07-189

## STATEMENT OF
## COMMISSIONER JONATHAN S. ADELSTEIN

*Re:   Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

Robust and fair competition across the communications landscape, particularly in the video marketplace, remains a central policy objective of mine. So I am pleased to support this Order which should lower barriers for the entry of new competitors and expand the options for video services available to the millions of Americans who live in apartment buildings, condominiums, mobile home parks, and other centrally-managed real estate developments. A person living in a multiple dwelling unit (MDU) property should not be shackled to one video provider. Too often, the landlord gets paid off while the tenants are stuck with no choice or bad service. People want competitive offerings, and today we are delivering them.

This Order addresses the use of exclusive agreements between multichannel video programming distributors (MVPDs) and private real estate developers and owners of MDU properties for video services. Significantly, the Order finds that exclusive access arrangements amount to anticompetitive practices that prevent or greatly hinder providers from providing MDU residents video programming services. Although the Commission has examined this issue before, recent industry trends warranted another look at the effect of exclusive contracts. According to the Commission's most recent Cable Price Survey Report, the average monthly price for basic-plus-expanded basic service has increased by ninety-three percent over a ten-year period.[1]  Further, cable rates were seventeen percent lower where wireline cable competition was present.[2]

The entry of some of the largest incumbent local exchange companies into the video marketplace also signifies a major and positive new development. Verizon, for example, is upgrading its facilities to fiber-based platforms in many areas across the country so that it can offer a suite of video, voice, and data services. This and other investments by phone companies could bring substantial new competition into the video marketplace that is likely to prove historic.

Equally significant is the potential for this new revenue stream to drive broadband deployment, which can benefit consumers and foster the free flow of information beyond the video marketplace. This action alone will not solve our broadband challenges of availability, affordability, and value – too few Americans enjoy the full benefits of competition for broadband services – but it takes an important step by opening the door for millions of Americans to exercise their right to choose their own provider.

In the instant item we find that exclusive contracts do in fact unreasonably impede the Commission's goals of enhancing multichannel video competition and accelerating the deployment of broadband, so it is critical that we act. By prohibiting cable operators from enforcing these exclusive contracts, consumers will benefit not only from more choices, better service, and lower prices, but they also stand to gain from a more robust exchange in the marketplace of ideas.

---

[1] Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Prices for Basic Service, Cable Programming Services, and Equipment, 21 FCC Rcd 1, 15087, ¶ 2 (2006).

[2] *Id.* at 15090, ¶ 10.

Federal Communications Commission                    FCC 07-189

I have long expressed grave concerns about the negative effects of media consolidation in this country, and have focused on the problems raised by growing vertical integration of programming and distribution. Vast new distribution networks promise to limit the ability of any vertically integrated conglomerates from imposing an economic, cultural, or political agenda on a public with few alternative choices. I truly believe the benefits of this new competition extend beyond even the many typical ones that accrue to consumers, and can actually improve the health of our overall democracy.

I am pleased that my colleagues agreed to seek comment on whether the Commission should prohibit exclusive marketing and bulk billing arrangements. I am especially satisfied that the Chairman agreed to finalize rules in this proceeding within six months. While I would have preferred to ban exclusive marketing agreements immediately in this Order, this is an important step.

These and other forms of exclusive arrangements seem to serve the primary purpose of raising the barriers of entry for competitive video providers, whether incumbent cable or telephone video providers, or overbuilders. Similar to exclusive *access* arrangements, exclusive *marketing* arrangements between MVPDs and MDU owners may have the potential to have an anticompetitive effect in the video market because an MVPD essentially purchases the right to prevent or hinder the ability of a competitive MVPD from reaching the MDU resident in a cost-efficient manner. Increasing a competing MVPD's cost is the name of the game, and the unsuspecting consumer is the pawn. They should be banned under the same reasoning we use here to ban exclusive access arrangements.

Bulk billing arrangements are a more sophisticated and, perhaps, insidious form of exclusive agreements. While MDU owners generally enter into a bulk billing arrangement with only one MVPD, if a resident is fortunate to receive video service from a competitive video provider, the resident is sometimes forced to pay two separate subscription fees for video service. While we need to ensure that bulk discounts are not undermined, I look forward to the comments and record generated from an inquiry into these practices.

Finally, I am pleased that this item includes a commitment to address the related issue of exclusive contracts for telecommunications services in residential MDUs. It should be our policy objective to promote fair competition throughout the communications landscape, so I'm pleased that we will take up this issue quickly.

For all these reasons, I support this *Order* and *Further Notice*.

Federal Communications Commission                                    FCC 07-189

# STATEMENT OF
## COMMISSIONER DEBORAH TAYLOR TATE

*Re:*     *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and*
          *Other Real Estate Developments*

The FCC continues to encourage competition across platforms and the stimulation of investment further down the marketplace, resulting in more competition and hopefully more choice and lower prices for consumers through the banning of exclusivity clauses in the MVPD market. I think we all recognize that exclusivity contracts in perpetuity are not in keeping with our pro-competitive policies and should be banned.

As a former state official, I am wary of acting in any area in which states have already taken the lead. We recognized state action granting video relief in our 621 Order and I do so again today. I am one of those unique federal officials who still believes that states have a critical role in our concept of "federalism." I appreciate the comments of the National Governors Association and the National Conference of State Legislatures and other local officials who contacted us. As we recognized in our earlier Orders on exclusivity clauses, today's action should not conflict with states that have already imposed a ban. Rather it extends this prohibition to those states that have not yet acted.

Like many of our decisions, the effects of today's Order will not truly be tangible until markets and technology evolve. Much of the U.S. still depends on cable for their video and broadband service and that will not change overnight. This order, which ends exclusivity clauses—as we did earlier in the telecom arena-- will not create competition in every MDU overnight. It will, however, set the stage for more competition through a gradual process that hopefully will allow cable companies and Wall Street to adjust to the change in investment strategy.

This Order does not abrogate existing contracts, but rather declares exclusivity clauses to be unenforceable. Other provisions of service contracts remain intact. Also, this Order is focused solely on access to MDUs. Other competitive, freely negotiated business arrangements are untouched by this action.

I am pleased that we have also agreed, within the next two months, to consider the issues raised in the 2000 Competitive Networks Further Notice of Proposed Rulemaking. In the interest of regulatory parity, it is essential that we seek to apply our rules consistently across all platforms in a timely manner.

**STATEMENT OF**
**COMMISSIONER ROBERT M. MCDOWELL, CONCURRING**

Re:    *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

Today the FCC helps give many consumers who live in apartment buildings and other multiple dwelling units (MDUs) the hope of having more choices among video service providers. If you live in a building where the property owner limits your freedom to choose among video service providers through an exclusive arrangement with just one company, today's Order liberates you.

In our Order, the Commission finds that contractual agreements granting cable operators exclusive access to MDUs is harmful to competition. Accordingly, our Order prohibits the enforcement of existing exclusivity clauses, and the execution of new ones, as an unfair method of competition. Although I agree that increased competition among video providers in MDUs will result in better service, innovative offerings to consumers, and lower prices, I am concerned about the legal sustainability of the Order, should it be appealed. My concern is this: after unanimously inviting cable companies and building owners to strike such deals in 2003, the FCC may now be abrogating those exact same agreements immediately rather than waiting for them to expire and without providing a grace period. In some cases, cable companies relied upon our 2003 Order to make arrangements with owners of older buildings to wire them for the first time, or to upgrade them with newer technologies, in exchange for a limited period of time when they could be the exclusive video service provider to allow for recovery of their investments. The record indicates that many buildings may have been upgraded, or brought online for the first time, as a result of this policy. To flash cut to a new regulatory regime without a sensible transition period only begs for an appeal that could result in a court throwing out all of our Order, the good with the bad. I am disappointed that our Order does not take the simple and small step of avoiding such exposure.

My concern is underscored by what can be perceived as a lack of sufficient evidence in the record to justify such an immediate mandate. In fact, in 2003, the Commission unanimously held that "the record developed in this proceeding indicates little support for governmental interference with privately negotiated exclusive MDU contracts.... We do not find a sufficient basis in this record to ban or cap the term of exclusive contracts."[1] Because the 2003 record reflected both pro-competitive and anti-competitive aspects of exclusive contracts, the Commission decided not to act. Now, only four years later, we do take action despite similar arguments being presented in the record. The Order should do a better job of distinguishing these apparent contradictions.

I am also concerned that our Order may not give sufficient deference to states that have passed their own laws helping consumers with this issue. The record indicates that 20 states have enacted such legislation and no state has abrogated existing contracts such as we are doing here. Arguments that our actions today may constitute a regulatory taking that requires compensation may have merit as well, and I wish the Commission's appellate lawyers the best of luck in defending against such claims. I only wish we were giving our attorneys more legal ammunition to use to defend the agency. At the end of the day, because I agree with the thrust of what the Commission is attempting to do today, namely giving consumers the freedom to choose among a variety of video services providers, I concur in this Order.

---

[1] *Telecommunications Services Inside Wiring: Cable Television Consumer Protection & Competition Act of 1992*, First Order on Reconsideration and Second Report and Order, 18 FCC Rcd 1342 (2003), at ¶ 68.

1   **BARRON E. RAMOS**
    Attorney at Law, A Professional Corporation
2   Barron E. Ramos (State Bar No. 179620)
    132 N. El Camino Real, # 303
3   Encinitas, California 92024
    Telephone: (760) 274-6438
4   Facsimile: (760) 994-1354

5   **CLARK & MARKHAM**
    David R. Markham (State Bar No. 071814)
6   R. Craig Clark (State Bar No. 129219)
    James M. Treglio (State Bar No. 228077)
7   401 West "A" Street, Suite 2200
    San Diego, CA 92101
8   Telephone: (619) 239-1321
    Facsimile: (619) 239-5888
9
    Attorneys for plaintiff and the Class
10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                       **COUNTY OF SAN DIEGO**

13   LEON ALPERT, an individual,                ) Case No. GIC 881621
     on behalf of himself, on behalf of all those)
14   similarly situated, and on behalf of the general) **CLASS ACTION**
     public,                                     )
15                                               ) **DECLARATION OF BARRON E. RAMOS**
            Plaintiffs,                          ) **IN OPPOSITION TO MOTION FOR**
16   v.                                          ) **SUMMARY JUDGMENT**
                                                 )
17   TIME WARNER CABLE, INC., a Delaware)
     corporation, and DOES 1 TO 100,            ) Date: April 4, 2008
18                                               ) Time: 10:30 a.m.
            Defendants.                          )
19                                               ) Dept: 63
                                                 ) Judge: Hon. Luis R. Vargas
20                                               )
                                                 ) Trial Date: None Set
21                                               ) Case Filed: March 13, 2007
                                                 )
22                                               )
                                                 )
23   _____)

24

25

26

27

28   I, Barron E. Ramos, declare as follows:

                              1

1.    I am one of the attorneys for plaintiff in this class action litigation and have personal knowledge of each of the facts set forth herein.  If called upon as a witness I could and would testify competently thereto.

2.    This declaration is submitted in opposition to Time Warner Cable's (TWC) Motion for Summary Judgment (MSJ).

3.    In response to a Request for Production of Documents, TWC produced recordings of all of the conversations it had with Alpert, except the one in the fall of 2006 where he requested that his bill be corrected.  According to TWC's counsel, someone destroyed that recording.  This was confirmed during the deposition of TWC's PMK.  Exhibit A, Depo Rhodes, at p.200:23.  In other words, TWC admits it destroyed the recording even though the lawsuit had been pending for at least six (6) months at the time.

4.    Exhibit A attached hereto is a true and correct copy of various pages of the deposition transcript of Ms. Terri Rhodes.

5.    Exhibit B attached hereto is a true and correct copy of TWC's San Diego/Desert Cities' Response to Plaintiff's Special Interrogatories No. 14, 15.

6.    Exhibit C attached hereto is a true and correct copy of TWC's HOA pricing sheet that Alpert received attached to his HOA's newsletter in the fall of 2006.

7.    Exhibit D attached hereto is a true and correct copy of the deposition transcript of Leon Alpert at pp. 97-106.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this ___19___ day of March, 2008 at Encinitas, California.

Barron E. Ramos

DECLARATION OF BARRON E. RAMOS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

# Deposition of

## TERESA JANE RHODES

### ALPERT v. TIME WARNER

*Taken On*
*March 14, 2008*

Transcript provided by:

# HUTCHINGS℠
## COURT REPORTERS, LLC
CSR 649

GLOBAL LEGAL SERVICES

**800.697.3210**

1    to write checks to Time Warner directly to do that is

2    going to pay fifty-five dollars more than -- fifty-four

3    ninety-five more than he had previously been paying,

4    whereas the person who was in the single family

5    residence across the street bill is going from about

6    fifty-one dollars to ninety-one dollars or about forty

7    dollars more.

8        MS. HUSSEY:  Objection, vague as to time.

1:22P  9        MR. MARKHAM:

10       Q.  Again, this is in the '05 and early '06 period

11    when you had the HOA DIGIPiCs.

12       A.  I would agree with the understanding that we

13    may be looking at two different years of rates.

14       Q.  Yeah, there may have been a couple of dollar

15    shift in that gap period but we tried to get as close in

16    terms of the time in the months as we could.  For

17    example, we knew that the HOA went in effect March of

18    '05 and the closest non-HOA rate card we could find

19    prior to that time was January, '05.  And I guess it's

20    theoretically possible something could have shifted a

21    couple of dollars.



22       But it still looks like the kick to bring in those

23    whole DIGIPiC 4000 packages would have cost the HOA

24    fellow about $55 more whereas the non-HOA person was

25    paying about $40 more to upgrade to that same service

106

set. Would you agree with me?

1:23P    A. Yes.

3    Q. Okay. Do you recall in any of the work you did

4    over the last five or ten years in the setting of

5    pricing at Time Warner any discussion with any other

6    Time Warner employees about the fact that it was costing

7    HOA customers more money to upgrade or increase their

8    services than it was costing people who were not in an

9    HOA?

10    A. No.

11    Q. Okay. Do you recall any -- ever seeing any

12    memos or emails which address that subject matter?

13    A. No, because we don't agree with the premise

14    that it's somehow different or unfair.

15    Q. Well, it's not -- that's getting a little

16    argumentative and I've tried to stay away -- I've just

17    tried to stay with numbers. But my question was whether

18    there were any emails or documents that address the --

19    specifically the subject of increases for

20    Additional Services and any discrepancy between the

21    cost of the increases between HOA members and non-HOA

22    members.

1:25P    23    A. No. In fact, if anything, it would be the

24    opposite of let's make some packages for the HOAs to

25    discount services for them from the a la carte pricing.

107

1    question.

2        Q.  When we did the totals on what Time Warner was

3    collecting from Mr. Alpert in September of '06 and what

4    they were collecting from the homeowners' association

5    did we not get to a larger number than the DIGIPiC 4000

6    package would have cost a non-HOA member who had just

7    moved into a new single family dwelling unit?

2:46P    8        A.  Yes.

