1   JEFFREY M. SHOHET (Bar No. 067529)
    JULIE L. HUSSEY (Bar No. 237711)
2   CARRIE S. DOLTON (Bar No. 234298)
    RYAN T. HANSEN (Bar No. 234329)
3   **DLA PIPER US LLP**
    401 B Street, Suite 1700
4   San Diego, CA  92101-4297
    Tel:  619.699.2700
5   Fax:  619.699.2701

6

7   Attorneys for Defendant
    TIME WARNER ENTERTAINMENT-ADVANCE/
    NEWHOUSE PARTNERSHIP, A NEW YORK GENERAL
8   PARTNERSHIP

9                      UNITED STATES DISTRICT COURT

10                  SOUTHERN DISTRICT OF CALIFORNIA

11

12

13  LEON ALPERT, an individual, on behalf of     CV No. 08CV582 BTM
    himself, on behalf of all those similarly
    situated, and on behalf of the general public,   **NOTICE OF LODGMENT OF EXHIBITS
14                                                   AND NON-CALIFORNIA AUTHORITIES
                    Plaintiffs,                      IN SUPPORT OF DEFENDANT TIME
15                                                   WARNER CABLE'S MOTION FOR
            v.                                       SUMMARY JUDGMENT OR, IN THE
16                                                   ALTERNATIVE, PARTIAL SUMMARY
    TIME WARNER CABLE, INC., a Delaware              JUDGMENT**
17  corporation, and DOES 1 TO 100,
                                                     Date       May 23, 2008
18                  Defendants.                      Time       11:00 a.m.
                                                     Ctrm:      15
19                                                   Judge:     Hon. Barry Ted Moskowitz

20                                                   **[NO ORAL ARGUMENT UNLESS
                                                     REQUESTED BY THE COURT]**
21
                                                     Complaint:   March 13, 2007
22                                                   FAC:         May 16, 2007
                                                     Removal:     March 28, 2008
23

24

25

26

27

28

DLA PIPER US LLP       SD\1789914.2
   SAN DIEGO           325566-11
                    ───────────────────────────────────────────────────────────────
                    NOTICE OF LODGMENT OF EXHIBITS ISO MOTION FOR SUMMARY JUDGMENT [CV NO. 08CV582]

1    Defendant Time Warner Entertainment-Advance/Newhouse Partnership, through its San

2    Diego Division, dba Time Warner Cable ("TWC") respectfully submits this Notice of Lodgment

3    of true and correct copies of the following exhibits in support of its motion for summary

4    judgment or, in the alternative, partial summary judgment:

5    **Exhibit A:** Excerpts from the Deposition of Plaintiff Leon Alpert ("Plaintiff"),
     November 6, 2007 ........................................................................................................ 3

6

7    **Exhibit B:** Residential Bulk Services Agreement between Sea Point Townhomes
     and TWC ...................................................................................................................... 32

8    **Exhibit C:** Time Warner Cable Residential Services Subscriber Agreement
     between Plaintiff and TWC .......................................................................................... 35

9

10   **Exhibit D:** Plaintiff's August 2006 bill from TWC for cable services TWC
     provided under the Time Warner Cable Residential Services Subscriber
     Agreement .................................................................................................................... 64

11

12   **Exhibit E:** Plaintiff's October 2006 bill from TWC for cable services TWC
     provided under the Time Warner Cable Residential Services Subscriber
     Agreement .................................................................................................................... 68

13

14   Dated: April 2, 2008

                                        DLA PIPER US LLP
15

16

17                                      By: s/Jeffrey M. Shohet
                                           _____
                                           JEFFREY M. SHOHET
18                                         JULIE L. HUSSEY
                                           CARRIE S. DOLTON
19                                         RYAN T. HANSEN
                                           Attorneys for Defendant Time Warner
20                                         Entertainment-Advance/Newhouse Partnership,
                                           a New York General Partnership, through its
21                                         San Diego Division, dba Time Warner Cable

22

23

24

25

26

27

28

# EXHIBIT A

EXHIBIT _A_ PAGE 3

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CENTRAL DIVISION

LEON ALPERT, an individual, on
behalf of himself, on behalf of
all those similarly situated,
and on behalf of the general
public,

        Plaintiff,

  vs.                        Case No. GIC881621

TIME WARNER CABLE, INC., a
Deleware corporation, and DOES
1 TO 100,

        Defendants.

**CERTIFIED**

**COPY**

---

VIDEOTAPED DEPOSITION OF LEON SETH ALPERT

VOLUME 1

SAN DIEGO, CALIFORNIA

TUESDAY, NOVEMBER 6, 2007

Reported by:
R. Denise Marlow
CSR No. 11631

Job No. 75324

EXHIBIT _A_ PAGE _4_

| | |
|---|---|
| 10:02:21 1 | Q    Okay.  Well, let's take those in pieces.  I |
| 10:02:24 2 | want to understand the sequence of that. |
| 10:02:25 3 | A    Sure. |
| 10:02:26 4 | Q    You have in mind the conversation that you had |
| 10:02:29 5 | with Time Warner in which you -- the result of which was |
| 10:02:33 6 | that your billing was changed.  Do you have that |
| 10:02:36 7 | conversation in mind? |
| 10:02:37 8 | A    Yes. |
| 10:02:38 9 | Q    Okay.  I will represent to you that that |
| 10:02:40 10 | conversation occurred in September of 2006.  Is that -- |
| 10:02:44 11 | A    Sounds correct. |
| 10:02:47 12 | Q    -- consistent with your recollection? |
| 10:02:48 13 | A    Yes. |
| 10:02:49 14 | Q    Okay.  Now, you mentioned that sometime before |
| 10:02:51 15 | that you received a notification from your homeowner, |
| 10:02:54 16 | some letter or some notification, about billing |
| 10:02:57 17 | packages? |
| 10:02:58 18 | A    Yeah, services offered from Time Warner. |
| 10:02:59 19 | Q    Okay.  When did you receive that material? |
| 10:03:02 20 | A    Well, if I -- if the conversation -- if I |
| 10:03:05 21 | called Time Warner September 2006, then it was pretty |
| 10:03:08 22 | much immediately after I received my -- the note from |
| 10:03:13 23 | the -- I mean the newsletter from the association, so |
| 10:03:16 24 | probably within a few days. |
| 10:03:17 25 | Q    Do you still have a copy of that newsletter |

26

EXHIBIT _A_ PAGE 5

LEON SETH ALᵣᵉRT                                11/06/07

| | | |
|---|---|---|
| 10:08:15 | 1 | A    As far as I recall, yes. |
| 10:08:17 | 2 | Q    How much after that? |
| 10:08:18 | 3 | A    I don't recall. |
| 10:08:18 | 4 | Q    Was it within days? |
| 10:08:20 | 5 | A    I -- I have no recollection -- |
| 10:08:22 | 6 | Q    All right. |
| 10:08:23 | 7 | A    -- of when.  I'm sorry. |
| 10:08:24 | 8 | Q    That's all right. |
| 10:08:25 | 9 | Before that date, that is, before the date you |
| 10:08:27 | 10 | received the HOA agreement sometime after your |
| 10:08:31 | 11 | conversation with Time Warner, had you ever seen it |
| 10:08:34 | 12 | before? |
| 10:08:34 | 13 | A    No. |
| 10:08:34 | 14 | Q    Had you ever discussed its terms before that |
| 10:08:38 | 15 | date? |
| 10:08:38 | 16 | A    No. |
| 10:08:39 | 17 | Q    Were -- you were aware, though, before that |
| 10:08:42 | 18 | date that your HOA was paying Time Warner for basic |
| 10:08:47 | 19 | cable service for your service.  Correct? |
| 10:08:49 | 20 | A    Yes. |
| 10:08:49 | 21 | Q    And you were aware of that for some period of |
| 10:08:54 | 22 | time.  Were you aware of that for as -- withdraw that |
| 10:08:58 | 23 | question. |
| 10:08:58 | 24 | When do you recall being first aware of the |
| 10:09:01 | 25 | fact that the HOA had an agreement with Time Warner, the |

32

EXHIBIT A  ₚₐ𝒸ₑ 6

10:09:05  1   result of which is basic cable was provided by Time

10:09:08  2   Warner -- by the HOA?

10:09:10  3       A    I believe it was around the time we moved in.

10:09:13  4   It was probably just represented to me by the seller or

10:09:17  5   someone else.  I don't recall.  Someone -- someone told

10:09:20  6   me or I read it.  I don't remember.

10:09:22  7       Q    Okay.  And other than the fact that the HOA

10:09:32  8   paid Time Warner for the service, the basic service,

10:09:36  9   before you received a copy of the agreement, were you

10:09:39 10   aware of any of the other terms or provisions of the

10:09:43 11   agreement between your HOA and Time Warner?

10:09:45 12       A    No.

10:09:46 13       Q    And just to close this line of questioning out,

10:09:51 14   other than the newsletter that you got sometime shortly

10:09:55 15   before you had the conversation with Time Warner Cable,

10:09:59 16   did you ever receive any information in the form of a

10:10:01 17   newsletter, bulletin, conversations with members of the

10:10:06 18   HOA, or otherwise regarding or relating to the terms of

10:10:09 19   the agreement between the HOA and Time Warner Cable?

10:10:12 20       A    Not that I recall.

10:10:14 21       Q    Did you ever serve -- serve on the board of the

10:10:17 22   HOA?

10:10:18 23       A    I think I went to a meeting.  I think they --

10:10:30 24   they wanted me to serve or perhaps I attended one

10:10:33 25   meeting of one committee, and I don't remember which

33

EXHIBIT __A__ PAGE 7

| | | |
|---|---|---|
| 11:26:16 | 1 | So after some conversation and whatever she |
| 11:26:19 | 2 | reviewed, she says, "Okay."  So they gave me -- she |
| 11:26:25 | 3 | agreed she's going to give me one free month of |
| 11:26:29 | 4 | telephone and lower the price that -- starting that |
| 11:26:33 | 5 | minute.  And that was basically the conversation. |
| 11:26:39 | 6 | MR. SHOHET:  Would you mind reading that back |
| 11:26:41 | 7 | for me. |
| 11:28:02 | 8 | (Record read) |
| 11:28:03 | 9 | THE WITNESS:  May I add something? |
| 11:28:04 | 10 | BY MR. SHOHET: |
| 11:28:04 | 11 | Q    Sure. |
| 11:28:04 | 12 | A    I was also paying my basic cable through the |
| 11:28:07 | 13 | association, which was another indicator in my mind that |
| 11:28:10 | 14 | I had to go through the association to get Time Warner |
| 11:28:12 | 15 | services.  And the customer service rep didn't argue |
| 11:28:14 | 16 | with me, didn't argue that point at all with me, so I |
| 11:28:19 | 17 | just assumed I was correct. |
| 11:28:22 | 18 | Q    You were aware at that time that the basic |
| 11:28:26 | 19 | cable service that you were receiving, which was the |
| 11:28:28 | 20 | basic and the expanded tier channels, were being paid |
| 11:28:31 | 21 | for by your HOA? |
| 11:28:33 | 22 | A    I don't know what the expanded tier is, but I |
| 11:28:36 | 23 | just know that the HOA paid the -- I mean my -- part of |
| 11:28:38 | 24 | my HOA fees went to pay for the basic cable. |
| 11:28:41 | 25 | Q    Okay.  I have a couple questions about some of |

86

EXHIBIT A  p.  B

| 11:30:01 | 1 | not discontinue my basic cable through the association |
| 11:30:04 | 2 | and contract separately with Time Warner for service, |
| 11:30:09 | 3 | but as far as which individual services I did get from |
| 11:30:12 | 4 | Time Warner, that's just between me and them. |
| 11:30:15 | 5 | Q     That's what confused me. |
| 11:30:17 | 6 | A     The wiring and, you know, the basic cable and |
| 11:30:19 | 7 | whatever. |
| 11:30:19 | 8 | Q     Right.  You understood at that point that the |
| 11:30:22 | 9 | basic cable was provided by your HOA under an agreement |
| 11:30:25 | 10 | with Time Warner and your HOA and that you were then |
| 11:30:28 | 11 | negotiating or dealing directly with Time Warner Cable |
| 11:30:34 | 12 | for your additional services. |
| 11:30:35 | 13 | A     I ordered the services, yeah. |
| 11:30:37 | 14 | Q     All right.  And you believed -- well, did you |
| 11:30:44 | 15 | think about whether you had the right to just simply |
| 11:30:47 | 16 | contract independently for the basic service if you |
| 11:30:50 | 17 | wanted to and just forget about your deal with the HOA, |
| 11:30:53 | 18 | or did you not think about that? |
| 11:30:54 | 19 | A     Please rephrase that, or just ask me that one |
| 11:30:59 | 20 | more time. |
| 11:30:59 | 21 | Q     Did you consider whether you would be able to |
| 11:31:04 | 22 | purchase, if you chose to, the basic package plus any |
| 11:31:08 | 23 | additional services you wanted as a -- as a non-HOA |
| 11:31:14 | 24 | resident in the same way that I or anybody else could |
| 11:31:17 | 25 | purchase that package from Time Warner? |

88

11:38:27  1   packages and they break it down.  So one -- one section,

11:38:32  2   you know, the headers would be the Digipac 2000, 3000,

11:38:36  3   4000, whatever it is.  And then they have a section on

11:38:38  4   cable services, so each -- each one has maybe more

11:38:42  5   premium channels or whatever.  Mine's a basic.  And

11:38:46  6   then -- then there's adding Road Runner to that, how

11:38:49  7   much more it would be to add Road Runner and how much

11:38:51  8   more it would be to add a digital phone line.  I --

11:38:54  9   that's my -- that's my state of mind.  And I compared

11:38:55 10   the two documents.

11:38:56 11       Q    And the document that you received from your

11:38:58 12   HOA had all of the services that you were looking at

11:39:02 13   under the Digipac 4000 for a single price, did it not?

11:39:04 14           MR. RAMOS:  Same objection.  Best evidence.

11:39:06 15           THE WITNESS:  I think so.  I don't know.  I

11:39:08 16   have to look at it.

11:39:09 17   BY MR. SHOHET:

11:39:09 18       Q    And as of that point in time, Mr. Alpert, you

11:39:12 19   knew what a bundled package of services was, didn't you?

11:39:16 20       A    Well, they advertised it or use a strong

11:39:18 21   marketing campaign, or they did at the time, about

11:39:21 22   bundling.  So, I guess, you know, I understood that if

11:39:23 23   you buy more of their services collectively, you get a

11:39:26 24   better rate.

11:39:26 25       Q    That was my point.  That was not a mystery to

96

EXHIBIT A PAGE 10

| | |
|---|---|
| 11:39:29 | 1 |
| 11:39:32 | 2 |
| 11:39:35 | 3 |
| 11:39:36 | 4 |
| 11:39:37 | 5 |
| 11:39:39 | 6 |
| 11:39:43 | 7 |
| 11:39:44 | 8 |
| 11:39:48 | 9 |
| 11:39:51 | 10 |
| 11:39:53 | 11 |
| 11:39:56 | 12 |
| 11:40:00 | 13 |
| 11:40:02 | 14 |
| 11:40:04 | 15 |
| 11:40:06 | 16 |
| 11:40:06 | 17 |
| 11:40:08 | 18 |
| 11:40:08 | 19 |
| 11:40:10 | 20 |
| 11:40:12 | 21 |
| 11:40:13 | 22 |
| 11:40:16 | 23 |
| 11:40:18 | 24 |
| 11:40:22 | 25 |

you that there were bundles that you could purchase
which would price the components of that bundle better
than if you bought them individually.   Correct?

    A    Correct.

    Q    In fact, the subcomponents or some portions of
your existing billing had that feature to it.   Correct?

    A    As far as I recall.

    Q    You had several of your movie channels -- I
mean, there was a package, and we'll get into this in a
minute, but there were -- there was a package of movie
channels where you bought four that were individually
priced at maybe 6.95 or whatever they were, and you got
them as a package for $11.   Correct?

    MR. RAMOS:   Objection.   Best evidence.   I mean,
if you've got the document, let's see it.

BY MR. SHOHET:

    Q    Yes?   Isn't that your recollection?   That you
had --

    A    You're asking -- you're -- you're -- you're
giving me specific numbers, and I can't recall what the
specific numbers are.

