## COPY

FILED

APR 15 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY

1  JEFFREY M. SHOHET (Bar No. 067529)
   JULIE L. HUSSEY (Bar No. 237711)
2  CARRIE S. DOLTON (Bar No. 234298)
   **DLA PIPER US LLP**
3  401 B Street, Suite 1700
   San Diego, CA 92101-4297
4  Tel: 619.699.2700
   Fax: 619.699.2701
5
   Attorneys for Defendant
6  TIME WARNER ENTERTAINMENT-ADVANCE/
   NEWHOUSE PARTNERSHIP, A NEW YORK GENERAL
7  PARTNERSHIP

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  LEON ALPERT, an individual, on behalf of    Case No. 08 CV 0582 BTM WMc
    himself, on behalf of all those similarly
12  situated, and on behalf of the general public,   **TIME WARNER CABLE'S RESPONSE
                                                     TO STATUS CONFERENCE**
13                Plaintiffs,
                                                     [FILED UNDER SEAL]
14        v.
                                                     (Redacted Version)
15  TIME WARNER CABLE, INC., a Delaware
    corporation, and DOES 1 TO 100,
16                                                   Judge:    Hon. Barry Ted Moskowitz
                  Defendants.                        Ctrm:     15
17

18

19

20

21

22

23

24

25

26

27

28

1    Defendant Time Warner Entertainment-Advance/Newhouse Partnership, a New York

2    general partnership ("TWC"), sued erroneously as Time Warner Cable, Inc., defendant in the

3    above-captioned action, hereby submits this response to the Status Conference.  Specifically, at

4    the April 8, 2008 Status Conference, Judge Moskowitz reported that he is a member of the

5    ████████ homeowners' association ("HOA") and a subscriber of TWC.  After discussion with

6    counsel regarding the nature of the allegations of the Complaint, Judge Moskowitz requested that

7    counsel for TWC submit this report (under seal) regarding the nature of any agreements between

8    the HOA and TWC which would cause him to be a potential member of the putative class alleged

9    in the Complaint or might otherwise affect his ability to serve as judge in this case.

10    TWC checked its records and does not believe that it has an agreement with ████████

11    HOA of the type that the plaintiff's HOA has with TWC (bulk video services for all units paid by

12    the HOA).  Thus, the Court would not be a member of the putative class as currently defined by

13    the most recent amendment of the Complaint in the above-captioned action.

14    While plaintiff's Complaint is based on the allegation that TWC overcharged plaintiff for

15    cable services by charging him for basic cable services already paid for by his HOA, plaintiff is

16    attempting through his opposition to TWC's pending motion for summary judgment to assert new

17    claims.  TWC fully disputes the attempt to assert new claims in order to defeat TWC's motion for

18    summary judgment on the pending claims.  *See Schlacter-Jones v. Gen. Tel. of Cal.*, 936 F.2d

19    435, 443 (9th Cir. 1991) (overruled on other grounds, *Cramer v. Consolidated Freightways, Inc.*,

20    255 F.3d 683, 692–93 (9th Cir. 2001) (en banc)); *see also M/V American Queen v. San Diego*

21    *Marine Constr. Corp.*, 708 F.2d 1483, 1492 (9th Cir. 1983).  We call this issue to the attention of

22    the Court as these new claims may attempt to expand the class beyond individuals residing in

23    HOAs that have bulk deals with TWC.

24    Plaintiff's Opposition to TWC's Motion for Summary Judgment is attached for the

25    convenience of the Court. (See Exhibit A.)  The attention of the Court is invited to the following

26    references to new theories of liability, unrelated to the allegations in plaintiff's Complaint relating

27    to claimed overcharges for basic cable services:

28    //////

-1-

1          a.     Plaintiff suggests it was an unlawful and deceptive business practice for

2  TWC to have created a new pricing program pursuant to which individually priced services were

3  bundled into a single package at a discount off the price of the individually priced components

4  without having given adequate notice of availability to plaintiff or members of the class.

5  (Opposition at p. 10, lines 14–20.)  Plaintiff suggests that TWC acted inappropriately in failing to

6  adequately publicize this offering so that it was only made available to "customers who called and

7  requested new additional services." (*Id.*)  This bundle was known as the "HOA DIGIPic" and a

8  similar product was available to all other customers (that is, those who were not affiliated with an

9  HOA that was providing basic cable services).  Plaintiff claims he was injured because he was

10  charged for his services at the higher, individually priced or "a la carte" rate even though he had

11  already purchased all of the components of the lower priced bundle.  (*Id.* at p. 11, lines 9–10.)

12  Because this additional proposed claim could potentially apply to all TWC customers who

13  purchased the components of a discount package at the higher "a la carte" rate and not just to

14  residents of HOAs receiving basic cable service through their HOA, we thought it appropriate to

15  bring it to the attention of the Court.

16          b.     Plaintiff also purports to add a new claim that TWC violated federal law by

17  charging a discriminatorily higher price for the additional cable services that he purchased

18  directly from TWC when compared to the price charged to others who were not receiving basic

19  cable through their HOA.  (*Id.* at page 12, lines 6–28.)

20  Dated:  April 10, 2008

21

22                 By                            

23                     JEFFREY M. SHOHET<br>                     DLA PIPER US LLP

24                     Attorneys for Defendant<br>                     Time Warner Entertainment-Advance/Newhouse<br>                     Partnership, A New York General Partnership

25                     Email: jeffrey.shohet@dlapiper.com

26

27

28

Exhibits

Table of Contents

| Exhibit | Title | Page |
|---------|-------|------|
| A | Plaintiff Leon Alpert's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment | 4 |

08 CV 0582 BTM WMc

**EXHIBIT A**

1  Barron E. Ramos (SBN 179620)
**LAW OFFICES OF BARRON E. RAMOS**
2  132 N El Camino Real #303
Encinitas, CA 92024
3  Tel:    (760) 274-6438
Fax:    (760) 994-1354
4

5  David R. Markham (Bar No. 071814)
R. Craig Clark (Bar No. 129219)
6  James M. Treglio (Bar No. 228077)
7  **CLARK & MARKHAM, LLP**
401 West "A" Street, Suite 2200
8  San Diego, CA 92101
Telephone: (619) 239-1321
9  Facsimile: (619) 239-5888
10

11  Attorneys for the Plaintiff,

12

13                SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                        FOR THE COUNTY OF SAN DIEGO

