David R. Markham (Bar No. 071814)
R. Craig Clark (Bar No. 129219)
James M. Treglio (Bar No. 228077)
**CLARK & MARKHAM, LLP**
600 B Street, Suite 2130
San Diego, CA 92101
Telephone: (619) 239-1321
Facsimile: (619) 239-5888
dmarkham@clarkmarkham.com

Barron E. Ramos (Bar No. 179620)
**LAW OFFICES OF BARRON E. RAMOS**
132 N El Camino Real #303
Encinitas, CA 92024
Telephone: (760) 274-6438
Facsimile: (760) 994-1354
barron@yourclasscounsel.com

Attorneys for plaintiff and the Class

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEON ALPERT, an individual on behalf of himself, and on behalf of all persons similarly situated, and on behalf of the general public, | Case No. 08 CV 582 W WMc |
| | **CLASS ACTION** |
| Plaintiff, | **DECLARATION OF BARRON E. RAMOS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TIME WARNER CABLE INC., a Delaware Corporation, and Does 1 to 100, | Date: June 30, 2008 |
| | Time: 10:00 a.m. |
| Defendant | Place: Courtroom 7; 880 Front Street, San Diego, CA |
| | Judge: Hon. Thomas J. Whelan |
| | [No Oral Argument Pursuant to LR 7.1(d)(1)] |
| | Complaint: March 13, 2007 |
| | Removal: March 27, 2008 |

I, Barron E. Ramos declare as follows:

1   1.    I am one of the attorneys for plaintiff in this class action litigation and have personal

2   knowledge of each of the facts set forth herein. If called upon as a witness I could and would

3   testify competently thereto

4   2    This declaration is submitted in opposition to Time Warner Cable's (TWC) Motion for

5   Summary Judgment (MSJ).

6   3.    In response to a Request for Production of Documents, TWC produced recordings of all of

7   the conversations it had with Alpert, except the one in the fall of 2006 where he requested that his

8   bill be corrected.   According to TWC's counsel, someone destroyed that recording.   This was

9   confirmed during the deposition of TWC's PMK   Exhibit A, Depo Rhodes, at p 200:23   In other

10   words, TWC admits it destroyed the recording even though the lawsuit had been pending for at

11   least six (6) months at the time.

12   4.    Exhibit A attached hereto is a true and correct copy of various pages of the deposition

13   transcript of Ms. Terri Rhodes.

14   5    Exhibit B attached hereto is a true and correct copy of TWC's San Diego/Desert Cities'

15   Response to Plaintiff's Special Interrogatories No. 14, 15.

16   6    Exhibit C attached hereto is a true and correct copy of TWC's HOA pricing sheet that

17   Alpert received attached to his HOA's newsletter in the fall of 2006.

18   7    Exhibit D attached hereto is a true and correct copy of the deposition transcript of Leon

19   Alpert at pp. 97-106

20       I declare under penalty of perjury under the laws of the State of California that the

21   foregoing is true and correct.  Executed this  19  day of March, 2008 at Encinitas, California.

22

23

24                                                    Barron E. Ramos

25

26

27

28                                          2

# EXHIBIT A

# Deposition of

## TERESA JANE RHODES

### ALPERT v. TIME WARNER

*Taken On*
*March 14, 2008*

Transcript provided by:

**HUTCHINGS**SM
COURT REPORTERS, LLC
CSR 649

GLOBAL LEGAL SERVICES

800.697.3210

1    to write checks to Time Warner directly to do that is

2    going to pay fifty-five dollars more than -- fifty-four

3    ninety-five more than he had previously been paying,

4    whereas the person who was in the single family

5    residence across the street bill is going from about

6    fifty-one dollars to ninety-one dollars or about forty

7    dollars more

8         MS  HUSSEY:  Objection, vague as to time.

1:22P    9         MR  MARKHAM:

10         Q.  Again, this is in the '05 and early '06 period

11    when you had the HOA DIGIPiCs.

12         A   I would agree with the understanding that we

13    may be looking at two different years of rates.

14         Q.  Yeah, there may have been a couple of dollar

15    shift in that gap period but we tried to get as close in

16    terms of the time in the months as we could   For

17    example, we knew that the HOA went in effect March of

18    '05 and the closest non-HOA rate card we could find

19    prior to that time was January, '05.  And I guess it's

20    theoretically possible something could have shifted a

21    couple of dollars.

22         But it still looks like the kick to bring in those

23    whole DIGIPiC 4000 packages would have cost the HOA

24    fellow about $55 more whereas the non-HOA person was

25    paying about $40 more to upgrade to that same service

106

set    Would you agree with me?

1:23P    A    Yes.

Q    Okay.  Do you recall in any of the work you did over the last five or ten years in the setting of pricing at Time Warner any discussion with any other Time Warner employees about the fact that it was costing HOA customers more money to upgrade or increase their services than it was costing people who were not in an HOA?

A    No

Q.    Okay.  Do you recall any -- ever seeing any memos or emails which address that subject matter?

A.    No, because we don't agree with the premise that it's somehow different or unfair.

Q.    Well, it's not -- that's getting a little argumentative and I've tried to stay away -- I've just tried to stay with numbers.  But my question was whether there were any emails or documents that address the -- specifically the subject of increases for Additional Services and any discrepancy between the cost of the increases between HOA members and non-HOA members.

