David R. Markham (Bar No. 071814)
R. Craig Clark (Bar No. 129219)
James M. Treglio (Bar No. 228077)
**CLARK & MARKHAM, LLP**
600 B Street, Suite 2130
San Diego, CA 92101
Telephone: (619) 239-1321
Facsimile:  (619) 239-5888
dmarkham@clarkmarkham.com
cclark@clarkmarkham.com
jtreglio@clarkmarkham.com

Barron E. Ramos (Bar No. 179620)
**LAW OFFICES OF BARRON E. RAMOS**
132 N El Camino Real #303
Encinitas, CA 92024
Telephone: (760) 274-6438
Facsimile:  (760) 994-1354
barron@yourclasscounsel.com

Attorneys for plaintiff and the Class

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEON ALPERT, an individual on behalf of himself, and on behalf of all persons similarly situated, and on behalf of the general public,<br><br>Plaintiff,<br><br>vs.<br><br>TIME WARNER CABLE INC., a Delaware Corporation, and Does 1 to 100,<br><br>Defendant | Case No. 08 CV 582 W WMc<br><br>**CLASS ACTION**<br><br>**PLAINTIFF LEON ALPERT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: June 30, 2008<br>Time: 10:00 a.m.<br>Place: Courtroom 7; 880 Front Street, San Diego, CA<br>Judge: Hon. Thomas J. Whelan<br><br>[No Oral Argument Pursuant to LR 7.1(d)(1)]<br><br>Complaint: March 13, 2007<br>Removal:  March 27, 2008 |

## TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

II.     SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

III.    APPLICABLE LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

IV.     STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

V.      ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

        i.    TWC Admits It Overcharged Alpert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

        ii.   TWC's Discrimination in Price for Additional Services against HOA members   is
              Unlawful under Federal Law and Section 17200. . . . . . . . . . . . . . . . . . . . . . . . . .12

        iii.  The FCC has Found that Use of an "exclusive" Cable Services Contract with an
              HOA is Unfair Competition. . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . 14

        iv.   TWC Admits It Concealed Its HOA Pricing. . . . . . . . . . . . . . . . . . . . .. . . . . . . . . .15

        v.    TWC Admits It Enforces An Unlawful 30 Day Billing Error Notice. . . . . .. . . . .18

VI.     TWC's MSJ FAILS BECAUSE IT IS BASED ON DISPUTED FACTS. . . . . . . . . 19

        i.    In 2006, Alpert Did Not Request Additional Services Nor To Be "Bundled". . . . .19

        ii.   TWC Had A Duty to Inform Residents of HOA Pricing. . . . . . . . . . . . . . . . . . . . 19

        iii.  Alpert Did Not Believe He Was Properly Charged. . . . . . . . . . . . . . . . . . . . . . . . 20

VII.    TWC RELIES UPON THE SAME INAPPOSITE AUTHORITY ALREADY
        CONSIDERED AND REJECTED BY THIS COURT. . . . . . . . . . . . . . . . . . . . . . . .21

VIII.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

**CASES**

*Aguilar v. Atlantic Richfield Company*
(2001) 25 Cal. 4th 826, 884 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Barquis v. Merchants Collection Association*
(1972) 7 Cal. 3d 94, 113. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Belton v. Comcast Cable Holdings, LLC*
(2007) 151 Cal.App.4th 1224151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Bronco Wine Co. v. Jolley*
(2004) 33 Cal. 4th 943 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Charnay v. Cobert*
(2006) 145 Cal. App. 4th 170. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*
(2001) 90 Cal.App.4th 335, 345. . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . .20

*Colgan v. Leatherman Tool Company*
135 Cal. App. 4th 680 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Committee on Children's Television v. General Foods Corp*
1983) 35 Cal.3d 197, 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13,15

*Daugherty v. American Honda Motor Co., Inc.*
(2006) 144 Cal.App.4th 824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Freeman v. Wal-Mart Stores, Inc.*
(2003) 111 Cal.App.4th 660, 670.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Gibson v. World Savings & Loan Assn.*
(2002) 103 Cal. App. 4th 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hodge v. Superior Court*
(2006) 145 Cal. App. 4th 278. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*
466 U.S. 2 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Kasky v. Nike, Inc.*
(2002) 27 Cal.4th 939. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Lavie v. Proctor & Gamble Co.*

105 Cal. App. 4th 504-509. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Massachusetts Mutual Life Insurance v. Superior Court*
    97 Cal. App. 4th at 1292-1293. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Moreno v. Sanchez*
    (2003) 106 Cal.App.4th 1415, 1430 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Orkin Exterminating Co., Inc. v. FTC,*
    849 F.2d 1354 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20

*People v. Wahl*
    (1940) 39 Cal. App. Supp. 2d 771, 774) . . . . . . . . . . . . . . . . . . . . . . . . . . .16,20

*Plotkin v. Sajahtera, Inc*.,
    106 Cal.App.4th 953 (2003) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Schnall v. Hertz Corporation*
    78 Cal.App.4th 1144 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Searle v. Wyndham Internat., Inc*.,
    (2002) 102 Cal.App.4th 1327. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*South Bay Chevrolet v. General Motors Acceptance Corp.*
    (1999) 72 Cal. App. 4th 861, 878. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Stevens v. Superior Court*
    (1999) 75 Cal. App. 4th 594, 602-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Stop Youth Addiction v. Lucky Stores*
    (1998) 17 Cal. 4th 553, 560. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13


**STATUTES**

47 U.S.C. 543(8)(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12-13

47 U.S.C. 543(8)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

47 U.S.C. 583(8)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Business & Professions Code §17200. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

15 U.S.C. §§45 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

1    **I.    <u>INTRODUCTION</u>**

2         This case really presents two unfair practice claims within a single unfair competition

3    case.  The first and simpler claim is whether the defendant, Time Warner Cable, (hereinafter

4    "TWC") can bill higher a la carte rates to its HOA customers without notifying them that lower

5    HOA rates are also in effect and when the customer agreement recites that current rates have

6    been disclosed.  This claim is brought under the deceptive prong of the UCL, California Business

7    & Professions Code § 17200, and covers the time period March 2005 through October 2007.

