David R. Markham (Bar No. 071814)
R. Craig Clark (Bar No. 129219)
James M. Treglio (Bar No. 228077)
**CLARK & MARKHAM, LLP**
600 B Street, Suite 2130
San Diego, CA 92101
Telephone: (619) 239-1321
Facsimile:  (619) 239-5888
dmarkham@clarkmarkham.com
cclark@clarkmarkham.com
jtreglio@clarkmarkham.com

Barron E. Ramos (Bar No. 179620)
**LAW OFFICES OF BARRON E. RAMOS**
132 N El Camino Real #303
Encinitas, CA 92024
Telephone: (760) 274-6438
Facsimile:  (760) 994-1354
barron@yourclasscounsel.com

Attorneys for plaintiff and the Class

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEON ALPERT, an individual, on behalf of himself, on behalf of all those similarly situated, and on behalf of the general public, | Case No. 08 CV 582 W WMc |
| | CLASS ACTION |
| Plaintiffs, | **REQUEST FOR JUDICIAL NOTICE** |
| v. | Date: June 30, 2008<br>Time: 10:00 a.m. |
| TIME WARNER CABLE, INC., a Delaware corporation, and DOES 1 TO 100, | Place: Courtroom 7; 880 Front Street, San Diego, CA<br>Judge: Hon. Thomas J. Whelan |
| Defendants. | [No Oral Argument Pursuant to LR 7.1(d)(1)] |
| | Complaint: March 13, 2007<br>Removal:  March 27, 2008 |

1    Plaintiff Leon Alpert, by and through his attorneys, hereby respectfully requests the Court

2    take judicial notice of the following documents lodged in support of Plaintiff's Response to

3    Defendant's Statement pursuant to Federal Rule of Evidence 201:

4

5        EX. 1: FCC 07-189, FCC **REPORT AND ORDER AND FURTHER NOTICE OF**
         **PROPOSED RULEMAKING** Exclusive Service Contracts for Provision of Video

6        Services in Multiple Dwelling Units and Other Real Estate Developments, October 31,
         2007.

7

8    To the extent the instant request for judicial notice is objected to and/or denied, Plaintiffs

9    further request that the Court permit Plaintiffs the opportunity to present information to the Court

10   pursuant to F.R.E. 201.

11

12   Dated: June 16, 2008                        **CLARK & MARKHAM LLP**

13

14                                               By:    /s/James M. Treglio
                                                        James M. Treglio, Esq.
15

16                                               **LAW OFFICES OF BARRON E.**
                                                 **RAMOS**
17                                                      Barron E. Ramos, Esq.

18                                               Attorneys for the Plaintiff and the Class.

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Exclusive Service Contracts for Provision of | ) | MB Docket No. 07-51 |
| Video Services in Multiple Dwelling Units and | ) | |
| Other Real Estate Developments | ) | |

**REPORT AND ORDER**
**AND**
**FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted: October 31, 2007**                    **Released: November 13, 2007**

**Comment Date: (30 days after date of publication in the Federal Register)**
**Reply Comment Date: (60 days after date of publication in the Federal Register)**

By the Commission: Chairman Kevin J. Martin, Commissioners Michael J. Copps, Jonathan S. Adelstein and Deborah Taylor Tate issuing separate statements; Commissioner Robert M. McDowell concurring and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                                    Paragraph #

I.    INTRODUCTION ................................................................................................1
II.   BACKGROUND ................................................................................................3
III.  DISCUSSION ..................................................................................................16
      A. Harms and Benefits of Exclusivity Clauses.................................................17
      B. Prohibition of Exclusivity Clauses..............................................................30
IV.   LEGAL AUTHORITY .......................................................................................40
V.    FURTHER NOTICE OF PROPOSED RULEMAKING .......................................61
VI.   PROCEDURAL MATTERS ...............................................................................67
      A. Filing Requirements...................................................................................67
      B. Regulatory Flexibility Analysis...................................................................70
      C. Paperwork Reduction Act Analysis.............................................................71
      D. Congressional Review Act..........................................................................72
      E. Additional Information ...............................................................................73
VII.  ORDERING CLAUSES .....................................................................................74

I.    **INTRODUCTION**

1.    The Notice of Proposed Rulemaking ("*Notice*") in this proceeding solicited comment on the need to regulate contracts containing clauses granting one multichannel video programming distributor (an "MVPD") exclusive access for the provision of video services ("exclusivity clauses") to multiple dwelling units ("MDUs") and other real estate developments.[1]  Approximately 30 percent of Americans

---

[1] *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units & Other Real Estate Developments,* Notice of Proposed Rulemaking, 22 FCC Rcd 5935 (2007).

live in MDUs, and their numbers are growing.  In this *Report and Order*, we find that contractual agreements granting such exclusivity to cable operators harm competition and broadband deployment and that any benefits to consumers are outweighed by the harms of such clauses.[2]  Accordingly, we conclude that such clauses are proscribed by Section 628[3] of the Communications Act of 1934, as amended.[4]  That Section prohibits unfair methods of competition that have the purpose or effect of hindering significantly or preventing MVPDs from providing "satellite cable" and/or "satellite broadcast" programming to subscribers and consumers.  Thus, in this Order we prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators and others subject to the relevant statutory provisions.  This prohibition will materially advance the Act's goals of enhancing competition and broadband deployment.[5]

2.    The record in this proceeding does not contain much information regarding the use of exclusivity clauses by providers of Direct Broadcast Satellite ("DBS") or other MVPDs that are not cable operators subject to Section 628 of the Act.[6]  In the interests of developing a fuller record, and in the interests of regulatory parity, we also issue a *Further Notice of Proposed Rulemaking* ("*Further Notice*") concerning MVPDs not subject to Section 628.  In this *Further Notice*, we also seek comment on whether the Commission should prohibit exclusive marketing and bulk billing arrangements.

---

[2] Previous decisions about this subject have discussed "exclusivity contracts."  Exclusive contracts are "contracts that specify that, for a designated term, only a particular MVPD and no other provider may provide video programming and related services to residents of an MDU."  *See Telecommunications Services Inside Wiring*, First Order on Reconsideration & Second Report & Order ("*2003 Inside Wiring Order*"), 18 FCC Rcd 1342, 1364 ¶ 59 (2003), *rev'd in part on other grounds*, *NCTA v. FCC*, 89 Fed. Appx. 743 (D.C. Cir. 2004). *See also Telecommunications Services Inside Wiring*, Report & Order & Second Further Notice of Proposed Rulemaking ("*1997 Inside Wiring Order*"), 13 FCC Rcd 3659, 3748-53, ¶¶ 191-203  (1997)  In this *Report and Order*, we use the more focused term "exclusivity clauses," while meaning no change in substance.  Exclusivity clauses appear in contracts between MVPDs and MDU owners or other real estate developments.  The most exclusionary exclusivity clauses prohibit any other MVPD from any access whatsoever to the premises of the MDU building or real estate development.  *See* AT&T Comments at 11.  These are called 'building exclusivity' clauses.  Other exclusivity clauses grant only "wire exclusivity," which allows more MVPDs in a MDU or real estate development but prohibits them from using the existing wires in the MDU or real estate development (which may be owned by the MVPD or by the MDU owner).  *See* Real Access Alliance ("RAA") Comments at 13.  Still other exclusivity clauses allow other MVPDs into a MDU or real estate development but prohibit the owner from marketing their services.  These provide for what is called "marketing exclusivity."  Comcast Comments at 19-20; Community Ass'ns Inst. ("CAI") Comments at 3; Embarq Comments at 1 n.1; Qwest Comments at iii; RAA Comments at 8-11; Verizon Comments at 7 n.4.  As these latter kinds of exclusivity clauses do not absolutely deny new entrants access to MDUs or real estate developments and thus do not cause the harms to consumers that building exclusivity clauses cause, they are not the focus of this proceeding.  This *Report  & Order* affects building exclusivity clauses, which for simplicity's sake we refer to hereafter as "exclusivity clauses."

[3] 47 U.S.C. § 548; *see also infra* Section IV.

[4] 47 U.S.C. §§ 151 *et seq.* (the "Act" or the "1934 Act").

[5] As explained in Section IV below, the purpose of Section 628 of the Act, 47 U.S.C. § 548 is to "promote the public interest, convenience, and necessity by increasing competition and diversity in the [MVP] market, . . . and to spur the development of communications technologies."  These purposes coincide with the broader purposes of the Cable Television Consumer Protection & Competition Act of 1992 (Pub. L. No. 102-385, 106 Stat. 1460 (1992), codified at 47 U.S.C. §§ 521 *et seq,* (the "1992 Cable Act")) and the 1934 Act generally.

[6] 47 U.S.C. § 548.

## II.    BACKGROUND

3.    This Section reviews the history of this proceeding and makes several important findings of fact.  Among these findings are that a large and growing number of Americans live in MDUs and that a significant number of those MDUs are subject to exclusivity clauses.  The beneficiaries of most of those clauses are incumbent cable operators.  Although Commission rules ensure that many residents of MDUs and other real estate developments may receive satellite-based video service,[7] exclusivity clauses protect cable operators from competition in MDUs from new entrants into the MVPD business, chiefly incumbent local exchange carriers ("LECs") and other wire-based MVPDs that bring satellite cable and satellite broadcast programming to their subscribers.  We also find that the entry of incumbent LECs into the MVPD business has led incumbent cable operators to increase their use of exclusivity clauses in order to bar or deter the new entrants.

4.    These practices are reached primarily by our authority under Section 628.  That Section, in brief, makes it unlawful for cable operators to engage in certain unfair acts and methods of competition.  Specifically, Section 628(b) prohibits cable operators from engaging in unfair practices that have the purpose or effect of hindering significantly or preventing their competitors from providing satellite cable programming or satellite broadcast programming to subscribers or consumers.  Such video programming is made for broadcast or cable systems and is delivered by satellite to MVPDs,[8] who in turn deliver it to their subscribers.  This programming comprises the substantial majority of programming carried by MVPDs.  In Section IV below, we conclude that clauses that grant cable operators exclusive access to MDUs and other real estate developments fall within the scope of Section 628(b), because those clauses effectively prohibit new entrants into the MVPD market from providing satellite-delivered programming to consumers who live in MDUs and other real estate developments.

5.    The Commission last considered issues concerning exclusivity clauses in its 2003 Inside Wiring Order.[9]  At that time, the Commission decided that exclusivity clauses had both pro-competitive and anti-competitive effects, and that the record before the Commission made it unclear what their net effect was.  The Commission therefore decided to take no action regarding exclusivity clauses at that time,[10] but it did not close the door to action if new circumstances arose in which such clauses had new anti-competitive effects.  The *Notice* of March 2007 re-opened the issue and prompted the submission of much new evidence.[11]  The *Notice* raised several questions concerning exclusivity clauses.  These

---

[7] 47 C.F.R. § 1.4000.

[8] Section 628 concerns two kinds of programming in particular.  One is "satellite cable programming," which is video programming (not including satellite broadcast programming) that is transmitted by satellite to cable operators for retransmission to cable subscribers.  *See* 47 U.S.C. §§ 548(i)(1), 605(d)(1).  The other is "satellite broadcast programming," which is broadcast video programming that is retransmitted by satellite by an entity other than the broadcaster or an entity under the broadcaster's control.  *See* 47 U.S.C. § 548(i)(3).

[9] *2003 Inside Wiring Order*, 18 FCC Rcd 1342 (2003), *rev'd in part on other grounds*, *NCTA v. FCC*, 89 Fed. Appx. 743 (D.C. Cir. 2004).

[10] *2003 Inside Wiring Order*, 18 FCC Rcd at 1345, ¶ 4 ("the record does not demonstrate a need for government intervention with marketplace forces and privately negotiated contracts"); *id.* at 1369, ¶ 68 ("the record developed in this proceeding indicates little support for government interference with privately negotiated exclusive MDU contracts"); *id.* at 1369, ¶ 69 ("The record does not indicate the extent to which exclusive contracts have been utilized, and, more importantly, does not demonstrate that such contracts have thwarted alternative providers' entrance into the MDU market, so as to warrant imposition of limits on such contracts."); *id.* at 1370, ¶ 71 ("We cannot state, based on the record, that exclusive contracts are predominantly anti-competitive.").

[11] We are mindful of the admonition of the U.S. Court of Appeals for the District of Columbia Circuit that the Commission "must always stand ready to hear new argument and to reexamine the basic propositions undergirding"

(continued….)

included the Commission's legal authority to regulate such clauses; the prevalence of such clauses; the possible increase in their number and scope at the instigation of incumbent cable operators with the impending entry of LECs into the MVPD marketplace; the benefits and harms to competition and consumers of exclusivity clauses; and the extent of any prohibition of such clauses, and other remedial action, that we should impose.

6.   The *Notice* attracted filings from large and small cable operators and LECs, other providers of MVPD services (including so-called private cable operators or "PCOs"[12]), builders and managers of MDUs and other dwellings, elected officials, two state government entities and many local governments, academic institutions, consumer groups, labor unions, and subscribers to MVPD and other services.

7.   For purposes of this *Report and Order*, we define the term "MDU" to include the kinds of dwellings that we have defined as being MDUs in past decisions implementing the Act.[13]   That is, MDUs include apartment, cooperative, and condominium buildings.  For purposes of this *Report and Order,* we adopt this definition but expand it to include other centrally managed real estate developments.  Thus, the term MDUs, for purposes of this *Report and Order*, also includes gated communities, mobile home parks, garden apartments, and other centrally managed residential real estate developments.[14]   All of these are collections of private individual households with residents remaining for lengthy, indefinite periods of time, each in a dwelling space that is distinctly separate but shares some common spaces requiring central management.  For purposes of this proceeding, MDUs do not include time share units, academic campuses and dormitories,[15] military bases, hotels, rooming houses, jails, prisons, halfway houses, hospitals, nursing and other assisted living places, and other group quarters characterized by institutional living, high transience and, in some cases, a high need for security.  These

---

(…continued from previous page)
its policies.  *Bechtel v. FCC*, 10 F.3d 875, 878 (D.C. Cir. 1993) (quotation marks omitted), citing *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir.1988); *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 603 (1981).

[12] PCOs are also known as Satellite Master Antenna Television providers or "SMATVs."  They are video distribution facilities that use closed transmission paths without using any public right-of-way.  PCOs acquire video programming and distribute it via terrestrial wiring in urban and suburban MDUs and commercial multiple tenant units such as hotels and office buildings.  They are small compared to major incumbent cable operators and incumbent LECs.

[13] 47 U.S.C. §§ 543(l)(1); 47 C.F.R. § 76.800(a) (defining MDU as "[a] multiple dwelling unit building (*e.g.,* an apartment building, condominium building or cooperative")); *Telecommunications Services Inside Wiring, Customer Premises Equipment, Implementation of the Cable Television Consumer Protection & Competition Act of 1992: Cable Home Wiring, Clarification of the Commission's Rules & Policies Regarding Unbundled Access to Incumbent Local Exchange Carriers' Inside Wire Subloop*, Report & Order & Declaratory Ruling, 22 FCC Rcd 10640, 10642, ¶ 4 n.6 (2007) ("*2007 Inside Wiring Order*") ("An MDU is a building or buildings with two or more residences, such as an apartment building, condominium building, or cooperative."); *Implementation of Sections of the Cable Television Consumer Protection & Competition Act of 1992: Rate Regulation, Buy-Through Prohibition*, Third Order on Reconsideration, 9 FCC Rcd 4316, 4324, ¶ 17 (1994) (addressing "dwelling units that are empty for a significant portion of the year" and observing that "[p]eople who are not present cannot be presumed to be choosing local competitive alternatives"); *see also* U.S. Census Bureau, *Decennial Management Division Glossary*, http://www.census. gov/dmd/www/glossary.html (visited Aug. 13, 2007) (defining "multi-unit structure" as "A building that contains more than one housing unit (for example, an apartment building).  Townhouses are not considered to be multi-unit structures for census purposes.").

[14] Concerning the growth of exclusivity clauses governing such dwellings, *see* SureWest Commun. Comments at 6 n.7.

[15] Comments of Ass'n for Telecommun. Professionals in Higher Education at 6-12.

latter institutions do not have most of the key defining attributes of MDUs that we have just described, including voluntary long-term residency and significant control by the resident over uses of the private dwelling space. These attributes give the resident a strong interest in making his or her own choice of a MVPD provider and thus warrant regulatory action to preserve the resident's ability to do so.

8.    The record in this proceeding indicates that approximately 30 percent of Americans live in MDUs[16] and that this percentage is growing.[17] The percentage of minorities living in MDUs is larger than that of the general population.[18] The majority of incumbent MVPDs serving MDUs pursuant to exclusivity clauses are incumbent providers of cable television service to the surrounding local community.[19] A few of the incumbent MVPDs that have executed contracts with exclusivity clauses are PCOs or small providers of fiber-based communications services.[20] Some incumbent LECs have requested exclusivity clauses from MDUs.[21] There is no evidence in the record that providers of DBS service use exclusivity clauses.

---

[16] AT&T Comments at 7 (citing Census data that 32 percent of U.S. households are occupied by renters and that 24.6 million U.S. households are in buildings with more than one unit); Qwest Commun. Int'l, Inc. Comments at 2 n.6 (citing 2005 Census data that 31.6 percent "of the 111 million households in the United States live in multifamily units"); SureWest Comments at 5-6 (citing 2005 Census data that "approximately 25% of total occupied housing units in the nation . . . are" MDUs); *see also Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* Order on Reconsideration, 19 FCC Rcd 15856, 15859, ¶ 7 (2004) ("millions of Americans today live in MDUs, constituting perhaps as much as one-third of the population").

[17] AT&T Comments at 7; Robert Currey, Vice Chairman of RCN Corporation, Prepared Testimony, Hearing before the U.S. Senate Judiciary Committee, Subcommittee on Antitrust, Business Rights, & Competition: "Cable and Video: Competitive Choices," at 4 (Apr. 4, 2001) (about 30-35 percent of U.S. population resides in MDUs), available at http://judiciary.senate.gov/oldsite.te040401rjc.pdf (visited July 31, 2007).

[18] Verizon Comments at 6 ("40% of minority households . . . are located in MDUs with 50 or more residents."), citing U.S. Departments of Commerce & Housing & Urban Development, AMERICAN HOUSING SURVEY FOR THE UNITED STATES: 2005 at 106, Table 2-25 (Aug. 2006), available at http://www.census.gov/prod/2006pubs/h150-05.pdf (visited Aug. 29, 2007); Letter from David Honig, Executive Director, Minority Media & Telecommun. Council, to Ms. Marlene H. Dortch, Commission Secretary (Oct. 11, 2007) ("Honig Ex Parte") (27.7% of all American households are located in MDUs with 50 or more residents, but 40% of all households headed by people of color (including Hispanics racially identifying as White) live in such MDUs.).

    According to United States Telecom Association, a disproportionately large percentage of senior and low-income Americans also live in MDUs. Letter from Glenn T. Reynolds, Vice President, Policy, United States Telecom Ass'n, to Ms. Dortch (Oct. 24, 2007) at 3 ("USTelecom Ex Parte") (in Los Angeles, 15.6% of all families are low income, but 19.2% of families in MDUs with 20 or more units are low income; in Atlanta, 19.2% of all families are low income, but 22.3% of families in MDUs with 50 or more units are low income; *id.* at 4: "[F]or each of the six cities that USTelecom provided, the percentage of senior citizens residing in larger MDUs exceeded the local averages by a ratio of at least 2 to 1, and in one instance (Atlanta) by a ratio of almost 6 to 1. . . . [S]enior citizens are voracious – and growing – consumers of video and broadband offerings.").

[19] Independent Multifamily Commun. Council ("IMCC") Comments at 23 ("franchised cable companies us[e] exclusive MDU access agreements to foreclose significant portions of the MVPD market to new entrants") and 24 (describing how "franchised cable company[ies] . . . lock in virtually all MDU properties in the area through the use of long-term exclusive MDU contracts"); SureWest Comments at 3-4 (in SureWest territory, 85.7 percent of the exclusivity clauses run in favor of Comcast); Verizon Comments at 12. "Cable service" is defined in 47 U.S.C. § 522(6).