9        Q.  Okay.  Then why do you say that Time Warner is

10   charging less to its customers who are HOA people than

11   to its customers who are not HOA people?

12       A.  We don't consider that that resident is

13   necessarily paying what's in the contract with us, with

14   an HOA or a multi-housing unit.

15       Q.  Okay.  Well, then who do you consider is paying

16   that negotiated price?

17       A.  Whoever the agreement is with.

18       Q.  Okay.  So you don't consider the collection

19   from the homeowners' association as part of the money

20   that is being paid to Time Warner from the HOA unit

21   owners in the various units?

22       MS. HUSSEY:  Objection, vague.

23       THE WITNESS:  As we're setting pricing we would not

24   consider that they have a charge on cable.

25       MR. MARKHAM:

1        Q.  Which is the high speed Internet access service

2    and that could be either wired or wireless as we talked

3    about before?

4        A.  Yes.

5        Q.  And is there like a cheaper version of the

6    Internet, something called Light or Road Runner --

7        A.  Yes.

8        Q.  -- Light?  What is Road Runner Light?

9        A.  It's a different speed, a slower speed than

10   standard Road Runner.

11       Q.  Okay.  But it's still a cable wire that comes

12   into people's houses or condos that provides Internet

13   access along the wire?

14       A.  Yes.

15       Q.  Okay.  And there's also digital telephone

16   service which is basically Internet telephony, the use

17   of the Internet to pass audio signals, correct?

18       A.  Yes.

19       Q.  And I think that's probably all I can think of.

20   You can probably think of others but I'm not thinking of

21   extra gadgets like converter boxes or digital recorders

22   or anything like that.

23       So what I was trying to get at though was -- and

24   for me the real breakdown was between the

25   Advantage Service, the Basic 75 channels and anything

153

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

1  above and beyond that, what the breakdown of your

2  customer base is as to what percentage of them really

3  confine themselves to the Advantage 75 channels and what

4  percentage buys something more and in addition to the

5  Basic 75 or 76 channels.

6      MS. HUSSEY:  Objection, vague, conjunctive and

7  exceeds the scope of the PMK deposition notice.

8      MR. MARKHAM:

9      Q.  Oh, well, do you know approximately what --

10     A.  It would be about 45 percent that have regular

11  Advantage Service and about 55 percent digital.

12     Q.  Okay.  Anything above Advantage is what you

13  call digital?

14     A.  Yes.

15     Q.  Because it is a digital fee?

16     A.  Yes.

17     Q.  At least up until recently I think at least.

18  Wasn't it true this month or last month or something or

19  is it next year that everything is supposed to go

20  digital --

21     A.  It's next year.

22     Q.  -- for everywhere because even the T.V. signal

23  will be digital?

24     Okay.  Let me start going through some of the

25  documents.  I also want to make sure that I've covered,

154

1    and I think I have covered much of the items that we

2    listed on Exhibit 1.

3        Okay.  Question Number 1, which is where we

4    started, we had gone over some of the rate cards.  As I

5    understand it, they might have changed and there might

6    have been earlier ones affecting different time periods.

7        But we looked at the non-HOA and the HOA rate cards

8    for the '05 and '06 time period, which are the various

9    exhibits we referred to, and as I understand what you

10   were saying is there is a difference between a la carte

11   and bundled pricing but very often what's called

12   a la carte pricing is sort of a mixed or hybrid version

13   of the a la carte that has bundles on a bill with other

14   a la carte items like we were looking at in Mr. Alpert's

15   bill from September, '06 --

16       MS. HUSSEY:  Objection, vague.

17       MR. MARKHAM:

18       Q.  -- correct?

19       A.  Yes.

20       Q.  And that, if I understand what you testified to

21   earlier, for at least the pre-'05 time period an HOA

22   member asking for additional or digital service above

23   and beyond the Basic 76 would normally have been put

24   into an a la carte or a la carte hybrid bill rather than

25   one of the DIGIPiC type bundles because it would have

                              155

1 been less expensive for that customer to do so?

2  A. Yes.

3  Q. Okay.  And I gather in response to

4 Question Number 2 for HOA members Time Warner Cable's

5 position is that it did not double charge for the

6 amounts that were being collected under bulk service

7 agreements from HOAs because the billings to HOA members

8 did not reflect a separate line item for the

9 Basic Advantage Service, correct?

10  A. Yes.

11  Q. Let's skip over three because I think we've

12 covered it to the extent that it's clearly asked there.

13  Okay.  Question Number 4, when these HOA bundles

14 started to be used in about the first or second quarter

15 of '05 what did you folks do to make known that these

16 HOA packages or bundles such as the HOA DIGIPiC bundles

17 were available to customers who were already subscribers

18 from Time Warner Cable and customers?  I'm talking about

19 the HOA customers.

20  MS. HUSSEY:  Objection, vague as to geographic

21 area.

22  MR. MARKHAM:

23  Q. I'm talking about the region you had

24 jurisdiction over.

25  MS. HUSSEY:  And what does that mean?

156

1          A.  It's maybe or maybe not.  We've looked in our

2     records and don't find anything else.  But my

3     recollection is that we did some promotion of our HOA

4     bundles in the Desert.

5          Q.  In the newspaper?

6          A.  In -- in possibly print and direct mail.

7          Q.  Okay.  I thought you were sure on direct mail.

8          A.  I am sure on direct mail.

9          Q.  But you're not sure --

10          A.  I remember doing --

11          Q.  -- as far as newspapers?

12          A.  Right.

13          Q.  And you looked for newspaper ads but couldn't

14     find any?

3:04P    15          A.  Right.

16          Q.  And then if we move to San Diego County

17     subscribers, do you know if there was any media

18     advertising that specifically mentioned the HOA rates in

19     media, again meaning either newspaper, T.V. or radio?

20          A.  No, there was not.

21          MS. HUSSEY:  Vague as to San Diego.

22          MR. MARKHAM:

23          Q.  The San Diego County subscribers, do you know

24     if you did any direct mail advertising or any kind of

25     notice to the HOAs or the HOA customers that these HOA

1    rates were in effect in '05 and '06?

2        A.  What we would have --

3        MS. HUSSEY:  Objection, vague as to location.

4        THE WITNESS:  What we would have done is mail them

5    the same offer as anyone else, again, Road Runner,

6    twenty-nine ninety-five a month for six months.  At the

7    time they call the CSR or go into a payment center, the

8    CSR would talk to them about the packages that would be

9    available after their discount period.

10       MR. MARKHAM:

11       Q.  Okay.  So there was nothing in the direct

12   mailing though that might have triggered a response and

13   a further discussion though that mentioned the subject

14   of HOA rates or HOA packages such as DIGIPiC?

15       MS. HUSSEY:  Objection, vague as to location.

16       MR. MARKHAM:

17       Q.  In San Diego County areas where you had HOA

18   subscribers.

19       A.  We often would mention about bundling and

20   savers, saving every month when you combine services.

21       Q.  But, again, any -- any communications that

22   actually mention the word HOA or HOA rates or new HOA

23   packages or words to that effect?

24       A.  Not that I recall.

25       Q.  Do you recall any consideration of any

                         164

1   or not the idea of switching over to the HOA DIGIPiC

2   bundle originated with a Time Warner service rep or

3   Mr. Alpert?

4        MS. HUSSEY:  Objection, vague, confusing.

5        THE WITNESS:  The customer would have had to have

6   called to talk to the service rep about his services and

7   at that point made a -- made a change.  The CSR is

8   trained to talk to the customer about what the

9   differences would be if they changed their package.

10       MR. MARKHAM:

11       Q.  Well, do you know actually one way or another

12   what Mr. Alpert said when he first called the

13   Time Warner service rep?

14       A.  No.

15       Q.  Would it be fair to say that you don't know

16   whether the idea of switching over the HOA DIGIPiC

17   bundle that was in effect in the fall of '06 came from

18   the service rep as opposed to Mr. Alpert?

19       MS. HUSSEY:  Objection, vague, confusing, and it's

20   not in line with Mr. Alpert's testimony either.

21       MR. MARKHAM:

4:12P   22   Q.  You can --

23       A.  I don't know what their conversation was.

24       Q.  Okay.  Basically you don't really know what was

25   said by either of the two parties to that conversation?

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

1    after a year; is that correct?

2        A.  Yes.

3        Q.  Is there a way to tell when this audio

4    recording was actually destroyed?

5        A.  I -- I would have to check to see if we kept a

6    record of the destruction dates.

7        Q.  Okay.  But if the audio recording was normally

8    destroyed after a year and this conversation took place

9    in October of '06 -- was it September or October?

10       MR. RAMOS:  September.

11       MR. MARKHAM:

12       Q.  September, the date -- some date in September

13   of '06, then that audiotape would normally have been

14   destroyed in or about September of '07; is that correct?

4:25P   15       A.  Yes.

16       Q.  But this lawsuit was filed and served in March

17   of '07, correct?

18       A.  Yes.

19       Q.  So that the audiotape was destroyed about five

20   or six months approximately after the lawsuit had been

21   filed or served assuming the normal record retention

22   policy had been followed?

23       A.  Yes.

24       Q.  Okay.  Do you know if there was any effort to

25   look for records or documents of any kind that related

                              200

        HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
                            800.697.3210

1     these tracts and condo developments?

2         A.   My understanding of why we include paragraphs

3     like this is so that we can go in and market our

4     services to the residents there.   And we would love

5     anything they'll do with us.

6         Q.   Okay.

7         A.   Most of the time we can't get them to take

8     materials and other things from us.

4:41P   9         Q.   Okay.   Well, under this Clause 4.4 and 1.4,

10    what I'm really trying to get at is this -- this then in

11    2005 and 2006 of HOA bundles, the HOA DIGIPiC packages

12    we were talking about before, to your knowledge there

13    was not a mass mailer for -- or communication of the new

14    rates to the various homeowners' associations, at least

15    in San Diego County?

16        MS. HUSSEY:   Objection to the characterization of

17    rates.

18        MR. MARKHAM:   The rates, the rate cards for the

19    DIGIPiC HOA bundle.

20        THE WITNESS:   And the HOA bundles are a discount

21    like these other things are discounts.   They're not

22    rates in particular.   But I do not recall that we did

23    any direct marketing of the HOA bundles.   Again, we

24    would depend on general marketing out in the marketplace

25    to drive sales for us.

211

# EXHIBIT B

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5
   Attorneys for Defendant
6  TIME WARNER ENTERTAINMENT-ADVANCE/
   NEWHOUSE PARTNERSHIP, A NEW YORK
7  GENERAL PARTNERSHIP, THROUGH ITS SAN
   DIEGO DIVISION, DBA TIME WARNER CABLE
8
9               SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
10                              CENTRAL DIVISION
11
12  LEON ALPERT, an individual, on behalf         CASE NO. GIC881621
    of himself, on behalf of all those similarly
13  situated, and on behalf of the general        **TIME WARNER ENTERTAINMENT-
    public,                                        ADVANCE/ NEWHOUSE PARTNERSHIP,
14                                                 A NEW YORK GENERAL PARTNERSHIP,
                   Plaintiff,                      THROUGH ITS SAN DIEGO DIVISION,
15                                                 DBA TIME WARNER CABLE'S
         v.                                        RESPONSES TO SPECIAL
16                                                 INTERROGATORIES (SET ONE) OF
    TIME WARNER CABLE, INC., a                     PLAINTIFF LEON ALPERT**
17  Delaware corporation, and DOES 1 TO
    100,                                           Dept:  63
18                                                 Judge: Luis R. Vargas
                   Defendants.
19
20
21
22
23
24
25
26
27
28

SD\1778981.8                          -1-

**RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

In addition to the General Objections set forth above, which are incorporated by reference herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "HOA bundle," and potentially seeks disclosure of information that is protected by the privacy rights of third parties.

Subject to and without waiving the foregoing objections or the General Objections set forth above, and assuming, for purposes of this Interrogatory, that "HOA bundle" refers to the bundled services that Plaintiff ordered in or about September 2006, TWC—SAN DIEGO/DESERT CITIES responds as follows: Bertha Ruiz.

**SPECIAL INTERROGATORY NO. 14:**

Did plaintiff Alpert have bundled services before he had the conversation with YOUR customer service representative that resulted in Alpert being placed in an HOA bundle in the fall of 2006?

**RESPONSE TO SPECIAL INTERROGATORY NO. 14:**

In addition to the General Objections set forth above, which are incorporated by reference herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "YOUR" and "HOA bundle."

Subject to and without waiving the foregoing objections or the General Objections set forth above, and assuming, for purposes of this Interrogatory, that "YOUR" refers to TWC—SAN DIEGO/DESERT CITIES, as defined above, and "HOA bundle" refers to the bundled services that Plaintiff ordered in or about September 2006, TWC—SAN DIEGO/DESERT CITIES responds as follows: Yes.

**SPECIAL INTERROGATORY NO. 15:**

If Plaintiff Alpert had bundled services before he had the conversation with YOUR customer service representative that resulted in Alpert being placed in an HOA bundle in the fall of 2006, please identify each and every bundle he already had in place at the time that conversation occurred.

/////

**RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

In addition to the General Objections set forth above, which are incorporated by reference herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "YOUR" and "HOA bundle."

Subject to and without waiving the foregoing objections or the General Objections set forth above, and assuming, for purposes of this Interrogatory, that "YOUR" refers to TWC—SAN DIEGO/DESERT CITIES, as defined above, TWC—SAN DIEGO/DESERT CITIES responds as follows:

Tier Package (Digital Movies, Digital Variety) (Plaintiff's San Diego Account);

Premium Package (HBO, Cinemax, Showtime, Starz) (Plaintiff's San Diego Account);

Digipic 2000 Combo (Plaintiff's Desert Cities Account).

**SPECIAL INTERROGATORY NO. 16:**

If plaintiff Alpert had bundled services before he had the conversation with YOUR customer service representative that resulted in Alpert being placed in an HOA bundle in the fall of 2006, for each bundle Alpert had at that time, please state whether Alpert had specifically requested that particular bundle or whether YOU had bundled Alpert.

**RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

In addition to the General Objections set forth above, which are incorporated by reference herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "YOU," "YOUR" and "HOA bundle." TWC—SAN DIEGO/DESERT CITIES further objects to this Interrogatory on the ground that it requests information that is equally available to Plaintiff and/or solely available from Plaintiff since it seeks information relating to whether he made certain requests. TWC—SAN DIEGO/DESERT CITIES also objects to this Interrogatory on the grounds that it is compound, conjunctive, and disjunctive and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections or the General Objections set forth above, and assuming, for purposes of this Interrogatory, that "YOU" and "YOUR" refers to

-15-

# EXHIBIT C

# EXHIBIT D

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CENTRAL DIVISION

LEON ALPERT, an individual, on
behalf of himself, on behalf of
all those similarly situated,
and on behalf of the general
public,

           Plaintiff,

  vs.                 Case No. GIC881621

TIME WARNER CABLE, INC., a
Deleware corporation, and DOES
1 TO 100,

## ORIGINAL

           Defendants.