    Q    I'm not asking about the specific numbers.   I'm
asking the concept, that if you buy and commit to
purchase a bundle of services, you get a better price on
the bundle than you get if you buy each of the

EXHIBIT A PAGE 11

| | | |
|---|---|---|
| 11:40:25 | 1 | components individually.  Right? |
| 11:40:27 | 2 | MR. RAMOS:  Well, I'll object.  It's vague and |
| 11:40:28 | 3 | ambiguous. |
| 11:40:30 | 4 | BY MR. SHOHET: |
| 11:40:30 | 5 | Q    You understand, don't you? |
| 11:40:31 | 6 | A    I understand that I purchased what I purchased |
| 11:40:34 | 7 | to get a better rate collectively than individually. |
| 11:40:37 | 8 | Q    But I'm asking you about the concept.  You |
| 11:40:40 | 9 | understand about the concept with Time Warner Cable and |
| 11:40:43 | 10 | with other companies, car rental companies -- Time |
| 11:40:45 | 11 | Warner isn't the first company to invent the concept |
| 11:40:48 | 12 | that if you commit to a package of services, you get a |
| 11:40:52 | 13 | lower rate than you get if you buy them individually. |
| 11:40:54 | 14 | You're familiar with that.  As an economist, you |
| 11:40:56 | 15 | understand that, don't you? |
| 11:40:58 | 16 | MR. RAMOS:  I'll object.  He's not an |
| 11:41:00 | 17 | economist. |
| 11:41:00 | 18 | THE WITNESS:  Yeah, I'm not an economist.  I |
| 11:41:03 | 19 | have a degree in economy. |
| 11:41:03 | 20 | BY MR. SHOHET: |
| 11:41:04 | 21 | Q    I thought you were. |
| 11:41:06 | 22 | It's not a surprise to you that that's a |
| 11:41:09 | 23 | practice that Time Warner engages in and other companies |
| 11:41:10 | 24 | engage in.  That's my question. |
| 11:41:10 | 25 | MR. RAMOS:  I'll object to the form of the |

98

EXHIBIT A PAGE 12

| | |
|---|---|
| 11:41:13 | 1 | question that we don't know Time Warner engages in that. |
| 11:41:16 | 2 |      MR. SHOHET:  Yeah, we do.  We do because it's |
| 11:41:19 | 3 | on his bill before he changed to the Digipac 4000. |
| 11:41:22 | 4 |      MR. RAMOS:  Vague and ambiguous. |
| 11:41:22 | 5 | BY MR. SHOHET: |
| 11:41:22 | 6 |    Q    I'm not -- I'm not trying to argue with you. |
| 11:41:24 | 7 | I'm trying to get your answer to the question. |
| 11:41:27 | 8 |     Is the concept that you can buy a bundle or |
| 11:41:30 | 9 | package of services and commit to that bundle and get a |
| 11:41:33 | 10 | cheaper price than you would get if you ordered each of |
| 11:41:37 | 11 | the components separately, is that a concept with which |
| 11:41:39 | 12 | you were familiar in September 2006? |
| 11:41:42 | 13 |    A    Yes, I believe so.  I -- I ordered a certain |
| 11:41:47 | 14 | package to get a better rate.  So I guess if that's what |
| 11:41:49 | 15 | you're saying, yes, that's what I did. |
| 11:41:52 | 16 |      MR. SHOHET:  Okay.  Let's take a short break. |
| 11:41:53 | 17 | Do you want to break for the noon hour now, or do you |
| 11:41:56 | 18 | want to continue?  What's your preference? |
| 11:41:57 | 19 |      MR. RAMOS:  Depends on how long you have. |
| 11:42:00 | 20 |      MR. SHOHET:  You know, I don't know.  I've got |
| 11:42:00 | 21 | some documents to go through.  I would say we're not |
| 11:42:01 | 22 | going to get done, in any event, much before 3:00 or |
| 11:42:04 | 23 | 4:00 o'clock this afternoon. |
| 11:42:06 | 24 |      THE WITNESS:  I have a problem.  I have to pick |
| 11:42:07 | 25 | up my daughter from school.  I have to leave no later |

99

EXHIBIT A PAGE 13

LEON SETH ALBERT                                    11/06/07

| | | |
|---|---|---|
| 12:34:02 | 1 | MR. RAMOS:  I'll object to the extent you're |
| 12:34:04 | 2 | asking him for a legal opinion or legal conclusion. |
| 12:34:06 | 3 | THE WITNESS:  Well -- |
| 12:34:07 | 4 | MR. SHOHET:  I'm just asking for his own |
| 12:34:11 | 5 | position both individually and as a representative of a |
| 12:34:14 | 6 | purported class, what his position is.  I think I'm |
| 12:34:17 | 7 | entitled to do that.  You can object.  Your objection is |
| 12:34:17 | 8 | noted. |
| 12:34:19 | 9 | MR. RAMOS:  Right.  My objection is you're |
| 12:34:21 | 10 | asking for a legal position, which his legal position |
| 12:34:26 | 11 | has been set forth in the complaint. |
| 12:34:28 | 12 | THE WITNESS:  My position and my understanding |
| 12:34:32 | 13 | is that Time Warner agreed to provide services to the |
| 12:34:37 | 14 | HOA members of Seapointe townhomes, and I'm a resident, |
| 12:34:42 | 15 | for a certain rate.  And when I got the notice from the |
| 12:34:48 | 16 | homeowners association, it wasn't that rate. |
| 12:34:49 | 17 | And when I called and spoke with the customer |
| 12:34:55 | 18 | service, they lowered the price, so that confirmed the |
| 12:34:57 | 19 | fact -- and the price is still lower -- and that |
| 12:35:00 | 20 | confirmed the fact that I think I was correct in |
| 12:35:03 | 21 | assuming that they owed me a lower rate. |
| 12:35:05 | 22 | And I don't really -- I didn't negotiate this |
| 12:35:10 | 23 | agreement, and I really didn't study it, and I don't see |
| 12:35:13 | 24 | how it really completely affected me, because when I |
| 12:35:19 | 25 | called Time Warner, I asked them I think I'm due a lower |

123

EXHIBIT A PAGE 14

LEON SETH ALBERT                        11/06/07

| | | |
|---|---|---|
| 12:35:22 | 1 | rate.  And if they would have said, No, you're not |
| 12:35:24 | 2 | because let's look at page 1 of this agreement, it says |
| 12:35:27 | 3 | blah, blah, blah, then fine.  But they didn't say that, |
| 12:35:29 | 4 | so I just assumed that I was correct because they |
| 12:35:32 | 5 | lowered the price when I said I was being overcharged. |
| 12:35:34 | 6 | BY MR. SHOHET: |
| 12:35:34 | 7 | Q    With whom did they agree to provide services at |
| 12:35:39 | 8 | a certain rate? |
| 12:35:40 | 9 | MR. RAMOS:  Objection.  Calls for speculation. |
| 12:35:41 | 10 | MR. SHOHET:  Well, he just said that they |
| 12:35:42 | 11 | agreed to provide services at a certain rate, and I |
| 12:35:45 | 12 | think I'm quoting from his answer and I'm asking -- |
| 12:35:47 | 13 | THE WITNESS:  Well, I don't know exactly |
| 12:35:49 | 14 | because I -- I'm not -- I wasn't -- I'm assuming to the |
| 12:35:54 | 15 | homeowners of the HOA, through the HOA. |
| 12:35:57 | 16 | BY MR. SHOHET: |
| 12:35:57 | 17 | Q    All right.  So, well, this is the agreement |
| 12:35:59 | 18 | here -- |
| 12:36:00 | 19 | A    Okay. |
| 12:36:00 | 20 | Q    -- with the HOA.  Do you see anything in |
| 12:36:03 | 21 | Subsection 1.1B where they say they may offer and |
| 12:36:08 | 22 | provide additional services, do you see anything that |
| 12:36:10 | 23 | says they will do so at a particular rate? |
| 12:36:12 | 24 | MR. RAMOS:  Objection.  Best evidence, document |
| 12:36:13 | 25 | speaks for itself, and you're asking him to make a legal |

124

EXHIBIT A pg. 15

LEON SETH ALPERT                                    11/06/07

| | | |
|---|---|---|
| 12:37:13 | 1 | layperson. |
| 12:37:13 | 2 | THE WITNESS: Operator may offer to provide |
| 12:37:17 | 3 | additional services to residents on a nonexclusive |
| 12:37:19 | 4 | basis. Okay. So additional services, nonexclusive. |
| 12:37:21 | 5 | Additional services means any services other than the |
| 12:37:24 | 6 | bulk multichannel video. Services that can be provided |
| 12:37:27 | 7 | to the residents over the system including but not |
| 12:37:30 | 8 | limited to premium channels, Pay-Per-View, blah, blah, |
| 12:37:34 | 9 | blah. |
| 12:37:34 | 10 | So my understanding of this would be any |
| 12:37:41 | 11 | services other than the bulk, so I'm assuming that the |
| 12:37:44 | 12 | bulk -- because when I called Time Warner and talked to |
| 12:37:47 | 13 | their customer service representative, I was only |
| 12:37:50 | 14 | speaking of the services that matched over to the |
| 12:37:52 | 15 | homeowners association pricing that I got from the -- in |
| 12:37:56 | 16 | the newsletter. I never discussed any of the extra |
| 12:38:00 | 17 | services that I got such as the extra cable box or the |
| 12:38:06 | 18 | wireless Internet. |
| 12:38:06 | 19 | So my understanding of this would be that, you |
| 12:38:08 | 20 | know, whatever they agreed to they agreed to, but it's |
| 12:38:11 | 21 | nonexclusive. It means if I want to order an extra |
| 12:38:14 | 22 | cable box or something else that's maybe outside the |
| 12:38:16 | 23 | scope of this agreement, then we can negotiate and Time |
| 12:38:21 | 24 | Warner will charge me whatever they charge me; I'll |
| 12:38:24 | 25 | agree to pay or not pay. That's how I understand it. |

126

A    16

| | | |
|---|---|---|
| 12:48:02 | 1 | Q    Mr. Alpert, I'm not quarreling that you are the |
| 12:48:06 | 2 | ultimate economic source of that payment.  I simply want |
| 12:48:10 | 3 | you to agree with me on a fact that I think is not in |
| 12:48:13 | 4 | dispute.  And that is the package of services that are |
| 12:48:16 | 5 | in the bulk multichannel video service group are |
| 12:48:18 | 6 | services that are provided to you through the HOA |
| 12:48:22 | 7 | payment that you make, and the additional services you |
| 12:48:27 | 8 | have to write a check for.  That's all I'm trying to get |
| 12:48:30 | 9 | to.  You agree with me on that, don't you? |
| 12:48:32 | 10 | A    I -- |
| 12:48:32 | 11 | MR. RAMOS:  Sorry.  Let me just object.  The |
| 12:48:34 | 12 | document speaks for itself, and it's vague and |
| 12:48:36 | 13 | ambiguous. |
| 12:48:37 | 14 | THE WITNESS:  If the scope of your question is |
| 12:48:39 | 15 | that outside of that -- excuse me -- that 28.77 I wrote |
| 12:48:44 | 16 | a check for to Time Warner every month, there is no |
| 12:48:48 | 17 | dispute because I, in fact, wrote a check for it every |
| 12:48:51 | 18 | month. |
| 12:48:51 | 19 | BY MR. SHOHET: |
| 12:48:51 | 20 | Q    And those are the additional services above and |
| 12:48:53 | 21 | beyond the services that your HOA provides to you. |
| 12:48:57 | 22 | MR. RAMOS:  Let me just object. |
| 12:48:58 | 23 | BY MR. SHOHET: |
| 12:48:58 | 24 | Q    Correct? |
| 12:48:59 | 25 | MR. RAMOS:  That calls for speculation because |

12:51:28  1    being overcharged for that also.

12:51:29  2             Q    So you think that for the $28.77 price that the

12:51:33  3    HOA was paying on your behalf to Time Warner that you

12:51:36  4    might have been entitled to digital phone service?  Is

12:51:39  5    that your sworn testimony?

12:51:41  6             A    I don't know what I was entitled to exactly.

12:51:43  7             Q    I'm asking your belief.

12:51:44  8             A    You know, my belief was, you know, I paid the

12:51:49  9    bill separately from the HOA -- okay.  My belief.  Had I

12:51:55  10   not paid any additional money to Time Warner Cable, then

12:51:58  11   I would have those 76 channels coming through the cable

12:52:04  12   with no box and no anything.

12:52:05  13            Q    And you didn't think that the --

12:52:07  14            A    And I understood -- I understand that

12:52:09  15   completely.

12:52:09  16            Q    And you didn't think that for that price that

12:52:12  17   the HOA was paying on your behalf, which I agree came

12:52:15  18   out of your pocket originally or ultimately, that you

12:52:19  19   got premium movie channels, Road Runner service, or

12:52:23  20   digital phone service, do you?

12:52:25  21            MR. RAMOS:  That calls for speculation as to

12:52:27  22   what would be included.

12:52:27  23            THE WITNESS:  Well, you know, I ordered the

12:52:32  24   stuff and they sent me a bill and I paid for it.

          25

                                                                    140

EXHIBIT   A   PAGE   18

| | | |
|---|---|---|
| 12:55:53 | 1 | your understanding that there was some obligation on the |
| 12:55:58 | 2 | part of Time Warner to charge you lower price than it |
| 12:56:01 | 3 | was, other than the fact that after you made a call to |
| 12:56:04 | 4 | them in September, they lowered the price? |
| 12:56:07 | 5 | A    The thing in the newsletter, that was my source |
| 12:56:11 | 6 | of the understanding, not this, because I never saw this |
| 12:56:15 | 7 | before. |
| 12:56:15 | 8 | Q    Okay.  Fair enough. |
| 12:56:24 | 9 | Let me show you exhibit -- what I will mark as |
| 12:56:29 | 10 | Exhibit 3. |
| 12:56:42 | 11 | (Exhibit 3 marked) |
| 12:56:42 | 12 | THE WITNESS:  Thank you. |
| 12:56:42 | 13 | BY MR. SHOHET: |
| 12:56:42 | 14 | Q    You're welcome. |
| 12:56:44 | 15 | Now, you recognize this, Mr. Alpert, as a copy |
| 12:56:53 | 16 | of the Time Warner invoice dated as of February 12th, |
| 12:56:59 | 17 | 2006. |
| 12:56:59 | 18 | A    That's what it says. |
| 12:57:02 | 19 | Q    And you recognize it as such, don't you? |
| 12:57:04 | 20 | A    Yeah, I do. |
| 12:57:05 | 21 | Q    All right.  Thank you. |
| 12:57:07 | 22 | Now, let's turn to the second page.  By the |
| 12:57:15 | 23 | way, you paid this bill in the ordinary course at the |
| 12:57:18 | 24 | time you received it, didn't you? |
| 12:57:19 | 25 | A    Yes, I did. |

144

EXHIBIT A PAGE 19

LEON SETH ALᵣᵨRT                                    11/06/07

| | | |
|---|---|---|
| 13:00:53 | 1 | THE WITNESS: I didn't really think about it. |
| 13:00:54 | 2 | BY MR. SHOHET: |
| 13:00:54 | 3 | Q    And just to clarify the record, you received |
| 13:00:58 | 4 | the services that are identified in this heading |
| 13:01:02 | 5 | "Digital Phone Package" as of the billing date of |
| 13:01:05 | 6 | February 12th, 2006.  Correct? |
| 13:01:06 | 7 | A    Correct. |
| 13:01:07 | 8 | Q    And then for your iControl premium service, |
| 13:01:11 | 9 | that's your digital or your -- your pay services on |
| 13:01:15 | 10 | demand subscription of $6.95, do you have any reason to |
| 13:01:19 | 11 | believe that there was a lower charge available to you |
| 13:01:23 | 12 | for that premium service ordered on -- on a standalone |
| 13:01:29 | 13 | or nonbundled basis? |
| 13:01:30 | 14 | MR. RAMOS:  Same objection.  It calls for |
| 13:01:32 | 15 | speculation. |
| 13:01:32 | 16 | BY MR. SHOHET: |
| 13:01:32 | 17 | Q    In other words, the question really is, Do you |
| 13:01:34 | 18 | have any understanding that that is not the proper rate |
| 13:01:37 | 19 | that Time Warner charges for that service as part of a |
| 13:01:41 | 20 | nonbundled package? |
| 13:01:42 | 21 | MR. RAMOS:  Calls for speculation. |
| 13:01:43 | 22 | THE WITNESS:  No.  I -- I mean, all I |
| 13:01:45 | 23 | understood was that I asked for, you know, a bundle of |
| 13:01:48 | 24 | those services, and then -- and they quoted me a rate or |
| 13:01:55 | 25 | I saw it on the ad or a combination, and that's the bill |

148

EXHIBIT *A* PAGE 20

LEON SETH ALPERT                    11/06/07

| | | |
|---|---|---|
| 13:01:58 | 1 | and that's what I paid. |
| 13:01:59 | 2 | BY MR. SHOHET: |
| 13:01:59 | 3 | Q    You say you asked for a bundle of services. |
| 13:02:05 | 4 | And I understand -- well, tell me when you asked for the |
| 13:02:09 | 5 | bundle of services? |
| 13:02:10 | 6 | A    I think when I first upgraded to the digital |
| 13:02:17 | 7 | phone and the wireless -- and the Road Runner, I -- I |
| 13:02:22 | 8 | wanted -- you know, wanted the extra movie channels and |
| 13:02:26 | 9 | the other stuff, so I believe that's when the whole |
| 13:02:28 | 10 | thing came up that way. |
| 13:02:29 | 11 | Q    I never remember you -- when you answered my |
| 13:02:31 | 12 | questions about that, I don't remember your stating that |
| 13:02:34 | 13 | you specifically asked the customer service |
| 13:02:36 | 14 | representative about a bundle or bundled rate.  Is it |
| 13:02:39 | 15 | your testimony that you did have that conversation with |
| 13:02:42 | 16 | the customer service rep? |
| 13:02:44 | 17 | A    I may have.  I may not have used the word |
| 13:02:47 | 18 | "bundle," or I may have.  I just saw -- responded to the |
| 13:02:51 | 19 | ad in wishing to upgrade my services. |
| 13:02:52 | 20 | Q    This is now going back to the 2004/2005 -- |
| 13:02:56 | 21 | A    Yeah.  No, I understand. |
| 13:02:58 | 22 | Q    I just wanted to be sure we were talking |
| 13:03:00 | 23 | about -- |
| 13:03:00 | 24 | A    No.  I understand exactly what you're talking |
| 13:03:02 | 25 | about. |

149

EXHIBIT A PAGE 21

13:09:27  1    you ever made a comparison with the rate for your

13:09:29  2    digital phone service to any published or rate card rate

13:09:34  3    to determine whether you were properly being charged for

13:09:36  4    that?