15

16  LEON ALPERT, an individual on behalf of    )    Case No.: GIC881621
himself, and on behalf of all persons similarly  )
17  situated, and on behalf of the general public,  )    **CLASS ACTION**
                                                 )
18              Plaintiff,                       )    **PLAINTIFF LEON ALPERT'S**
                                                 )    **MEMORANDUM OF POINTS AND**
19         vs.                                   )    **AUTHORITIES IN OPPOSITION TO**
                                                 )    **DEFENDANT'S MOTION FOR**
20  TIME WARNER CABLE INC., a Delaware           )    **SUMMARY JUDGMENT**
Corporation, and Does 1 to 100,                  )
21                                               )
                                                 )    **Hearing**
22              Defendant                        )    Date:       April 4, 2008
                                                 )    Time:       10:30 a.m.
23                                               )    Dept:       63
                                                 )    Judge:      Luis R. Vargas
24                                               )
                                                 )    Complaint:  March 13, 2007
25                                               )    FAC:        May 16, 2007
26  _____            )

27

28

                        EXHIBIT A    4

1

# TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

II.    SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

III.   APPLICABLE LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

IV.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    i.  TWC Admits It Overcharged Alpert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

    ii.  TWC's Discrimination in Price for Additional Services against HOA members  is

        Unlawful under Federal Law and Section 17200. . . . . . . . . . . . . . . . . . . . .12

    iii.  The FCC has Found that Use of an "exclusive" Cable Services Contract with an

        HOA is Unfair Competition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    iv.  TWC Admits It Concealed Its HOA Pricing. . . . . . . . . . . . . . . . . . . . . . . . .15

    v.  TWC Admits It Enforces An Unlawful 30 Day Billing Error Notice. . . . . . . . . . .18

VI.   TWC's MSJ FAILS BECAUSE IT IS BASED ON DISPUTED FACTS. . . . . . . . . 19

    i.  In 2006, Alpert Did Not Request Additional Services Nor To Be "Bundled". . . . .19

    ii.  TWC Had A Duty to Inform Residents of HOA Pricing. . . . . . . . . . . . . . . . . . 19

    iii.  Alpert Did Not Believe He Was Properly Charged. . . . . . . . . . . . . . . . . . . . . 20

VII.  TWC RELIES UPON THE SAME INAPPOSITE AUTHORITY ALREADY

      CONSIDERED AND REJECTED BY THIS COURT. . . . . . . . . . . . . . . . . . . . .21

VIII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EXHIBIT A   5

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3

*Aguilar v. Atlantic Richfield Company*

4

(2001) 25 Cal. 4th 826, 884 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

5

6

*Barquis v. Merchants Collection Association*

7

(1972) 7 Cal. 3d 94, 113. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

8

*Belton v. Comcast Cable Holdings, LLC*

9

(2007) 151 Cal.App.4th 1224151. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

10

*Bronco Wine Co. v. Jolley*

11

(2004) 33 Cal. 4th 943. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

12

*Charnay v. Cobert*

13

14

(2006) 145 Cal. App. 4th 170. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

15

*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*

16

(2001) 90 Cal.App.4th 335, 345. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

17

*Colgan v. Leatherman Tool Company*

18

19

135 Cal. App. 4th 680. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

20

*Committee on Children's Television v. General Foods Corp*

21

1983) 35 Cal.3d 197, 211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13,15

22

*Daugherty v. American Honda Motor Co., Inc.*

23

(2006) 144 Cal.App.4th 824. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

24

25

*Freeman v. Wal-Mart Stores, Inc.*

26

(2003) 111 Cal.App.4th 660, 670.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

27

*Gibson v. World Savings & Loan Assn.*

28

(2002) 103 Cal. App. 4th 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

EXHIBIT A    6

*Hodge v. Superior Court*

    (2006) 145 Cal. App. 4th 278. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*

    466 U.S. 2 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Kasky v. Nike, Inc.*

    (2002) 27 Cal.4th 939. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Lavie v. Proctor & Gamble Co.*

    105 Cal. App. 4th 504-509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Massachusetts Mutual Life Insurance v. Superior Court*

    97 Cal. App. 4th at 1292-1293. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Moreno v. Sanchez*

    (2003) 106 Cal.App.4th 1415, 1430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Orkin Exterminating Co., Inc. v. FTC,*

    849 F.2d 1354 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20

*People v. Wahl*

    (1940) 39 Cal. App. Supp. 2d 771, 774) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16,20

*Plotkin v. Sajahtera, Inc.,*

    106 Cal.App.4th 953 (2003) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Schnall v. Hertz Corporation*

    78 Cal.App.4th 1144 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Searle v. Wyndham Internat., Inc.,*

    (2002) 102 Cal.App.4th 1327. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*South Bay Chevrolet v. General Motors Acceptance Corp.*

    (1999) 72 Cal. App. 4th 861, 878. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

## EXHIBIT A    7

1    *Stevens v. Superior Court*

2        (1999) 75 Cal. App. 4th 594, 602-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

3    *Stop Youth Addiction v. Lucky Stores*

4

5        (1998) 17 Cal. 4th 553, 560. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

6    **STATUTES**

7    47 U.S.C. 543(8)(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12-13

8    47 U.S.C. 543(8)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9

10   47 U.S.C. 583(8)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

11   Business & Professions Code §17200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

12   15 U.S.C. §§45 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A    8

## I.    INTRODUCTION

This case really presents two unfair practice claims within a single unfair competition case. The first and simpler claim is whether TWC can bill higher a la carte rates to its HOA customers without notifying them that lower HOA rates are also in effect and when the customer agreement recites that current rates have been disclosed. This claim covers the time period March 2005 through October 2007.

The second and more complex claim covers the entire class period. It involves the use of exclusive contracts for sale of basic cable channels to HOAs at rates below the basic rates for non-HOA customers, and once the HOA members are locked in, charging them higher, discriminatory rates for additional services as they are added, in violation of 47 U.S.C. §543. This is done through steering the HOA customers into a la carte pricing, and using bundled pricing for non-HOA customers.

## II.    SUMMARY OF ARGUMENT

This action is brought under California's Unfair Competition Law ("UCL") to remedy overcharging and discriminatory pricing directed against cable subscribers who are members of homeowners' associations ("HOAs"). Time Warner Cable ("TWC") negotiates "bulk" contracts with HOAs to provide basic 77 channel cable service to all units in a subscribing HOA at prices below the prevailing rates for basic services available to members of the general public, in return locking in all members of the HOA into exclusive contracts which bar the members from getting basic cable service from TWC's competitors. Each unit owner then reimburses his HOA for the cost of these basic services in monthly assessments. After the bulk contract is in place, HOA members then purchase "Additional Services" from TWC such as digital cable, premium channels, internet and digital phone service. According to TWC's PMK witness, the majority of its customers order Additional Services and not just the basic 77 channels. Decl. of Ramos, Exh. A, Rhodes Dep. at 153:23-154:11.