1:25P    A.    No.  In fact, if anything, it would be the opposite of let's make some packages for the HOAs to discount services for them from the a la carte pricing

107

1    question.

2         Q.  When we did the totals on what Time Warner was

3    collecting from Mr. Alpert in September of '06 and what

4    they were collecting from the homeowners' association

5    did we not get to a larger number than the DIGIPiC 4000

6    package would have cost a non-HOA member who had just

7    moved into a new single family dwelling unit?

2:46P    8         A.  Yes

9         Q.  Okay   Then why do you say that Time Warner is

10   charging less to its customers who are HOA people than

11   to its customers who are not HOA people?

12        A.  We don't consider that that resident is

13   necessarily paying what's in the contract with us, with

14   an HOA or a multi-housing unit.

15        Q.  Okay.  Well, then who do you consider is paying

16   that negotiated price?

17        A   Whoever the agreement is with.

18        Q.  Okay.  So you don't consider the collection

19   from the homeowners' association as part of the money

20   that is being paid to Time Warner from the HOA unit

21   owners in the various units?

22        MS. HUSSEY:  Objection, vague.

23        THE WITNESS:  As we're setting pricing we would not

24   consider that they have a charge on cable

25        MR   MARKHAM:

150

1       Q.  Which is the high speed Internet access service

2   and that could be either wired or wireless as we talked

3   about before?

4       A.  Yes.

5       Q.  And is there like a cheaper version of the

6   Internet, something called Light or Road Runner --

7       A.  Yes.

8       Q.  -- Light?  What is Road Runner Light?

9       A.  It's a different speed, a slower speed than

10  standard Road Runner.

11      Q.  Okay.  But it's still a cable wire that comes

12  into people's houses or condos that provides Internet

13  access along the wire?

14      A.  Yes.

15      Q.  Okay.  And there's also digital telephone

16  service which is basically Internet telephony, the use

17  of the Internet to pass audio signals, correct?

18      A.  Yes.

19      Q.  And I think that's probably all I can think of.

20  You can probably think of others but I'm not thinking of

21  extra gadgets like converter boxes or digital recorders

22  or anything like that.

23      So what I was trying to get at though -- and

24  for me the real breakdown was between the

25  Advantage Service, the Basic 75 channels and anything

153

1    above and beyond that, what the breakdown of your

2    customer base is as to what percentage of them really

3    confine themselves to the Advantage 75 channels and what

4    percentage buys something more and in addition to the

5    Basic 75 or 76 channels.

6        MS. HUSSEY:  Objection, vague, conjunctive and

7    exceeds the scope of the PMK deposition notice.

8        MR. MARKHAM:

9        Q.  Oh, well, do you know approximately what --

10       A.  It would be about 45 percent that have regular

11   Advantage Service and about 55 percent digital.

12       Q.  Okay.  Anything above Advantage is what you

13   call digital?

14       A.  Yes.

15       Q.  Because it is a digital fee?

16       A.  Yes.

17       Q.  At least up until recently I think at least.

18   Wasn't it true this month or last month or something or

19   is it next year that everything is supposed to go

20   digital --

21       A.  It's next year.

22       Q.  -- for everywhere because even the T.V. signal

23   will be digital?

24       Okay.  Let me start going through some of the

25   documents.  I also want to make sure that I've covered,

-154

1    and I think I have covered much of the items that we

2    listed on Exhibit 1.

3        Okay. Question Number 1, which is where we

4    started, we had gone over some of the rate cards. As I

5    understand it, they might have changed and there might

6    have been earlier ones affecting different time periods.

7        But we looked at the non-HOA and the HOA rate cards

8    for the '05 and '06 time period, which are the various

9    exhibits we referred to, and as I understand what you

10   were saying is there is a difference between a la carte

11   and bundled pricing but very often what's called

12   a la carte pricing is sort of a mixed or hybrid version

13   of the a la carte that has bundles on a bill with other

14   a la carte items like we were looking at in Mr. Alpert's

15   bill from September, '06 --

16       MS. HUSSEY:  Objection, vague.

17       MR. MARKHAM:

18       Q.  -- correct?

19       A.  Yes.

20       Q.  And that, if I understand what you testified to

21   earlier, for at least the pre-'05 time period an HOA

22   member asking for additional or digital service above

23   and beyond the Basic 76 would normally have been put

24   into an a la carte or a la carte hybrid bill rather than

25   one of the DIGIPiC type bundles because it would have

                        155

1    been less expensive for that customer to do so?

2        A.  Yes.

3        Q.  Okay.  And I gather in response to

4    Question Number 2 for HOA members Time Warner Cable's

5    position is that it did not double charge for the

6    amounts that were being collected under bulk service

7    agreements from HOAs because the billings to HOA members

8    did not reflect a separate line item for the

9    Basic Advantage Service, correct?

10       A.  Yes.

11       Q.  Let's skip over three because I think we've

12   covered it to the extent that it's clearly asked there.

13       Okay.  Question Number 4, when these HOA bundles

14   started to be used in about the first or second quarter

15   of '05 what did you folks do to make known that these

16   HOA packages or bundles such as the HOA DIGIPiC bundles

17   were available to customers who were already subscribers

18   from Time Warner Cable and customers?  I'm talking about

19   the HOA customers.