8         The second and more complex claim covers the entire class period.  It involves the use of

9    exclusive contracts for sale of basic cable channels to HOAs at rates below the basic rates for

10   non-HOA customers, and once the HOA members are locked in, charging them higher,

11   discriminatory rates for additional services as they are added, in violation of the unlawfulness

12   prong of the UCL, borrowing the provisions of 47 U.S.C. §543.  This is done through steering

13   the HOA customers into a la carte pricing, and using bundled pricing for non-HOA customers.

14        In short, Plaintiff alleges that he and all other TWC consumers whose HOA's contracted

15   with TWC to provide basic cable were damaged because they were charged more for additional

16   services than the non-HOA consumer.  Plaintiff alleges that these overcharges were both

17   deceptive and unlawful under the UCL.

18

19   **II.    <u>SUMMARY OF ARGUMENT</u>**

20        This action is brought under California's Unfair Competition Law ("UCL") to remedy

21   overcharging and discriminatory pricing directed against cable subscribers who are members of

22   homeowners' associations ("HOAs").  Time Warner Cable ("TWC") negotiates "bulk" contracts

23   with HOAs to provide basic 77 channel cable service to all units in a subscribing HOA at prices

24   below the prevailing rates for basic services available to members of the general public, in return

25   locking in all members of the HOA into exclusive contracts which bar the members from getting

26   basic cable service from TWC's competitors.  Each unit owner then reimburses his HOA for the

27   cost of these basic services in monthly assessments.  After the bulk contract is in place, HOA

28   members then purchase "Additional Services" from TWC such as digital cable, premium

1  channels, internet and digital phone service.  According to TWC's PMK witness, the majority of

2  its customers order Additional Services and not just the basic 77 channels.  Decl. of Ramos, Exh.

3  A, Rhodes Dep. at 153:23-154:11.

4  Not disclosed when the bulk HOA contracts are negotiated is TWC's business strategy of

5  using a pricing structure which charges more to HOA customers for  additional cable services

6  beyond basic service than non-HOA customers are charged.  For HOA subscribers who purchase

7  such additional services, the savings in the bulk contracts disappear and ultimately they pay more

8  for cable service then they would pay had they not been part of an HOA, or if their HOA had not

9  negotiated any bulk contract with TWC at all.

10  Plaintiff, for example, was a member of the SeaPoint HOA which purchased basic 77-

11  channel cable service for each of its 237 units (including plaintiff's) for $28.77 a month, an

12  apparent savings of $23 a month below the $50.97 a non-HOA customer would pay per month

13  for basic 77-channel service.  As plaintiff and other HOA members subscribed for additional

14  services, TWC charged HOA customers a higher price for each additional service than non-HOA

15  customers were being charged.  This was accomplished through steering HOA subscribers to

16  additional services to "a la carte" pricing, while non-HOA customers were priced through a

17  series of "bundles" which included the basic 77 channels but also included a lower price increase

18  for each additional service.  In this way, the benefit and savings in the HOA's basic services

19  contract quickly disappeared and, as more services were added, HOA customers ended up paying

20  more for the same basket of services than members of the general public.   For example, Mr.

21  Alpert was charged $25.80 a month more than a member of the public would have paid to

22  upgrade their basic 77 channel cable service to digital and premium channels.

23  Then, in 2005, TWC introduced a new "HOA bundle" pricing structure which eliminated

24  the overcharge for additional services.  However, for HOA customers, it was illusory.  In fact, it

25  was a "stealth" pricing system as it was not advertised anywhere, notices were not sent to HOAs,

26  and the HOA bundle prices were not even posted on TWC's website.  Plaintiff discovered that

27  there was lower pricing by happenstance and demanded his pricing be lowered in September

28  2006 - after the lower pricing had been in effect for 18 months.

1    These practices violate the "deceptive" and "unlawful" prongs of the UCL as follows.

2    First, there was "deception" under section 17200 in not disclosing, at either the time of the

3    signing of the bulk HOA contract or when new HOA customers order additional services, that

4    (1) in 2005-2006, there was a second, undisclosed, lower rate structure for HOA customers; and

5    (2) the HOA prices for additional services would be higher than the prices charged to non-HOA

6    customers.  TWC does not disclose its business strategy of obtaining exclusive service contracts

7    with HOAs by negotiating lower rates for basic services with the intent to recapture margins

8    through higher prices to HOA members for additional services once the HOA members are

9    locked in to TWC for basic television service.

10    Second, price discrimination against HOA customers with exclusive HOA cable service

11    contracts is unlawful as it violates 47 U.S.C. 543(8)(d) which prohibits price discrimination for

12    the same services between customers in the same geographic area.   While bulk "*discounts*" to

13    HOAs are permitted, there is no provision in law or in the HOA agreement for charging a higher

14    price to HOA customers for exactly the same additional services as it charged to non-HOA

15    customers.

16    Third, the FCC has recently held that the use of "exclusivity" provisions in HOA cable

17    service contracts is unfair competition.   Order No. FCC 07-189 of the FCC dated October 31,

18    2007 and lodged herewith.  Request for Judicial Notice, Exhibit 1.

19    In this motion, TWC argues two things: first, that the amounts it collects from HOAs

20    each month for basic service to each unit should not be included in the calculation of the amount

21    each HOA customer pays in determining whether there was an overcharge for additional services

22    – without disputing that the customer ultimately does pay this amount when billed by his HOA.

23    TWC's position is an oversimplification and does not provide a defense to the unlawful and

24    deceptive practices claims.  Second, it argues that it did not have the duty to disclose to any HOA

25    members the new "HOA bundled" pricing it introduced in 2005, and thus that it had no duty to

26    disclose that the same services were available at lower prices to preexisting HOA customers

27    unless and until they somehow discovered and asked for them.  Again, as will be shown, TWC is

28    also wrong on this contention as a matter of law.