[20] *See* Comcast Comments, Attachment A (Declaration of William F. Revell, Comcast Vice President of MDU Sales Operations, Exh. A (Agreement between MVPD Knology and a MDU containing an exclusivity clause) at 1 § 1.1.

[21] *See* RAA Comments at 48, 51-52.

**Federal Communications Commission**                    **FCC 07-189**

9.    Exclusivity clauses that run in favor of cable operators typically are a complete bar to entry into MDUs by fiber-deploying LECs such as Verizon, AT&T, and Qwest, as well as PCOs.  These competitors in the MVPD marketplace receive much of their programming, both cable and broadcast, via satellite for retransmission directly to their subscribers.  Although exclusivity clauses do not prevent MDU residents from installing receiving dishes and receiving DBS service where the Commission's "Over the Air Reception Devices" rules apply,[22] they bar new wire-based competitors from MDUs.

10.    The record herein reveals that exclusivity clauses are widespread in agreements between MVPDs and MDU owners, and that the overwhelming majority of them grant exclusive access to incumbent cable operators.[23]  Exclusivity clauses between MVPDs and MDU owners have the clear effect of barring new entry into MDUs by wire-based MVPDs.  The evidence before us shows that this effect occurs on a large scale.  Verizon provided examples of exclusivity clauses, most of them in favor of incumbent cable operators, that provoked requests to cease and desist the marketing of its FiOS cable service.[24]  Verizon has "repeatedly encountered exclusive access arrangements which have prevented it from providing cable services to significant numbers of residents."[25]  Early in its offering of FiOS, Verizon encountered exclusivity clauses running in favor of incumbent cable operators, which barred it from serving more than 3,000 residential units in the Dallas, Texas, area and many other places, all totaling "tens of thousands of units in five separate states."[26] Other examples of exclusion, again mostly

---

[22] Our "OTARD" rules generally prohibit MDU owners from  unreasonably restricting residents' use of receiving dishes for  DBS service.  47 C.F.R. § 1.4000, *adopted in Preemption of Local Zoning Regulation of Satellite Earth Stations; Implementation of Section 207 of the Telecommunications Act of 1996; & Restrictions on Over-the-Air Reception Devices: Television Broadcast Service & Multichannel Multipoint Distribution Service*, Report & Order, Memorandum Opinion & Order, & Further Notice of Proposed Rulemaking, 11 FCC Rcd 19276 (1996); *see also* Qwest Comments at 5 n.13; Ygnition Networks Comments at 3; American Cable Ass'n ("ACA") Reply Comments at 2 ("the small and rural markets served by ACA's members are already intensely competitive"), 3 ("competition – especially DBS competition – is booming in the markets served by ACA's members").

[23] AT&T Comments at 8-9 (at 8, "these agreements are between cable incumbents and building owners" and "exclusive access arrangements with MDUs have become prevalent and are becoming more so"; survey finding that at least 90 percent of MDU residents in Raleigh and Charlotte, North Carolina, were subject to "exclusive access arrangements"); Comcast Comments at 18 ("MVPDs of all sizes have entered into these types of agreements, and continue to do so."); SureWest Comments at 3-4 (at least 28 percent of 40,000 MDU units passed by SureWest are subject to some form of exclusivity (presumably marketing, wire, or building); in SureWest's "historic core" territory, the number is 35.8 percent; the status of another substantial percent in each case is unclear, but some of them are likely also subject to some form of exclusivity; 85.7 percent of the exclusivity clauses run in favor of Comcast)); Letter from Jeffrey J. Gee, Fletcher, Heald & Hildreth, P.L.C., counsel for SureWest, to Ms. Dortch (May 16, 2007) (MVPDs other than SureWest "had exclusive agreements with approximately fifty percent of the multiple dwelling units passed by SureWest's network," some of which provided only for marketing exclusivity).

[24] Letter from Leora Hochstein, Executive Director, Federal Regulatory, Verizon, to Ms. Dortch, MB Docket No. 05-311 (July 6, 2006) ("Verizon July 6 Ex Parte") at 3 (discussing various examples, including a cease and desist letter from Bright House Networks regarding marketing of FiOS in the River Chase apartment complex in Tampa, Florida; a letter from BDR Broadband, LLC, regarding the provision of FiOS in apartment complexes in Plano and Carrollton, Texas; and negotiations with Armiger Management in Maryland that have an exclusivity clause with Comcast).

[25] Verizon July 6 Ex Parte at 3.

[26] Verizon Comments at 11-12.

involving incumbent cable operators, are in the record from would-be MVPDs,[27] a local government,[28] and a MDU owner who agreed to exclusivity clauses in the past and now is prohibited from offering its residents new and improved communications services.[29] AT&T states that "efforts to lock-up MDUs have occurred in California, Texas, and virtually every market where AT&T has begun to enter the video service market"[30] – efforts that are "plainly intended to block competition and . . . not designed to address aesthetics or congestion in a MDU's common areas."[31] The exclusivity clauses that AT&T has recently encountered typically last between five and 15 years, often with automatic renewal, or are perpetual.[32] Hargray CATV Inc., an affiliate of the incumbent LEC in Hilton Head, South Carolina, began to provide cable service there as a new entrant.[33] It was forced to stop serving or marketing to 20,000 of the 25,000 homes in the community, however, due to exclusivity clauses entered into by real estate developers and the incumbent cable operator (originally Adelphia, whose systems later were acquired by Time Warner), decades ago in some cases..[34]

11. Consumer groups are also concerned about exclusive agreements. As noted by several consumer groups, a disproportionately large number of communities of color live within MDUs.[35] Consumer groups are concerned that these residents are unable to enjoy the benefits of competition in

---

[27] AT&T Comments at 10-12 (incidents in California (Exhs. A & E), Florida (Exh. C), and North Carolina (Exh. B)); SureWest Comments at 4-5; *see also* SureWest Comments in MM Docket No. 06-189 (*Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*) at 3.

[28] Manatee County Comments in MB Docket No. 05-311 (*Implementation of Section 621(a) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection & Competition Act of 1992*) at 16 (exclusivity clauses are common within its borders).

[29] Comments of Warner Properties, LLC, and Warner Properties Commun., LLC, at 2 ("[p]roperty owners, such as WP, could offer their tenants more cable choices if they were not prohibited from doing so [by] . . . existing exclusive contracts").

[30] AT&T Comments at 10.

[31] *Id.* at 11.

[32] *Id.* at 12.

[33] Letter from David Armistead, Esq., General Counsel, Hargray CATV Inc., to Ms. Dortch (Oct. 12, 2007) ("Hargray Oct. 12 Ex Parte") at 1-5, under cover of Letter from Joshua S. Turner, Esq., Wiley Rein, LLP, counsel for Hargray, to Ms. Dortch (Oct. 12, 2007); Letter from Brian C. Pitts, Esq., Smoot, Pitts, Elliott & Biel, counsel for Palmetto Dunes Property Owners Ass'n, Inc. (Oct. 19, 2007) ("Palmetto Ex Parte"); Letter from Mr. Armistead to Ms. Dortch (Oct. 24, 2007) ("Hargray Oct. 24 Ex Parte").

[34] Time Warner asserts that it does not seek perpetual exclusivity clauses in agreements it originates, and that it only obtained the agreements through inheritance. Letter from Matthew A. Brill, Esq., Latham & Watkins LLP, counsel for Time Warner, to Ms. Dortch (Oct. 18, 2007) ("Time Warner Ex Parte") at 1 ("TWC does not enter into perpetual exclusive contracts under any circumstances. Indeed, soon after inheriting a few such agreements in Hilton Head (and the attendant litigation) from Adelphia, TWC set out to shorten the exclusivity period to two years through settlement negotiations."). We note that one suit has been settled and the exclusivity period shortened to two years (along with other adjustments in the agreements between Time Warner and the MDUs). *Id.*

[35] *See generally* Ex Parte Comments of Consumer Federation of America, Consumers Union, New America Foundation, Free Press, Public Knowledge, and U.S. PIRG (filed by Media Access Project) (Oct. 24, 2007) ("CFA *et al.* Ex Parte"); Letter from Chris Murray, Senior Counsel, Consumers Union, to Ms. Dortch (Oct. 23, 2007) ("Consumers Union Ex Parte"); Honig Ex Parte.

the video marketplace, and ask that the Commission act to ensure that all consumers can reap the benefits of competition.[36]

12. The record indicates that the evidence before us understates the frequency of exclusivity clauses because many MDU owners are unwilling or legally unable to make public the contracts containing them.[37] Also, many exclusivity clauses date from the time when cable operators had a *de facto* or *de jure* monopoly on wire-based MVPD service.[38] In those market conditions, a MDU owner might have thought that agreeing to exclusivity was not giving the cable operator anything of significance.[39] Some commenters state that a MDU owner can bargain for good service, low prices, and other concessions in exchange for exclusives.[40] But the owner had no such bargaining power when the first cable operator was "the only game in town."[41]

13. More recent developments were not part of the record the Commission compiled in the proceeding that culminated in the *2003 Inside Wiring Order*.[42] Significantly, LECs and other wire-based providers have begun entering the video service business on a large scale.[43] In this environment, exclusivity clauses executed by incumbent cable operators are causing an important loss of potential competition within MDUs and thereby depriving MDU residents of recognized benefits generated by competition in the form of price and service options. Exclusivity clauses may also be deterring new entry into the MVPD market in many areas because they put a significant number of new customers off limits to new entrants.

---

[36] *Id.*

[37] *See, e.g.,* AT&T Comments at 7-8; Verizon Comments at 8-9; Letter from Leora Hochstein, Executive Director, Federal Regulatory, Verizon, to Ms. Dortch, MB Docket No. 05-311 (Aug. 9, 2006) at 3 (Verizon survey of MDU units in and around Tampa, Florida showing that 42 percent of them were "subject to . . . exclusive access arrangements"; the actual percent is probably higher because 15 percent of building owners did not know or would not say whether their buildings were subject to exclusivity clauses; in most cases cited, the beneficiary of exclusivity was an incumbent cable operator). *Cf.* SureWest Comments at 3 n.2.

[38] Hotwire Commun., LLC, Comments at 7; IMCC Comments at 27 (stating that old contracts are more likely to contain exclusivity clauses that are perpetual); Qwest Comments at 4; Verizon Comments at 4. Concerning perpetual contracts, *see infra* note 105.

[39] *See, e.g.,* AT&T Comments and 13; IMCC Comments at 27.

[40] *See, e.g.,* ACA Comments at 3; Comcast Comments at 15, 19.

[41] Hotwire Comments at 7.

[42] *See supra* note 2.

[43] *FCC eases way for telephone companies to offer TV*, Reuters in USA TODAY (Dec. 20, 2006) ("The telephone carriers see offering television as a necessary component to their bundle of communications services to better compete against cable operators, who now offer their own telephone and high-speed Internet services."), http://www.usatoday.com/money/industries/telecom/2006-12-20-FCCtelevision_x.htm (visited Oct. 29, 2007); Tom Bawden, *Dolans bid $19bn for control of Cablevision*, Times (UK) at 57 (Oct. 10, 2006) ("Cablevision is being squeezed by telephone companies, which are launching rival cable services"); *Verizon Pursues Local Cable Franchises*, WASH. POST NEWSBYTES (July 19, 2005) ("Verizon's television initiative [is] underway in 15 states . . . In 2004, Verizon invested $1 billion in its nationwide television initiative, and it has accelerated construction this year."); *Microsoft Sees Commercial IPTV Ready for Delivery by Year-End*, TELECOMMUN. REP. DAILY (July 1, 2005), available at 2005 WLNR 25545059 ("Microsoft's IPTV platform is used by several major telephone companies getting into the IPTV business, including SBC Communications, Inc., Verizon Communications, Inc., [and] BellSouth Corp.")

14. Moreover, AT&T, Lafayette Utilities in Louisiana, United States Telecom Association, and Verizon report that, with the imminent entry of LECs into the multichannel video marketplace, incumbent cable operators have increased the use of exclusivity clauses in their agreements with MDU owners.[44] As one commenter noted, "[i]ncumbent providers commonly engage in a flurry of activity to lock up MDUs and other real estate developments in exclusive arrangements as soon as it becomes clear that a new entrant will be coming to town."[45] Sometimes these clauses are inserted in fine print, in "legalese," and without adequate notice to the MDU owner.[46]

15. In sum, the record demonstrates that exclusivity clauses bar entry into MDUs by new providers of multichannel video service. It also shows that, in reaction to the recent competitive challenge posed by LEC entry into the video marketplace, incumbent providers (chiefly incumbent cable operators) are increasingly using exclusivity clauses in new agreements with MDU owners to bar the entry of their new rivals and potential rivals. These developments constitute a substantial change to the record the Commission compiled in the period leading up to the *2003 Inside Wiring Order*.

## III. DISCUSSION

### A. Harms and Benefits of Exclusivity Clauses

16. In this Section, we first describe the harms and benefits of exclusivity clauses. We conclude that the harms significantly outweigh the benefits in ways they did not at the time of the Commission's 2003 *Inside Wiring Order*. Specifically, they bar new entry and competition for both MVPD services and the so-called "triple play" of voice, video, and broadband Internet access services. They also discourage the deployment of broadband facilities to American consumers. This, in turn, has the effect of significantly hindering or preventing new MVPDs from providing to MDU residents video programming services that are within the scope of Section 628(b).[47] We therefore conclude that cable

---

[44] AT&T Comments at 5, 9-10 (at 9, "Incumbents have recently sought to increase their use of exclusive access contracts, especially in response to the threat of entry by wireline video entrants"; at 10, "efforts to lock-up MDUs have occurred in California, Texas, and virtually every market where AT&T has begun to enter the video service market"); United States Telecom Ass'n ("USTA") Comments at 6-8 (at 6, "cable incumbents are aggressively pursuing exclusive agreements with MDU owners"); Verizon Comments at 1-2 (many agreements continuing exclusivity clauses "have been entered into recently – indicating that incumbent providers are resorting to exclusive access arrangements as a means of 'locking up' [MDUs] immediately prior to the entry of a new competitor."), 3 ("cable incumbents have countered this competitive threat in many instances by entering into exclusive access contracts that shield incumbent providers from competition"), and at 10-11 (recounting several specific incidents in Florida of exclusivity granted shortly before Verizon began marketing). We find these descriptions of recent events more convincing than the contrary description in RAA's Comments Exh. C (Declaration of Chris Acker, Director of Building Technology Services Group for Forest City Residential Group, Inc.), ¶ 5. One reply commenter challenges some details of Verizon's characterizations of a few incidents, but does not dispute that an incumbent cable operator effected exclusivity clauses close in time to Verizon's entry. Reply Comments of Advance/Newhouse Commun. at 10-11.

[45] Lafayette Comments at 9.

[46] AT&T Comments at 12-13; Verizon Comments at 8, 12-13.

[47] 47 U.S.C. § 548(b). Section 628(b) of the Act makes it unlawful for cable operators and their vertically integrated programmers to engage in certain practices that hinder or prevent MVPDs from providing "satellite cable programming" or "satellite broadcast programming" to subscribers. "Satellite cable programming" is video programming (not including satellite broadcast programming) that is transmitted by satellite to cable operators for retransmission to cable subscribers. *See id.* §§ 548(i)(1), 605(d)(1). "Satellite broadcast programming" is broadcast video programming that is retransmitted by satellite by an entity other than the broadcaster or an entity under the broadcaster's control. *See id.* § 548(i)(3).

operators' use of exclusivity clauses in contracts for the provision of video services to MDUs constitutes an unfair method of competition or an unfair act or practice proscribed by Section 628(b).[48]

17. <u>Harms Caused by Exclusivity Clauses.</u>  By far the greatest harm that exclusivity clauses cause residents of MDUs is that they deny those residents another choice of MVPD service and thus deny them the benefits of increased competition.[49]  Congress and the Commission have repeatedly found, and few parties dispute here, that entry by LECs and other providers of wire-based video service into various segments of the multichannel video marketplace will produce major benefits for consumers.[50]  A significant increase in multichannel competition usually results in lower prices, more channels, and a greater diversity of information and entertainment from more sources.[51]  Notably, our most recent Cable Price Survey Reports show that the presence of a second wire-based MVPD competitor clearly holds prices down more effectively than is the case where DBS is the only alternative.[52]  The fact that an incumbent cable operator may face competitive pressures on its pricing in a franchise area surrounding or adjacent to a MDU does not mean that the residents of a MDU served by the same cable operator will reap the benefits of such competition, including the option to choose among

---

[48] *Id.* § 548(b).

[49] *See* Corning Comments at 5 ("exclusive access contracts discourage [fiber to the premises] deployment, impede competition, and discourage innovation."); SureWest Comments at 3 ("exclusive service contracts constitute significant barriers to entry and thus greatly impede competition in the MVPD service market."); *see also* Consumers Union Ex Parte at 2 (noting the disproportionately large impact of exclusivity clauses on "communities of color").

[50] 47 U.S.C. § 548(a) ("The purpose of this section is to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market, to increase the availability of satellite cable programming and satellite broadcast programming to persons in rural and other areas not currently able to receive such programming, and to spur the development of communications technologies."); *see also Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television & Consumer Protection Act of 1992*, Report & Order & Further Notice of Proposed Rulemaking ("*Franchise Reform Order*"), 22 FCC Rcd 5101, 5103, ¶ 2 ("competition for delivery of bundled services will benefit consumers by driving down prices and improving the quality of service offerings"), 5126, ¶ 50 ("new cable competition reduces rates far more than competition from DBS") (2006), *appeal pending sub nom. Alliance for Cmty. Media v. FCC*, No. 07-3391 (6th Cir.); S. Rep. No. 102-92 at 47 (1991) available at 1992 U.S.C.C.A.N. 1133, 1146 & 1991 WL 125145 at 14 (Leg. Hist.) ("it is clear that there are benefits from competition between two cable systems"); H.R. Rep. 102-628 at 46 (1992), available at 1992 WL 166238 at 46 (Leg. Hist.) ("consumers would benefit greatly from the existence of two competing cable systems operating in a given market").  These predictions have been borne out in the Commission's recent Cable Price Survey Reports.  *See infra* note 52.

[51] *See, e.g.*, New Jersey Division of Rate Counsel ("NJDRC")  Comments at 8 ("The prohibition on exclusive contracts in New Jersey [under state law] encourages lower prices . . . and provides consumers with a greater number of alternatives."); Verizon Comments at 5-6 (stating that when it began to enter two Florida counties, Comcast announced that it would not raise its cable rates (for the first time in a decade); six months after Verizon entered into competition with the incumbent cable operator in three areas in Texas, consumers saved almost $27 a month on the average cable TV bill.").

[52] *Implementation of Section 3 of the Cable Television Consumer Protection & Competition Act of 1992; Statistical Report on Average Rates for Basic Service, Cable Programming Service, and Equipment,* Report on Cable Industry Prices, 21 FCC Rcd 15087, ¶ 2 (2006) ("Prices are 17 percent lower where wireline cable competition is present."), 20 FCC Rcd 2718, 2721, ¶ 12 (2005) (the degree by which cable rates (monthly rates and price per channel) were lower in competitive areas compared to non-competitive areas was greatest where there was "wireline overbuild competition"), 18 FCC Rcd 13284, 13286-87, ¶ 5 (2003) (areas with competition from a wireline, overbuild, or municipal cable system had a lower average rate per channel than areas that had no competition or only DBS competition).

competitive providers, some of which may provide a reduced-priced bundled package.  This is particularly true when incumbent cable operators and MDU owners sign contracts before a competitive provider enters the market, a practice that the record in this proceeding indicates is quite common.  Within the MDU, the incumbent, protected by its exclusivity clause from any competition it may face outside the MDU's boundaries, would have no incentive to hold down its prices within the MDU.  The MDU's residents would also be denied the benefits of taking service from the new entrant, with potentially lower rates and better features than the incumbent's.