_____

VIDEOTAPED DEPOSITION OF LEON SETH ALPERT

VOLUME 1

SAN DIEGO, CALIFORNIA

TUESDAY, NOVEMBER 6, 2007

Reported by:
R. Denise Marlow
CSR No. 11631

Job No. 75324

877.955.3855
www.sarnoffcourtreporters.com



SARNOFF
Court Reporters and
Legal Technologies

IRVINE ▪ LAS VEGAS ▪ LOS ANGELES ▪ SAN DIEGO ▪ SAN FRANCISCO



| | | |
|---|---|---|
| 11:39:29 | 1 | you that there were bundles that you could purchase |
| 11:39:32 | 2 | which would price the components of that bundle better |
| 11:39:35 | 3 | than if you bought them individually.  Correct? |
| 11:39:36 | 4 | A    Correct. |
| 11:39:37 | 5 | Q    In fact, the subcomponents or some portions of |
| 11:39:39 | 6 | your existing billing had that feature to it.  Correct? |
| 11:39:43 | 7 | A    As far as I recall. |
| 11:39:44 | 8 | Q    You had several of your movie channels -- I |
| 11:39:48 | 9 | mean, there was a package, and we'll get into this in a |
| 11:39:51 | 10 | minute, but there were -- there was a package of movie |
| 11:39:53 | 11 | channels where you bought four that were individually |
| 11:39:56 | 12 | priced at maybe 6.95 or whatever they were, and you got |
| 11:40:00 | 13 | them as a package for $11.  Correct? |
| 11:40:02 | 14 | MR. RAMOS:  Objection.  Best evidence.  I mean |
| 11:40:04 | 15 | if you've got the document, let's see it. |
| 11:40:06 | 16 | BY MR. SHOHET: |
| 11:40:06 | 17 | Q    Yes?  Isn't that your recollection?  That you |
| 11:40:08 | 18 | had -- |
| 11:40:08 | 19 | A    You're asking -- you're -- you're -- you're |
| 11:40:10 | 20 | giving me specific numbers, and I can't recall what the |
| 11:40:12 | 21 | specific numbers are. |
| 11:40:13 | 22 | Q    I'm not asking about the specific numbers.  I |
| 11:40:16 | 23 | asking the concept, that if you buy and commit to |
| 11:40:18 | 24 | purchase a bundle of services, you get a better price |
| 11:40:22 | 25 | the bundle than you get if you buy each of the |

9-

LEON SETH ALPERT                    11/06/07

| 11:40:25 | 1 | components individually.  Right? |
| 11:40:27 | 2 | MR. RAMOS:  Well, I'll object.  It's vague and |
| 11:40:28 | 3 | ambiguous. |
| 11:40:30 | 4 | BY MR. SHOHET: |
| 11:40:30 | 5 | Q    You understand, don't you? |
| 11:40:31 | 6 | A    I understand that I purchased what I purchased |
| 11:40:34 | 7 | to get a better rate collectively than individually. |
| 11:40:37 | 8 | Q    But I'm asking you about the concept.  You |
| 11:40:40 | 9 | understand about the concept with Time Warner Cable and |
| 11:40:43 | 10 | with other companies, car rental companies -- Time |
| 11:40:45 | 11 | Warner isn't the first company to invent the concept |
| 11:40:48 | 12 | that if you commit to a package of services, you get a |
| 11:40:52 | 13 | lower rate than you get if you buy them individually. |
| 11:40:54 | 14 | You're familiar with that.  As an economist, you |
| 11:40:56 | 15 | understand that, don't you? |
| 11:40:58 | 16 | MR. RAMOS:  I'll object.  He's not an |
| 11:41:00 | 17 | economist. |
| 11:41:00 | 18 | THE WITNESS:  Yeah, I'm not an economist.  I |
| 11:41:03 | 19 | have a degree in economy. |
| 11:41:03 | 20 | BY MR. SHOHET: |
| 11:41:04 | 21 | Q    I thought you were. |
| 11:41:06 | 22 | It's not a surprise to you that that's a |
| 11:41:09 | 23 | practice that Time Warner engages in and other companies |
| 11:41:10 | 24 | engage in.  That's my question. |
| 11:41:10 | 25 | MR. RAMOS:  I'll object to the form of the |

98

LEON SETH ALPERT                    11/06/07

11:41:13  1    question that we don't know Time Warner engages in that.

11:41:16  2            MR. SHOHET:  Yeah, we do.  We do because it's

11:41:19  3    on his bill before he changed to the Digipac 4000.

11:41:22  4            MR. RAMOS:  Vague and ambiguous.

11:41:22  5    BY MR. SHOHET:

11:41:22  6        Q    I'm not -- I'm not trying to argue with you.

11:41:24  7    I'm trying to get your answer to the question.

11:41:27  8            Is the concept that you can buy a bundle or

11:41:30  9    package of services and commit to that bundle and get a

11:41:33  10   cheaper price than you would get if you ordered each of

11:41:37  11   the components separately, is that a concept with which

11:41:39  12   you were familiar in September 2006?

11:41:42  13       A    Yes, I believe so.  I -- I ordered a certain

11:41:47  14   package to get a better rate.  So I guess if that's what

11:41:49  15   you're saying, yes, that's what I did.

11:41:52  16           MR. SHOHET:  Okay.  Let's take a short break.

11:41:53  17   Do you want to break for the noon hour now, or do you

11:41:56  18   want to continue?  What's your preference?

11:41:57  19           MR. RAMOS:  Depends on how long you have.

11:42:00  20           MR. SHOHET:  You know, I don't know.  I've got

11:42:00  21   some documents to go through.  I would say we're not

11:42:01  22   going to get done, in any event, much before 3:00 or

11:42:04  23   4:00 o'clock this afternoon.

11:42:06  24           THE WITNESS:  I have a problem.  I have to pick

11:42:07  25   up my daughter from school.  I have to leave no later

99

LEON SETH ALPERT                                11/06/07

| | |
|---|---|
| 11:42:10 | 1 |
| 11:42:11 | 2 |
| 11:42:13 | 3 |
| 11:42:14 | 4 |
| 11:42:16 | 5 |
| 11:42:16 | 6 |
| 11:42:16 | 7 |
| 11:42:18 | 8 |
| 11:42:22 | 9 |
| 11:42:26 | 10 |
| 11:42:29 | 11 |
| 11:42:32 | 12 |
| 11:42:33 | 13 |
| 11:42:36 | 14 |
| 11:42:36 | 15 |
| 11:42:40 | 16 |
| 11:42:41 | 17 |
| 11:42:41 | 18 |
| 11:42:43 | 19 |
| 11:42:47 | 20 |
| 11:42:50 | 21 |
| 11:42:50 | 22 |
| 11:42:52 | 23 |
| 11:42:53 | 24 |
| 11:42:55 | 25 |

1  than 1:30.

2          MR. SHOHET:  All right.  Well, then, we won't

3  finish.

4          THE WITNESS:  Okay.

5          MR. SHOHET:  Not today.

6          Why don't we do this, then.  If you've got to

7  go till 1:30, I don't think I'll finish you, and I'm not

8  going to rush it, but what we'll do is let's take, then,

9  a short break for now, and then we'll skip the noon

10  break.  We'll work through till 1:00 o'clock if that's

11  acceptable to everybody.  1:15?  What time do you have

12  to leave to pick up your daughter?

13          THE WITNESS:  I would feel comfortable leaving

14  no later than 1:30.

15          MR. SHOHET:  No later than 1:30?

16          THE WITNESS:  Yeah, no later than 1:30 in my

17  car and --

18          MR. SHOHET:  Well, let's work until -- through

19  until we, you know, collectively conclude that it's time

20  to break, and then we'll pick this up at another time.

21  All right?

22          Let's just take a short break now off the

23  record.

24          THE VIDEOGRAPHER:  This marks the end of Media

25  No. 1, going off the record.  Time is 11:42 a.m.

100

LEON SETH ALPERT                                    11/06/07

| | |
|---|---|
| 11:42:58 | 1 |

(Off record)

THE VIDEOGRAPHER:  Okay.  We're back on the record.  The time is 12:08 p.m.  This marks the beginning of Media No. 2.  This is the deposition of Leon Alpert.

BY MR. SHOHET:

Q    Just a few more questions, Mr. Alpert, about the conversation that you had with the CSR.  You said words to the effect that, It looks like I have the Digipac 4000, to the CSR.  Is that true?

MR. RAMOS:  I'll object.  It misstates his testimony.

BY MR. SHOHET:

Q    I can read your testimony back for you if you'd like.

A    No.  I -- I -- it could have been the four -- if the 4000 was the package that I had prior and -- then it's correct.  I identified a package that I currently had at the time versus what the HOA package presented to me by the association was, you know, the -- the thing, the notice on the newsletter.

Q    But the --

A    So I said one on my bill, it looks like what I have now is -- is this thing here that I -- from what I got from the association.

101

LEON SETH ALPERT                               11/06/07

| | | |
|---|---|---|
| 12:09:29 | 1 | Q    And on the association -- I think you answered |
| 12:09:31 | 2 | this -- you think it said Digipac 4000. |
| 12:09:36 | 3 | A    Yeah, I could have.  I'm sure -- I'm -- if |
| 12:09:38 | 4 | that's the bundle. |
| 12:09:39 | 5 | Q    Okay.  And what, if anything, do you recall the |
| 12:09:47 | 6 | CSR said in response to that? |
| 12:09:49 | 7 | A    As far as I knew, she agreed with me. |
| 12:09:51 | 8 | Q    And was she, then, familiar with the Digipac |
| 12:09:55 | 9 | 4000 package? |
| 12:09:56 | 10 | MR. RAMOS:  Objection.  Calls for speculation. |
| 12:09:58 | 11 | THE WITNESS:  I -- I imagine she was familiar |
| 12:10:00 | 12 | with whatever Time Warner products she was representing, |
| 12:10:04 | 13 | because she agreed with me. |
| 12:10:06 | 14 | BY MR. SHOHET: |
| 12:10:06 | 15 | Q    You hadn't sent her the flier from the |
| 12:10:10 | 16 | homeowners association in advance of the conversation, |
| 12:10:13 | 17 | had you? |
| 12:10:13 | 18 | A    No. |
| 12:10:13 | 19 | Q    And did you mention -- well, withdraw that |
| 12:10:18 | 20 | question. |
| 12:10:18 | 21 | At least as far as you can tell, she had no |
| 12:10:27 | 22 | problem understanding what the Digipac 4000 bundle of |
| 12:10:31 | 23 | services was at the time you mentioned it to her. |
| 12:10:33 | 24 | MR. RAMOS:  Calls for speculation. |
| 12:10:34 | 25 | THE WITNESS:  Well, my understanding -- I mean, |

102

LEON SETH ALPERT                    11/06/07

12:11:44  1        THE WITNESS:  I don't know that she understood.

12:11:46  2    I think she knew what I was -- the bundle, because I

12:11:50  3    guess it was a bundle.  I had the cable television, I

12:11:54  4    had the phone, and I had the Road Runner.  So I had --

12:11:59  5    and the cable television had certain services associated

12:12:03  6    with it, you know, the digital HD, whatever, and she

12:12:07  7    agreed that -- that this HOA thing was the same thing or

12:12:13  8    similar enough, so that's -- we agreed on that point.

12:12:18  9    BY MR. SHOHET:

12:12:18  10       Q    All right.  But I guess my question is when you

12:12:20  11   said, It looks like I have the HOA Digipac 4000, she

12:12:25  12   didn't come back with a response that suggested to you

12:12:28  13   that she didn't know what you were talking about, did

12:12:32  14   she?

12:12:32  15       A    No, I don't think so.

12:12:35  16       Q    Okay.  And then you said that she agreed with

12:12:48  17   you that the services that you were -- well, tell me

12:12:51  18   what you think she agreed with.

12:12:52  19       A    That I was being overcharged.

12:12:54  20       Q    And why so?

12:12:55  21       A    Because Time Warner seems to have agreed to

12:13:00  22   provide the services that I was paying X amount of

12:13:02  23   dollars for for X amount minus a certain amount to the

12:13:07  24   homeowners at Seapointe townhomes, and I wasn't getting

12:13:09  25   a lower rate, so she gave me the lower rate.

                                                            104

LEON SETH ALPERT                    11/06/07

| | |
|---|---|
| 12:13:12 | 1 |
| 12:13:15 | 2 |
| 12:13:22 | 3 |
| 12:13:26 | 4 |
| 12:13:29 | 5 |
| 12:13:30 | 6 |
| 12:13:34 | 7 |
| 12:13:38 | 8 |
| 12:13:41 | 9 |
| 12:13:43 | 10 |
| 12:13:44 | 11 |
| 12:13:45 | 12 |
| 12:13:46 | 13 |
| 12:13:47 | 14 |
| 12:13:47 | 15 |
| 12:13:57 | 16 |
| 12:14:01 | 17 |
| 12:14:04 | 18 |
| 12:14:11 | 19 |
| 12:14:13 | 20 |
| 12:14:14 | 21 |
| 12:14:16 | 22 |
| 12:14:18 | 23 |
| 12:14:21 | 24 |
| 12:14:24 | 25 |

Q    Did she tell you that the reason that the Digipac 4000 was priced lower than the -- what you were paying at the time was because you were in a homeowners association or because you were purchasing the package in a bundle?

MR. RAMOS:  Objection.  It's leading, first of all, which I do know is permitted.  However, you characterized -- mischaracterized his testimony that he's purchasing something at this juncture.  He's not purchasing anything.

MR. SHOHET:  Okay.  Let me withdraw the question and start over again.

MR. RAMOS:  Okay.  Thank you.

BY MR. SHOHET:

Q    What, if anything, else did she say to you regarding why, in your view, she agreed with you that we're being -- you were being overcharged?  What about -- what was different about the pricing that she agreed you should be getting from the pricing that you were getting?

A    What was different?  The price.

Q    Nothing else?

A    Not that I recall.  The price was the issue. That's the only thing I called about was the price.

Q    So in -- there was no discussion about the fact

105

LEON SETH ALPERT                                11/06/07

12:14:29  1   that the reason the pricing would be lower was because

12:14:33  2   you were entitled to lower pricing as a result of the

12:14:37  3   HOA paying your basic cable rate?

12:14:40  4       A    Well, I don't know the reason why I was

12:14:43  5   overcharged, first of all.  I just knew I was being

12:14:48  6   overcharged.  Second of all, she -- I said what I wanted

12:14:53  7   was a credit on my bill on the amount of however many

12:14:59  8   months I was being overcharged times the amount of the

12:15:04  9   overcharge per month.  I thought perhaps I was being

12:15:08  10  overcharged for since 2005 and most -- and up to that

12:15:12  11  point in 2006.  She said she wasn't authorized to do

12:15:16  12  that.  The best she could do was lower my rate for what

12:15:21  13  it should be and should have been at that point in time,

12:15:24  14  and she was willing to throw in a free month of the

12:15:29  15  phone.

12:15:29  16      Q    Now, is it your sworn testimony that there was

12:15:31  17  no discussion with the CSR about the fact that Time

12:15:34  18  Warner had developed a bundled rate or a bundled package

12:15:37  19  of services which your services just happened to fit

12:15:40  20  into?