13:09:36  5            MR. RAMOS:  Objection.  Asked and answered.

13:09:37  6            THE WITNESS:  I -- you know, when I first

13:09:41  7    ordered these services in a bundle, I believe I probably

13:09:46  8    checked my bill against what I was told, and it was

13:09:49  9    probably correct, and then I never --

13:09:51 10    BY MR. SHOHET:

13:09:51 11        Q    All right.

13:09:51 12        A    I look at my bill every month, but I never --

13:09:54 13    you know, I didn't notice any big changes, so --

13:09:58 14        Q    And then at the bottom of the first page where

13:10:03 15    it says high-speed Internet service --

13:10:05 16        A    Yeah.

13:10:05 17        Q    -- Road Runner 44.95, and then the wireless is

13:10:09 18    9.95, which totals 54.90, do you see that?

13:10:13 19        A    Yes.

13:10:14 20        Q    And did you ever make that comparison against

13:10:16 21    what you were being charged for Wireless Road Runner to

13:10:19 22    see if you were being charged the correct rate card

13:10:23 23    rate?

13:10:23 24        A    I most likely compared it on the first bill

13:10:27 25    after I ordered the services to make sure I was being

A_page 25

| | | |
|---|---|---|
| 13:11:39 | 1 | BY MR. SHOHET: |
| 13:11:44 | 2 | Q    This is, for the record, a bill to you for your |
| 13:11:59 | 3 | Caminito del Canto residence, dated December 12th, 2006. |
| 13:12:03 | 4 | Do you recognize it as such? |
| 13:12:04 | 5 | A    Yes. |
| 13:12:04 | 6 | Q    And on the second page it identifies the HOA |
| 13:12:10 | 7 | Digipac 4000 Trio.  Correct? |
| 13:12:12 | 8 | A    Yes. |
| 13:12:12 | 9 | Q    And this is a bill that is similar to, in terms |
| 13:12:17 | 10 | of the identification of the Digipac 4000 Trio combo, |
| 13:12:23 | 11 | that is a bill -- this bill represents the billing after |
| 13:12:26 | 12 | the change as a result of your conversation with Time |
| 13:12:30 | 13 | Warner in or about September.  Correct? |
| 13:12:32 | 14 | A    Yeah. |
| 13:12:33 | 15 | Q    Now, it -- and in your -- in your complaint in |
| 13:12:43 | 16 | paragraph 12 of your complaint, you state that this |
| 13:12:46 | 17 | changed the billing to reflect what it should have been |
| 13:12:49 | 18 | all along.  Right? |
| 13:12:50 | 19 | A    Believe so, yes. |
| 13:12:51 | 20 | Q    So you don't dispute the correctness of this |
| 13:12:54 | 21 | bill from this point forward. |
| 13:12:57 | 22 | A    The new -- you mean Exhibit -- |
| 13:13:00 | 23 | Q    The bill -- the billing that's reflected in |
| 13:13:03 | 24 | Exhibit 12 -- I'm sorry -- in Exhibit 5 -- |
| 13:13:05 | 25 | A    Exhibit 5. |

EXHIBIT A PAGE 27

13:13:06  1        Q      -- which is dated December 12th, which you

13:13:08  2   identified as similar to the billings that you began to

13:13:12  3   receive after the phone call in September with Time

13:13:14  4   Warner Cable, this now correctly, in your view, charges

13:13:18  5   you for these services.  Is that right?

13:13:19  6        A      I believe so, yes.

13:13:20  7        Q      All right.  And now I want to understand one

13:13:26  8   thing that I've been confused about, I have to tell you,

13:13:29  9   since I first began this case --

13:13:30  10       A      Okay.

13:13:31  11       Q      -- in reading the complaint.  Is it your

13:13:36  12  contention that the reduction in the bill is somehow

13:13:39  13  because before the change you were being charged for

13:13:45  14  services to which you were already entitled because your

13:13:48  15  HOA contracted for those services and paid $28.77 on

13:13:54  16  your behalf?  Is that your testimony?

13:13:56  17       A      My understanding is that I understood that I

13:14:00  18  was being overcharged because there's -- had been some

13:14:05  19  sort of an agreement on pricing reflected by the notice

13:14:09  20  in the homeowners association newsletter and I was being

13:14:13  21  overcharged for that, purely just overcharged.

13:14:16  22       Q      Okay.  And the agreement related some special

13:14:19  23  pricing for the additional services above and beyond

13:14:23  24  what the HOA was paying on your behalf for as basic

13:14:28  25  services.  Is that your understanding?

EXHIBIT A PAGE 28

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10    testimony given.

11          Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [  ] was [  ] was not requested.

15          I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20

21    Dated: _____NOV 1 2 2007_____

22

23               _R. Denise Marlow_____

               R. DENISE MARLOW

24               CSR No. 11631

25

# EXHIBIT B

B_PAGE 32

**Recording Requested By**

And Return To:
    Time Warner Cable
    8949 Ware Court
    San Diego, CA 92121-2275

Transfer Tax:  None

**TIME WARNER CABLE**

---

## TIME WARNER CABLE
### SYSTEM INSTALLATION AND SERVICE AGREEMENT
#### CITY OF SAN DIEGO/SAN DIEGO SYSTEM

**EFFECTIVE DATE:**  10/1/05

### PARTIES:

**Operator:**

**Time Warner Entertainment-Advance Newhouse Partnership, a New York general partnership, dba TIME WARNER CABLE**
8949 Ware Court
San Diego, CA 92121
Contact Person: Janette Larson
Telephone: (858) 635-8418
Facsimile: (858) 536-8729

**HOA:**

**SEA POINT COMMUNITY ASSOCIATION**
13022 Caminito Del Rocio
Del Mar, CA 92014
Contact Person: Dale Cook
Telephone: (858) 755-1918
Facsimile: (858) 755-4929

### PROPERTY:

**SEA POINT TOWNHOMES**
13022 Caminito Del Rocio
Del Mar, CA 92014
Number of Units: 237

### RECITALS

- HOA is the homeowners, condominium owners, or townhome owners association for the multi-unit residential property referred to above and

as further described in the legal description set forth on *Exhibit A* (the "Property").

- HOA and Operator desire to make the Services available to residents of the Property ("Residents") in accordance with the terms and conditions of this Agreement.

### TERMS AND CONDITIONS

In consideration of the Recitals and the mutual covenants contained in this Agreement, HOA and Operator agree as follows:

1.  **OPERATOR'S SERVICE OBLIGATIONS.**

1.1  **Services.** The term "Services" means the services described below.

    (A) **Bulk Multi-Channel Video Services.** Upon the Activation Date (as defined below), Operator will offer Bulk Multi-Channel Video Services to Residents. "**Bulk Multi-Channel Video Services**" means the package of multi-channel cable television and other video-and/or-sound services provided over the System (as defined below), as set forth on *Exhibit B*.

    (B) **Additional Services.** Operator may offer and provide Additional Services to Residents on a non-exclusive basis. "**Additional Services**" means any services other than the Bulk Multi-Channel Video Services that can be provided to the Residents over the System, including, but not limited to, premium channels, pay-per-view, music, digital tier, video-on-


EXHIBIT B PAGE 33

demand, and other video and music services not included in the Bulk Multi-Channel Video Services package, high-speed data and Internet access services, voice services, etc.

**1.2    Installation of System (as Applicable).** To the extent necessary (*e.g.*, there is no, or there is insufficient, existing wiring and facilities) and at Operator's sole expense, Operator will design, construct, install, and/or upgrade the System on the Property in accordance with industry standards, Laws and Regulations (as defined in Section 14.3), and a construction plan, specifications and schedule (the "**Construction Plan**") agreed upon by HOA and Operator within 60 days of the Effective Date. The "**Activation Date**" shall be that date agreed upon by HOA and Operator in the Construction Plan. "**System**" means all equipment, facilities, wiring (including internal building wiring and external distribution wiring), conduit, and molding that Operator installs or upgrades on the Property, that Operator provides for installation by HOA or a third party at the Property, or that exist on the Activation Date and that Operator uses to deliver the Services, regardless of whether any such components are in use at any given time.

**1.3    Maintenance of System; Restoration of Property.** At Operator's sole expense, Operator will (A) maintain, repair, and operate the System in accordance with industry standards and Laws and Regulations and (B) repair and restore all portions of the Property damaged by Operator (regardless of whether such damage occurred during installation, upgrading, repair, or removal of the System) to its condition immediately prior to such damage.

**1.4    Marketing Materials.** Operator will provide HOA with marketing materials, service-order materials, sales support, and sales training so that HOA can market the Services as provided in Section 4.4.

**2.    RATES AND SERVICES.**

HOA shall pay to Operator a monthly Bulk Multi-Channel Video Services fee as set forth on *Exhibit B*. HOA acknowledges that Operator (and its designated Affiliates (as defined in Section 11.1)) is the sole provider of the Bulk Multi-Channel Video Services under the terms of this Agreement, and that HOA is not a reseller or provider of the Services. Residents will be billed directly for all service charges, taxes, franchise fees, and other fees assessed in conjunction with Additional Services. In no event will HOA be responsible for any fees or

charges incurred by Residents for Additional Services.

**3.    OWNERSHIP AND USE OF SYSTEM DURING TERM.**

During the Term, Operator will own and have the exclusive right to access, control, and operate the System, except for any equipment, facilities, conduit, or wiring owned by HOA or a third party (if any), in which case (as between HOA and Operator) HOA shall own such items, and HOA hereby grants to Operator the exclusive right to access, use, maintain, and upgrade such items during the Term. For purposes of clarity, Operator owns any wiring provided by Operator to HOA for installation by HOA or its contractors. HOA shall not, and HOA shall not permit any third party to, access, move, use, or interfere with any part of the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. HOA will provide the power necessary to operate any of Operator's equipment that is located on the Property.

**4.    HOA'S OBLIGATIONS.**

**4.1    Grant of Easement; Termination of Easement.** At the time of signing this Agreement, HOA will execute an Easement and Memorandum of Agreement in the form of *Exhibit C*, which may be recorded by either party at any time. Upon the expiration or proper earlier termination of this Agreement as permitted hereby, and upon HOA's request, Operator promptly will execute a reasonable Termination of Easement and Memorandum of Agreement that HOA may record to evidence the termination of this Agreement and the Easement and Memorandum of Agreement.

**4.2    Grant of Rights.** HOA acknowledges that Operator will spend substantial time, resources, and money in meeting its obligations under this Agreement, and that Operator is relying on HOA's covenants in this Agreement in order to recoup its investment by providing the Services to the Property and by collecting revenues therefor. Accordingly, HOA hereby grants to Operator (A) the exclusive right for the first five years of the Term, and the non-exclusive right thereafter, to design, construct, install, operate, maintain, upgrade, and remove a system at the Property for the provision of multi-channel video services; (B) the exclusive right during the Term to install, occupy, maintain, and remove the molding and other conduit housing the wiring of the System without alteration by HOA or third parties; (C) the exclusive right for the first

five years of the Term, and the non-exclusive right thereafter, to offer and provide multi-channel video services to Residents; (D) the exclusive right for the Term to market on site at the Property multi-channel video services to Residents; and (E) the non-exclusive right during the Term to market, offer, and provide Additional Services. During the Term, HOA shall not contract with any other provider to purchase services under a bulk-buy arrangement for multi-channel video services, high-speed data or Internet access service, telephone or telephony–related services. If Laws and Regulations in effect as of the Effective Date prohibit HOA from granting or Operator from obtaining exclusive rights under this Section 4.2, then such rights automatically shall be deemed non-exclusive to the extent and only for so long as required by such Laws and Regulations.

4.3    **System Inspection Requirement.** No less than one time per calendar quarter during the Term, HOA shall cause its on-site management to carefully and diligently inspect the pedestals, lockboxes, and other secured or accessible areas housing the components of the System to ensure the integrity thereof and to ensure that no other party has accessed or is using the System. HOA immediately shall notify Operator of (A) any damage to, forced access of, or unauthorized use of, the System (including any pedestal, lockbox, or other secured or accessible area housing the components of the System), and (B) any condition or occurrence that is likely to adversely affect the System or provision of Services.

4.4    **Marketing and Sales.**

(A)    HOA will (i) provide Residents and prospective Residents with Operator's current publications describing Operator's Services and (ii) display Operator's marketing and sales materials relating to Services in HOA's sales office or clubhouse for the Property.

(B)    HOA will allow Operator to periodically host an event on the Property, at Operator's expense, to introduce Services to Residents and prospective Residents. Operator may reasonably try to remarket Services to Residents who order less than all available Services.

5.    **TERM.**

The initial term of this Agreement commences on the Effective Date and shall continue in effect for 5 (five) years. The initial term automatically will be

extended for successive one-year periods unless either party notifies the other at least 90 days before the expiration of the initial term or any renewal term, as the case may be, that it does not wish to extend the Agreement. The initial term and any extensions thereof are collectively referred to as the "Term".

6.    **REPRESENTATIONS AND WARRANTIES.**

6.1    **HOA's Representations and Warranties.** HOA represents, warrants, and covenants to Operator that (A) HOA is the sole legal and equitable owner in fee simple of the areas of the Property where the System will be located; (B) no purchase contracts exist with respect to such areas of the Property (although the parties acknowledge that the individual units will be available for sale to purchasers); (C) the legal description attached to this Agreement is the complete, accurate and current legal description of the Property; (D) the Property is not part of a bankruptcy proceeding, foreclosure action, deed-in-lieu-of-foreclosure transaction, or similar proceeding; (E) HOA has the full power and authority to negotiate, execute, deliver, and perform this Agreement and the Easement and Memorandum of Agreement; (F) the party signing this Agreement and the Easement and Memorandum of Agreement is duly authorized to execute and deliver such documents on behalf of HOA; (G) HOA owns and/or has the right to grant to Operator hereunder the exclusive right to use all parts of the System not owned by Operator (including any third party wiring, molding or components), if any; and (H) there are no agreements, understandings, or intentions with or between HOA and any other party that conflict with this Agreement.

6.2    **Operator's Representations and Warranties.** Operator represents, warrants and covenants to HOA that (A) Operator has the full power and authority to negotiate, execute, deliver, and perform this Agreement; (B) the party signing this Agreement is duly authorized to execute and deliver the Agreement on behalf of Operator; (C) Operator currently has, and will maintain during the Term, all required licenses, permits, and approvals necessary to permit Operator to operate the System and provide the Services; and (D) there are no agreements, understandings, or intentions with or between Operator and any other party that conflict with this Agreement.