Not disclosed when the bulk HOA contracts are negotiated is TWC's business strategy of using a pricing structure which charges more to HOA customers for additional cable services beyond basic service than non-HOA customers are charged. For HOA subscribers who purchase

EXHIBIT A    9

1  such additional services, the savings in the bulk contracts disappear and ultimately they pay more

2  for cable service then they would pay had they not been part of an HOA, or if their HOA had not

3  negotiated any bulk contract with TWC at all.

4        Plaintiff, for example, was a member of the SeaPoint HOA which purchased basic 76-

5  channel cable service for each of its 237 units (including plaintiff's) for $28.77 a month, an

6  apparent savings of $23 a month below the $50.97 a non-HOA customer would pay per month

7  for basic 77-channel service.  As plaintiff and other HOA members subscribed for additional

8  services, TWC charged HOA customers a higher price for each additional service than non-HOA

9  customers were being charged.  This was accomplished through steering HOA subscribers to

10  additional services to "a la carte" pricing, while non-HOA customers were priced through a

11  series of "bundles" which included the basic 77 channels but included a lower price increase for

12  each additional service.  In this way, the benefit and savings in the HOA's basic services contract

13  quickly disappeared and, as more services were added, HOA customers ended up paying more

14  for the same basket of services than members of the general public.  For example, Mr. Alpert

15  was charged $25.80 a month more than a member of the public would have paid to upgrade their

16  basic 77 channel cable service to digital and premium channels.

17        Then, in 2005, TWC introduced a new "HOA bundle" pricing structure which eliminated

18  the overcharge for additional services.  However, for HOA customers, it was illusory.  In fact, it

19  was a "stealth" pricing system as it was not advertised anywhere, notices were not sent to HOAs,

20  and the HOA bundle prices were not even posted on TWC's website.  Plaintiff discovered that

21  there was lower pricing by happenstance and demanded his pricing be lowered in September

22  2006 - after the lower pricing had been in effect for 18 months.

23        These practices violate the "deceptive" and "unlawful" prongs of the UCL as follows.

24  First, there was "deception" under section 17200 in not disclosing, at either the time of the

25  signing of the bulk HOA contract or when new HOA customers order additional services, that

26  the HOA prices for additional services would be higher than the prices charged to non-HOA

27  customers.  TWC does not disclose its business strategy of obtaining exclusive service contracts

28  with HOAs by negotiating lower rates for basic services with the intent to recapture margins

EXHIBIT A    10

1   through higher prices to HOA members for additional services once the HOA members are

2   locked in to TWC for basic television service.

3           Second, price discrimination against HOA customers with exclusive HOA cable service

4   contracts is unlawful as it violates 47 U.S.C. 543(8)(d) which prohibits price discrimination for

5   the same services between customers in the same geographic area.   While bulk "*discounts*" to

6   HOAs are permitted, there is no provision in law or in the HOA agreement for charging a higher

7   price to HOA customers for exactly the same additional services as it charged to non-HOA

8   customers.

9           Third, the FCC has recently held that the use of "exclusivity" provisions in HOA cable

10  service contracts is unfair competition.   Order No. FCC 07-189 of the FCC dated October 31,

11  2007 and lodged herewith.  Request for Judicial Notice, Exhibit 1.

12          In this motion, TWC argues two things: first, that the amounts it collects from HOAs

13  each month for basic service to each unit should not be included in the calculation of the amount

14  each HOA customer pays in determining whether there was an overcharge for additional services

15  – without disputing that the customer ultimately pays this amount.  This is an oversimplification

16  and does not provide a defense to the unlawful and deceptive practices claims.  Second, it argues

17  that it did not have the duty to disclose to any HOA members the new "HOA bundled" pricing it

18  introduced in 2005, and thus that it had no duty to disclose that the same services were available

19  at lower prices to preexisting HOA customers unless and until they somehow discovered and

20  asked for them.  Again, as will be shown, TWC is also wrong on this contention as a matter of

21  law.

22  **III    APPLICABLE LEGAL STANDARD**

23          As set forth in *Aguilar v. Atlantic Richfield Company* (2001) 25 Cal.4th 826, 884,

24  California's specific test for either party to successfully move for summary judgment is first, the

25  party moving for summary judgment bears the burden of persuasion that there is no triable issue

26  of material fact and that he is entitled to judgment as a matter of law; and, (*Id.* at 850)  second,

27  the party moving for summary judgment bears an initial burden of production to make a prima

28  facie showing of the nonexistence of any triable issue of material fact; and, third, the party

EXHIBIT A   11

1    moving for, and opposing, summary judgment may each carry their burden of persuasion and/or

2    production depends on which would bear what burden of proof at trial. *Id.* at 851. Summary

3    judgment law in this state, unlike federal law, still "requires a defendant moving for summary

4    judgment to present evidence, and not simply point out through argument, that the plaintiff does

5    not possess, and cannot reasonably obtain, needed evidence." *Id.* at 884. TWC fails to meet this

6    burden.

7    IV.    **STATEMENT OF FACTS**

8         As a resident of SeaPoint Townhomes ("SeaPoint"), Alpert is required to pay monthly

9    HOA dues. Included in that monthly fee is an assessment paid to TWC for Alpert's monthly

10   cable bill for the basic 77 channels. Decl. Leon Alpert at para. 8. That fee is $ 28.77 per month

11   and is charged to Alpert in his monthly assessments. TWC's NOL, Exhibit B at Ex. B. This

12   represented a savings of about $23 below the $50.97 a non-HOA customer would pay for the

13   basic channels in the simplest bundle called "Advantage Service." Nutten Decl. Para. 4 and 5.