20       MS. HUSSEY:  Objection, vague as to geographic

21   area.

22       MR. MARKHAM:

23       Q.  I'm talking about the region you had

24   jurisdiction over.

25       MS. HUSSEY:  And what does that mean?

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

1      A   It's maybe or maybe not.  We've looked in our

2  records and don't find anything else.  But my

3  recollection is that we did some promotion of our HOA

4  bundles in the Desert.

5      Q   In the newspaper?

6      A   In -- in possibly print and direct mail.

7      Q   Okay.  I thought you were sure on direct mail

8      A   I am sure on direct mail.

9      Q   But you're not sure --

10     A   I remember doing --

11     Q   -- as far as newspapers?

12     A   Right.

13     Q   And you looked for newspaper ads but couldn't

14  find any?

3:04P  15     A.  Right

16     Q.  And then if we move to San Diego County

17  subscribers, do you know if there was any media

18  advertising that specifically mentioned the HOA rates in

19  media, again meaning either newspaper, T.V or radio?

20     A.  No, there was not.

21     MS. HUSSEY:  Vague as to San Diego

22     MR  MARKHAM:

23     Q.  The San Diego County subscribers, do you know

24  if you did any direct mail advertising or any kind of

25  notice to the HOAs or the HOA customers that these HOA

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800 697 3210

rates were in effect in '05 and '06?

1     A.  What we would have --

2     MS. HUSSEY:  Objection, vague as to location.

3     THE WITNESS:  What we would have done is mail them

4 the same offer as anyone else, again, Road Runner,

5 twenty-nine ninety-five a month for six months.  At the

6 time they call the CSR or go into a payment center, the

7 CSR would talk to them about the packages that would be

8 available after their discount period.

9     MR. MARKHAM:

10    Q.  Okay.  So there was nothing in the direct

11 mailing though that might have triggered a response and

12 a further discussion though that mentioned the subject

13 of HOA rates or HOA packages such as DIGIPiC?

14    MS. HUSSEY:  Objection, vague as to location.

15    MR. MARKHAM:

16    Q.  In San Diego County areas where you had HOA

17 subscribers.

18    A.  We often would mention about bundling and

19 savers, saving every month when you combine services.

20    Q.  But, again, any -- any communications that

21 actually mention the word HOA or HOA rates or new HOA

22 packages or words to that effect?

23    A.  Not that I recall.

24    Q.  Do you recall any consideration of any

1    or not the idea of switching over to the HOA DIGIPiC

2    bundle originated with a Time Warner service rep or

3    Mr. Alpert?

4         MS. HUSSEY:  Objection, vague, confusing.

5         THE WITNESS:  The customer would have had to have

6    called to talk to the service rep about his services and

7    at that point made a -- made a change.  The CSR is

8    trained to talk to the customer about what the

9    differences would be if they changed their package.

10        MR  MARKHAM:

11        Q   Well, do you know actually one way or another

12   what Mr  Alpert said when he first called the

13   Time Warner service rep?

14        A   No.

15        Q   Would it be fair to say that you don't know

16   whether the idea of switching over the HOA DIGIPiC

17   bundle that was in effect in the fall of '06 came from

18   the service rep as opposed to Mr. Alpert?

19        MS  HUSSEY:  Objection, vague, confusing, and it's

20   not in line with Mr  Alpert's testimony either.

21        MR. MARKHAM:

4:12P  22        Q   You can --

23        A   I don't know what their conversation was.

24        Q.  Okay.  Basically you don't really know what was

25   said by either of the two parties to that conversation?

                              193

1     after a year; is that correct?

2          A.  Yes.

3          Q.  Is there a way to tell when this audio

4     recording was actually destroyed?

5          A.  I -- I would have to check to see if we kept a

6     record of the destruction dates.

7          Q.  Okay.  But if the audio recording was normally

8     destroyed after a year and this conversation took place

9     in October of '06 -- was it September or October?

10          MR. RAMOS:  September.

11          MR. MARKHAM:

12          Q.  September, the date -- some date in September

13     of '06, then that audiotape would normally have been

14     destroyed in or about September of '07; is that correct?

4:25P    15          A.  Yes.

16          Q.  But this lawsuit was filed and served in March

17     of '07, correct?

18          A.  Yes.

19          Q.  So that the audiotape was destroyed about five

20     or six months approximately after the lawsuit had been

21     filed or served assuming the normal record retention

22     policy had been followed?

23          A.  Yes

24          Q.  Okay.  Do you know if there was any effort to

25     look for records or documents of any kind that related

1    these tracts and condo developments?

2        A.  My understanding of why we include paragraphs

3    like this is so that we can go in and market our

4    services to the residents there   And we would love

5    anything they'll do with us.

6        Q.  Okay.

7        A.  Most of the time we can't get them to take

8    materials and other things from us

4:41P    9        Q.  Okay   Well, under this Clause 4.4 and 1.4,

10    what I'm really trying to get at is this -- this then in

11    2005 and 2006 of HOA bundles, the HOA DIGIPiC packages

12    we were talking about before, to your knowledge there

13    was not a mass mailer for -- or communication of the new

14    rates to the various homeowners' associations, at least

15    in San Diego County?