1

2    **III    APPLICABLE LEGAL STANDARD**

3        Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper when the

4    pleadings and discovery, read in the light *most favorable to the non-moving party*, show that

5    there is no genuine issue as to any material fact and that the moving party is entitled to judgment

6    as a matter of law." *Allstate Insurance Company v. Gilbert*, 852 F.2d 449, 451 (9th Circuit

7    1988).  The court must view the evidence presented on the motion in the light most favorable to

8    the opposing party and all reasonable inferences must be drawn in the opposing party's favor

9    both where the underlying facts are undisputed and where they are in controversy.  At the

10   summary judgment stage, "the nonmovant's version of any disputed issue of facts is presumed

11   correct."  *Eastman Kodak Co. v. Image Technical Services*, Inc. 504 U.S. 451 (1992); *T.W. Elec.

12   Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630-631  (9th Cir. 1987).  Plaintiff has

13   here presented disputed facts that indicate that he was harmed by the unlawful and deceptive acts

14   of the defendant.  Furthermore, "[it] is not enough for summary judgment ... with a conclusory

15   assertion that the (opposing party) has no evidence to prove his case."  *Celotex Corp. v. Catrett*,

16   477 U.S. 317, 326 (1986).

17

18

19   **IV.    STATEMENT OF FACTS**

20       As a resident of SeaPoint Townhomes ("SeaPoint"), Alpert is required to pay monthly

21   HOA dues.  Included in that monthly fee is an assessment paid to TWC for Alpert's monthly

22   cable bill for the basic 77 channels.  Decl. Leon Alpert at para. 8.  That fee is $ 28.77 per month

23   and is charged to Alpert in his monthly assessments.  TWC's NOL, Exhibit B at Ex. B.  This

24   represented a savings of about $23 below the $50.97 a non-HOA customer would pay for the

25   basic channels in the simplest 77 channel bundle called "Advantage Service."  Nutten Decl. Para.

26   4 and 5.

27       Since at least March of 2003 TWC has had an exclusive contract with SeaPoint to

28   provide basic cable services.  Decl. Rhodes at para. 3; TWC's NOL, Exhibit B.  Under Paragraph

4.2 of the exclusive contract between SeaPoint HOA and TWC, "Additional Services" (i.e., other

1    than basic cable) would be provided directly from TWC to the consumer and billed separately to

2    the consumer.  TWC's NOL, Exhibit B, 1.1(B), 2.   The TWC-SeaPoint contract gives TWC "the

3    exclusive right for the first five years to …install, operate [and] maintain…a system at the

4    Property for the provision of multi-channel video services…."  TWC's NOL, Exhibit B,

5    Paragraph 4.2.

6        From the beginning of the class period until March 2005, TWC offered various bundled

7    packages to non-HOA customers in San Diego and Riverside Counties. These included both the

8    basic 77 channels as well as the additional services each customer decided to purchase; as each

9    bundle included progressively more services, its price increased.  However, HOA customers

10   asking for additional services were placed into what TWC calls "a la carte" billing systems

11   which itemized each additional service.  Decl. Ramos, Exhibit A, Depo Rhodes at p. 155:20-

12   156:2.   The a la carte increases in price for additional services were higher than the increases

13   between bundles charged to non-HOA customers for the same increases in additional services.

14   Nutten Decl at 6.  When the amount TWC billed to each HOA customer was added to the

15   amount he reimbursed his HOA ($28.77 in the case of SeaPoint), the savings ($23.00) an HOA

16   customer enjoyed under the HOA-TWC basic service contract disappeared.  For example,

17   analysis by an auditor expert, Wesley Nutten, shows that by 2005 and 2006 Mr. Alpert was

18   paying more for cable services than he would have paid had he not been in an HOA and instead

19   been a member of the general public.  Nutten Decl. para. 6.  In fact, when determining pricing

20   for HOA customers, TWC admits that it did not consider that Alpert and the other HOA

21   members *are already paying for basic cable at all*.  Decl. Ramos, Exhibit A, Depo Rhodes, at

22   p.150:12

23        TWC's business strategy of charging HOA members higher prices for additional services

24   once they were locked into exclusive cable contracts is not disclosed when the HOA contracts

25   are negotiated with HOAs.

26        Then, in March 2005, TWC created a new bundled pricing structure for HOA customers

27   (called Digipic HOA 1000, 2000 and 4000).  The bundles reduced the prices to HOA members

28   by about $24 (*though still charging HOA members $15 more for the additional services*).

1  However, the new HOA bundles were not advertised or put on TWC's website with all TWC's

2  other prices, and no notice was sent to existing HOA customers or their association boards or

3  property managers.  The new bundle prices were only made available to HOA customers who

4  called and requested new additional services.  Decl. Ramos, Exhibit A, Depo Rhodes at pp.

5  163:22-164:9.  In its MSJ, TWC argues it had no duty to disclose the new HOA bundle rates to

6  existing HOA customers.  At the same time when a new HOA customer signs up for additional

7  services, TWC requires them to adopt and agree to a form contract in which they acknowledge

8  they are aware of its current pricing and rates.  (TWC's NOL, Exhibit C) sets forth the terms of

9  the agreement between Alpert and TWC for the "Additional Services" offered over and above

10  basic cable.  Paragraph no. 2 governing charges states that "*[c]harges for the Services are set

11  forth on a separate price list that I (the subscriber) have received.*"  In the case of the 2005 HOA

12  rates and its existing HOA customers in 2005 and 2006, this recital TWC inserts in its form

13  contracts is false.

14      In the fall of 2006, 18 months after the new HOA rates went into effect, Alpert received a

15  newsletter from his association indicating that HOA pricing was available to SeaPoint residents.

16  Decl. Alpert at para. 11.  (It is still not clear how his association discovered the new pricing.)

17  After reviewing the pricing, Alpert realized he was being overcharged for his services.  *Ibid.*

18  Once Alpert learned of the correct pricing in the fall of 2006, he called TWC to get his bill

19  adjusted.  Decl. Alpert at para. 12.  TWC admitted its error to Alpert, apologized, and then

20  adjusted his bill accordingly.  *Ibid.*  However, TWC refused to credit Alpert for the overcharges,

21  instead limiting the credit to one month's partial service.  *Id.* at para. 13.