18.  In addition, a new provider of MVPD services such as a LEC is likely to bring into a MDU some satellite-delivered cable programming that the incumbent beneficiary of the exclusivity clause does not.  Absent the new entrant, the MDU's residents who favor that programming will be denied the programming of their choice.  This denial will fall disproportionately on minorities and low-income families (and on programmers specializing in programming oriented to those groups), and all residents will be denied increased competition in programming among MVPD providers.[53]  We agree with Consumers Union that we should ensure that the "no segment of the population is denied the benefits of video competition."[54]

19.  LEC entry is also likely to result in increased deployment of fiber to American homes at lower cost per residence,[55] and a new competitor offering the "triple play" bundle of video, voice, and Internet access service.  An exclusivity clause in a MDU's agreement with a MVPD denies all these benefits to the MDU's residents.[56]  Even if exclusivity clauses do not completely bar new entrants from the MVPD market everywhere, they foreclose new entrants from many millions of households, a significant part of the national marketplace.  Such clauses could therefore deter new entrants from attempting to enter the market in many areas.  More important, exclusivity clauses deny consumers in a part of the market the benefits that could flow to them, and exclusivity clauses confer few, if any, benefits on those consumers.  These harms to consumers are greater than they were several years ago, when new entry by LECs had not begun on a large scale, the recent increase in fiber construction had not yet materialized,[57] and the popularity of the triple play was unproven.

20.  The effect of exclusivity clauses on broadband deployment and "triple play" services merits further discussion.  We have stated that broadband deployment and entry into the MVPD business are "inextricably linked."[58]  One basis for this observation is the recent emergence of LECs, cable operators, and some other providers offering consumers a "triple play" of voice, MVPD, and broadband Internet access services.[59]  The offering of, and competition in, the triple play brings to consumers not just

---

[53] *See generally* CFA *et al.* Ex Parte; Consumers Union Ex Parte; Honig Ex Parte; USTelecom Ex Parte.

[54] Consumers Union Ex Parte at 2.

[55] Corning Incorporated Comments at 1, 4-9; NJDRC Comments at 8 ("The prohibition of exclusive contracts [under state law] encourages . . . technological development and deployment"); *see also* Letter from Larry Cohen, President, Communications Workers of America, to Ms. Dortch (Oct. 24, 2007) ("Commission action to prohibit these arrangements – not only in the future but also those already negotiated – will support investment in competing high-speed broadband networks and the growth of good jobs associated with that investment.").

[56] *See* RAA Comments at 22 ("some property owners might welcome the opportunity to void some existing contracts to introduce competitors for new services").

[57] Corning Comments at 3.

[58] *Franchise Reform Order,* 22 FCC Rcd at 5126, ¶ 51.

[59] *Id.,* 22 FCC Rcd at 5103, ¶ 2 ("We believe this competition for delivery of bundled services will benefit consumers by driving down prices and improving the quality of service offerings."); Comcast Corp. Comments at 6
(continued….)

advanced telecommunications capability, but also a simplicity and efficiency that is proving to be highly attractive in the marketplace.[60]

21. In a MDU where an incumbent has the exclusive right to provide MVPD service, no other provider can offer residents the triple play today on its own facilities.[61] Any new entrant that could offer all three parts of the triple play but for the existence of an exclusivity clause, which limits its offerings to voice and broadband Internet access, would find entry less attractive.[62] The new entrant might not enter at all. Or, if the new entrant enters despite that handicap and provides MDU residents with only voice and Internet access services, leaving MVPD service to the beneficiary of an exclusivity clause, the new entrant's wire is inefficiently underutilized.[63] Thus, exclusivity clauses reduce competition in the provision of triple play services and result in inefficient use of communications facilities.

22. Exclusivity clauses can cause other harms to MDU residents. A MDU owner may grant exclusivity to one MVPD based on the available choice of service providers at a given time, and in doing so bar entry into the MDU by a more desirable but later-arriving MVPD.[64] Or, the person who grants exclusivity to one MVPD may be the developer or builder of a MDU, who may grant exclusivity against the long-term interests of the residents and soon thereafter relinquish control of the MDU.[65] In addition, exclusivity clauses can insulate the incumbent MVPD from any need to improve its service;[66] Manatee

---

(…continued from previous page)
("One of the most significant changes since the Commission last sought comment on this issue is the ability of cable operators to deliver multiple services over a single wire."), 13; USTA Comments at 10.

[60] Comcast Comments at 7; USTA Comments at 10.

[61] *Franchise Reform Order*, 22 FCC Rcd at 5126, ¶ 51 ("broadband deployment is not profitable without the ability to compete with the bundled services that cable companies provide"); *see also* Embarq Comments at 1-3; Qwest Comments at 6-7. We are aware that some LECs are partnering with DBS Providers to offer triple plays. *See, e.g.,* DirecTV, http://www.directv.com/DTVAPP/discover/broadband Bundle.jsp (visited Aug. 14, 2007). We see no reason to deny wire-based MVPDs, however, the opportunity to provide all parts of the triple play on one facility. That may be more efficient and convenient, both for the subscriber and the provider – saving the subscriber the need to install a dish and sparing the LEC dependence on a second network and a second work force.

[62] Qwest Comments at 2 ("the creation of a new revenue stream from multichannel video service is driving wireline broadband deployment nationwide"); USTA Comments at 10-11; Verizon Comments at 7-8.

[63] *See* SureWest Comments at 7-8.

[64] USTA Reply Comments at 4 (noting that a certain new entrant "offer[s] residential . . . users broadband speeds up to 60 Mbps – far greater then [sic] available from cable competitors. But this technology is being denied to residents of MDUs with exclusive access arrangements."); Warner Properties, Comments at 2 ("[p]roperty owners, such as WP, could offer their tenants more cable choices if they were not prohibited from doing so [by] . . . existing exclusive contracts"); *see also* Verizon July 6 Ex Parte at 4 (stating that some landlords would like to give tenants a greater variety of cable choices, but are unable to do so because of exclusivity clauses); Hargray Oct. 12 Ex Parte at 1.

[65] Verizon Comments at 8 (quoting the government of Manatee County, Florida), 8, 9 n.5; Manatee County Comments in MB Docket No. 05-311 at 12 ("it is often a developer who strikes an agreement that will not impact that developer once the development is completed"); *see also* Letter from Paul J. Feldman, Esq., Fletcher, Heald & Hildreth, P.L.C., counsel to SureWest, to Ms. Dortch (Oct. 11, 2007), Attachment (Presentation of SureWest Communications on MDU Exclusive Service Contracts") at 1 (exclusivity clauses are "[g]enerally negotiated by developers, not residents"); Hargray Oct. 12 Ex Parte at 1.

[66] SureWest Comments at 25 n.50 ("once the exclusive contracts are in place, [incumbent] providers have little incentive to respond to non-existent competition with better services or lower rates."); Warner Properties Comments at 2; Manatee County Comments, MB Docket No. 05-311, at 12.

County, Florida, aptly describes incumbent beneficiaries of exclusivity clauses as "sitting on these 'fiefdoms.'"[67]

23. Finally, the record indicates that exclusivity clauses are not always in the best interest of MDUs owners, either.[68] Technologically advanced buildings are important for attracting and retaining residents, and a lack of competition for providing new communications services can negatively affect a residential development.[69] A MDU owner may not see a benefit in an exclusivity clause that bars entry by new providers that were not in the market when the clause was written.[70]

24. <u>Benefits of Exclusivity Clauses.</u> When the Commission last considered issues concerning exclusivity clauses in its *2003 Inside Wiring Order*, it determined that exclusivity clauses had some pro-competitive effects.[71] In some cases, exclusivity clauses, or at least those of a limited duration, may help a MVPD to obtain financing to wire an entire building for cable and other services and to recover its investment over the term of exclusivity.[72] Similarly, some commenters claim that exclusivity clauses are especially necessary to attract investment in marginally attractive MDUs.[73]

25. Some commenters argue in support of the use of exclusivity clauses that, with the decline of LECs' and cable operators' traditional duty to serve all homes in an area, an exclusivity clause may be necessary to attract a MVPD into a new real estate development.[74] Other commenters state that a MDU owner, needing to attract buyers or tenants, may be counted on to represent them and will agree to an

---

[67] Manatee County Comments, MB Docket No. 05-311, at 16.

[68] *See, e.g.,* Palmetto Ex Parte at 2 (urging Commission action in order to eliminate the need to "further protracted litigation," against Time Warner in order to obtain competition in its community).

[69] Lennar Corp. Comments at 1 ("As one of the nation's largest developers and builders of new, large-scale residential communities, Lennar has a strong interest in ensuring that the buyers of its homes have available the widest possible range of competing advanced broadband services, including multichannel video, broadband data, and other evolving new service offerings"); RAA Comments at 3 ("Owners must be sure that access to reliable voice, video, and broadband services is available because potential apartment residents demand them"); Warner Properties Comments at 2 ("Property owners, such as WP, could offer their tenants more cable choices if they were not prohibited from doing so because of often perpetual existing exclusive contracts").

[70] *See infra* ¶ 28.

[71] *2003 Inside Wiring Order* at 1366, ¶ 63 (noting that exclusive agreements may "enable alternative providers to recoup the investment required to enter MDUs and thus to become or remain viable."). Despite this, the alternative providers of the time, which we refer to as PCOs in this proceeding, have a small market share and do not have a significant effect on MVPD competition.

[72] ACA Comments at 2-3; Charter Commun., Inc., Comments at 3-4; Comcast Comments at 18-19; Greenfield Service Provider Coalition ("GSPC") Comments at 3, 6-9; IMCC Comments at 5, 7-10; Microwave Satellite Technologies Inc. ("MSTI") Comments at 1; OpenBand MultiMedia, L.L.C., Comments at 3-4; Pavlov Media, Inc., Comments at 1; Qwest Comments at 2-3; RAA Comments at 5; WorldNet Telecommun., Inc., Comments at 1-3; Ygnition Networks Comments at 1-2; Time Warner Ex Parte at 2; Letter from Megan M. Delany, Esq., Vice President & Senior Counsel, Charter, to Ms. Dortch ("Charter Oct. 16 Ex Parte") (Oct. 16, 2007).

[73] Letter from Matthew C. Ames, Esq., Miller & Van Eaton, P.L.L.C., counsel for RAA (Sept. 5, 2007), Attachment ("The Real Access Alliance Opposes FCC Regulation . . . ," hereinafter "RAA Sept. 5 Attachment"); *see also, e.g.,* Letter from Robert G. de Posada, President, The Latino Coalition, to Chairman Martin *et al*. (Oct. 14, 2007); Letter from the Honorable Sheryl Williams Stapleton to Commission Chairman Kevin J. Martin *et al.* (Oct. 23, 2007); Letter from Dr. Luke E. Torian, Pastor, First Mount Zion Baptist Church, to the Commission (Oct. 24, 2007).

[74] Lennar Comments at 7; RAA Comments at 48-51, 62.

exclusivity clause only if it is in their interests.[75]  The rational owner, these commenters claim, will give exclusive access to the one of several bidding MVPDs that offers the best mix of low price, quality service, promised improvements and in some cases, specialized program offerings.[76]  An exclusivity clause, in this view, substitutes competition for the MDU for competition for individual residents, and the resulting benefits may be passed on to the residents.[77]  In the same vein, some commenters deny that exclusivity clauses allow MVPDs to become complacent and provide inferior service; these entities believe that the high turnover in MDUs requires building owners to maintain and constantly improve their service so that the building or development will attract new residents who will become its subscribers.[78]

26.  Conclusion.  We conclude that exclusivity clauses cause significant harm to competition and consumers that the record did not reflect at the time of our 2003 *Inside Wiring Order*.  We further find that although exclusivity clauses may in certain cases be beneficial, at least in the short term, to consumers, the harms of exclusivity clauses outweigh their benefits.  The evidence described in the preceding paragraphs demonstrates that exclusivity clauses, especially when used in current market conditions by incumbent cable operators, are a barrier to new entry into the multichannel video marketplace and the provision of triple play offerings.  Such exclusivity clauses inhibit competition in these markets and slow the deployment of broadband facilities.  In doing so, exclusivity clauses deny MDU residents the benefits of increased competition, including lower prices[79] and the availability of more channels with more diverse content, as well as access to alternative providers of broadband facilities and the triple play of communications services their facilities support.  These harms to consumers are traceable to the incumbent cable operators' practice, increased recently, of using exclusivity clauses, sometimes in fine print and without adequate notice to MDU owners, to forestall

---

[75] IMCC Comments at 18.

[76] Hotwire Comments at 3-4 (at 4, exclusivity clauses can enable "deep discounts . . . on a bulk basis."); IMCC Comments at 18-19 ("where sufficient volume can be secured through exclusivity, PCOs typically offer services at rates approximately 10 percent below the next highest competitive rate"); Lennar Comments at 3; OpenBand Comments at 6; RAA Comments at 17-18; WorldNet Comments at 3-5; Letter from Rev. Miguel Rivera, President, National Coalition of Latino Clergy & Christian Leaders, to Chairman Martin *et al.* (Oct. 18, 2007); *see also* AT&T Comments, Exh. A (Letter from Eric Minoski, Account Executive, Comcast Cable, South Bay, to Kara Patterson, Remi Co. (June 27, 2006) (offering significant discounts in exchange for exclusivity); Bandwidth Consulting Comments at 2; GSPC Comments at 14 ("Some new competitive entrants also offer television channels dedicated specifically to the communities they serve including channels for user-created content."), 17; Hotwire Comments at 4; Shentel Comments at 10-11 ("Consumers served under an [exclusive service contract or] ESC often make up a relatively narrow customer base, typically with shared demographic traits.  As a result, entities that provide services under ESCs are able to customize their service offerings to meet the particular needs of that customer base. . . . In locations with a high ratio of Spanish speaking residents, for example, Shentel has customized its offering to provide additional Spanish language channels on the basic tier.  In Johnson City, Tennessee, where Shentel serves a MDU in which a significant number of the residents happen to be Lebanese, Shentel offers a premium package of seven Arabic and Lebanese programming channels to residents in the building.").

[77] Comcast Comments at 19; CAI Comments at 3, 5-8; GSPC Comments at 15-17; IMCC Comments at 17; OpenBand Comments at 4-5; ShenTel Comments at 6.

[78] Charter Comments at 3 & n.7; RAA Comments, Exh. E (Declaration of Kent McDonald, Director of Communications Services for Apartment & Investment Management Co.) at ¶ 9.  Indeed, Charter claims that exclusivity clauses appear not because of cable operators' market power, but because of MDU owners' power over cable operators needing access to their MDUs.  Charter Comments at 2-3; *see also* Comcast Comments at 19.

[79] Consumers Union Ex Parte at 2.  It is also noteworthy that there is no evidence in the record that MDU residents pay higher rates for MVPD services in states whose laws prohibit or limit exclusivity.

competition, particularly when new competitors are about to enter the market.  We do not wish to deny MDU residents these benefits based on incumbents' alleged need to be shielded from additional competition,[80] or to subject them to something resembling the exclusive franchises of an earlier era.[81]

27. Moreover, we find that cable operators' use of exclusivity clauses in contracts for the provision of video services to MDUs constitutes an unfair method of competition or an unfair act or practice proscribed by Section 628(b).[82]  Section 628 is designed to increase "competition and diversity" in the multichannel video marketplace, increase the availability of satellite cable and satellite broadcast programming to persons in "areas not currently able to receive such programming," and "spur the development of communications technologies."[83]  That provision specifically prohibits cable operators from engaging in unfair methods of competition or unfair acts or practices that have the purpose or effect of hindering significantly or preventing any MVPD from providing satellite cable programming or satellite broadcast programming to consumers.  We have found above that a significant percentage of consumers live in MDUs.  We also found that, with the increasing entry of wire-based competitors, such as LECs, into the MVPD marketplace, incumbent cable operators have increased their use of exclusivity clauses with MDU owners, particularly when new competitors are on the verge of entering a particular market.[84]  The record shows that these exclusivity clauses have the purpose or effect of preventing other MVPDs from providing the kind of programming covered by Section 628 – satellite cable and/or broadcast programming – to certain consumers; indeed, that is the intended and inevitable effect of exclusivity clauses.[85]  Exclusivity clauses prevent new entrant MVPDs from competing with entrenched incumbent providers on the basis of service offerings, including programming, and on price.  Foreclosing competition in the MDU market in this way is unfair because it deprives consumers residing in MDUs of the opportunity to choose a MVPD provider.   Cable operators' execution of exclusivity clauses, which foreclose the competitive provision of MVPD service, the triple play, broadband deployment, and satellite-delivered programming to MDUs, thus constitutes an unfair method of competition in violation of Section 628(b).

28. We reject arguments that exclusivity clauses mostly work to the benefit of MDU owners and residents.  First, as explained in paragraph 22 above, the person signing an exclusivity clause for a MDU may be a builder or manager whose interests do not coincide with those of the MDU's residents, especially after a few years.[86]  Second, the cable operator may have induced the MDU owner to accept an exclusivity clause before any wire-based competitor was on the horizon, in which case there was no

---

[80] Letter from William H. Johnson, Esq., Ass't General Counsel, Verizon, to Ms. Dortch (Oct. 23, 2007) ("Verizon Oct. 23 Ex Parte") at 9.

[81] Consumers Union Ex Parte at 2.

[82] 47 U.S.C. § 548(b).

[83] 47 U.C.S. § 548.

[84] AT&T Comments at 5, 9-10; Lafayette Comments at 9; USTA Comments at 6-8; Verizon Comments at 1-2.

[85] *See e.g.*, Verizon Comments at 11-12; AT&T Comments at 10-12.

[86] Verizon Comments at 8 (quoting the government of Manatee County, Florida), 9 n.5; Manatee County Comments in MB Docket No. 05-311 at 12 ("it is often a developer who strikes an agreement that will not impact that developer once the development is completed"); *see also* Letter from Paul J. Feldman, Esq., Fletcher, Heald & Hildreth, P.L.C., counsel to SureWest, to Ms. Dortch (Oct. 11, 2007), Attachment (Presentation of SureWest Communications on MDU Exclusive Service Contracts") at 1 (exclusivity clauses are "[g]enerally negotiated by developers, not residents"); Hargray Oct. 12 Ex Parte at 1.

"competition for the MDU" at the time and no prospect of it in the future.[87]   Third, the exclusivity clause may be in "legalese" and in fine print and the MDU owner may be unaware of it.[88]   Fourth, the fact that a new entrant wants to serve the MDU undercuts any claim that only one wire-based provider can serve the building profitably – if new entry would be unprofitable, it is unlikely that the new entrant would want to enter.  Fifth, there is no evidence in the record, other than generalities and anecdotes, that incumbent MVPD providers couple exclusivity clauses with significant new investments that they do not make elsewhere, such as in states whose laws prohibit exclusivity.[89]   Sixth, SureWest states that the triple play, which offers a provider revenue from three services, reduces any need for exclusivity that it may have had in the past, when MVPD revenue was the only way it could recover its investment.[90]   Finally, other agreements between incumbent MVPDs and MDU owners, perhaps providing for marketing exclusivity or bulk discounts, can provide benefits similar to those alleged for exclusivity clauses without causing the latter clauses' entry-foreclosing harms to consumers.[91]   Therefore, although "competition for the MDU" may have some theoretical advantages in some cases over competition for individual consumers, it may not describe reality in many cases.  Even if it does, in general we find that the best results for consumers come from preserving their ability to play an active role in making an individual choice rather than allowing cable operators using exclusivity clauses to foreclose individual choice.  In addition, as noted above, exclusivity clauses tend to insulate the incumbent from any need to improve its service.  Thus, we conclude that exclusivity clauses generally do not benefit MDU residents.[92]

29.    The record contains claims that exclusivity clauses may lead to lower prices.[93]   Although we cannot rule out the possibility that those claims may be true in some cases, such assertions are outweighed by the numerous studies showing that a second wire-based MVPD lowers prices.[94]   We also reject arguments that "exclusivity is not really a problem"[95] because many MDUs are not subject to

---

[87] Hotwire Commun., LLC, Comments at 7; IMCC Comments at 27; Qwest Comments at 4; Verizon Comments at 4.