12:15:40  21      A    It's my sworn testimony that I have no

12:15:44  22  recollection about speaking about bundles with the Time

12:15:47  23  Warner rep, only about my bill and what I thought I

12:15:50  24  should be paying from the homeowners association.

12:15:53  25  That's -- that was the conversation.

106

1  **BARRON E. RAMOS**
Attorney at Law, A Professional Corporation
2  Barron E. Ramos (State Bar No. 179620)
132 N. El Camino Real, # 303
3  Encinitas, California 92024
Telephone: (760) 274-6438
4  Facsimile:  (760) 994-1354

5  **CLARK & MARKHAM**
David R. Markham (State Bar No. 071814)
6  R. Craig Clark (State Bar No. 129219)
James M. Treglio (State Bar No. 228077)
7  401 West "A" Street, Suite 2200
San Diego, CA 92101
8  Telephone: (619) 239-1321
Facsimile: (619) 239-5888

9
Attorneys for plaintiff and the Class
10

11           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                    **COUNTY OF SAN DIEGO**

13  LEON ALPERT, an individual,                ) Case No. GIC 881621
on behalf of himself, on behalf of all those )
14  similarly situated, and on behalf of the general ) **CLASS ACTION**
public,                                      )
15                                           ) **DECLARATION OF LEON ALPERT IN**
                                             ) **OPPOSITION TO MOTION FOR**
16         Plaintiffs,                       ) **SUMMARY JUDGMENT**
    v.                                       )
17                                           )
    TIME WARNER CABLE, INC., a Delaware )
18  corporation, and DOES 1 TO 100,          ) Date:  April 4, 2008
                                             ) Time:  10:30 a.m.
19         Defendants.                       )
                                             ) Dept: 63
20                                           ) Judge: Hon. Luis R. Vargas
                                             )
21                                           ) Trial Date: None Set
                                             ) Case Filed: March 13, 2007
22                                           )
                                             )
23  ─────────────────────────────────────── )

24

25

26

27

28  I, Leon Alpert, declare as follows:

                                    1
─────────────────────────────────────────────────────────────
DECLARATION OF LEON ALPERT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1.     I am the representative plaintiff in this class action litigation and have personal knowledge of each of the facts set forth herein. If called upon as a witness I could and would testify competently thereto.

2.     This declaration is submitted in opposition to Time Warner Cable's (TWC) Motion for Summary Judgment (MSJ).

3.     TWC's MSJ relies upon misrepresentations of my deposition testimony. In particular, TWC's MSJ is premised largely on one central and repeated misstatement: that in late 2006 I specifically requested that TWC change my services and bundle me to thereby lower my bill. See, e.g., TWC's Separate Statement of "Fact" Nos. 25, 26, 27, 28, 40, 42, 43, 45, 62, 64, 72, 74, 76, 87, 89, 96, 98, 110, 112, 113, 115. Each of these purported "undisputed facts" assumes that in late 2006 I called TWC and specifically requested additional services and that these services be "bundled." That is completely false.

4.     I never testified that I asked TWC to bundle me for a discount in late 2006. Rather, I clearly testified that I called to complain to TWC that my bill was too high and that TWC must lower it. Specifically, I testified as follows: "It's my sworn testimony that I have no recollection about speaking about bundles with the Time Warner rep, only about my bill and what I thought I should be paying." Decl. Ramos, Exhibit D, Depo Alpert at p.106.

5.     I did not ask for any bundle. I did not ask to change services. I just wanted my bill to be corrected, and it was. Indeed, during that conversation, TWC admitted its error to me but refused to credit more than one month of the overcharge.

6.     TWC's citation to my deposition at 99 is in response to the question TWC originally presented to me on page 97, line 8, where the question was as follows: "There was a package of movie channels where you bought four that were individually priced at maybe 6.95 or whatever they were, and you bought them for a package for $ 11. Correct?" Decl. Ramos, Exhibit D, Depo Alpert at p.97:8-12. The following two pages of the deposition was clarification of that question interspersed with objections by my counsel. I eventually answered that specific question on page 99, which TWC now misrepresents to be an answer to the question presented later on p.106.

2

7.      I am a resident of SeaPoint, a condominium project consisting of about 250 units near Torrey Pines Beach in Del Mar, CA. I have had TWC as my cable provider for as long as they have contracted with my HOA.

8.      TWC provides me with basic cable which I pay TWC through the assessment of my HOA monthly dues. I pay about $ 28.77 each month for basic cable to my HOA which, in turn, remits those monies to TWC.

9.      Since at least 2003, I have not had a choice of cable providers. In fact, as best I can recall, TWC has been the exclusive cable provider to SeaPoint since the mid 1990s. I believe TWC remains the exclusive provider of cable to SeaPoint even though I have learned that the FCC has recently ruled such exclusive relationships are unlawful and unfair.

10.     Among the services provided to me by TWC, I have basic cable, Roadrunner high speed Internet service, telephone service, and an assortment of movie channels. I have had some of these various additional services since 2003. Although I have ordered Additional Services in addition to basic cable, I do not recall ever being provided a "Subscriber Agreement."

11.     In the fall of 2006 I received a notice from my HOA that TWC had lower pricing for services provided to HOA members than I was paying at the time. The notice was attached to a newsletter I received from my HOA.

12.     As a result of receiving that notice, I called TWC and demanded that my bill be immediately corrected and that I receive a credit for the overcharges I had suffered. TWC admitted its error and corrected by bill. I did not order any new services nor did I request any sort of "bundle." I just asked to have my bill corrected, and it was.

13.     Although TWC admitted its error and corrected my bill, TWC refused to give me a credit for all of the months, if not years, of overcharges. Instead, TWC gave me one month's credit for phone service, or something similar. TWC refused to properly credit my account for its hundreds of dollars of overcharges.

14.     The next month after I called TWC and complained, by bill went down by about $ 30 and finally reflected correct HOA pricing. However, to this day, TWC has not properly credited my

3

1  account for the overcharges.

2  15.    I am familiar with TWC's television ads and its Internet website.  To this day, I have never

3  seen any HOA pricing advertised by TWC such that I, or any other potential class member, would

4  ever have known that HOA pricing was available.  Had I not received the HOA newsletter in late

5  2006, I too would never have known such pricing existed.

6  16.    I understand that TWC is taking the position that I had only 30 days to inform TWC of

7  errors on my billing statements.  Since TWC has concealed its HOA pricing from me and the other

8  class members, I am not sure exactly how I or any class member would have been able to detect the

9  error within 30 days, if at all.  While I do not think it unreasonable to require consumers to

10  complain within 30 days about obvious errors in their bills, I am not a lawyer and do not know if

11  such a provision is legal or enforceable.  Moreover, I do not think it is reasonable to have such a 30

12  day rule when the vendor, in this case TWC, is concealing information necessary for a consumer to

13  determine if the bill has an error.  For example, the itemization of charges in TWC's bills was

14  deceptive in that the bills did not disclose the existence of HOA pricing available to me.  I never

15  agreed that TWC could deceive me and then limit me to 30 days to catch the deception.

16  17.    Contrary to TWC's statements, I never ordered any of my services "a la carte."  I simply

17  ordered cable services.  In fact, some of the services I ordered were put by TWC into what appear

18  on my billing statements to be mini-bundles.  My billing statements, even before TWC put me into

19  an HOA bundle in late 2006, clearly indicate that I was not "a la carte."  I was, apparently, in

20  various mini-bundles, though I had never specifically requested any particular type of package or

21  pricing – I had just ordered cable and cable related services and was billed by TWC accordingly.

22  Until I called and complained in September of 2006, TWC had never put me into an HOA bundle.

23  18.    Given TWC's ongoing television advertising campaign over the last several years

24  encouraging consumers to order more services and thereby get bigger discounts, I assumed TWC

25  would likewise provide me such discounts when I ordered additional services.  TWC's television

26  advertising stated plainly during the class period, as it does to this day, that if I ordered other

27  additional services (in addition to basic cable) such as premium movie channels, telephone and/or

28

4

1 Internet service, I would pay less since those services are discounted when many services are
2 ordered together.  However, unbeknownst to me until the fall of 2006, I had not been given a
3 discount for ordering more services and was never informed by TWC that HOA pricing was
4 available for the exact same set of services that I had purchased.  Since TWC did not advertise
5 HOA pricing, I had no way of knowing what the correct charges were for the services I was
6 receiving.

7 19.      I am not aware of any other cable company that offers movies on demand and other cable
8 television related services at SeaPoint without the consumer purchasing basic cable service from
9 that provider.  TWC was my basic cable provider.  Thus, I ordered additional cable services from
10 TWC, not another cable company.  Moreover, since residents like pay for basic cable to TWC
11 through our HOA, there is no other meaningful economic choice in selecting a provider for
12 additional services.

13

14 20.      TWC argues that instead of ordering additional services from TWC I could have chosen
15 other alternatives.  For example, TWC argues that I could have simply rented movies, read books,
16 used a satellite service, used another phone provider, and used another Internet provider.  But since
17 I was already paying TWC each month for basic cable service through my HOA, it would make
18 little sense to pay another cable or satellite provider for the same service just to get additional
19 services.  There was never a meaningful choice to select another provider for additional services
20 while simultaneously paying TWC each and every month.
21

22 21.      As for reading books, yes, I do read books.  But I have yet to find a book that broadcasts
23 live Padres games or otherwise provides real time news and information.  Nor have I found a book
24 that provides recently released movies on demand.  TWC provided such content in addition to the
25 basic cable service already in my home.
26 22.      In its Motion and Separate Statement, TWC speculates that "HOA Pricing" as referred to in
27 my complaint "is merely the pricing of one bundle of Additional Services that, until recently, was
28

5

available to HOA residents who were willing to purchase all of the bundled services." HOA Pricing refers to both TWC's concealed HOA pricing which, apparently, became effective in 2005 and to TWC's pricing prior to that which should have reflected the fact that I was already paying for basic cable.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 18 day of March, 2008 at Encinitas, California.

Leon Alpert

DECLARATION OF LEON ALPERT IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT



1  Barron E. Ramos (SBN 179620)
   **LAW OFFICES OF BARRON E. RAMOS**
2  132 N El Camino Real #303
   Encinitas, CA 92024
3  Tel:   (760) 274-6438
   Fax:   (760) 994-1354
4

5  David R. Markham (Bar No. 071814)
6  R. Craig Clark (Bar No. 129219)
   James M. Treglio (Bar No. 228077)
7  **CLARK & MARKHAM, LLP**
   401 West "A" Street, Suite 2200
8  San Diego, CA 92101
   Telephone: (619) 239-1321
9  Facsimile: (619) 239-5888
10

11 Attorneys for the Plaintiff,

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                    FOR THE COUNTY OF SAN DIEGO

15

16 LEON ALPERT, an individual on behalf of    )   Case No.: GIC881621
   himself, and on behalf of all persons similarly )
17 situated, and on behalf of the general public,  )   **CLASS ACTION**
                                                    )
18             Plaintiff,                           )
                                                    )   **DECLARATION OF WESLEY L.**
19       vs.                                        )   **NUTTEN IN OPPOSITION TO**
                                                    )   **DEFENDANT'S MOTION FOR**
20 TIME WARNER CABLE INC., a Delaware              )   **SUMMARY JUDGMENT**
   Corporation, and Does 1 to 100,                 )
21                                                  )   **Hearing**
22             Defendant                            )   Date:      April 4, 2008
                                                    )   Time:      10:30 a.m.
23                                                  )   Dept:      63
                                                    )   Judge:     Luis R. Vargas
24                                                  )
                                                    )
25                                                  )   Complaint:  March 13, 2007
                                                    )   FAC:        May 16, 2007
26                                                  )
                                                    )
27                                                  )
28

DECLARATION OF WESLEY L. NUTTEN

I, Wesley L. Nutten, declare as follows:

1.      I am a Partner at Desmond, Marcello & Amster (DM&A), a valuation and litigation consulting firm. I am a Certified Public Accountant (CPA), licensed to practice in the state of California, a Certified Management Accountant (CMA), am Accredited in Business Valuation (ABV), and am a Certified Fraud Examiner (CFE). I have an undergraduate degree in business with an emphasis in finance from the University of Southern California and a graduate degree in business, also with an emphasis in finance, from Loyola Marymount University. I make this declaration based on my personal knowledge, and if called to testify, I could and would testify competently to the facts stated in this declaration. Attached hereto as Exhibit A is a current copy of my curriculum vitae.

2.      My education and over 23 years of experience include significant involvement in the analysis and measurement of economic damages. I have testified on numerous occasions on economic damage issues, forensic accounting matters, and business valuations.

3.      In the current instance, I was retained by attorney David Markham to analyze and report on charges incurred by Mr. Leon Alpert for cable television, wireless Internet and digital telephone services provided by Time Warner Cable ("Time Warner") at Mr. Alpert's residence at 12968 Caminito Del Canto, Del Mar, California. As part of my assignment, I was asked to compare the charges incurred by Mr. Alpert to the prices available to the general public (i.e., a Time Warner customer that is not a member of a homeowners association) as advertised by Time Warner.

4.      In 2005, Sea Point Community Association, the homeowners association (HOA) of Sea Point Townhomes ("Sea Point"), the facility where Mr. Alpert lived, signed a System Installation and Service Agreement (the "Agreement") with Time Warner. Under the terms of the Agreement, the HOA would pay $28.77 per month per unit as a Bulk Multi-Channel Video Services fee and Time Warner would provide basic Expanded Cable Television Service ("Advantage Service") to all units within Sea Point. Approximately 75 to 77 cable channels were included with Advantage Service. The HOA passed the $28.77 fee through to the residents

1   of Sea Point as part of their monthly homeowner assessment; however, to the extent residents

2   added additional services, they were billed directly by Time Warner.

3       5.    At the time the Agreement was executed, the cost of Advantage Service to non-

4   HOA members of the general public, based on Time Warner Cable's advertised rates, was

5   $50.97. Accordingly, Mr. Alpert and the other residents Sea Point were expected to enjoy a

6   savings of approximately $22.20 per month ($50.97 less $28.77) directly attributable to the

7   Agreement. This figure represents the difference between what a non-HOA member of general

8   public and a member of the HOA would pay for the same Advantage Service consisting of 75 to

9   77 channels (see sample document TW0212.)

10      6.    A review of Mr. Alpert's Time Warner bills, and a comparison of these bills to

11  Time Warner's advertised rates to non-HOA members of the general public, revealed that Time

12  Warner charged HOA members more for added services than that which was charged to non-

13  HOA members of the general public for the same added services. As a direct result of this

14  billing practice, the economic benefit of $22.20 enjoyed by Mr. Alpert declined and ultimately

15  disappeared as Mr. Alpert added services to his Time Warner plan. For example, in July 2005,

16  Mr. Alpert's services included the basic 75 to 77 cable channels, digital cable service, premium

17  cable channels, wireless Internet service, and digital phone service. The incremental monthly

18  charge for these additional services was $151.75. This amount was paid by Mr. Alpert in

19  addition to the $28.77 he was assessed each month by his HOA for the basic 75 to 77 cable

20  channels that was billed to the HOA by Time Warner. In contrast, following the introduction of

21  "TRIO" packages available to non-HOA members of the general public wherein digital and

22  premium cable television, wireless Internet, and digital phone service were available in a

23  package, the advertised price to non-HOA members of the general public for these same added

24  services was approximately $125.95 or $25.80 less than what was being paid by Mr. Alpert.