7. **DEFAULT AND REMEDIES.**

7.1 **Default.** In addition to the other breaches or defaults specified in this Agreement, a "default" exists under this Agreement upon any of the following events: (A) if HOA fails to meet or perform any payment obligation contained in this Agreement and then does not cure such failure within five business days after receiving notice from Operator of such payment default; (B) if HOA or Operator fails to meet or perform any material term, provision, covenant, agreement, or obligation contained in this Agreement (excluding failures to pay subject to (A) above, but including, without limitation, an Assignment Default (as defined in Section 11.2)) and then does not cure such failure within 30 days (or, if applicable, such longer time period as is expressly permitted elsewhere hereunder) after receiving notice from the other party that reasonably details such breach; (C) if HOA or Operator becomes a debtor in a bankruptcy proceeding or similar action or proceeding that is not permanently dismissed within 60 days; or (D) if HOA or Operator becomes insolvent.

7.2 **Remedies.** Except as specifically provided otherwise in this Agreement, the parties shall be entitled to seek all remedies available at law or in equity with respect to a breach or default under this Agreement by the other (including injunctive relief and specific performance, in cases where it is provable that such breach or default is causing or would cause irreparable damage or where no adequate remedy at law is available), and such rights and remedies shall be cumulative. If a party defaults and fails to cure such default as provided in this Agreement, then the nondefaulting party, in addition to all other available remedies, may terminate this Agreement by giving 30 days' notice to the defaulting party. If HOA defaults pursuant to Section 7.1(A), or if HOA fails to make timely payment to Operator more than two times in any 12-month period (notwithstanding any requirement of notice from Operator or opportunity to cure under Section 7.1(A)), then, in addition to any other remedies available to Operator, Operator may elect to terminate the Bulk Multi-Channel Video Services and in lieu thereof to provide its multi-channel video services on an individually billed basis directly to Residents for the remainder of the Term.

8. **LIMITATION OF WARRANTIES AND LIABILITY.**

EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, OPERATOR MAKES NO REPRESENTATIONS OR WARRANTIES-- EXPRESS OR IMPLIED-- REGARDING THE SYSTEM OR THE SERVICES, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED. NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES.

9. **INDEMNIFICATION.**

9.1 **From Operator.** Operator will defend, indemnify and hold harmless HOA and, as applicable, HOA's shareholders, members, partners, directors, managers, officers, employees, contractors, agents, representatives, and affiliates (collectively, "Related Parties") from and against all claims, liabilities, losses, costs, or damages, including reasonable attorney and other fees and costs relating to the investigation and defense of such matters (collectively, "Losses"), incurred by HOA or its Related Parties that result from (A) Operator's design, construction, installation, operation, or maintenance of the System, (B) Operator's provision of Services, or (C) Operator's breach of its representation and warranties in Section 6.2.

9.2 **From HOA.** HOA will indemnify and hold harmless Operator and, as applicable, Operator's Related Parties from and against all Losses incurred by Operator or its Related Parties that result from (A) damage to any part of the System caused by HOA or its Related Parties, (B) any claim arising out of HOA's operation of the Property, or (C) HOA's breach of its representations and warranties in Section 6.1, or its covenants in Section 4.3 or 11.2.

10. **OWNERSHIP AND REMOVAL OF SYSTEM AFTER TERM.**

10.1 **Ownership and Removal of System after Termination or Expiration.** Subject to Laws and Regulations, upon expiration or proper earlier termination of this Agreement as permitted hereby, Operator shall retain ownership of, and for 90 days after such expiration or termination be entitled at Operator's option, to remove, abandon,

EXHIBIT *B*    36

disable, or sell, all of the respective components of the System, unless HOA or a third party owns any such System components, in which case (as between HOA and Operator) HOA shall retain ownership of such components and Operator shall not be entitled to remove or disturb such components not owned by Operator. Operator will pay its removal costs unless this Agreement was terminated as a result of HOA's uncured default, in which case HOA will bear Operator's reasonable removal costs.

10.2    **Mandatory Access Laws and Regulations.** Notwithstanding anything to the contrary in this Article 10 or the Agreement, if Laws and Regulations require HOA to provide Operator with access to the Property for the provision of any service, then Operator shall (A) continue to own and/or be permitted to access and use all System components (as provided in Article 3) to provide service to the Property, and (B) have the right to remove, abandon, disable, or sell the System components (as provided in Section 10.1) within 90 days after Operator no longer is permitted access to the Property by Laws and Regulations to provide such service.

11.    **ASSIGNMENT.**

Operator may assign this Agreement to (A) any parent, Affiliate (an "Affiliate" means an entity in which Operator, Time Warner Inc., Time Warner Cable Inc., or Time Warner Entertainment Company, L.P. has an ownership interest of 25% or more), successor (by operation of law or otherwise), or subsidiary that Operator may have or (B) any entity that purchases Operator's overall cable television system serving the Property. Upon the new operator's written assumption of all of Operator's obligations and duties under this Agreement, Operator will be relieved of any further liability or obligations to HOA attributable to periods from and after the effective date of such assumption.

12.    **CONFIDENTIALITY.**

Except as specifically provided in this Agreement, and except for disclosures required by Laws and Regulations, HOA and Operator will (A) keep this Agreement and its terms confidential, (B) keep confidential and not disclose to any other party any information that is provided by one party to the other and that is marked as confidential, (C) not disclose or use any such confidential information for any purpose other than performance of this Agreement, and (D) not make any public

announcement or press release about this Agreement without the other's prior approval. Notwithstanding the foregoing, each party shall be entitled to disclose the terms of this Agreement to its financial, legal, and other advisors and consultants, and to prospective lenders or purchasers of the Property, in each case on a need-to-know basis and provided that such recipients are obligated to maintain the confidentiality of the terms of this Agreement without further disclosure to any other party.

13.    **PROPRIETARY NAMES.**

Neither party will use any proprietary or trade name of the other except as specifically permitted in writing by the owner of the name.

14.    **MISCELLANEOUS PROVISIONS.**

14.1    **Notices.** All notices, requests, approvals, demands, consents, and other communications that are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by facsimile, courier, registered, or certified mail (postage prepaid), overnight delivery or in person to a party's address stated at the head of this Agreement. Such notice shall be effective, (A) if sent by facsimile, when confirmation of transmission is received, or (B) otherwise, upon actual receipt or rejection by the intended recipient. Either party may change its address by giving notice to the other party in accordance with this Section.

14.2    **Force Majeure.** Despite anything to the contrary in this Agreement, neither party will be liable or in breach of or default under this Agreement for any delay or failure of performance resulting directly from anything beyond the reasonable control of the non-performing party (a "Force Majeure Event"), including, but not limited to, acts of God; acts of civil or military authority; acts of a public enemy; war; terrorism; severe weather, earthquakes, or floods; fires or explosions; governmental action or regulation; strikes, lockouts, or other work interruptions or labor shortages; supplier shortages; transportation and delivery delays; or blocked access rights. Payment of monies due shall not be subject to Force Majeure Events. So long as the non-performing party diligently and continuously attempts to cure the non-performance caused by the Force Majeure Event (giving consideration to the effect of the Force Majeure Event on such party's overall business operations), the time for performance shall be extended commensurate with the duration of the Force Majeure Event.

EXHIBIT _B_  37

14.3    **Compliance with Laws and Regulations; Choice of Law; Waiver of Right to Jury Trial.** The terms of this Agreement shall be subject to, and in the performance of their respective obligations under this Agreement the parties shall comply with, all applicable federal, state, and local laws and regulations (including the rules and regulations of governmental and regulatory authorities with jurisdiction over the parties), and, with respect to Operator only, the requirements of Operator's franchise agreement for the franchise area where the Property is located (collectively, **"Laws and Regulations"**). Nothing in this Agreement shall prohibit Operator from fully complying with all Laws and Regulations, including any consents, agreements, orders, or other requirements mandated by or entered into with the Federal Communications Commission or other governmental authority, and such compliance shall be deemed not to constitute a breach of or default under this Agreement. This Agreement is governed by and shall be interpreted under the laws of the state in which the Property is located, without regard to its choice-of-law provisions. **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY ENFORCEMENT ACTION OR CLAIM RELATING HERETO.**

14.4    **Severability and Unenforceable Provisions.** If any portion of this Agreement is rendered invalid or otherwise unenforceable under Laws and Regulations or by a governmental, legal or regulatory authority with jurisdiction over the parties, then the remainder of this Agreement will continue in full force unless such continuance will deprive one of the parties of a material benefit intended hereunder or frustrate the main purpose(s) of this Agreement. In such event, the party that has been deprived of such material benefit (**"Affected Party"**) may notify the other, and the parties promptly thereafter shall use their reasonable best efforts to replace or modify the invalid or unenforceable provision with a provision that, to the extent not prohibited by Laws and Regulations, achieves the purposes intended under the invalid or unenforceable provision.

14.5    **Scope of Agreement; Modifications.** This Agreement constitutes the entire agreement between HOA and Operator with respect to, and supersedes all other agreements relating to, the subject matter contained herein. This Agreement can be modified or changed only by a written instrument signed by both parties. A party's waiver of enforcement of

any of the terms or conditions of this Agreement will be effective only if in writing. The relationship between HOA and Operator is that of independent contractors, and not one of principal and agent, joint venture, or partnership.

14.6    **Enforcement Costs.** If either party sues or brings any other type of enforcement action in connection with this Agreement, then the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs in connection with such enforcement.

14.7    **Headings; Exhibits.** Headings are for reference only and do not affect the interpretation of this Agreement. All exhibits are fully incorporated into this Agreement by their reference herein.

14.8    **Survival.** The terms of Articles 8, 9, 10 and 12 and Sections 14.3 and 14.6 will survive the expiration or termination of this Agreement for any reason.

14.9    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which is considered an original.

The parties have caused their duly authorized representatives to sign this Agreement effective as of the Effective Date.

**TIME WARNER CABLE**

Signature: _Ernie Villicana_    11/30/05

By: Ernie Villicana

Title: Vice President – Marketing & Programming

**SEA POINT COMMUNITY ASSOCIATION**

Signature: _Sheldon Krueger_

By: _SHELDON KRUEGER_

Title: _PRESIDENT_

Confidential & Proprietary
Residential Bulk Services Agreement

EXHIBIT B    38

**EXHIBIT A**
**TO**
**RESIDENTIAL BULK SERVICES AGREEMENT**


**Legal Description of the Property**


(Attached.)

**EXHIBIT B**
**TO**
**RESIDENTIAL BULK SERVICES AGREEMENT**

**Description of Bulk Multi-Channel Video Services and Fee**

**BULK MULTI-CHANNEL VIDEO SERVICES**

A channel line-up for the Bulk Multi-Channel Video Services is attached. Subject to Laws and Regulations, Operator shall be entitled to add to, delete from, move channel positions, and otherwise modify the Bulk Multi-Channel Video Services in its sole discretion from time to time, but the level of Bulk Multi-Channel Video Services shall at all times remain reasonably comparable to the level of Bulk Multi-Channel Video Services offered by Operator in the Franchise area.

**BULK MULTI-CHANNEL VIDEO SERVICES FEE**

The Bulk Multi-Channel Video Services fee shall be $28.77 per home/unit (plus any applicable taxes and franchise fees) per month, regardless of whether such homes/units are occupied. The Bulk Multi-Channel Video Services fee does not include Operator's fees (if applicable) to provide necessary consumer-grade equipment to Residents to receive the Bulk Multi-Channel Video Services, which fees (if applicable) shall be billed for and paid by HOA. Consumer-grade equipment provided to Residents for Additional Services shall be billed to and paid by the individual Resident subscribers. Upon at least 30 days' prior written notice to HOA, Operator shall be entitled to raise the Bulk Multi-Channel Video Services fee, provided that such increases shall not exceed 5% during any calendar year.

During the Term, Operator will bill HOA for the Bulk Multi-Channel Video Services fee on a monthly basis and payment by HOA shall be due within 30 days after the date of such invoice. Operator may bill HOA in advance for the Bulk Multi-Channel Video Services fee, provided that HOA shall not be required to pay any invoice more than 30 days prior to the month to which such invoice applies. If Operator fails to present an invoice prior to the first day of the month for which Bulk Multi-Channel Video Services are being provided, such failure shall not constitute a waiver of the Bulk Multi-Channel Video Services fee, and HOA promptly shall pay such invoice when delivered by Operator.

Any payments not received by Operator within 30 days after the date of invoice automatically shall incur a late payment fee of 1.5% per month (pro-rated on a daily basis), or the maximum monthly amount permitted by Laws and Regulations, whichever is less. The late payment fee shall apply from the due date of such payment until the date such amount is paid in full.

EXHIBIT B 40



## Expanded Cable Television Service (Advantage Service)

1 On-Demand
2 TBS
3 WGN
4 Cable 4 Padres
5 KSWB (69) San Diego (WB)
6 XETV (6) San Diego (FOX)
7 KNSD (39) San Diego (NBC)
8 KFMB (8) San Diego (CBS)
9 KUSI (51) San Diego (IND)
10 KGTV (10) San Diego (ABC)
11 KPBS (15) San Diego (PBS)
12 San Diego Network
13 XUPN (13) San Diego (UPN)
14 KTLA (5) Los Angeles (WB)
15 San Diego News Channel 15
16 ITVS San Diego's Learning Channel
17 KBNT (Univision)
18 UCSD-TV
19 CPC Community Programming
20 C-SPAN
22 County
23 C-SPAN 2
24 Cityscape/NASA
25 QVC
26 CNN
27 TNT
28 CNN Headline News
29 ESPN
30 ESPN 2
31 FOX Sports Net West
32 Lifetime
33 Nickelodeon
34 USA Network
35 ABC Family
36 MTV
37 Fox News Channel
38 Spike TV
39 Court TV

40 Bravo
41 Outdoor Life Network
42 VH1
43 American Movie Classics
44 Discovery Channel
45 A&E
46 International Channel
TV Guide Channel
48 E!
49 CNBC
50 MSNBC
51 Food Network
52 FX Channel
53 Home & Garden TV
54 WE: Women's Entertainment
55 The Learning Channel
56 The History Channel
57 Sci-Fi Channel
58 MOVIEPlex
59 Turner Classic Movies
60 Hallmark
61 Lifetime Movie Network
62 Cartoon Network
63 The Disney Channel
64 Animal Planet
65 TV Land
66 Telemundo (XHAS Ch.33)
67 Golf Channel
68 Comedy Central
69 National Geographic
70 The Travel Channel
71 Leased Access
72 Home Shopping Network
73 PAX
74 Country Music Television
75 BET
76 The Weather Channel

EXHIBIT B    41

EXHIBIT C
TO
RESIDENTIAL BULK SERVICES AGREEMENT

**Form of Easement and Memorandum of Agreement**

Attached.

EXHIBIT B 42

# EASEMENT AND
# MEMORANDUM OF AGREEMENT

**DOCUMENT PREPARED BY:**

Janette Larson

**AFTER RECORDING, RETURN TO:**

Time Warner Cable
8949 Ware Court
San Diego, CA 92121

## I.     Grant of Easement

In consideration of the covenants and agreements in the Agreement (as defined below), for $10, and for other good and valuable consideration, the receipt and sufficiency of which **SEA POINT COMMUNITY ASSOCIATION** ("Grantor") grants to **TIME WARNER CABLE** ("Grantee"), its successors and assigns, a non-exclusive easement on Grantor's property and all its improvements (as described in the attached *Exhibit A* hereto) (the "Property"). This Easement is for the purposes of permitting Grantee and its affiliates and contractors to design, construct, install, operate, market, maintain, upgrade, repair, replace, and remove a system (including internal and external wiring, poles, conduits, molding, pipes, antennas, servers, switch equipment, software, central processing units, and other facilities and equipment ("System")) for the offering and delivery of multi-channel video, television, entertainment, Internet, and other services that may be delivered over the System to the Property and any other properties that can be served by such System, as more fully provided in the Residential Bulk Services Agreement between Grantor and Grantee with respect to the Property (the "Agreement"). During the term of the Agreement and this Easement, Grantee shall own, and Grantee shall have the exclusive right to access, control, and operate, the System. The System is not, and shall not be deemed to be, affixed to or a fixture of the Property. Ownership and removal of the System after the expiration of the Agreement and this Easement shall be pursuant to the Agreement. Grantor will also provide reasonable space for Grantee's equipment.

Grantor reserves the right to grant other easements on the Property, but will not allow such other easements to cause unreasonable interference with the easement granted to Grantee herein.