14        Since at least March of 2003 TWC has had an exclusive contract with SeaPoint to

15   provide basic cable services. Decl. Rhodes at para. 3; TWC's NOL, Exhibit B. Under Paragraph

16   4.2 of the exclusive contract between SeaPoint HOA and TWC, "Additional Services" (i.e., other

17   than basic cable) would be provided directly from TWC to the consumer and billed separately to

18   the consumer. TWC's NOL, Exhibit B, 1.1(B), 2. The TWC-SeaPoint contract gives TWC "the

19   exclusive right for the first five years to …install, operate [and] maintain…a system at the

20   Property for the provision of multi-channel video services…." TWC's NOL, Exhibit B,

21   Paragraph 4.2.

22        From the beginning of the class period until March 2005, TWC offered various bundled

23   packages to non-HOA customers in San Diego and Riverside Counties. These included both the

24   basic 77 channels as well as the additional services each customer decided to purchase; as each

25   bundle included progressively more services, its price increased. However, HOA customers

26   asking for additional services were placed into what TWC calls "a la carte" billing systems

27   which itemized each additional service. Decl. Ramos, Exhibit A, Depo Rhodes at p. 155:20-

28   156:2. The a la carte increases in price for additional services were higher than the increases

EXHIBIT A    12

1 | between bundles charged to non-HOA customers for the same increases in additional services.

2 | Nutten Decl at 6. When the amount TWC billed to each HOA customer was added to the

3 | amount he reimbursed his HOA ($28.77 in the case of SeaPoint), the savings ($23.00) an HOA

4 | customer enjoyed under the HOA-TWC basic service contract disappeared. For example,

5 | analysis by an auditor expert, Wesley Nutten, shows that by 2005 and 2006 Mr. Alpert was

6 | paying more for cable services than he would have paid had he not been in an HOA and instead

7 | been a member of the general public. Nutten Decl. para. 6. In fact, when determining pricing

8 | for HOA customers, TWC admits that it did not consider that Alpert and the other HOA

9 | members *are already paying for basic cable at all*. Decl. Ramos, Exhibit A, Depo Rhodes, at

10 | p.150:12

11 |    TWC's business strategy of charging HOA members higher prices for additional services

12 | once they were locked into exclusive cable contracts is not disclosed when the HOA contracts

13 | are negotiated with HOAs.

14 |    Then, in March 2005, TWC created a new bundled pricing structure for HOA customers

15 | (called Digipic HOA 1000, 2000 and 4000). The bundles reduced the prices to HOA members

16 | by about $24 (*though still charging HOA members $15 more for the additional services*).

17 | However, the new HOA bundles were not advertised or put on TWC's website with all TWC's

18 | other prices, and no notice was sent to existing HOA customers or their association boards or

19 | property managers. The new bundle prices were only made available to HOA customers who

20 | called and requested new additional services. Decl. Ramos, Exhibit A, Depo Rhodes at pp.

21 | 163:22-164:9. In its MSJ, TWC argues it had no duty to disclose the new HOA bundle rates to

22 | existing HOA customers. At the same time when a new HOA customer signs up for additional

23 | services, TWC requires them to adopt and agree to a form contract in which they acknowledge

24 | they are aware of its current pricing and rates. (TWC's NOL, Exhibit C) sets forth the terms of

25 | the agreement between Alpert and TWC for the "Additional Services" offered over and above

26 | basic cable. Paragraph no. 2 governing charges states that "*[c]harges for the Services are set

27 | forth on a separate price list that I (the subscriber) have received.*" In the case of the 2005,

28 |

EXHIBIT A   13 '

1   HOA rates and its existing HOA customers in 2005 and 2006, this recital TWC inserts in its form

2   contracts is false.

3         In the fall of 2006, 18 months after the new HOA rates went into effect, Alpert received a

4   newsletter from his association indicating that HOA pricing was available to SeaPoint residents.

5   Decl. Alpert at para. 11. (It is still not clear how his association discovered the new pricing.)

6   After reviewing the pricing, Alpert realized he was being overcharged for his services. *Ibid.*

7   Once Alpert learned of the correct pricing in the fall of 2006, he called TWC to get his bill

8   adjusted. Decl. Alpert at para. 12. TWC admitted its error to Alpert, apologized, and then

9   adjusted his bill accordingly. *Ibid.* However, TWC refused to credit Alpert for the overcharges,

10   instead limiting the credit to one month's partial service. *Id.* at para. 13.

11         Alpert never requested any additional services and never requested to be bundled. *Id.* at

12   para. 12. He asked that his bill be corrected. *Ibid.* Unfortunately, TWC erased the recording of

13   this conversation while the lawsuit was pending. Decl. Ramos, Exhibit A, Depo Rhodes, at

14   p.200:23. After Alpert called to complain, Alpert's bill dropped to reflect the correct pricing for

15   his services. Decl. Alpert at para. 14. His new bill finally reflected TWC's HOA pricing. *Ibid.*;

16   FAC, Exhibit C; TWC's Amended Separate Statement, Exhibit E.

17   **V.**     **ARGUMENT**

18        (i)    **TWC Admits It Overcharged Alpert**

19         Before 2006, Alpert was not bundled into TWC's "Digipic" packages used for the

20   general public with an offset or credit for the values of basic cable service his HOA had already

21   subscribed for and which would have cost $50.97 a month to non-HOA customers. (Doing so, of

22   course, would have resulted in an "apples to apples" billing system for HOA and non-HOA

23   customers and avoided discriminatory pricing.) Instead, until 2005, TWC chose to force Alpert

24   and other HOA class members to pay "a la carte" pricing, which charged more for each

25   additional service than non-HOA customers were being charged through progressively larger

26   non-HOA bundles. Because of this, as HOA members like Alpert added additional services, the

27   incremental amount billed by TWC for those services was higher than the incremental amount

28   non-HOA customers for comparable additional services. Decl. Nutten at para. 8.

**EXHIBIT A    14**

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN          - 11 -
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    Case No. GIC881621

1  In 2005 TWC began to finally offer bundled packages "designed for bulk [HOA]

2  customers." Decl. Rhodes, para. 8. The only "design" was the lowering of the price since those

3  HOA packages were exactly the same as those for non-HOA customers (e.g., Digipic 4000 vs.

4  Digipic HOA 4000) - the HOA version just had a lower price, but still charged an additional $15

5  for the additional services.

6     (ii)   **TWC's Discrimination in Price for Additional Services against HOA**

7        **members is Unlawful under Federal Law and Section 17200.**

8     TWC's pricing scheme is also unlawful because cable operators "may not discriminate

9  between subscribers to the basic service tier and other subscribers with regard to the rates

10  charged for video programming offered on a per channel or per program basis." 47 U.S.C.

11  §543(8) (a). Further:

12  
13      **A cable operator shall have a rate structure for the provision of cable
service that is uniform throughout the geographic area in which cable service
is provided over its cable system . . . Bulk discounts to multiple dwelling units
shall not be subject to this subsection, except that a cable operator of a cable
system that is not subject to effective competition may not charge predatory prices
to a multiple dwelling unit. Upon a prima facie showing by a complainant that
there are reasonable grounds to believe that the discounted price is predatory, the
cable system shall have the burden of showing that its discounted price is not
predatory.**

18  *Id.* at section (d).