16        MS  HUSSEY:  Objection to the characterization of

17    rates

18        MR. MARKHAM:  The rates, the rate cards for the

19    DIGIPiC HOA bundle.

20        THE WITNESS:  And the HOA bundles are a discount

21    like these other things are discounts   They're not

22    rates in particular   But I do not recall that we did

23    any direct marketing of the HOA bundles.  Again, we

24    would depend on general marketing out in the marketplace

25    to drive sales for us

HUTCHINGS COURT REPORTERS, LLC - GLOBAL LEGAL SERVICES
800.697.3210

# EXHIBIT B

JEFFREY M. SHOHET (Bar No. 067529)
JULIE L. HUSSEY (Bar No. 237711)
CARRIE S. DOLTON (Bar No. 234298)
**DLA PIPER US LLP**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: 619.699.2700
Fax: 619.699.2701

Attorneys for Defendant
TIME WARNER ENTERTAINMENT-ADVANCE/
NEWHOUSE PARTNERSHIP, A NEW YORK
GENERAL PARTNERSHIP, THROUGH ITS SAN
DIEGO DIVISION, DBA TIME WARNER CABLE

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

### CENTRAL DIVISION

| | |
|---|---|
| LEON ALPERT, an individual, on behalf of himself, on behalf of all those similarly situated, and on behalf of the general public,<br><br>   Plaintiff,<br><br>  v.<br><br>TIME WARNER CABLE, INC., a Delaware corporation, and DOES 1 TO 100,<br><br>   Defendants | CASE NO. GIC881621<br><br>**TIME WARNER ENTERTAINMENT-ADVANCE/ NEWHOUSE PARTNERSHIP, A NEW YORK GENERAL PARTNERSHIP, THROUGH ITS SAN DIEGO DIVISION, DBA TIME WARNER CABLE'S RESPONSES TO SPECIAL INTERROGATORIES (SET ONE) OF PLAINTIFF LEON ALPERT**<br><br>Dept: 63<br>Judge: Luis R. Vargas |

**RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

In addition to the General Objections set forth above, which are incorporated by reference herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "HOA bundle," and potentially seeks disclosure of information that is protected by the privacy rights of third parties

Subject to and without waiving the foregoing objections or the General Objections set forth above, and assuming, for purposes of this Interrogatory, that "HOA bundle" refers to the bundled services that Plaintiff ordered in or about September 2006, TWC—SAN DIEGO/DESERT CITIES responds as follows: Bertha Ruiz

**SPECIAL INTERROGATORY NO. 14:**

Did plaintiff Alpert have bundled services before he had the conversation with YOUR customer service representative that resulted in Alpert being placed in an HOA bundle in the fall of 2006?

**RESPONSE TO SPECIAL INTERROGATORY NO. 14:**

In addition to the General Objections set forth above, which are incorporated by reference herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "YOUR" and "HOA bundle."

Subject to and without waiving the foregoing objections or the General Objections set forth above, and assuming, for purposes of this Interrogatory, that "YOUR" refers to TWC—SAN DIEGO/DESERT CITIES, as defined above, and "HOA bundle" refers to the bundled services that Plaintiff ordered in or about September 2006, TWC—SAN DIEGO/DESERT CITIES responds as follows: Yes.

**SPECIAL INTERROGATORY NO. 15:**

If Plaintiff Alpert had bundled services before he had the conversation with YOUR customer service representative that resulted in Alpert being placed in an HOA bundle in the fall of 2006, please identify each and every bundle he already had in place at the time that conversation occurred.

/////

1  **RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

2       In addition to the General Objections set forth above, which are incorporated by reference

3  herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it

4  is vague and ambiguous as to the meaning of "YOUR" and "HOA bundle."

5       Subject to and without waiving the foregoing objections or the General Objections set

6  forth above, and assuming, for purposes of this Interrogatory, that "YOUR" refers to TWC—

7  SAN DIEGO/DESERT CITIES, as defined above, TWC—SAN DIEGO/DESERT CITIES

8  responds as follows:

9       Tier Package (Digital Movies, Digital Variety) (Plaintiff's San Diego Account);

10      Premium Package (HBO, Cinemax, Showtime, Starz) (Plaintiff's San Diego Account);

11      Digipic 2000 Combo (Plaintiff's Desert Cities Account).

12 **SPECIAL INTERROGATORY NO. 16:**

13      If plaintiff Alpert had bundled services before he had the conversation with YOUR

14 customer service representative that resulted in Alpert being placed in an HOA bundle in the fall

15 of 2006, for each bundle Alpert had at that time, please state whether Alpert had specifically

16 requested that particular bundle or whether YOU had bundled Alpert

17 **RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

18      In addition to the General Objections set forth above, which are incorporated by reference

19 herein, TWC—SAN DIEGO/DESERT CITIES objects to this Interrogatory on the grounds that it

20 is vague and ambiguous as to the meaning of "YOU," "YOUR" and "HOA bundle." TWC—

21 SAN DIEGO/DESERT CITIES further objects to this Interrogatory on the ground that it requests

22 information that is equally available to Plaintiff and/or solely available from Plaintiff since it

23 seeks information relating to whether he made certain requests. TWC—SAN DIEGO/DESERT