22      Alpert never requested any additional services and never requested to be bundled.  *Id.* at

23  para. 12.  He asked that his bill be corrected.  *Ibid.*  Unfortunately, TWC erased the recording of

24  this conversation while the lawsuit was pending.  Decl. Ramos, Exhibit A, Depo Rhodes, at

25  p.200:23.  After Alpert called to complain, Alpert's bill dropped to reflect the correct pricing for

26  his services.  Decl. Alpert at para. 14.  His new bill finally reflected TWC's HOA pricing.  *Ibid.*;

27  FAC, Exhibit C; TWC's Amended Separate Statement, Exhibit E.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.    ARGUMENT

(i)    **TWC Admits It Overcharged Alpert**

Before 2006, Alpert was not bundled into TWC's "Digipic" packages used for the general public with an offset or credit for the values of basic cable service his HOA had already subscribed for and which would have cost $50.97 a month to non-HOA customers. (Doing so, of course, would have resulted in an "apples to apples" billing system for HOA and non-HOA customers and avoided discriminatory pricing.)  Instead, until 2005, TWC chose to force Alpert and other HOA class members to pay "a la carte" pricing, which charged more for each additional service than non-HOA customers were being charged through progressively larger non-HOA bundles.  Because of this, as HOA members like Alpert added additional services, the incremental amount billed by TWC for those services was higher than the incremental amount non-HOA customers for comparable additional services.  Decl. Nutten at para. 8.

In 2005 TWC began to finally offer bundled packages "designed for bulk [HOA] customers." Decl.  Rhodes, para. 8.  The only "design" was the lowering of the price since those HOA packages were exactly the same as those for non-HOA customers (e.g., Digipic 4000 vs. Digipic HOA 4000) - the HOA version just had a lower price, but still charged an additional $15 for the additional services.

(ii)    **TWC's Discrimination in Price for Additional Services against HOA members is Unlawful under Federal Law and Section 17200.**

TWC's pricing scheme is also unlawful because cable operators "may not discriminate between subscribers to the basic service tier and other subscribers with regard to the rates charged for video programming offered on a per channel or per program basis."  47 U.S.C. §543(8) (a).  Further:

> **A cable operator  shall have a rate structure for the provision of cable service that is uniform throughout the geographic area in which cable service is provided over its cable system** . . . Bulk discounts to multiple dwelling units shall not be subject to this subsection, except that a cable operator of a cable system that is not subject to effective competition may not charge predatory prices to a multiple dwelling unit.  Upon a prima facie showing by a complainant that

1
2

> there are reasonable grounds to believe that the discounted price is predatory, the
> cable system shall have the burden of showing that its discounted price is not
> predatory.

*Id*. at section (d).

3

4      Nothing in 47 U.S.C. §543 permits TWC to charge *more* to MDUs for additional services

5      than to general retail customers. When this happens, the rates are no longer "uniform." Forcing

6      Alpert and the class members to pay "a la carte" or otherwise pay more than non-HOA

7      customers is not only unlawful, unfair and deceptive, it is predatory. That is exactly what TWC

8      admits it did here. Moreover, under 47 U.S.C. §543(d), TWC bears the burden, not the Plaintiff,

9      of proving that its rates are *not* predatory. TWC has not done that. A review of Mr. Alpert's

10     records, and the rate cards reviewed by Plaintiff's expert shows that HOA residents like Mr.

11     Alpert paid a higher price for additional services, with or without the HOA bundle started in

12     2005.

13     The California Legislature specifically designed the UCL to enforce the legal obligations

14     imposed by federal laws and regulations such as FCC 07-189, and 47 U.S.C. §583 (8)(d). Any

15     law may serve as the predicate for a UCL claim. *Stevens v. Superior Court* (1999) 75 Cal. App.

16     4th 594, 602-3. As consistent decisions in California have maintained:

17

> [W]hether a private right of action should be implied under [the
> predicate] statute... is immaterial since any unlawful business
> practice... may be redressed by a private action charging unfair
> competition... *Stevens*, *supra*, at 602.

18
19
20

21     Because the Plaintiff was a victim of the practice and was injured by the invasion of his legal

22     rights, the UCL claim is a valid claim.

23     As discussed above, Mr. Alpert suffered economic injury by paying for products at a

24     higher rate than other, non-HOA residents. TWC cannot now claim that despite this obvious

25     discrimination and disparity, in violation of 47 U.S.C. §583 (8)(d), that there is no cause of

26     action. Plaintiff and the class members have all been harmed by TWC's unlawfully

27     discriminatory pricing. For Mr. Alpert, the benefit of the original bargain, $50.97 of basic

28     services bought for $28.77, is lost as the HOA customer orders additional services. By April of

2006, he, in fact, paid more for his services than a non-HOA subscriber. It was only until

1   September 21, 2006, when he received an "HOA bundle," that Mr. Alpert paid less than a non-

2   HOA subscriber for the same services (though still more for the additional services).

3       Under Business & Professions Code §17200, businesses cannot engage in any unlawful

4   practices or acts. As defined, an unlawful practice under the UCL is "anything that properly be

5   called a business practice and that at the same time is forbidden by law." *Barquis v. Merchants*

6   *Collection Association* (1972) 7 Cal. 3d 94, 113. In *Committee on Children's Television*, supra,

7   35 Cal. 3d at 210-211, a violation of the Sherman Antitrust Act was grounds for claiming

8   defendant's unlawful conduct. Similarly, in *Stop Youth Addiction v Lucky Stores* (1998) 17 Cal.

9   4th 553, 560, the violation was selling cigarettes to minors in violation of the Penal Code section

10  308. In *Hodge v. Superior Court* (2006) 145 Cal. App. 4th 278, the violation of the law was

11  based on the failure to pay overtime, a violation of the California Labor Code. Clearly,

12  discriminatory pricing, as prohibited by law under 47 U.S.C. §583 (8)(d) is unlawful. These

13  regulations and laws were created specifically to protect consumers like Alpert.