[88] AT&T Comments at 12-13; Verizon Comments at 8, 12-13.

[89] IMCC Comments at 14 (stating that there are 15 such states).  *But cf.* Charter Oct. 16 Ex Parte (listing MDUs with exclusivity clauses where Charter upgraded services).

[90] SureWest Comments at iv, 25 n.50; SureWest Reply Comments at 2 n.2.

[91] AT&T Reply Comments at 10-11; Verizon Reply Comments at 9-10; Verizon Oct. 23 Ex Parte at 10.

[92] Two commenters note that MDU residents may not appreciate the disruption caused by a second MVPD in the building when it installs its facilities.  CAI Comments at 9; RAA Comments at 6-7.  We do not doubt the validity of that observation.  Nothing herein, however, imposes a duty or rule on a MDU owner to allow multiple MVPD providers within its premises.

[93] CAI Comments at 9; RAA Comments at 18; AT&T Comments, Exh. A (Letter from Eric Minoski, Account Executive, Comcast Cable, South Bay, to Kara Patterson, Remi Co. (June 27, 2006), (offering significant discounts in exchange for exclusivity).

[94] *See supra* note 52; *see also* CFA *et al.* Ex Parte at 2 ("exclusive contracts may, under some circumstances, serve the interests of competition. . . .  [But] nothing in the record demonstrates that they are so widespread that the millions of consumers in [MDUs] should be denied their choice of provider for the sake of these relatively few instances").

[95] RAA Sept. 5 Ex Parte, Attachment at 2 (emphasis deleted).

exclusivity clauses and such clauses expire.[96]  A practice that harms a significant number of households in this country warrants remedial action even if it does not harm everyone.[97]

> **B.**      **Prohibition of Exclusivity Clauses**

30. For the reasons set forth above, we prohibit cable operators and other entities that are subject to Section 628 from enforcing existing exclusivity clauses and executing contracts containing new ones. These other entities are LECs and open video systems and are discussed in Section IV below.

31. Specifically, 30 days after publication of this *Report and Order* in the Federal Register, no cable operator or multichannel video programming distributor subject to Section 628 of the Act[98] shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU .  Any such exclusivity clause shall be null and void.

32. We fashion the prohibition pursuant to Section 628 for several reasons.  First, that provision is a basis of our statutory authority to regulate exclusivity clauses.[99]  Second, incumbent cable operators, which are subject to Section 628, are the beneficiaries of the vast majority of exclusivity clauses.  As described in paragraph 10 above, incumbent cable operators are primarily responsible for the recent increase in newly executed exclusivity clauses.  Also, the evidence in the record indicates that incumbent cable operators are using them to impede the entry of new competitors into the MVPD market in many areas.  Incumbent cable operators are still by far the dominant force in the MVPD business, with a market share most recently measured at 67 percent[100] and the ability to impose steadily rising prices.[101]  Our prohibition is limited to those MVPDs covered by Section 628(b).  It does not reach PCOs or DBS providers because we do not have an adequate record on which to decide whether such a prohibition is warranted for non-cable operators.  Nevertheless, we are adopting the *Further Notice of Proposed Rulemaking* below in order to develop such a record and, based on it, evaluate whether action is called for.

33. We put no time limit on the prohibition we adopt in the instant order and we do not exempt from it any kind of MDU or any geographic location.  We do, however, limit our prohibition to those residential real estate developments that we define as MDUs as discussed in paragraph 7 above.

34. The rule we adopt in this proceeding is consistent with the longstanding Congressional prohibition of exclusive franchises for cable service[102] and the statement in our most recent *Inside Wiring*

---

[96] RAA Reply Comments at 6-12.

[97] Letter from Stephen Weinstein (Oct. 9, 2007).

[98] *See* 47 U.S.C. §§ 548(b) (cable operators), 548(j) (common carriers or their affiliates that provide video programming by any means to their subscribers), 573(c)(1)(A) (open video systems).

[99] *See infra* Section IV.

[100] *See* Docket MB No. 07-29, *Implementation of the Cable Television Consumer Protection & Competition Act of 1992, Development of Competition and Diversity in Video Programming Distribution: Section 628(c)(5) of the Communications Act: Sunset of Exclusive Contract Prohibition,* Cablevision Comments at 2 (stating that cable's market share is 67 percent); Comcast Comments at 8 (stating that cable's market share is 67.8 percent as of the end of 2006); NCTA Comments at 4 (stating that cable's market share is 66.9 percent).

[101] *Implementation of Section 3 of the Cable Television Consumer Protection & Competition Act of 1992: Statistical Report on Average Rates*, Report on Cable Industry Prices, 21 FCC Rcd 15087, 15090, ¶ 10 (2006).

[102] *See* 47 U.S.C. § 541(a)(1).

*Order* that "[n]ew entrants to the video services and telephony markets should not be foreclosed from competing for consumers in multi-unit buildings."[103]

35. The rule we adopt in this proceeding prohibits both the enforcement of existing exclusivity clauses and the execution of new ones.[104]  Both have the same competition- and broadband-deterring effect that harms consumers.  A rule that left exclusivity clauses in effect would allow the vast majority of the harms caused by such clauses to continue for years, and we believe that it is strongly in the public interest to prohibit such clauses from being enforced.  Those harms would continue indefinitely in the cases of exclusivity clauses that last perpetually or contemplate automatic renewal upon the renewal of the incumbent cable operator's franchise.[105]

36. Our prohibition of the enforcement of existing exclusivity clauses does not disturb legitimate expectations of investors in MDUs and the video service providers affected by this Order.  The lawfulness of exclusivity clauses has been under our active scrutiny for a decade, making the parties to them aware that such clauses may be prohibited.[106]  Although we have not prohibited enforcement of them until now, we had previously recognized the reasons for doing so but had lacked an adequate record on which to base such a decision.[107]  We have prohibited the enforcement of exclusivity clauses for satellite-delivered programming before.  For example, the Commission prohibits, with respect to distribution to persons in areas served by cable operators and other MVPDs covered by Section 628(b), exclusivity clauses for satellite cable programming and satellite broadcast programming between a cable operator and a vendor of such programming in which a cable operator has an attributable interest, unless the Commission determines that such contracts are in the public interest.[108]  Also, in the context of

---

[103] *2007 Inside Wiring Order,* 22 FCC Rcd at 10641, at ¶ 3.

[104] Comments supporting prohibiting the enforcement of some or all existing exclusivity clauses include AT&T Comments at 15; Lafayette Comments at 10; SureWest Comments at 1, 8-10; Verizon Comments at 2, 13; Warner Properties Comments at 2.  Comments favoring the continued validity of exclusivity clauses include ACA Comments at 2-5; Charter Comments at 6-7; Comcast Comments at 33-35; Hotwire Comments at 5-7; National Cable & Telecommun. Ass'n ("NCTA") Comments at 11-13; OpenBand Comments at 8; Shentel Comments at 4, 18; Time Warner Comments at 2-3; and Advance/Newhouse Commun. Reply Comments at 18.

[105] AT&T Comments at 12; Hotwire Comments at 7-8; IMCC Comments at 14 (estimating that 10-15 percent of all MDU units are governed by perpetual exclusivity, and that the number is declining), 23 (complaining of *de facto* perpetuity in automatic renewal at franchise renewal), 27; MSTI Comments at 2; RAA Comments at 23-24; Verizon Comments at 2; Warner Properties Comments at 2.

[106] *Telecommunications Services Inside Wiring:  Customer Premises Equipment*, Notice of Proposed Rulemaking, 11 FCC Rcd 2747, 2773-76, ¶¶ 58-64 (1996); Report & Order & Second Further Notice of Proposed Rulemaking ("*1997 Inside Wiring Order*"), 13 FCC Rcd 3659, 3778-80, ¶¶ 258-66 (1997) (subsequent history omitted); *2003 Inside Wiring Order*, 18 FCC Rcd at 1364-70, ¶¶ 59-71; *see also* authority cited *supra* note 2.

[107] *1997 Inside Wiring Order,* 13 FCC Rcd at 3664, ¶ 3 ("We believe that the record would benefit from additional comment on the following issues . . . . : (1) exclusive service contracts between service providers and MDU owners"); *id.* at 3754, ¶ 203; 18 FCC Rcd at 1370, ¶ 71 ("In sum, we find that the record does not support a prohibition on exclusive contracts for video services in MDUs . . . .  The parties have identified both pro-competitive and anti-competitive aspects of exclusive contracts.  We cannot state, based on the record, that exclusive contracts are predominantly anti-competitive.") (footnote omitted); *see also* authorities & quotations *supra* note 10.

[108] *Implementations of the Cable Television Consumer Protection & Competition Act of 1992:  Development of Competition & Diversity in Video Programming Distribution & Carriage*, Memorandum Opinion & Order on Reconsideration of the First Report & Order ("*1994 Memorandum Opinion & Order*"), 10 FCC Rcd 1902, 1941, ¶ 88 (1994); First Report & Order ("*Section 628 Report & Order*"), 8 FCC Rcd 3359, 3364, ¶ 16; *id.* at 3424-25, ¶¶ 120-21 (1993).

commercial telecommunications services, the Commission has prohibited the execution of exclusive access arrangements in multiple tenant environments and has sought comment on whether to prohibit the enforcement of existing exclusive access provisions.[109]   Some states have given some or all MVPD providers rights of access to MDUs.[110]

37. Moreover, incumbent cable operators will still be able to use their equipment in MDUs to provide service to residents who wish to continue to subscribe to their services.   Finally, we note that the rule we adopt today does not require that any new entrant be given access to any MDU.   A MDU owner still retains the rights it has under relevant state law to deny a particular provider the right to provide service to its property.[111]   We merely prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators.   While this Order prohibits the enforcement of existing exclusivity clauses, it does not, on its own terms, purport to affect other provisions in contracts containing exclusivity clauses.[112]

38. We reject proposals that we should exempt contracts with exclusivity clauses from this prohibition on a case-by-case basis[113] or that we should allow exclusivity clauses for small cable operators,[114] cable operators in rural areas,[115] MVPDs that are found to lack "market power,"[116] MVPDs other than incumbent cable operators,[117] "planned communities,"[118] and new real estate developments.[119]

---

[109] *See Promotion of Competitive Networks in Local Telecommunications Markets*, First Report & Order & Further Notice of Proposed Rulemaking, 15 FCC Rcd 22983, 23000, ¶ 36 (2000).  We recognize that the Commission has yet to address the issue raised in the *Competitive Networks FNPRM* regarding the enforceability of exclusivity clauses for telecommunications services in residential MDUs.  In light of the competitive parity implications, we will resolve that issue within the next two months.

[110] *See, e.g.,* IMCC Comments at 14.

[111] RAA Comments at iv, 26 ("the Communications Act does not authorize the Commission to regulate the real estate industry.").

[112] The treatment of such provisions will be determined by the terms of particular contracts, which may, for example, contain change of law clauses, as well as state law.  *See* Verizon Oct. 23 Ex Parte at 8, Attachment A at 4 (containing example of contract between MDU and Comcast including clause stating that "[i]f any provision of this Agreement is found to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Agreement will not be affected or impaired."); Verizon Comments, Attachment 6 at 5 (containing example of contact between MDU and Bright House stating that if any portion of the agreement is rendered invalid or unenforceable by a "government, legal, or regulatory authority," then "the remainder of this Agreement will continue in full force unless such continuance will deprive one of the parties of a material benefit hereunder or frustrate the main purpose(s) of this Agreement" -- in that event, parties shall make "their reasonable best efforts to replace or modify the invalid or unenforceable provision" but any party may terminate the Agreement upon 60 days notice if such efforts are unsuccessful).

[113] Lafayette Comments at 10; *see also* ShenTel Comments at 17 (advocating allowing exclusivity for 20 years for new real estate developments in which the beneficiary of exclusivity installs fiber to the home).

[114] 47 C.F.R. § 76.901(f) (definition of "small cable operator"); Hotwire Comments at 5-7; MSTI Comments at 2.

[115] ShenTel Comments *passim.*

[116] ACA Comments *passim*; Comcast Comments at 12; GSPC Comments at 10; IMCC Comments at 5-6, 25; OpenBand Comments at 2, 7-8 (advocating a lack of "effective competition," 47 U.S.C. § 543(l)(1), as the measure of effective competition); Qwest Comments at ii (advocating a prohibition of exclusivity clauses "until such time as [the Commission] determines that competition among [MVPDs] has rendered the prohibition unnecessary"), 3.

[117] GSPC Comments at 1-2; Hotwire Comments at 2; OpenBand Comments at 8; *see also* ShenTel Comments at 18-19.

We are reluctant to deny any large class of MDU residents the benefits of increased competition or to allow any cable operator to engage in future harmful conduct. Finally, we wish to avoid the burden that would be imposed by numerous individual adjudications about whether market power or some other undesirable condition exists in an individual MDU or community,[120] or whether a particular entity in an allegedly unique situation is exempted from the prohibition. In addition, as discussed in Section IV, restrictions adopted pursuant to Section 628(b) apply automatically to certain categories of MVPDs pursuant to Sections 602(7), 628(j), and 653(c)(1)(A).[121]

39. Some commenters have suggested that we allow exclusivity clauses for a period of years[122] or that we put a time limit on our prohibition of them, such as a specific term of years, the end of the current franchise of the incumbent cable operator, until "effective competition" is found to exist in an area, or until some other measure of competition is shown.[123] We decline these suggestions. We are reluctant to grant any communications companies an artificial period of immunity from pro-competitive regulation during which the recovery of their investment is guaranteed; companies in communications markets regularly invest billions of dollars without any such guarantees.[124] Chiefly, we wish to avoid the burden of individualized adjudications and measurements because we believe that they would burden us and the industry, and we believe that the limited benefits that such clauses confer are outweighed by their deleterious long-term effects on the provision of competitive services to consumers.

## IV.    LEGAL AUTHORITY

40. Several sources afford the Commission ample authority to prohibit exclusivity clauses in contracts between cable operators and owners of MDUs. First, consistent with our tentative conclusion in the *Notice*, we conclude that we have authority under Section 628(b) of the Act to adopt rules prohibiting cable operators from enforcing or executing contracts that give them the exclusive right to provide video programming services (alone or in combination with other services) to MDUs.[125] Moreover, we conclude that pursuant to the Act the same prohibition will apply to common carriers or their affiliates that provide video programming directly to subscribers under Section 628(j) of the Act and to operators of open video systems under Section 653(c)(1).[126] Finally, we conclude that, even in the

---

(…continued from previous page)

[118] *See* OpenBand Comments at 5.

[119] *See* Lennar Comments at 11.

[120] *See* RAA Comments at ii ("There are over 500,000 apartment buildings in the United States, with hundreds more being built every year."); ShenTel Reply Comments at 10.

[121] 47 U.S.C. §§ 522(7), 548(j), 573(c)(1)(A).

[122] ShenTel Comments at 17 (10 years for MDUs); Verizon Comments at 2, 13-14 (5 years).

[123] *See, e.g.,* Qwest Comments at 7-8 (at 8, advocating a prospective prohibition of exclusivity clauses "until such time as [the Commission] determines that competition among MVPDs has rendered the prohibition unnecessary. . . . when . . . terrestrial competitors have had a full and fair opportunity to obtain franchises, build out facilities, and obtain the critical mass of subscribers necessary to establish a foothold in the market."); *see also* ¶ 38 *supra.*

[124] *See, e.g.,* Mark Jewell, *Proposed bill would move cable franchises to state level,* PROVIDENCE J. BULL. at D 3 (June 6, 2007), available at 2007 WLNR 10624299 (visited Oct. 26, 2007) ("Verizon's push comes as the company invests billions of dollars for its so-called 'FiOS' project to rewire more than half of its copper telephone network so it can sell cable TV and superfast Internet connections.").

[125] *Notice*, 22 FCC Rcd at 5939, ¶ 9.

[126] 47 U.S.C. §§ 548(j), 573(c)(1). "Cable operator" is defined as "any person or group of persons (A) who provides cable service over a cable system . . . ." 47 U.S.C. § 522(5). "Cable system" is defined to exclude "a facility of a

(continued….)

absence of this explicit statutory authority, we have ancillary authority to prohibit incumbent cable operators from entering into contracts that are for the provision of video services to MDUs and that contain exclusivity clauses.

41. Turning first to cable operators, the plain language of the statute provides a solid legal foundation for the rule adopted today. Section 628(b) broadly states that:

"[i]t shall be unlawful for a cable operator . . . to engage in unfair methods of competition or unfair or deceptive acts or practices, the purpose or effect of which is to hinder significantly or to prevent any multichannel video programming distributor from providing satellite cable programming or satellite broadcast programming to subscribers or consumers."[127]

42. Section 628(c)(1), in turn, directs the Commission, "in order to promote the public interest, convenience, and necessity by increasing competition and diversity in the multichannel video programming market and the continuing development of communications technologies," to promulgate rules specifying the conduct prohibited by Section 628(b).[128]

43. The plain language of Section 628(b) encompasses the conduct at issue here.[129] First, although we have never specifically defined what constitutes an "unfair method of competition" or "unfair . . .act or practice" beyond that conduct specifically proscribed in Section 628(c)(2), we have recognized that there is additional conduct that could be proscribed under Section 628(b).[130] As discussed above, the use of an exclusivity clause by a cable operator to "lock up" a MDU owner is an unfair method of competition or unfair act or practice because it can be used to impede the entry of competitors into the market and foreclose competition based on the quality and price of competing service offerings.[131] Moreover, as we have shown above, such a contract clearly has the effect of preventing a MVPD from providing satellite programming to consumers. Indeed, by its very nature, such an exclusivity clause prevents other MVPDs from providing service to the consumers who live in the MDU.[132] Thus, we have explicit authority under Section 628(b) to prohibit cable operators from entering into exclusivity clauses with MDU owners.[133]

---

(…continued from previous page)

common carrier which is subject, in whole or in part, to the provisions of title II of this Act, *except* that such facility shall be considered a cable system (other than for purposes of Section 621(c)) to the extent such facility is used in the transmission of video programming directly to subscribers . . . ." 47 U.S.C. § 522(7)(C) (emphasis added).

[127] 47 U.S.C. § 548(b).

[128] 47 U.S.C. § 548(c)(1).

[129] *See Limtiaco v. Camacho*, 549 U.S. __, __, 127 S. Ct. 1413, 1418 (2007) ("As always, we begin with the text of the statute.").

[130] *Section 628 Report & Order*, 8 FCC Rcd at 3373-3374, ¶¶ 40-41(recognizing that the objectives of Section 628(b) "provide a mechanism for addressing those types of conduct . . . that inhibit the development of multichannel video distribution competition . . . [and] emerge as barriers to competition").

[131] *See supra* Sections II-III.

[132] We reject Advance/Newhouse Communications's suggestion that this interpretation of Section 628(b) suffers a logical flaw – why would Congress only focus on "satellite" programming if it sought to vest the Commission with the authority to "curb unfair practices in the cable industry generally." Advance/Newhouse Commun. Reply Comments at 18. First, we are not finding that Section 628(b) vests the Commission with some unlimited authority to limit unfair practices in the cable industry. Rather, we are finding that the language of Section 628(b) prohibits unfair methods of competition with the purpose or effect of hindering significantly or preventing MVPDs from

(continued….)

44. Contrary to commenters' suggestions,[134] the Commission's authority under Section 628(b) is not restricted to unfair methods of competition or unfair or deceptive practices that deny MVPDs access to programming. Section 628(b) is not so narrowly drawn. Anticompetitive practices can hinder or prevent MVPDs from providing programming to consumers either by blocking their access to programming or by blocking their access to consumers, and there is nothing in Section 628(b) that suggests that the Commission's authority is limited to the former. Although NCTA argues that the language "from providing satellite cable programming or satellite broadcast programming to subscribers or consumers" indicates that Section 628(b) was "squarely directed at practices that unfairly denied MVPDs access to *programming*,"[135] the better reading is the one based on the clear and complete terms of the provision: any practices that unfairly deny MVPDs the ability to provide such programming to consumers are prohibited. Had Congress wanted Section 628(b) to proscribe only practices denying MVPDs access to programming it could easily have done so by focusing that provision explicitly on conduct that impairs MVPDs' access to programming.[136] Congress knew how to draft narrowly drawn provisions of that kind as evidenced by another subsection, Section 628(c)(2), which proscribes specific conduct hindering MVPDs' access to programming. Thus, we believe that our interpretation of Section 628(b) gives meaning to the broad, plain language of the statutory provision.