25  Hence, from July 2005 through September 2006, the net economic benefit enjoyed by Mr. Alpert

26  stemming from the Agreement had disappeared and Mr. Alpert appears to have been paying

27  approximately $3.60 per month more than the non-HOA general public for comparable services.

28  This calculation was performed by comparing the amount Mr. Alpert paid to Time Warner in

1 addition to the $28.77 he was assessed by his HOA to the amount charged by Time Warner to

2 non-HOA members of the general public. Consequently, by virtue of the difference in the

3 amounts paid by Mr. Alpert for added services beyond the basic 75 to 77 channels relative to

4 what was paid by a non-HOA member of the general public for the same services, Mr. Alpert

5 suffered damages of approximately $25.80 per month during the July 2005 through September

6 2006 time period (see sample documents TW0212, TW0213, TW214, and TW0071.)

7    7.    In March 2005, Time Warner introduced "HOA Packages" presumably available

8 to subscribers that were provided Advantage Service via HOAs such as Sea Point Community

9 Association. From this time through September 2006, Mr. Alpert continued to be charged for

10 services on an "ala carte" basis. A comparison of total monthly charges incurred by Mr. Alpert

11 relative to charges he would have incurred had he been a subscriber of the HOA package reveals

12 that Mr. Alpert was actually paying a total of approximately $15.85 more per month than he

13 would have been paying for comparable services under an HOA package. Mr. Alpert testified

14 that he was unaware of the availability of the HOA Package from March 2005 through

15 September 2006. In October 2006, Mr. Alpert was switched into an HOA Package that resulted

16 in a reduction in his monthly charges of approximately $23.85 (see sample documents TW0566,

17 TW0184, TW0113, and TW0116.)

18    8.    In conclusion, my findings are that a) the Agreement between Time Warner and

19 the HOA provided a savings to HOA members of approximately $22.20 relative to what non-

20 HOA members of the general public were being charged for the basic 75 to 77 channels, b) as

21 HOA members added additional services, the incremental amount Time Warner billed for these

22 services was higher than the incremental amount billed to non-HOA members of the general

23 public for comparable services, c) the economic benefit of the Agreement to HOA members was

24 not preserved and by mid 2005, Mr. Alpert was paying more than the non-HOA general public

25 for comparable services, d) in 2005 and 2006, Time Warner instituted HOA Package rates which

26 would have restored the economic benefit of the Agreement and reduced the amount paid by Mr.

27 Alpert by approximately $23.85 per month; however, the benefit of the HOA Package rates was

28 not made available to Mr. Alpert until October 2006, and e) Mr. Alpert suffered damages of

3

1 approximately $25.80 per month during the July 2005 through September 2006 time period..

2      I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE

3 OF CALIFORNIA, THAT THE FOREGOING IS TRUE AND CORRECT.

4 Executed this _____21ST_____ day of _____MARCH_____ , 2008 at Los Angeles, California.

5

6

7                     Wesley L. Nutten

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Exhibit A

## WESLEY L. NUTTEN, CPA/ABV, CMA, CFE
*Partner*

| | |
|---|---|
| **EXPERIENCE** | Mr. Nutten brings over 23 years of litigation consulting experience to Desmond, Marcello & Amster, with a practice emphasis on damage analyses, forensic accounting investigations, business valuations, and class action claims administration. |
| | In addition to his litigation consulting experience, Mr. Nutten has managed financial statement audits, reviews and compilations, and has prepared tax returns for corporations, partnerships and individuals. |
| | Prior to joining Desmond, Marcello & Amster, Mr. Nutten was a Director of Litigation Consulting Services at BDO Seidman, and before that gained valuable experience at Price Waterhouse, Peterson Consulting and Biggs & Company. |
| **TECHNICAL AND SPECIAL EXPERTISE** | Mr. Nutten provides litigation consulting services and expert witness testimony to clients involved in disputes. This aspect of his practice typically relates to the preparation and analysis of damage claims and forensic accounting investigations. |
| | Mr. Nutten also provides business valuation services in commercial, litigation and eminent domain settings; and class action claims administration services in connection with large class action settlements. |
| **EDUCATION AND CERTIFICATIONS** | MBA degree, Finance, Loyola Marymount University<br>BS degree, Finance, University of Southern California<br>Certified Public Accountant (CPA)<br>Certified Management Accountant (CMA)<br>Accredited in Business Valuation (ABV)<br>Certified Fraud Examiner (CFE) |
| **PROFESSIONAL AFFILIATIONS** | American Institute of Certified Public Accountants (AICPA)<br>California Society of Certified Public Accountants (CSCPA)<br>Institute of Management Accountants (IMA)<br>Association of Certified Fraud Examiners (ACFE)<br>Loyola Marymount University – Adjunct Professor of Accounting<br>Westchester Family YMCA – Board Member / Current Vice-Chair / Former Treasurer<br>Westchester Neighborhood School – Former Board Member / Former Treasurer<br>California Academic Decathlon – Former Board Member<br>Junior Achievement – Former Economics Instructor |

**DM&A**

1   Barron E. Ramos (SBN 179620)
2   **LAW OFFICES OF BARRON E. RAMOS**
    132 N El Camino Real #303
3   Encinitas, CA 92024
    Tel:   (760) 274-6438
4   Fax:   (760) 994-1354

5
    David R. Markham (Bar No. 071814)
6   R. Craig Clark (Bar No. 129219)
    James M. Treglio (Bar No. 228077)
7   **CLARK & MARKHAM, LLP**
    401 West "A" Street, Suite 2200
8   San Diego, CA 92101
9   Telephone: (619) 239-1321
    Facsimile: (619) 239-5888
10
11  Attorneys for the Plaintiff,

12

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                   FOR THE COUNTY OF SAN DIEGO

15

16  LEON ALPERT, an individual on behalf of      )   Case No.: GIC881621
    himself, and on behalf of all persons similarly )
17  situated, and on behalf of the general public, )   **CLASS ACTION**
                                                   )
18              Plaintiff,                         )   **APPLICATION TO FILE EXHIBITS TO**
                                                   )   **THE DECLARATION OF WESLEY L.**
19          vs.                                    )   **NUTTEN IN OPPOSITION TO**
                                                   )   **DEFENDANT'S MOTION FOR**
20  TIME WARNER CABLE INC., a Delaware            )   **SUMMARY JUDGMENT UNDER SEAL;**
    Corporation, and Does 1 to 100,               )   **[PROPOSED ORDER]**
21                                                 )
22              Defendant                          )
                                                   )   **Hearing**
23                                                 )   Date:         April 4, 2008
                                                   )   Time:         10:30 a.m.
24                                                 )   Dept:         63
                                                   )   Judge:        Luis R. Vargas
25                                                 )
26                                                 )   Complaint:    March 13, 2007
                                                   )   FAC:          May 16, 2007
27                                                 )
28

---

APPLICATION AND [PROPOSED] ORDER                                    - 1 -
TO FILE DOCUMENTS UNDER SEAL                          Case No. GIC881621

1    Plaintiff Leon Alpert hereby requests pursuant to Cal. Rules of Court, Rule 2.550, and the

2    March 17, 2008 Stipulated Protective Order, an Order sealing the exhibits to the Declaration

3    Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment, filed with the

4    Court on March 21, 2008.  The exhibits have been previously labeled by the Defendant, TIME

5    WARNER CABLE CO. (hereinafter "TWC") as "Confidential" and may cause trade secrets of

6    the Defendant to be made available to the general public.   These documents indicate the internal

7    pricing methods and procedure used by TWC, and should therefore kept under seal.

8    The forgoing exhibits are lodged with the Declaration Wesley L. Nutten in Opposition to

9    Defendant's Motion for Summary Judgment. Pursuant to a stipulated protective order filed with

10    this Court on March 17, 2008, parties may designate documents as Confidential Counsel's Eyes

11    Only. The Protective Order requires that, when so designated, such materials are to be filed with

12    the Court under seal. *Id.* at ¶ 5.  The exhibits that Plaintiff wishes to be attached to Mr. Nutten's

13    declaration have been labeled as confidential by TWC, and are required to be filed under seal.

14    Accordingly, this narrowly-tailored request to seal is only for material for which

15    good cause to seal has been established.

16

17    Dated: March 21, 2008

**CLARK & MARKHAM LLP**

18

19    By:_____

James M. Treglio, Esq.

20    LAW OFFICES OF BARRON E. RAMOS

21    Barron E. Ramos, Esq.

22    Attorneys for the Plaintiff and the Class.

23

24

25

26

27

28

1

### [PROPOSED] ORDER

2    **GOOD CAUSE APPEARING,** it is hereby ordered that the Exhibits to the Declaration

3    of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment are hereby

4    sealed.

5    DATED:

6                                                    _____
                                                     Hon. Luis R. Vargas
7                                                          Judge of the Superior Court
                                                     of California, In and for the County
8                                                    of San Diego

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  | Barron E. Ramos (SBN 179620)
2  | **LAW OFFICES OF BARRON E. RAMOS**
   | 132 N El Camino Real #303
3  | Encinitas, CA 92024
   | Tel:    (760) 274-6438
4  | Fax:    (760) 994-1354

5  | David R. Markham (Bar No. 071814)
6  | R. Craig Clark (Bar No. 129219)
   | James M. Treglio (Bar No. 228077)
7  | **CLARK & MARKHAM, LLP**
8  | 401 West "A" Street, Suite 2200
   | San Diego, CA 92101
9  | Telephone: (619) 239-1321
   | Facsimile:  (619) 239-5888
10 |
11 | Attorneys for the Plaintiff,

12 |

13 |                SUPERIOR COURT OF THE STATE OF CALIFORNIA

14 |                      FOR THE COUNTY OF SAN DIEGO

15 |

16 | LEON ALPERT, an individual on behalf of    ) Case No.: GIC881621
   | himself, and on behalf of all persons similarly )
17 | situated, and on behalf of the general public,  ) **CLASS ACTION**
18 |                                            )
   |                     Plaintiff,             ) **APPLICATION TO FILE EXHIBITS TO**
19 |                                            ) **THE DECLARATION OF WESLEY L.**
   |              vs.                           ) **NUTTEN IN OPPOSITION TO**
20 | TIME WARNER CABLE INC., a Delaware         ) **DEFENDANT'S MOTION FOR**
   | Corporation, and Does 1 to 100,            ) **SUMMARY JUDGMENT UNDER SEAL;**
21 |                                            ) **[PROPOSED ORDER]**
22 |                     Defendant              )
23 |                                            ) **Hearing**
   |                                            ) Date:       April 4, 2008
24 |                                            ) Time:       10:30 a.m.
   |                                            ) Dept:       63
25 |                                            ) Judge:      Luis R. Vargas
26 |                                            )
   |                                            ) Complaint:  March 13, 2007
27 |                                            ) FAC:        May 16, 2007
28 |                                            )

---

APPLICATION AND [PROPOSED] ORDER                                    - 1 -
TO FILE DOCUMENTS UNDER SEAL
                                                    Case No. GIC881621

1    Plaintiff Leon Alpert hereby requests pursuant to Cal. Rules of Court, Rule 2.550, and the

2  March 17, 2008 Stipulated Protective Order, an Order sealing the exhibits to the Declaration

3  Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment, filed with the

4  Court on March 21, 2008.  The exhibits have been previously labeled by the Defendant, TIME

5  WARNER CABLE CO. (hereinafter "TWC") as "Confidential" and may cause trade secrets of

6  the Defendant to be made available to the general public.   These documents indicate the internal

7  pricing methods and procedure used by TWC, and should therefore kept under seal.

8    The forgoing exhibits are lodged with the Declaration Wesley L. Nutten in Opposition to

9  Defendant's Motion for Summary Judgment. Pursuant to a stipulated protective order filed with

10  this Court on March 17, 2008, parties may designate documents as Confidential Counsel's Eyes

11  Only. The Protective Order requires that, when so designated, such materials are to be filed with

12  the Court under seal.  *Id.* at ¶ 5.  The exhibits that Plaintiff wishes to be attached to Mr. Nutten's

13  declaration have been labeled as confidential by TWC, and are required to be filed under seal.

14    Accordingly, this narrowly-tailored request to seal is only for material for which

15  good cause to seal has been established.

16

17  Dated: March 21, 2008

18                                                 **CLARK & MARKHAM LLP**

19                                                 By: _____

20                                                     James M. Treglio, Esq.

21                                                 LAW OFFICES OF BARRON E. RAMOS
                                                     Barron E. Ramos, Esq.

22

23                                                 Attorneys for the Plaintiff and the Class.

24

25

26

27

28

**[PROPOSED] ORDER**

**GOOD CAUSE APPEARING,** it is hereby ordered that the Exhibits to the Declaration of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment are hereby sealed.

DATED:

_____

Hon. Luis R. Vargas
        Judge of the Superior Court
of California, In and for the County
of San Diego

Barron E. Ramos (SBN 179620)
**LAW OFFICES OF BARRON E. RAMOS**
132 N El Camino Real #303
Encinitas, CA 92024
Tel:    (760) 274-6438
Fax:    (760) 994-1354

David R. Markham (Bar No. 071814)
R. Craig Clark (Bar No. 129219)
James M. Treglio (Bar No. 228077)
**CLARK & MARKHAM, LLP**
401 West "A" Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 239-1321
Facsimile: (619) 239-5888

Attorneys for the Plaintiff,

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| LEON ALPERT, an individual on behalf of himself, and on behalf of all persons similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>vs.<br><br>TIME WARNER CABLE INC., a Delaware Corporation, and Does 1 to 100,<br><br>Defendant | ) Case No.: GIC881621<br>) <br>) **CLASS ACTION**<br>) <br>) **EXHIBITS OF THE DECLARATION OF**<br>) **WESLEY L. NUTTEN IN OPPOSITION**<br>) **TO DEFENDANT'S MOTION FOR**<br>) **SUMMARY JUDGMENT (TO BE FILED**<br>) **UNDER SEAL)**<br>) <br>) **Hearing**<br>) Date:          April 4, 2008<br>) Time:          10:30 a.m.<br>) Dept:          63<br>) Judge:        Luis R. Vargas<br>) <br>) Complaint:   March 13, 2007<br>) FAC:            May 16, 2007<br>) |

EXHIBITS OF THE DECLARATION OF WESLEY L. NUTTEN
TO BE FILED UNDER SEAL

- 1 -

Case No. GIC881621

# Time Warner Cable Monthly Rates

San Diego / Coronado
1/05

| Advantage (Expanded and Basic) | | Local Basic | |
|---|---|---|---|
| Local Basic | $11.70 | Local Basic | $11.70 |
| Expanded Cable | 36.25 | Copyright Fee | 0.19 |
| Advantage Cable | 47.95 | *Franchise Tax (5%) | 0.86 |
| Copyright Fee | 0.19 | FCC Regulatory Fee | 0.06 |
| *Franchise Tax (5%) | 2.77 | Total Basic (21 Channels) | 12.81 |
| FCC Regulatory Fee | 0.06 | | |
| Total Advantage (77 Channels) | 50.97 | | |

*Additional $.25 incremental Franchise Tax included in San Diego. Additional $.24 incremental Franchise
Tax included in Coronado.

| | |
|---|---|
| POD (Premium On Demand) | $6.95 |
| DVR Service per outlet | $9.95; $5.95 with DIGIPiC |
| HD ViP Pak | $9.95; $6.95 with DIGIPiC |
| Digital Packages: | |
| Variety, Movie, Sports, ¡Más Latino! | $5.00; $3.00 each additional (Digital Navigator required)* |

*Digital Navigator includes On-screen Guide and Music Choice.