Grantee will have and hold the easement, together with every right and appurtenance connected to it, for an initial term of ten years from the Activation Date (as defined in the Agreement) and for so long thereafter as Grantee is providing services to the Property under the Agreement. Upon the natural expiration of the Agreement or proper earlier termination of the Agreement by Grantor for Grantee's uncured breach under the Agreement, this Easement automatically will terminate after an additional 90-day continuation period solely for the purpose of allowing Grantee to remove its System. Grantor, its successors and assigns hereby agree to warrant and forever defend the easement to Grantee--as well as its successors and assigns--against every person who claims any part of it.

This easement and other rights granted to Grantee run with the title to the Property and are binding on Grantor and on all subsequent owners of the Property, as well as on others who may claim an interest in the Property.

EXHIBIT B PAGE 43

2.    **Memorandum of Agreement**

In addition to the rights granted above, the Agreement grants to Grantee certain exclusive rights to market, offer, and provide multi-channel video services and the non-exclusive right to market, offer, and provide additional services to residents of the Property.

DATED EFFECTIVE AS OF: *10/1/2005*

**SEA POINT COMMUNITY ASSOCIATION**                          **WITNESSED BY:**

By: *Sheldon Krueger*                                        By: _____

_____                             _____

Title: *PRESIDENT*                                           Printed Name: _____

_____

State of *California* )                    *See attached: CALIFORNIA ALL-PURPOSE*
                       ) ss:               *ACKNOWLEDGMENT*
County of *San Diego* )

This instrument was acknowledged before me by _____ as the __

_____ of _____

_____ on _____

_____, 20___.

Witness my hand and official seal.

_____
                          [SEAL]
Notary Public

My commission expires: _____

State of _____ )
                          ) ss:
County of _____ )

This instrument was acknowledged before me by _____
_____ as a witness to the execution of this instrument by the above-named Grantor representative on ___
_____, 20___.

Witness my hand and official seal.

_____
                          [SEAL]
Notary Public

My commission expires: _____

3363043.0 – 5/2/05
Confidential & Proprietary
Residential Services Agreement
Escondera Condominiums2/__/05                                              Page 14

*B    44*

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**

State of California

County of _San Diego_ } ss.

On _October 14, 2005_ before me, _Linda J. Luke, Notary Public,_
<br>Date ——— Name and Title of Officer (e.g., "Jane Doe, Notary Public")
<br>personally appeared _Sheldon Krueger_
<br>Name(s) of Signer(s)

☐ personally known to me
<br>☑ proved to me on the basis of satisfactory evidence

> LINDA J. LUKE
> Commission # 1486500
> Notary Public - California
> San Diego County
> My Comm. Expires May 26, 2008

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Linda J. Luke_
<br>Signature of Notary Public

——————————————— **OPTIONAL** ———————————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _Time Warner Cable System Installation_

Document Date: _10/01/05    Ex "A" & "B" & "C"_    Number of Pages: _____

Signer(s) Other Than Named Above: _Time Warner Cable_

**Capacity(ies) Claimed by Signer**

Signer's Name: _____

☐ Individual
<br>☐ Corporate Officer — Title(s): _____
<br>☐ Partner — ☐ Limited ☐ General
<br>☐ Attorney-in-Fact
<br>☐ Trustee
<br>☐ Guardian or Conservator
<br>☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

B    45

# EXHIBIT C

EXHIBIT _C_ PAGE_46

Case 3:08-cv-00582-W-WMC     Document 4-7     Filed 04/02/2008     Page 41 of 65

Time Warner Cable Reside.    Services Subscriber Agreement                    Page 1 of 17

# TIME WARNER CABLE RESIDENTIAL SERVICES SUBSCRIBER AGREEMENT

## IMPORTANT INFORMATION ABOUT YOUR TIME WARNER CABLE SERVICES

The account holder(s) referred to on the accompanying Time Warner Cable Work Order or statement ("I," "me" or "my") agrees that the Work Order (if provided to me on or after January 1, 2006), this Agreement, the Terms of Use referred to below, and any applicable Tariff(s) on file with the state utility commission or comparable state agency in the jurisdiction in which I live, set forth the terms and conditions that govern my receipt of Services from Time Warner Cable, which may include, among others, video, high-speed data and voice Services. The term "Services" and all other capitalized terms used in this Agreement are defined in Section 15.

In consideration of TWC's provision of the Services that I have requested, subject to applicable law, I AGREE AS FOLLOWS:

### 1. Important Information About This Agreement

(a) This Agreement, the Work Order, the Terms of Use and any effective and applicable Tariff(s), each of which TWC may amend as set forth below, constitute the entire agreement between TWC and me. This Agreement supersedes all previous written or oral agreements between TWC and me. I am not entitled to rely on any oral or written statements by TWC's representatives relating to the subjects covered by these documents, whether made prior to the date of my Work Order or thereafter, and TWC will have no liability to me except in respect of its obligations as described in this Agreement and the other documents referred to above. The use of my Services by any person other than me is also subject to the terms of this Agreement, the Terms of Use, and any applicable Tariff(s).

(b) TWC has the right to add to, modify, or delete any term of this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s) at any time. An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my local TWC office.

(c) TWC will notify me of any significant change(s) in this Agreement, the Terms of Use, the Subscriber Privacy Notice or any applicable Tariff(s). Any such changes shall become effective immediately except where applicable law requires a notice period, in which case the change will become effective at the end of the requisite notice period. Upon effectiveness of any change to any of these documents, my continued use of the Services will constitute my consent to such change and my agreement to be bound by the terms of the document as so changed. If I do not agree to any such change, I will immediately stop using the Services and notify TWC that I am terminating my Services account.

(d) My acceptance of Services constitutes my acceptance of the terms and conditions contained in this Agreement. In the event that a portion of my Services is terminated, or any aspect of it is changed, any remaining service or replacement service will continue to be governed by this Agreement.

## 2. Payment; Charges

(a) I agree to pay TWC for (i) all use of my Services (including, if TWC is the party billing me for ISP or OLP Service, for my subscription to my choice of ISP or OLP, as applicable), (ii) installation and applicable service charges, (iii) TWC Equipment, and (iv) all applicable local, state and federal fees and taxes. Charges for the Services are set forth on a separate price list that I have received. I will be billed monthly in advance for recurring monthly charges. Other charges will be billed in the next practicable monthly billing cycle following use, or as otherwise specified in the price list. TWC may change both the fees and the types of charges (e.g., periodic, time-based, use-based) for my Services. If I participate in a promotional offer that requires a minimum time commitment and I terminate early, I agree that I am responsible for early termination fees associated with such promotion.

(b) Charges for installation Services and related equipment available from TWC for a standard Services installation are as described in TWC's list of charges and any applicable Tariff(s). Non-standard installations, if available, may result in additional charges as described in TWC's list of charges. In addition, I agree to pay charges for repair service calls resulting from my misuse of TWC Equipment or for failures in equipment not supplied by TWC.

(c) If my Services account is past due and TWC sends a collector to my premises, a field collection fee may be charged. The current field collection fee is on the price list or can be provided on request. I will also be responsible for all other expenses (including reasonable attorneys' fees and costs) incurred by TWC in collecting any amounts due under this Agreement and not paid by me.

(d) All charges are payable on the due date specified, or as otherwise indicated, on my bill. I agree that late charges may be assessed, subject to applicable law, on amounts that are past due. My failure to deliver payment by the due date is a breach of this Agreement. The current late fees are on the price list or can be provided upon request and, if applicable, will not exceed the maximum late fees as set forth by applicable law. TWC reserves the right to change the late fees.

(e) I agree that if my Services account with TWC is past due, TWC may terminate any of my Services or accounts, including Digital Phone Service, in accordance with applicable law. If I have a credit due to me or a deposit is being held on any account with TWC, I agree that the credit or deposit may be used to offset amounts past due on any other account I may have with TWC without notice to me. To reconnect any terminated Services, I may be required, in addition to payment of all outstanding balances on all accounts with TWC, to pay reconnect charges or trip charges (where applicable) and/or security deposits before reconnection.

(f) TWC may verify my credit standing with credit reporting agencies and require a deposit based on my credit standing or other applicable criteria. TWC may require a security deposit, or a bank or credit card or account debit authorization from me as a condition of providing or continuing to provide Services. If TWC requires a security deposit, the obligations of TWC regarding such security deposit will be governed by the terms of the deposit receipt provided by TWC to me at the time the deposit is collected. I agree that TWC may deduct amounts from my security deposit, bill any bank or credit card submitted by me, or utilize any other means of payment available to TWC, for any past due amounts payable by me to TWC, including in respect of damaged or unreturned Equipment.

EXHIBIT C PAGE 48

(g) If I have elected to be billed by credit card, debit card or ACH transfer, I agree that I will automatically be billed each month for any amounts due under this Agreement. If I make payment by check, I authorize TWC and its agents to collect this item electronically.

(h) TWC may charge fees for all returned checks and account debit, bank card or charge card chargebacks. The current return/chargeback fees are listed in the list of charges on the price list or can be provided on request. TWC reserves the right to change return/chargeback fees.

(i) If I subscribe to HSD Service, I acknowledge that, even if TWC is billing for the HSD Service, my ISP or OLP may require a bank or credit card or account debit authorization or other assurance of payment from me, including for charges for additional or continuing Services outside the HSD Service billed by TWC that are payable under the ISP Terms. I agree that TWC or ISP (and, if applicable, OLP) may bill any bank or credit card submitted by me to ISP or OLP, or utilize any other means of payment available to ISP or OLP for any past due amounts payable by me to TWC. I also agree that responsibility for billing for my HSD Service subscription may be changed between TWC and ISP or OLP upon notice to me.

(j) All use of my Services, whether or not authorized by me, will be deemed my use and I will be responsible in all respects for all such use, including for payment of all charges attributable to my account (e.g., for VOD movies, merchandise ordered via Internet, international long distance charges, etc.). TWC is entitled to assume that any communications made through my Services or from the location at which I receive the Services are my communications or have been authorized by me. My Services may contain or make available information, content, merchandise, products and Services provided by third parties and for which there may be charges payable to third parties (which may include my choice of ISP or OLP and/or entities affiliated with TWC). I agree that all such charges incurred by me or attributed to my account will be my sole and exclusive responsibility and agree to pay the same when due, and shall indemnify and hold harmless the TWC Parties for all liability for such charges. I agree that TWC is not responsible or liable for the quality of any content, merchandise, products or Services (or the price thereof) made available to me via the Services, for the representations or warranties made by the seller or manufacturer of any such item, or for damage to or injury, if any, resulting from the use of such item.

(k) I acknowledge that currently, and from time to time, there is uncertainty about the regulatory classification of some of the Services TWC provides and, consequently, uncertainty about what fees, taxes and surcharges are due from TWC and/or its customers. Accordingly, I agree that TWC has the right to determine, in its sole discretion, what fees, taxes and surcharges are due and to collect and remit them to the relevant governmental authorities, and/or to pay and pass them through to me. I further agree to waive any claims I may have regarding TWC's collection or remittance of such fees, taxes and surcharges. I further understand that I may obtain a list of the fees, taxes and surcharges that my local TWC office currently collects or passes through by writing to TWC at the following address and requesting same: Time Warner Cable, 7800 Crescent Executive Drive, Charlotte, North Carolina, 28217; Attention: Subscriber Tax Inquiries.

(l) I agree that it is my responsibility to report TWC billing errors within 30 days from receipt of the bill so that service levels and all payments can be verified. If not reported within 30 days, the errors are waived.

## 3. Installation; Equipment and Cabling

C 49

(a) If I am not the owner of the house, apartment or other premises upon which TWC Equipment and Software are to be installed, I warrant that I have obtained the consent of the owner of the premises for TWC personnel and/or its agents to enter the premises for the purposes described in Section 3(d). I agree to indemnify and hold the TWC Parties harmless from and against any claims of the owner of the premises arising out of the performance of this Agreement (including costs and reasonable attorneys' fees).

(b) I authorize TWC to make any preparations to the premises necessary for the installation, maintenance, or removal of equipment. TWC shall not be liable for any effects of normal Services installation and workmanship, such as holes in walls, etc., which may remain after installation or removal of the TWC Equipment, except for damage caused by negligence on the part of TWC.

(c) The TWC Equipment is and at all times shall remain the sole and exclusive personal property of TWC, and I agree that I do not become an owner of any TWC Equipment by virtue of the payments provided for in this Agreement or the Tariff(s) or the attachment of any portion of the TWC Equipment to my residence or otherwise. Upon termination of any Services, subject to any applicable laws or regulations, TWC may, but shall not be obligated to, retrieve any associated TWC Equipment not returned by me as required under Section 3(f) below. TWC will not be deemed to have "abandoned" the TWC Equipment if it does not retrieve such equipment.

(d) I agree to provide TWC and its authorized agents access to my premises during regular business hours upon reasonable notice during the term of this Agreement and after its termination to install, connect, inspect, maintain, repair, replace, alter or disconnect or remove the TWC Equipment, to install Software, to conduct service theft audits, or to check for signal leakage. I agree that TWC may have reasonable access to easements and TWC Equipment located on my grounds.

(e) TWC shall have the right to upgrade, modify and enhance TWC Equipment and Software from time to time through "downloads" from TWC's network or otherwise. Without limiting the foregoing, TWC may, at any time, employ such means to limit or increase the throughput available through individual cable modems whether or not provided by TWC.

(f) If the Services are terminated, I agree that I have no right to possess or use the TWC Equipment related to the terminated Services. As required under Section 10(b), I agree that I must arrange for the return of TWC Equipment to TWC, in the same condition as when received (excepting ordinary wear and tear), upon termination of the Services. If I do not promptly return the TWC Equipment or schedule with TWC for its disconnection and removal, TWC may enter any premises where the TWC Equipment may be located for the purpose of disconnecting and retrieving the TWC Equipment. I will pay any expense incurred by TWC in any retrieval of the unreturned TWC Equipment. TWC may charge me a continuing monthly fee until any outstanding TWC Equipment is returned, collected by TWC or fully paid for by me in accordance with Section 3(g). The current fee is listed in the list of charges on the price list or can be provided on request.

(g) I agree to pay TWC liquidated damages in the amount demanded by TWC, but not to exceed that specified in the then-current price list, for the replacement cost of the TWC Equipment without any deduction for depreciation, wear and tear or physical condition of such TWC Equipment if (i) I tamper with, or permit others to tamper with, TWC Equipment, (ii) the TWC Equipment is destroyed, lost, or stolen, whether or not due to circumstances

beyond my reasonable control, and even if I exercised due care to prevent such destruction, loss, or theft, or (iii) the TWC Equipment is damaged (excluding equipment malfunction through no fault of my own) while in my possession, whether or not due to circumstances beyond my reasonable control, and even if I exercised due care to prevent such damage. I agree that these liquidated damages are reasonable in light of the problem of theft of cable Services; the existence of a "black market" in TWC Equipment; the ability of third parties to steal Services with unlawfully obtained TWC Equipment, causing loss of revenues for installation and service fees; and the difficulty in determining the actual damages that arise from the unauthorized tampering with, loss, destruction, or theft of TWC Equipment. I agree to return any damaged TWC Equipment to TWC.

(h) I agree that TWC may place equipment and cables on my premises to facilitate the provision of Services to me and to other locations in my area. The license granted under this Section 3(h) will survive the termination of this Agreement until the date that is one year from the date on which I first notify TWC in writing that I am revoking such license.

## 4. Use of Services; TWC Equipment and Software

(a) I agree that TWC has the right to add to, modify, or delete any aspect, feature or requirement of the Services (including content, price, equipment and system requirements). I further agree that my ISP (and, if applicable, OLP) has the right to add to, modify, or delete any aspect, feature or requirement of the HSD Service (including content, price and system requirements). If TWC changes its equipment requirements with respect to any Services, I acknowledge that I may not be able to receive such Services utilizing my then-current equipment. Upon any such change, my continued use of Services will constitute my consent to such change and my agreement to continue to receive the relevant Services, as so changed, pursuant to this Agreement, the Terms of Use and the Tariff(s). If I participate in a promotional offer for any Service(s) that covers a specified period of time, I agree that I am assured only that I will be charged the promotional price for such Service(s) during the time specified. I agree that TWC shall have the right to add to, modify, or delete any aspect, feature or requirement of the relevant Service (s), other than the price I am charged, during such promotional period.

(b) I agree that the Services I have requested are residential Services, offered for reasonable personal, non-commercial use only. I will not resell or redistribute (whether for a fee or otherwise) the Services, or any portion thereof, or charge others to use the Services, or any portion thereof. Among other things:

(i) If I receive Video Service, I agree not to use the Services for the redistribution or retransmission of programming or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of the Services to transmit or distribute the Video Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose. I acknowledge that programs and other materials that I receive as part of the Video Service remain part of the Video Service even if I record or capture all or a portion of any such program or material in a data file or on a hard drive, DVR or similar device.