19     Nothing in 47 U.S.C. §543 permits TWC to charge *more* to MDUs for additional services

20  than to general retail customers. When this happens, the rates are no longer "uniform." Forcing

21  Alpert and the class members to pay "a la carte" or otherwise pay more than non-HOA

22  customers is not only unlawful, unfair and deceptive, it is predatory. That is exactly what TWC

23  admits it did here. Moreover, under 47 U.S.C. §543(d), TWC bears the burden, not the Plaintiff,

24  of proving that its rates are *not* predatory. TWC has not done that. A review of Mr. Alpert's

25  records, and the rate cards reviewed by Plaintiff's expert shows that HOA residents like Mr.

26  Alpert paid a higher price for additional services, with or without the HOA bundle started in

27  2005.

**EXHIBIT A   15**

1    The California Legislature specifically designed the UCL to enforce the legal obligations

2  imposed by federal laws and regulations such as FCC 07-189, and 47 U.S.C. §583 (8)(d).  Any

3  law may serve as the predicate for a UCL claim.  *Stevens v. Superior Court* (1999) 75 Cal. App.

4  4th 594, 602-3.  As consistent decisions in California have maintained:

> [W]hether a private right of action should be implied under [the
> predicate] statute... is immaterial since any unlawful business
> practice... may be redressed by a private action charging unfair
> competition... *Stevens, supra,* at 602.

8  Because the Plaintiff was a victim of the practice and was injured by the invasion of his legal

9  rights, the UCL claim is a valid claim.

10    As discussed above, Mr. Alpert suffered economic injury by paying for products at a

11  higher rate than other, non-HOA residents.  TWC cannot now claim that despite this obvious

12  discrimination and disparity, in violation of 47 U.S.C. §583 (8)(d), that there is no cause of

13  action.  Plaintiff and the class members have all been harmed by TWC's unlawfully

14  discriminatory pricing.  For Mr. Alpert, the benefit of the original bargain, $50.97 of basic

15  services bought for $28.77, is lost as the HOA customer orders additional services.  By April of

16  2006, he, in fact, paid more for his services than a non-HOA subscriber.  It was only until

17  September 21, 2006, when he received an "HOA bundle," that Mr. Alpert paid less than a non-

18  HOA subscriber for the same services (though still more for the additional services).

19    Under Business & Professions Code §17200, businesses cannot engage in any unlawful

20  practices or acts.  As defined, an unlawful practice under the UCL is "anything that properly be

21  called a business practice and that at the same time is forbidden by law." *Barquis v. Merchants*

22  *Collection Association* (1972) 7 Cal. 3d 94, 113.  In *Committee on Children's Television*, supra,

23  35 Cal. 3d at 210-211, a violation of the Sherman Antitrust Act was grounds for claiming

24  defendant's unlawful conduct.  Similarly, in *Stop Youth Addiction v Lucky Stores* (1998) 17 Cal.

25  4th 553, 560, the violation was selling cigarettes to minors in violation of the Penal Code section

26  308.  In *Hodge v. Superior Court* (2006) 145 Cal. App. 4th 278, the violation of the law was

27  based on the failure to pay overtime, a violation of the California Labor Code.  Clearly,

28

## EXHIBIT A    16

1    discriminatory pricing, as prohibited by law under 47 U.S.C. §583 (8)(d) is unlawful. These

2    regulations and laws were created specifically to protect consumers like Alpert.

3            (iii)The FCC has Found that Use of an "exclusive" Cable Services Contract with an

4            HOA Is Unfair Competition.

5            On October 31, 2007 the Federal Communications Commission, adopted and later

6    published FCC 07-189, which is attached herein as Exhibit 1 to Plaintiff's Request for Judicial

7    Notice. The FCC, in writing this order, specifically found that:

8            That contractual agreements granting such exclusivity to cable operators harm
         competition and broadband deployment and that any benefits to consumers are
9        outweighed by the harms of such clauses . . . In this Order we prohibit the
         enforcement of existing exclusivity clauses and the execution of new ones by
10       cable operators and others subject to the relevant statutory provisions. This
         prohibition will materially advance the Act's goals of enhancing competition and
11       broadband deployment.

12

13   FCC 07-189, Paragraph 1. The FCC further defines exclusivity clauses as follows: "Exclusive

14   contracts are contracts that specify that, for a designated term, only a particular MVPD and no

15   other provider may provide video programming and related services to residents of an MDU."

16   FCC-07-189, Fn 2. The FCC held that exclusivity contracts limited the availability of satellite-

17   based video service in Multi-Dwelling Units (or MDU's), and that based upon the prevalence of

18   such units, and the extent that such clauses prohibit competition, the Commission had no choice

19   but to prohibit these clauses. *Id.* at Paragraphs 3-12. Specifically, the Commission noted that a

20   MDU or the residents of such MDU's have no bargaining power when "when the first cable

21   operator was 'the only game in town.' *Id* at Paragraph 12. Thus, the Commission concludes:

22           Exclusivity clauses deny MDU residents the benefits of increased competition,
         including lower prices and the availability of more channels with more diverse
23       content, as well as access to alternative providers of broadband facilities and the
         triple play of communications services their facilities support.
24

25   *Id.* at Paragraph 26. Exclusivity clauses were specifically held to hold no benefit for any

26   consumer and were unfair competition.

27           As stated above, Business and Professions Code § 17200 was designed by the Legislature

28   to enable victims of unfair competition, such as exclusivity contracts, to recoup their losses. A

EXHIBIT A    17

1  review of Mr. Alpert's declaration and the declaration of Mr. Nutten indicates that Plaintiff, and

2  other members of the putative class, clearly suffered damages from being locked into these

3  exclusivity contracts by overpaying for additional services.

4        (iv)    **TWC Admits It Concealed Its HOA Pricing**

5        TWC states that it had "no duty" to inform Alpert or the class members of TWC's new

6  HOA bundled pricing which was adopted in March 2005. See TWC's Separate Statement, Nos.

7  36, 78, 103, 106. In other words, TWC is arguing that it can lawfully *conceal* its pricing from its

8  own customers when that pricing may result *in a reduction of charges* to the consumer. That is

9  plainly a *per se* deceptive business practice since such conduct would "likely deceive"

10  consumers into far paying more for the same services that they could otherwise pay had such

11  concealment not taken place. *Committee on Children's Television v. General Foods Corp.*

12  (1983) 35 Cal.3d 197, 211; accord, *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939. Indeed, here, when

13  Alpert learned of the lower pricing available from TWC for exactly the same set of services that

14  he already had, he called and complained and his bill was reduced.