24 CITIES also objects to this Interrogatory on the grounds that it is compound, conjunctive, and

25 disjunctive and seeks information that is neither relevant nor reasonably calculated to lead to the

26 discovery of admissible evidence

27      Subject to and without waiving the foregoing objections or the General Objections set

28 forth above, and assuming, for purposes of this Interrogatory, that "YOU" and "YOUR" refers to

SD\1778981.8

-15-

# EXHIBIT C

TIME WARNER CABLE

## San Diego and Desert Cities 2006 DIGIPIC HOA Packages

Internal Use Only

### HOA DIGIPIC On-Demand
- Advantage Service
- Favorites On Demand
- Music Choice
- One Digital Pak-Variety, Movies, Sports or Mas Latino
- Access to select HDTV channels
- Interactive Program Guide

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$16.00 with converter

*Additional TV's pay $8.00 per converter*

Combo with Road Runner or Earthlink
*(Does not include Premium or Lite)*
$56.00 with converter
Trio with Phone
$91.00 with converter

### HOA DIGIPIC On-Demand 1000
- Advantage Service
- Favorites On Demand
- Music Choice
- Access to select HDTV channels
- Interactive Program Guide
- One Premium
- Premium on Demand
- One Digital Pak-Variety, Movies, Sports or Mas Latino

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$29.95 with converter

*Additional TV's pay $8.00 per converter*

Combo with Road Runner or Earthlink
*(Does not include Premium of Lite)*
$69.95 with converter
Trio with Phone
$99.95 with converter

### HOA DIGIPIC On-Demand 2000
- Advantage Service
- Favorites On Demand
- Music Choice
- Access to select HDTV channels
- Interactive Program Guide
- Two Premium's
- Premium on Demand
- Two Digital Paks-Variety, Movies, Sports or Mas Latino

Access to for additional cost:
- Movies on Demand
- Pro and College Sports Paks

$46.95 with converter

*Additional TV's pay $8.00 per converter*

Combo with Road Runner or Earthlink
*(Does not include Premium of Lite)*
$81.95 with converter
Trio with Phone
$111.95 with converter

### HOA DIGIPIC On-Demand 4000
- Advantage Service
- Favorites On Demand
- Music Choice
- Access to select HDTV channels
- Interactive Program Guide
- Four Premium's
- Premium on Demand
- Three Digital Paks-Variety, Movies, Sports or Mas Latino

Access to for additional cost:
- Movies onDemand
- Pro and College Sports Paks

$54.95 with converter

*Additional TV's pay $3.00 per converter*

Combo with Road Runner or Earthlink
*(Does not include RR Premium of Lite)*
$94.95 with converter
Trio with Phone
$124.95 with converter

| Premium Channel Add ON's-On Demand | |
| --- | --- |
| First Premium | $11.00 |
| Any 2 Premiums | $18.00 |
| Any 3 Premiums | $24.00 |
| Any 4 Premiums | $29.00 |

| Premium Channel Add ON's-On Demand 1000 | |
| --- | --- |
| One Premium add on only | |
| First Premium | $11.00 |

| Premium Channel Add ON's-On Demand 2000 | |
| --- | --- |
| With Trio only | |
| First Premium | $11.00 |
| All 4 Premiums | $18.00 |

- When a distinct subset or a Digital Pak is not included in a package, they pay retail rates. The first Digital Pak is $5 and each additional is $3.
- DVR service (not applicable to HD DVR) is available at a separate rate of $9.95 one monthly.
- Road Runner Wireless can be added to a package for an additional $9.95 monthly.
- HD/VIP Pak can be added for an additional per month, this does not include HV.

March 28, 2006

# EXHIBIT D

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CENTRAL DIVISION

LEON ALPERT, an individual, on
behalf of himself, on behalf of
all those similarly situated,
and on behalf of the general
public,

         Plaintiff,

  vs.

TIME WARNER CABLE, INC., a
Deleware corporation, and DOES
1 TO 100,

        Defendants.

Case No. GIC881621

# ORIGINAL

VIDEOTAPED DEPOSITION OF LEON SETH ALPERT

VOLUME 1

SAN DIEGO, CALIFORNIA

TUESDAY, NOVEMBER 6, 2007

Reported by:
R. Denise Marlow
CSR No. 11631

Job No. 75324

877.955.3855
www.sarnoffcourtreporters.com

IRVINE ▪ LAS VEGAS ▪ LOS ANGELES ▪ SAN DIEGO ▪ SAN FRANCISCO



SARNOFF
Court Reporters and
Legal Technologies

11:39:29   1   you that there were bundles that you could purchase

11:39:32   2   which would price the components of that bundle better

11:39:35   3   than if you bought them individually.  Correct?

11:39:36   4       A    Correct.

11:39:37   5       Q    In fact, the subcomponents or some portions of

11:39:39   6   your existing billing had that feature to it.  Correct?

11:39:43   7       A    As far as I recall.

11:39:44   8       Q    You had several of your movie channels -- I

11:39:48   9   mean, there was a package, and we'll get into this in a

11:39:51  10   minute, but there were -- there was a package of movie

11:39:53  11   channels where you bought four that were individually

11:39:56  12   priced at maybe 6.95 or whatever they were, and you got

11:40:00  13   them as a package for $11.  Correct?