14      (iii) **The FCC has Found that Use of an "exclusive" Cable Services Contract with an**

15          **HOA Is Unfair Competition.**

16      On October 31, 2007 the Federal Communications Commission, adopted and later

17  published FCC 07-189, which is attached herein as Exhibit 1 to Plaintiff's Request for Judicial

18  Notice. The FCC, in writing this order, specifically found that:

19          That contractual agreements granting such exclusivity to cable operators harm
20          competition and broadband deployment and that any benefits to consumers are
            outweighed by the harms of such clauses . . . In this Order we prohibit the
21          enforcement of existing exclusivity clauses and the execution of new ones by
            cable operators and others subject to the relevant statutory provisions. This
22          prohibition will materially advance the Act's goals of enhancing competition and
            broadband deployment.
23

24  FCC 07-189, Paragraph 1. The FCC further defines exclusivity clauses as follows: "Exclusive

25  contracts are contracts that specify that, for a designated term, only a particular MVPD and no

26  other provider may provide video programming and related services to residents of an MDU."

27  FCC-07-189, Fn 2. The FCC held that exclusivity contracts limited the availability of satellite-

28  based video service in Multi-Dwelling Units (or MDU's), and that based upon the prevalence of

such units, and the extent that such clauses prohibit competition, the Commission had no choice

but to prohibit these clauses.  *Id.* at Paragraphs 3-12.  Specifically, the Commission noted that a MDU or the residents of such MDU's have no bargaining power when "when the first cable operator was 'the only game in town.'  *Id* at Paragraph 12.  Thus, the Commission concludes:

> Exclusivity clauses deny MDU residents the benefits of increased competition, including lower prices and the availability of more channels with more diverse content, as well as access to alternative providers of broadband facilities and the triple play of communications services their facilities support.

*Id.* at Paragraph 26.  Exclusivity clauses were specifically held to hold no benefit for any consumer and were unfair competition.

As stated above, Business and Professions Code § 17200 was designed by the Legislature to enable victims of unfair competition, such as exclusivity contracts, to recoup their losses.  A review of Mr. Alpert's declaration and the declaration of Mr. Nutten indicates that Plaintiff, and other members of the putative class, clearly suffered damages from being locked into these exclusivity contracts by overpaying for additional services.

### (iv)    TWC Admits It Concealed Its HOA Pricing

TWC states that it had "no duty" to inform Alpert or the class members of TWC's new HOA bundled pricing which was adopted in March 2005.  See TWC's Separate Statement, Nos. 36, 78, 103, 106.  In other words, TWC is arguing that it can lawfully *conceal* its pricing from its own customers when that pricing may result *in a reduction of charges* to the consumer.  That is plainly a *per se* deceptive business practice since such conduct would "likely deceive" consumers into far paying more for the same services that they could otherwise pay had such concealment not taken place.  *Committee on Children's Television v. General Foods Corp.* (1983) 35 Cal.3d 197, 211; accord, *Kasky v. Nike, Inc.* (2002) 27 Cal.4[th] 939.  Indeed, here, when Alpert learned of the lower pricing available from TWC for exactly the same set of services that he already had, he called and complained and his bill was reduced.

This argument is fundamentally undermined by the fact that TWC makes all its customers adopt an agreement under which consumers admit and acknowledge that they are aware of all TWC current pricing, TWC NOL, Ex. C, paragraph 2, *and at the same time TWC inconsistently argues now that it had no duty to disclose current pricing.*

1    Even if TWC's argument was correct that it was up to Alpert and the class members to

2    somehow find TWC's "hidden" HOA pricing, TWC's PMK admitted that TWC did not advertise

3    its San Diego HOA rates and did not even inform HOAs of the existence of HOA pricing.  Decl.

4    Ramos, Exhibit A, Depo Rhodes, p.163:20, 211:20.

5    It its MSJ, TWC argues that such customers may *now* contact TWC or visit TWC's

6    website and so on.  Decl. Rhodes at para. 12.  But since TWC no longer offers such HOA pricing

7    as of October 2007, unless the HOA customer ordered it before that time (*Id*. at para. 11:13),

8    contacting TWC *now* would be irrelevant as would looking online.  The question is whether,

9    during the class period, TWC made its HOA pricing known to Alpert and the class members.

10    TWC admits it did not.

11    The most common expression of the standard of deception is the reasonable consumer

12    standard.  *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 504-509.  The statement by the

13    defendant need not be false, but "deceptive and misleading in its implications."  *Lavie*, at 510

14    (*quoting People v. Wahl,* (1940) 39 Cal. App. Supp. 2d 771, 774).  The practice must be such

15    that it is "likely to deceive the reasonable consumer to whom the practice is directed." *South Bay*

16    *Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal. App. 4th 861, 878.  Likewise,

17    "[t]he CLRA is to be "'liberally construed and applied to promote its underlying purposes, which

18    are to protect consumers against unfair and deceptive business practices and to provide efficient

19    and economical procedures to secure such protection.'"  *Colgan v. Leatherman Tool Company*,

20    135 Cal. App. 4th 680.  Where the deception concerns a material fact the court should presume

21    causation.  *Massachusetts Mutual Life Insurance v. Superior Court*, 97 Cal. App. 4th at 1292-

22    1293.  The Court in *Massachusetts Mutual Life Insurance* held that a misrepresentation of fact is

23    material when it was sufficient to cause the plaintiffs to alter their behavior.  *Id.* at 1294.

24    The HOA consumer in this case is deceived when TWC created a bundle or package for

25    its HOA consumers, *and then concealed the HOA bundle pricing from pre-existing HOA*

26    *customers*.  Decl. Ramos, Exhibit A, Depo Rhodes, p.163:20; 211:20.  Worse yet, even with the

27    bundle, HOA members were *still being overcharged for additional services*.  Decl. of Nutten,

28    Para. 6.

---

1

2

3

   In *Schnall v. Hertz Corporation*, 78 Cal.App.4th 1144 (2000), the court held that a car rental company's practice of disclosing its otherwise lawful fuel charge in a separate document was deceptive.  The court also concluded that:

4

5

6

7

> Deception calculated to induce customers to subject themselves to an avoidable charge is inimical to the very concept of avoidability.  The failure of a rental car company to make it clear to customers that an avoidable charge is considerably higher than the retail rate for an item or service … would doubtless encourage some and perhaps many customers to incur a fuel service charge they could and would otherwise avoid.

8

*Id.* at p.1164.