45. We recognize, as commenters point out,[137] that much of Section 628's legislative history focuses on MVPDs' access to programming.[138] However, the legislative history indicates that a primary concern underlying Section 628 was fostering competition among cable operators and enhancing

---

(…continued from previous page)

providing satellite cable and broadcast programming to consumers. Moreover, we acknowledge that Section 628 was primarily, but not exclusively, concerned about the vertical integration of cable operators and satellite programming vendors, and thus Section 628 significantly focuses on those relationships. In addition, we note that our decision to prohibit exclusivity clauses for the provision of video services to MDU owners is consistent with the focus on satellite programming because most programming is delivered via satellite.

[133] We note that the New Jersey Division of Rate Counsel raises a number of issues, including the argument that the Commission's regulation of exclusivity clauses for MDUs violates the Tenth Amendment of the U.S. Constitution, that hinge on its view that the Commission lacks any authority to adopt the prohibition on exclusivity clauses described herein. New Jersey Division of Rate Counsel Comments at 6-8, New Jersey Division of Rate Counsel Reply Comments at 2-6. We need not address these tangential issues because, as explained herein, we find that we have specific statutory authority to adopt the prohibition.

[134] *See, e.g.*, Comcast Comments at 27; RAA Comments at 29-30; NCTA Comments at 4.

[135] NCTA Comments at 4.

[136] Notably, the House of Representatives considered and rejected a proposal, in the context of a more comprehensive amendment, that prohibited "any video programming vendor [owned or controlled by] a multichannel video system operator . . . from refusing to deal with any [MVPD] with respect to the *provision of video programming*." *See* 138 Cong. Rec. H6545-01 (July 23, 1992); Verizon Comments at 16. We cannot agree with NCTA that the House's rejection of this proposal suggests nothing of relevance; it provides support for the proposition that Congress could have drafted narrowly tailored language directed solely at MVPD access to programming but did not. *See* NCTA Reply Comments at 4.

[137] *See* RAA Comments at 30; NCTA Comments at 4-5; Comcast Comments at 27.

[138] *See e.g.,* 138 Cong. Rec. H6487, H6533 (July 23, 1992)("[t]he Tauzin Amendment, very simply put, requires the [cable industry] to stop refusing to sell its products to other distributors of television programs").

consumer choice.[139]  For example, the Conference Report on Section 628 reflects a concern that is broader than MVPDs' access to programming:

> "[T]he conferees expect the Commission to address and resolve the problems of unreasonable cable industry practices, *including* restricting the availability of programming and charging discriminatory prices to non-cable technologies.  The conferees intend that the Commission shall encourage arrangements which promote the development of new technologies providing facilities based competition to cable and extending programming to areas not served by cable."[140]

46. Our adoption of a rule prohibiting exclusivity clauses addresses the Congressional concerns underlying Section 628(b).  The rule will prohibit the continuation and proliferation of an anticompetitive cable practice that has erected a barrier to the provision of competitive video services.  It also will promote the development of new technologies that will provide facilities-based competition to existing cable operators, and thus serves the purposes set forth in Section 628(a) (as well as other provisions of law, such as Section 706 of the Telecommunications Act of 1996[141]).  As Verizon points out, fiber optic services and interactive video are new facilities-based technologies that competitors seek to deploy.[142]  Exclusivity clauses prevent competitive MVPDs from providing satellite cable and broadcast programming to consumers by means of such new technologies.  SureWest similarly argues that, because the deployment of broadband networks and the provision of video service are intrinsically linked, exclusivity clauses that prevent it from providing video services compromise its ability to deploy other advanced telecommunications services, by inhibiting its ability to market a package of services that consumers demand and reducing the revenues it needs to support investment in new and innovative services.[143]

47. More broadly, prohibiting exclusivity clauses for the provision of video services will further the purposes of the 1992 Cable Act and the 1934 Act.[144]  As several commenters point out,[145] the 1992 Cable Act sought to promote competition and consumer choice in cable communications.[146]  In addition, the purpose of the Communications Act of 1934, as amended, is "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide and world-wide wire and radio

---

[139] *Id.* (Congressman Tauzin stating that "[w]e can give [Americans] competition in television . . . We can give them choice.  What do Americans want most in a free enterprise system?  Two stores in town . . . . With the Tauzin amendment we will create two stores in the television marketplace."); *id.* at H6503 (Congressman Tauzin stating that "real heart and soul of this bill ought to be to create competition").

[140] H.R. Conf. Rep. 102-862 at 92 (1992) (Conf. Rep.), *as reprinted in*  1992 U.S.C.C.A.N. 1231, 1275 (emphasis added).

[141] *See* 47 U.S.C. § 157 nt ("The Commission . . . shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.").

[142] Verizon Comments at 2.

[143] SureWest Comments at 22.

[144] *See* 47 U.S.C. §§ 151, 157 nt.

[145] AT&T Comments at 19; SureWest Communications Comments at 13; Verizon Comments at 16.

[146] 47 U.S.C.§ 521(6).  *See also* Verizon Comments at 16 ("overall purpose of the 1992 Act . . . [was] to 'encourage the further development of robust competition in the video programming marketplace.'"); *see also supra* note 130.

communication service with adequate facilities at reasonable charges."[147]  Moreover, Section 706 of the Telecommunications Act of 1996 directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans. . . ."[148]  Removing barriers to allow access to a broad segment of consumers in the multichannel video programming distribution market by prohibiting exclusivity clauses for the provision of video services will further these statutory purposes.  As Verizon notes, once a MDU owner is "locked" into an exclusivity clause, "residents are prevented from choosing alternative services that they might prefer – on the basis of price, quality, and innovative and technologically advanced service offerings."[149]  Thus, contrary to some commenters' arguments,[150] our interpretation of Section 628(b) to prohibit exclusivity clauses for the provision of video services is not only consistent with the plain language of that statutory provision and confirmed by that provision's legislative history, but also furthers the broader purposes of the Act.[151]

48. We disagree with those commenters who argue that the regulatory requirements outlined in Section 628(c) circumscribe the Commission's authority to prohibit exclusivity clauses for the provision of video services.[152]  For example, Real Access Alliance ("RAA") states that the specific provisions of Sections 628(c)(2)(A),(B),(C), and (D) establish the full scope of the Commission's authority under Section 628.[153]  However, nothing in these provisions indicate that they were intended to establish the outer limits of the Commission's authority under Section 628(b).  In fact, the very title of Section 628(c)(2), "Minimum Contents of Regulations," strongly suggests that the rules the Commission was required to implement had to cover the conduct described in Sections 628(c)(2) at the *least*, but that the Commission's authority under Section 628(b) was broader.[154]  This interpretation is confirmed by Section 628(c)(1), which grants the Commission wide latitude to "specify particular conduct that is prohibited by [Section 628(b)]."[155]  Other commenters' suggestions along the same lines are unconvincing for the same reasons.[156]

---

[147] 47 U.S.C. § 151.

[148] 47 U.S.C. § 157 nt.

[149] Verizon Comments at 4.

[150] *See, e.g.,* RAA Comments at 29-31; NCTA Comments at 4-5; Comcast Comments at 27; CAI Comments at 13-14.

[151] We also find that Congress's failure *in 1984* to include a provision that would have mandated access to MDUs for cable service has no bearing on our interpretation of the subsequent legislation that became the 1992 Cable Act, particularly since there is no evidence that Congress's failure to act in 1984 is at all related to the action it did take in adopting Section 628(b) in 1992.  *See* Comcast Comments at 25.

[152] *See e.g.,* RAA Comments at 30-31; Comcast Comments at 27-28; Time Warner Comments at 8; CAI Comments at 13-14**.**

[153] RAA Comments at 30-31; *see also* CAI Comments at 13-14.

[154] The term "minimum" indicates that more could be covered since it is defined as "the least quantity assignable, admissible, or possible."  Webster's *New Collegiate Dictionary* (1977).

[155] 47 U.S.C. § 548(c)(1).

[156] Time Warner Cable states that the Commission has recognized that Section 628(b) cannot be read in isolation, but "must be interpreted in connection with Sections 628(c)(2)(D) and 628(h) which specifically address the legality of exclusive *programming* contracts."  Time Warner Comments at 8, *citing American Cable Co. & Jay Copeland v. Telecable of Columbus, Inc.,* Memorandum Opinion & Order, 11 FCC Rcd 10090, 10114-15, ¶ 55 (CSB 1996) (*CSB Order*).  First, we note that the decision cited by Time Warner is a Cable Services Bureau decision upon which the Commission did not pass.  Moreover, the quoted language, although accurate, was made in the context of a

(continued….)

49. As pointed out by several commenters, the Commission's implementation of this provision to date has focused on ensuring MVPD access to the programming they need to provide a viable and competitive multichannel alternative to consumers, *i.e.*, on the regulations adopted pursuant to Section 628(c)(2).[157] In the decision initially implementing Section 628, the Commission described the provision as "intended to increase competition and diversity in the multichannel video programming market, as well as to foster the development of competition to traditional cable systems, by prescribing regulations that govern the access by competing multichannel systems to cable programming services."[158] Nevertheless, the Commission stated:

> "Neither the record of this proceeding nor the legislative history offer much insight into the types of practices that might constitute a violation of the statute with respect to the unspecified "unfair practices" prohibited by Section 628(b) beyond those more specifically referenced in Section 628(c). The objectives of the provision, however, are clearly to provide a mechanism for addressing those types of conduct, primarily associated with horizontal and vertical concentration within the cable and satellite cable programming field, that inhibit the development of multichannel video distribution competition. . . . [A]lthough the types of conduct more specifically referenced in the statute . . . appear to be the primary areas of congressional concern, Section 628(b) is a clear repository of Commission jurisdiction to adopt additional rules or to take additional actions to accomplish the statutory objectives should additional types of conduct emerge as barriers to competition and obstacles to the broader distribution of satellite cable and broadcast video programming."[159]

Viewing the implementation history as a whole, the Commission's early focus on program access is not surprising. It was shaped both by the specific provisions of Section 628(c)(2) – since these regulations were statutorily required and thus appeared to be of the most pressing concern to Congress[160] – and the policy goal in the 1992 Cable Act of "'rely[ing] on the marketplace, to the maximum extent feasible' in

---

(…continued from previous page)

programming access dispute. Thus, it was reasonable for the Cable Services Bureau to look to these more specific programming access provisions to determine if they were relevant to the dispute at hand. *CSB Order*, 11 FCC Rcd at 10110, ¶ 43. In addition, Time Warner cites to the Commission's decision not to extend the exclusivity clause prohibition found in Section 628(c)(2)(D) to non-vertically integrated satellite-delivered programming as further evidence of the Commission's view that Section 628(b) is limited in scope to program access issues. Time Warner Comments at 8, *citing Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, Report & Order, 17 FCC Rcd 12124, 12157-12158, ¶¶ 71-74 (2002). The Commission's decision there was specifically focused on Section 628(c)(2)(D)'s express limitations as to exclusivity clauses and program access.

Comcast suggests that Section 628(d), which allows MVPDs to seek redress of a violation of Section 628(b) through an adjudicatory proceeding before the Commission, limits the Commission ability to adopt rules to enforce Section 628(b). Comcast Comments at 27-28. This argument is without merit because Section 628(c)(1) expressly grants the Commission rulemaking authority to "prescribe regulations to specify particular conduct that is prohibited by [628(b)]." 47 U.S.C. § 548(c)(1).

[157] *See e.g.*, RAA Comments at 31-34; Time Warner Comments at 8.

[158] *Section 628 Report & Order*, 8 FCC Rcd at 3360, ¶ 1. Subsequent Commission decisions have also focused on the narrow issue of MVPD access to programming. *See e.g., Application for Consent to the Transfer of Control of Licenses & Section 214 Authorizations by Time Warner Inc. & America Online, Inc., Transferors, to AOL Time Warner, Transferee*, Memorandum Opinion & Order, 16 FCC Rcd 6547, 6650, ¶ 253 (2001).

[159] *Section 628 Report & Order*, 8 FCC Rcd at 3373-3374, ¶¶ 40-41.

[160] *See supra* ¶ 45.

promoting the availability of programming to the public."[161]  But the Commission's prior attention to these requirements in no way precludes its exercise of clear statutory authority to regulate unfair practices, beyond program access, which have the purpose or effect of hindering significantly or preventing the provision of certain programming to subscribers or consumers.  The Commission has imposed no such artificial limitation on the scope of its authority, and Section 628(b) does not require it.[162]

50.  The Commission has authority to delineate by rule conduct prohibited under Section 628(b) in order to promote the public interest through increased competition and diversity in the MVPD market and continued development of communications technologies.[163]  We have explained how a rule prohibiting exclusivity clauses for the provision of video services promotes the public interest here because it will likely increase competition in the MVPD market and promote continued development of communications technologies.  Thus, we find that we may by rule prohibit cable operators from executing exclusivity clauses for the provision of video services to MDUs.

51.  This prohibition necessarily also applies to common carriers and open video systems.  Although Section 628(b) extends only to cable operators, Section 628(j) explicitly states that "[a]ny provision that applies to a cable operator under this section shall apply to a common carrier or its affiliate that provides video programming by any means directly to subscribers."[164]  In addition, Section 653(c)(1)(A) provides that "[a]ny provision that applies to a cable operator under (A) section[] . . . 628 . . . of this title shall apply . . . to any operator of an open video system."[165]  Thus, pursuant to Sections 628(j) and 653(c)(1)(A), our prohibition on exclusivity clauses for the provision of video services applies to both any common carrier or its affiliate and also to OVS operators to the extent that these entities provide video programming to subscribers or consumers.

52.  Although we believe that we have specific statutory authority to adopt this prohibition, as described above, we note that our ancillary authority, under titles I and III of the 1934 Act, also provides a sufficient basis to prohibit cable operators from enforcing or executing exclusivity clauses for the provision of video service to MDUs.[166]  Courts have long recognized that, even in the absence of explicit statutory authority, the Commission has authority to promulgate regulations to effectuate the goals and provisions of the Act if the regulations are "reasonably ancillary to the effective performance of the

---

[161] *Implementation of Sections 12 and 19 of the Cable Television Consumer Protection and Competition Act of 1992; Development of Competition and Diversity in Video Programming Distribution and Carriage*, Notice of Proposed Rulemaking, 8 FCC Rcd 194, 197, ¶ 12 (1992), *citing* 1992 Cable Act, Section 2(b)(2).

[162] Even if Commission precedent could be read to suggest that Section 628(b) was limited to programming access, we would find such an interpretation incorrect.  For the reasons discussed above, ¶¶ 43-47, the interpretation that Section 628(b) covers the conduct we prohibit herein is more consistent with the language and purpose of Section 628(b).  *Cf. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Moreover, we agree with AT&T that the Commission's decision not to extend Section 628 to MVPDs' ability to offer terrestrially delivered cable programming does not address the issue raised here:  whether exclusivity clauses for the provision of video services to MDU owners are unfair methods of competition in the provision of satellite cable and broadcast programming to consumers.  *See* AT&T Reply Comments at 20.

[163] 47 U.S.C. § 628(a-c).

[164] 47 U.S.C. § 548(j).

[165] 47 U.S.C. § 573(c)(1)(A).

[166] 47 U.S.C. §§ 151, 152(a), 154(i), 335.

Commission's various responsibilities" under the Act.[167]  The Supreme Court has established a two-part ancillary jurisdiction test:  (1) the regulation must cover interstate or foreign communication by wire or radio; and (2) the regulation must be reasonably ancillary to the Commission's statutory responsibilities.[168]  The prohibition we adopt here applies to "interstate and foreign communication by wire or radio," advances the purposes of both the 1992 Cable Act and Section 706 of the 1996 Telecommunications Act, and serves the public interest.

53. Title I confers on the Commission regulatory jurisdiction over all interstate radio and wire communication.[169]  The multichannel video services provided by cable operators are interstate in nature[170] and are covered by the Act's definitions of "radio communications" and "wire communication."[171]  In addition, these services fall within the definition of "cable service."[172]  Thus, cable services are within the scope of our subject matter jurisdiction granted in Title I.

54. In addition, we find that applying the prohibition against exclusivity clauses for the provision of video services to cable operators is reasonably ancillary to our statutory responsibilities under the Act.  As we have explained, prohibiting exclusivity clauses for the provision of video services to MDUs will prohibit an anticompetitive cable practice that has erected a barrier to the provision of competitive video services.  It also will promote the development of new technologies that will provide facilities-based competition to existing cable operators, and thus serves the purposes set forth in Section 628(a).[173]  In addition, for the same reasons explained above,[174] applying this prohibition to cable operators will ensure the furtherance of the broad goals of the 1992 Cable Act and the 1934 Act generally.

55. Because several commenters raise concerns about the treatment of exclusivity clauses in existing MDU contracts,[175] we take particular care to observe that the law affords us wide authority to

---

[167] *United States v. Southwestern Cable Co.*, 392 U.S. 157, 178 (1968) (upholding Commission regulation of cable television systems as a valid exercise of ancillary jurisdiction); *see also Rural Tel. Coalition v. FCC*, 838 F.2d 1307, 1315 (D.C. Cir. 1988) (upholding Commission authority to establish a "Universal Service Fund" in the absence of specific statutory authority as ancillary to FCC responsibilities under Sections 1 and 4(i) of the Act); *GTE Serv. Corp. v. FCC*, 474 F.2d 724, 731 (2d Cir. 1973) ("even absent explicit reference in the statute, the expansive power of the Commission in the electronic communications field includes the jurisdictional authority to regulate carrier activities in an area as intimately related to the communications industry as that of computer services, where such activities may substantially affect the efficient provision of reasonably priced communications service").

[168] *See American Library Ass'n v. FCC*, 406 F.3d 689, 700 (D.C. Cir. 2005), *citing Southwestern Cable,* 392 U.S. at 177-78.

[169] 47 U.S.C. §§ 151, 152(a).

[170]  *Southwestern Cable*, 392 U.S. at 168-69.

[171] 47 U.S.C. §§ 153(33), (52).

[172] 47 U.S.C. § 522(6).  Section 2 of the Act, as amended, states that "the provisions of this Act shall apply with respect to cable service . . . ."  47 U.S.C. § 152(a).  For example, by definition, cable operators provide cable service. 47 U.S.C. § 522(5).

[173] 47 U.S.C. § 548(a).

[174] *See supra* ¶ 42-43.

[175] *See* Comcast Comments at 35 (asserting that the Commission's "legal authority to abrogate existing contracts is simply non-existent"); ACA Comments at 4-5 (same); NCTA Comments at 11-14 (same); Time Warner Comments at 11-13 (same).

prohibit the enforcement of such clauses where, as here, the public interest so requires.[176]  Indeed, as the Commission has previously stated, "Congress intended that rules promulgated pursuant to implement Section 628 should be applied prospectively to existing contracts, except as specifically provided for in Section 628(h)."[177]  In addition, the Fifth Amendment's Takings Clause[178] presents no obstacle to prohibiting the enforcement of existing exclusivity clauses.  To begin with, such a step obviously does not involve the permanent condemnation of physical property and thus does not constitute a *per se* taking.[179]

57.  Nor does the proposed rule represent a regulatory taking.  The Supreme Court has outlined the framework for evaluating regulatory takings claims as follows:  "In all of these cases, we have eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case.  To aid in this determination, however, we have identified three factors which have particular significance: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."[180]  None of these factors counsels in favor of finding a regulatory taking here.