---

**Premium Choices:**

HBO, Cinemax, Showtime/TMC, and STARZ!

One Premium Service                     $11.00
(See DIGIPiC On Demand packages for additional Premiums.)

---

| | |
|---|---|
| • Filipino Channel and Saigon Broadcast Television are digital only/stand-alone | $11.95 |
| • Playboy Channel is digital only/stand-alone | $14.95 |
| • Analog HBO (no longer available to new customers) | $14.95 |

CONFIDENTIAL –
ATTORNEYS' EYES ONLY

TW0212

# (NEW) DIGIPiC On Demand Packages

| DIGIPiC On Demand | DIGIPiC On Demand 1000 |
|---|---|
| • Advantage Service<br>• Free On Demand channels<br>• Music Choice<br>• Access to select HD channels<br>• Interactive Program Guide<br><br>Available for purchase:<br>• Movies On Demand<br>• Pro and College Sports Packages | • Advantage Service<br>• Free On Demand channels<br>• Music Choice<br>• Access to select HD channels<br>• Interactive Program Guide<br>• One Premium w/Premium On Demand (STARZ! On Demand not available)<br>• One Digital Pak (Variety, Movies, Sports, or ¡Más Latino!)<br><br>Available for purchase:<br>• Movies On Demand<br>• Pro and College Sports Packages |

DIGIPiC On Demand:

|  |  |
|---|---|
|  | $44.95 |
| Converter/Remote | $7.00 |
| Total | $51.95 |

| COMBO w/Road Runner | $91.95 |
| TRIO w/Digital Phone | $126.95 |

DIGIPiC On Demand 1000:

|  |  |
|---|---|
|  | $59.95 |
| Converter/Remote | $7.00 |
| Total | $66.95 |

| COMBO w/Road Runner | $106.95 |
| TRIO w/Digital Phone | $136.95 |

| DIGIPiC On Demand 2000 | DIGIPiC On Demand 4000 |
|---|---|
| • Advantage Service<br>• Free On Demand channels<br>• Music Choice<br>• Access to select HD channels<br>• Interactive Program Guide<br>• Two Premiums w/Premium On Demand (STARZ! On Demand not available)<br>• Two Digital Paks (Variety, Movies, Sports, or ¡Más Latino!)<br><br>Available for purchase:<br>• Movies On Demand<br>• Pro and College Sports Packages | • Advantage Service<br>• Free On Demand channels<br>• Music Choice<br>• Access to select HD channels<br>• Interactive Program Guide<br>• Four Premiums w/Premium On Demand (STARZ! On Demand not available)<br>• Three Digital Paks (Variety, Movies, Sports, or ¡Más Latino!)<br><br>Available for purchase:<br>• Movies On Demand<br>• Pro and College Sports Packages |

DIGIPiC On Demand 2000:

|  |  |
|---|---|
|  | $69.95 |
| Converter/Remote | $7.00 |
| Total | $76.95 |

| COMBO w/Road Runner | $116.95 |
| TRIO w/Digital Phone | $146.95 |

DIGIPiC On Demand 4000:

|  |  |
|---|---|
|  | $84.95 |
| Converter/Remote | $7.00 |
| Total | $91.95 |

| COMBO w/Road Runner | $131.95 |
| TRIO w/Digital Phone | $161.95 |

CONFIDENTIAL –
ATTORNEYS' EYES ONLY

TW0213

**DIGIPiC Options**

- DVR        $5.95 with DIGIPiC, $ 9.95 per additional outlet (TV)
- HD ViP Pak      $6.95 with DIGIPiC
- Digital Packages (in addition to those included in DIGIPiC package):
         $5.00 and $3.00 for each additional
- Premiums (in addition to those included in DIGIPiC package):
         $11.00 first, $7.00 second, $6.00 third, $5.00 fourth
- Additional TVs:      $7.00 per converter
- Road Runner Wireless    $4.95 with DIGIPiC

## San Diego DIGIPiC Packages No longer available to new customers.

| DIGIPiC 1000 | DIGIPiC 2000 |
|---|---|
| • Advantage Service<br>• Choice of One Digital Pak<br>  (Variety, Movies, or Sports)<br>• Free On Demand channels<br>• Music Choice<br>• Access to select HD channels<br>• Interactive  Program Guide<br><br>Available for purchase:<br>• Movies On Demand<br>• Pro and College Sports Packages<br><br>            $55.95<br>Converter/Remote    $7.00<br>Total           $62.95<br><br>COMBO w/Road Runner   $102.90 | • Advantage Service<br>• Free On Demand channels<br>• Music Choice<br>• Access to select HD channels<br>• Interactive Program Guide<br>• Two Premiums<br>  w/Premiums On Demand<br>  (STARZ! On Demand not available)<br>• One Digital Pak (Variety, Movies, or Sports)<br><br>Available for purchase:<br>• Movies On Demand<br>• Pro and College Sports Packages<br><br>            $74.85<br>Converter/Remote    $7.00<br>Total           $81.85<br><br>COMBO w/Road Runner   $121.80 |

| DIGIPIC 4000 |
|---|
| Same as DIGIPiC 2000, but includes all<br>4 Premiums and available<br>On Demand Channels (STARZ! On Demand<br>not available)<br>            $82.85<br>Converter/Remote    $7.00<br>Total           $89.85<br><br>COMBO w/Road Runner   $129.80 |

CONFIDENTIAL –
ATTORNEYS' EYES ONLY

TW0214

LEON ALPERT
Billing Date:
Account Number:

8340 1000 NX 7 12    0005211

Page 2 of 3
July 12, 2005
834010 110 0088309

## *Account Details*

This statement is for service from 7\12\05 to 8\11\05
Payments received after July 12, 2005 will be reflected on your next bill.

| Previous Balance | | | $ 103.80 |
|---|---|---|---|

| Payments | | | Amount |
|---|---|---|---|
| 06/29 | Payment — Thank You | | − 53.00 |

| Monthly Charges | | | Amount |
|---|---|---|---|
| 07/12 − 08/11 | Digital Phone Package — Includes Unlimited Local And | | 39.95 |
| | Long Distance Calling Within The United States, | | |
| | Us Territories And Canada | | |
| 07/12 − 08/11 | iCONTROL Premium Service | | 6.95 |
| | Your Pay Service(s) On Demand | | |
| 07/12 − 08/11 | HDTV Converter    (Includes Digital Remote) | | 7.00 |
| 07/12 − 08/11 | HDTV Converter    (Includes Digital Remote) | | 7.00 |
| 07/12 − 08/11 | Service Protection Plan | | 2.95 |
| 07/12 − 08/11 | Premier Digital | | 11.00 |
| | Digital Movie Pack | $4.00 | |
| | Digital Variety Pack | $4.00 | |
| | Navigator Screen Guide | $3.00 | |
| 07/12 − 08/11 | Any 4 Premium Channels | | 24.95 |
| | Cinemax | $6.24 | |
| | HBO | $6.24 | |
| | Showtime | $6.24 | |
| | STARZ | $6.23 | |
| 07/12 − 08/11 | Wireless Road Runner | | 54.90 |
| 07/12 − 08/11 | Navigator Screen Guide | | .00 |

| Pay−Per−View Charges | | | Amount |
|---|---|---|---|
| 07/01 | Finding Neverland | Start 07:47 P.M. | 3.95 |

| Adjustments | | | Amount |
|---|---|---|---|
| 06/19 | Broken Mirror    − Adjustment | | − 50.00 |

**ADDITIONAL DETAILS CONTINUED ON NEXT PAGE**

ABOUT YOUR TIME WARNER CABLE AGREEMENT

OFFICE LOCATION and WRITTEN INQUIRIES:
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3220, or (619) 435-0157.
Payments: Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically. Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
Franchising Authority Information:

| City of San Diego | County of San Diego | City of Poway | City of Coronado | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | P.O. Box 789 | Coronado, CA 92118 | San Diego, Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92064 | (619) 522-7335 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 679-4347 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0428 | (619) 595-4500 | Comm ID# CA0572 | | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

Digital Phone Consumer Information: Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or at www.cpuc.ca.gov, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming"). The California consumer protection rules are available online at www.cpuc.ca.gov.

TW0071

TIME WARNER CABLE

## San Diego and Desert Cities 2006 DIGIPIC HOA Packages

### HOA DIGIPIC On-Demand

- Advantage Service
- Favorites On Demand
- Music Choice
- One Digital Pak-Variety, Movies, Sports or Mas Latino!
- Access to select HDTV channels
- Interactive Program Guide

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$16.00 with converter

*Additional TV's pay $8.00 per converter*

**Combo with Road Runner or Earthlink**
*(Does not include Premium or Lite)*

$56.00 *with converter*

Trio with Phone

$91.00 *with converter*

### HOA DIGIPIC On-Demand 1000

- Advantage Service
- Favorites On Demand
- Music Choice
- Access to select HDTV channels
- Interactive Program Guide
- One Premium
- Premium on Demand
- One Digital Pak-Variety, Movies, Sports or Mas Latino!

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$29.95 with converter

*Additional TV's pay $8.00 per converter*

**Combo with Road Runner or Earthlink**
*(Does not include Premium or Lite)*

$69.95 *with converter*

Trio with Phone

$99.95 *with converter*

### HOA DIGIPIC On-Demand 2000

- Advantage Service
- Favorites On Demand
- Music Choice
- Access to select HDTV channels
- Interactive Program Guide
- Two Premium's
- Premium on Demand
- Two Digital Paks-Variety, Movies, Sports or Mas Latino!

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$41.95 *with converter*

*Additional TV's pay $8.00 per converter*

**Combo with Road Runner or Earthlink**
*(Does not include Premium or Lite)*

$81.95 *with converter*

Trio with Phone

$111.95 *with converter*

### HOA DIGIPIC On-Demand 4000

- Advantage Service
- Favorites On Demand
- Music Choice
- Access to select HDTV channels
- Interactive Program Guide
- Four Premium's
- Premium on Demand
- Three Digital Paks-Variety, Movies, Sports or Mas Latino!

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$54.95 *with converter*

*Additional TV's pay $8.00 per converter*

**Combo with Road Runner or Earthlink**
*(Does not include RR Premium or Lite)*

$94.95 *with converter*

Trio with Phone

$124.95 *with converter*

| Premium Channel Add ON's-On Demand | |
|---|---|
| First Premium | $11.00 |
| Any 2 Premiums | $18.00 |
| Any 3 Premiums | $24.00 |
| Any 4 Premiums | $29.00 |

| Premium Channel Add ON's-On Demand 1000 | |
|---|---|
| *One Premium add on only* | |
| First Premium | $11.00 |

| Premium Channel Add ON's-On Demand 2000 | |
|---|---|
| *with Trio only* | |
| First Premium | $11.00 |
| All 4 Premiums | $18.00 |

- When a customer adds on a Digital Pak not included in a package, they pay retail rates. The first Digital Pak is $5 and each additional $3.
- DVR service (Not applicable to HD DVR) is available at a discounted rate of $5.95 on one outlet. Additional outlets pay $9.95. HD DVR pays $9.95 per outlet.
- Road Runner Wireless can be added for an additional $4.95 per month.
- HDVIP Pak can be added for an additional $6.95 per month. Use discount code HV.

March 28, 2006

Internal Use Only

TW0566

**TIME WARNER CABLE**
THE POWER OF YOU™

# San Diego and Desert Cities "All the Best" HOA Packages

| All the Best Intro | All the Best Value | All the Best Value Plus | All the Best Everything |
|---|---|---|---|
| • Advantage Service<br>• Free On Demand<br>• Music Choice / Radio channels<br>• Access to HDTV channels<br>• Interactive Program Guide | • Advantage Service<br>• Free On Demand<br>• Music Choice / Radio channels<br>• Access to HDTV channels<br>• Interactive Program Guide<br>• Variety Pak | • Advantage Service<br>• Free On Demand<br>• Music Choice / Radio channels<br>• Access to HDTV channels<br>• Interactive Program Guide<br>• Variety Pak<br>• **Choice of one Digital Pak-** Choice, Movies, Sports or Mas Latino | • Advantage Service<br>• Free On Demand<br>• Music Choice / Radio channels<br>• Access to HDTV channels<br>• Interactive Program Guide<br>• Variety Pak<br>• **Choice of three Digital Paks-** Choice, Movies, Sports or Mas Latino |
| **Access to for additional cost:**<br>• Movies on Demand<br>• Pro and College Sports Digital iN DEMAND | **Access to for additional cost:**<br>• Movies on Demand<br>• Pro and College Sports Digital iN DEMAND | **Access to for additional cost:**<br>• Movies on Demand<br>• Pro and College Sports Digital IN DEMAND | **Access to for additional cost:**<br>• Movies on Demand<br>• Pro and College Sports Digital IN DEMAND |
| **$8.00** *converter* | **$13.00** *with converter* | **$18.00** *with converter* | **$28.00** *with converter* |
| **Combo with Road Runner or Earthlink**<br><br>**$48.00** (Standard RR or Earthlink)<br>**$28.00** (RR Lite) | **Combo with Road Runner or Earthlink**<br><br>**$53.00** (Standard RR or Earthlink)<br>**$33.00** (RR Lite) | **Combo with Road Runner or Earthlink**<br><br>**$58.00** (Standard RR or Earthlink)<br>**$38.00** (RR Lite) | **Combo with Road Runner or Earthlink**<br><br>**$68.00** (Standard RR or Earthlink)<br>**$48.00** (RR Lite) |
| **Trio with Digital Phone**<br><br>**$78.00** (Unlimited Nat'l)<br>**$57.95** (Unlimited CA + RR Lite) | **Trio with Digital Phone**<br><br>**$83.00** (Unlimited Nat'l)<br>**$62.95** (Unlimited CA + RR Lite) | **Trio with Digital Phone**<br><br>**$88.00**(Unlimited Nat'l)<br>**$67.95** (Unlimited CA + RR Lite) | **Trio with Digital Phone**<br><br>**$98.00** (Unlimited Nat'l)<br>**$77.95** (Unlimited CA + RR Lite) |
| *Above pricing includes converter* | *Above pricing includes converter* | *Above pricing includes converter* | *Above pricing includes converter* |

- Premiums with SVOD: 1 at $12.00, 2 at $20.00, 3 at $27.00 and 4 at $33.00. Digital Pak's: $5.00 each when outside a package.
- DVR service (not applicable to HD DVR) is available at a discounted rate of $5.95 on the first outlet.
- Road Runner Wireless can be added for an additional $5.00 per month. HDVIP Pak can be added for an additional $6.95 per month. Use Discount code HV.