(ii) If I receive Digital Phone Service, I agree not to use the Services for telemarketing, call center, medical transcription or facsimile broadcasting Services or for any enterprise purpose whether or not the enterprise is

C. 51

directed toward making a profit. I agree that, among other things, my use of the Services to make available my Digital Phone Service, or any portion thereof, to (or to provide or permit access by) persons outside the location identified in the Work Order (even if to a limited group of people or to other residences that I own or have the right to use), will constitute an enterprise purpose.

(iii) If I receive HSD Service, I agree not to use the HSD Service for operation as an Internet service provider, for the hosting of websites (other than as expressly permitted as part of the HSD Service) or for any enterprise purpose whether or not the enterprise is directed toward making a profit. I agree that, among other things, my use of any form of transmitter or wide area network that enables persons or entities outside the location identified in the Work Order to use my Services, whether or not a fee is sought, will constitute an enterprise purpose. Furthermore, if I use a wireless network within my residence, I will limit wireless access to the HSD Service (by establishing and using a secure password or similar means) to the members of my household.

(c) Theft or willful damage, alteration, or destruction of TWC Equipment, or unauthorized reception, theft or diversion of Services, or assisting such theft, diversion, or unauthorized reception is a breach of this Agreement and potentially punishable under law (including by way of statutory damages, fine and/or imprisonment). Nothing in this Agreement, including, Section 3(g) above, shall prevent TWC from enforcing any rights it has with respect to theft or unauthorized tampering of Services or TWC Equipment under applicable law.

(d) I will not, nor will I allow others to, open, alter, misuse, tamper with or remove the TWC Equipment as and where installed by TWC or use it contrary to this Agreement, the Terms of Use, or the Tariff(s). I will not, nor will I allow others to, remove any markings or labels from the TWC Equipment indicating TWC ownership or serial or identity numbers. I will safeguard the TWC Equipment from loss or damage of any kind, including accidents, breakage or house fire, and will not permit anyone other than an authorized representative of TWC to perform any work on the TWC Equipment.

(e) I agree that to the extent any Software is licensed (or sublicensed) to me by TWC, such Software is provided for the limited purpose of facilitating my use of the Services as described in this Agreement. I will not engage in, or permit, any additional copying, or any translation, reverse engineering or reverse compiling, disassembly or modification of or preparation of any derivative works based on the Software, all of which are prohibited. I will return or destroy all Software provided by TWC and any related written materials promptly upon termination of the associated Services to me for any reason. Software licensed to me by my ISP or OLP, for instance my ISP's or OLP's client or browser software, is licensed under the ISP Terms or OLP Terms, as applicable, and is not the responsibility of TWC.

(f) I agree that I will use the Services for lawful purposes only, and in accordance with this Agreement, the Terms of Use and the Tariff(s).

(g) I agree to be responsible for protecting the confidentiality of my screen names, passwords, personal identification numbers (PINs), parental control passwords or codes, and any other security measures made available, recommended or required by Time Warner Cable. I also acknowledge that TWC's Services may from time to time include interactive features, the use of which may result in the transmission to, and use by, TWC or certain third parties of information that may constitute personally identifiable information (as such term is used in the Federal Communications Act of 1934) about me

EXHIBIT C PAGE 52

and for which TWC may be required, under the Federal Communications Act of 1934, to obtain my consent. I agree that TWC may seek such consents (or indications of my election to "opt in" to certain TWC programs) electronically, including through the use of a "click through" screen, and that TWC is entitled to assume that any such consent or opt-in election communicated through my Services or from the location at which I receive the Services is my consent or opt-in election or has been authorized by me.

(h) I agree that TWC has no liability for the completeness, accuracy or truth of the programs or information it transmits.

## 5. Special Provisions Regarding Digital Phone Service

(a) I acknowledge that the voice-enabled cable modem used to provide the Digital Phone Service is electrically powered and that the Digital Phone Service, including the ability to access 911 Services and home security and medical monitoring Services, may not operate in the event of an electrical power outage or if my broadband cable connection is disrupted or not operating. I acknowledge that, in the event of a power outage in my home, any battery included in my voice-enabled cable modem may enable back-up service for a limited period of time or not at all, depending on the circumstances, and that inclusion of the battery does not ensure that Digital Phone Service will be available in all circumstances. I also acknowledge that, in the event of a loss of power that disrupts my local TWC cable system, the battery in my voice-enabled cable modem will not provide back-up service and the Digital Phone Service will not be available.

(b) I agree that TWC will not be responsible for any losses or damages arising as a result of the unavailability of the Digital Phone Service, including the inability to reach 911 or other emergency Services, or the inability to contact my home security system or remote medical monitoring service provider. I acknowledge that TWC does not guarantee that the Digital Phone Service will operate with my home security and/or medical monitoring systems, and that I must contact my home security or medical monitoring provider in order to test my system's operation with the Digital Phone Service. I agree that I am responsible for the cost of any such testing or any fees for configuring my home security or medical monitoring system to work with the Digital Phone Service.

(c) The location and address associated with my Digital Phone Service will be the address identified on the Work Order. I acknowledge that, under Section 4 (d) of this Agreement, I am not permitted to move TWC Equipment from the location and address in which it has been installed. Furthermore, if I move my voice-enabled cable modem to an address different than that identified on the Work Order, calls from such modem to 911 will appear to 911 emergency service operators to be coming from the address identified on the Work Order and not the new address.

(d) I acknowledge that the existing telephone wiring inside my home may not support both Digital Phone Service and digital subscriber line (DSL) service. Therefore, if I intend to use Digital Phone Service on all of my phone jacks, I may be required to maintain separate wiring, not provided by TWC, within my home specifically for DSL service or to disconnect my DSL service prior to receiving the Digital Phone Service over my existing in-home wiring.

(e) I agree to provide TWC and its authorized agents with access to my telephone inside wiring at the Network Interface Device or at some other minimum point of entry in order to provide the Digital Phone Service over my

C ---- 53

existing in-home wiring.

(f) I acknowledge that the Digital Phone Service may not be compatible with certain data transmission Services, including but not limited to fax transmissions and dial-up Internet access and that I may be required to maintain a separate telephone line, not provided by TWC, in order to access such Services.

## 6. Special Provisions Regarding HSD Service

(a) Speeds and Network Management. I acknowledge that each tier or level of the HSD Service has limits on the maximum speed at which I may send and receive data at any time, as set forth in the price list or Terms of Use. I understand that the actual speeds I may experience at any time will vary based on a number of factors, including the capabilities of my equipment, Internet congestion, the technical properties of the websites, content and applications that I access, and network management tools and techniques employed by TWC. I agree that TWC or ISP may change the speed of any tier by amending the price list or Terms of Use. My continued use of the HSD Service following such a change will constitute my acceptance of any new speed. I also agree that TWC may use technical means, including but not limited to suspending or reducing the speed of my HSD Service, to ensure compliance with its Terms of Use and to ensure that its service operates efficiently. I further agree that TWC and ISP have the right to monitor my usage patterns to facilitate the provision of the HSD Service and to ensure my compliance with the Terms of Use and to efficiently manage its network and the provision of services. TWC or ISP may take such steps as it determines appropriate in the event my usage of the HSD Service does not comply with the Terms of Use. Additionally, TWC may use such tools and techniques as it determines appropriate in order to efficiently manage its network and to ensure a quality user experience for its subscribers ("Network Management Tools"). These Network Management Tools are described in the Terms of Use, which include the Acceptable Use Policy, http://help.twcable.com/html/twc_misp_aup.html.

(b) Republication.

(i) I acknowledge that material posted or transmitted through the HSD Service may be copied, republished or distributed by third parties, and that the TWC Parties will not be responsible for any harm resulting from such actions.

(ii) I grant to TWC, and I represent, warrant and covenant that I have all necessary rights to so grant, the non-exclusive, worldwide, royalty-free, perpetual, irrevocable, right and license to use, reproduce, modify, adapt, publish, translate, distribute, perform and display in any media all

material posted on the public areas of the HSD Service via my account and/or to incorporate the same in other works, but only for purposes consistent with operation and promotion of the HSD Service.

(iii) I agree that unsolicited email, or "spam," is a nuisance and that TWC and my ISP (and, if applicable, my OLP) are entitled to establish limits on the volume of email that I send. Such volume limits may be set by reference to a number of emails per day, week, month or year.

(c) Continuity of Service. In order to provide continuity of service to me, if my choice of ISP is no longer available over my local TWC cable system, I agree that TWC may provide me with an alternative ISP. In such event, TWC will

C    54

notify me of the date as of which I will begin receiving service from the
alternative ISP, the provision of which shall also be governed by this
Agreement, and TWC will provide to me a price list for such alternative ISP
service. I will have the right at any time to terminate the alternative ISP or to
change my subscription to any other ISP then offered by TWC.

(d) Unfiltered Internet Access. I acknowledge that the ISP Service provides a
connection to the Internet that may be unfiltered, and that the TWC Parties
neither control nor assume responsibility for any content on the Internet or
content that is posted by a subscriber. Although TWC or my ISP or OLP may
make available certain parental control features, I acknowledge that such
parental control features may not be entirely effective or foolproof and that,
notwithstanding such features, I or members of my household may be
exposed to unfiltered content.

(e) Use of ISP and OLP Service. I agree that TWC and/or my ISP and/or OLP
has the right, but not the obligation, to edit, refuse to post or transmit, request
removal of, or remove or block any material transmitted through, submitted to
or posted on the HSD Service, if it determines in its discretion that the
material is unacceptable or violates the terms of this Agreement, any TWC
consumption limits or any other Terms of Use. Such material might include
personal home

pages and links to other sites. In addition, I agree that, under such
circumstances, TWC may suspend my account, take other action to prevent
me from utilizing certain account privileges (e.g., home pages) or cancel my
account without prior notification. I also agree that TWC and/or ISP and/or
OLP may suspend or cancel my account for using all or part of the HSD
Service to post content to the Internet or to engage in "peer to peer" file
exchanges or other forms of file exchanges that violate this Agreement or the
Terms of Use.

(f) Responsibility for HSD Service. Each of TWC and my ISP (and, if
applicable, my OLP) has responsibilities for the HSD Service. I acknowledge
that each of my ISP and OLP may have one or more separate agreements,
policies or other terms covering my rights and obligations with regard to the
HSD Service ("ISP Terms" or "OLP Terms," as applicable) that are also
binding on me. This Agreement does not cover any ISP or OLP features or
Services that are not dependent upon distribution over TWC's cable systems
(for example, dial up access or my use of ISP or OLP software that enables
access to ISP or OLP features or Services through non-TWC access means)
or that may otherwise be provided to me by ISP or OLP separately from the
HSD Service under the ISP Terms or OLP Terms, as applicable. In the event
of termination of the HSD Service, I must also contact my ISP (and, if
applicable, my OLP) to ensure that these other features or Services (such as
dial-up access) are properly continued or discontinued.

(g) Computer Requirements. I agree that each Computer will need to meet
certain minimum hardware and software requirements that will be specified
for the HSD Service, and that such requirements may be changed from time
to time by TWC or my ISP or OLP.

**7. Support; Service and Repairs**

(a) My Services include the right to request reasonable service and
maintenance calls to check and correct problems with the Services. TWC will,
at its own expense, repair damage to or, at TWC's option, replace TWC
Equipment, and otherwise attempt to correct interruptions of the Services, due



to reasonable TWC Equipment wear and tear, or technical malfunction of the system or network operated by TWC. The Subscriber Materials contain details on contacting

TWC for this support.

(b) Unless I have obtained a TWC service protection plan (if available in my area), I agree that I am responsible for all wiring, equipment and related software installed in my residence that is not TWC Equipment or TWC-licensed Software and TWC will have no obligation to install, connect, support, maintain, repair or replace any Computer, television, telephone or telephone answering device, audiovisual recording or playback device (e.g., VCR, DVR, DVD), audio equipment, any software, or any cable modem, cabling or other equipment (other than TWC Equipment or TWC-licensed Software). TWC will not support, repair, replace, or maintain any Network Interface Card, regardless of whether provided and installed by TWC.

(c) I agree that TWC has no responsibility for the operation of any equipment, software or service other than the Services, the TWC Equipment and the TWC-licensed Software. For instance, I acknowledge that certain commercially available televisions, converter boxes and recording devices, which may be identified by their manufacturers as "cable ready" or "digital cable ready," may not be able to receive or utilize all available Services without the addition of a TWC converter box or other TWC Equipment for which a fee may be charged. If I receive HSD Service, TWC has no responsibility to support, maintain or repair any equipment, software or service that I elect to use in connection with the HSD Service, whether provided by my ISP, my OLP or a third party. For assistance with technical problems arising from such equipment, software or Services, I should refer to the Subscriber Materials for information regarding the technical support provided by my ISP or OLP or to the support area of the ISP or OLP or to the relevant third party's material.

(d) If TWC determines that non-TWC cabling or equipment connecting my residence to TWC Equipment installed on the side of or adjacent to my residence (i.e., at a ground block) is the cause of a service problem, I agree that TWC may charge me to resolve such service problem. If available from TWC in my area, I may subscribe to a TWC service protection plan that covers service related calls within my residence. If any other support Services are available from TWC, such Services will be at additional charges as described in TWC's price list.

**8. Service Interruptions; Force Majeure**

(a) I agree that TWC has no liability for delays in or interruption to my Services, except that if for reasons within TWC's reasonable control, for more than twenty-four (24) consecutive hours, (i) service on all cable channels is interrupted, (ii) there is a complete failure of the HSD Service or (iii) there is a complete failure of the Digital Phone Service, TWC will give me a prorated credit for the period of such interruption or failure if I request one within 30 days of the interruption or failure. Notwithstanding the above, TWC will issue credits for VOD, pay-per-view and pay-per-play events for service problems where a credit request is made within 30 days of the interruption or failure. In no event shall TWC be required to credit me an amount in excess of applicable service fees. TWC will make any such credit on the next practicable bill for my Services. State and local law or regulation may impose other outage credit requirements with respect to some or all of my Services. In such event, the relevant law or regulation will control.

C   56

(b) I acknowledge that TWC may conduct maintenance from time to time that may result in interruptions of my Services.

(c) The TWC Parties shall have no liability, except as set forth in Section 8(a), for interruption of the Services due to circumstances beyond its reasonable control, including acts of God, flood, natural disaster, vandalism, terrorism, regulation or governmental acts, fire, civil disturbance, electrical power outage, computer viruses or worms, strike or weather.

(d) TWC is only obligated to provide the above-referenced credits for loss of HSD Service if TWC is billing me for the HSD Service at the time of the outage. If my ISP or OLP is billing me, I will look solely to my ISP or OLP, as applicable, for a credit with respect to the HSD Service.

**9. Review and Enforcement**

(a) TWC may suspend or terminate all or a portion of my Services without prior notification if TWC determines in its discretion that I have violated this Agreement, any of the Terms of Use or any Tariff(s), even if the violation was a one-time event. If all or a portion of my Services are suspended, I will not be charged for the relevant Services during the suspension. If my account is terminated, I will be refunded any pre-paid fees minus any amounts due TWC.

(b) If I receive HSD Service, I acknowledge that TWC has the right, but not the obligation, to review content on public areas of the HSD Service, including chat rooms, bulletin boards and forums, in order to determine compliance with this Agreement and the Terms of Use.

(c) I agree that TWC shall have the right to take any action that TWC deems appropriate to protect the Services, TWC's facilities or TWC Equipment.

**10. Termination of Service**

(a) Either TWC or I may terminate all or any portion of my Services at any time for any or no reason, in its sole discretion, in accordance with applicable law.

(b) If I am moving or wish to terminate all or any portion of my Services for any reason, I will notify TWC by phone or by mail as instructed in the Subscriber Materials in order to set up a disconnect appointment and provide TWC with access to my premises to disconnect the relevant Services and recover the TWC Equipment specified on the Work Order on a DATE PRIOR TO the last day of residency. This also applies if I am receiving a period of free or discounted Services. In other words, at the end of the free or discounted period, TWC is entitled to begin billing me for the usual charges associated with the relevant Services unless I take the appropriate steps to terminate the Services as described in this paragraph.