15        This argument is fundamentally undermined by the fact that TWC makes all its

16  customers adopt an agreement under which consumers admit and acknowledge that they are

17  aware of all TWC current pricing, TWC NOL, Ex. C, paragraph 2, *and at the same time TWC*

18  *inconsistently argues now that it had no duty to disclose current pricing.*

19        Even if TWC's argument was correct that it was up to Alpert and the class members to

20  somehow find TWC's "hidden" HOA pricing, TWC's PMK admitted that TWC did not advertise

21  its San Diego HOA rates and did not even inform HOAs of the existence of HOA pricing. Decl.

22  Ramos, Exhibit A, Depo Rhodes, p.163:20, 211:20.

23        It its MSJ, TWC argues that such customers may *now* contact TWC or visit TWC's

24  website and so on. Decl. Rhodes at para. 12. But since TWC no longer offers such HOA pricing

25  as of October 2007, unless the HOA customer ordered it before that time (*Id.* at para. 11:13),

26  contacting TWC *now* would be irrelevant as would looking online. The question is whether,

27  during the class period, TWC made its HOA pricing known to Alpert and the class members.

28  TWC admits it did not.

EXHIBIT A   1 8

1    The most common expression of the standard of deception is the reasonable consumer

2    standard. *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 504-509. The statement by the

3    defendant need not be false, but "deceptive and misleading in its implications." *Lavie*, at 510

4    (*quoting People v. Wahl*, (1940) 39 Cal. App. Supp. 2d 771, 774). The practice must be such

5    that it is "likely to deceive the reasonable consumer to whom the practice is directed." *South Bay*

6    *Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal. App. 4th 861, 878. Likewise,

7    "[t]he CLRA is to be "'liberally construed and applied to promote its underlying purposes, which

8    are to protect consumers against unfair and deceptive business practices and to provide efficient

9    and economical procedures to secure such protection.'" *Colgan v. Leatherman Tool Company*,

10    135 Cal. App. 4th 680. Where the deception concerns a material fact the court should presume

11    causation. *Massachusetts Mutual Life Insurance v. Superior Court*, 97 Cal. App. 4th at 1292-

12    1293. The Court in *Massachusetts Mutual Life Insurance* held that a misrepresentation of fact is

13    material when it was sufficient to cause the plaintiffs to alter their behavior. *Id.* at 1294.

14    The HOA consumer in this case is deceived when TWC created a bundle or package for

15    its HOA consumers, *and then concealed the HOA bundle pricing from pre-existing HOA*

16    *customers.* Decl. Ramos, Exhibit A, Depo Rhodes, p.163:20; 211:20. Worse yet, even with the

17    bundle, HOA members were *still being overcharged for additional services.* Decl. of Nutten,

18    Para. 6.

19    In *Schnall v. Hertz Corporation*, 78 Cal.App.4th 1144 (2000), the court held that a car

20    rental company's practice of disclosing its otherwise lawful fuel charge in a separate document

21    was deceptive. The court also concluded that:

22    Deception calculated to induce customers to subject themselves to an avoidable
       charge is inimical to the very concept of avoidability. The failure of a rental car
23    company to make it clear to customers that an avoidable charge is considerably
       higher than the retail rate for an item or service ... would doubtless encourage
24    some and perhaps many customers to incur a fuel service charge they could and
25    would otherwise avoid.

26    *Id.* at p.1164.

27    This case is far more egregious than *Hertz* in that TWC claims that it had no duty

28    whatsoever to reveal its HOA pricing to its own HOA customers. Unlike *Hertz*, where the

## EXHIBIT A   19

1    charge in dispute was fully, though inconspicuously, disclosed, here, TWC admits that it actually
2    concealed its pricing and that it had no duty to disclose it. There was no notice. TWC failed to
3    disclose its MDU bundle pricing to Alpert until a year after it was available all the while
4    overcharging consumers for services that could otherwise have been obtained at a much lower
5    rate.

6        Moreover, TWC argues that its "Subscriber Agreement" (TWC's NOL, Exhibit C) sets
7    forth the terms of the agreement between Alpert and TWC for the "Additional Services" offered
8    over and above basic cable. Of particular interest is paragraph no. 2 governing charges which
9    states that "[c]harges for the Services are set forth on a separate price list that I (the subscriber)
10   have received." TWC has submitted no evidence that it ever provided Alpert with its HOA price
11   list before September 2006.

12       Put simply, TWC elected to charge Alpert full "a la carte" pricing when TWC could
13   have, and should have, priced Alpert correctly. Prior to 2005, TWC should have bundled Alpert
14   like any other retail customer who ordered exactly the same set of services, and then credited
15   Alpert's account for the $50.97 value of basic cable which was already paid for and provided to
16   Alpert each month. Then, from 2005 on, TWC should have modified Alpert's price to reflect the
17   change TWC made in pricing for HOAs in San Diego. TWC did neither.

18       TWC once again argues that its business practices were not deceptive. It cites *Plotkin v.*
19   *Sajahtera, Inc.*, 106 Cal.App.4th 953 (2003) (Def.'s Memo at p.13:27) for the proposition that
20   reasonable notice does not have to be the best possible notice. Again, in this case, it is not a
21   matter of insufficient notice – it is a matter of *no notice*. In 2005, when TWC offered the
22   discounted price to HOA customers for bundles, TWC did not bother to provide *any* notice to
23   Alpert or the HOA whatsoever. Moreover, unlike *Plotkin* where no one was forced to use the
24   valet service, here, Alpert and the other residents were all *required* to pay TWC a fee through
25   their HOA/MDU for basic cable. It was not an option. TWC was the "exclusive" provider of
26   basic cable.

27       Similarly, TWC also once again cites *Searle v. Wyndham Internat., Inc.*, 102 Cal.App.4th
28   1327 (2002) for the proposition that not expressly advising a hotel's patrons that a service charge

**EXHIBIT A    20**

1   added to a room bill was paid by the hotel to a server did not violate Section 17200. *Searle* did

2   not involve an allegation of discriminatory charging or overcharging for the same service(s) as is

3   the case here. The question is not what TWC is doing with the money it collects, as was the case

4   in *Searle*, but whether TWC is entitled to overcharge for its services.