11:40:02  14           MR. RAMOS:  Objection.  Best evidence.  I mean

11:40:04  15   if you've got the document, let's see it.

11:40:06  16   BY MR. SHOHET:

11:40:06  17       Q    Yes?  Isn't that your recollection?  That you

11:40:08  18   had --

11:40:08  19       A    You're asking -- you're -- you're -- you're

11:40:10  20   giving me specific numbers, and I can't recall what the

11:40:12  21   specific numbers are.

11:40:13  22       Q    I'm not asking about the specific numbers.  I

11:40:16  23   asking the concept, that if you buy and commit to

11:40:18  24   purchase a bundle of services, you get a better price

11:40:22  25   the bundle than you get if you buy each of the

| 11:40:25 | 1 | components individually.  Right? |
| 11:40:27 | 2 | MR. RAMOS:  Well, I'll object.  It's vague and |
| 11:40:28 | 3 | ambiguous. |
| 11:40:30 | 4 | BY MR. SHOHET: |
| 11:40:30 | 5 | Q    You understand, don't you? |
| 11:40:31 | 6 | A    I understand that I purchased what I purchased |
| 11:40:34 | 7 | to get a better rate collectively than individually. |
| 11:40:37 | 8 | Q    But I'm asking you about the concept.  You |
| 11:40:40 | 9 | understand about the concept with Time Warner Cable and |
| 11:40:43 | 10 | with other companies, car rental companies -- Time |
| 11:40:45 | 11 | Warner isn't the first company to invent the concept |
| 11:40:48 | 12 | that if you commit to a package of services, you get a |
| 11:40:52 | 13 | lower rate than you get if you buy them individually. |
| 11:40:54 | 14 | You're familiar with that.  As an economist, you |
| 11:40:56 | 15 | understand that, don't you? |
| 11:40:58 | 16 | MR. RAMOS:  I'll object.  He's not an |
| 11:41:00 | 17 | economist. |
| 11:41:00 | 18 | THE WITNESS:  Yeah, I'm not an economist.  I |
| 11:41:03 | 19 | have a degree in economy. |
| 11:41:03 | 20 | BY MR. SHOHET: |
| 11:41:04 | 21 | Q    I thought you were. |
| 11:41:06 | 22 | It's not a surprise to you that that's a |
| 11:41:09 | 23 | practice that Time Warner engages in and other companies |
| 11:41:10 | 24 | engage in.  That's my question. |
| 11:41:10 | 25 | MR. RAMOS:  I'll object to the form of the |

| | | |
|---|---|---|
| 11:41:13 | 1 | question that we don't know Time Warner engages in that. |
| 11:41:16 | 2 | MR. SHOHET: Yeah, we do. We do because it's |
| 11:41:19 | 3 | on his bill before he changed to the Digipac 4000. |
| 11:41:22 | 4 | MR. RAMOS: Vague and ambiguous. |
| 11:41:22 | 5 | BY MR. SHOHET: |
| 11:41:22 | 6 | Q    I'm not -- I'm not trying to argue with you. |
| 11:41:24 | 7 | I'm trying to get your answer to the question. |
| 11:41:27 | 8 | Is the concept that you can buy a bundle or |
| 11:41:30 | 9 | package of services and commit to that bundle and get a |
| 11:41:33 | 10 | cheaper price than you would get if you ordered each of |
| 11:41:37 | 11 | the components separately, is that a concept with which |
| 11:41:39 | 12 | you were familiar in September 2006? |
| 11:41:42 | 13 | A    Yes, I believe so. I -- I ordered a certain |
| 11:41:47 | 14 | package to get a better rate. So I guess if that's what |
| 11:41:49 | 15 | you're saying, yes, that's what I did. |
| 11:41:52 | 16 | MR. SHOHET: Okay. Let's take a short break. |
| 11:41:53 | 17 | Do you want to break for the noon hour now, or do you |
| 11:41:56 | 18 | want to continue? What's your preference? |
| 11:41:57 | 19 | MR. RAMOS: Depends on how long you have. |
| 11:42:00 | 20 | MR. SHOHET: You know, I don't know. I've got |
| 11:42:00 | 21 | some documents to go through. I would say we're not |
| 11:42:01 | 22 | going to get done, in any event, much before 3:00 or |
| 11:42:04 | 23 | 4:00 o'clock this afternoon. |
| 11:42:06 | 24 | THE WITNESS: I have a problem. I have to pick |
| 11:42:07 | 25 | up my daughter from school. I have to leave no later |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | | |
|---|---|---|
| 11:42:10 | 1 | than 1:30. |
| 11:42:11 | 2 | MR. SHOHET:  All right.  Well, then, we won't |
| 11:42:13 | 3 | finish. |
| 11:42:14 | 4 | THE WITNESS:  Okay. |
| 11:42:16 | 5 | MR. SHOHET:  Not today. |
| 11:42:16 | 6 | Why don't we do this, then.  If you've got to |
| 11:42:16 | 7 | go till 1:30, I don't think I'll finish you, and I'm not |
| 11:42:18 | 8 | going to rush it, but what we'll do is let's take, then, |
| 11:42:22 | 9 | a short break for now, and then we'll skip the noon |
| 11:42:26 | 10 | break.  We'll work through till 1:00 o'clock if that's |
| 11:42:29 | 11 | acceptable to everybody.  1:15?  What time do you have |
| 11:42:32 | 12 | to leave to pick up your daughter? |
| 11:42:33 | 13 | THE WITNESS:  I would feel comfortable leaving |
| 11:42:36 | 14 | no later than 1:30. |
| 11:42:36 | 15 | MR. SHOHET:  No later than 1:30? |
| 11:42:40 | 16 | THE WITNESS:  Yeah, no later than 1:30 in my |
| 11:42:41 | 17 | car and -- |
| 11:42:41 | 18 | MR. SHOHET:  Well, let's work until -- through |
| 11:42:43 | 19 | until we, you know, collectively conclude that it's time |
| 11:42:47 | 20 | to break, and then we'll pick this up at another time. |
| 11:42:50 | 21 | All right? |
| 11:42:50 | 22 | Let's just take a short break now off the |
| 11:42:52 | 23 | record. |
| 11:42:53 | 24 | THE VIDEOGRAPHER:  This marks the end of Media |
| 11:42:55 | 25 | No. 1, going off the record.  Time is 11:42 a.m. |