9

10

11

12

13

14

15

   This case is far more egregious than *Hertz* in that TWC claims that it had no duty whatsoever to reveal its HOA pricing to its own HOA customers.  Unlike *Hertz*, where the charge in dispute was fully, though inconspicuously, disclosed, here, TWC admits that it actually concealed its pricing and that it had no duty to disclose it.  There was no notice.  TWC failed to disclose its MDU bundle pricing to Alpert until a year after it was available all the while overcharging consumers for services that could otherwise have been obtained at a much lower rate.

16

17

18

19

20

21

   Moreover, TWC argues that its "Subscriber Agreement" (TWC's NOL, Exhibit C) sets forth the terms of the agreement between Alpert and TWC for the "Additional Services" offered over and above basic cable.  Of particular interest is paragraph no. 2 governing charges which states that "[c]harges for the Services are set forth on a separate price list that I (the subscriber) have received."  TWC has submitted no evidence that it ever provided Alpert with its HOA price list before September 2006.

22

23

24

25

26

27

28

   Put simply, TWC elected to charge Alpert full "a la carte" pricing when TWC could have, and should have, priced Alpert correctly.  Prior to 2005, TWC should have bundled Alpert like any other retail customer who ordered exactly the same set of services, and then credited Alpert's account for the $50.97 value of basic cable which was already paid for and provided to Alpert each month.  Then, from 2005 on, TWC should have modified Alpert's price to reflect the change TWC made in pricing for HOAs in San Diego.  TWC did neither.

1    TWC once again argues that its business practices were not deceptive. It cites *Plotkin v.*

2    *Sajahtera, Inc*., 106 Cal.App.4th 953 (2003) (Def.'s Memo at p.13:27) for the proposition that

3    reasonable notice does not have to be the best possible notice.  Again, in this case, it is not a

4    matter of insufficient notice – it is a matter of *no notice*.  In 2005, when TWC offered the

5    discounted price to HOA customers for bundles, TWC did not bother to provide *any* notice to

6    Alpert or the HOA whatsoever.  Moreover, unlike *Plotkin* where no one was forced to use the

7    valet service, here, Alpert and the other residents were all *required* to pay TWC a fee through

8    their HOA/MDU for basic cable.  It was not an option.  TWC was the "exclusive" provider of

9    basic cable.

10    Similarly, TWC also once again cites *Searle v. Wyndham Internat., Inc*., 102 Cal.App.4th

11    1327 (2002) for the proposition that not expressly advising a hotel's patrons that a service charge

12    added to a room bill was paid by the hotel to a server did not violate Section 17200.  *Searle* did

13    not involve an allegation of discriminatory charging or overcharging for the same service(s) as is

14    the case here.  The question is not what TWC is doing with the money it collects, as was the case

15    in *Searle*, but whether TWC is entitled to overcharge for its services.

16    **(v)    TWC Admits It Enforces An Unlawful 30 Day Billing Error Notice**

17    TWC admits that its Consumer Agreement, under which Additional Services were

18    provided by TWC, required Alpert to notify TWC within 30 days of identifying a billing error or

19    he would otherwise "waive" the error.  See TWC's Separate Statement, Nos. 30, 66, 67, 71, 91,

20    92.  TWC's 30-day "waiver" is *per* se unfair, deceptive and unlawful since (1) TWC believes

21    that it may conceal its pricing from its customers, as set forth above, rendering it impossible for

22    consumers to know if they have been overcharged; (2) TWC disclaims the accuracy of its own

23    billing statements in the Consumer Agreement (TWC NOL, Exhibit C, 2 (j), thus consumers

24    have no way of knowing, since TWC apparently does not know either, whether a bill is ever

25    correct; and (3) while contractually shortening a limitations period is generally permitted, it has

26    never been permitted for a period of less than six (6) months without being deemed

27    unconscionable.  See e.g., *Charnay v. Cobert*, 145 Cal. App. 4th 170 (2006)[finding that where a

28    six month contractual limitations period was not unreasonable, there was "no doubt" requiring a

1  client to assert a claim for breach of contract within 10 days of receipt of a billing statement is

2  "inherently unreasonable."]

3      Moreover, contractually shortening limitations periods are only permitted when

4  identifying a breach is "immediate and obvious." *Moreno v. Sanchez* (2003) 106 Cal.App.4th

5  1415, 1430:

6      ["[A] contractually shortened limitations period has never been recognized
       outside the context of straightforward transactions in which the triggering event
7      for either a breach of a contract or for the accrual of a right is *immediate and
       obvious*. … Most reported decisions upholding shortened periods involve
8      straightforward commercial contracts plus the unambiguous breaches or accrual
       of rights under those contracts." (Emphasis added)]
9

10 TWC's admitted concealment of its pricing makes detection of its systematic overcharging

11 neither "immediate" nor "obvious."

12      Significantly, waivers in form consumer adhesion contracts of obligations under federal

13 statute are void as against public policy.  15 U.S.C. §§45 et seq.**.**  *Orkin Exterminating Company,*

14 *Inc. v. Federal Trade Commission* (11th Cir. 1988) 849 F.2d 1354, 1367, *cert. denied*, 488 U.S.

15 1041 (1989).

16 **VI.    TWC's MSJ FAILS BECAUSE IT IS BASED ON DISPUTED FACTS**

17      (i) **In 2006, Alpert Did Not Request Additional Services Nor To Be "Bundled"**

18      TWC's MSJ is premised almost entirely on one central and repeated "fact": that in late

19 2006 Alpert specifically requested that TWC *change* his services and *bundle* him to thereby

20 lower his bill.  See, e.g., TWC's Separate Statement, Nos. 25, 26, 27, 28, 40, 42, 43, 45, 62, 64,

21 72, 74, 76, 87, 89, 96, 98, 110, 112, 113, 115.  He did not.  In fact, Alpert *never* testified that he

22 asked TWC to bundle him for a discount in late 2006.  Rather, Alpert testified that he called to

23 complain to TWC that his bill was too high and that TWC must lower it: "It's my sworn

24 testimony that I have no recollection about speaking about bundles with the Time Warner rep,

25 only about my bill and what I thought I should be paying."  Decl. Alpert at para. 4 citing

26 Deposition Alpert at p.106, Decl. Ramos, Exhibit D.  He did *not* ask for any bundle, nor did he

27 ask to change his services.  He just wanted his bill to be corrected to the proper HOA rate, and it

28 was.  Decl. Alpert at para. 5.