57.  First, prohibiting the enforcement of exclusivity clauses will have minimal adverse economic impact on affected MVPDs.  Nothing in the rule precludes MVPDs from utilizing the wires they own to provide services to MDUs or requires them to jettison capitalized investments.  Neither does it prohibit the enforcement of other types of agreements between MDUs or MVPDs, such as exclusive marketing agreements.  The rule merely prohibits clauses that serve as a bar to other MVPDs that seek to provide services to a MDU.  The record in this proceeding demonstrates that in some cases, exclusivity clauses in existing MDU contracts impose adverse *and* absolute impacts upon would-be competitors who are otherwise ready and able to provide customers the benefits of increased competition.[181]

---

[176] *See, e.g., BellSouth Telecom, Inc. v. MCImetro Access Transmission Servs., LLC,* 425 F.3d 964, 969-70 (11th Cir. 2005); *Western Union Tel. Co. v. FCC*, 815 F.2d 1501 (D.C. Cir. 1987).

[177] *1994 Memorandum Opinion & Order*, 10 FCC Rcd at 1939; *see also Section 628 First Report & Order*, 8 FCC Rcd at 3365.

[178] U.S. CONST., amend V ("nor shall private property be taken for public use, without just compensation.").

[179] *Cf. Loretto v. Teleprompter Manhattan City Corp.*, 458 U.S. 419, 427 (1982) ("When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking."); *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner.").

[180] *Connolly v. Pension Ben. Guaranty Corp.*, 475 U.S. 211, 224-25 (1986) (citations and internal quotation marks omitted).

[181] *See supra* ¶¶ 1 note 2, 8-9, 17; AT&T Comments at 11 ("The breadth of these clauses – particularly that they apply to alternative providers that already have deployed facilities to the MDU – demonstrates that these exclusive arrangements are plainly intended to block competition and are not designed to address aesthetics or congestion in an MDU's common areas."); AT&T Reply Comments at 8 (in discussing entry by wireline competitors that are Carriers of Last Resort, stating that "carriers such as AT&T are obligated to build facilities in certain areas to new and greenfield developments to comply with their obligations to provide voice services when no other carrier is willing to do so.  Exclusive access arrangements for video services are particularly inappropriate under these circumstances because they deprive MDU tenants with competitive choices and favorable rates offered by COLR carriers.").

58. Second, the rule does not improperly interfere with investment-backed expectations. As previously stated in footnote 7 and paragraph 36, exclusivity clauses in MDU contracts have been under active scrutiny for over a decade, and the Commission has prohibited the enforcement of such clauses in similar contexts. States have also taken action to prohibit such clauses. Moreover, to the extent that MVPDs have used exclusivity clauses to "lock up" MDUs in anticipation of competitive entry or to obstruct competition, as described in Section II above, any underlying investment-backed expectations are not sufficiently longstanding or pro-competitive in nature to warrant immunity from regulation.[182]

59. Finally, with respect to the character of governmental action, the rule's prohibition of the enforcement of exclusivity clauses in existing MDU contracts substantially advances the legitimate governmental interest in protecting consumers of programming from "unfair methods of competition or unfair acts or practices" – an interest Congress explicitly has recognized and protected by statute, *see* 47 U.S.C. § 628(b), and commanded the Commission to vindicate by adopting appropriate regulations, *see id*. § 628(c)(1). The rule we adopt today is based upon the Commission's detailed analysis of the harms and benefits of exclusive MDU contracts, discussed above in Section III, and is carefully calibrated to promote this interest.[183]In short, the rule at issue here does not invoke Justice Holmes' observation that "if regulation goes too far it will be recognized as a taking."[184]

60. Because the prohibition that we adopt today applies only to cable operators, common carriers or their affiliates that provide video programming directly to subscribers, and operators of open video systems, and does not require MDU owners to provide access to all MVPDs, we do not address comments raising concerns about the Commission's authority to mandate such access.[185]  However, we reject arguments suggesting that the Commission has no authority to regulate such entities' contractual conduct because of the tangential effect of such regulation on MDU owners. As explained above, Sections 628(b), 628(j), and our ancillary jurisdiction provide ample bases for regulating these specific

---

[182]  *Cf. Connolly*, 475 U.S. at 226-27 (declining to find interference with investment-backed expectations where subjects of regulation long had been "objects of legislative concern"; where "it was clear" that agency discretion to regulate, if exercised, would result in liability; and where affected entities had "more than sufficient notice" of possibility of regulation); *FHA v. The Darlington, Inc*., 358 U.S. 84, 91 (1958) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."). Furthermore, we do not believe that any MVPD has a legitimate investment-backed expectation in profits obtained through anticompetitive behavior such as that found to exist in this Order. *Cf. Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973) (antitrust law proscribing monopolies "assumes that an enterprise will protect itself against loss by operating with superior service, lower costs, and improved efficiency," and a monopolist may not "substitute for competition anticompetitive uses of its dominant power"); *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp*., 902 F.2d 174, 178 (2d Cir. 1990) ("A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits."). To the extent that Comcast and Time-Warner argue otherwise, we reject their arguments. *See* Comcast Comments at 33-35; Time-Warner Comments at 11-13.

[183]  *Cf. Connolly*, 475 U.S. at 225 (upholding governmental "interference with . . . property rights . . . [because it] arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under our cases, does not constitute a taking requiring Government compensation").

[184]  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). In addition, the Contract Clause of the U.S. Constitution does not limit our authority in this regard, because as Verizon points out, "by its terms [it] applies only to state, not federal, enactments." Verizon Comments at 18, *citing Washington Star Co. v. International Typographical Union Negotiated Pension Plan*, 729 F.2d 1502, 1507 (D.C. Cir. 1984).

[185]  *See e.g.,* RAA Comments at 26-28; CAI Comments at 11-12.

MVPDs.  Moreover, Sections 4(i), 201(b), and 303(r) supply the Commission with strong authority to enforce the full scope of the Cable Act prohibition at issue.[186]

## V.    FURTHER NOTICE OF PROPOSED RULEMAKING

61.    The *Report and Order* is limited to those MVPDs covered by Section 628.  In this regard, we note that the record in this proceeding predominantly addressed exclusivity clauses involving cable operators.[187]  Therefore, in order to assess whether we should take action to address exclusivity clauses entered into by DBS providers, PCOs, and other MVPDs who are not subject to Section 628, we ask for comment on several matters.[188]  Do DBS service providers, PCOs, and other MVPD providers not subject to Section 628 use any or all forms of exclusivity clauses (building, wire, and/or marketing)?  If they do, what kinds of exclusivity do those clauses provide?  Is it likely that an MVPD provider subject to Section 628, in reaction to the foregoing *Report and Order* and seeking to avoid its effects, would partner with a DBS provider or PCO?  What are the effects of the use of exclusivity clauses by MVPD providers not subject to Section 628 on consumer choice, competition for multi-channel video and other services, and on the deployment of broadband and other advanced communications facilities?  Are those effects and the balance of benefits and harms the same as we have found with respect to the use of exclusivity clauses by providers that are subject to Section 628?

62. If the net effect of the use of exclusivity clauses by MVPD providers not subject to Section 628 is harmful to consumers, what remedy should we impose – the same kind of prohibition we adopt in the *Report and Order*, or something different?  We also ask for comment about two legal matters.  First, do our OTARD rules[189] affect the remedy we should impose on DBS providers?  Second, we ask for comment about our legal authority.  Does the Commission have the authority to regulate the use of exclusivity clauses by MVPD providers not subject to Section 628.  Does the Commission have

---

[186] *See National Cable & Telecommun. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("Congress has delegated to the Commission the authority to 'execute and enforce' the Communications Act, § 151, and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act, § 201(b)."); *City of New York v. FCC*, 486 U.S. 57, 70 n.5 (The Commission has "broad rulemaking power 'as may be necessary to carry out the provisions of this chapter,' 47 U.S.C. § 303(r), which includes the body of the Cable Act as one of its subchapters."); *see also* 47 U.S.C. § 154(i) ("The Commission may . . . make such rules and regulations, and issue such orders, not inconsistent with this chapter, which may be necessary in the execution of its functions.").  It bears noting that the Commission previously has exercised its authority under Sections 4(i) and 303(r) to regulate cable wiring inside MDUs.  *See 1997 Inside Wiring Order,* 13 FCC Rcd at 3700, ¶ 83, 3703, ¶ 87 (1997) (adopting rules for the disposition of cable "home run" wiring inside MDUs pursuant to Sections 4(i) and 303(r)).

[187] *See supra* ¶¶ 9-10, 14-15.

[188] *See generally supra* note 12; Bandwidth Consulting Comments at 2 (without exclusivity, a PCO's "ability to offer a customized product would not exist" and "only the large monopolies . . . will be able to survive"); Charter Comments at 1, 4 ("if the Commission were to impose any limitations on . . . exclusive contracts it must do so for all bidders"); Comcast Comments at 10-11 (similar to Charter); Consolidated Smart Systems Comments at 1-2 (similar to Bandwidth Consulting); IMCC Comments at 5, 7-11 (similar to Bandwidth Consulting); Lafayette Comments at 10 (similar to Charter); MSTI Comments at 1 (similar to Bandwidth Consulting); NCTA Comments at 8-9 (similar to Charter); SureWest Comments at 8 (similar to Charter); Time Warner Comments at 5-8 (similar to Charter); Ygnition Networks Comments at 1-2 (similar to Bandwidth Consulting); Letter from Terry L. Clifford, Sr., Astro Telecommun. Inc., to the Commission (June 30, 2007) (PCOs "do not have the unlimited resources to funding like the major cable competitors have").

[189] *See supra* note 27.

authority over DBS providers under Section 335 of the Act?[190]   Does the Commission have authority over DBS and other providers under Title III generally, Title VI, its ancillary authority, or some other source?  We ask for comment on all the foregoing factual, analytical, and legal issues.

63. We also seek comment on whether the Commission should prohibit exclusive marketing and bulk billing arrangements.  For example, we are aware that certain clauses in contracts allow one MVPD into a MDU or real estate development but constrain the ability of competitive MVPDs to market their services directly to MDU residents.  These arrangements provide for what is called "marketing exclusivity,"[191] and may be anticompetitive.  Some argue that in order for MDU residents to exercise freely their choice, they must know about their MVPD options.

64. In particular, we seek comment on a number of questions.  How pervasive are these exclusive marketing arrangements?  What is the typical scope of such arrangements?  In other words, we seek comment on how the Commission should define them for regulatory purposes.  Have they been used to impede competition in the video marketplace?  Can other MVPDs effectively communicate with MDU residents in those MDUs that have signed exclusive marketing agreements?  Do the costs of marketing, promotions and sales substantially increase when a competitive video provider confronts exclusive marketing arrangements?  Do these arrangements constitute an unfair method of competition or an unfair act or practice in violation of Section 628(b) of the Act?  If so, how should the Commission act to address this problem?  Should we prohibit the enforcement of all existing exclusive marketing arrangements as well as the execution of new ones?  That is, should we treat them in the same manner as we treat exclusive access arrangements in the item we adopt today?  Is our legal authority to address such agreements the same as our legal authority for addressing exclusive access arrangements?

65. We also seek comment on these same questions with respect to "bulk billing" arrangements.  Some have argued that bulk contracts are anti-competitive.[192]  As we understand them, bulk billing arrangements may be exclusive contracts because MDU owners agree to these arrangements with only one MVPD, barring others from a similar arrangement.  Such arrangements may not prohibit MDU residents from selecting a competitive video provider.  However, because of the "bulk billing" nature of the contract, residents would have to continue paying a fee to the provider with the bulk billing contract as well as pay a subscription fee to the new service provider.  We seek comment on whether these "bulk billing" arrangements are typically formalized as agreements between cable operators and MDUs or between MDUs and residents (or both)?  Do these arrangements have the same practical effect as exclusive access arrangements in that most customers would be dissuaded from switching video providers?

66. The Commission will conclude this rulemaking and release an order within six months of publication of this *Order*.

## VI.    PROCEDURAL MATTERS

### A.    Filing Requirements

67. *Ex Parte Rules*.  The *Further Notice of Proposed Rulemaking* in this proceeding will be treated as a "permit-but-disclose" subject to the "permit-but-disclose" requirements under Section

---

[190] 47 U.S.C. § 335.

[191] Comcast Comments at 19-20; CAI Comments at 3; Embarq Comments at 1 n.1; Qwest Comments at iii; RAA Comments at 8-9; Verizon Comments at 7 n.4.

[192] Lafayette Comments at 5; SureWest Reply Comments at 5.

1.1206(b) of the Commission's rules.[193]  *Ex parte* presentations are permissible if disclosed in accordance with Commission rules, except during the Sunshine Agenda period when presentations, *ex parte* or otherwise, are generally prohibited.  Persons making oral *ex parte* presentations are reminded that a memorandum summarizing a presentation must contain a summary of the substance of the presentation and not merely a listing of the subjects discussed.  More than a one- or two-sentence description of the views and arguments presented is generally required.[194]  Additional rules pertaining to oral and written presentations are set forth in Section 1.1206(b).

        68.  *Comments and Reply Comments*.  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using:  (1) the Commission's Electronic Comment Filing System (ECFS), (2) the Federal Government's eRulemaking Portal, or (3) by filing paper copies.[195]

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://www.fcc.gov/cgb/ecfs/ or the Federal eRulemaking Portal: http://www.regulations.gov.  Filers should follow the instructions provided on the website for submitting comments.

    - For ECFS filers, if multiple docket or rulemaking numbers appear in the caption of this proceeding, filers must transmit one electronic copy of the comments for each docket or rulemaking number referenced in the caption.  In completing the transmittal screen, filers should include their full name, U.S. Postal Service mailing address, and the applicable docket or rulemaking number.  Parties may also submit an electronic comment by Internet e-mail. To get filing instructions, filers should send an e-mail to ecfs@fcc.gov, and include the following words in the body of the message, "get form."  A sample form and directions will be sent in response.

- Paper Filers:  Parties who choose to file by paper must file an original and four copies of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

    Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail (although we continue to experience delays in receiving U.S. Postal Service mail).  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

    - The Commission's contractor will receive hand-delivered or messenger-delivered paper filings for the Commission's Secretary at 236 Massachusetts Avenue, NE, Suite 110, Washington, DC  20002.  The filing hours at this location are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes must be disposed of before entering the building.

---

[193] *See* 47 C.F.R. § 1.1206(b), as revised.

[194] *See id.* § 1.1206(b)(2).

[195] *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- ▪ Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD  20743.

- ▪ U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC  20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

69.      *Availability of Documents*.  Comments, reply comments, and *ex parte* submissions will be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 445 12th Street, S.W., CY-A257, Washington, D.C., 20554.  Persons with disabilities who need assistance in the FCC Reference Center may contact Bill Cline at (202) 418-0267 (voice), (202) 418-7365 (TTY), or bill.cline@fcc.gov.  These documents also will be available from the Commission's Electronic Comment Filing System.  Documents are available electronically in ASCII, Word 97, and Adobe Acrobat.  Copies of filings in this proceeding may be obtained from Best Copy and Printing, Inc., Portals II, 445 12th Street, S.W., Room CY-B402, Washington, D.C., 20554; they can also be reached by telephone, at (202) 488-5300 or (800) 378-3160; by e-mail at fcc@bcpiweb.com; or via their website at http://www.bcpiweb.com.  To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY).

## B.      Regulatory Flexibility Analysis

70. Pursuant to the Regulatory Flexibility Act of 1980, as amended,[196] the Commission has prepared a Final Regulatory Flexibility Analysis ("FRFA") of the possible significant economic impact on small entities of the policies and rules addressed in this document.  The FRFA is set forth in Appendix B.

## C.      Paperwork Reduction Act Analysis

71. This document does not contain new or modified information collection requirements subject to the paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  In addition, therefore, it does not contain any new or modified "information collection burdens for small business concerns with fewer than 25 employees," pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4).

## D.      Congressional Review Act

72. The Commission will send a copy of the *Report and Order*, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[197]  In addition, the Commission will send a copy of the *Report and Order*, including the FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the *Report and Order* and the FRFA (or summaries thereof) will also be published in the Federal Register.[198]

---

[196] 5 U.S.C. §§ 601 *et seq.*

[197] *See* 5 U.S.C. § 801(a)(1)(A).

[198] *See* 5 U.S.C. § 604(b).

### E.    Additional Information

73. For additional information on this proceeding, please contact John W. Berresford, (202) 418-1886, or Holly Saurer, (202) 418-7283, both of the Policy Division, Media Bureau.

## VII.    ORDERING CLAUSES

74. Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i) 157 nt., 303(r),335, 601(6), 628(b, c), and 653(c)(1) of the Communications Act of 1934, as amended; 47 U.S.C. §§ 151, 152(a), 154(i), 157 nt., 303(r), 335, 521(6), 548(b, c), and 573(c)(1), this *Report and Order* **IS ADOPTED**.

75. **IT IS FURTHER ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i) 157 nt., 303(r), 335, 601(6), 628(b, c), and 653(c)(1) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 157 nt., 303(r), 335, 521(6), 548(b, c), and 573(c)(1), 47 C.F.R. Part 76.2000 of the Commission's Rules **IS AMENDED**, as set forth in Appendix D. It is our intention in adopting these rule changes that, if any provision of the rules is held invalid by any court of competent jurisdiction, the remaining provisions shall remain in effect to the fullest extent permitted by law.

76. **IT IS FURTHER ORDERED** that the following documents shall be made part of the record in this proceeding: (a) Letter from Leora Hochstein, Executive Director, Federal Regulatory, Verizon, to Marlene H. Dortch, Commission Secretary, MB Docket No. 05-311 (Aug. 9, 2006); (b) Letter from Ms. Hochstein to Ms. Dortch, MB Docket No. 05-311 (July 6, 2006); (c) Comments of SureWest Communications in MM Docket No. 06-189; (d) Comments of Manatee County, Florida, in MB Docket No. 05-311; and (e) the Comments of Cablevision and Comcast in MB Docket No. 07-29.

77. **IT IS FURTHER ORDERED** that the rule contained herein **SHALL BECOME EFFECTIVE** 30 days after publication of this **REPORT AND ORDER** in the Federal Register.

78. **IT IS FURTHER ORDERED** that, pursuant to Sections 1, 4(i), 303(r), 335, 623 and 628(b, c) of the Communications Act of 1934, as amended, and Section 706 of the Telecommunications Act of 1996, 47 U.S.C. §§ 151, 154(i), 303(r), 335, 543, and 548(b, c), this Further Notice of Proposed Rulemaking IS **HEREBY ADOPTED**.

79. **IT IS FURTHER ORDERED** that the Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Further Notice of Proposed Rulemaking, including the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

**APPENDIX A**

<u>List of Commenters</u>

American Cable Association

Association for Telecommunications Professionals in Higher Education

AT&T, Inc.

Bandwidth Consulting

Charter Communications, Inc.

Comcast Corporation

Community Associations Institute

Community Home Entertainment

Consolidated Smart Systems

Corning Incorporated

Embarq

Greenfield Service Provider Coalition

Independent Multifamily Communications Council

Lafayette Utilities System

Lennar Corporation

Litestream Holdings, LLC

Microwave Satellite Technologies Inc.

National Association of Telecommunications Officers and Advisors

National Cable & Telecommunications Association

New Jersey Division of Rate Counsel

OpenBand Multimedia, L.L.C.

Pavlov Media, Inc.

Real Access Alliance

Qwest Communications International, Inc.

Shenandoah Telecommunications Company ("Shentel")

SureWest Communications

Time Warner Cable

United States Telecom Association

Verizon Communications, Inc.

Warner Properties, LLC, and Warner Properties Communications, LLC

Stephen Weinstein

Video Associates

WorldNet Telecommunications, Inc.

Ygnition Networks


<u>List of Reply Commenters</u>

Access Media 3

Advance/Newhouse Communications

American Cable Association

AT&T Inc.

Charter Communications, Inc.

Comcast Corporation

Conexus Networks LLC

Convergent Broadband Communications, Inc.

Digital Streets

DirecPath

Mr. Pat Hagan

Hotwire Communications, LLC

Independent Multifamily Communications Council

Litestream Holdings, LLC

Microwave Satellite Technologies Inc.