November 29, 2006

CONFIDENTIAL -
ATTORNEYS' EYES ONLY

TW0184

2

LEON ALPERT
Billing Date:
Account Number:

8340 1000 NX 7 12    0004721

Page 2 of 3
September 12, 2006
834010 110 0088309

## *Account Details*

This statement is for service from 9\12\06 to 10\11\06
Payments received after September 12, 2006 will be reflected on your next bill.

| Previous Balance | | | $ 180.66 |
|---|---|---|---|

| Payments | | | Amount |
|---|---|---|---|
| 09/01 | Payment - Thank You | | - 180.66 |

| Monthly Charges | | | Amount |
|---|---|---|---|
| 09/12 - 10/11 | Digital Phone Package – Includes Unlimited Local And Long Distance Calling Within The United States, Us Territories And Canada | | 39.95 |
| 09/12 - 10/11 | iCONTROL Premium Service | | 6.95 |
| | Your Pay Service(s) On Demand | | |
| 09/12 - 10/11 | HDTV Converter        (Includes Digital Remote) | | 8.00 |
| 09/12 - 10/11 | HDTV Converter        (Includes Digital Remote) | | 8.00 |
| 09/12 - 10/11 | Service Protection Plan | | 2.95 |
| 09/12 - 10/11 | Premier Digital | | 11.00 |
| | Digital Movie Pack | $4.00 | |
| | Digital Variety Pack | $4.00 | |
| | Navigator Screen Guide | $3.00 | |
| 09/12 - 10/11 | Any 4 Premium Channels | | 24.95 |
| | Cinemax | $6.24 | |
| | HBO | $6.24 | |
| | Showtime | $6.24 | |
| | STARZ | $6.23 | |
| 09/12 - 10/11 | Wireless Road Runner | | 54.90 |
| 09/12 - 10/11 | Navigator Screen Guide | | .00 |

| Pay-Per-View Charges | | | Amount |
|---|---|---|---|
| 08/26 | The Matador | Start 09:01 P.M. | 3.95 |
| 09/02 | Angels With Dirty Fa | Start 08:41 P.M. | 0.00 |
| 09/02 | 16 Blocks Widscreen | Start 09:09 P.M. | 3.99 |

### ADDITIONAL DETAILS CONTINUED ON NEXT PAGE

---

**ABOUT YOUR TIME WARNER CABLE AGREEMENT**

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
**Note:** If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3220, or (619) 435-0157.
**Payments:** Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically. Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to your equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
**Franchising Authority Information:**

| City of San Diego | County of San Diego | City of Poway | City of Coronado: | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | Coronado, CA 92118 | San Diego, Code N52 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92054 | (619) 522-7335 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 668-4590 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0428 | (619) 595-4650 | Comm ID# CA0572 | | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or at www.cpuc.ca.gov, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming"). The California consumer protection rules are available online at www.cpuc.ca.gov.

TW0113

LEON ALPERT
Billing Date:
Account Number:

Page 2 of 3
October 12, 2006
834010 110 0088309

8340 1000 NX 7 12    0004700

## Account Details

This statement is for service from 10\12\06 to 11\11\06
Payments received after October 12, 2006 will be reflected on your next bill.

| Previous Balance | | |
|---|---|---|
| | | $ 172.30 |

**Payments**

| 10/03 | Payment - Thank You | Amount |
|---|---|---|
| | | - 99.00 |

**Monthly Charges**

| Date | Description | | Amount |
|---|---|---|---|
| 09/21 | Digital Phone Package -- | Partial Month(s) 09/12-10/11 | - 39.95 |
| 09/21 | iCONTROL Premium Service | Partial Month(s) 09/12-10/11 | - 6.95 |
| 09/21 | HDTV Converter | Partial Month(s) 09/12-10/11 | - 8.00 |
| 09/21 | Premier Digital | Partial Month(s) 09/12-10/11 | - 11.00 |
| 09/21 | Any 4 Premium Channels | Partial Month(s) 09/12-10/11 | - 24.95 |
| 09/21 | Wireless Road Runner | Partial Month(s) 09/12-10/11 | - 54.90 |
| 09/21 | Hoa DIGIPiC 4000 Trio | Partial Month(s) 09/12-10/11 | 121.90 |
| 10/12 - 11/11 | HDTV Converter (Includes Digital Remote) | | 8.00 |
| 10/12 - 11/11 | Service Protection Plan | | 2.95 |
| 10/12 - 11/11 | Hoa DIGIPiC 4000 Trio | | 121.90 |
| | Wireless Road Runner | | |
| | Digital Phone Package -- | | |
| | Free On Demand | | |
| | iCONTROL Premium Service | | |
| | Digital Access | | |
| | Cinemax | | |
| | HBO | | |
| | Navigator Screen Guide | | |
| | Showtime | | |
| | STARZ | | |
| | Digital Movie Pack | | |
| | Digital Sports Pack | | |
| | Digital Variety Pack | | |
| | Hoa Standard Service | | |
| | Road Runner High Speed | | |

**ADDITIONAL DETAILS CONTINUED ON NEXT PAGE**

OFFICE LOCATION and WRITTEN INQUIRIES:
San Diego: 8549 Ware Ct., San Diego, CA 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3228, or (619) 435-0157.
Payments: Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220 or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically. Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cables. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
Franchising Authority Information:

City of San Diego:
City of San Diego
1200 3rd Ave., Suite 250
San Diego, CA 92101
(619) 236-6010
Comm ID# CA0428

County of San Diego:
County of San Diego
(outside city limits):
1600 Pacific Hwy., Room 208
San Diego, CA 92101
(619) 595-4650
Comm ID# CA0568

City of Poway:
City of Poway
13325 Civic Center Drive
Poway, CA 92064
(858) 668-4590
Comm ID# CA0572

City of Coronado:
City of Coronado
1825 Strand Way
Coronado, CA 92118
(619) 522-7335
Comm ID# CA0431

Navy Housing:
NAVCOMTELSTA
San Diego, Code NS2
Box 357056
San Diego, CA 92135-7056
(619) 532-1364
Comm ID# CA0428

Digital Phone Consumer Information: Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or at www.cpuc.ca.gov, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier charges ("slamming"). The California consumer protection rules are available online at www.cpuc.ca.gov.



| SUPERIOR COURT OF THE STATE OF CALIFORNIA<br>IN AND FOR THE COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| TITLE OF CASE (Abbreviated):<br>ALPERT v. TIME WARNER CABLE, INC. | |

| ATTORNEY(S) NAME AND ADDRESS:<br>**CLARK & MARKHAM**<br>401 West "A" Street, Suite 2200<br>San Diego, California 92101 | TELEPHONE:<br>(619) 239-1321 | |

| ATTORNEY(S) FOR:<br>Plaintiff, LEON ALPERT | HEARING: DATE-TIME-DEPT | CASE NUMBER:<br>GIC 881621 |

### DECLARATION OF SERVICE

I, the undersigned, was at the time of service of the papers herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Diego, California, within which county the subject service occurred. My business address is 401 West "A" Street, Suite 2200, San Diego, California 92101. I am readily familiar with the ordinary business practices of my place of employment with regard to collection for mailing with the United States Postal Service; overnight express delivery, e-mailing and with serving documents via facsimile. I served an original and/or a true and correct copy of the following document(s):

1. *Plaintiff Leon Alpert's Memorandum of Point and Authorities in Opposition to Defendant's Motion for Summary Judgment.*
2. *Plaintiff and Opposing Party, Leon Alpert's Statement of Disputed and Undisputed Facts in Support of his Opposition to Defendant Time Warner Cable's Motion for Summary Judgment.*
3. *Request for Judicial Notice in Opposition to Defendant's Motion for Summary Judgment.*
4. *Declaration of Barron E. Ramos in Opposition to Motion for Summary Judgment.*
5. *Declaration of Leon Alpert in Opposition to Motion for Summary Judgment.*
6. *Declaration of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment.*
7. *Declaration of Application to File Exhibits to the Declaration of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment Under Seal; [Proposed Order].*
8. *Application to File Exhibits to the Declaration of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgment Under Seal; [Proposed Order].*
9. *Exhibits of the Declaration of Wesley L. Nutten in Opposition to Defendant's Motion for Summary Judgent (To Be Filed Under Seal).*

✔ by placing a copy thereof in a separate envelope addressed to each such addressee respectively named as follows and sealed each envelope and placed them for collection and mailing to each addressee, as set forth below:

| Counsel Name, Address & Telephone | Counsel for: |
|---|---|
| Jeffrey M. Shohet, Esq<br>Julie L. Hussey, Esq.<br>Carris S. Dolton, Esq.<br>DLA PIPER US LLP<br>401 B Street, Suite 1700<br>San Diego, CA 92101 | *Defendant:*<br>TIME WARNER CABLE, INC. |

I declare under penalty of perjury under the laws of the State of California and I certify that the foregoing is true and correct.

Executed on this 21st day of March, 2007, in the County of San Diego, State of California.

_____
Misty Dirksen

FILED
CIVIL BUSINESS OFFICE 12
COPY
2001 SEP -5 P 4: 11

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5
6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER CABLE
9
10                  SUPERIOR COURT OF CALIFORNIA
11                      COUNTY OF SAN DIEGO
12
   LEON ALPERT, an individual, on behalf          CASE NO. GIC881621
13 of himself, on behalf of all those similarly
   situated, and on behalf of the general         **DEFENDANT TIME WARNER**
14 public,                                         **ENTERTAINMENT-ADVANCE/**
                                                   **NEWHOUSE PARTNERSHIP, THROUGH**
15              Plaintiffs,                         **ITS SAN DIEGO DIVISION, DBA TIME**
                                                   **WARNER CABLE'S ANSWER TO**
16         v.                                      **PLAINTIFF LEON ALPERT'S FIRST**
                                                   **AMENDED COMPLAINT**
17 TIME WARNER CABLE, INC., a
   Delaware corporation, and DOES 1 TO            Dept:      63
18 100,                                           Judge:     Luis R. Vargas
19              Defendants.                        Complaint: March 13, 2007
                                                   FAC:       May 16, 2007
20
21
22
23
24
25
26
27
28

DLA PIPER US LLP
SAN DIEGO

GT\6543415.2

DEFENDANT TIME WARNER CABLE, INC.'S ANSWER TO PLAINTIFF'S UNVERIFIED FAC

1    Defendant Time Warner Entertainment-Advance/Newhouse Partnership, a New York

2    general partnership, through its San Diego Division, dba Time Warner Cable ("TWC"), sued

3    erroneously as Time Warner Cable, Inc., answers the unverified First Amended Complaint

4    ("FAC") of Leon Alpert ("Plaintiff"), individually and on behalf of all those similarly situated,

5    and on behalf of the general public as follows:

6                  **GENERAL DENIAL**

7    Pursuant to California Code of Civil Procedure section 431.30, TWC denies generally

8    and specifically each and every allegation contained in Plaintiff's unverified FAC. TWC further

9    denies that Plaintiff, individually and on behalf of all others similarly situated, sustained any

10    injuries or damages or is entitled to any of the relief sought in the FAC. TWC specifically denies

11    that Plaintiff, or any class member has been damaged in the manner alleged, or in the sum or

12    sums alleged or to be alleged, or in any many or sum, by any act of TWC.

13                 **AFFIRMATIVE DEFENSES**

14    As a further and separate answer to Plaintiff's FAC, and by way of affirmative defenses,

15    TWC alleges as follows:

16              **FIRST AFFIRMATIVE DEFENSE**

17          **(Failure to State a Claim for Section 17200)**

18    Plaintiff's claim for unlawful, unfair, and/or deceptive business practices fails to state

19    facts sufficient to constitute a cause of action against TWC under California Business and

20    Professions Code section 17200.

21             **SECOND AFFIRMATIVE DEFENSE**

22              **(Compliance with Law)**

23    Plaintiff's FAC fails to state a claim for unlawful conduct under Business & Professions

24    Code section 17200 because TWC completely complied with applicable law.

25             **THIRD AFFIRMATIVE DEFENSE**

26             **(Justification of Practices)**

27    TWC's business practices alleged in the FAC are not unfair, unlawful, or deceptive, or

28    otherwise within the meaning of Business & Professions Code section 17200 in that the practices,

1    if any, were justified because they were made in a good faith effort to protect TWC's legitimate

2    business interests.

### FOURTH AFFIRMATIVE DEFENSE

#### (Good Faith)

5    To the extent that any misstatements or omissions occurred as alleged by Plaintiff, and

6    TWC denies that any such misstatements or omissions occurred, TWC at all times acted in good

7    faith and did not directly or indirectly induce the making of any alleged misstatement or

8    omission.

### FIFTH AFFIRMATIVE DEFENSE

#### (Statutes Insufficiently Definite)

11    Plaintiff's claims are barred in whole or in part because the applicable statutes are

12    insufficiently definite to provide adequate or fair notice of the conduct proscribed in violation of

13    the Due Process Clause of the Fifth Amendment to the United States Constitution and Article 1,

14    Section 7 of the California Constitution.

### SIXTH AFFIRMATIVE DEFENSE

#### (Unconstitutionality / Due Process)

17    The California Unfair Business Practices Act (California Business & Professions Code

18    sections 17200 *et seq*.) is unconstitutional in that it violates the due process rights of TWC and/or

19    members of the general public.

### SEVENTH AFFIRMATIVE DEFENSE

#### (Preemption)

22    Plaintiff's claims are preempted, in whole or in part, by federal law pursuant to the

23    Supremacy Clause of the United States Constitution.

### EIGHTH AFFIRMATIVE DEFENSE

#### (Mootness)

26    Plaintiff's claims for injunctive or other equitable relief are barred as moot in whole or in

27    part.

28    /////

### NINTH AFFIRMATIVE DEFENSE

**(Lack of Standing)**

Plaintiff, or some of them, is not a real party-in-interest in this action.

### TENTH AFFIRMATIVE DEFENSE

**(Inability to Meet Requirements to Maintain Class Action)**

Plaintiff cannot meet the requirements of Code of Civil Procedure section 382, Civil Code section 1781 and corresponding case law to maintain a class action in that the purported class does not have sufficient numerosity, common issues of law and fact do not sufficiently predominate, the plaintiff class does not have sufficient commonality of injuries and damages, the named Plaintiff does not adequately represent the Plaintiff's class, there is no benefit to litigants and the Court in bringing this action as a class action, and class action status is not superior to bringing this action in the normal course of the judicial system

### ELEVENTH AFFIRMATIVE DEFENSE

**(Statute of Limitations)**

Plaintiff's claims, or some of them, are barred by applicable statutes of limitations.