(c) I cannot terminate my Services by writing "Canceled" (or any other messages) on my bill or check, or by making a disconnect appointment that does not result in TWC's physical recovery of the TWC Equipment. In addition, I agree that any restrictive endorsements (such as "paid in full"), releases or other statements on or accompanying checks or other payments accepted by TWC shall have no legal effect.

(d) If I subscribe to HSD Service, I acknowledge that notice given by me to

C   57

TWC of termination of my HSD Service may not be sufficient to terminate billing by my ISP or OLP for additional or continuing Services under the ISP Terms or OLP Terms (for example, "dial up" access). I agree that I am solely responsible for contacting my ISP or OLP in addition to TWC to ensure that all such Services are terminated in accordance with the ISP Terms or OLP Terms, as applicable.

**11. Disclaimer of Warranty; Limitation of Liability**

(a) I AGREE THAT THE SERVICES ARE PROVIDED BY TWC ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF TITLE OR NONINFRINGEMENT OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN THOSE WARRANTIES THAT ARE IMPLIED BY, AND INCAPABLE OF EXCLUSION, RESTRICTION OR MODIFICATION UNDER, THE LAWS APPLICABLE TO THIS AGREEMENT. TWC MAKES NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE OR THAT THE TWC EQUIPMENT WILL OPERATE AS INTENDED. IN PARTICULAR, I AGREE THAT MY USE OF THE HSD SERVICE (INCLUDING THE CONTENT, INFORMATION, SERVICES, EQUIPMENT AND SOFTWARE, THE PURCHASE OF MERCHANDISE AND SERVICES, THE TRANSMISSION OF INFORMATION AND OTHER COMMUNICATIONS BY AND TO ME AND THE DOWNLOADING OF COMPUTER FILES) IS AT MY SOLE RISK. I FURTHER AGREE THAT TWC IS NOT RESPONSIBLE FOR THE RECORDING OF OR FAILURE TO RECORD ANY PROGRAM OR PORTION THEREOF, OR FOR THE CONTENT OF ANY PROGRAM OR CONTENT ON MY DVR. WITHOUT LIMITING THE FOREGOING:

(i) ANY AND ALL PRODUCTS AND SERVICES PROVIDED BY TWC AND/OR ISP AND/OR OLP AND/OR ANY LONG DISTANCE PROVIDER TO ME THAT ARE NOT PART OF THE SERVICES AS DEFINED HEREIN ARE OUTSIDE THE SCOPE OF THIS AGREEMENT AND THE TWC PARTIES HAVE NO RESPONSIBILITY OR LIABILITY FOR ANY SUCH PRODUCTS OR SERVICES; AND

(ii) NONE OF THE TWC PARTIES MAKES ANY WARRANTIES AS TO THE SECURITY OF MY COMMUNICATIONS VIA TWC'S FACILITIES OR THE SERVICES (WHETHER SUCH COMMUNICATIONS ARE DIRECTED WITHIN THE SERVICES, OR OUTSIDE THE SERVICE TO OR THROUGH THE INTERNET), OR THAT THIRD PARTIES WILL NOT GAIN UNAUTHORIZED ACCESS TO OR MONITOR MY COMPUTERS(S) OR ONLINE (INCLUDING VOICE) COMMUNICATIONS. I AGREE THAT NONE OF THE TWC PARTIES WILL BE LIABLE FOR ANY SUCH UNAUTHORIZED ACCESS. I HAVE THE SOLE RESPONSIBILITY TO SECURE MY COMPUTER AND ONLINE (INCLUDING VOICE) COMMUNICATIONS.

(b) I ACKNOWLEDGE THAT TWC'S OR MY INSTALLATION, USE, INSPECTION, MAINTENANCE, REPAIR, REPLACEMENT OR REMOVAL OF THE SERVICES, TWC EQUIPMENT AND SOFTWARE MAY RESULT IN DAMAGE TO MY COMPUTER(S), TELEPHONES AND TELEPHONE ANSWERING DEVICES, TELEVISIONS, RECORDING AND PLAYBACK DEVICES, AUDIO EQUIPMENT, OR ANY CABLE MODEM, CABLING OR OTHER EQUIPMENT OR HARDWARE, INCLUDING SOFTWARE AND DATA FILES STORED THEREON. I SHALL BE SOLELY RESPONSIBLE FOR BACKING UP ALL EXISTING COMPUTER OR OTHER SOFTWARE OR DATA FILES PRIOR TO THE PERFORMANCE OF ANY OF THE FOREGOING ACTIVITIES. NONE OF THE TWC PARTIES, OR THEIR



VENDORS, LICENSEES OR PROGRAMMERS, SHALL HAVE ANY LIABILITY, AND EACH EXPRESSLY DISCLAIMS ANY RESPONSIBILITY WHATSOEVER, FOR ANY DAMAGE TO OR LOSS OR DESTRUCTION OF ANY EQUIPMENT, SOFTWARE, HARDWARE, DATA OR FILES.

(c) EXCEPT FOR THE REFUND OR CREDIT AS EXPRESSLY PROVIDED IN SECTIONS 9(a) AND 8(a) RESPECTIVELY, IN NO EVENT (INCLUDING NEGLIGENCE) WILL ANY TWC PARTY OR ANY PERSON OR ENTITY INVOLVED IN CREATING, PRODUCING OR DISTRIBUTING THE SERVICES (INCLUDING THE CONTENT INCLUDED THEREIN OR THE SERVICES ACCESSED THEREBY) OR EQUIPMENT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THE USE OF OR INABILITY TO USE THE SERVICES, INCLUDING THE USE OF OR INABILITY TO USE EMERGENCY 911 SERVICES, OR FOR ANY ACTION TAKEN BY TWC TO PROTECT

THE SERVICES OR THE BREACH BY TWC OF ANY WARRANTY.

(d) I AGREE THAT THE PROVISIONS OF THIS SECTION 11 SHALL APPLY TO ALL CONTENT OR SERVICES INCLUDED IN, OR ACCESSIBLE THROUGH, THE SERVICES, AND ARE FOR THE BENEFIT OF, AND MAY BE ENFORCED BY, ALL OF THE TWC PARTIES.

## 12. Privacy

(a) My privacy interests, including my ability to limit disclosure of certain information to third parties, are addressed by, among other laws, the Federal Communications Act of 1934, as amended, and the Electronic Communications Privacy Act. Personally identifiable information that may be collected, used or disclosed in accordance with applicable laws is described in the Subscriber Privacy Notice delivered to me by TWC on its own behalf and on behalf of its Affiliated ISPs. I acknowledge receipt of the Subscriber Privacy Notice, which is deemed to form a part of this Agreement, and expressly consent to the collection, use and disclosure of personally identifiable and other information as described in the Subscriber Privacy Notice, as it may be amended from time to time.

(b) I agree that, in addition to actions and disclosures specifically authorized by law or statute or authorized elsewhere in this Agreement, TWC and its Affiliated ISPs shall each have the right (except where prohibited by law notwithstanding my consent), but not the obligation, to disclose any information to protect their respective rights, property and/or operations, or where circumstances suggest that individual or public safety is in peril. I consent to such actions or disclosures.

(c) If I am a Digital Phone customer, I consent to TWC's disclosure of my name, address and/or telephone number to the general public in connection with Caller ID functions, telephone directories, and 411 and 911 Services. I also consent to TWC's disclosure of personally identifiable information to the telephone companies serving those end users to whom I make calls so that the calls can be completed. If I wish to have TWC remove this information from one or more of these Services, I understand that I may notify TWC to do so, subject to any applicable fees.

## 13. Consent to Phone and Email Contact

(a) I consent to TWC calling the phone numbers I supply to it for any purpose,

including the marketing of its current and future Services. I agree that these phone calls may be made using any method, including an automatic dialing system or an artificial or recorded voice. Upon my request, the phone numbers I have previously provided will be removed from TWC's phone marketing list. I can make this request by calling or writing my local TWC office and asking to be placed on TWC's Do Not Call List.

(b) I acknowledge that being included in any state or federal "do not call" registry will not be sufficient to remove me from TWC's phone marketing list.

(c) I consent to TWC emailing me, at any email address, including that of a wireless or mobile device, that I provide to TWC (or that TWC issues to me in connection with the HSD Service), for any purpose, including the marketing of TWC's current and future Services. If my wireless or mobile provider charges me for receipt of such messages, I acknowledge and agree that I am responsible for paying such charges. I may revoke this authorization insofar as it relates to marketing messages at any time by calling or writing my local TWC office.

**14. Arbitration**

EXCEPT FOR CLAIMS FOR INJUNCTIVE RELIEF AND CLASS ACTION LAWSUITS, AS DESCRIBED BELOW, ANY PAST, PRESENT, OR FUTURE CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE RESOLVED BY BINDING ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION UNDER ITS COMMERCIAL ARBITRATION RULES, INCLUDING, IF APPLICABLE, THE SUPPLEMENTARY PROCEDURES FOR THE RESOLUTION OF CONSUMER RELATED DISPUTES. CONSOLIDATED OR CLASS ACTION ARBITRATIONS SHALL NOT BE PERMITTED, AND THE ARBITRATOR OF ANY DISPUTE OR CLAIM BROUGHT UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL NOT HAVE THE POWER TO AWARD INJUNCTIVE RELIEF. INJUNCTIVE RELIEF MAY BE SOUGHT, AND CLASS ACTION LAWSUITS MAY BE BROUGHT, SOLELY IN AN APPROPRIATE COURT OF LAW. NO CLAIM SUBJECT TO ARBITRATION UNDER THIS AGREEMENT MAY BE COMBINED WITH A CLAIM SUBJECT TO RESOLUTION BEFORE A COURT OF LAW. THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR, EXCEPT THAT THE ARBITRABILITY OF ANY DISPUTE PURPORTING TO CONSTITUTE A CLASS ACTION SHALL BE DETERMINED BY A COURT OF COMPETENT JURISDICTION. JUDGMENT UPON AN AWARD MAY BE ENTERED IN ANY COURT HAVING COMPETENT JURISDICTION. IF ANY PORTION OF THIS SECTION IS HELD TO BE UNENFORCEABLE, THE REMAINDER SHALL CONTINUE TO BE ENFORCEABLE.

**15. Definitions**

(a) "Affiliated ISP" means Road Runner and any other ISP in which any TWC Party holds an ownership interest.

(b) "Agreement" means this Services Subscription Agreement, as it may be amended from time to time by TWC.

(c) "Computer" means the personal computer(s) located at my residence that will be used to access the HSD Service, as specified on the accompanying Work Order.

C      60

(d) "Digital Phone Service" means the TWC phone service that provides users with the ability to send and receive local and/or long distance calls and to access additional related features and functions through TWC's cable systems.

(e) "DVR" means a set-top box or other device enabled with a digital video recorder that is provided to me by TWC.

(f) "HSD Service" and "High Speed Data Service" mean the online content, features, functions and Services (which may include Internet access) of the ISP or OLP selected by me, as provided over TWC's cable systems.

(g) "including" or "include" shall mean inclusion, without limitation.

(h) "ISP" means the Internet service provider selected by me from among those offered now or in the future by TWC for the HSD Service. My ISP is the entity that provides my Internet connectivity.

(i) "Me," "My," and "I" mean the account holder identified on the Work Order who is authorized by TWC to access and use the Services.

(j) "OLP" or "On-line Provider" means a provider of on-line content, features, functions and Services that are used in conjunction with my ISP Service (and whose service may be purchased with an ISP Service as part of a combined offering) but that does not itself provide Internet connectivity.

(k) "Services" means any and all Services provided to me by TWC, which may include Video Service, High Speed Data Service, Digital Phone Service and equipment based Services such as digital video recorder Services.

(l) "Software" means the computer software, if any, licensed by ISP or OLP to me to access the HSD Service, or licensed by TWC to me to facilitate installation or use of my ISP's or OLP's service or any other Services. Software also refers to any executable code that may be included in, downloaded to, or utilized by, any TWC Equipment.

(m) "Subscriber Materials" means the handbooks, manuals and other guide materials provided by TWC or any third party (including my ISP or OLP) regarding use of the Services.

(n) "Subscriber Privacy Notice" means the Subscriber Privacy Notice described in Section 12(a), as it may be amended from time to time by TWC.

(o) "Tariff(s)" means the materials describing the terms upon which TWC offers Digital Phone Service, which have been filed at the Public Service Commission or comparable state agency serving the jurisdiction in which I live.

(p) "Terms of Use" shall mean all rules, terms and conditions set forth in this Agreement or otherwise established now or hereafter by TWC regarding permissible or impermissible uses of or activities related to, the HSD Service.

(q) "TWC" means the local Time Warner Cable-affiliated cable operator that is providing the Services over its cable system, or any cable operator to whom TWC assigns this Agreement.

C     61

(r) "TWC Equipment" means any equipment provided by TWC to me including, but not limited to, wire, cable, cable conduit, splitters, junction boxes, converter boxes (also known as "set top" boxes), decoders, CableCARD™, terminals, cable modems, voice-enabled cable modems, remote control units, and any other equipment or materials provided to me by TWC for use in connection with the receipt of Services. TWC Equipment does not include any Network Interface Card ("NIC") installed in my Computer.

(s) "TWC Parties" means TWC and its corporate parents, affiliates and subsidiaries and their respective directors, officers, employees and agents.

(t) "Video Service" means video and/or audio programming Services such as basic, standard, digital and premium Services, Services provided on a per-channel or per-program basis, pay-per-play, pay-per-view or VOD.

(u) "VOD" means video on demand.

(v) "Work Order" means the Time Warner Cable work order provided to me on or after January 1, 2006 in connection with the installation or commencement of my Service(s).

**16. Indemnification**

I agree to defend, indemnify and hold harmless the TWC Parties from and against any and all claims and expenses, including reasonable attorneys' fees, arising out of or related in any way to my use of the Services or otherwise arising out of the use of my account or any equipment or facilities in connection therewith, or my use of any other TWC products or Services or any ISP's or OLP's products or Services.

**17. Term**

This Agreement will remain in effect until terminated by either party or superseded by a revised Subscription Agreement.

**18. Interpretation; Severability**

This Agreement is, and shall be interpreted as, subject to applicable law and regulation and to any applicable franchise agreement between a governmental authority and TWC. In the event that any portion of this Agreement is held to be invalid or unenforceable, the invalid or unenforceable portion shall be construed in accordance with applicable law as nearly as possible to reflect the original intentions of the parties as set forth herein, and the remainder of this Agreement shall remain in full force and effect.

**19. Consent to Electronic Notice**

I agree that unless otherwise specified, all notices required or contemplated hereunder will be provided by TWC by such means as TWC shall determine in its discretion. Without limiting the foregoing, I agree that TWC may provide any notices required or contemplated hereunder or by applicable law, including notice of changes to this Agreement, the Terms of Use, the Tariff(s) or the Privacy Notice, by electronic means (for example, email or online posting). An online version of this Agreement, the Terms of Use, the Subscriber Privacy Notice and any applicable Tariff(s), as so changed from time to time, will be accessible at http://help.twcable.com/html/policies.html or another online location designated by TWC, or can be obtained by calling my

http://help.twcable.com/html/twc_sub_agreement_ca.html                    4/26/2007



local TWC office.

## 20. Waiver

I agree that failure by TWC to enforce any of its rights hereunder shall not constitute a waiver of any such rights. No waiver by either party of any breach or default shall be deemed to be a waiver of any preceding or subsequent breach or default.

## 21. Assignment

I understand that my Services are being provided only to the location identified on my Work Order and that I am not allowed to transfer all or any portion of the Services, or TWC's Equipment, to any other person, entity or location, including a new residence. I agree that I may not assign or transfer this Agreement. TWC may transfer or assign any portion or all of this Agreement at any time without notice to me, and I waive any such notice which may be required.

## 22. Effect of Applicable Law; Reservation of Rights

This Agreement, the Work Order and the Terms of Use are subject to all applicable federal, state or local laws and regulations in effect in the relevant jurisdiction(s) in which I receive my Services. If any provision of this Agreement, the Work Order or the Terms of Use contravene or are in conflict with any such law or regulation, or if I am entitled to more favorable rights under any such law or regulation than are set forth in any provision in this Agreement, the Work Order or the Terms of Use, then the terms of such law or regulation, or the rights to which I am entitled under such law or regulation, shall take priority over the relevant provision of this Agreement, the Work Order or the Terms of Use. If the relevant law or regulation applies to some but not all of my Service(s), then such law or regulation will take priority over the relevant provision of this Agreement, the Work Order or the Terms of Use only for purposes of those Service(s) to which the law or regulation applies. Except as explicitly stated in this Agreement, nothing contained in this Agreement shall constitute a waiver by me or TWC of any rights under applicable laws or regulations pertaining to the installation, operation, maintenance or removal of the Services, facilities or equipment.