5           (v)      **TWC Admits It Enforces An Unlawful 30 Day Billing Error Notice**

6           TWC admits that its Consumer Agreement, under which Additional Services were

7   provided by TWC, required Alpert to notify TWC within 30 days of identifying a billing error or

8   he would otherwise "waive" the error. See TWC's Separate Statement, Nos. 30, 66, 67, 71, 91,

9   92. TWC's 30-day "waiver" is *per se* unfair, deceptive and unlawful since (1) TWC believes

10  that it may conceal its pricing from its customers, as set forth above, rendering it impossible for

11  consumers to know if they have been overcharged; (2) TWC disclaims the accuracy of its own

12  billing statements in the Consumer Agreement (TWC NOL, Exhibit C, 2 (j), thus consumers

13  have no way of knowing, since TWC apparently does not know either, whether a bill is ever

14  correct; and (3) while contractually shortening a limitations period is generally permitted, it has

15  never been permitted for a period of less than six (6) months without being deemed

16  unconscionable. See e.g., *Charnay v. Cobert*, 145 Cal. App. 4th 170 (2006)[finding that where a

17  six month contractual limitations period was not unreasonable, there was "no doubt" requiring a

18  client to assert a claim for breach of contract within 10 days of receipt of a billing statement is

19  "inherently unreasonable."]

20          Moreover, contractually shortening limitations periods are only permitted when

21  identifying a breach is "immediate and obvious." *Moreno v. Sanchez* (2003) 106 Cal.App.4th

22  1415, 1430:

23          ["[A] contractually shortened limitations period has never been recognized
            outside the context of straightforward transactions in which the triggering event
24          for either a breach of a contract or for the accrual of a right is *immediate and*
            *obvious*. ... Most reported decisions upholding shortened periods involve
25          straightforward commercial contracts plus the unambiguous breaches or accrual
26          of rights under those contracts." (Emphasis added)]

27  TWC's admitted concealment of its pricing makes detection of its systematic overcharging

28  neither "immediate" nor "obvious."

## EXHIBIT A   21

1       Significantly, waivers in form consumer adhesion contracts of obligations under federal

2  statute are void as against public policy. 15 U.S.C. §§45 et seq.. *Orkin Exterminating Company,*

3  *Inc. v. Federal Trade Commission* (11th Cir. 1988) 849 F.2d 1354, 1367, *cert. denied*, 488 U.S.

4  1041 (1989).

5  **VI.    TWC's MSJ FAILS BECAUSE IT IS BASED ON DISPUTED FACTS**

6       **(i) In 2006, Alpert Did Not Request Additional Services Nor To Be "Bundled"**

7       TWC's MSJ is premised almost entirely on one central and repeated "fact": that in late

8  2006 Alpert specifically requested that TWC *change* his services and *bundle* him to thereby

9  lower his bill. See, e.g., TWC's Separate Statement, Nos. 25, 26, 27, 28, 40, 42, 43, 45, 62, 64,

10  72, 74, 76, 87, 89, 96, 98, 110, 112, 113, 115. He did not. In fact, Alpert *never* testified that he

11  asked TWC to bundle him for a discount in late 2006. Rather, Alpert testified that he called to

12  complain to TWC that his bill was too high and that TWC must lower it: "It's my sworn

13  testimony that I have no recollection about speaking about bundles with the Time Warner rep,

14  only about my bill and what I thought I should be paying." Decl. Alpert at para. 4 citing

15  Deposition Alpert at p.106, Decl. Ramos, Exhibit D. He did *not* ask for any bundle, nor did he

16  ask to change his services. He just wanted his bill to be corrected to the proper HOA rate, and it

17  was. Decl. Alpert at para. 5.

18       Significantly, of all the recordings TWC made of its multiple interactions with Alpert

19  over the years, the <u>*only*</u> recording missing (TWC records all of its conversations with customers)

20  was the one where Alpert called TWC in late 2006 and demanded that his bill be corrected.

21  According to TWC, that recording was "destroyed," even though this lawsuit had been pending

22  for at least six (6) months at the time. Decl. Ramos, Exhibit A, Depo Rhodes, p.200:23. Since

23  TWC destroyed this evidence, it is now Alpert's word against TWC's – which is necessarily a

24  disputed issue of fact which cannot be resolved in a motion for summary judgment.

25  Additionally, TWC's destruction of that evidence necessarily leads to a legal presumption in

26  Alpert's favor as to the content of that conversation. Evid. Code sections 412 and 413.

27       **(ii) TWC Had A Duty to Inform Residents of HOA Pricing**

28

**EXHIBIT A    22**

1        TWC argues that it had no duty to inform Alpert or the other HOA residents of TWC's

2  HOA pricing. TWC is wrong. As discussed above, TWC requires each subscriber to agree he

3  has been given TWC's pricing rates (TWC NOL Exhibit C at para. 2). It cannot at the same time

4  refuse to give out applicable pricing rates. Under the Service Agreement (TWC NOL Exhibit B

5  at paras. 1.4 and 4.4), TWC was to inform Alpert's HOA and, in turn, the residents though the

6  HOA, of TWC's current marketing materials.

7        At a minimum, TWC had a duty to act in good faith when dealing with Alpert and his

8  HOA co-residents for whom the contract was intended to benefit. "Every contract imposes on

9  each party an implied duty of good faith and fair dealing." *Chateau Chamberay Homeowners*

10  *Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 345. TWC obviously did not

11  act in good faith or deal fairly by concealing its HOA pricing.

12        TWC once again, as it did in its demurrer, argues that B&P Code section 17200 claim

13  cannot be based on a breach of contract. Again, TWC is wrong. In *Orkin Exterminating Co.,*

14  *Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988), the FTC successfully sued Orkin over systematic

15  breach of a form contract used in hundreds of consumer transactions.[1] *See Gibson v. World*

16  *Savings & Loan Assn.* (2002) 103 Cal. App. 4th 1291 [lender's systematic breach of form

17  consumer contracts actionable under "unlawful" clause of section 17200]. *See also Bronco Wine*

18  *Co. v. Jolley* (2004) 33 Cal. 4th 943.

19        (iii) **Alpert Did Not Believe He Was Properly Charged**

20        TWC argues in its MSJ and likewise asserts in its Separate Statement (at Nos. 40, 72, 74,

21  87, 96,11, 112, and 120) that Alpert believed he was previously being charged the correct sum

22  for his TWC services before TWC put Alpert into the HOA bundle in late 2006. That is false.

23  First, the cited testimony does not indicate Alpert's agreement that TWC's bills were correct

24  before he was put into HOA pricing. See e.g., TWC's NOL, Exhibit A, at p.144:15-18; 148:17;

25  151:21; 155:25; 158:2. Agreeing that a bill was received is obviously not the same as agreeing a

26  bill was accurate.