100

| | | |
|---|---|---|
| 11:42:58 | 1 | (Off record) |
| 11:42:58 | 2 | THE VIDEOGRAPHER:  Okay.  We're back on the |
| 12:08:33 | 3 | record.  The time is 12:08 p.m.  This marks the |
| 12:08:36 | 4 | beginning of Media No. 2.  This is the deposition of |
| 12:08:39 | 5 | Leon Alpert. |
| 12:08:40 | 6 | BY MR. SHOHET: |
| 12:08:40 | 7 | Q    Just a few more questions, Mr. Alpert, about |
| 12:08:43 | 8 | the conversation that you had with the CSR.  You said |
| 12:08:45 | 9 | words to the effect that, It looks like I have the |
| 12:08:49 | 10 | Digipac 4000, to the CSR.  Is that true? |
| 12:08:52 | 11 | MR. RAMOS:  I'll object.  It misstates his |
| 12:08:57 | 12 | testimony. |
| 12:08:57 | 13 | BY MR. SHOHET: |
| 12:08:57 | 14 | Q    I can read your testimony back for you if you'd |
| 12:09:01 | 15 | like. |
| 12:09:01 | 16 | A    No.  I -- I -- it could have been the four -- |
| 12:09:04 | 17 | if the 4000 was the package that I had prior and -- then |
| 12:09:09 | 18 | it's correct.  I identified a package that I currently |
| 12:09:12 | 19 | had at the time versus what the HOA package presented to |
| 12:09:16 | 20 | me by the association was, you know, the -- the thing, |
| 12:09:19 | 21 | the notice on the newsletter. |
| 12:09:20 | 22 | Q    But the -- |
| 12:09:21 | 23 | A    So I said one on my bill, it looks like what I |
| 12:09:25 | 24 | have now is -- is this thing here that I -- from what I |
| 12:09:28 | 25 | got from the association. |

101

| | | |
|---|---|---|
| 12:09:29 | 1 | Q    And on the association -- I think you answered |
| 12:09:31 | 2 | this -- you think it said Digipac 4000. |
| 12:09:36 | 3 | A    Yeah, I could have.  I'm sure -- I'm -- if |
| 12:09:38 | 4 | that's the bundle. |
| 12:09:39 | 5 | Q    Okay.  And what, if anything, do you recall the |
| 12:09:47 | 6 | CSR said in response to that? |
| 12:09:49 | 7 | A    As far as I knew, she agreed with me. |
| 12:09:51 | 8 | Q    And was she, then, familiar with the Digipac |
| 12:09:55 | 9 | 4000 package? |
| 12:09:56 | 10 | MR. RAMOS:  Objection.  Calls for speculation. |
| 12:09:58 | 11 | THE WITNESS:  I -- I imagine she was familiar |
| 12:10:00 | 12 | with whatever Time Warner products she was representing, |
| 12:10:04 | 13 | because she agreed with me. |
| 12:10:06 | 14 | BY MR. SHOHET: |
| 12:10:06 | 15 | Q    You hadn't sent her the flier from the |
| 12:10:10 | 16 | homeowners association in advance of the conversation, |
| 12:10:13 | 17 | had you? |
| 12:10:13 | 18 | A    No. |
| 12:10:13 | 19 | Q    And did you mention -- well, withdraw that |
| 12:10:18 | 20 | question. |
| 12:10:18 | 21 | At least as far as you can tell, she had no |
| 12:10:27 | 22 | problem understanding what the Digipac 4000 bundle of |
| 12:10:31 | 23 | services was at the time you mentioned it to her. |
| 12:10:33 | 24 | MR. RAMOS:  Calls for speculation. |
| 12:10:34 | 25 | THE WITNESS:  Well, my understanding -- I mean, |