1    Significantly, of all the recordings TWC made of its multiple interactions with Alpert

2  over the years, the _only_ recording missing (TWC records all of its conversations with customers)

3  was the one where Alpert called TWC in late 2006 and demanded that his bill be corrected.

4  According to TWC, that recording was "destroyed," even though this lawsuit had been pending

5  for at least six (6) months at the time.  Decl. Ramos, Exhibit A, Depo Rhodes, p.200:23.  Since

6  TWC destroyed this evidence, it is now Alpert's word against TWC's – which is necessarily a

7  disputed issue of fact which cannot be resolved in a motion for summary judgment.

8  Additionally, TWC's destruction of that evidence necessarily leads to a legal presumption in

9  Alpert's favor as to the content of that conversation.  Evid. Code sections 412 and 413.

10    (ii) **TWC Had A Duty to Inform Residents of HOA Pricing**

11    TWC argues that it had no duty to inform Alpert or the other HOA residents of TWC's

12  HOA pricing.  TWC is wrong.  As discussed above, TWC requires each subscriber to agree he

13  has been given TWC's pricing rates (TWC NOL Exhibit C at para. 2).  It cannot at the same time

14  refuse to give out applicable pricing rates.  Under the Service Agreement (TWC NOL Exhibit B

15  at paras. 1.4 and 4.4), TWC was to inform Alpert's HOA and, in turn, the residents though the

16  HOA, of TWC's current marketing materials.

17    At a minimum, TWC had a duty to act in good faith when dealing with Alpert and his

18  HOA co-residents for whom the contract was intended to benefit.  "Every contract imposes on

19  each party an implied duty of good faith and fair dealing."  *Chateau Chamberay Homeowners*

20  *Assn. v. Associated Internat. Ins. Co*. (2001) 90 Cal.App.4th 335, 345.  TWC obviously did not

21  act in good faith or deal fairly by concealing its HOA pricing.

22    TWC once again, as it did in its demurrer, argues that B&P Code section 17200 claim

23  cannot be based on a breach of contract.  Again, TWC is wrong.  In *Orkin Exterminating Co.,*

24  *Inc. v. FTC*, 849 F.2d 1354 (11th Cir. 1988), the FTC successfully sued Orkin over systematic

25  breach of a form contract used in hundreds of consumer transactions.[1]  *See Gibson v. World*

26  *Savings & Loan Assn*. (2002) 103 Cal. App. 4th 1291 [lender's systematic breach of form

27

28  [1] Decisions by federal courts in construing the FTC Act are "more than ordinarily persuasive" in guiding the California courts in construing Section 17200.  *People ex rel. Mosk v. National Research Co. of Calif*., 201 Cal.App.2d 765, 772 (1962).

consumer contracts actionable under "unlawful" clause of section 17200]. *See also Bronco Wine Co. v. Jolley* (2004) 33 Cal. 4th 943.

### (iii) **Alpert Did Not Believe He Was Properly Charged**

TWC argues in its MSJ and likewise asserts in its Separate Statement (at Nos. 40, 72, 74, 87, 96,11, 112, and 120) that Alpert believed he was previously being charged the correct sum for his TWC services before TWC put Alpert into the HOA bundle in late 2006.  That is false.  First, the cited testimony does not indicate Alpert's agreement that TWC's bills were correct before he was put into HOA pricing.  See e.g., TWC's NOL, Exhibit A, at p.144:15-18; 148:17; 151:21; 155:25; 158:2.  Agreeing that a bill was received is obviously not the same as agreeing a bill was accurate.

Second, each cited instance in the deposition transcript where Alpert was actually asked to speculate whether his bill was "accurate" is preceded by a "speculation" objection asserted by Alpert's counsel.  See e.g., TWC's NOL, Exhibit A at p,.148:21; 151:16.  These objections, coupled with the fact that when Alpert learned he was being overcharged in late 2006 he called TWC and demanded a correction to his bill, and that the bill was, in fact, corrected, all undermine TWC's entire argument that Alpert believed his bills were accurate.  Decl. Alpert at para. 11, 12.

## VII.    ALPERT STATED VALID CLAIMS UNDER THE CLRA

Parroting the same argument made in its previous demurrer in this case, and rejected by the Superior Court, TWC once again argues that the CLRA requires that an action based upon omission must be contrary to a representation made by the defendant or an omission of a fact that defendant was required to disclose, citing *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824.  TWC's MSJ at p.8:4.  The *Daugherty* court stated that nondisclosure is not actionable under the CLRA in the absence of a related representation or disclosure obligation.  *Id*. at 835.  Here, the related representation is the posting of regular retail a la carte rates by TWC in notices and on its website without any disclosure whatsoever of pricing for HOA residents where the HOAs have an existing contract with TWC.  Also, TWC

1   misrepresented it furnished correct pricing in its contracts with the HOA and the HOA customer.

2   The representation of wrong pricing, coupled with the nondisclosure of the correct pricing

3   applicable to HOA customers, is a violation of the CLRA.

4        TWC also argues again, as it did in its demurrer which was rejected by the Superior

5   Court, that the "voluntary payment doctrine" and applies *Leahy v. Warden* (1912) 163 Cal. 178,

6   181.  But for the doctrine to apply such payments be made "with knowledge of the facts."

7   TWC's MSJ at p.12:6; Since Alpert had no knowledge of the facts before September 2006, the

8   "voluntary payment doctrine" is obviously irrelevant.

9        TWC also argues that its 30 day notice requirement is not unconscionable since there

10  were "alternative sources from which to obtain the desired service."  TWC's MSJ citing

11  *Freeman v. Wal-Mart Stores, Inc.* (2003) 111 Cal.App.4[th] 660, 670.  Similarly, TWC also claims

12  that the additional services ordered by Alpert amount to nothing more than "recreational

13  activities," thus, again, Alpert had the "option of simply foregoing the activity" citing *Belton v.*

14  *Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4[th] 1224.