Multiband Corporation

National Association of Telecommunications Officers and Advisors

National Cable & Telecommunications Association

New Jersey Division of Rate Counsel

Paradigm Marketing Group

Pavlov Media, Inc.

Privatel Incorporated

Real Access Alliance

SDL Ventures, LLC

Shenandoah Telecommunications Company

SureWest Communications

United States Telecom Association

Verizon Communications, Inc.

Stephen Weinstein

WorldNet Telecommunications, Inc.

# APPENDIX B

## Final Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended ("RFA"),[1] an Initial Regulatory Flexibility Analysis ("IRFA") was incorporated in the *Notice of Proposed Rulemaking* (the "*Notice*") to this proceeding.[2]  The Commission sought written public comment on the proposals in the NPRM, including comment on the IRFA.  The Commission received one comment on the IRFA, from the Real Access Alliance.  This Final Regulatory Flexibility Analysis ("FRFA") conforms to the RFA.[3]

### A. Need for, and Objectives of, the Report and Order

2.    This Report and Order adopts rules and provides guidance to implement Sections 1, 2(a), 4(i) 157 nt., 303(r), 335, 601(6), 628, and 653(c)(1) of the Communications Act of 1934, as amended (the "Act").[4]  Those Sections of the Act authorize the Commission to prohibit cable operators and other providers subject to Section 628[5] of the Act from enforcing or executing clauses in contracts for video service in MDUs that grant to a single service provider the exclusive right to have access to the premises of a MDU for the purpose of providing such service (alone or in combination with other services).  The Commission has found that existing and future exclusivity clauses constitute an unreasonable barrier to entry for competitive entrants that would impede enhanced cable competition and accelerated broadband deployment, and that they constitute an unfair method of competition that has the purpose or effect of hindering significantly or preventing video service providers from providing satellite-delivered programming to subscribers and consumers as set forth in Section 628 of the Act.

### B.  Summary of Significant Issues Raised by Public Comments in Response to the IRFA

3.    Only one commenter, the Real Access Alliance ("RAA"), submitted a comment that specifically responded to the IRFA.  RAA asserts that the IRFA was defective because it did not address the effects of possible outcomes on apartment building owners.[6]

4.    We disagree with RAA's assertion.  In fact, the IRFA discussed apartment building owners specifically in paragraph 15.[7]  Moreover, an IRFA need only address the concerns of entities directly regulated by the Commission.[8]  The Commission does not directly regulate apartment building operators.

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. § 601 *et. seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).  The SBREFA was enacted as Title II of the Contract With America Advancement Act of 1996.

[2] *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units & Other Real Estate Developments,* Notice of Proposed Rulemaking, 22 FCC Rcd 5935 (2007).

[3] *See* 5 U.S.C. § 604.

[4] 47 U.S.C. §§ 151, 152(a), 154(i), 157 nt., 303(r), 521(6), 548(b), 573(c)(1).

[5] 47 U.S.C. § 548.

[6] RAA Joint Regulatory Flexibility Act Comments at 2.

[7] *Notice*, 22 FCC Rcd at 5947, ¶ 15 ("The SBA has developed definitions of small entities for operators of . . . apartment buildings").

[8] *Mid-Tex Elec. Co-Op., Inc. v. FERC,* 773 F.2d 327, 343 (D.C. Cir. 1985) (inferring that "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy").

Accordingly, even if the IRFA had not addressed the concerns of apartment building owners, it would not be defective. Finally, the IRFA correctly concluded that the kind of rule adopted herein would not impose any direct burden on apartment building owners.[9]  When an agency finds that there is no significant impact on a substantial number of small entities, then no discussion of alternatives, less costly than the proposed rule, is required.[10]

## C.  Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

### Entities Directly Affected By Proposed Rules

5.    The RFA directs the Commission to provide a description of and, where feasible, an estimate of the number of small entities that will be affected by the rules adopted herein.[11]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small government jurisdiction."[12]   In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[13]  A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration (SBA).[14]

6.    The rule adopted by this *Report and Order* will ease the entry of newcomers into the MVPD business and the business of providing the "triple play" of voice, MVPD, and broadband Internet access service.  The Commission has determined that the group of small entities directly affected by the rules adopted herein consists of MVPDs (some of which are also incumbent local exchange carriers).  Therefore, in the *Report and Order*, we consider the impact of the rules on MVPDs.  A description of such small entities, as well as an estimate of the number of such small entities, is provided below.

### Cable Operators

7.    The "Cable and Other Program Distribution" census category includes cable systems operators, closed circuit television services, direct broadcast satellite services, multipoint distribution systems, satellite master antenna systems, and subscription television services.  The SBA has developed small business size standard for this census category, which includes all such companies generating

---

[9] *Notice,* 22 FCC Rcd at 5945, ¶ 8 ("The Commission has determined that the group of small entities possibly directly affected by our action consists of small governmental entities.").

[10] *United Distribution Cos. v. FERC*, 88 F.3d 1105, 1170 (D.C. Cir. 1996) ("no analysis is necessary when an agency determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule.") (internal quotation marks and italics omitted).

[11] 5 U.S.C. § 603(b)(3).

[12] 5 U.S.C. § 601(6).

[13] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register." 5 U.S.C. § 601(3).

[14] 15 U.S.C. § 632. Application of the statutory criteria of dominance in its field of operation and independence are sometimes difficult to apply in the context of broadcast television. Accordingly, the Commission's statistical account of television stations may be over-inclusive.

$13.0 million or less in revenue annually.[15]  According to Census Bureau data for 1997, there were a total of 1,311 firms in this category that had operated for the entire year.[16]  Of this total, 1,180 firms had annual receipts of under $10 million and an additional 52 firms had receipts of $10 million or more but less than $25 million. Consequently, the Commission estimates that the majority of providers in this service category are small businesses that may be affected by the rules and policies adopted herein.

8.    Cable System Operators (Rate Regulation Standard).  The Commission has developed its own small-business-size standard for cable system operators, for purposes of rate regulation. Under the Commission's rules, a "small cable company" is one serving fewer than 400,000 subscribers nationwide.[17]  The most recent estimates indicate that there were 1,439 cable operators who qualified as small cable system operators at the end of 1995.[18]  Since then, some of those companies may have grown to serve over 400,000 subscribers, and others may have been involved in transactions that caused them to be combined with other cable operators. Consequently, the Commission estimates that there are now fewer than 1,439 small entity cable system operators that may be affected by the rules and policies adopted herein.

9.    Cable System Operators (Telecom Act Standard).  The Act also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[19]  The Commission has determined that there are 67,700,000 subscribers in the United States.[20]  Therefore, an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[21]  Based on available data, the Commission estimates that the number of cable operators serving 677,000 subscribers or fewer, totals 1,450.[22]  The Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[23] and therefore is unable, at this time, to estimate more accurately the number of cable system operators that would qualify as small cable operators under the size standard contained in the Communications Act of 1934.

---

[15] 13 C.F.R. § 121.201, North American Industry Classification System (NAICS) code 517510.

[16] U.S. Census Bureau, 1997 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization)," Table 4, NAICS code 513220 (issued October 2000).

[17] 47 C.F.R. § 76.901(e). The Commission developed this definition based on its determination that a small cable system operator is one with annual revenues of $100 million or less. *See Implementation of Sections of the 1992 Cable Act: Rate Regulation,* Sixth Report & Order & Eleventh Order on Reconsideration, 10 FCC Rcd 7393 (1995).

[18] Paul Kagan Associates, Inc., Cable TV Investor, February 29, 1996 (based on figures for December 30, 1995).

[19] 47 U.S.C. § 543(m)(2).

[20] *See FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice DA 01-158 (2001).

[21] 47 C.F.R. § 76.901(f).

[22] *See FCC Announces New Subscriber Count for the Definition of Small Cable Operator*, Public Notice DA 01-158 (2001).

[23] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.

10. *Open Video Services.* Open Video Service ("OVS") systems provide subscription services.[24] As noted above, the SBA has created a small business size standard for Cable and Other Program Distribution.[25] This standard provides that a small entity is one with $13.0 million or less in annual receipts. The Commission has certified approximately 25 OVS operators to serve 75 areas, and some of these are currently providing service.[26] Affiliates of Residential Communications Network, Inc. (RCN) received approval to operate OVS systems in New York City, Boston, Washington, D.C., and other areas. RCN has sufficient revenues to assure that they do not qualify as a small business entity. Little financial information is available for the other entities that are authorized to provide OVS and are not yet operational. Given that some entities authorized to provide OVS service have not yet begun to generate revenues, the Commission concludes that up to 24 OVS operators (those remaining) might qualify as small businesses that may be affected by the rules and policies adopted herein.

### Telecommunications Service Entities

11. As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation."[27] The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent local exchange carriers are not dominant in their field of operation because any such dominance is not "national" in scope.[28] We have therefore included small incumbent local exchange carriers in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

12. *Incumbent Local Exchange Carriers.* Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[29] According to Commission data,[30] 1,303 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees. Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action. In addition, limited

---

[24] *See* 47 U.S.C. § 573.

[25] 13 C.F.R. § 121.201, NAICS code 517510.

[26] *See* FCC, Media Bureau, *Archived,* http://www.fcc.gov/mb/ovs/csovsarc.html (visited Aug. 7, 2007).

[27] 15 U.S.C. § 632.

[28] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999). The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business." *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis. *See* 13 C.F.R. § 121.102(b).

[29] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[30] FCC, Wireline Competition Bureau, Industry Analysis & Technology Division, "Trends in Telephone Service," Table 5.3 at 5-5 (June 2005) ("Trends in Telephone Service"). This source uses data that are current as of October 1, 2004.

preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[31]

### D.  Description of Projected Reporting, Record Keeping and other Compliance Requirements

13.  The rule adopted in the *Report and Order* will require no additional reporting, record keeping, and other compliance requirements.

### E.  Steps Taken to Minimize Significant Impact on Small Entities, and Significant Alternatives Considered

14.  The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[32]

15.  Because the *Report and* Order imposes no compliance on reporting requirements on any entity, only the last of the foregoing alternatives is material.  The *Report and Order* describes in paragraphs 16-29 and 38 that the Commission considered, but rejected after due consideration, exempting small MVPDs from the rule that the *Report and* Order adopts.

---

[31] *See* U.S. Census Bureau, *2002 Economic Census, Industry Series: "Information,"* Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513310 (issued Nov. 2004).  The preliminary data indicate that the total number of "establishments" increased from 20,815 to 27, 891.  In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control.  The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[32] 5 U.S.C. §§ 603(c)(1)-(c)(4).

## APPENDIX C

### Initial Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended (the "RFA"),[1] the Commission has prepared this Initial Regulatory Flexibility Analysis ("IRFA") of the possible significant economic impact of the policies and rules proposed in the Further Notice of Proposed Rulemaking ("FNPRM") on a substantial number of small entities.  Written public comments are requested on this IRFA.   Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the FNPRM provided on the first page of the item.  The Commission will send a copy of the FNPRM, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration ("SBA").[2]  In addition, the FNPRM and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### Need for, and Objectives of, the Proposed Rules

2.    The FNPRM initiates a proceeding to investigate the effects on competition and consumers of certain practices that occur in the provision of MVPD[4] service in MDUs.[5]  Specifically, the FNPRM solicits comment on the  use of all kinds of exclusivity clauses[6] by providers of Direct Broadcast Satellite ("DBS") service and PCOs[7] and the use, by all kinds of MVPD service providers, of marketing exclusivity[8] and bulk billing arrangements.[9]  The FNPRM also asks for comment on  whether the Commission has authority to prohibit the use of such clauses and agreements by DBS service providers, PCOs, and other MVPDs.

### Legal Basis

3.    The FNPRM also asks whether the Commission has authority to regulate the above-mentioned practices of MVPD service providers.  It specifically asks whether such authority can be found in Sections 335 (for DBS service providers), 628, and Titles I and III of the Communications Act of 1934, as amended, and the Commission's ancillary authority.[10]

---

[1] The RFA, *see* 5 U.S.C. §§  601 -- 612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *See* 5 U.S.C. § 603(a).

[4] *See* 47 U.S.C. § 522(13).

[5] *See supra* ¶ 7.

[6] *See supra* note 2.

[7] *See supra* note 12.

[8] *See supra* note 2.

[9] *See supra* ¶ 65.

[10] 47 U.S.C. §§ 151 *et seq.*, 335, 521 *et seq.* (especially 548).

**Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

4.     The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[11]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[12]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[13]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the Small Business Administration ("SBA").[14]

5.     Small Businesses.  Nationwide, there are a total of approximately 22.4 million small businesses, according to SBA data.[15]

6.     Small Organizations.  Nationwide, there are approximately 1.6 million small organizations.[16]

7.     Small Governmental Jurisdictions.  The term "small governmental jurisdiction" is defined generally as "governments of cities, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[17]  Census Bureau data for 2002 indicate that there were 87,525 local governmental jurisdictions in the United States.[18]  We estimate that, of this total, 84,377 entities were "small governmental jurisdictions."[19]  Thus, we estimate that most governmental jurisdictions are small.

8.     The Commission has determined that the group of small entities possibly directly affected by our action consists of small governmental entities.  In addition the Commission voluntarily provides, below, descriptions of certain entities that may be merely indirectly affected by any rules that may ultimately result from the FNPRM.

---

[11] 5 U.S.C. § 603(b)(3).

[12] 5 U.S.C. § 601(6).

[13] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[14] 15 U.S.C. § 632.

[15] *See* SBA, Programs and Services, SBA Pamphlet No. CO-0028, at 40 (July 2002).

[16] Independent Sector, The New Nonprofit Almanac & Desk Reference (2002).

[17] 5 U.S.C. § 601(5).

[18] U.S. Census Bureau, Statistical Abstract of the United States: 2006, Section 8, page 272, Table 415.

[19] We assume that the villages, school districts, and special districts are small, and total 48,558. *See* U.S. Census Bureau, Statistical Abstract of the United States: 2006, section 8, page 273, Table 417.  For 2002, Census Bureau data indicate that the total number of county, municipal, and township governments nationwide was 38,967, of which 35,819 were small.  *Id.*

**Cable Operators**

9.   *Cable and Other Program Distribution.*  The Census Bureau defines this category as follows: "This industry comprises establishments primarily engaged as third-party distribution systems for broadcast programming. The establishments of this industry deliver visual, aural, or textual programming received from cable networks, local television stations, or radio networks to consumers via cable or direct-to-home satellite systems on a subscription or fee basis. These establishments do not generally originate programming material."[20]  The SBA has developed a small business size standard for Cable and Other Program Distribution, which is: all such firms having $13.5 million or less in annual receipts.[21]  According to Census Bureau data for 2002, there were a total of 1,191 firms in this category that operated for the entire year.[22]  Of this total, 1,087 firms had annual receipts of under $10 million, and 43 firms had receipts of $ 10 million or more but less than $25 million.[23]  Thus, under this size standard, the majority of firms can be considered small.

10. *Cable Companies and Systems.*  The Commission has also developed its own small business size standards, for the purpose of cable rate regulation.  Under the Commission's rules, a "small cable company" is one serving 400,000 or fewer subscribers, nationwide.[24]  Industry data indicate that, of 1,076 cable operators nationwide, all but eleven are small under this size standard.[25]  In addition, under the Commission's rules, a "small system" is a cable system serving 15,000 or fewer subscribers.[26]  Industry data indicate that, of 7,208 systems nationwide, 6,139 systems have under 10,000 subscribers, and an additional 379 systems have 10,000-19,999 subscribers.[27]  Thus, under this second size standard, most cable systems are small.

11. *Cable System Operators.*  The Communications Act of 1934, as amended, also contains a size standard for small cable system operators, which is "a cable operator that, directly or through an affiliate, serves in the aggregate fewer than 1 percent of all subscribers in the United States and is not affiliated with any entity or entities whose gross annual revenues in the aggregate exceed $250,000,000."[28]  The Commission has determined that an operator serving fewer than 677,000 subscribers shall be deemed a small operator, if its annual revenues, when combined with the total

---

[20] U.S. Census Bureau, 2002 NAICS Definitions, "517510 Cable and Other Program Distribution"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.

[21] 13 C.F.R. § 121.201, NAICS code 517510.

[22] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, Table 4, Receipts Size of Firms for the United States: 2002, NAICS code 517510 (issued November 2005).

[23] *Id.*  An additional 61 firms had annual receipts of $25 million or more.

[24] 47 C.F.R. § 76.901(e). The Commission determined that this size standard equates approximately to a size standard of $100 million or less in annual revenues. Implementation of Sections of the 1992 Cable Act: Rate Regulation, Sixth Report and Order and Eleventh Order on Reconsideration, 10 FCC Rcd 7393, 7408 (1995).

[25] These data are derived from: R.R. Bowker, Broadcasting & Cable Yearbook 2006, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, Television & Cable Factbook 2006, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[26] 47 C.F.R. § 76.901(c).

[27] Warren Communications News, Television & Cable Factbook 2006, "U.S. Cable Systems by Subscriber Size," page F-2 (data current as of Oct. 2005).  The data do not include 718 systems for which classifying data were not available.

[28] 47 U.S.C. § 543(m)(2); *see* 47 C.F.R. § 76.901(f) & nn. 1-3.

annual revenues of all its affiliates, do not exceed $250 million in the aggregate.[29]  Industry data indicate that, of 1,076 cable operators nationwide, all but ten are small under this size standard.[30]  We note that the Commission neither requests nor collects information on whether cable system operators are affiliated with entities whose gross annual revenues exceed $250 million,[31] and therefore we are unable to estimate more accurately the number of cable system operators that would qualify as small under this size standard.

12. Open Video Services.  Open Video Service ("OVS") systems provide subscription services.[32]  As noted above, the SBA has created a small business size standard for Cable and Other Program Distribution.[33]  This standard provides that a small entity is one with $13.5 million or less in annual receipts.  The Commission has certified approximately 25 OVS operators to serve 75 areas, and some of these are currently providing service.[34]  Affiliates of Residential Communications Network, Inc. (RCN) received approval to operate OVS systems in New York City, Boston, Washington, B.C., and other areas. RCN has sufficient revenues to assure that they do not qualify as a small business entity.  Little financial information is available for the other entities that are authorized to provide OVS and are not yet operational.  Given that some entities authorized to provide OVS service have not yet begun to generate revenues, the Commission concludes that up to 24 OVS operators (those remaining) might qualify as small businesses that may be affected by our action.

**Telecommunications Service Entities**

13. As noted above, a "small business" under the RFA is one that, *inter alia*, meets the pertinent small business size standard (*e.g.*, a telephone communications business having 1,500 or fewer employees), and "is not dominant in its field of operation."[35]  The SBA's Office of Advocacy contends that, for RFA purposes, small incumbent local exchange carriers are not dominant in their field of operation because any such dominance is not "national" in scope.[36]  We have therefore included small incumbent local exchange carriers in this RFA analysis, although we emphasize that this RFA action has no effect on Commission analyses and determinations in other, non-RFA contexts.

---

[29] 47 C.F.R. §  76.901(f); *see* Public Notice, FCC Announces New Subscriber Count for the Definition of Small Cable Operator, DA 01-158 (Cable Services Bureau, Jan. 24, 2001).

[30] These data are derived from: R.R. Bowker, Broadcasting & Cable Yearbook 2006, "Top 25 Cable/Satellite Operators," pages A-8 & C-2 (data current as of June 30, 2005); Warren Communications News, Television & Cable Factbook 2006, "Ownership of Cable Systems in the United States," pages D-1805 to D-1857.

[31] The Commission does receive such information on a case-by-case basis if a cable operator appeals a local franchise authority's finding that the operator does not qualify as a small cable operator pursuant to § 76.901(f) of the Commission's rules.  *See* 47 C.F.R. § 76.909(b).

[32] *See* 47 U.S.C. § 573.

[33] 13 C.F.R. § 121.201, NAICS code 517510.

[34] *See* http://www.fcc.gov/mb/ovs/csovscer.html (visited December 19, 2006), http://www.fcc.gov/mb/ovs/csovsarc.html (visited December 19, 2006).

[35] 15 U.S.C. § 632.