### TWELFTH AFFIRMATIVE DEFENSE

**(Estoppel)**

TWC alleges on information and belief that Plaintiff, or some of them, have engaged in conduct and activities with respect to the matters alleged in the FAC by reason of which Plaintiff, or some of them, are estopped to obtain the requested relief.

### THIRTEENTH AFFIRMATIVE DEFENSE

**(Waiver)**

TWC alleges on information and belief that Plaintiff, or some of them, waived their right to obtain the requested relief with respect to the matters alleged in the FAC.

### FOURTEENTH AFFIRMATIVE DEFENSE

**(Laches)**

TWC alleges on information and belief that Plaintiff, or some of them, unreasonably and inexcusably delayed in bringing this action and as a result of such delay, TWC is substantially

1   prejudiced, and by reason thereof Plaintiff, or some of them, are barred by the doctrine of laches

2   from obtaining the requested relief.

### FIFTEENTH AFFIRMATIVE DEFENSE

#### (Failure to Mitigate Damages)

Plaintiff, or some of them, failed to exercise reasonable care and diligence to avoid loss and minimize damages and therefore they may not recover for losses which could have been prevented by reasonable efforts on their part, or by expenditures which might reasonably have been made; therefore their recovery, if any, should be reduced by the failure of them to mitigate their damages, if any.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (Knowledge of Plaintiff)

At the time Plaintiff, or some of them, purchased TWC's services as alleged in the FAC, he had actual or constructive knowledge of facts alleged in the FAC and of facts concerning the subject matter of the alleged untruths and omissions upon which liability is asserted in this action, and made the purchases of services despite this knowledge.

### SEVENTEENTH AFFIRMATIVE DEFENSE

#### (No Claim for Fees, Costs and Interest)

Plaintiff's FAC fails to state a claim against TWC upon which relief may be granted as to costs, attorneys' fees, expenses, pre-judgment interest, post-judgment interest, disgorgement and restitution.

### EIGHTEENTH AFFIRMATIVE DEFENSE

#### (Consent)

The facts alleged in Plaintiff's FAC if true (which TWC denies), were consented to, ratified, accepted and confirmed by Plaintiff, any class members and/or the general public.

### NINETEENTH AFFIRMATIVE DEFENSE

#### (Voluntary Payment Doctrine)

Plaintiff's claims are barred by the voluntary payment doctrine because Plaintiff, or some of them, voluntarily made payment to TWC, with knowledge of the necessary facts.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Right to Assert Additional Defenses)

TWC presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, defenses available. TWC reserves the right to assert additional affirmative defenses in the event that discovery and/or investigation indicates that additional affirmative defenses would be appropriate.

WHEREFORE, TWC prays for judgment against Plaintiffs as follows:

1.    That Plaintiff takes nothing by way of their FAC;

2.    That TWC be awarded judgment in their favor and against Plaintiffs;

3.    That TWC be awarded costs of suit herein incurred;

4.    That TWC be awarded reasonable attorneys' fees to the maximum extent allowed by law; and

5.    For such other and further relief as the Court deems just and proper.

Dated: September  4 , 2007

DLA PIPER US LLP

By
JEFFREY M. SHOHET
JULIE L. HUSSEY
CARRIE S. DOLTON
Attorneys for Defendant
TIME WARNER ENTERTAINMENT-
ADVANCE/NEWHOUSE PARTNERSHIP, A
NEW YORK GENERAL PARTNERSHIP,
THROUGH ITS SAN DIEGO DIVISION,
DBA TIME WARNER CABLE

FILED
BUSINESS OFFICE 12
DIVISION

COPY

2007 SEP -5 I P 4: 11

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel:  619.699.2700
   Fax:  619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER CABLE, INC.
7

8              SUPERIOR COURT OF CALIFORNIA

9                  COUNTY OF SAN DIEGO

10

11 LEON ALPERT, an individual, on behalf     CASE NO.  GIC881621
   of himself, on behalf of all those similarly
12 situated, and on behalf of the general     **PROOF OF SERVICE**
   public,
13                                            Dept:      63
              Plaintiffs,                     Judge:     Luis R. Vargas
14
                                             First Amended Complaint: May 16, 2007
15        v.

16 TIME WARNER CABLE, INC., a
   Delaware corporation, and DOES 1 TO
17 100,

18            Defendants.

19

20

21

22

23

24

25

26

27

28

1    I am a resident of the State of California, over the age of eighteen years, and not a party to

2    the within action. My business address is DLA Piper US LLP, 401 B Street, Suite 1700,

3    San Diego, California 92101. On September 5, 2007, I served the within document(s):

**DEFENDANT TIME WARNER ENTERTAINMENT-ADVANCE/ NEWHOUSE**
**PARTNERSHIP, THROUGH ITS SAN DIEGO DIVISION, DBA TIME WARNER**
**CABLE'S ANSWER TO PLAINTIFF LEON ALPERT'S FIRST AMENDED**
**COMPLAINT** .

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐    by placing a sealed envelope or package designated by UPS, with delivery fees paid or provided for, a true copy of each documents(s) above, in DLA Piper US LLP's mail room for collection, processing and delivery this same day to a deposit box or other facility regularly maintained by the express service carrier, or delivered to an authorized courier or driver authorized by the express service carrier to receive documents. I further declare that I am readily familiar with the business' practice for collection and processing of correspondence for delivery with express service carriers (i.e., FedEx, DHL, etc.); and that the correspondence shall be deposited with an express service carrier this same day in the ordinary course of business, to each addressee as set forth below.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

Barron E. Ramos, Esq.
Kristen E. Caverly
Henderson & Caverly LLP
P.O. Box 9144
16236 San Dieguito Road, Suite 4-13
Rancho Santa Fe, CA 92067
Phone: (858) 756-6342
Fax: (858) 756-4732

23    I am readily familiar with the firm's practice of collection and processing correspondence

24    for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same

25    day with postage thereon fully prepaid in the ordinary course of business. I am aware that on

26    motion of the party served, service is presumed invalid if postal cancellation date or postage

27    meter date is more than one day after date of deposit for mailing affidavit.

28

1      I declare under penalty of perjury under the laws of the State of California that the above

2 is true and correct.

3      Executed on September 5, 2007, at San Diego, California.

4                   _____

5                  Sarah Van

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

SD\1735197.1
325566-11

-3-

PROOF OF SERVICE

**EXHIBIT C**

1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)
    **DLA PIPER US LLP**
3   401 B Street, Suite 1700
    San Diego, CA  92101-4297
4   Tel: 619.699.2700
    Fax: 619.699.2701
5

6   Attorneys for Defendant
    TIME WARNER ENTERTAINMENT-ADVANCE/
7   NEWHOUSE PARTNERSHIP, A NEW YORK
    GENERAL PARTNERSHIP, THROUGH ITS SAN
8   DIEGO DIVISION, DBA TIME WARNER CABLE

9

                    SUPERIOR COURT OF CALIFORNIA
10
                       COUNTY OF SAN DIEGO
11

12  LEON ALPERT, an individual, on behalf        CASE NO.  GIC881621
    of himself, on behalf of all those similarly
13  situated, and on behalf of the general       **NOTICE TO SUPERIOR COURT AND TO**
    public,                                      **ADVERSE PARTIES OF REMOVAL TO**
14                                               **FEDERAL COURT**
                Plaintiffs,
15                                               Dept:      63
          v.                                     Judge:     Hon. Luis R. Vargas
16
    TIME WARNER CABLE, INC., a                   Complaint: March 13, 2007
17  Delaware corporation, and DOES 1 TO          FAC:       May 16, 2007
    100,
18
                Defendants.
19

20

21

22

23

24

25

26

27

28
    GT\6565332.1
    325566-11
    _____
          NOTICE TO SUPERIOR COURT AND TO ADVERSE PARTIES OF REMOVAL TO FEDERAL COURT

1    **TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO PLAINTIFF**

2    **ALPERT AND HIS ATTORNEYS OF RECORDS:**

3        PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446, and

4    1453, Defendant Time Warner Entertainment-Advance/Newhouse Partnership, through its San

5    Diego Division, dba Time Warner Cable ("TWC") filed their Notice of Removal of the above-

6    referenced action in the United States District Court for the Southern District of California on

7    March 27, 2008, under Federal Case No. _____. A copy of the Notice of

8    Removal is attached to this Notice as Exhibit 1, and is served and filed herewith.

9        PLEASE TAKE FURTHER NOTICE that pursuant to 28 U.S.C. § 1446(d), the filing of

10    said Notice of Removal in the United States District Court, together with the filing of the copy of

11    said Notice of Removal of Civil Action with this Court, effects the removal or this action, and this

12    Court may proceed no further unless and until the case is remanded by the United States District

13    Court.

14    Dated: March 7, 2008

                                    DLA PIPER US LLP

15

16

17                                By _____

                                 JEFFREY M. SHOHET

18                                   Attorney for Defendant

                               TIME WARNER ENTERTAINMENT-

19                                   ADVANCE/ NEWHOUSE PARTNERSHIP, A

                               NEW YORK GENERAL PARTNERSHIP,

20                                   THROUGH ITS SAN DIEGO DIVISION,

                               DBA TIME WARNER CABLE

21

22

23

24

25

26

27

28

## ORIGINAL

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA  92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5

6  Attorneys for Defendant
   TIME WARNER ENTERTAINMENT-ADVANCE/
7  NEWHOUSE PARTNERSHIP, A NEW YORK
   GENERAL PARTNERSHIP, THROUGH ITS SAN
8  DIEGO DIVISION, DBA TIME WARNER
   CABLE, SUED ERRONEOUSLY AS TIME
9  WARNER CABLE, INC.

10

11                    UNITED STATES DISTRICT COURT

12                 SOUTHERN DISTRICT OF CALIFORNIA

13  LEON ALPERT, an individual, on behalf    CV NO. **'08 CV 0582 BTM WMc**
    of himself, on behalf of all those similarly
14  situated, and on behalf of the general      **DECLARATION OF SERVICE**
    public,
15
                Plaintiffs,
16
          v.
17
    TIME WARNER CABLE, INC., a
18  Delaware corporation, and DOES 1 TO
    100,
19
                Defendants.
20

21       I am a resident of the State of California, over the age of eighteen years, and not a party to

22  the within action.  My business address is DLA Piper US LLP, 401 B Street, Suite 1700, San

23  Diego, California  92101-4297.  On March 27, 2008, I served the within document(s):

24  **NOTICE OF REMOVAL OF DEFENDANT TIME WARNER ENTERTAINMENT-**
    **ADVANCE/ NEWHOUSE PARTNERSHIP, THROUGH ITS SAN DIEGO DIVISION,**
25  **DBA TIME WARNER CABLE PURSUANT TO 28 U.S.C. § 1331(B) (FEDERAL**
    **QUESTION) AND 1332 (CAFA)**
26

27  **CIVIL COVER SHEET**

28  **TIME WARNER CABLE'S NOTICE OF PARTY WITH FINANCIAL INTEREST**

DLA PIPER US LLP
   SAN DIEGO            SD\1789633.1                      -1-                                    CV No. _____
                        325566-11

1

2  ☐  by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

3

4  ☐  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below.

5

6  ☒  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, and deposited with Federal Express or UPS Overnight at San Diego, California addressed as set forth below.

7

8  ☐  by transmitting via e-filing the document(s) listed above to the Case Management/ Electronic Case Filing system.

9

10  **Attorneys for Plaintiff Leon Alpert**          **Attorneys for Plaintiff Leon Alpert**
    Barron E. Ramos, Esq.                            David R. Markham, Esq.

11  132 N. El Camino Real, Ste. 303                  Clark & Markham
    Encinitas, CA 92024                              401 West A Street, Ste. 2200

12  T: (858) 349-6019                                San Diego, CA 92101
    F: (760) 994-1354                                T: (619) 239-1321

13                                                   F: (619) 239-5888

14      I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same

15  day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage

16  meter date is more than one day after date of deposit for mailing in affidavit. I further declare that I am familiar with the firm's practice for collection and processing of correspondence for

17  Federal Express and United Parcel Service, and that all correspondence will be deposited with Federal Express or United Parcel Service the same day during the ordinary course of business.

18      I declare that I am employed in the office of a member of the Bar of or permitted to practice before this Court at whose direction the service was made.

19

20      Executed on March 27, 2008, at San Diego, California.

21  _____
                                 Gini Wiese

22

23

24

25

26

27

28

DLA PIPER US LLP
SAN DIEGO

SD\1789633.1
325566-11

CV No. _____

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET    ORIGINAL

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Leon Alpert, an individual, on behalf of himself, on behalf of all those similarly situated, and on behalf of the general public

## DEFENDANTS
Time Warner Entertainment-Advance/Newhouse Partnership, a New York general partnership, sued erroneously as Time Warner Cable, Inc.

**(b)** County of Residence of First Listed Plaintiff **San Diego**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  2008 MAR 27  PH 4:13
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. SOUTHERN DISTRICT OF CALIFORNIA

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
See attachment

Attorneys (If Known)
Jeffrey M. Shohet, Esq.
DLA Piper US LLP   BY _____ DEPUTY
401 B Street, Suite 1700   '08 CV 0582 BTM WMc
San Diego, CA 92101-4297
T: 619-699-2700

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | | Safety/Health | | ☒ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | **PERSONAL PROPERTY** | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 370 Other Fraud | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
47 U.S.C § 543; FCC 07-189; 28 U.S.C. § 1332(d)

Brief description of cause:
Predatory pricing and unfair competition state law claim pursuant to Cal. Bus. & Prof. Code § 17200 et seq.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $0.00    CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
March 27, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # 141104    AMOUNT $350    APPLYING IFP ___    JUDGE ___    MAG. JUDGE ___

American LegalNet, Inc.
www.FormsWorkflow.com

cc    81  3/27/08

| SHORT TITLE: Leon Alpert v. Time Warner Cable, Inc. | CASE NUMBER:<br>CV NO. |
|---|---|

**ATTACHMENT** (Number): <u>1.(c)</u>
*(This Attachment may be used with any Judicial Council form.)*

Page 1 of 1
*(Add pages as required)*

1

2  Barron E. Ramos, Esq.
   Attorney at Law, A Professional Corporation
3  132 N. El Camino Real # 303
   Encinitas, CA 92024
4  T: 760-274-6438; F: 760-994-1354

5  David R. Markham, Esq.
   Clark & Markham
6  401 West A Street, Suite 2200
   San Diego, CA 92101
7  T: 619-239-1321; F: 619-239-5888

8  Attorneys for Plaintiff Leon Alpert

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  *(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. January 1, 2007]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

# UNITED STATES
# DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# # 149164    — SH
**\* \* C O P Y \* \***
**March 27, 2008**
**16:11:49**

## Civ Fil Non-Pris
USAO #.: 08CV0582
Judge..: BARRY T MOSKOWITZ
Amount.:                    $350.00 CK
Check#.: BC757274


**Total—>  $350.00**


FROM: ALPERT ET AL V. TIME WARNER ET