## 23. Parental Control Device

I acknowledge that I have been advised of the availability of TWC's parental control device which can filter or block certain programming. Additional information about the device is available at the TWC contact number in the Subscriber Materials.

## 24. Conflicting Terms

In the event of a conflict in the terms and conditions between this Residential Services Subscriber Agreement and the accompanying Work Order, then the terms and conditions of this Agreement shall control.

C    63

# EXHIBIT D

D     64

Page 1 of 3

8949 WARE COURT SAN DIEGO CA
92121-2275        8340 1000 NX 7 12        0004598

**Billing Date:**                        August 12, 2006
**Account Number:**        834010 110 0088309

#BWNKTKR
#1659898899911696#
LEON ALPERT
12968 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

**How to reach us ....**
☏        CUSTOMER SERVICE (858) 695-3220
        TECHNICAL SUPPORT OPEN 24 HOURS
        BILLING OR SALES 8-8 M-F & 8-5 SAT

ll..l..l.lll.....ll.l.l.ll.l..l.l.l..ll.l..l.l.l

## *Account Snapshot*

| | |
|---|---:|
| Previous Balance | $ 170.73 |
| Payments | − 170.73 |
| Monthly Charges | 156.70 |
| Pay-Per-View Charges | 3.95 |
| Adjustments | 11.59 |
| Taxes & Fees | 8.42 |
| **Amount Due** | **$ 180.66** |
| **Payment Due Date** | **09/01/06** |

*(See additional page(s) for account details.)*

## *Important Viewer News*

 Tune to Answers On Demand channel 100 for information on how your equipment works. Topics include Getting Started, Using Parental Controls, Changing Pin Numbers, and more. Visit twcsd.com for details.

 Don't miss Barrera vs. Juarez live on Pay-Per-View Saturday, Sept. 16, on ch 801 on Time Warner Digital Cable. Easy ordering using your remote control! Also avialable on HD ch 726. An HD TV and HD converter are required. Restrictions apply. Details at twcsd.com.

The method for determining contributions to the Federal Universal Service Fund has recently changed and has resulted in an increase in the amount you will be billed for those contributions. Please visit www.timewarnercable.com/FUSF for more information about this change.

## Payment Coupon

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE .*
Allow 4-5 days for your mailed payment to be credited.

**CUSTOMER SERVICE (858) 695-3220**

LEON ALPERT
Billing Date:                        August 12, 2006
**Account Number:**        834010 110 0088309

| | |
|---|---:|
| **Amount Due** | $ 180.66 |
| **Payment Due Date** | 09/01/06 |
| **Amount Enclosed** | $ |

*Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX  AZ 85038-9390

ll..l.l.ll.......ll.l.l.l...lll.l.l.ll..l.l.l....ll.l

8340101100088309001801661



LEON ALPERT
Billing Date:
Account Number:

8340 1000 NX 7 12     0004598

Page 2 of 3
August 12, 2006
834010 110 0088309

## Account Details

This statement is for service from 8\12\06 to 9\11\06
Payments received after August 12, 2006 will be reflected on your next bill.

| Previous Balance | | $ 170.73 |
|---|---|---|

**Payments**

| | | Amount |
|---|---|---|
| 08/01 | Payment – Thank You | – 170.73 |

**Monthly Charges**

| | | | Amount |
|---|---|---|---|
| 08/12 – 09/11 | Digital Phone Package — Includes Unlimited Local And Long Distance Calling Within The United States, Us Territories And Canada | | 39.95 |
| 08/12 – 09/11 | iCONTROL Premium Service Your Pay Service(s) On Demand | | 6.95 |
| 08/12 – 09/11 | HDTV Converter     (Includes Digital Remote) | | 8.00 |
| 08/12 – 09/11 | HDTV Converter     (Includes Digital Remote) | | 8.00 |
| 08/12 – 09/11 | Service Protection Plan | | 2.95 |
| 08/12 – 09/11 | Premier Digital | | 11.00 |
| | Digital Movie Pack | $4.00 | |
| | Digital Variety Pack | $4.00 | |
| | Navigator Screen Guide | $3.00 | |
| 08/12 – 09/11 | Any 4 Premium Channels | | 24.95 |
| | Cinemax | $6.24 | |
| | HBO | $6.24 | |
| | Showtime | $6.24 | |
| | STARZ | $6.23 | |
| 08/12 – 09/11 | Wireless Road Runner | | 54.90 |
| 08/12 – 09/11 | Navigator Screen Guide | | .00 |

**Pay–Per–View Charges**

| | | | Amount |
|---|---|---|---|
| 07/15 | Aeon Flux | Start 07:13 P.M. | 3.95 |

**Adjustments**

| | | Amount |
|---|---|---|
| 07/13 | Oper/Dir Assistance | 2.97 |

### ADDITIONAL DETAILS CONTINUED ON NEXT PAGE

ABOUT YOUR TIME WARNER CABLE AGREEMENT

OFFICE LOCATION and WRITTEN INQUIRIES:
San Diego: 8949 Ware Ct., San Diego, CA, 92121. Lobby Hours: Monday-Saturday, 8:00am to 7:00pm.
Coronado: 1110 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3220, or (619) 435-0157.
Payments: Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 435-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically.
Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
Franchising Authority Information:

City of San Diego:
City of San Diego
1200 3rd Ave., Suite 250
San Diego, CA 92101
(619) 236-6010
Comm ID# CA0428

County of San Diego
(outside city limits):
County of San Diego
1600 Pacific Hwy., Room 208
San Diego, CA 92101
(619) 595-4650
Comm ID# CA0568

City of Poway:
City of Poway
13325 Civic Center Drive
Poway, CA 92064
(858) 668-4500
Comm ID# CA0572

City of Coronado:
City of Coronado
1825 Strand Way
Coronado, CA 92118
(619) 522-7335
Comm ID# CA0431

Navy Housing:
NAVCOMTELSTA
San Diego, Code N52
Box 357056
San Diego, CA 92135-7056
(619) 532-1364
Comm ID# CA0428

Digital Phone Consumer Information: Non-payment of any portion of your cable television, high-speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission at Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or at www.cpuc.ca.gov, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note: the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming"). The California consumer protection rules are available online at www.cpuc.ca.gov.
sc080127

D     66     TW0110

LEON ALPERT
Billing Date:
Account Number:

8340 1000 NX 7 12    0004598

Page 3 of 3
August 12, 2006
834010 110 0088309

## Account Details

This statement is for service from 8\12\06 to 9\11\06

Payments received after August 12, 2006 will be reflected on your next bill.

| | | |
|---|---|---|
| 08/11 | Oper/Dir Assistance | |
| 08/12 | International L.D. Calls | 3.97 |
| | | 4.65 |

**Taxes & Fees**

| | | Amount |
|---|---|---|
| 08/12 | Cable Franchise Fee | 3.46 |
| 08/12 | CA Relay Service & Comm. Device Fund | .11 |
| 08/12 | CA Universal Lifeline Tel Serv Surcharge | .36 |
| 08/12 | CA High Cost Fund A | .05 |
| 08/12 | CA High Cost Fund B | .74 |
| 08/12 | Emergency Telephone Users Surcharge Tax | .22 |
| 08/12 | Federal Universal Service Fund | 3.48 |

**Amount Due**                                               $ 180.66

D    67    **TW0111**

# EXHIBIT E

E     68

Page 1 of 3

8949 WARE COURT SAN DIEGO CA
92121-2275          8340 1000 NX 7 12    0004700

Billing Date:                    October 12, 2006
Account Number:    834010 110 0088309

#BWNKTKR
#1659898899911696#
LEON ALPERT
12968 CAMINITO DEL CANTO
DEL MAR CA 92014-3757

How to reach us ....
☎    CUSTOMER SERVICE (858) 695-3220
       TECHNICAL SUPPORT OPEN 24 HOURS
       BILLING OR SALES 8-8 M-F & 8-5 SAT

## Account Snapshot

| | |
|---|---|
| Previous Balance | $ 172.30 |
| Payments | - 99.00 |
| Monthly Charges | 109.00 |
| Pay-Per-View Charges | 3.99 |
| Adjustments | - 42.95 |
| Taxes & Fees | 6.42 |

*(See additional page(s) for account details.)*

| | |
|---|---|
| Amount Due | $ 149.76 |
| Payment Due Date | 11/01/06 |

## Important Viewer News



Section 14 of your Subscriber Agreement has been amended. The new version is available at http://help.twcable.com/html/policies.html.

To view the call detail for all of your Digital Phone calls, go to http://www.twcdigitalphone.com and select the "My Account" link.

---

## Payment Coupon

LEON ALPERT
Billing Date:                    October 12, 2006
Account Number:    834010 110 0088309

Please detach and enclose this coupon with your payment.
*Do not send cash. Make checks payable to*
*TIME WARNER CABLE*
Allow 4-5 days for your mailed payment to be credited.

CUSTOMER SERVICE (858) 695-3220

| | |
|---|---|
| Amount Due | $ 149.76 |
| Payment Due Date | 11/01/06 |

Amount Enclosed  [ $          ]

*Thank You*
*We appreciate your business.*

TIME WARNER CABLE
PO BOX 29390
PHOENIX AZ 85038-9390

834010110008830900149765

**TW0115**

E    69

LEON ALPERT
Billing Date:       Page 2 of 3
October 12, 2006
Account Number:

8340 1000 NX 7 12    0004700

## Account Details

This statement is for service from 10\12\06 to 11\11\06
Payments received after October 12, 2006 will be reflected on your next bill.

**Previous Balance** $ 172.30

**Payments**

| Date | Description | Amount |
|---|---|---|
| 10/03 | Payment - Thank You | - 99.00 |

**Monthly Charges**

| Date | Description | | Amount |
|---|---|---|---|
| 09/21 | Digital Phone Package | Partial Month(s) 09/12-10/11 | - 39.95 |
| 09/21 | iCONTROL Premium Service | Partial Month(s) 09/12-10/11 | - 6.95 |
| 09/21 | HDTV Converter | Partial Month(s) 09/12-10/11 | - 8.00 |
| 09/21 | Premier Digital | Partial Month(s) 09/12-10/11 | - 11.00 |
| 09/21 | Any 4 Premium Channels | Partial Month(s) 09/12-10/11 | - 24.95 |
| 09/21 | Wireless Road Runner | Partial Month(s) 09/12-10/11 | - 54.90 |
| 09/21 | Hoa DIGIPiC 4000 Trio | Partial Month(s) 09/12-10/11 | 121.90 |
| 10/12 - 11/11 | HDTV Converter | (Includes Digital Remote) | 8.00 |
| 10/12 - 11/11 | Service Protection Plan | | 2.95 |
| 10/12 - 11/11 | Hoa DIGIPiC 4000 Trio | | 121.90 |
| | Wireless Road Runner | | |
| | Digital Phone Package | | |
| | Free On Demand | | |
| | iCONTROL Premium Service | | |
| | Digital Access | | |
| | Cinemax | | |
| | HBO | | |
| | Navigator Screen Guide | | |
| | Showtime | | |
| | STARZ | | |
| | Digital Movie Pack | | |
| | Digital Sports Pack | | |
| | Digital Variety Pack | | |
| | Hoa Standard Service | | |
| | Road Runner High Speed | | |

**ADDITIONAL DETAILS CONTINUED ON NEXT PAGE**

**ABOUT YOUR TIME WARNER CABLE AGREEMENT**

**OFFICE LOCATION and WRITTEN INQUIRIES:**
San Diego: 8949 Ware Ct., San Diego, CA. 92121. Lobby Hours: Monday-Saturday, 8:90am to 7:00pm.
Coronado: 1190 Orange Ave., Coronado, CA. 92118. Lobby Hours: Monday-Friday, 8:30am-5:00pm, Saturday 8:30am-Noon.
Note: If you believe this statement contains a billing error, we must hear from you within 30 days of receipt of the statement in question. If we are not notified of the discrepancy the statement will be considered correct. Our billing number is (858) 695-3226, or (619) 435-0157.
Payments: Your bill is due and payable upon receipt and becomes delinquent the day after the due date shown on your bill. If we do not receive your payment by this date, your service may be interrupted. If your service is interrupted for non-payment, reconnection will require payment in full of the amount owed plus a reconnection charge for each outlet. Advance payment of a deposit and your next month's service fee may also be required. You may request your deposit returned after one year of a good payment record by calling (858) 695-3220, or (619) 436-0157. If we have not received your full payment for the previous month's service within seventeen days past the delinquent statement process date, a late charge of $4.25 will be applied to your account. Time Warner Cable reserves the right to process your check payment electronically.
Equipment: Cable channel selectors, remote control units, video switchers, cable modem equipment, and all other equipment installed at your home shall remain the property of Time Warner Cable. Additional cable connections and alterations to our equipment are not authorized unless performed by company personnel on behalf of the company. Upon termination, for whatever reason, of your cable service with us, you must return this equipment to us in the original operating condition as when received, reasonable wear and tear excepted. If our cable equipment is destroyed, damaged, lost or stolen, or if you fail to return it to us upon termination of your service, you will be charged the amount necessary to repair or replace the equipment. We will return to you any credit due you within thirty (30) days of our receipt of the equipment. If your credit is less than $3.00, please call (858) 695-3220 or (619) 435-0157 to request a refund. However, if you have an outstanding balance at the time service is terminated, we will apply any deposits to the payment of such charges and issue a refund, if applicable, of the difference.
Franchising Authority Information:

| City of San Diego | County of San Diego | City of Poway | City of Coronado | Navy Housing: |
|---|---|---|---|---|
| City of San Diego | (outside city limits): | City of Poway | 1825 Strand Way | NAVCOMTELSTA |
| 1200 3rd Ave., Suite 250 | County of San Diego | 13325 Civic Center Drive | Coronado, CA 92118 | San Diego, CA 92135-7056 |
| San Diego, CA 92101 | 1600 Pacific Hwy., Room 208 | Poway, CA 92064 | (619) 522-7335 | Box 357056 |
| (619) 236-6010 | San Diego, CA 92101 | (858) 668-4590 | Comm ID# CA0431 | San Diego, CA 92135-7056 |
| Comm ID# CA0428 | (619) 595-4850 | Comm ID# CA0572 | | (619) 532-1364 |
| | Comm ID# CA0568 | | | Comm ID# CA0428 |

**Digital Phone Consumer Information:** Non-payment of any portion of your cable television, high speed data, and/or Digital Phone service could result in disconnection of your local telephone service. If you have a complaint you cannot resolve with us, write the California Utilities Commission of Consumer Affairs Branch, 505 Van Ness Ave., San Francisco, CA 94102, or at www.cpuc.ca.gov, or call (800) 649-7570 or TDD (800) 229-6846. If your complaint concerns interstate or international calling, write the FCC at Consumer Complaints, 445 12th Street SW, Washington, DC 20554 or at fccinfo@fcc.gov, or call (888) 225-5322 or TTY (888) 835-5322. Note the CPUC handles complaints of both interstate and intrastate unauthorized carrier changes ("slamming") The California consumer protection rules are available online at www.cpuc.ca.gov.
sc080127

TW0116

E  70 

LEON ALPERT
Billing Date:                           Page 3 of 3
8340 1000 NX 7 12    0004700    Account Number:            October 12, 2006
                                                834010 110 0088309

## Account Details

This statement is for service from 10\12\06 to 11\11\06
Payments received after October 12, 2006 will be reflected on your next bill.

**Pay-Per-View Charges**

| Date | Description | | Amount |
|------|-------------|--|--------|
| 10/08 | Syriana | Start 09:08 P.M. | 3.99 |

**Adjustments**

| Date | Description | | Amount |
|------|-------------|--|--------|
| 09/15 | Oper/Dir Assistance | | .99 |
| 09/02 | 16 Blocks Widescreen | Adjustment | - 3.99 |
| 09/20 | Digital Phone - Adjustment | | - 39.95 |

**Taxes & Fees**

| Date | Description | Amount |
|------|-------------|--------|
| 10/12 | Cable Franchise Fee | 2.41 |
| 10/12 | CA Relay Service & Comm. Device Fund | .01 |
| 10/12 | CA Universal Lifeline Tel Serv Surcharge | .38 |
| 10/12 | CA High Cost Fund A | .06 |
| 10/12 | CA High Cost Fund B | .58 |
| 10/12 | Emergency Telephone Users Surcharge Tax | .19 |
| 10/12 | Federal Universal Service Fund | 2.79 |

| Amount Due | $ 149.76 |
|------------|----------|

TW0117

E    71