27

28

---

[1] Decisions by federal courts in construing the FTC Act are "more than ordinarily persuasive" in guiding the California courts in construing Section 17200. *People ex rel. Mosk v. National Research Co. of Calif.*, 201 Cal.App.2d 765, 772 (1962).

EXHIBIT A  23

1    Second, each cited instance in the deposition transcript where Alpert was actually asked

2    to speculate whether his bill was "accurate" is preceded by a "speculation" objection asserted by

3    Alpert's counsel. See e.g., TWC's NOL, Exhibit A at p,.148:21; 151:16. These objections,

4    coupled with the fact that when Alpert learned he was being overcharged in late 2006 he called

5    TWC and demanded a correction to his bill, and that the bill was, in fact, corrected, all

6    undermine TWC's entire argument that Alpert believed his bills were accurate. Decl. Alpert at

7    para. 11, 12.

8    **VII.    TWC RELIES UPON THE SAME INAPPOSITE AUTHORITY ALREADY
         CONSIDERED AND REJECTED BY THIS COURT**

9

10    Parroting the same argument made in its demurrer, TWC once again argues that the

11    CLRA requires that an action based upon omission must be contrary to a representation made by

12    the defendant or an omission of a fact that defendant was required to disclose, citing *Daugherty*

13    *v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824. TWC's MSJ at p.8:4. The

14    *Daugherty* court stated that nondisclosure is not actionable under the CLRA in the absence of a

15    related representation or disclosure obligation. *Id.* at 835. Here, the related representation is the

16    posting of regular retail a la carte rates by TWC in notices and on its website without any

17    disclosure whatsoever of pricing for HOA residents where the HOAs have an existing contract

18    with TWC. The representation of wrong pricing, coupled with the nondisclosure of the correct

19    pricing applicable to HOA customers, is a violation of the CLRA.

20    TWC also argues again, as it did in its demurrer, that the "voluntary payment doctrine"

21    and applies *Leahy v. Warden* (1912) 163 Cal. 178, 181. But for the doctrine to apply such

22    payments be made "with knowledge of the facts." TWC's MSJ at p.12:6; Since Alpert had no

23    knowledge of the facts before September 2006, the "voluntary payment doctrine" is obviously

24    irrelevant.

25    TWC also argues that its 30 day notice requirement is not unconscionable since there

26    were "alternative sources from which to obtain the desired service." TWC's MSJ citing

27    *Freeman v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4th 660, 670. Similarly, TWC also claims

28    that the additional services ordered by Alpert amount to nothing more than "recreational

EXHIBIT A    24

1  activities," thus, again, Alpert had the "option of simply foregoing the activity" citing *Belton v.*

2  *Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224.

3       In *Wal-Mart*, plaintiffs alleged that Wal-Mart's gift cards unconscionably charged a $ 1

4  per month fee for every month after 24 months the card has not been fully used. The court

5  concluded that consumers did not have to buy the card in the first place defeating a claim of

6  unconscionability in the terms of the card. *Id.* at 670.

7       In *Wal-Mart*, there obviously was no preexisting "exclusive" contract as there is here.

8  While a Wal-Mart customer was free to pay any retailer for a gift card, here, Alpert and the other

9  class members had no choice in the matter: they were all required to pay TWC a monthly fee

10 through their HOA's exclusive contract for basic cable.

11      In *Comcast Cable*, a legally blind plaintiff sued Comcast for requiring that he purchase a

12 basic cable package in order to get Comcast's music channels. The court concluded that it was

13 not oppressive to require the purchase of basic cable to obtain additional services like music

14 since there were many music alternatives available to plaintiff such as online streaming audio

15 from radio stations or simply using a radio itself. *Comcast*, 151 Cal.App.4th at 1246.

16      Again, in *Comcast* as in *Wal-Mart*, there was no pre-existing "exclusive" contract and the

17 customer in *Comcast* was free to obtain music from other outlets, some of which were *free*, such

18 as radio. Alpert had no choice but to pay TWC for his basic cable through his HOA/MDU.

19 Moreover, there were technical reasons supporting Comcast's position that it could not offer its

20 music channels without basic cable thereby rendering plaintiff's claim that music channels be

21 offered "a la carte" potentially impossible. *Id.* at p.1242. Moreover, if Alpert purchased digital

22 services from any one else, it would have had to include basic cable, as per *Comcast*, and *Alpert*

23 *would have violated the exclusivity clause.*

24      TWC's citation to *Comcast* unwittingly supports Alpert's claims in that it is clear from

25 the *Comcast* decision that basic cable is required to obtain additional services from other cable

26 companies. TWC asks this Court to just assume, without any supporting evidence, that Alpert

27 could have obtained additional cable related services from another vendor. *Few consumers buy*

28 *their first 76 channels from a cable company and the rest from a satellite service or other cable*

EXHIBIT A    25

1    *provider.* *Comcast* stands for the contrary position: one must have basic cable to obtain

2    additional services. Here, the "exclusive" contract for basic cable locked Alpert into a

3    relationship with TWC. That is the point and why the FCC has recently ruled such agreements

4    are unlawful and unfair.

5            TWC asks the Court to "judicially notice" that Alpert could have alternatively rented

6    movies, read books, used a satellite service, used another phone provider, and used another

7    Internet provider. TWC's RJN, paras 1 and 2. But since Alpert was already paying TWC each

8    month for basic cable service through his HOA, it would make little sense to pay another cable

9    or satellite provider for the same service just to get additional services. Decl. Alpert at para. 20.

10    There was never a meaningful choice to select another provider for additional services while

11    simultaneously paying TWC each month. *Ibid.*

12            TWC also cites to *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) for

13    the proposition that bundling is not necessarily undesirable for consumers, nor is it inherently

14    anticompetitive. TWC's MSJ, p.16:16-18. Alpert does not argue that it is undesirable to bundle.

15    He argues that TWC consistently charged him a higher rate for additional services.

16    **VIII.    CONCLUSION**

17            As the above authorities show, and for the foregoing reasons, TWC's practices are

18    unlawful, deceptive and unfair, and summary judgment should be denied.

19

20    Dated: March 21, 2008                          **CLARK & MARKHAM LLP**

21                                                                  By: _____

22                                                                          David R. Markham, Esq.

23                                                                  LAW OFFICES OF BARRON E. RAMOS
                                                                             Barron E. Ramos, Esq.
24

25                                                                  Attorneys for the Plaintiff and the Class.

26

27

28


EXHIBIT A    26