102

LEON SETH ALPERT                                    11/06/07

| | | |
|---|---|---|
| 12:11:44 | 1 | THE WITNESS: I don't know that she understood. |
| 12:11:46 | 2 | I think she knew what I was -- the bundle, because I |
| 12:11:50 | 3 | guess it was a bundle. I had the cable television, I |
| 12:11:54 | 4 | had the phone, and I had the Road Runner. So I had -- |
| 12:11:59 | 5 | and the cable television had certain services associated |
| 12:12:03 | 6 | with it, you know, the digital HD, whatever, and she |
| 12:12:07 | 7 | agreed that -- that this HOA thing was the same thing or |
| 12:12:13 | 8 | similar enough, so that's -- we agreed on that point. |
| 12:12:18 | 9 | BY MR. SHOHET: |
| 12:12:18 | 10 | Q  All right. But I guess my question is when you |
| 12:12:20 | 11 | said, It looks like I have the HOA Digipac 4000, she |
| 12:12:25 | 12 | didn't come back with a response that suggested to you |
| 12:12:28 | 13 | that she didn't know what you were talking about, did |
| 12:12:32 | 14 | she? |
| 12:12:32 | 15 | A  No, I don't think so. |
| 12:12:35 | 16 | Q  Okay. And then you said that she agreed with |
| 12:12:48 | 17 | you that the services that you were -- well, tell me |
| 12:12:51 | 18 | what you think she agreed with. |
| 12:12:52 | 19 | A  That I was being overcharged. |
| 12:12:54 | 20 | Q  And why so? |
| 12:12:55 | 21 | A  Because Time Warner seems to have agreed to |
| 12:13:00 | 22 | provide the services that I was paying X amount of |
| 12:13:02 | 23 | dollars for for X amount minus a certain amount to the |
| 12:13:07 | 24 | homeowners at Seapointe townhomes, and I wasn't getting |
| 12:13:09 | 25 | a lower rate, so she gave me the lower rate. |

LEON SETH ALPERT                    11/06/07

| 12:13:12 | 1 | Q    Did she tell you that the reason that the |
| 12:13:15 | 2 | Digipac 4000 was priced lower than the -- what you were |
| 12:13:22 | 3 | paying at the time was because you were in a homeowners |
| 12:13:26 | 4 | association or because you were purchasing the package |
| 12:13:29 | 5 | in a bundle? |
| 12:13:30 | 6 | MR. RAMOS:  Objection.  It's leading, first of |
| 12:13:34 | 7 | all, which I do know is permitted.  However, you |
| 12:13:38 | 8 | characterized -- mischaracterized his testimony that |
| 12:13:41 | 9 | he's purchasing something at this juncture.  He's not |
| 12:13:43 | 10 | purchasing anything. |
| 12:13:44 | 11 | MR. SHOHET:  Okay.  Let me withdraw the |
| 12:13:45 | 12 | question and start over again. |
| 12:13:46 | 13 | MR. RAMOS:  Okay.  Thank you. |
| 12:13:47 | 14 | BY MR. SHOHET: |
| 12:13:47 | 15 | Q    What, if anything, else did she say to you |
| 12:13:57 | 16 | regarding why, in your view, she agreed with you that |
| 12:14:01 | 17 | we're being -- you were being overcharged?  What |
| 12:14:04 | 18 | about -- what was different about the pricing that she |
| 12:14:11 | 19 | agreed you should be getting from the pricing that you |
| 12:14:13 | 20 | were getting? |
| 12:14:14 | 21 | A    What was different?  The price. |
| 12:14:16 | 22 | Q    Nothing else? |
| 12:14:18 | 23 | A    Not that I recall.  The price was the issue. |
| 12:14:21 | 24 | That's the only thing I called about was the price. |
| 12:14:24 | 25 | Q    So in -- there was no discussion about the fact |

105

LEON SETH ALPERT                              11/06/07

| | |
|---|---|
| 12:14:29 1 | that the reason the pricing would be lower was because |
| 12:14:33 2 | you were entitled to lower pricing as a result of the |
| 12:14:37 3 | HOA paying your basic cable rate? |
| 12:14:40 4 | A    Well, I don't know the reason why I was |
| 12:14:43 5 | overcharged, first of all.  I just knew I was being |
| 12:14:48 6 | overcharged.  Second of all, she -- I said what I wanted |
| 12:14:53 7 | was a credit on my bill on the amount of however many |
| 12:14:59 8 | months I was being overcharged times the amount of the |
| 12:15:04 9 | overcharge per month.  I thought perhaps I was being |
| 12:15:08 10 | overcharged for since 2005 and most -- and up to that |
| 12:15:12 11 | point in 2006.  She said she wasn't authorized to do |
| 12:15:16 12 | that.  The best she could do was lower my rate for what |
| 12:15:21 13 | it should be and should have been at that point in time, |
| 12:15:24 14 | and she was willing to throw in a free month of the |
| 12:15:29 15 | phone. |
| 12:15:29 16 | Q    Now, is it your sworn testimony that there was |
| 12:15:31 17 | no discussion with the CSR about the fact that Time |
| 12:15:34 18 | Warner had developed a bundled rate or a bundled package |
| 12:15:37 19 | of services which your services just happened to fit |
| 12:15:40 20 | into? |
| 12:15:40 21 | A    It's my sworn testimony that I have no |
| 12:15:44 22 | recollection about speaking about bundles with the Time |
| 12:15:47 23 | Warner rep, only about my bill and what I thought I |
| 12:15:50 24 | should be paying from the homeowners association. |
| 12:15:53 25 | That's -- that was the conversation. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855