15       In *Wal-Mart,* plaintiffs alleged that Wal-Mart's gift cards unconscionably charged a $ 1

16  per month fee for every month after 24 months the card has not been fully used.  The court

17  concluded that consumers did not have to buy the card in the first place defeating a claim of

18  unconscionability in the terms of the card.  *Id*. at 670.

19       In *Wal-Mart*, there obviously was no preexisting "exclusive" contract as there is here.

20  While a Wal-Mart customer was free to pay any retailer for a gift card, here, Alpert and the other

21  class members had no choice in the matter: they were all required to pay TWC a monthly fee

22  through their HOA's exclusive contract for basic cable.

23       In *Comcast Cable*, a legally blind plaintiff sued Comcast for requiring that he purchase a

24  basic cable package in order to get Comcast's music channels.  The court concluded that it was

25  not oppressive to require the purchase of basic cable to obtain additional services like music

26  since there were many music alternatives available to plaintiff such as online streaming audio

27  from radio stations or simply using a radio itself.  *Comcast*, 151 Cal.App.4[th] at 1246.

28

1    Again, in *Comcast* as in *Wal-Mart*, there was no pre-existing "exclusive" contract and the

2    customer in *Comcast* was free to obtain music from other outlets, some of which were *free*, such

3    as radio.  Alpert had no choice but to pay TWC for his basic cable through his HOA/MDU.

4    Moreover, there were technical reasons supporting Comcast's position that it could not offer its

5    music channels without basic cable thereby rendering plaintiff's claim that music channels be

6    offered "a la carte" potentially impossible.  *Id.* at p.1242.  Moreover, if Alpert purchased digital

7    services from anyone else, it would have had to include basic cable, as per *Comcast*, and *Alpert*

8    *would have violated the exclusivity clause*.

9    TWC's citation to *Comcast* unwittingly supports Alpert's claims in that it is clear from

10   the *Comcast* decision that basic cable is required to obtain additional services from other cable

11   companies.  TWC asks this Court to just assume, without any supporting evidence, that Alpert

12   could have obtained additional cable related services from another vendor. *Few, if any,*

13   *consumers buy their first 77 channels from a cable company and the rest from a satellite service*

14   *or other cable provider.  Comcast* stands for the contrary position: one must have basic cable to

15   obtain additional services.  Here, the "exclusive" contract for basic cable locked Alpert into a

16   relationship with TWC.  That is the point and why the FCC has recently ruled such agreements

17   are unlawful and unfair.

18   TWC asks the Court to "judicially notice" that Alpert could have alternatively rented

19   movies, read books, used a satellite service, used another phone provider, and used another

20   Internet provider.  TWC's RJN, paras 1 and 2.  But since Alpert was already paying TWC each

21   month for basic cable service through his HOA, it would make little sense to pay another cable

22   or satellite provider for the same service just to get additional services.  Decl. Alpert at para. 20.

23   There was never a meaningful choice to select another provider for additional services while

24   simultaneously paying TWC each month.  *Ibid.*

25   TWC also cites to *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) for

26   the proposition that bundling is not necessarily undesirable for consumers, nor is it inherently

27   anticompetitive.  TWC's MSJ, p.16:16-18.  Alpert does not argue that it is undesirable to bundle.

28   He argues that TWC consistently charged him a higher rate for additional services.

**VIII.    CONCLUSION**

As the above authorities show, and for the foregoing reasons, TWC's practices are unlawful, deceptive and unfair, and summary judgment should be denied.


Dated: June 16, 2008, 2008                            **CLARK & MARKHAM LLP**


                                                      By:____/s/James M. Treglio_____
                                                              David R. Markham, Esq.
                                                              James M. Treglio, Esq.
                                                      **LAW OFFICES OF BARRON E.
                                                      RAMOS**
                                                              Barron E. Ramos, Esq.

                                                      Attorneys for the Plaintiff and the Class

1

## PROOF OF SERVICE

2       I am over 18 and not a party to the within action. My business address is 600 B Street,

3  Suite 2130, San Diego, CA 92101.

4  On June 16, 2008, I served a true and correct copy of the following document(s):

5        **1.  MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**

6            **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

7        **2.  PLAINTIFF AND OPPOSING PARTY, LEON ALPERT'S STATEMENT**

             **OF DISPUTED AND UNDISPUTED FACTS IN SUPPORT OF HIS**

8             **OPPOSITION TO DEFENDANT TIME WARNER CABLE'S MOTION**

9             **FOR SUMMARY JUDGMENT**

10      **3.  REQUEST FOR JUDICIAL NOTICE**

11      **4.  DECLARATION OF BARRON RAMOS IN OPPOSITION TO**

             **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

12

13      **5.  DECLARATION OF LEON ALPERT IN OPPOSITION TO**

             **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

14

15      **6.  DECLARATION OF WESLEY NUTTEN IN OPPOSITION TO**

             **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

16  Upon the following person(s)

17     Jeffrey M. Shohet, Esq

18     Julie L. Hussey, Esq.

      Carris S. Dolton, Esq.

19     **DLA PIPER US LLP**

20     401 B Street, Suite 1700

      San Diego, CA 92101

21     jeffrey.shohet@dlapiper.com

22     julie.hussey@dlapiper.com

      carrie.dolton@dlapiper.com

23     Attorneys for the Defendant, Time Warner Cable

24

25

| | |
|---|---|
| | **BY HAND DELIVERY**: By causing such document(s) to be delivered by hand to the above person(s) at the address(es) set forth above. |
| | **BY MAIL**: By placing a copy thereof enclosed in a sealed envelope, with postage thereon fully prepaid, in the United States mail at San Diego, Californian, addressed as set forth above. |
| | **BY THIRD-PARTY COMMERCIAL CARRIER (OVERNIGHT DELIVERY):** By delivering a copy thereof to a third party |

26

27

28

| | | |
|---|---|---|
| | commercial carrier addressed as set forth above, for delivery on the next business day. | |
| | **BY FACSIMILE**: By transmitting the above document(s) to the facsimile number(s) of the addressee(s) designated above. | |
| X X | **BY ELECTRONIC TRANSMISSION OF THE "NOTICE OF ELECTRONIC FILING"** By electronically filing the document(s) | |

I certify that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed on June 16, 2008 at San Diego, California

/s/ James M. Treglio
James M. Treglio