[36] Letter from Jere W. Glover, Chief Counsel for Advocacy, SBA, to William E. Kennard, Chairman, FCC (May 27, 1999).  The Small Business Act contains a definition of "small-business concern," which the RFA incorporates into its own definition of "small business."  *See* 15 U.S.C. § 632(a) (Small Business Act); 5 U.S.C. § 601(3) (RFA). SBA regulations interpret "small business concern" to include the concept of dominance on a national basis.  *See* 13 C.F.R. § 121.102(b).

14. *Incumbent Local Exchange Carriers*.  Neither the Commission nor the SBA has developed a small business size standard specifically for incumbent local exchange services. The appropriate size standard under SBA rules is for the category Wired Telecommunications Carriers. Under that size standard, such a business is small if it has 1,500 or fewer employees.[37]  According to Commission data,[38] 1,303 carriers have reported that they are engaged in the provision of incumbent local exchange services. Of these 1,303 carriers, an estimated 1,020 have 1,500 or fewer employees and 283 have more than 1,500 employees.  Consequently, the Commission estimates that most providers of incumbent local exchange service are small businesses that may be affected by our action.  In addition, limited preliminary census data for 2002 indicate that the total number of wired communications carriers increased approximately 34 percent from 1997 to 2002.[39]

15. Wired Telecommunications Carriers.  The SBA has developed a small business size standard for wireline firms within the broad economic census category, "Wired Telecommunications Carriers."[40]  Under this category, the SBA deems a wireline business to be small if it has 1,500 or fewer employees. Census Bureau data for 2002 show that there were 2,432 firms in this category that operated for the entire year.[41]  Of this total, 2,395 firms had employment of 999 or fewer employees, and 37 firms had employment of 1,000 employees or more.[42]  Thus, under this category and associated small business size standard, the majority of firms can be considered small.

**Dwelling Units**

16. MDU Operators.  The SBA has developed definitions of small entities for operators of nonresidential buildings, apartment buildings, and dwellings other than apartment buildings, which include all such companies generating $6 million or less in revenue annually.[43]  According to the Census Bureau, there were 31,584 operators of nonresidential buildings generating less than $6 million in revenue that were in operation for at least one year at the end of 1997.[44]  Also according to the Census Bureau, there were 51,275 operators of apartment dwellings generating less than $6 million in revenue

---

[37] 13 C.F.R. § 121.201, NAICS code 517110 (changed from 513310 in Oct. 2002).

[38] FCC, Wireline Competition Bureau, Industry Analysis & Technology Division, "Trends in Telephone Service," Table 5.3 at  5-5 (June 2005) ("Trends in Telephone Service").  This source uses data that are current as of October 1, 2004.

[39] *See* U.S. Census Bureau, *2002 Economic Census, Industry Series: "Information,"* Table 2, Comparative Statistics for the United States (1997 NAICS Basis): 2002 and 1997, NAICS code 513310 (issued Nov. 2004).  The preliminary data indicate that the total number of "establishments" increased from 20,815 to 27, 891.  In this context, the number of establishments is a less helpful indicator of small business prevalence than is the number of "firms," because the latter number takes into account the concept of common ownership or control.  The more helpful 2002 census data on firms, including employment and receipts numbers, will be issued in late 2005.

[40] 13 C.F.R. § 121.201, NAICS code 517110.

[41] U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 5, NAICS code 517110 (issued Nov. 2005).

[42] *Id.*  The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

[43] 13 C.F.R. § 121.601 (NAICS Code 531110, 531311, 531312).

[44] 1997 Economic Census: Comparative Statistics for the United States; 1987 SIC Basis: Financial, Insurance, and Real Estate Industries, SIC 6512.

that were in operation for at least one year at the end of 1997.[45]  The Census Bureau provides no separate data regarding operators of dwellings other than apartment buildings, and we are unable at this time to estimate the number of such operators that would qualify as small entities.

**Description of Projected Reporting, Recordkeeping and Other Compliance Requirements**

17. We anticipate that any rules that result from this action would have at most a *de minimis* compliance burden on cable operators and telecommunications service entities.  Any rules that might be adopted pursuant to this FNPRM likely would not require any reporting or recordkeeping requirements.

**Steps Taken to Minimize Significant Economic Impact on Small Entities and Significant Alternatives Considered**

18. The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities."[46]

19. As discussed in the FNPRM, the Commission has initiated this proceeding to ensure that use of exclusivity clauses of all kinds and bulk billing for the provision of video services to MDUs and other real estate developments are pro-competitive.  As noted above, applying any rules regarding the use of such practices in the provision of video services to MDUs or other real estate developments likely would have at most a *de minimis* impact on small governmental jurisdictions.  We seek comment on the impact that any rules might have on such small governmental entities, as well as the other small entities described, and on what effect alternative rules would have on those entities.  For instance, if marketing exclusivity clauses were forbidden – for DBS providers, PCOs, or all MVPD service providers – would there be any effect on the regulatory activities of small government jurisdictions?  We also invite comment on ways in which the Commission might impose restrictions of the use of exclusivity clauses and bulk billing arrangements while at the same time imposing lesser burdens on small entities.

**Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

20. None.

---

[45] 1997 Economic Census: Comparative Statistics for the United States; 1987 SIC Basis: Financial, Insurance, and Real Estate Industries, SIC 6513.

[46] 5 U.S.C. §§ 603(c)(1)-(4).

**APPENDIX D**

<u>Final Rule</u>

<u>Subpart X – Access to Multiple Dwelling Units and Centrally Managed Real Estate Developments</u>

47 C.F.R. *§* 76.2000.  Exclusive Access to Multiple Dwelling Units Generally

(a) <u>Prohibition.</u>  No cable operator or other provider of MVPD service subject to 47 U.S.C. § 548 shall enforce or execute any provision in a contract that grants to it the exclusive right to provide any video programming service (alone or in combination with other services) to a MDU.  All such exclusivity clauses are null and void.

(b) <u>Definition.</u>  For purposes of this rule, MDU shall include a multiple dwelling unit building (such as an apartment building, condominium building or cooperative) and any other centrally managed residential real estate development (such as a gated community, mobile home park, or garden apartment); provided however, that MDU shall not include time share units, academic campuses and dormitories, military bases, hotels, rooming houses, prisons, jails, halfway houses, hospitals, nursing homes or other assisted living facilities."

**STATEMENT OF
CHAIRMAN KEVIN J. MARTIN**

Re:  *In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

All consumers, regardless of where they live, should enjoy the benefits competition in the video marketplace.  Exclusive contracts between incumbent cable operators and owners of "multiple dwelling units" (MDUs) have been a significant barrier to competition.  Today's order removes this barrier.  Specifically, the item we adopt today finds that the use of exclusivity clauses in contracts for the provision of video services to MDUs constitutes an unfair method of competition or an unfair act or practice in violation of Section 628(b) of the Act.  Thus, we prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators.

Fostering greater competition in the market for video services is a primary and long-standing goal of federal communications policy.  Congress recognized that competition in the video services market benefits consumers.  Indeed, one of the Communications Act's explicit purposes is to "promote competition in cable communications." Competition and choice in the video services market results in lower prices, higher quality of services, and generally enhances the consumers' experience by giving them greater choice over the purchased video programming.

As the Commission has found, from 1995 to 2005, cable rates have risen 93%.  In 1995, cable service cost $22.37 per month.  Prices for expanded basic cable service have now almost doubled.  The trend in pricing of cable services is of particular importance to consumers.  Since 1996 the prices of every other communications service (such as long distance and wireless calling) have declined while cable rates have risen year after year after year.

The Commission has been working hard to take steps to introduce greater competition in the video market for the benefit of consumers.  For example, last year we removed regulatory barriers by giving meaning to the words Congress wrote in section 621 of the Cable Act.  This item found that local franchise authorities must not "*unreasonably refuse to award an additional competitive franchise*" to new companies seeking to enter the video marketplace.  And, more recently, we took action to make sure that new entrants, in addition to existing players, will continue to have access to critical programming on a nondiscriminatory basis.  In that same item, we also began an inquiry into the "tying" practices of programmers where broadcast and cable programmers routinely tie marquee programming, such as premium channels or regional sports programming, with unwanted or less desirable programming. These practices have been identified by cable operators as increasing the cost and decreasing choice in video programming.

I believe that people that live in apartment buildings deserve to have the same choices as people that live in the suburbs.  In today's item, the Commission found that people who live in apartment buildings often have no choice of companies when it comes to their video service provider.  This is because building owners often strike exclusive deals with one cable operator to serve the entire building, eliminating competition.  There is no reason that consumers living in apartment buildings should be locked into one service provider.  This phenomenon is particularly problematic given the large number of Americans that live in apartment buildings.  Right now over one quarter of all Americans lives in apartment buildings.  And, according to the American Housing Survey Report, 40% of all households headed by Hispanics or African-Americans live in apartments.  Thus, because a greater percentage of minority-headed households live in apartment buildings, I believe minorities in particular will benefit from today's ruling.

**Federal Communications Commission**                    **FCC 07-189**

I am pleased that the Commission has taken action that will not only enhance video competition but advance broadband deployment by encouraging the deployment of facilities by new entrants.  The Commission will continue to look for ways to remove barriers to competition across all platforms and with respect to all services that we regulate.  The public interest demands that all Americans reap the benefits of competition.

## STATEMENT OF
## COMMISSIONER MICHAEL J. COPPS

Re:    *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

Thanks to this item, Americans who live in multiple dwelling units (MDUs) will be able to reap the benefits of competition and consumer choice just like those who live in single-family homes.  It's a lot of people – nearly thirty percent of our total population and an even higher percentage of the overall minority population.

Today's decision is a significant step forward not just for what it does, but also for what it does not do.  It does not prevent a property owner from negotiating a bulk discount for its residents or bargaining for heightened customer service requirements.  Nor does it give any video provider the right to enter an MDU over the objection of the property owner.  It simply removes a large obstacle to providing residents of MDUs with the ability to choose among alternative providers serving the surrounding community.

We could have gone even further.  I am particularly concerned about the potential of tipping the playing field in favor of particular services or particular competitors. Markets can move quickly in response to regulatory changes, and it may be that some MVPDs not covered by today's decision will attempt to fill the vacuum by marketing themselves as the only exclusive game in town.  Happily we will be addressing these competitive parity issues in the next six months.  In the meantime, I would caution any MVPDs seeking to take advantage of this regulatory lag time that they do so at their own risk.  I agree with several public interest commenters in this record who argued, "the Commission should apply the policy of access with an equal and impartial hand."[1]  In this regard, I'm pleased that my colleagues have agreed to conclude within the next two months the open proceeding examining the permissibility of exclusive contracts for telecommunications services in residential MDUs.  I am also pleased that we will be looking at expanding the multi-channel video service providers (MVPDs) covered by the rule we adopt today.  The sooner we complete action on all this, the better off consumers will be.

This is a good and significant step forward, I thank the Bureau and my colleagues for their hard work on it, and I am pleased to support the item.

---

[1] *See Ex Parte Comments of Consumer Federation of America, Consumers Union, New America Foundation, Free Press, Public Knowledge, and U.S. PIRG*, dated October 24, 2007.

**STATEMENT OF**
**COMMISSIONER JONATHAN S. ADELSTEIN**

Re:    *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

Robust and fair competition across the communications landscape, particularly in the video marketplace, remains a central policy objective of mine.  So I am pleased to support this Order which should lower barriers for the entry of new competitors and expand the options for video services available to the millions of Americans who live in apartment buildings, condominiums, mobile home parks, and other centrally-managed real estate developments.  A person living in a multiple dwelling unit (MDU) property should not be shackled to one video provider.  Too often, the landlord gets paid off while the tenants are stuck with no choice or bad service.  People want competitive offerings, and today we are delivering them.

This Order addresses the use of exclusive agreements between multichannel video programming distributors (MVPDs) and private real estate developers and owners of MDU properties for video services.  Significantly, the Order finds that exclusive access arrangements amount to anticompetitive practices that prevent or greatly hinder providers from providing MDU residents video programming services.  Although the Commission has examined this issue before, recent industry trends warranted another look at the effect of exclusive contracts.  According to the Commission's most recent Cable Price Survey Report, the average monthly price for basic-plus-expanded basic service has increased by ninety-three percent over a ten-year period.[1]  Further, cable rates were seventeen percent lower where wireline cable competition was present.[2]

The entry of some of the largest incumbent local exchange companies into the video marketplace also signifies a major and positive new development. Verizon, for example, is upgrading its facilities to fiber-based platforms in many areas across the country so that it can offer a suite of video, voice, and data services.  This and other investments by phone companies could bring substantial new competition into the video marketplace that is likely to prove historic.

Equally significant is the potential for this new revenue stream to drive broadband deployment, which can benefit consumers and foster the free flow of information beyond the video marketplace.  This action alone will not solve our broadband challenges of availability, affordability, and value – too few Americans enjoy the full benefits of competition for broadband services – but it takes an important step by opening the door for millions of Americans to exercise their right to choose their own provider.

In the instant item we find that exclusive contracts do in fact unreasonably impede the Commission's goals of enhancing multichannel video competition and accelerating the deployment of broadband, so it is critical that we act.  By prohibiting cable operators from enforcing these exclusive contracts, consumers will benefit not only from more choices, better service, and lower prices, but they also stand to gain from a more robust exchange in the marketplace of ideas.

---

[1] Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Prices for Basic Service, Cable Programming Services, and Equipment, 21 FCC Rcd 1, 15087, ¶ 2 (2006).

[2] *Id.* at 15090, ¶ 10.

**Federal Communications Commission**                          **FCC 07-189**

I have long expressed grave concerns about the negative effects of media consolidation in this country, and have focused on the problems raised by growing vertical integration of programming and distribution. Vast new distribution networks promise to limit the ability of any vertically integrated conglomerates from imposing an economic, cultural, or political agenda on a public with few alternative choices. I truly believe the benefits of this new competition extend beyond even the many typical ones that accrue to consumers, and can actually improve the health of our overall democracy.

I am pleased that my colleagues agreed to seek comment on whether the Commission should prohibit exclusive marketing and bulk billing arrangements. I am especially satisfied that the Chairman agreed to finalize rules in this proceeding within six months. While I would have preferred to ban exclusive marketing agreements immediately in this Order, this is an important step.

These and other forms of exclusive arrangements seem to serve the primary purpose of raising the barriers of entry for competitive video providers, whether incumbent cable or telephone video providers, or overbuilders. Similar to exclusive *access* arrangements, exclusive *marketing* arrangements between MVPDs and MDU owners may have the potential to have an anticompetitive effect in the video market because an MVPD essentially purchases the right to prevent or hinder the ability of a competitive MVPD from reaching the MDU resident in a cost-efficient manner. Increasing a competing MVPD's cost is the name of the game, and the unsuspecting consumer is the pawn. They should be banned under the same reasoning we use here to ban exclusive access arrangements.

Bulk billing arrangements are a more sophisticated and, perhaps, insidious form of exclusive agreements. While MDU owners generally enter into a bulk billing arrangement with only one MVPD, if a resident is fortunate to receive video service from a competitive video provider, the resident is sometimes forced to pay two separate subscription fees for video service. While we need to ensure that bulk discounts are not undermined, I look forward to the comments and record generated from an inquiry into these practices.

Finally, I am pleased that this item includes a commitment to address the related issue of exclusive contracts for telecommunications services in residential MDUs. It should be our policy objective to promote fair competition throughout the communications landscape, so I'm pleased that we will take up this issue quickly.

For all these reasons, I support this *Order* and *Further Notice*.

## STATEMENT OF
## COMMISSIONER DEBORAH TAYLOR TATE

Re:    *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*

The FCC continues to encourage competition across platforms and the stimulation of investment further down the marketplace, resulting in more competition and hopefully more choice and lower prices for consumers through the banning of exclusivity clauses in the MVPD market.  I think we all recognize that exclusivity contracts in perpetuity are not in keeping with our pro-competitive policies and should be banned.

As a former state official, I am wary of acting in any area in which states have already taken the lead. We recognized state action granting video relief in our 621 Order and I do so again today.  I am one of those unique federal officials who still believes that states have a critical role in our concept of "federalism."  I appreciate the comments of the National Governors Association and the National Conference of State Legislatures and other local officials who contacted us. As we recognized in our earlier Orders on exclusivity clauses, today's action should not conflict with states that have already imposed a ban.  Rather it extends this prohibition to those states that have not yet acted.

Like many of our decisions, the effects of today's Order will not truly be tangible until markets and technology evolve.  Much of the U.S. still depends on cable for their video and broadband service and that will not change overnight.  This order, which ends exclusivity clauses—as we did earlier in the telecom arena-- will not create competition in every MDU overnight.  It will, however, set the stage for more competition through a gradual process that hopefully will allow cable companies and Wall Street to adjust to the change in investment strategy.

This Order does not abrogate existing contracts, but rather declares exclusivity clauses to be unenforceable.  Other provisions of service contracts remain intact.  Also, this Order is focused solely on access to MDUs.  Other competitive, freely negotiated business arrangements are untouched by this action.

I am pleased that we have also agreed, within the next two months, to consider the issues raised in the 2000 Competitive Networks Further Notice of Proposed Rulemaking.  In the interest of regulatory parity, it is essential that we seek to apply our rules consistently across all platforms in a timely manner.

**STATEMENT OF**
**COMMISSIONER ROBERT M. MCDOWELL, CONCURRING**

Re:      *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and*
         *Other Real Estate Developments*

Today the FCC helps give many consumers who live in apartment buildings and other multiple dwelling units (MDUs) the hope of having more choices among video service providers. If you live in a building where the property owner limits your freedom to choose among video service providers through an exclusive arrangement with just one company, today's Order liberates you.

In our Order, the Commission finds that contractual agreements granting cable operators exclusive access to MDUs is harmful to competition. Accordingly, our Order prohibits the enforcement of existing exclusivity clauses, and the execution of new ones, as an unfair method of competition. Although I agree that increased competition among video providers in MDUs will result in better service, innovative offerings to consumers, and lower prices, I am concerned about the legal sustainability of the Order, should it be appealed. My concern is this: after unanimously inviting cable companies and building owners to strike such deals in 2003, the FCC may now be abrogating those exact same agreements immediately rather than waiting for them to expire and without providing a grace period. In some cases, cable companies relied upon our 2003 Order to make arrangements with owners of older buildings to wire them for the first time, or to upgrade them with newer technologies, in exchange for a limited period of time when they could be the exclusive video service provider to allow for recovery of their investments. The record indicates that many buildings may have been upgraded, or brought online for the first time, as a result of this policy. To flash cut to a new regulatory regime without a sensible transition period only begs for an appeal that could result in a court throwing out all of our Order, the good with the bad. I am disappointed that our Order does not take the simple and small step of avoiding such exposure.

My concern is underscored by what can be perceived as a lack of sufficient evidence in the record to justify such an immediate mandate. In fact, in 2003, the Commission unanimously held that "the record developed in this proceeding indicates little support for governmental interference with privately negotiated exclusive MDU contracts…. We do not find a sufficient basis in this record to ban or cap the term of exclusive contracts."[1] Because the 2003 record reflected both pro-competitive and anti-competitive aspects of exclusive contracts, the Commission decided not to act. Now, only four years later, we do take action despite similar arguments being presented in the record. The Order should do a better job of distinguishing these apparent contradictions.

I am also concerned that our Order may not give sufficient deference to states that have passed their own laws helping consumers with this issue. The record indicates that 20 states have enacted such legislation and no state has abrogated existing contracts such as we are doing here. Arguments that our actions today may constitute a regulatory taking that requires compensation may have merit as well, and I wish the Commission's appellate lawyers the best of luck in defending against such claims. I only wish we were giving our attorneys more legal ammunition to use to defend the agency. At the end of the day, because I agree with the thrust of what the Commission is attempting to do today, namely giving consumers the freedom to choose among a variety of video services providers, I concur in this Order.

---

[1] *Telecommunications Services Inside Wiring: Cable Television Consumer Protection & Competition Act of 1992*, First Order on Reconsideration and Second Report and Order, 18 FCC Rcd 1342 (2003), at ¶ 68.